# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **THE TORO COMPANY,**<br>a Delaware Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. _____ |
| v. | ) ) ) | **COMPLAINT** |
| **TEXTRON, INC.,**<br>a Delaware Corporation, | ) ) ) | (Jury Trial Demanded) |
| **JACOBSEN, A TEXTRON COMPANY,**<br>a Division of Textron, Inc , and | ) ) ) | |
| **TEXTRON INNOVATIONS INC.,**<br>a Delaware Corporation, | ) ) ) | |
| Defendants. | ) ) | |

Comes now the Plaintiff, and for its Complaint against Defendants, states and alleges as follows:

### THE PARTIES

1.    Plaintiff, The Toro Company, is incorporated in the State of Delaware, having a principal place of business at 8111 Lyndale Avenue South, Bloomington, MN 55420.

2.    Upon information and belief, Defendant, Textron, Inc., is incorporated under the laws of the state of Delaware, having a principal place of business at 40 Westminster Street, Providence, RI 02903.

3    Upon information and belief, Defendant, Jacobsen, A Textron Company, is a division of Textron, Inc. with its principal place of business at 3800 Arco Corporate Drive, Suite 310, Charlotte, NC 28273.

4.    Upon information and belief, Defendant, Textron Innovations Inc., is incorporated under the laws of the state of Delaware, having a principal place of business at 40 Westminster Street, Providence, RI 02903.

5.    On July 9, 1996, United States Patent No. 5,533,325 (hereinafter "the '325 patent") entitled ALL WHEEL HYDRAULIC DRIVE SYSTEM was duly and legally issued to Plaintiff as assignee; and since that date Plaintiff has been, and still is, owner of all right, title and interest in the '325 patent. A copy of the '325 patent is attached hereto as Exhibit A.

6.    On February 10, 1998, United States Patent No. 5,715,664 (hereinafter "the '664 patent") entitled ALL WHEEL HYDRAULIC DRIVE SYSTEM was duly and legally issued to Plaintiff as assignee; and since that date Plaintiff has been, and still is, owner of all right, title and interest in the '664 patent. A copy of the '664 patent is attached hereto as Exhibit B.

7.    On July 12, 2005, Defendant Textron Innovations Inc., filed suit in Delaware Federal District Court alleging that Toro infringes United States Patent Nos. 6,047,530 (hereinafter "the '530 patent"), 6336,311 (hereinafter "the '311 patent") and 6,336,312 (hereinafter "the '312 patent"). A copy of the Complaint filed by Textron Innovations Inc. is attached hereto as Exhibit C

## JURISDICTION AND VENUE

9.    This is a claim of patent infringement arising under the Acts of Congress relating to patents, 35 U.S.C. §1, *et seq.*

10.    This Court has subject matter jurisdiction over Plaintiff's patent infringement lawsuit under 28 U.S.C §§ 1331 and 1338(a). This Court has subject matter jurisdiction over Plaintiff's declaratory judgment counterclaims under the Declaratory Judgment Act, Title 28,

2

United States Code, §§ 2201 *et seq.* and under the laws of the United States concerning actions

relating to patents, 35 U.S.C. §§ 101 *et seq.*, and 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has personal jurisdiction over the Defendants by virtue of, *inter alia*,

their continuous and systematic contacts with Minnesota.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) and 28

U.S.C § 1400(b).

### COUNT I - INFRINGEMENT OF U.S. PAT. NO. 5,533,325

13.     Plaintiff restates the allegations set forth in paragraphs 1-12 and incorporates

them herein by reference.

14.     By virtue of its ownership of the '325 patent, Plaintiff has acquired and continues

to maintain the right to sue on and the right to recover for infringement of the '325 patent.

15.     On information and belief, Defendant, Jacobsen, A Textron Company and

Defendant, Textron, Inc., (herein after jointly "the Jacobsen Defendants") have directly

infringed, contributed to the infringement of, and/or induced infringement of the '325 patent

through the manufacture, use, sale, and offer for sale of its products, including its Groom Master

II.

16.     Plaintiff has been damaged by the Jacobsen Defendants' infringement of the '325

patent and will continue to be damaged in the future unless the Jacobsen Defendants are

permanently enjoined from infringing that patent, contributing to the infringement of that patent,

and/or inducing the infringement of that patent by others.

17.     Upon information and belief, the Jacobsen Defendants have had actual knowledge

of the '325 patent and, on information and belief, have had actual knowledge that the use,

manufacture, sale, and offer for sale of the above-identified products infringes that patent,
contributes to the infringement of that patent and induces the infringement of that patent by
others.

18    Upon information and belief, the Jacobsen Defendants' infringement of that patent
is now and has been willful and will continue unless enjoined by the Court.

### COUNT II - INFRINGEMENT OF U.S. PAT. NO. 5,714,664

19.    Plaintiff restates the allegations set forth in paragraphs 1-18 and incorporates
them by reference.

20.    By virtue of its ownership of the '664 patent, Plaintiff has acquired and continues
to maintain the right to sue on and the right to recover for infringement of the '664 patent.

21.    On information and belief, the Jacobsen Defendants have directly infringed,
contributed to the infringement of, and induced infringement of the '664 patent through the
manufacture, use, sale, and offer for sale of its products, including its Groom Master II.

22.    Plaintiff has been damaged by the Jacobsen Defendants' infringement of that
patent and will continue to be damaged in the future unless the Jacobsen Defendants are
permanently enjoined from infringing that patent, contributing to the infringement of that patent,
and/or inducing the infringement of that patent by others.

23.    Upon information and belief, the Jacobsen Defendants have had actual knowledge
of the '664 patent and, on information and belief, have had actual knowledge that the use,
manufacture, sale, and offer for sale of the above-identified products infringes that patent,
contributes to the infringement of that patent and induces the infringement of that patent by
others.

4

ı

24.     Upon information and belief, the Jacobsen Defendants' infringement of said patent is now and has been willful and will continue unless enjoined by the Court.

## COUNT III - DECLARATORY JUDGMENT

25.     Plaintiff restates the allegations set forth in paragraphs 1-24 and incorporates them herein by reference.

26.     Defendant Textron Innovations Inc.'s legal assertions that the '530 patent, the '311 patent and the '312 patent are infringed by Plaintiff create an actual controversy within the meaning of 28 U.S.C. § 2201 between Defendant Textron Innovations Inc. and Plaintiff over the alleged infringement, validity, and unenforceability of the '530 patent, the '311 patent, and the '312 patent.

27.     None of Plaintiff's products infringe any claim of the '530 patent, the '311 patent, or the '312 patent.

28.     The '530 patent claims are invalid.

29.     The '311 patent claims are invalid.

30.     The '312 patent claims are invalid.

31.     Plaintiff reserves the right to assert additional claims for a declaratory judgment of unenforceability of the '530 patent, the '311 patent, and the '312 patent following a reasonable opportunity for investigation. Plaintiff also reserves the right to assert additional claims for declaratory judgment should Defendants allege products infringe.

### COUNT IV - EQUITABLE ESTOPPEL

32.    Plaintiff restates the allegations set forth in paragraphs 1-31 and incorporates them herein by reference.

33    Upon information and belief, and as will likely be supported by evidence after reasonable opportunity for further investigation and discovery, Defendant Textron Innovations Inc.'s claims are barred, in whole or in part, by the doctrine of equitable estoppel.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment that:

A    United States Patent No. 5,533,325 was duly and legally issued, is valid and enforceable;

B.    United States Patent No. 5,715,664 was duly and legally issued, is valid and enforceable;

C.    The Jacobsen Defendants have directly infringed, contributorily infringed, and/or induced infringement of one or more claims of United States Patent No. 5,533,325;

D.    The Jacobsen Defendants' infringement of one or more claims of United States Patent No. 5,533,325 was willful;

E    The Jacobsen Defendants have directly infringed, contributorily infringed, and/or induced infringement of one or more claims of United States Patent No 5,715,664;

F    The Jacobsen Defendants' infringement of one or more claims of United States Patent No. 5,715,664 was willful;

G    The Jacobsen Defendants, their officers, agents, servants and employees, and those persons in active concert or participation with any of them be enjoined from further

6

infringing, contributing to the infringement, or inducing the infringement of United States Patent No. 5,533,325;

H.    The Jacobsen Defendants, their officers, agents, servants and employees, and those persons in active concert or participation with any of them be enjoined from further infringing, contributing to the infringement, or inducing the infringement of United States Patent No. 5,715,664;

I.    An accounting be had and that Plaintiff be awarded damages arising out of the Jacobsen Defendants' infringement of United Sates Patent No. 5,533,325, including treble damages for willful infringement as provided by 35 U.S.C. § 284, with interest;

J.    An accounting be had and that Plaintiff be awarded damages arising out of the Jacobsen Defendants' infringement of United Sates Patent No. 5,715,664, including treble damages for willful infringement as provided by 35 U.S.C. § 284, with interest;

K.    The Jacobsen Defendants be preliminarily and permanently enjoined from continued use, importation, offer for sale, or sale of the Jacobsen Defendants' products used to infringe the patents-in-suit;

L.    The Complaint filed by Defendant Textron Innovations Inc. in United States District Court for the District of Delaware be dismissed with prejudice and judgment be entered for Plaintiff Toro on its declaratory judgment action;

M.    United States Patent Nos. 6,047,530, 6,336,311 and 6,336,312 be adjudged and decreed to be invalid and unenforceable;

7

N       Plaintiff be adjudged and decreed not to have infringed, contributorily infringed,

or induced others to infringe any claim of United States Patent Nos. 6,047,530, 6,336,311 and

6,336,312;

O.      This case be adjudged and decreed exceptional pursuant to 35 U.S.C § 285 and

that Plaintiff be awarded its costs and attorney's fees in pursuing this action; and

P       Plaintiff be awarded such other and further relief as this Court may deem

necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable

Dated: Aug. 15, 2005      By: *Earl D. Reiland*

Earl D. Reiland, MN Reg. #90426
Thomas R. Johnson MN Reg. #242032
Thomas J. Leach MN Reg. #311844
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 332-5300

**ATTORNEYS FOR PLAINTIFF**
**THE TORO COMPANY**

8

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| **THE TORO COMPANY,** | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-cv-1835 |
| | ) | |
| v. | ) | |
| | ) | |
| **TEXTRON, INC.,** | ) | (Jury Trial Demanded) |
| a Delaware Corporation, | ) | |
| | ) | |
| **JACOBSEN, A TEXTRON COMPANY,** | ) | |
| a Division of Textron, Inc., and | ) | |
| | ) | |
| **TEXTRON INNOVATIONS INC.,** | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## JOINT STIPULATION TO DISMISS TEXTRON INNOVATIONS, INC

Pursuant to Fed. R. Civ. P. 41(a)(1)(ii), the parties, by their attorneys, hereby stipulate to the

dismissal without prejudice of The Toro Company's ("Toro") declaratory judgment claims (Count

III) and its equitable estoppel claims (Count IV) against Textron Innovations Inc. ("TII") in the

above-captioned matter. As TII will be dismissed from this action, its motion to dismiss for lack of

personal jurisdiction filed on August 30, 2005, is now moot.

Dated: November 1, 2005      By:    /s/ Earl D. Reiland
                                    Earl D. Reiland, Esq. (#90426)
                                    Thomas R. Johnson, Esq. (#242032)
                                    Thomas J. Leach, Esq. (#311844)
                                    MERCHANT & GOULD P.C.
                                    3200 IDS Center
                                    80 South 8th Street
                                    Minneapolis, MN 55402
                                    (612) 332-5300

                                    **ATTORNEYS FOR PLAINTIFF**
                                    **THE TORO COMPANY**

Dated:  November 1, 2005          By:     /s/ Kurt J. Niederluecke
                                          Thomas S. Fraser, Esq. (#31641)
                                          Kurt J. Niederluecke, Esq. (#271597)
                                          Fredrikson & Byron P.A.
                                          200 South 6th Street, Suite 4000
                                          Minneapolis, MN  55402-1425
                                          (612) 492-7000

                                          Scott L. Robertson, Esq.
                                          Christopher C. Campbell, Esq.
                                          Hunton & Williams LLP
                                          1900 K Street N.W.
                                          Washington, D.C. 20006
                                          (202) 955-1500

                                          **ATTORNEYS FOR DEFENDANTS
                                          TEXTRON, INC.;
                                          JACOBSEN, A TEXTRON COMPANY;
                                          and TEXTRON INNOVATIONS INC.**

2

# EXHIBIT 6

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
Group Art Unit 3616

*11/19/99*

In re

Patent Application of

Richard D. Bednar

Serial No. 08/794,141

Filed: February 3, 1997

Examiner: Pezzuto, R.

GANG-TYPE ROTARY LAWN MOWER

I, Mary K. Vuk, hereby certify that this
correspondence is being sent by facsimile
transmission addressed to Assistant Commissioner
for Patents, Washington, D.C 20231, on the date of
my signature.

*Mary K. Vuk*
Signature

*November 4, 1999*
Date of Signature

Assistant Commissioner for Patents
Washington, D C  20231

## DECLARATION UNDER RULE 132

I, Richard D. Bednar, do hereby declare that:

1      I am an adult citizen of the United States, residing in Lake Mills, Wisconsin.

2.     I am the inventor of the invention claimed in the above-referenced patent
application (hereinafter the "Gang-type Rotary Mower").

3      As one skilled in the art of mowers and their design and construction, I
conclude that my invention would not have been obvious at the time the invention was made
to a person having ordinary skill in the art to which the subject matter pertains.  My invention
provides a unique solution to a long-term mower problem, as described herein.  With the
extensive knowledge base in the mower industry of mowers and their shortcomings, my
invention would have been made long ago if it had been obvious.  In fact, conventional
wisdom, as described herein, steered manufacturers away from my invention as a solution to
existing problems with mowers.

4.     I am told that some of the claims of my patent application have been rejected
as being obvious based on a combination of features found in a number of patent applications

and a publication. With the vast number of mower designs and mower manufacturers in the industry, any obvious combination of features that might give a company a competitive edge has likely been tried. Rotary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length, because nobody prior to me has recognized the desirability of using, or figured out how to use, gang-type rotary mowers to cut golf course roughs. Conventional wisdom in the art of gang-type mowers held that rotary mowers could not be used to cut golf course roughs. My invention of individual cutting units with the addition of rear rollers, however, made the use of gang-type rotary mowers possible to cut golf course roughs. To the best of my knowledge, gang-type rotary mowers have never had such rear rollers.

5.      My Gang-type Rotary Mower invention, which was unknown in the industry only a few years ago, is now worth millions of dollars in annual sales to my company and to the companies that copied my invention.

6.      For many years, the mower industry had unsuccessfully sought a solution to the problem of scalping grass while mowing over undulating terrain. Previous rotary mowers are ineffective in compensating for elevation changes in the turf being mowed, resulting in uneven cut heights. This is particularly problematic when the turf is cut at or below ground level, leaving barren spots.

7.      My invention provides a solution to that problem by teaching an apparatus with excellent ground-following and anti-scalp characteristics.

8.      The effectiveness of my invention as a solution to this long-term problem is evidenced by the extraordinary commercial success of my invention. Annual sales of my company's previous gang-type mower averaged approximately $4.5 million over the years 1995 to 1997, with no significant increases or decreases from year to year. Our new model embodying my invention was introduced in 1997. The addition of my invention was the only significant change from the prior model. Sales of the new model totaled $1.3 million in 1997, jumped to $8.5 million in 1998, and are projected to be $10 million in 1999. The addition of my invention has more than doubled our mower sales, as compared to our previous model. Because market demand for gang-type mowers remained relatively constant between 1997

-2-

and 1999, the doubling of our mower sales and the nearly tenfold increase in sales of the new model itself can only be attributed to the addition of my invention to my company's mowers.

9.    The effectiveness of my invention as a solution to the long-term problem previously described is also evidenced by the prompt copying of my invention by competitors. Following public disclosure of my invention in 1997, at least two major competing mower manufacturers, Nunes and Toro, realized the efficacy of my solution to the problem. These two companies copied my invention by altering their previous designs to produce and market mowers embodying my invention. These two companies now enjoy significant sales of the models incorporating my invention.

10.    I enclose as Appendix A a copy of a Toro advertisement from 1999 highlighting a gang-type single-spindle rotary mower in which the mower decks include rear rollers. These Toro units were new in 1999 and were not previously available.

11.    I enclose as Appendix B copies of Nunes advertisements from 1999 highlighting gang-type single-spindle rotary mowers, including rear rollers, as replacements for Toro and John Deere units. These Nunes replacement units were new in 1999 and were not previously available.

12.    I understand the scope of pending Claim 1 of my application and conclude that Claim 1 covers the features of my invention that have resulted in the mower's commercial success and copying by competitors. In other words, it is the invention as claimed that produced the mower's success and copying.

13.    I believe that the success of the Gang-type Rotary Mower embodying my invention demonstrates that this Gang-type Rotary Mower fulfills a long-felt need for a solution to the problems encountered in mowing undulating terrain. The substantial recent sales of the Gang-type Rotary Mower and the prompt copying by competitors indicate that consumers and the mower industry, respectively, see my Gang-type Rotary Mower as a previously-unknown solution to their mowing problems.

14.    I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so

-3-

made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Richard D. Bednar

11-4-99
Date

-4-

APPENDIX A

# *Groundsmaster® with Contour™ 66 Deck* 





- ◆ Patent pending Sidewinder™ system slides decks 24˝ (61 cm) left and right for overhang and varying tire tracks

- ◆ Powerful 35 hp Kubota Turbo Diesel



- ● HOC range of 1˝-4˝ (2.5-10 cm) in ¼˝ (.64 cm) increments

- ◆ 3 full floating 25˝ (64 cm) mulching decks follow ground contours superbly

- ● Rear rollers provide attractive striping

- ◆ 66˝ (168 cm) width of cut

- ● Patented Series/ Parallel 3-wheel drive traction minimizes spin-outs



  

TORO IS PROUD TO SUPPORT THE NATION'S TURF PROFESSIONALS WITH TOP QUALITY EQUIPMENT, SERVICE AND PARTS

Visit Toro on the World Wide Web at www.toro.com

Specifications and designs are subject to change without notice
©1998 The Toro Company, 8111 Lyndale Ave. S. Bloomington, MN 55420-1196, All Rights Reserved. Printed in U.S.A.

Part No. 91-1

*Product Preview*

APPENDIX B



Nunes Manufacturing is proud to introduce to you our newest hydraulic rotary mower with 22 ½" decks for the Toro Model 6500 or the Toro Model 6700. The mower can be mounted in place of the reel mower with no modifications to the power unit. Each deck has one high efficiency hydraulic motor, with special bearings to provide excellent support for blades. For more information please call our sales department and they will be happy to answer any questions

**Nunes** Manufacturing, Inc.

1707 Magnolia Ave
Patterson, CA 95363
(209) 892-8773 or
Fax (209) 892-5627

Introducing our newest rotary equipment sales

"Specializing in adapting rotary mowers to fit most traction units"



Nunes Manufacturing is proud to introduce to you the newest hydraulic rotary mower with 22 ½" decks for the John Deere Model 3235A. The mower can be mounted in place of the reel mower with no modifications to the power unit. Each deck has one high efficiency hydraulic motor, with special bearings to provide excellent support for blades. For more information please call our sales department and they will be happy to answer any questions

**Nunes** Manufacturing, Inc.

1707 Magnolia Ave
Patterson, CA 95363
(209) 892-8773 or
Fax (209) 892-5627

Introducing our newest rotary equipment sales

"Specializing in adapting rotary mowers to fit most traction units"

# EXHIBIT 7

GP3616
3671
PE/11/B

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

GROUP ART UNIT 3616

In re

Patent Application of

Richard D. Bednar

Serial No. 08/794,141

Filed: February 3, 1997

Examiner: Melius, T.

GANG-TYPE ROTARY LAWN
MOWER

I, Tamara A. Stevens hereby certify that this
correspondence is being deposited with the US
Postal Service as first class mail in an envelope
addressed to Assistant Commissioner for
Patents, Washington, D.C. 20231, on the date
of my signature

_Tamara A. Stevens_
Signature

_April 29, 1999_
Date of Signature

EAm
5/11/99

**AMENDMENT B**

RECEIVED

MAY 1 0 1999

GROUP 3800

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

    In response to the Patent Office action mailed January 29, 1999, please amend

the application as follows

<u>IN THE CLAIMS</u>

1. (Second Amendment) A gang-type rotary lawn mower comprising

a frame supported by <u>front and rear</u> wheels for movement over the ground,

a power source which is mounted on the frame and which drives at least two of the wheels,

an operator's seat mounted on the frame,

a steering system enabling the operator to steer the lawn mower,

at least two side-by-side front rotary cutting deck assemblies mounted on the frame <u>in front of the front wheels,</u> the front deck assemblies defining a gap between adjacent front deck assemblies, and

at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies <u>and between the front and rear wheels,</u> each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies,

each of the front and rear deck assemblies including a single-spindle cutting deck defining a downwardly opening space, a single spindle mounted for rotation about a generally vertical axis within the space, at least one cutting blade mounted on the spindle for rotation therewith, and a rear roller supporting the deck for movement over the ground, the deck having a width such that the roller extends across substantially the entire width of the deck

7. (Second Amendment) A gang-type rotary lawn mower comprising

a frame supported by wheels for movement over the ground,

a power source which is mounted on the frame and which drives at least two of the wheels,

an operator's seat mounted on the frame,

a steering system enabling the operator to steer the lawn mower,

at least two side-by-side front rotary cutting deck assemblies mounted on the frame, the front deck assemblies defining a gap between adjacent front deck assemblies, and

at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies,

each of the front and rear deck assemblies including a pair of laterally-spaced, generally vertically-extending side plates, a single-spindle cutting deck defining a downwardly opening space, the deck being mounted between the side plates, a single spindle mounted for rotation about a generally vertical axis within the space, and at least one cutting blade mounted on the spindle for rotation therewith, wherein each deck assembly is connected to the frame in part by a cross member connected to the frame for pivotal movement about a generally vertical axis and about a generally horizontal axis extending in the forward-rearward direction, the cross member having opposite, laterally-spaced ends, one of the cross member ends being connected to one of the side plates of the associated deck assembly for pivotal movement about a generally horizontal, laterally-extending axis adjacent the forward ends of the side plates, and the other of the cross member ends being connected to the other of the side plates of the associated deck assembly for pivotal movement about the generally horizontal, laterally-extending axis, the ends of the cross member having thereon respective downwardly extending arms, the arms having respective lower ends, the lower end of one of the arms being connected to one of the side plates for pivotal movement about the generally horizontal, laterally-extending axis, and the lower end of the other of the arms being connected to the other of the side plates for pivotal movement about the generally horizontal, laterally-extending axis

3

8   (Second Amendment) A gang-type rotary lawn mower comprising

a frame supported by wheels for movement over the ground,

a power source which is mounted on the frame and which drives at least two of the wheels,

an operator's seat mounted on the frame,

a steering system enabling the operator to steer the lawn mower,

at least two side-by-side front rotary cutting deck assemblies mounted on the frame, the front deck assemblies defining a gap between adjacent front deck assemblies, and

at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies,

each of the front and rear deck assemblies including a pair of laterally-spaced, generally vertically-extending side plates, a single-spindle cutting deck defining a downwardly opening space, the deck being mounted between the side plates, a single spindle mounted for rotation about a generally vertical axis within the space, and at least one cutting blade mounted on the spindle for rotation therewith, wherein each deck assembly is connected to the frame in part by a cross member connected to the frame for pivotal movement about a generally vertical axis and about a generally horizontal axis extending in the forward-rearward direction, the cross member having opposite, laterally-spaced ends, one of the cross member ends being connected to one of the side plates of the associated deck assembly for pivotal movement about a generally horizontal, laterally-extending axis adjacent the forward ends of the side plates, and the other of the cross member ends being connected to the other of the side plates of the associated deck assembly for pivotal movement about the generally horizontal, laterally-extending axis, wherein each of the deck assemblies is connected to the frame by a respective generally L-shaped, horizontally-extending arm having a laterally-extending inner leg with an inner end connected to the frame for pivotal movement about a generally horizontal axis extending in the forward-rearward direction, and the arm having an outer leg extending in the forward-rearward direction, the outer leg having an outer end, and wherein the cross member is mounted on the outer end of the outer leg,

4

## REMARKS

The Examiner's indication that claims 7-9 and 11-20 remain allowable and that claim 4 contains allowable subject matter is gratefully acknowledged. Claims 7 and 8 have been amended to provide antecedent basis for the side plates

Claims 1, 2, 5, 6 and 10 have been rejected as being unpatentable over Smith in view of Mountfield. Reconsideration is respectfully requested.

Claim 1 specifies a gang-type rotary lawn mower comprising, among other things, at least two side-by-side front rotary cutting deck assemblies mounted on the frame in front of the front wheels, and at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies and between the front and rear wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies, each of the front and rear deck assemblies including a single-spindle cutting deck and a rear roller supporting the deck for movement over the ground, the deck having a width such that the roller extends across substantially the entire width of the deck. This construction is not suggested by any of the cited references taken alone, and is not suggested by either Smith or Nunes, the references which were originally relied upon by the Examiner and which teach gang-type mowers. The Examiner has taken the position that it would have been obvious to modify Smith in view of Mountfield, which teaches a walk-behind rotary mower with a rear roller. Applicant respectfully disagrees

Claim 1 has been amended to emphasize the fact that Applicant's invention is a frame-mounted, gang-type, single-blade rotary deck mower with each deck having a rear roller extending substantially all the way across the deck. This construction is not suggested by the cited references.

A lawn mower designer faces many choices. Rotary or reel? Riding or walk-behind? One reel/deck or gang-type? Frame-mounted or tow-behind? Single-blade deck or multiple-blade? Rear roller or not? Not all combinations of these features are possible or desirable, or perhaps more importantly, thought to be desirable. The choices are influenced by many factors, but the intended use of the mower is probably most significant.

As explained in the Background of the Invention portion of Applicant's specification, rotary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length. Tow-behind gangs are also undesirable for this purpose. Frame-

5

mounted reel mowers, usually gang-type, have been used almost exclusively for cutting golf course roughs. Nobody prior to Applicant has recognized the desirability of using, or figured out how to use, gang-type rotary mowers to cut golf course roughs.

Smith and Nunes reflect the state of the art with respect to gang-type lawn mowers. While gang-type mowers and walk-behind mowers often have common features, features of the two types of mowers are not necessarily interchangeable. Smith and Nunes teach that both reel mowers and rotary mowers can be used in gang-type mowers, but neither suggests using a rotary mower with a rear roller that extends substantially all the way across the deck. It is interesting to note that although reel mowers, both gang-type and walk-behind, have had such rear rollers for decades, gang-type rotary mowers have never (to the best of Applicant's knowledge) had such rear rollers, and even walk-behind rotary mowers have rarely (Mountfield is the exception) had such rear rollers. It cannot simply be concluded, with the benefit of hindsight, that it would have been obvious to make a change that was contrary to conventional wisdom in the art of gang-type mowers.

Referring to the above-mentioned choices faced by a lawn mower designer, it has not been merely a matter of picking any combination of the listed options. As explained above, certain combinations were thought to be either desirable or undesirable, depending on the intended purpose. If the intended purpose was cutting a golf course rough, it was not thought desirable to use a frame-mounted, gang-type, single-blade rotary deck mower with each deck having a rear roller extending substantially all the way across the deck. In fact, it was not known to use such a construction for any purpose. That is why Smith and Nunes do not suggest such a construction. Moreover, the fact that Mountfield teaches a rear roller extending substantially all the way across the deck on a single-deck walk-behind mower does not make it obvious to use such a rear roller on a frame-mounted, gang-type, rotary deck mower as claimed by Applicant. The considerations are completely different, and the combination would not have been obvious, as is evidenced by the fact that, notwithstanding the hundreds of patents directed to lawn mowers, not a single one suggests the claimed combination. (Applicant is aware of the standard counter-argument saying the absence of a patent showing a claimed construction does not make that construction non-obvious, and that such absence may simply indicate that the combination was so obvious that nobody bothered to claim it, but that counter-

6

argument is specious in this crowded art in which lawn mower manufacturers patent every little improvement made ) In this case, Applicant has made a significant improvement that was not obvious to those of ordinary skill in the art.

Applicant has invented a lawn mower that is, as explained in the Summary of the Invention portion of Applicant's specification, a tremendous improvement over the known prior art, because a rotary mower typically requires substantially less maintenance than a reel mower. Applicant has invented the first rotary mower that is suitable for cutting a golf course rough. Applicant's invention is not just an arbitrary, minor improvement over the prior art. Applicant's invention is a significant step forward in the art, as has been demonstrated by the commercial success of Applicant's lawn mower, which has now been copied by at least two competitors.

Accordingly, claim 1 and dependent claims 2, 4-6 and 10 are allowable.

In view of the foregoing, entry of the above amendment and allowance of claims 1, 2, 4-6 and 10, in addition to the previous allowance of claims 7-9 and 11-20, are respectfully requested.

The undersigned is available for telephone consultation at any time.

Respectfully submitted,

David R. Price
Reg. No. 31,557

File No. 78209/9009

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, WI 53202-4108
(414) 271-6560

7

# EXHIBIT 8

Nov-04-99 03:57pm From-MICHAEL FIRST                    T-140 P 03/11 F-959

#15/Recov

11/17/99

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

### GROUP ART UNIT 3671

In re

Patent Application of

Richard D. Bednar

Serial No. 08/794,141

Filed: February 3, 1997

Examiner: Pezzuto, R.

GANG-TYPE ROTARY LAWN
MOWER

I, Mary K. Vuk, hereby certify that this correspondence is
being sent by facsimile transmission addressed to Assistant
Commissioner for Patents, Washington, D.C. 20231, on the
date of my signature.

Mary K. Vuk
_____
          Signature

November 4, 1999
_____
       Date of Signature

### RESPONSE TO FINAL REJECTION

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

This is in response to the Final Rejection dated June 4, 1999. A request for an
extension of the time for response is attached.

The Examiner's indication that claims 7-9 and 11-20 remain allowable and that claim
4 contains allowable subject matter is gratefully acknowledged.

On the merits, the Examiner has essentially repeated his rejections from the prior
Office Action to which Applicant responded in the Amendment dated May 3, 1999.

Claims 1, 2, 5, 6 and 10 have been rejected as being unpatentable over Smith in view
of Mountfield or Cracraft. Reconsideration is respectfully requested.

Claim 1 specifies a gang-type rotary lawn mower comprising, among other things, at
least two side-by-side front rotary cutting deck assemblies mounted on the frame in front of
the front wheels, and at least one rear rotary cutting deck assembly mounted on the frame
behind the front deck assemblies and between the front and rear wheels, each rear deck
assembly being aligned with a respective gap between adjacent front deck assemblies, each of
the front and rear deck assemblies including a single-spindle cutting deck and a rear roller
supporting the deck for movement over the ground, the deck having a width such that the
roller extends across substantially the entire width of the deck. This construction is not

suggested by any of the cited references taken alone, and is not suggested by either Smith or Nunes, the references which were originally relied upon by the Examiner and which teach gang-type mowers. The Examiner has taken the position that it would have been obvious to modify Smith in view of Mountfield, which teaches a walk-behind rotary mower with a rear roller, or in view of Cracraft. Applicant respectfully disagrees.

Cracraft does not change the conclusions of Applicant's Amendment dated May 3, 1999, because Cracraft does not teach rollers that extend across substantially the entire width of the deck. Cracraft simply has rollers that extend a small part of the distance across the deck and serve the same function as wheels, not the function of Applicant's wider roller.

Applicant has invented a lawn mower that is, as explained in the Summary of the Invention portion of Applicant's specification, a tremendous improvement over the known prior art, because a rotary mower typically requires substantially less maintenance than a reel mower. Applicant has invented the first rotary mower that is suitable for cutting a golf course rough. Applicant's invention is not just an arbitrary, minor improvement over the prior art. Applicant's invention is a significant step forward in the art, as has been demonstrated by the commercial success of Applicant's lawn mower, which has now been copied by at least two competitors.

To further demonstrate the unobviousness of Applicant's mower, Applicant submits herewith a Declaration of Richard D. Bednar, the inventor, demonstrating the commercial success and prevalent copying of the invention. As shown by the Declaration, Applicant, in less than three years, has made nearly $20 million in sales to date of the mower embodying the invention, and at least two competitors have attempted to appropriate a share of this market by copying the invention.

The commercial success and copying of Applicant's product demonstrate that Applicant's mower is not obvious, and that there is a long-felt need for a mower that can effectively mow over undulating terrain, a need which has not been met by any other product.

The aforementioned Declaration establishes the nexus between the claimed invention and the commercial success and copying of the product embodying the invention.

Accordingly, independent claim 1 and dependent claims 2, 4-6 and 10 are allowable.

In view of the foregoing, allowance of claims 1, 2, 4-6 and 10, in addition to the previous allowance of claims 7-9 and 11-20, is respectfully requested.

2

The undersigned is available for telephone consultation at any time.

Respectfully submitted,

David R. Price
Reg. No. 31,557

File No. 78209/9009

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, WI 53202-4108
(414) 271-6560

3

# EXHIBIT 9

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

GROUP ART UNIT 3671

In re

Patent Application of

Richard D. Bednar

Serial No. 08/794,141

Filed: February 3, 1997

Examiner: Pezzuto, R.

GANG-TYPE ROTARY LAWN
MOWER

I, Mary K. Vuk, hereby certify that this correspondence is
being sent by facsimile transmission addressed to Assistant
Commissioner for Patents, Washington. D.C. 20231. on the
date of my signature.

*Mary K. Vuk*
Signature

*December 1, 1999*
Date of Signature

## SUPPLEMENTAL RESPONSE TO FINAL REJECTION

Assistant Commissioner for Patents
Washington. D.C. 20231

Sir:

This is in response to the Final Rejection dated June 4, 1999 and supplements the response to final rejection submitted on November 4, 1999. A request for an extension of the time for the additional month needed for this response is attached.

The Examiner's indication that claims 7-9 and 11-20 remain allowable and that claim 4 contains allowable subject matter is gratefully acknowledged.

Claims 1, 2, 5, 6 and 10 have been rejected as being unpatentable over Smith in view of Mountfield or Cracraft. Reconsideration is respectfully requested.

Obviousness under 35 U.S.C. § 103 is a legal conclusion, which requires the resolution of four preliminary factual inquiries:

1) the scope and content of the prior art;

2) the differences between the claims and the prior art;

3) the level of ordinary skill in the pertinent art; and

4) secondary considerations, if any, of nonobviousness.

See Uniroyal v. Rudkin-Wiley Corp., 837 F.2d 1044, 1050 (Fed. Cir. 1988), cert. denied, 488 U.S. 825 (1988). Secondary considerations include objective indicia of nonobviousness such as commercial success due to the invention, long-felt but unresolved need, and copying of the

invention in preference to copying the prior art. See Graham v. John Deere & Co., 383 U.S.

1, 17-18 (1966); Panduit Corp. v. Dennison Mfg., 810 F.2d 1561, 1566-1568 (Fed. Cir.

1987). cert. denied, 481 U.S. 1052 (1987). Such objective evidence of obviousness

> must always when present be considered en route to a determination of
> obviousness because: evidence of secondary considerations may often be the
> most probative and cogent evidence in the record. It may often establish that
> an invention appearing to have been obvious in light of the prior art was not.
> It is to be considered as part of all the evidence, not just when the
> decisionmaker remains in doubt after reviewing the art.

Uniroyal, 837 F.2d at 1053 (emphasis added) (quoting Stratoflex, Inc. v. Aeroquip Corp., 713

F.2d 1530, 1538-39 (Fed. Cir. 1983)). See also Graham, 383 U.S. at 35; Gillette Co. v. S.C.

Johnson & Son, Inc., 919 F.2d 720, 725 (Fed. Cir. 1990) ("[A]n analysis of obviousness must

address objective evidence of nonobviousness").

    Although often termed "secondary," the Federal Circuit has noted that these objective

factors highlighted in Graham v. John Deere are often the most probative evidence of non-

obviousness, because all other evidence is potentially tainted by hindsight. W.L. Gore &

Assocs. v. Garlock, Inc., 721 F.2d 1540, 1553 (Fed. Cir. 1983), cert. denied, 469 U.S. 851

(1984). See Stratoflex, Inc v. Aeroquip Corp., 713 F.2d 1530, 1538 (Fed. Cir. 1983)

(evidence of secondary considerations "must always, when present, be considered en route to

a determination of obviousness"); In Re GPAC, Inc., 57 F.3d 1573, 35 U.S.P.Q.2d 1116,

1121 (Fed. Cir. 1995).

    Courts consider commercial success of an invention because, "had the invention been

obvious, inventors would have produced it earlier to reap the monetary rewards." Indian

Head Indus. v. Ted Smith Equip., 859 F. Supp. 1095, 1105 (E.D. Mich. 1994). The Supreme

Court has long recognized the relevance of commercial success. For example, in Graham v.

John Deere Co., 383 U.S. 1 (1966), the Court noted that commercial success is an indication

of non-obviousness that must be considered in a patentability analysis and that the

commercial response to an invention is entitled to fair weight. Id. at 17-18, 35-36; see also

Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick, 730 F.2d 1452, 1461

(Fed. Cir. 1984).

    Federal Circuit decisions regularly rely on evidence of commercial success for a

determination of non-obviousness. For example, in Fromson v. Advance Offset Plate, 755

F.2d 1549 (Fed. Cir. 1985), the court held that the patented invention's market-dominating

2

properties undermined arguments that the success was attributable to developments in related technology, especially when the related technology existed for a number of years before the invention. Id. at 1557-58; see also Gillette Co. v. S.C. Johnson & Son, Inc., 919 F.2d 720, 726 (Fed. Cir. 1990) (district court found patentee's product was new and radically different from previously marketed products and its success was due to its innovative properties).

"[F]or commercial success of a product embodying a claimed invention to have true relevance to the issue of non-obviousness, that success must be shown to have in some way been due to the nature of the claimed invention, as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter." Cable Elec. Prods. v. Genmark, Inc., 770 F.2d 1015, 1027 (Fed. Cir. 1985). This "nexus" between the commercially successful product and the invention is satisfied by the inventor simply by showing that the product that "is commercially successful is the invention disclosed and claimed in the patent." Demaco Corp. v. F. Von Langsdorff Licensing, 851 F.2d 1387, 1392 (Fed. Cir. 1988), cert. denied, 488 U.S. 956 (1988); see also Rite-Hite Corp. v. Kelley Co., 629 F. Supp. 1042, 231 U.S.P.Q. 161, 166, 169 (E.D. Wis. 1986) ("While one can never be certain of the precise causal relationship of commercial success, nevertheless in this case, it appears from all of the evidence that the invention of the '847 patent was a very significant factor"), aff'd, 819 F.2d 1120 (Fed. Cir. 1987).

Numerous decisions rely upon facts showing a long-felt need for an invention, and the failure of others to meet that need, as evidence probative of patentability. See, e.g., Goodyear Tire & Rubber v. Ray-O-Vac, 321 U.S. 275; Eibel Process v. Minnesota & Ontario Paper, 261 U.S. 45, 53-54, 68 (1923); Great Northern Corp. v. Henry Molded Prods., 864 F. Supp. 865 (E.D. Wis. 1994). As one court noted:

> The existence of an enduring, unmet need is strong evidence that the invention is novel, not obvious, and not anticipated. If people are clamoring for a solution, and the best minds do not find it for years, that is practical evidence--the kind that can't be bought from a hired expert, the kind that does not depend on fallible memories or doubtful inferences--of the state of knowledge.

In re Mahurkar Patent Litig., 831 F. Supp. 1354, 1378 (N.D. Ill. 1993), aff'd, 71 F.3d 1573 (Fed. Cir. 1995).

One of the most relevant objective factors of non-obviousness is a competitor's copying of the invention rather than copying the prior art reference that supposedly rendered the invention obvious. Specialty Composites v. Cabot Corp., 845 F.2d 981, 991 (Fed. Cir.

3

1988) ("[C]opying the claimed invention, rather than one in the public domain, is indicative of unobviousness"). See Windsurfing Int'l v. AMF, 782 F.2d 995. 1000 (Fed. Cir. 1986), cert. denied, 477 U.S. 905 (1986). The reason for the importance of this factor is that if the invention was so obvious from the prior art, then the copier could use the prior art and would not need to use the invention. See Kurtz v. Belle Hat Lining, 280 F. 277, 281 (2d Cir. 1922) ("The imitation of a thing patented by a defendant, who denies invention, has often been regarded . . . as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think").

In a number of cases, courts have considered deliberate copying of the inventor's device by the defendant as evidence supporting patentability. In Diamond Rubber v. Consolidated Rubber Tire, 220 U.S. 428 (1911), the Supreme Court viewed such copying of a narrow patent claim in a "crowded art" as significant.

> The prior art was open to the [Defendant] Rubber Company. That "art was crowded," it says "with numerous prototypes and predecessors, of the Grant tire," and they, it is insisted, possessed all of the qualities which the dreams of experts attributed to the Grant Tire. And yet the rubber company uses the Grant tire. It gives the tribute of its praise to the prior art. but gives the Grant tire the tribute of its imitation, as others have done.

Id. at 441; see also Photo Elecs. v. England, 581 F.2d 772, 782 (9th Cir. 1978) ("The Court properly considered Ferrex's copying of Photoelectronic's machine as evidence of non-obviousness").

Numerous Federal Circuit decisions consider copying as evidence of non-obviousness. See, e.g., Avia Group Int'l v. L.A. Gear California, 853 F.2d 1557, 1564 (Fed. Cir. 1988) ("Copying is additional evidence of non-obviousness"); Diversitech Corp. v. Century Steps, 850 F.2d 675, 679 (Fed. Cir. 1988) ("Copying is an indicium of non-obviousness, and is to be given proper weight"); Specialty Composites v. Cabot Corp., 845 F.2d 981, 991 (Fed. Cir. 1988) (The infringer "closely copied the invention in the patent . . . . [C]opying the claimed invention, rather than one in the public domain, is indicative of unobviousness").

To demonstrate the unobviousness of Applicant's mower, Applicant submitted previously a Declaration of Richard D. Bednar, the inventor, demonstrating the commercial success and prevalent copying of the invention. As shown by the Declaration. Applicant, in less than three years, has made nearly $20 million in sales to date of the mower embodying

4

the invention, and at least two competitors have attempted to appropriate a share of this market by copying the invention.

The commercial success and copying of Applicant's product demonstrate that Applicant's mower is not obvious, and that there is a long-felt need for a mower that can effectively mow over undulating terrain, a need which has not been met by any other product.

The aforementioned Declaration establishes the nexus between the claimed invention and the commercial success and copying of the product embodying the invention.

Applicant has invented a lawn mower that is, as explained in the Summary of the Invention portion of Applicant's specification, a tremendous improvement over the known prior art, because a rotary mower typically requires substantially less maintenance than a reel mower. Applicant has invented the first rotary mower that is suitable for cutting a golf course rough. Applicant's invention is not just an arbitrary, minor improvement over the prior art. Applicant's invention is a significant step forward in the art, as has been demonstrated by the commercial success of Applicant's lawn mower, which has now been copied by at least two competitors.

Accordingly, independent claim 1 and dependent claims 2, 4-6 and 10 are allowable.

In view of the foregoing, allowance of claims 1, 2, 4-6 and 10, in addition to the previous allowance of claims 7-9 and 11- 20, is respectfully requested.

The undersigned is available for telephone consultation at any time.

Respectfully submitted,

David R. Price
Reg. No. 31,557

File No. 78209/9009

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, WI 53202-4108
(414) 271-6560

X:\XF\CLIENTB\78209\9009\RWF0542

5

# EXHIBIT 10

# Rotaries take to golf courses

*Improved cut and easy maintenance have helped rotary mowers gain wider acceptance on golf courses. Small rotaries can go where reel mowers fear to tread.*

By Dave Buchanan, *Jacobsen Division of Textron*

Larry Della Bianca got an unexpected bonus when he took delivery of his new rough mower—his fairways improved.

Shortly after the new rotary mower came to Pine Valley Golf Club in Southington, Conn., where Della Bianca is superintendent, repeat customers began complimenting him on the great shape of the fairways. He hadn't changed any of his fairway maintenance practices, so he was at a loss to explain their sudden improvement.

"Finally, I was up at the clubhouse, looking out at the first fairway," Della Bianca recalls. "One of my people had just mowed the rough (with the new mower) and then it dawned on me. Because of the fine cut and the grass standing up, it gave a striping effect that was so distinctive, the rough stood out from the fairway and made it look better. It was accenting the fairway."

The new mower that gave Della Bianca such a fine cut and distinctive striping wasn't a traditional reel mower. It was a rotary mower. At courses across the country, rotaries are gaining acceptance as good tools for certain applications.

The vacuum action rotary cutting decks create and the equipment's relatively light weight have helped make them more popular.

"The main reason I like using them is their ability to really stand the grass up as they cut," says Mike Sauls, superintendent at Butler National Golf Club, Oak Brook, Ill. "With cart traffic driving down the rough, we've had a tendency to have the grass lay down. The rotary makes the grass stand up for denser growth."

Pine Valley's Della Bianca now uses both a large dedicated rotary mower and two riding rotaries with front-mounted decks to cut his roughs. He had used a 7-gang mower for that job.

"Before, when conditions were wet, I could not get the cut I was looking for," he says. "Now, I can go out there when it's wet or when it's dry. In fact, two of my 18 roughs are extremely wet, and the way the HR-15—that's the large rotary—floats over them, I can cut them when they're wet without tracking."

Maneuverability is another plus for rotary mowers. Although they aren't as productive as gang mowers due to the limited cutting deck size, riding mowers with rotary decks can run rings around obstacles and sneak into tight spots with ease.

"In roughs, we use gang mowers and rotaries," says David Denley, superintendent at Lochinvar Golf Club, Houston, Texas. "Our course has a lot of pine trees, and we use a tractor with a 72-inch deck to get close to and in between them without damaging the trees."

Crews use gangs and rotaries in combination to maintain the roughs at Delaire Country Club, part of a development community in Del Ray Beach, Fla. Superintendent Ray Hansen uses riding rotaries with rear-discharge decks to trim along property lines that separate the course from the homes built along it.

"In most cases, we can get right up to the edge of the property line with a gang mower," Hansen says. "When that's not possible, where there are trees, we use the rotaries and string trimmers. We mulch and spray around the trees to reduce the amount of work we have to do with trimmers. That way, the rotaries can handle most of it."

Although most superintendents restrict rotary use solely to roughs, it's not unusual to find rotaries doing trim work around greens.

"I can mow the greens' banks (with

Continued



Riding rotary mowers are highly maneuverable, making them ideal for cutting around trees and other obstacles.

# The first turf fertilizers so specialized, they make the competition see red.



## Distributor's Own Turf Supplies™

It's understandable, because no other distributor offers what we do. Some suppliers may pass their pre-packaged fertilizers off as custom blends, but when it comes right down to it, their products simply aren't formulated to meet your specific needs. As a result, your expertise and input are ignored which turns into frustration for you.

**At DOTS (Distributor's Own Turf Supplies), we do things differently.**

Our fertilizer/pesticide products are designed so you can develop your program professionally with specialized formulas for your specific needs. With a DOTS distributor, you're treated individually—not clumped together with others and sold "off-the-shelf" blends.

**We test the soil before we make the formula.**

We realize that the markets you serve have different turf, climate, and soil conditions. You tell us your specialized needs and problems, we'll provide soil testing when needed, and then work with you to prepare an individual solution. It's easy on your part, thorough on ours.

All DOTS products are designed to meet the highest industry standards in uniformity and performance. In-house quality control means that each order delivered to you complies with our rigid specifications, assuring you the quality you expect.

Just look for the red dot to know you're getting the best ... from the best distributor. For more information, call **1-800-345-DOTS.**

Circle (34) on Reply Card

## Rotaries on golf courses

(Continued from page 58)



**Large, dedicated rotary mowers** give maximum productivity. They are best for large areas with few obstacles

a rotary) three times a week and still stay within my mowing schedule," says Don Cook, superintendent at Milburn Country Club in Overland Park, Kan. "And I can cut my grass a little higher because we're cutting it so often. It looks neat and the grass is healthier because we're cutting it at 2½ or 3 inches instead of something shorter with a reel mower"

### Selecting a rotary

A variety of rotaries can be useful on a golf course. Selecting the right one depends on course conditions and personal preference.

So-called dedicated mowers (large tractors used solely to cut turf) give maximum productivity. They are best suited for courses with wide, open roughs and few trees. Dedicated mowers deliver a clean cut in roughs, and not just to the turf. According to Della Bianca, small branches, leaves, pine cones and other debris that tend to clutter up roughs disappear under the rotary's blades.

"You can run over that stuff, grind it right up, shoot it out the discharge and leave no traces of it at all. It gives a clean cut," he says.

For productivity with maneuverability, use a riding rotary mower with a front-mounted deck. A 72-inch cutting width is the most popular, but decks from 44- to 88-inches wide are available.

When choosing a cutting deck, consider your site's contours and landscaping features. If the area has distinct undulations, a larger deck's greater productivity will be negated by its ina-

bility to follow contours.

"At one time, we had a 72-inch deck that was too big for most of the areas we were using it in," says Tom Alex, superintendent at Grand Cypress Golf Club in Orlando, Fla. "We went down to a 60-inch deck and many of our scalping problems went away. If your gauge wheels are set okay and you've got the right deck for the area, scalping usually isn't a problem."

If you plan to use the mower in tight spots, make sure the cutting deck is small enough. If the machine *just fits*, you are depending on the operator to slow down and move through certain areas exactly correctly. In the real world, you are probably asking for several collisions that may damage both the machine and the landscape, not to mention the operator

Rear-wheel and power steering make riding rotaries highly maneuverable. Look into 4-wheel drive if your course has hilly terrain.

Flexibility is another riding rotary advantage. It will probably mow most of the time, but attachments are available to blow leaves and clippings, throw snow, sweep with a rotary brush and accomplish a number of other jobs.

Labor-intensive walk-behind rotary mowers are less prevalent in golf courses, but they do have their place. Butler National uses 36-inch rotaries on some greens' banks.

Small walk-behind rotaries are in use at the prestigious Sherwood Country Club in Thousand Oaks, Calif., where the clientele includes former President Ronald Reagan, major sports celebrities, leaders of major corporations and

stars of the motion picture industry. There is pressure on superintendent Rich Wagner to provide exceptional conditions, right down to the last clipping.

"We're using commercial walk-behind rotary mowers for trim work and walk-behinds with bags for our primary roughs around the greens," Wagner says. "It's extremely labor intensive, but our players expect first-class conditions. They don't want any grass lying around the greens. In fact, they don't want any grass lying around the golf course."

Wagner says he has 10 rotaries cutting about 5 acres of low spots and tee complexes three times a week. The job usually takes all day.

### Rotaries require training

"Like any piece of equipment, the operator has to know how to use it," says Milburn Country Club's Don Cook. "Once they get used to it, they're usually very good at it."

Use your experienced workers to train new operators. Have them explain how to avoid scalping and which parts of the course are off limits to rotaries. Your trainers should know how to explain the steps involved in providing the finished look you want.

"There's definitely an operator technique to it," says Butler National's Mike Sauls about using a rotary. "We've got three fellows who have been doing the rotary mowing for about 8 years now. We usually have one of them work closely with a new person the first couple of times. We explain what we're trying to accomplish and what look we want. We like a little striping around the banks, but we don't want grass in the bunkers around the greens. We explain the aesthetic appearance we're looking for"

At Muirfield Village Golf Club in Dublin, Ohio, new operator training involves more than learning the course. Superintendent Mike McBride wants his new people also to understand the machines they'll be using.

"Everyone goes through a training course where a supervisor, a foreman, the service manager or a combination of the three, will go through a machine thoroughly," McBride says. "We do this not only to show them how it operates, but also the daily maintenance they have to do before they take it out, and what

# On a golf course a bad score should be the only thing that stinks.

Foul odors, algae and sludge in golf course ponds are enough to ruin anyone's game. The results of poor water management can be unsightly, smelly and costly.

Now Otterbine has developed CONCEPT$_2$, the new high-technology surface aerators that can revolutionize your approach to water quality management.

CONCEPT$_2$ High Volume aerators are built to last, made of stainless steel and tough, versatile thermoplastics, with a rugged, custom built motor and a virtually unbreakable stainless steel prop designed to handle large volumes of water.

And CONCEPT$_2$ offers almost unlimited versatility, with easily installed, totally inter-changeable spray patterns.

SUNBURST$_2$ in Otterbine's CONCEPT$_2$ line answers the challenge of producing a sparkling water display with minimal effect on pumping rates.

CONCEPT$_2$ and SUNBURST$_2$ fulfill the Otterbine tradition of scientifically designed, highly efficient, compact, self-contained aeration systems. They are simple to install and economical to operate.

They need no foundation, external pumps, or other costly plumbing fixtures. All Otterbine Aerators are safety tested and approved by the Electrical Testing Laboratory.

Call or write, today, to find out how CONCEPT$_2$ can help you keep your water quality up to par.

SUNBURST$_2$

CONCEPT$_2$ High Volume

See us at the GCSAA—Booth #837



## Water works with Otterbine.

## Rotaries on golf courses

(Continued from page 60)

they do with it when they bring it back in. We also show them the limitations of that machine—where they can go, where they can't go—so they don't get in trouble, mainly from a safety point of view."

McBride says the training process usually takes a couple of days.

### Maintenance ease

With 400 acres of prime Florida real estate to tend, Grand Cypress's Tom Alex and his crew know the importance of good equipment maintenance. Two out-front rotary mowers cut 30 to 40 of those acres. They are in use up to 4 days a week.

"Each time they're used, our mechanics will go through and perform any daily maintenance that's needed," Alex says. "That includes greasing, checking the spindles and then sharpening the blades."

That kind of daily maintenance is essential for a machine to deliver peak performance and long service life. John Oldenburg, service manager for Jacob-

sen Textron, recommends checking the equipment's vital fluids daily.

"The engine oil and hydraulic fluid should be checked and the cutting deck greased, without fail, every day," Oldenburg says. "The deck should be cleaned daily and the radiator should be checked every day to make sure it's clear. Rotaries blow more dry debris into the air than reels. Debris can get into the engine compartment and clog things. That will reduce its efficiency, and could eventually cause overheating."

Oldenburg recommends using an air hose to clean radiators and cooling fins. He says cleaning with water can pack dust and dirt into openings between fins and clog them.

In addition to cleaning and greasing decks daily, sharpen blades regularly and maintain proper balance. Simple, inexpensive devices are available to check blade balance. An unbalanced blade can cause vibration that may contribute to premature bearing failure and structural damage.

Examine mechanical decks for loose

or worn belts. If your machine has hydraulic decks, regularly check hoses and fittings for wear or leakage. A worn, damaged or leaking component is a warning signal that a more serious problem is in the making. Address these warning signals immediately before a more serious problem occurs that could damage the turf or put the equipment out of commission.

Assign one person to do these preventive maintenance chores. Along with the daily checks, make that person responsible for keeping track of oil, fluid and filter changes.

The responsibility for keeping equipment running properly doesn't have to rest solely on the mechanic's shoulders, Oldenburg says. Operators can help by reporting any machine problems. That should start even before the operator climbs aboard in the morning.

"A quick visual inspection of the machine every morning before it goes out can save a lot of headaches," Oldenburg says.

Photo credit: Author



# TORQUE-FREE One-Man Earth Drilling

## Easy drilling, No kickback

- Patented torque bar eliminates kick back.
- Simple, safe one-man operation cuts labor costs in half.
- Digs a fast clean hole in seconds — diameters of 1½" to 16".
- Available in mechanical and hydraulic models with a variety of auger selections.
- Centrifugal clutch protects the operator and the equipment.
- Complete selection of augers and accessories.



Hydraulic Drills

Also Available



Send Today for Complete Information



## LITTLE BEAVER

**LITTLE BEAVER INC.**
P.O. Box 840 • Livingston, Texas 77351
(409) 327-3121 • Telex: 386596 • Fax: (409) 327-4025

Circle (36) on Reply Card



# WHEN YOU TREAT YOUR CUSTOMER'S LAWN LIKE YOUR OWN...



hine has h
ck hoses and
ge. A worn
ponent is
erious prob
ddress these
ely before
rs that could
e equipment

hese preven
ong with th
rson respon
il, fluid an

eping equip
esn't have to
's shoulder
s can help p
oblems. Th
the operation
ning.
on of the m
e it goes o
," Oldenbur

g

# YOU'VE GOT A CUSTOMER FOR LIFE.

Getting a *new* customer can be a whole lot harder—and a lot more costly—than doing the kind of good job that *keeps* an existing customer. And keeping a single customer can mean thousands of dollars over the life of your business.

**We're in it for the long haul, too.**
For over 25 years, The Andersons has provided the kind of proven product line-up and results-getting performance that has helped hundreds of lawn care operators grow their businesses in healthy ways.

Our broad range of fertilizers, herbicides, insecticides and combination products have helped us win over many a customer. And our product quality, consistency, exceptional service and reliability have helped us keep them.

We'd like the chance to prove ourselves to you. We think you'll find we're *good people* to do business with.

Call us toll free, 1-800-225-ANDY for a comprehensive full-line Selection Guide or for the name of your nearest distributor.

**the professional's partner®**







Personal service. Consistently high product quality. Technical service. Proven performance. All backed by a genuine integrity that is all too uncommon in today's business world. That's The Andersons.

© 1989 The Andersons

# EXHIBIT 11

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 46 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                    Page 1 of 10

Service: **Get by LEXSEE®**
Citation: **2004 US Dist LEXIS 20469**

*2004 U.S. Dist. LEXIS 20469, \**

MARTEK BIOSCIENCES CORPORATION, Plaintiff, v. NUTRINOVA INC., NUTRINOVA NUTRITION SPECIALTIES & FOOD INGREDIENTS GMBH, CELANESE VENTURES GMBH, and CELANESE AG, Defendants.

View the Full Docket from LexisNexis CourtLink for 1:03cv896
Civil Action No. 03-896 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2004 U.S. Dist. LEXIS 20469

October 8, 2004, Decided

**SUBSEQUENT HISTORY:** Motion granted by Martek Biosciences Corp. v. Nutrinova Inc., 2005 U.S. Dist. LEXIS 14315 (D. Del., July 19, 2005)

**DISPOSITION:** Plaintiff's motion to strike paragraph 26 of affirmative defenses denied. Plaintiff's motion to dismiss paragraph 48 of Count I and Count III of defendants' counterclaims granted in part and denied in part. Plaintiff's motion for more definite statement granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff patentee filed suit against defendants, alleging infringement of United States Patent Nos. 6,607,900 and 6,451,567. The patentee moved to strike defendants' affirmative defense of inequitable conduct and to dismiss defendants' counterclaim for a declaratory judgment.

**OVERVIEW:** The court found that defendants' inequitable conduct pleadings failed to satisfy the requirements of Fed. R. Civ. P. 9(b). Although defendants may not have been required to describe why the data the patentee submitted to the United States Patent and Trademark Office was false or to state why that data was material, defendants should have identified the data in their affirmative defense and counterclaim. The proper remedy was to require defendants to provide a more definite statement. The declaratory judgment claim related to other patents that the patentee held. In particular, the patentee sent defendants an e-mail that included a list of 18 of its nearly 50 patents that it selected as relevant to defendants' conduct. Although the patentee did not explicitly threaten to bring an infringement suit, the e-mail created a reasonable apprehension in defendants that the patentee would sue. Thus, while the district court agreed that defendants' claim for non-liability as to "any valid and enforceable claim of any issued United States patent owned by the patentee" was too broad, the 18 patents referenced in the e-mail were proper subjects for defendants' declaratory judgment claim.

**OUTCOME:** The patentee's motion to strike defendants' affirmative defense and to dismiss the counterclaims was granted in part and denied in part. The court dismissed defendants' counterclaim except for 18 specific patents. The patentee's motion for a more definite statement was granted.

**CORE TERMS:** patent, inequitable conduct, counterclaim, email, apprehension, infringement, declaratory judgment, actual controversy, definite, subject matter jurisdiction, declaratory judgment action, patentee, unenforceable, prosecuted, portfolio, particularity, infringing, vague, motion to strike, microalgae, intellectual property, affirmative defense, responsive pleading, motion to dismiss, devoid of merit, facial attack, insubstantial, declaration, ambiguous, succeed

Case 1:05-cv-00486-GMS     Document 56-5     Filed 06/01/2006     Page 47 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                    Page 2 of 10

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Strike > General Overview 🔁

*HN1* ± Fed. R. Civ. P. 12(f) allows a court to strike any insufficient defense from any pleading. Motions to strike affirmative defenses are disfavored. When ruling on such a motion, the court must construe all facts in favor of the nonmoving party and deny the motion if the defense is sufficient under the law. Furthermore, courts prefer not to grant a motion to strike unless it appears to a certainty that the movant would succeed despite any statement of the facts which could be proved in support of the defense. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Defects of Form 🔁

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview 🔁

*HN2* ± Fed. R. Civ. P. 12(e) allows a party to move for a more definite statement when a pleading is so vague or ambiguous that the party cannot reasonably be required to frame a responsive pleading. Fed. R. Civ. P. 12(e). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, or the issues cannot be determined. Courts have also granted the motion where the pleading has failed to satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). More Like This Headnote | *Shepardize: Restrict By Headnote*

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview 🔁

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss 🔁

*HN3* ± A motion to dismiss for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), challenges the jurisdiction of a court to address the merits of a plaintiff's complaint. A motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). When reviewing a facial attack, the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. More Like This Headnote

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview 🔁

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss 🔁

Evidence > Procedural Considerations > Burdens of Proof > General Overview 🔁

*HN4* ± For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a plaintiff bears the burden to prove that jurisdiction does in fact exist. However, the plaintiff's burden is relatively light, since dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of the court, or otherwise completely devoid of merit as to not involve a federal controversy. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Denials 🔁

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 48 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                    Page 3 of 10

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims

Patent Law > Inequitable Conduct > General Overview

*HN5* The particularity requirement of Fed. R. Civ. P. 9(b) applies to inequitable conduct charges in patent cases. In the context of alleged inequitable conduct before the United States Patent and Trademark Office during a patent prosecution, Fed. R. Civ. P. 9(b) does not require that a party plead the date, place or time of the fraud, so long as that party uses an alternative means of injecting precision and some measure of substantiation into their allegations of fraud. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview

Civil Procedure > Discovery > Methods > Interrogatories > Use

*HN6* A plaintiff cannot use its interrogatory responses to fulfill the particularity requirements of Fed. R. Civ. P. 9(b). More Like This Headnote

Civil Procedure > Declaratory Judgment Actions > General Overview

*HN7* See 28 U.S.C.S. § 2201(a).

Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes

Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview

Patent Law > Remedies > Declaratory Relief

*HN8* The federal courts have jurisdiction over a declaratory judgment action only if an "actual controversy" exists between the parties at the time a plaintiff files its complaint and throughout the pending action. In the patent context, the United States Court of Appeals for the Federal Circuit has articulated a two-part test to determine whether an actual controversy exists: (1) an explicit threat or other act by the patentee creating in the declaratory plaintiff a reasonable apprehension that the patentee will initiate suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to infringe. More Like This Headnote

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > Declaratory Judgment Actions > State Judgments > Discretion

*HN9* A court's exercise of jurisdiction over a declaratory judgment action is discretionary. More Like This Headnote

Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview

Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview

*HN10* In determining whether jurisdiction exists over a declaratory judgment action, in determining whether an "actual controversy" exists, the United States Court of Appeals for the Federal Circuit has stated that the question is whether the relationship between the parties can be considered a "controversy," and that inquiry does not turn on whether the parties have used particular "magic words" in communicating with one another. The test for

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469

Page 4 of 10

finding a "controversy" is a pragmatic one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling.  <u>More Like This Headnote</u>

**COUNSEL: [*1]**  For MARTEK BIOSCIENCES CORPORATION, Plaintiff: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For NUTRINOVA INC., NUTRINOVA NUTRITION SPECIALTIES & FOOD INGREDIENTS GMBH, Defendants: George Pazuniak, Oleh V. Bilynsky, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For NUTRINOVA INC., NUTRINOVA NUTRITION SPECIALTIES & FOOD INGREDIENTS GMBH, Counter-Claimants: George Pazuniak, Oleh V. Bilynsky, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For MARTEK BIOSCIENCES CORPORATION, Counter-Defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION: MEMORANDUM**

**I. INTRODUCTION**

The plaintiff, Martek Biosciences Corporation ("Martek"), filed the above-captioned action against Nutrinova Inc. and Nutrinova Nutrition Specialties & Food Ingredients GMBH (collectively, "Nutrinova") on September 23, 2003. n1 In its complaint, Martek alleges that the defendant is infringing <u>United States Patent Nos. 6,607,900 (the "900 patent")</u> and 6,451,567 (the "567 patent").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Celanese Ventures GMBH and Celanese AG have been dismissed as defendants in this case.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*2]**

Presently before the court is Martek's motion to strike paragraph 26 of the affirmative defenses, and to dismiss paragraph 48 of Count I and Count III of Nutrinova's counterclaim. n2 For the following reasons, the court will deny Martek's motion to strike, but grant Martek's motion for a more definite statement. In addition, the court will grant in part and deny in part Martek's request to dismiss Count III of Nutrinova's counterclaim.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Martek titles its motion as a motion to strike. However, in its Opening Brief in support of the motion (D.I. 12), Martek requests, in the alternative, that the court require Nutrinova to provide a more definite statement pursuant to <u>Rule 12(e) of the Federal Rules of Civil Procedure.</u> The court will consider both of Martek's motions.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 50 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                    Page 5 of 10

## II. BACKGROUND

Martek is a Delaware Corporation that develops and sells products from microalgae, including nutritional fatty acids such as the omega-3 fatty acid, docosahexaenoic acid ("DHA"). This case involves two of Martek's patents [*3] relating to DHA. DHA is a major and essential structural fatty acid, necessary for the development of organs including the eye retina, the brain, and the heart. The human body produces DHA in only limited quantities, creating a need in the medical science community to find alternate sources of DHA or develop processes to produce it. Martek recognized this need and developed microalgae processes to make DHA and products relating to its processes. Its patent portfolio consists of nearly fifty United States patents as well as foreign patents, including many directed to its DHA products.

Nutrinova is a Delaware Corporation that developed a microalgae process to make DHA, and currently markets its product under the brand name DHActive TM. After Nurtinova began marketing DHActive TM, Martek initiated discussions with Nutrinova regarding its potentially infringing activities. On May 27, 2003, Martek sent an email to Nutrinova, citing its patent portfolio and requesting to discuss the situation. (D.I. 13, Exh. 2). Nutrinova replied, requesting information regarding the patents and claims that Martek believed Nutrinova was potentially infringing. On June 18, 2003, Martek responded, via email, [*4] citing eighteen specific patents from its portfolio that it believed were relevant to the discussions. (*Id.* Exh. 4). Nutrinova reviewed the list and concluded that the patents offered by Martek were either not infringed or were invalid. Nutrinova then requested a meeting with Martek to discuss the situation further. (*Id.* Exh. 5) According to Martek, the parties were unable to amicably settle the matter. On September 23, 2003, Martek filed its complaint.

## III. STANDARDS OF REVIEW

### A. Rule 12(f)

HN1 Rule 12(f) of the Federal Rules of Civil Procedure allows a court to strike "any insufficient defense" from any pleading. Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc., 697 F. Supp. 1360, 1362 (D. Del. 1988)*. When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party . . . and deny the motion if the defense is sufficient under the law." *Id.* Furthermore, courts prefer not to grant a motion to strike "unless it appears to a certainty that . . . [the movant] would succeed despite any statement of the facts which could be proved in support of the defense." *Greiff v. T.I.C. Enterprises, L.L.C., 2004 U.S. Dist. LEXIS 680, No. Civ. 03-882, 2004 WL 115553 [*5] (D. Del. Jan. 9, 2004)*.

### B. Rule 12(e)

HN2 Rule 12(e) allows a party to move for a more definite statement when a pleading is "so vague or ambiguous that the party cannot reasonably be required to frame a responsive pleading." FED. R. Civ. P. 12(e); *see Schaedler v. Reading Eagle Publications, Inc., 370 F.2d 795, 798 (3d Cir. 1967)* (same). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, *see CFMT, Inc. v. Yieldup Int'l Corp., 1996 U.S. Dist. LEXIS 22795, No.CIV.A.95-549, 1996 WL 33140642, at *1 (D. Del. Apr. 5, 1996)*; *United States v. Bd. of Harbor Comm'rs, 73 F.R.D. 460, 462 (D. Del. 1997)*, or the issues cannot be determined. *See Fischer & Porter Co. v. Sheffield Corp., 31 F.R.D. 534, 536 (D. Del. 1962)*. Courts have also granted the motion where the pleading has failed to satisfy the heightened pleading requirements of Rule 9(b). *See EMC Corp. v. Storage Tech. Corp., 921 F. Supp. 1261 (D. Del. 1996)*.

### C. Rule 12(b)(1)

HN3 A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), challenges the jurisdiction of the court [*6] to address the merits of a plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction can take two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). *Mortensen v. First Federal Savings and Loan, 549 F.2d 884, 891 (3d Cir. 1977)*.

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 51 of 61

. ,  Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                    Page 6 of 10

When reviewing a facial attack the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id. See also Barrister v. Wendy's Int'l, Inc., 1993 U.S. Dist. LEXIS 10422, 1993 WL 293896, *3 (E.D. Pa. July 30, 1993).*

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen, 549 F.2d at 891.* Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* *HN4*⊕The plaintiff bears the burden to prove that jurisdiction **[*7]** does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick v. Pocono Downs Racing Ass'n, 816 F.2d 895, 899 (3d Cir. 1987)* (quoting *Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 666, 39 L. Ed. 2d 73, 94 S. Ct. 772 (1974)).*

## IV. DISCUSSION

### A. Paragraph 26 of Nutrinova's Affirmative Defenses and Paragraph 48 of Nutrinova's Counterclaim n3

" - - - - - - - - " - - - - - Footnotes - - - - - - - - - - - - - - -

n3 Paragraph 26 of the affirmative defenses states:

> 26. The '567 patent is unenforceable, because of the applicants' inequitable conduct in the prosecution of the patent. In particular, Martek prepared, filed and prosecuted a patent application, Serial Number 07/580,778 filed on September 11, 1990, which issued as the Martek '567 patent. That application was prepared, filed and prosecuted with material false data. The applicants knew that the application contained false data, but nevertheless filed, continued to prosecute, and convinced the Patent Office to issue the '567 patent based on such material false data. Such misconduct constitutes inequitable conduct, and renders the '567 patent and all affiliated patents unenforceable.

Paragraph 48 of Count I of the counterclaim states:

> 48. The '567 patent is unenforceable, because the applicants' inequitable conduct in the prosecution of the patent. In particular, Martek prepared, filed and prosecuted a patent application, Serial Number 07/580,778 filed on September 11, 1990, (the "778 application"), which is a parent application from which Martek's '567 patent on its face claims priority. A claim for priority from the 778 application is also made in a declaration filed by the inventors in connection with the '567 patent. The 778 application was prepared, filed and prosecuted with material false data. The applicants knew that the application contained false data, but nevertheless filed, continued to prosecute, and convinced the Patent Office to issue the '567 patent based on such material false data. Such misconduct constitutes inequitable conduct, and renders the '567 patent and all affiliated patents unenforceable.

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 52 of 61

· ·  Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                                    Page 7 of 10

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*8]**

As one of its affirmative defenses, Nutrinova alleges that Martek engaged in inequitable conduct in acquiring the '567 patent. Martek moves to strike the defense, as well as paragraph 48 of Nutrinova's counterclaim, which is predicated on the inequitable conduct defense, on the grounds that they do not meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, Martek claims that the language in Nutrinova's affirmative defense and counterclaim fails to provide any specifics concerning Martek's inequitable conduct in obtaining the '567 patent. In response, Nutrinova asserts that its pleading is not "vague or conclusory." Further, Nutrinova asserts that there is no authority that requires a pleading that claims inequitable conduct to identify specific falsified data, describe why it is false, or state why it was material, as Martek suggests it should have done.

The parties do not dispute that [HN5]the particularity requirement of Rule 9(b) applies to inequitable conduct charges. In the context of alleged inequitable conduct before the PTO during a patent prosecution, Rule 9(b) does not require that a party plead the "date, place or time" of the fraud, **[\*9]** so long as that party uses an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984),* cert denied, 469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985); *see EMC Corp. v. Storage Tech. Corp.,* 921 F. Supp. 1261, 1262-63 (D. Del. 1996). Nutrinova's pleadings do not pass the *Seville* test. Even if Nutrinova did not have to describe why the data Martek submitted to the Patent Office was false or state why that data was material, it should have identified the data in its affirmative defense and counterclaim. n4 The court, therefore, finds that Nutrinova has failed to plead facts with sufficient particularity in paragraph 26 of its affirmative defenses and paragraph 48 of its counterclaim to establish a charge of inequitable conduct based on Martek's alleged submission of false data during the prosecution of the '567 patent. n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n4 The court notes that Nutrinova provided a more detailed description of its inequitable conduct claim in a letter to Martek, stating that Martek's letter application "contains examples which do not represent actual data, and they are written in past tense." (D.I. 13, Exh. 1). The court will not determine whether the information contained in Nutrinova's letter is sufficient to meet the Rule 9(b) pleading requirements. The court uses the letter only to point out that Nutrinova possesses more detailed information regarding Martek's alleged inequitable conduct. **[\*10]**


n5 Because Nutrinova has not adequately pled its inequitable conduct claim, its pleading cannot be salvaged by future discovery. *EMC Corp.,* 921 F. Supp. at 1264 (concluding that [HN6]the plaintiff could not "use its interrogatory responses to fulfill the particularity requirements of Rule 9(b)").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In the present case, it does not appear to a certainty that Martek would succeed despite any statement of facts which could be proved in support of Nutrinova's inequitable conduct defense. Thus, the court does not conclude that the proper remedy in this case is to strike Nutrinova's pleadings. However, Martek has requested, in the alternative, that the court require Nutrinova to provide a more definite statement. The court finds that Nutrinova's inequitable conduct pleadings fail to satisfy the Rule 9(b) requirements in that they are so vague and ambiguous that Martek cannot draft a responsive pleading. Therefore, the court will grant Martek's request for a more definite statement.

## B. Count III of Nutrinova's Counterclaim

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469

Page 8 of 10

Martek next asserts that the court should dismiss Count III [*11] of Nutrinova's counterclaim for lack of subject jurisdiction. In its motion, Martek attacks Nutrinova's complaint on factual grounds. Thus, the court will consider evidence outside of the pleadings to determine whether subject matter jurisdiction exists. Nutrinova has the burden of proving that jurisdiction exists and must demonstrate that its claim is not wholly insubstantial, frivolous, devoid of merit, or made for the purpose of obtaining jurisdiction. *See Kulick*, 816 F.2d at 899. Count III is a declaratory judgment claim. n6 Martek argues that the facts of the case do not give rise to declaratory judgment jurisdiction.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Martek reproduces all of Count III in its Opening Brief in support of its motion (D.I. 12, at 7). The court, however, will paraphrase the language. Count III entitled, Non-Liability as to DHActive TM and Nutrinova Process, essentially asks the court to conclude that Nutrinova's activities do not infringe and that it is not liable for infringement of any valid and enforceable right of Martek, including any valid and enforceable claim of any issued United States patent owned by Martek.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*12]

The Declaratory Judgment Act provides:

> *HN7*In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201 (a). *HN8*The federal courts have jurisdiction over a declaratory judgment action only if an "actual controversy" exists between the parties at the time the plaintiff files its complaint and throughout the pending action. *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 887 (Fed. Cir. 1992)*. In the patent context, the United States Court of Appeals for the Federal Circuit has articulated a two-part test to determine whether an actual controversy exists: (1) an explicit threat or other act by the patentee creating in the declaratory plaintiff a reasonable apprehension that the patentee will initiate suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to infringe. *BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed. Cir. 1993).* [*13] Martek asserts that Nutrinova does not satisfy the first prong of *BP Chemicals* because Nurtinova's broad claims do not cite the specific patents or rights at issue, and could potentially encompass all of Martek's intellectual property, including its nearly fifty U.S. patents and its non-patent intellectual property rights. In addition, Martek contends that Nutrinova has not alleged, and cannot allege, facts necessary to establish that Martek's conduct placed Nutrinova in reasonable apprehension of an infringement suit over such broad subject matter. Lastly, Martek asserts that even if the court determines that an actual controversy exists, considerations of justice and efficiency require the court to decline declaratory judgment jurisdiction over Count III. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 *HN9*The court's exercise of jurisdiction over a declaratory judgment action is discretionary. *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991)*.

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 54 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469                                    Page 9 of 10

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Nutrinova argues that its declaratory judgment counterclaim is not [*14] broad and open-ended because it seeks a declaration only as to the one specific product, DHActive TM, made by the one specific process that is the subject of Martek's complaint. Nutrinova further argues that an actual controversy exists because Martek has already brought a suit for infringement against it for making DHActive TM. Moreover, Nutrinova contends that even if Martek had not initiated this lawsuit, its written assertions to Nutrinova constitute a basis for a declaratory judgment action under _Dainippon Screen Mfg. Co. v. CFMT, Inc., 142 F.3d 1266 (Fed. Cir. 1998)_ (affirming jurisdiction because a voice-mail to the defendant, stating that the patentee intended to protect its rights, created a reasonable apprehension in the defendant that the patentee would sue).

The parties do not dispute whether there is "present activity which could constitute infringement." n8 Thus, the court must determine whether Martek's conduct has been such that it caused Nutrinova to have an objectively reasonable apprehension of being sued by Martek at the time the declaratory judgment action was filed. In making its determination, the court must consider the totality of the circumstances. [*15] _Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992)._

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Nevertheless, the court finds that Nutrinova satisfies the "present activity" prong of _BP Chems. Ltd._ because it engages in the manufacture and production of DHActive TM, which is sufficiently similar to Martek's patents. See _Millipore Corp. v. Univ. Patents, Inc., 682 F. Supp. 227, 232 (D. Del. 1987)._

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The court agrees with Nutrinova that the litigious history between the parties and Martek's written assertions weigh in favor of a finding that Nutrinova has a reasonable apprehension of suit. HN10 The Federal Circuit has stated that "the question is whether the relationship between the parties can be considered a 'controversy,' and that inquiry does not turn on whether the parties have used particular 'magic words' in communicating with one another." _EMC Corp. v. Norand Corp., 89 F.3d 807, 812 (Fed. Cir. 1996)._ The court also cautioned that the "test for finding a 'controversy' . . . is a pragmatic [*16] one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling." _Id._

In the present case, even though Martek did not explicitly threaten to bring an infringement suit in any correspondence with Nutrinova, the court concludes that Martek's June 18, 2003 email (D.I. 13, Exh. 4) created a reasonable apprehension in Nutrinova that Martek would sue. In fact, Martek filed its complaint on September 23, 2003, approximately three months after its email to Nutrinova and one month after Nutrinova's request for a meeting. Nevertheless, Martek's June 18, 2003 email included a list of eighteen of its nearly fifty U.S. patents that it selected as relevant to Nutrinova's conduct. Beyond that, the email discussed Martek's patents and patent portfolio in a general sense. Martek's email created a reasonable apprehension in Nutrinova that Martek only would sue for infringement of one or more of the eighteen listed patents, not "any" or all of its patents. Thus, Nutrinova's claim for non-liability as to "any valid and enforceable claim of any issued United States patent owned by Martek," and "any valid and enforceable right of Martek" [*17] is too broad. Only those patents referenced in the June 18, 2003 email are proper subjects for Nutrinova's declaratory judgment claim. The court, therefore, will dismiss Count III of Nutrinova's counterclaim as it relates to Martek patents other than the eighteen listed in the June 18, 2003 email.

Dated: October 8, 2004

Gregory M. Sleet

Case 1:05-cv-00486-GMS    Document 56-5    Filed 06/01/2006    Page 55 of 61

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 20469    Page 10 of 10

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

> 1. The plaintiff's Motion to Strike Paragraph 26 of the Affirmative Defenses and Dismiss Paragraph 48 of Count I and Count III of the Counterclaims by Nutrinova and Nutrinova Specialties & Food Ingredients GMBH (D.I. 11) is GRANTED in part and DENIED in part.

> 2. The plaintiff's Motion, in the alternative. For a More Definite Statement (D.I. 12) is GRANTED.

Dated: October 8, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Service: **Get by LEXSEE®**
Citation: **2004 US Dist LEXIS 20469**
View: Full
Date/Time: Wednesday, May 31, 2006 - 5:35 PM EDT

\* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case

LexisNexis®    About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.



# EXHIBIT 12

1 of 40 DOCUMENTS

SYNOPSYS, INC., Plaintiff, v. MAGMA DESIGN AUTOMATION, Defendant.
MAGMA DESIGN AUTOMATION, Counter Claimant, v. SYNOPSYS, INC.,
Counter Defendant.

C.A. No. 05-701 (GMS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 33751

May 25, 2006, Decided

COUNSEL: [*1] For Synopsys Inc., a Delaware corporation, Plaintiff: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE ; Leslie A. Polizoti, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Magma Design Automation, a Delaware corporation, Defendant: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.

For Magma Design Automation, a Delaware corporation, Counter Claimant: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE

OPINIONBY: Gregory M. Sleet

OPINION:
    MEMORANDUM

## I. INTRODUCTION

In the above-captioned action, Plaintiff and Counter Defendant Synopsys, Inc. ("Synopsys") alleges three counts of patent infringement in violation of 35 U.S.C.A. § 271 (2001 & Supp. 2005) against Defendant and Counter Claimant Magma Design Automation ("Magma"). In its first amended answer, Magma alleges against Synopsys one count of monopolization (Count I) and one count of attempted monopolization (Count II), both in violation of Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (Supp. 2005), one count of product disparagement and trade libel (Count [*2] III) in violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (1998 & Supp. 2005), one count of statutory unfair competition (Count IV) in violation of the Delaware Deceptive Trade Practices Act, Del. Code. Ann. tit. 6, § § 2531, *et seq.* (1999), one count of unfair competition (Count V) and one count of tortious interference with business relations (Count VI), both in violation of Delaware common law, and one count of patent infringement (Count VII). Presently before the court are Synopsys' motion to dismiss Counts I-VI of Magma's first amended answer (D.I. 9), Synopsys' motion to bifurcate and stay (D.I. 31), and Magma's motion for leave to file a second amended answer to include four additional patent infringement counterclaims (D.I. 50).

## II. JURISDICTION

The court has subject matter jurisdiction pursuant to 28 U.S.C.A. § § 1331, 1367 (1993).

## III. BACKGROUND

According to the first amended answer, the patents at issue in this case relate to improvements in computer software used to design extremely complex integrated circuits. In general, such software translates a user's [*3] high-level description of the circuit he or she has designed and wishes to implement into a low-level description of the necessary

components. This translation process is known as logic synthesis. The software then engages in a process known as physical design, in which the actual circuit layout and interconnections are determined. Eventually (after several steps irrelevant to this discussion) the newly-designed circuit is manufactured and ready for testing. The testing process typically requires the insertion of "scan chains" into the low-level description produced during logic synthesis. These scan chains consist of interconnected storage elements capable of being read from and written to during testing.

Magma alleges that Synopsys has a 91% share in both the logic-synthesis market and the scan-chain insertion market, which are monopolies Synopsys procured and maintains through anti-competitive conduct. More specifically, Magma contends that two of the patents asserted by Synopsys in this case were obtained by fraudulent means, and that Synopsys has attempted to create exclusive-dealing contracts with Magma's customers. Magma further alleges that Synopsys has engaged in a public [*4] campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot afford to both defend itself in court and remain solvent.

# IV. DISCUSSION

## A. Motion to Dismiss

"When considering a Rule 12(b)(6) motion, [the court is] required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005). "A Rule 12(b)(6) motion should be granted 'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" *Id.* at 351 (quoting *D.P. Enter. Inc. v. Bucks County Cmty. Coll.*, 725 F.2d 943, 944 (3d Cir. 1984)). "However, [the] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Evancho*, 423 F.3d at 351.

### 1. Sherman Act (Counts I & II)

Synopsys argues that Magma's monopolization and attempted monopolization claims under Section 2 of the Sherman Act should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) [*5] because they are unsupported by adequate factual allegations. In particular, Synopsys contends that the first amended answer fails to allege "antitrust injury," which, according to Synopsys, requires "harm to competition in the marketplace," and a causal connection between that harm and the anti-competitive activities.

In *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, the Supreme Court explained:

> "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

425 U.S. 738, 746 (1976). In this case, the clear import of Magma's allegations is that Synopsys, with a 91% share in both relevant markets, is acting anti-competitively by using the patent system and exclusive-dealing [*6] contracts to run a competitor, *i.e.*, Magma, out of business. If Synopsys is successful, Magma contends that there will be a decrease in competition because significant barriers to entry prevent would-be competitors from replacing the void left by Magma. These allegations are sufficient to state a claim under Section 2 of the Sherman Act. *Gill v. Del Park, L.L.C.*, 294 F. Supp. 2d 638, 644 (D. Del. Dec. 2, 2003) (explaining that "the anti-trust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market").

### 2. Lanham Act (Count III)

Synopsys argues that Magma's Lanham Act claim is subject to the heightened pleading requirements of Rule 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). However, the "state of the law [is unsettled] as to whether Rule 9(b) was intended to incorporate claims brought under the Lanham Act." *H.H. Fluorescent Parts, Inc. v. DM Tech. & Energy, Inc.*, No. 04-1997, 2005 U.S. Dist. LEXIS 26699, [*7] at *13 (E.D. Pa. Nov. 3, 2005). If Count III is not subject to the

heightened pleading requirements of Rule 9(b), then Magma's allegations need only satisfy the notice pleading requirements of Rule 8(a).

The purpose of "Rule 9(b) [is] to give defendants 'notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). Here, none of these purposes would be served by requiring Magma to satisfy the pleading requirements of Rule 9(b). The Lanham Act claim in this case is one of seven claims Magma brought in response to a suit originally filed by Synopsys. Thus, this is not a case in which the court must protect Synopsys against a "frivolous suit brought *solely* to extract a settlement." Moreover, the need to provide increased protection for Synopsys' reputation is not as crucial in this case because Count III was brought as a means of protecting Magma's reputation. [*8] Finally, even if Magma's pleadings do not specify the "who, when, and where" of Synopsys' allegedly damaging statements, that problem is easily cured in discovery. Therefore, the court holds that the heightened pleading requirements of Rule 9(b) are not applicable in this context.

"Under the Lanham Act a plaintiff must allege that: (1) defendant made false or misleading statements as to its product, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 427 (D. Del. Mar. 31, 2003). However, the required level of specificity with which each element must be pleaded is not high because Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The first two elements [*9] are adequately pleaded by the allegation that Synopsys, knowing its patents were obtained by fraudulent means, engaged in a public campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot afford to both defend itself in court and remaining solvent. The third element (materiality) and the fifth element (injury) are adequately pleaded by the allegation that Synopsys' campaign of disparagement has damaged Magma. And the fourth element (interstate commerce) is explicitly pleaded in paragraph 156 of the first amended answer. Thus, Magma has met the requirements of Rule 8 with regard to its Lanham Act claim.

### 3. State Law Claims (Counts IV, V & VI)

Synopsys argues that the court has no subject matter jurisdiction pursuant to 28 U.S.C.A. § 1367 over Magma's state law claims if Counts I-III are dismissed. However, because those counts will not be dismissed at this time, the court retains jurisdiction over Counts IV-VI.

### B. Motion to Bifurcate and Stay

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate [*10] trial of any claim, cross-claim, counterclaim, or third-party claim . . . " Fed. R. Civ. P. 42(b). "[T]he decision to bifurcate *vel non* is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir. 1978).

Synopsys argues that the court should bifurcate the antitrust claims from the infringement claims because other courts routinely do so. This argument runs contrary to the guiding principle enunciated in *Lis*. There, the district court had simply followed its customary practice of separating the liability and damages phases in negligence cases without considering the unique circumstances of the negligence case at bar. On appeal, the Third Circuit held that this methodology ran afoul of Rule 42(b): "A general policy of a district judge bifurcating all negligence cases offends the philosophy that the decision must be made by a trial judge only as a result of an informed exercise of discretion *on the merits of each case.*" *Lis*, 579 F.2d at 824 (emphasis added). Therefore, although [*11] the routine practice of other courts may indicate that "experience has demonstrated [the] worth" of bifurcation in these circumstances, Fed. R. Civ. P. 42 advisory committee's note, the court's decision in this case will be guided first and foremost by the merits of this case.

With that principle in mind, the court is not convinced that bifurcation of the antitrust claims from the infringement claims is necessary to prevent jury confusion. In this court's experience, jurors are quite adept at comprehending and adhering to the instructions they are given, even in the most complex factual and legal scenarios. Therefore, the court will not pre-judge the yet-unnamed jurors by assuming they are unable to digest the facts and law in this case. Moreover, the court is confident that the experienced attorneys handling this case will craft cogent presentations to aid the jury in this process. The court is further unpersuaded by Synopsys' contention that bifurcation would serve the interest

2006 U.S. Dist. LEXIS 33751, *

efficiency. Magma's antitrust claims are based in part on the allegation that Synopsys fraudulently-obtained two of its patents and asserted them against Magma in [*12] violation of Section 2 of the Sherman Act. Synopsys' alleged fraud is also a centerpiece of Magma's invalidity claims. Thus, were the court to bifurcate, the evidentiary presentation in one case would likely be substantially duplicative of the evidentiary presentation in the other. In addition, bifurcation would likely create further duplication of evidence because both juries would need to be educated in the same relevant technology. Accordingly, the court concludes that neither jury confusion nor efficiency weigh in favor of bifurcating the antitrust claims from the infringement claims.

Synopsys also argues that the antitrust claims should be stayed until the infringement claims are resolved mainly because resolution of the infringement claims could streamline subsequent adjudication of the antitrust claims. Assuming *arguendo* that the litigation could be streamlined in this way, it is telling that Synopsys does not propose to shorten the number of days allocated for trial in the event that a stay is granted. Thus, even if the court stays the antitrust claims, the minimum amount of time allocated to try this case does not decrease. Consequently, it appears that a stay only has [*13] the potential to consume *more* of this court's valuable time. Therefore, the court will not stay the antitrust portion of this action.

For similar reasons, the court also declines to stay Synopsys' infringement claims pending re-examination by the PTO. The validity of the asserted patents will be litigated regardless of whether a stay is granted because that issue is relevant to Magma's Sherman Act claims. The most efficient course of action, then, is to also litigate infringement in order to capitalize on the jury's understanding of the relevant technology. Thus, the court will deny Synopsys' motion in its entirety.

### C. Motion to Amend

Pursuant to the court's scheduling order of December 28, 2005, the deadline for amended pleadings is March 24, 2006. On that date -- March 24 -- Magma timely filed a motion for leave to amend its first amended answer to include four additional counterclaims for patent infringement. "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "In the absence of any apparent [*14] or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis,* 371 U.S. 178, 182 (1962).

Synopsys' primary basis for opposing Magma's motion is that fact discovery is scheduled to close on September 26, 2006, thus giving the parties less than six months to both conclude discovery on the claims already in the case, and to conduct full discovery on the four additional patent infringement claims. However, trial in this case is not scheduled to begin until June 11, 2007, which should give the parties ample time to conduct additional discovery beyond September 26 without disturbing the trial date. Thus, the court will grant the motion and order the parties to meet and confer regarding an amendment to the court's scheduling order. n1

n1 Synopsys claims that Magma's four additional patents are not sufficiently similar to the technology at issue in this case to justify their inclusion. However, Synopsys merely proposes that "a review of the patents quickly reveals that there is little similarity" among the patents. (D.I. 63 at 8.) In this lay court's opinion, a review of the patents quickly reveals enough similarity among the patents to justify including them in this lawsuit.

[*15]

## V. CONCLUSION

For the reasons stated, the court will deny the motion to dismiss, deny the motion to bifurcate and stay, and grant the motion to amend. The court will further order the parties to meet and confer to regarding an amendment to the court's scheduling order.

Dated: May 25, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

2006 U.S. Dist. LEXIS 33751, *

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The motion to dismiss (D.I. 9) be DENIED;

2. The motion to bifurcate and stay (D.I. 31) be DENIED;

3. The motion to amend (D.I. 50) be GRANTED; and

4. The parties MEET and CONFER regarding the scheduling order.

Dated: May 25, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE