## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **TEXTRON INNOVATIONS INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **C. A. No. 05-486 (GMS)** |
| | ) | |
| **THE TORO COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |


## PLAINTIFF TEXTRON INNOVATIONS INC.'S BRIEF IN SUPPORT OF
## ITS PROPOSED CLAIM CONSTRUCTION


THE BAYARD FIRM

Edmond D. Johnson   (#2257)
Peter B. Ladig (#3513)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19801
Telephone :  (302) 655-5000
Facsimile:  (302) 658-6395


OF COUNSEL:


Scott L. Robertson
Christopher C. Campbell
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone:  (202) 955-1500


Attorneys for Plaintiff
Textron Innovations Inc.

**TABLE OF CONTENTS**

Page

I.     STATEMENT OF FACTS ...............................................................................1

II.    SUMMARY OF ARGUMENT .......................................................................3

III.   GENERAL CLAIM CONSTRUCTION PRINCIPLES.......................................4

    A.    The Federal Circuit Has Reaffirmed The Paramount Importance Of
        Intrinsic Evidence .............................................................................4

    B.    The Claim Language Defines The Metes And Bounds Of The
        Inventions..........................................................................................5

    C.    Claim Terms Generally Should Be Given Their Ordinary And
        Customary Meaning............................................................................5

    D.    The Claims Must Be Read In View Of The Specification............................6

    E.    Limitations May Not Be Read From The Specification Into The
        Claims ..............................................................................................7

    F.    The Prosecution History May Be Helpful In Construing Claims................9

    G.    Extrinsic Evidence, Including Expert And Inventor Testimony, Is
        Less Significant Than Intrinsic Evidence In Construing The Claims........10

IV.   THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT ......................11

    A.    "Gang-Type Rotary Lawn Mower" Is A Claim Limitation, and
        Should Be Given Its Ordinary And Customary Meaning..........................12

    B.    "Front And Rear Wheels" Should Be Given Its Ordinary And
        Customary Meaning..........................................................................15

    C.    "Rotary Cutting Deck Assembly" Should Be Given Its Ordinary And
        Customary Meaning..........................................................................16

    D.    "Mounted On The Frame" Should Be Given Its Ordinary And
        Customary Meaning..........................................................................19

    E.    "Deck Defining A Downwardly Opening Space" Should Be Given Its
        Ordinary And Customary Meaning ...................................................24

    F.    "Roller Extends Across Substantially The Entire Width Of The
        Deck" Is Not Indefinite, And Should Be Given Its Ordinary And
        Customary Meaning..........................................................................25

    G.    "Lifting Arm" Should Be Given Its Ordinary And Customary
        Meaning ..........................................................................................27

    H.    "Side Plates" Should Be Given Its Ordinary And Customary Meaning....30

    I.    "Rear Roller Extends Between The Side Plates And Supports The
        Side Plates For Movement Over The Ground" Should Be Given Its
        Ordinary And Customary Meaning ...................................................32

i

J.  "Each Rear Deck Assembly Being Aligned With A Respective Gap Between Adjacent Front Deck Assemblies" Should Be Given Its Ordinary And Customary Meaning ............................................................34

K.  "Roller" Should Be Given Its Ordinary And Customary Meaning ...........36

V.  CONCLUSION..........................................................................................................37

## TABLE OF AUTHORITIES

**Cases:**

*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 1042 (1984)..................................................................................................35

*Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997) .............................................5

*Catalina Marketing International v. Coolsavings.com*, 289 F.3d 801 (Fed. Cir. 2002) ...............................................................................................................................14

*Chimie v. PPG Industrial, Inc.*, 402 F.3d 1371 (Fed. Cir. 2005).....................................9, 13

*Dow Chemical Co. v. U.S.*, 226 F.3d 1334 (Fed. Cir. 2000) ................................................6

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997) .......................................35

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed. Cir. 2004)..................................................................................................4, 5, 6, 8

*Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) .........8

*Lampi Corp. v. America Power Products, Inc.*, 228 F.3d 1365 (Fed. Cir. 2000)................9

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)..........................................................................................4, 5, 6, 8, 9

*McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110 (1895)................................................5, 8

*Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2001) ................6

*Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364 (Fed. Cir. 2005) ...............................................................................................................................8

*Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir. 1998)....................................................26

*Pfizer, Inc. v. Teva Pham. USA Inc.*, 429 F.3d 1364 (Fed. Cir. 2005)..................................8

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ............................................ *passim*

*Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) ..................8

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 (Fed. Cir. 2002)..............................8

*Southwall Techs., Inc. v. Cardinal ID Co.*, 54 F.3d 1570 (Fed. Cir. 1995), cert. denied, 116 S.Ct. 515 (1995) ..........................................................................................13

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)...............................11

*Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116 (Fed. Cir. 2002) .....................................26

*Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ..................4, 5, 6, 7

*Vivid Technologies, Inc. v. American Science and Engineering, Inc.*, 200 F.3d 795 (Fed. Cir. 1999)..............................................................................................................6

*White v. Dunbar*, 119 U.S. 47 (1886) ............................................................................5, 8

*York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568 (Fed. Cir. 1996)................................................................................................................26

**Statutes:**

35 U.S.C. §112 ............................................................................................................29

## I.  STATEMENT OF FACTS

United States Patent Nos. 6,047,530 ("the '530 patent"), 6,336,311 ("the '311 patent") and 6,336,312 ("the '312 patent") (collectively, "the Textron Patents") generally relate to golf course mowing equipment.  Golf courses are often meticulously maintained to provide a consistent playing surface and promote the aesthetic appearance of the course.  Various specialized pieces of equipment have been developed to meet the sometimes conflicting goals of providing fast mowing, aesthetic quality, and low equipment maintenance.

The Textron Patents are directed to a gang type rotary mower used to cut golf course roughs.[1]  Examples of the mower and cutting deck disclosed in the Textron Patents are depicted in Figure 1 (top view of mower and cutting decks) and Figure 2 (close-up view of cutting deck) of the '530 Patent, reproduced below.



---

[1] Copies of the '530, '311 and '312 patents are attached hereto as Exhibits 1, 2 and 3, respectively, and copies of the patent's prosecution histories are attached as Exhibits 10, 11 and 12, respectively.  The '530 patent and the '311 patent share a common disclosure, and the '312 patent is a continuation-in-part of the '311 patent.  Citations are provided solely to the '530 patent where the same disclosure is repeated in the other patents.  For simplicity, references to the specification, *e.g.*, "1:6-20", are in "column:line number" format.

The mower depicted in Figure 1 includes three forward cutting decks 34 positioned in a front row 26 and two rear cutting decks 34 positioned in a rear row 30. The cutting decks in the front row 26 — three are shown in Figure 1 — have gaps between them. And the cutting decks in the rear row 30 — two are shown in Figure 1 — have gaps between them. The cutting decks in the rear row 30 are positioned between the wheels 14, 16 and aligned with the gaps between the decks in the front row 26. A rear roller 58 (*see* Figure 2) extends across substantially the entire width of the cutting decks.

Prior to the present inventions, golf course mowing machines were incapable of performing highly-efficient rough cutting (relatively fast cutting operations with relatively low equipment maintenance) while also providing the aesthetic benefit of "striped" grass in the roughs. Confronted with this challenge, the inventors developed a gang-type frame-mounted rotary mower that could mow roughs while still offering the maintenance benefits of rotary mowers, could follow the undulations of typical roughs without scalping or high spots, and could provide greater striping capability than typical rotary mowers.

The commercial products embodying the invention have enjoyed tremendous commercial success in the marketplace, and were quickly copied by several competitors, one of which is The Toro Company ("Toro"). In this patent infringement case, Plaintiff, Textron Innovations Inc. ("Textron"), accuses Toro of infringing the Textron Patents. Prior to determining the question of infringement, the Court must construe the disputed claim limitations. The Parties' proposed constructions were previously submitted to the Court in the Parties' Joint Claim Construction Statement Table ("JCCS") (attached as

Exhibit 13), which was attached to the Joint Claim Construction Statement filed July 21,

2006. Textron submits this memorandum in support of its Proposed Claim Construction.

## II.    SUMMARY OF ARGUMENT

All of the limitations of the Textron Patents should be given their ordinary and

customary meanings. Textron relies upon the intrinsic evidence, namely the claims, the

specifications, and the prosecution histories of the Textron Patents to support its

constructions for the disputed claim limitations. These constructions are confirmed by

Richard Parish, PhD, PE, an expert in agricultural equipment and machinery, including

lawn mowers, who testifies that the claim limitations are used in accordance with their

ordinary and customary meanings. *See* Parish Declaration, Exh. 4, at ¶ 34 ("Parish

Decl."). As explained in detail in the following discussions, Textron relies upon the

following legal propositions in support of its proposed claim constructions:

1. The Court first looks at the words of the claims to define the scope of the patented invention. *See, e.g., Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

2. The words of a claim are generally given their ordinary and customary meaning, that is, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).

3. The claims must be read in view of the specification, of which they are a part. *Phillips*, 415 F.3d at 1315 (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)).

4. Although the specification may describe very specific embodiments of the invention, the claims are not confined to those embodiments. *Phillips,* 415 F.3d at 1323 (citing *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005)).

5. The patent's prosecution history may inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be. *Phillips,* 415 F.3d at 1317 (citing *Vitronics,* 90 F.3d at 1582-83).

6. Extrinsic evidence may be useful to shed light on the relevant art, but it is less significant than the intrinsic record in determining the legally operative meaning of claim language. *Phillips*, 415 F.3d at 1317 (citations omitted).

## III.  GENERAL CLAIM CONSTRUCTION PRINCIPLES

### A.  The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence

The Federal Circuit recently revisited the applicable principles of claim

construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). This

*en banc* decision expressly reaffirmed the court's previous holdings in *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

(1996), *Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576 (Fed. Cir. 1996), and

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed.

Cir. 2004). *Phillips*, 415 F.3d at 1312 ("What we said in those cases bears restating, for

the basic principles of claim construction outlined there are still applicable, and we

reaffirm them today."); *see also id.* at 1324 ("Today, we adhere to that approach and

reaffirm the approach to claim construction outlined in that case [*Vitronics*], in *Markman*,

and in *Innova*.").

The *Phillips* court confirmed that the most probative evidence of the meaning of a

patent claim term is found primarily in the intrinsic record, *i.e.*, the claims themselves,

the specification, and to a lesser extent, the prosecution history. *See id.* at 1312-17.

Extrinsic evidence, such as dictionaries and treatises, may still be considered, but are

generally disfavored as a means of interpreting claim terms. *See id.* at 1317-19.

Furthermore, the court reaffirmed those holdings admonishing against any claim

construction that attempts to limit the scope of the claims by the number of embodiments

described in the specification. *See id.* at 1323-24.

**B.    The Claim Language Defines The Metes And Bounds Of The Inventions**

The Federal Circuit in *Phillips* set forth clear guidance for the claim construction process. The analysis begins with the words of the claim. *Phillips*, 415 F.3d at 1312 ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (citing *Innova,* 381 F.3d at 1115); *see also Vitronics,* 90 F.3d at 1582 ("we look to the words of the claims themselves ... to define the scope of the patented invention"); *Markman,* 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). Relying upon Supreme Court precedent, *Phillips* emphasized the "primary importance" of the claims in determining "precisely what it is that is patented." *Phillips*, 415 F.3d at 1312 (citing *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)). "Because the patentee is required to define precisely what his invention is," the court explained, "it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *Id.* at 1312 (citing *White v. Dunbar*, 119 U.S. 47, 52 (1886); also citing *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim ... , we should never know where to stop")); *see also Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("the language of the claim frames and ultimately resolves all issues of claim interpretation.").

**C.    Claim Terms Generally Should Be Given Their Ordinary And Customary Meaning**

The Court in *Phillips* reaffirmed that "the words of a claim are generally given their ordinary and customary meaning," *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415

F.3d at 1312-13 (citing *Vitronics*, 90 F.3d at 1582; *Innova*, 381 F.3d at 1116); *see also*

*Vivid Technologies, Inc. v. American Science and Engineering, Inc.*, 200 F.3d 795, 804

(Fed. Cir. 1999) ("patents are written by and for skilled artisans"). A person of ordinary

skill in the art is deemed to read the claim term not only in the context of the particular

claim in which the disputed term appears, but in the context of the entire patent, including

the other claims and the specification. *Phillips*, 415 F.3d at 1313. The Court continued:

> Other claims of the patent in question, both asserted and
> unasserted, can also be valuable sources of enlightenment
> as to the meaning of a claim term. Because claim terms are
> normally used consistently throughout the patent, the usage
> of a term in one claim can often illuminate the meaning of
> the same term in other claims. Differences among claims
> can also be a useful guide in understanding the meaning of
> particular claim terms. For example, the presence of a
> dependent claim that adds a particular limitation gives rise
> to a presumption that the limitation in question is not
> present in the independent claim.[2]

*Id.* at 1314-15 (citations omitted). In other words, limitations from dependent claims

generally should not be read into independent claims.

## D.     The Claims Must Be Read In View Of The Specification

After stressing the "primary importance" of the claims themselves, *Phillips* added

that "[t]he claims, of course, do not stand alone"; rather they "must be read in view of the

specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citing *Markman*, 52

F.3d at 978). "[T]he specification is 'highly relevant to the claim construction analysis.

---

[2] This doctrine, known as the doctrine of claim differentiation, is a canon of claim construction that holds that a broader scope should be given to a claim that uses a more general term than a dependent claim using a more specific term; otherwise, such a dependent claim would be superfluous. *See generally Mycogen Plant Science, Inc. v. Monsanto Co.*, 243 F.3d 1316, 1329 (Fed. Cir. 2001); *Dow Chem. Co. v. U.S.*, 226 F.3d 1334, 1341-42 (Fed. Cir. 2000).

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"

*Id.* (quoting *Vitronics*, 90 F.3d at 1582). The court added:

> Consistent with that principle, our cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.

*Id.* at 1316 (citations omitted) (emphasis added).

### E.    Limitations May Not Be Read From The Specification Into The Claims

While emphasizing the importance of the specification in claim construction,

*Phillips* warned against the "danger of reading limitations from the specification into the

claim." *See Phillips*, 415 F.3d at 1323. Indeed, the Federal Circuit has repeatedly

cautioned courts not to use the specification to construe the claims in a manner

inconsistent with their plain language. As the court explained in *Innova*:

> Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express. The context may, undoubtedly, be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim; but not for the purpose of changing it, and making it different from what it is. ***The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms***. This has been so often expressed in the opinions of this court that it is unnecessary to pursue the subject further.

*Innova*, 381 F.3d at 1117 (quoting *White,* 119 U.S. at 51-52) (emphasis added); *see also Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1333-44 (Fed. Cir. 2001) (reversing various claim constructions of district court for importing limitations from specification into patent claims); *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("we do not permit courts to redraft claims"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). Indeed, this has been the law for more than one hundred years. *See, e.g., McCarty,* 160 U.S. at 116 ("We know of no principle of law which would authorize us to read into a claim an element which is not present … The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim …, we should never know where to stop.").

The Federal Circuit has also repeatedly admonished against any claim construction exercise that attempts to limit the scope of the claims by the number of embodiments described in the specification. *See, e.g., Pfizer, Inc. v. Teva Pham. USA Inc.,* 429 F.3d 1364, 1374 (Fed. Cir. 2005) (refusing to limit interpretation of claim limitation to the disclosed preferred embodiment); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"); *Innova*, 381 F.3d at 1117 ("even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359 at 1366 (Fed. Cir.

8

2002) (accused infringer may not narrow claim term's ordinary meaning "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history"); *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("[i]t is a familiar principle of patent law that a claim need not be limited to a preferred embodiment").

The *Phillips* court reaffirmed this basic tenet of claim construction. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

## F.    The Prosecution History May Be Helpful In Construing Claims

In addition to consulting the specification, *Phillips* instructs that a court "should also consider the patent's prosecution history, if it is in evidence."[3] *Id.* at 1317 (citing *Markman*, 52 F.3d at 980). "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317 (citations omitted); *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotation marks omitted). The *Phillips* Court cautioned, however, against relying too heavily on the prosecution history: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the

---

[3] The prosecution history consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent. *See Phillips, supra* at 1317.

applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1317 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1380-82 (Fed. Cir. 2002)) (the ambiguity of the prosecution history made it less relevant to claim construction).

> G.    **Extrinsic Evidence, Including Expert And Inventor Testimony, Is Less Significant Than Intrinsic Evidence In Construing The Claims**

Importantly, *Phillips* signaled a shift away from excessive reliance on the extrinsic record, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips,* 415 F.3d at 1317. The court explained, "while extrinsic evidence can shed useful light on the relevant art, we have explained that it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (citations omitted). The court listed a number of reasons why extrinsic evidence in general is less reliable than the intrinsic record in construing claim terms. *Id.* at 1318-19. In particular, the court highlighted the dangers inherent in placing too much emphasis on dictionaries and treatises to construe claim terms:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* at 1321. The court concluded, "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

## IV.    THE PROPER CONSTRUCTION OF THE PATENTS IN SUIT

The parties have identified eleven claim limitations in dispute. As explained below, the majority of the limitations in dispute are simple, straightforward, and used in accordance with their ordinary and customary meaning. These limitations are written in everyday terms that will be readily understood by the jury with no clarification by the Court, and therefore it is unnecessary for the Court to provide any claim construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."). While the terms are all used in accordance with their ordinary and customary meaning, in some cases, it may be helpful to explain to the jury the meanings of terms specific to the art of turf maintenance vehicles, such as "gang-type rotary mower" and "rotary cutting deck assembly."

In contrast, Toro seeks improper, results-oriented constructions for the disputed limitations. Primarily, Toro asks the Court to disregard the ordinary and customary meaning of the words of the claims in favor of interpretations that strictly limit the invention to cover only mirror images of the disclosed exemplary embodiments of the

invention. Toro's approach is contrary to law, an invitation to reversible error, and should be rejected.

**A.    "Gang-Type Rotary Lawn Mower" Is A Claim Limitation, and Should Be Given Its Ordinary And Customary Meaning**

All but one of the independent claims at issue are directed to a "gang-type rotary lawn mower."[4] The remaining independent claim[5] is for a "cutting deck assembly for a gang-type rotary lawn mower." "Gang-type rotary lawn mower" is a limitation of the claims because it is described in the specification as being critical to the invention, was relied upon to distinguish the claims at issue over the prior art, and provides antecedent basis for claim limitations in the body of the claim. *See* Parish Decl., Exh. 4 at ¶ 35.

From the very outset, the Textron Patents distinguish the inventive mower from various types of prior art mowers, such as reel mowers and tow-behind gang mowers, which were understood to be unsuitable or undesirable for certain mowing operations. *See* Exh. 1 at 1:6-20. Furthermore, the Textron Patents describe the invention in the context of gang-type rotary mowers having multiple separate rotary cutting decks attached to the frame, as opposed to being towed behind the vehicle. *Id.* at 1:4-5, 1:22-23, 1:38-44; 2:64-3:5; and Fig. 1. During prosecution, these distinctions were critical to overcome various prior art references. For example, the claims at issue distinguish over tow-behind gang mowers, reel mowers, and walk-behind mowers based in part on the fact that the claims recite a frame-mounted gang of rotary cutting decks. *See* Amendment of Apr. 29, 1999 at 5-6 (Paper no. 11) at 5-6 ("Claim 1 has been amended to emphasize

---

[4] '530 Patent Claim 1; '311 Patent Claims 1, 2 and 10; and '312 Patent Claims 1 and 24.

[5] '312 Patent Claim 19.

the fact that Applicant's invention is a frame-mounted, gang-type, single-blade rotary deck mower...") (attached as Exhibit 5[6]); *see also,* Amendment of Nov. 4, 1999 (Paper no. 15) at 1-2 (attached as Exhibit 6); *and* Declaration Under Rule 132 dated Nov. 4, 1999 (Paper no. 14) at ¶ 4 (attached as Exhibit 7). Because the applicant expressly defined its invention as a "gang-type rotary mower" and the Patent Office relied upon this distinction over prior art mowers, "gang-type rotary lawn mower" is a limitation of the claims. *See, e.g., Southwall Techs., Inc. v. Cardinal ID Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995), *cert. denied,* 116 S.Ct. 515 (1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution."); *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.") (internal quotation marks omitted).

Furthermore, the "gang-type rotary lawn mower" limitation in the preamble provides an antecedent basis for claim terms that follow. *See, e.g.,* Exh. 1, Claim 1 ("A gang-type rotary lawn mower comprising ... a steering system enabling the operator to steer *the lawn mower*...") (emphasis added); *see also,* Exh. 2, Claims 1, 2 and 10; *and* Exh. 3, Claims 1 and 24. This is particularly true in the case of '312 patent Claim 19: "A cutting deck assembly for *a gang-type rotary lawn mower having a frame*, the cutting deck assembly comprising: ... a lifting arm adapted to pivotally interconnect said cutting deck assembly *and the frame*." Exh. 3 at 9:32-10:5 (Claim 19). If these preambles are

---

[6] The markings in Exhibit 5 and elsewhere in the prosecution history documents are original markings as found in the Patent Office's official file wrapper.

not limitations, the same terms appearing later in the claims lack antecedent basis. The preamble recitations are thus properly construed as claim limitations. *See Catalina M'ktg Int'l v. Coolsavings.com,* 289 F.3d 801 at 808 (Fed. Cir. 2002) ("dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention").

From the foregoing, it is clear that "gang-type rotary lawn mowers" is not just surplusage, but a necessary limitation that gives life, meaning and vitality to the claims. *See Catalina M'ktg,* 289 F.3d at 808 ("[i]n general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim"). If further clarification of this claim limitation is required, in keeping with the ordinary and customary meaning, Textron proposes that the limitation be construed simply as "a lawn mower having a rotary gang-type mower configuration."

In contrast, Toro disagrees that the phrase "gang-type rotary lawn mower" is a limitation. *See* JCCS, Exh. 13 at 1. However, Toro appears to ignore the importance of this limitation in the Textron Patent specifications and prosecution histories, and overlooks that this element is necessary to provide antecedent basis for other claim limitations. Furthermore, Toro's proposed construction of the limitation is critically flawed. Toro argues that it should be construed as "[a] mower having at least two cutting devices of the rotary type," but this completely eliminates the "gang-type" limitation. "Gang-type rotary mowers" have multiple independent rotary cutting deck assemblies. *See* Parish Decl., Exh. 4 at ¶ 37. Toro's interpretation would appear to cover a conventional non-gang rotary mower having a single cutting deck with two rotary cutters,

and no other cutting decks. This would not be a "gang-type mower" at all, because it would not have multiple decks. *Id.*.

**B.      "Front And Rear Wheels" Should Be Given Its Ordinary And Customary Meaning**

Claim 1 of the '530 patent and claims 2 and 10 of the '311 patent recite a gang-type rotary lawn mower having a frame supported by "front and rear wheels." This limitation has a plain and ordinary meaning that will be readily grasped by the jury. The word "wheels" indicates that there are at least two wheels. *Id.* at ¶ 38. The words "front" and "rear" indicates that the claimed "wheels" must be located at the front and rear of the vehicle. *Id.* Because there are at least two wheels, and because they must be located at the front and the rear of the vehicle, there must be at least one front wheel, and at least one rear wheel. *Id.* For example, a bicycle has "front and rear wheels." If the Court determines that the jury would benefit from clarifying this limitation, in keeping with the ordinary and customary meaning, Textron believes that the proper interpretation of this limitation should be "at least one front wheel and at least one rear wheel."

This construction is consistent with the ordinary meaning of the limitation, and the manner in which the limitation is used in the patent claims. *Id.* at ¶ 39. For example, the '530 patent discloses an embodiment of the invention having a frame (12) supported by two front wheels (14) and two rear wheels (16). *See, e.g.,* Exh. 1 at 2:45-48, and Fig. 1. These embodiments are exemplary, *id.* at 2:25-34, and do not limit the plain meaning of the claim limitations. *Phillips,* 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.")

In contrast, Toro seeks to construe "front and rear wheels" to mean "[a]t least two front wheels and at least two rear wheels." JCCS, Exh. 13 at 4. Toro appears to find alleged support for this construction in the fact that the '530 patent discloses a four-wheeled vehicle, and that claim 2 of the '530 patent narrows this limitation to recite plural rear wheels. *Id.* at 4-6. However, there is no basis for narrowing the plain language of the claim limitations to cover only the illustrated embodiments, and claim 2 merely further limits the recitation of "front and rear wheels" to require plural rear wheels. Toro's construction should be rejected as an improper attempt to confine the claims to the specific embodiments of the invention disclosed in the patent specifications.

## C.   "Rotary Cutting Deck Assembly" Should Be Given Its Ordinary And Customary Meaning

The Textron Patents use the limitation "rotary cutting deck assembly" according to its ordinary and customary meaning in the art — namely, to describe a cutting deck assembly that has a rotary blade, as distinguished from a reel blade. *See* Parish Decl., Exh. 4 at ¶ 41. This is consistent with the use of the limitation in the Textron Patents, which all describe cutting deck assemblies that have "rotary" blades that rotate in a plane and about a generally vertical axis, as opposed to "reel" blades, which rotate in a cylindrical manner and about a generally horizontal axis. *See, e.g.*, Exh. 1 at 1:4-5, 1:6-20 (distinguishing invention from reel mowers), 1:22-56, 3:45-65, and Figs. 2-6 (showing cutting deck assembly with blade sets (92, 96) that rotate about a generally vertical axis). This distinction is abundantly clear to those of ordinary skill in the art. *See* Parish Decl., Exh. 4, ¶ 41 Furthermore, this distinction was recognized throughout the prosecution of the Textron Patents. *See, e.g.*, Office Action of Apr. 13, 1998 (Paper no. 4) at 5 (Examiner acknowledging distinction between reel and rotary cutters) (attached as

Exhibit 8); Office Action of Jan. 29, 1999 (Paper no. 10) at 2-3 (same) (attached as Exhibit 9); Exh. 6 at 2 (Applicant distinguishing claimed rotary mower from reel mowers).

While the distinction between a "rotary" cutting deck assembly and a "reel" cutting deck assembly is abundantly clear to one of ordinary skill in the art, in keeping with the ordinary and customary meaning, Textron proposes that the jury be instructed that "rotary cutting deck assembly" (and variations thereof) means "a cutting deck assembly that has a rotary blade, as distinguished from a reel blade." *See* Parish Decl., Exh. 4 at ¶ 41. If further required, Textron also suggests that the Court explain that rotary blades rotate about a generally vertical axis, and reel blades rotate about a generally horizontal axis.

Toro does not appear to disagree that the limitation "rotary cutting deck assembly" requires rotary-type cutting devices, as opposed to reel-type cutting devices. Rather, Toro contends that this limitation includes a host of other limitations, some of which are redundant (and thus, unnecessary), and some of which are nothing more than an attempt to import unclaimed features of the exemplary embodiments of the invention. Namely, Toro seeks to interpret "rotary cutting deck assembly" to mean "a cutting unit having [i] laterally-spaced, generally vertically-extending side plates, [ii] a cross member, [iii] front wheels supporting the side plates, [iv] a rear roller extending between and supporting the side plates, and [v] a single spindle rotary deck mounted between the side plates." These additional limitations are not in keeping with the ordinary and customary of the limitation "rotary cutting deck assembly." *Id.* at ¶ 42.

Toro's proposed interpretation is curious at best, and clearly results-oriented. The added features of [i] "laterally-spaced, generally vertically-extending side plates"; [iii] "front wheels supporting the side plates," and [iv] "a rear roller extending between and supporting the side plates" do not appear in *any* independent claim of the Textron Patents. Rather, these limitations actually appear in various *dependent* claims. *See*, *e.g.*, Exh. 1 at 5:10-22 (Claim 4); Exh. 2 at 5:23-35 (Claim 4), and 6:39-51 (Claim 12). Toro's attempt to read these limitations into the "rotary cutting deck assembly" limitation would cause the later specific recitations of the very same limitations in the dependent claims to be completely redundant. *See Phillips*, 415 F.3d at 1314-1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim") (citations omitted).

Furthermore, Toro's assertion that the limitation "rotary cutting deck assembly" also requires the deck assembly to be a "single spindle rotary deck" also renders other claim terms within the independent claims redundant. For example, '530 patent claim 1 and '311 patent claim 1 both specifically recite that the "rotary cutting deck assemblies" comprise a "single-spindle cutting deck" separately and apart from the recitation of the "rotary cutting deck assembly." Thus, if the limitation "rotary cutting deck assembly" already includes the imported "single spindle" limitation as Toro advocates, the separate specific recitation of the "single spindle" feature would be superfluous. Furthermore, the "single spindle" requirement does not even appear in independent claims 2 and 10 of the '311 patent, or independent claims 1 and 24 of the '312 patent. Instead, these claims recite "at least one cutting blade mounted on a spindle," *see, e.g.*, Exh. 2 at 5:13-14, but they say nothing about the *number* of spindles. Thus, Toro's proposed construction finds

no support in the actual claim terms used to describe the invention. *See* Parish Decl.,

Exh. 4 at ¶ 43.

Toro's proposed interpretation also attempts to import the "cross member" of the

exemplary embodiments into the claims. The "cross member," element 128 in Fig. 2 of

the '530 patent, is used to mount the cutting deck assemblies to the vehicle frame. *See,*

*e.g.*, Exh. 1 at 1:62-2:3, 4:7-19, and Figs. 2, 3 and 5. Notably, the "cross member" is not

recited in any of the claims at issue, and thus does not limit the claims at issue. *Compare*

Exh. 1 at 5:62-67 (unasserted '530 patent Claim 7, in which a "cross member" is

claimed) *with id.* at 4:41-67 ('530 patent Claim 1, in which *no* "cross member" is

claimed). The fact that "cross member" is written into various unasserted claims, but not

the claims presently asserted against Toro, demonstrates that the claims at issue do not, in

fact, include this limitation. *See Phillips*, 415 F.3d at 1314-1315.

### D.    "Mounted On The Frame" Should Be Given Its Ordinary And Customary Meaning

Toro seeks to interpret the limitation "mounted on the frame," which describes

how the deck assemblies are mounted on the frame, and variations thereof. This

limitation appears in '530 patent claim 1, '311 patent claims 1, 2 and 10, and '312 patent

claims 1 and 24.[7] This limitation is simple and straightforward, and used in accordance

with its ordinary and customary meaning. *See* Parish Decl., Exh. 4 at ¶ 45. While

Textron believes that there is no need for the Court to define this term for the jury, if the

Court does determine that clarification is necessary, in keeping with the ordinary and

---

[7] "Mounted on the frame" appears in '530 Patent claims 1 and 2, and '311 Patent claim 1;
"mounted on said frame" appears in '311 Patent claims 2, 7 and 10, and '312 Patent claims 1 and
24; and "mounted to said frame" appears in '311 Patent claim 10, and '312 patent claim 12.

customary meaning, Textron contends that "mounted on the frame" should be construed as "connected to the frame." *See id.* at ¶ 48.

Textron's proposed construction is consistent with the use of the limitation "mounted on the frame," and the related term "mounted on," as they are used throughout the specification, and commonly used by those of ordinary skill in the art. *See id.* at ¶ 45. For example, the '530 patent describes and claims that a power source, an operator's seat, and front and rear cutting deck assemblies are all "mounted on the frame":

> A gang-type rotary lawn mower including ... a power source which is *mounted on the frame* ... an operator's seat *mounted on the frame* ... front rotary cutting deck assemblies *mounted on the frame* ... rear rotary cutting deck assembly *mounted on the frame*....

Exh. 1, Abstract (emphasis added); 1:38-44. The '530 patent specification illustrates the power source (18) and operators seat (20) being joined to the frame without any discernable moveable relationship between the parts. *See* Exh. 1 at Fig. 1, and 2:52-63.[8] The power source and operator's seat are also specifically *claimed* as being "mounted on the frame." *See, e.g.,* Exh. 1 at 4:44 (Claim 1 reciting "a power source which is mounted on the frame") and 4:46 (Claim 1 reciting "an operator's seat mounted on the frame").

In contrast, the front and rear cutting deck assemblies (34) are described and illustrated as being "mounted on the frame" by way of "lifting arms" (112). *See id.,* at 1:34-37, 1:57-65, 3:66-4:11, and Figs. 1-5. The independent claims do not recite the "lifting arm" limitation, but various dependent claims do. *See, e.g., id.* at 5:5-9 (Claim 3 reciting "A lawn mower as set forth in claim 1 wherein each deck assembly is *connected*

---

[8] The details of how these parts can be attached would be understood by a person of ordinary skill in the art, *See* Parish Decl., Exh. 4 at ¶ 44, and therefore are not required in the specification.

*to the frame by a respective lifting arm* operable to lift the associated deck assembly relative to the frame ...") (emphasis added); *see also,* Exh. 2 at 5:18-22 (Claim 3) and 6:34-38 (Claim 11); Exh. 3 at 9:17-22 (Claim 14). In the exemplary embodiment illustrated in the '530 and '311 patents, each deck assembly has its own lifting arm, and the lifting arms are configured to lift the decks assemblies relative to the frame, and allow pivoting movement about three mutually perpendicular axes. *See* Exh. 1, Fig. 2. The '312 patent adds another exemplary embodiment in which the lifting arms are configured to lift the decks relative to the frame, but only allow pivoting about perpendicular horizontal axes, and not the vertical axis. *See* Exh. 3 at 5:66-6:19, and Figs. 9 and 10. Again, these embodiments are exemplary. *See, e.g.,* Exh. 1 at 2:25-34; *and* Exh. 3 at 3:3-12.

The Textron Patents also use the term "mounted on" to describe and claim various other connections between the various parts of the mower. For example, the '530 patent describes, illustrates and claims cutting blades "*mounted on* the spindle for rotation therewith." Exh. 1, Abstract, 3:51-52, 4:62-64 (Claim 1) and Fig. 4. The cutting blades are rigidly fixed to the rotating spindle, and therefore "mounted on" is used to describe a rigid connection between parts. In addition, the '530 patent describes the cutting deck assemblies as having a cutting deck "*mounted on* the side plates 46 and 48 such that the height of the deck 38 relative to the ground is adjustable." *Id.* at 3:22-24 (emphasis added); *see also id.* at 1:50-54 and Figs. 2-6. The '530 patent claims this arrangement in dependent claim 4. *See id.* at 5:10-22 ("...the associated deck is located between the side plates and in front of the roller and is *mounted on* the side plates such that the height of the deck relative to the ground is adjustable...") (emphasis added). The term "mounted

21

on" is thus also used to describe parts that are connected such that they can be moved or repositioned relative to one another. *See* Parish Decl., Exh. 4 at ¶ 47.

As can be seen from the foregoing examples, the terms "mounted on the frame" and "mounted on" are phrases that are used to describe various different manners of connecting parts together, and the patent claims use these terms to describe various different associations between various different elements of the claimed mower. The term "mounted on the frame" is clearly used in the specification and claims in a broad sense to convey that the part "mounted on the frame" is simply connected to the frame in some manner. *See id.* at ¶ 48.

Despite broad import of the limitation "mounted on the frame" as used consistently throughout the Textron Patents, Toro suggests a much narrower interpretation: "attached directly to the frame so that the deck can move vertically relative to the frame and can pivot relative to the frame about three mutually perpendicular axes." JCCS, Exh. 13 at 9. Toro's request is contrary to law, is at odds with the plain and ordinary meaning of this limitation as evidenced by it usage in the Textron Patents, and would render several of the unasserted claims of the '530 patent redundant.

Toro's attempt to read portions of the specification directly into the claims is legally improper. Indeed, the Textron Patents assign no special meaning to the "mounted on the frame" limitation, and do not demonstrate any intention to limit the phrase "mounted on the frame" to require the superfluous features of the specification that Toro would have the Court read into it. *Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Toro's proposed construction is also at odds with how "mounted on the frame" is used in the specification and claims. As explained above, the power source and operator's seat are also described and claimed as being "mounted on the frame." Under Toro's proposed interpretation, the "power source" and "operator's seat" of '530 patent claim 1 must likewise be able to "move vertically relative to the frame and can pivot relative to the frame about three mutually perpendicular axes." *Phillips*, 415 F.3d at 1313 ("claim terms are normally used consistently throughout the patent"). But clearly this is not the case. Toro's construction also fails to comport with how the term "mounted on" is used to describe the connection between other parts, such as the cutting blades being fixedly "mounted on" rotating spindles and the cutting deck assemblies being "mounted on" the side plates to allow vertical adjustment, but not relative pivoting movement.

Toro's proposed construction also fails under the doctrine of claim differentiation. For example, unasserted claim 7 of the '530 patent recites that the cutting deck assemblies are "mounted on the frame," Exh. 1 at 5:47-48, and 5:51-52, then *further* recites that the deck assemblies are mounted with structure to provide pivotal movement about "a generally vertical axis," "a generally horizontal axis extending in the forward-rearward direction," and "a generally horizontal, laterally-extending axis" — that is, about three mutually perpendicular axes. *Id.* at 5:62-6:16. Because Toro's interpretation of "mounted on the frame" would already require these three pivoting relationships, the portions of claim 7 that recite pivotal movement about the three perpendicular axes would be superfluous and unnecessary. For this additional reason, Toro's interpretation is legally incorrect. *See Phillips*, 415 F.3d at 1314-1315.

E.    **"Deck Defining A Downwardly Opening Space" Should Be Given Its Ordinary And Customary Meaning**

Toro also asks the Court to interpret the limitation "deck defining a downwardly opening space." Once again, this limitation is simple, straightforward, and used consistently with its ordinary and customary meaning, and no further clarification is required by the Court. *See* Parish Decl., Exh. 4 at ¶ 51. If interpretation is required, in keeping with the ordinary and customary meaning, Textron proposes to interpret this limitation as "the deck has a downwardly opening space." This is consistent with the manner in which this limitation is used in the patent specifications: "Each of the cutting deck assemblies 34 includes (see FIGS. 2-5) a single spindle mulching deck 38 defining a downwardly opening space 42 (FIG. 4)." Exh. 1 at 3:6-8, 3:45-47 ("A single spindle 84 (FIG. 4) is mounted for rotation about a generally vertical axis within the space 42 defined by the deck 38.") and Figs. 2-4; Exh. 3 at 5:48-50.

In contrast, Toro seeks to interpret this simple limitation to mean "[a] deck defined by a continuous solid vertical wall of uniform height open at the bottom." JCCS, Exh. 13 at 15. In effect, Toro seeks to limit the deck's "downwardly opening space" to a very particular *kind* of downwardly opening space. Once again, Toro improperly seeks a results-oriented interpretation that strictly limits the patent claims to precisely the structure illustrated in the patent drawings. *Phillips*, 415 F.3d at 1323 ("[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."). A person of ordinary skill in the art would not understand the term "deck defining a downwardly opening space" to

include all of the extraneous limitations put forth in Toro's proposed claim construction. *See* Parish Decl., Exh. 4 at ¶ 52.

Furthermore, the patent Figures are ambiguous with regard to Toro's proposed interpretation. The limited views of the deck shown in the patent Figures do not provide sufficient detail to conclusively determine that the sidewall of the deck is "continuous" or "solid," or that it has a "uniform height." Figures 2, 3 and 5 are obstructed, and Figures 4 and 6 show the deck with a portion of it removed. Furthermore, Toro's apparent reliance on the statements in the Textron Patents that the decks may be "mulching" decks (which, Toro apparently contends, require an extremely specific structure) overlooks the fact that none of the patent claims actually *recite* that the decks are "mulching" decks.

Finally, the Textron Patent specifications do not even use the terms in Toro's suggested construction to describe the decks,[9] so it is curious how Toro developed this proposed construction. At best, Toro simply examined the patent Figures and drafted a new set of limitations for this Court to import into the existing claims to achieve a result-oriented construction, *i.e.,* one that supports its non-infringement position.

F.    **"Roller Extends Across Substantially The Entire Width Of The Deck" Is Not Indefinite, And Should Be Given Its Ordinary And Customary Meaning**

The claim limitation "roller extends across substantially the entire width of the deck" appears in '530 patent claim 1, and a variation of this limitation appears in '311 patent claim 2. In addition, '311 patent claim 10 recites the similar limitation "said roller

---

[9] The words "solid" and "uniform" do not appear in any of the Textron Patents, and the word "continuous" appears only three times in the '312 Patent to describe a continuous roller and a continuous roller stripe, but not to describe the shape of the deck. *See* Exh. 3 at 5:60-65, 7:29-33, and 7:36-38.

extending substantially across the entire width of said cutting path". These limitations are consistent with the patent specifications, which disclose a roller (58) that extends across substantially the entire width of a cutting deck (38). *See, e.g.,* Exh. 1 at 1:54-56, 3:16-21, and Figs. 2, 3 and 5; Exh. 3 at 5:60-65 (describing '312 patent Fig. 9). The use of the word "substantially" does not render the terms indefinite. *See Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1120 (Fed. Cir. 2002) ("It is well established that when the term 'substantially' serves reasonably to describe the subject matter so that its scope would be understood by persons in the field of the invention, and to distinguish the claimed subject matter from the prior art, it is not indefinite."); *Pannu v. Iolab Corp.*, 155 F.3d 1344 (Fed. Cir. 1998) (interpreting "substantially coplanar" as allowing an angle between the two elements up to 10%); *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1572-1573 (Fed. Cir. 1996) ("Ordinarily, ... 'substantially' means 'considerable in ...extent," American Heritage Dictionary Second College Edition 1213 (2d ed. 1982), or 'largely but no wholly that which is specified,' Webster's Ninth New Collegiate Dictionary 1176 (9[th] ed. 1983).")

As will be appreciated by those of ordinary skill in the art at the time of the invention, the '530 patent and '311 patent disclose a roller that extends substantially across the width of the deck to provide a continuous striping effect behind the cutting deck. *See, e.g.,* Exh. 1 at 1:54-56; *see also* Parish Decl., Exh. 4 at ¶ 53. Such a person of ordinary skill in the art would further understand that to provide this continuous striping effect, the roller must extend across substantially the entire width of the deck, but is not required to be exactly as wide as the deck. Parish Decl., Exh. 4 at ¶ 53.

Toro contends that this limitation "is indefinite and not capable of construction," JCCS, Exh. 13 at 17, but does not explain how the term is indefinite. Rather than speculate as to Toro's reasoning, Textron will address this contention in its Reply Brief.

### G.    "Lifting Arm" Should Be Given Its Ordinary And Customary Meaning

"Lifting arm" appears in '530 patent claim 3, '311 patent claims 3 and 11, and '312 patent claims 14 and 19. This limitation is used in accordance with its ordinary and customary meaning, is clear on its face, and needs no further clarification. Parish Decl., Exh. 4 at ¶ 54. Should the Court determine, however, that further clarification is required for the jury, in keeping with the ordinary and customary meaning, Textron proposes the limitation be interpreted as "an arm that is operable to lift at least one cutting deck assembly." *See id.* This interpretation is consistent with the manner in which this term is used in the specification. *Id.*

For example, the '530 patent describes a "lifting arm" that is used to lift the decks vertically relative to the frame. *See* Exh. 1 at 1:34-37, 1:57-62, 3:66-4:7, 4:20-31, and Figs. 1-5. While the embodiment of the lifting arm shown in the '530 patent is L-shaped and is attached by various pivots, the embodiment is exemplary, *see id.* at 2:25-34, and the claims are notably — and intentionally — silent about the details of the "lifting arm." The '312 patent further describes another exemplary embodiment of a "lifting arm" that lifts the a deck relative to the frame, but this additional embodiment has a different shape and various different mounting and pivoting features than the "lifting arm" embodiment of the '530 and '311 patents. *See* Exh. 3 at 5:66-6:7, 6:13-19, and Figs. 9-10. Textron's interpretation is also consistent with the use of "lifting arm" in the claims. For example,

'530 patent claim 3 recites simply that the "lifting arm" is "operable to lift the associated deck assembly relative to the frame." Exh. 1 at 5:5-9 (Claim 3).

Despite the apparent simplicity of the term "lifting arm," Toro yet again seeks to strictly limit the Textron Patents to the precise details of the exemplary embodiments, rather than to the ordinary meaning of the words used in the claims themselves. Toro contends that the simple term "lifting arm" actually means "[i] a generally L-shaped, [ii] horizontally-extending device [iii] having inner and outer ends operable to lift the deck assembly relative to the frame, [iv] the inner end pivotally connected to the frame, [v] the outer end pivotally connected to the deck assembly for pivotal movement about a generally vertical axis and [vi] about a generally horizontal axis extending in the forward-rearward direction." JCCS, Exh. 13 at 22-23. Once again, Toro's invitation to add superfluous limitations to the claims should be rejected.

As with the previous attempts to read the specification into the claims, Toro's approach to claim construction is contrary to law. *Phillips*, 415 F.3d at 1323. Toro's results-oriented interpretation is also inconsistent with the way in which the term "lifting arm" is used in the patent specifications. While the '530 and '311 patents both disclose "lifting arm" embodiments that include a vertical pivot axis, the '312 patent discloses a separate "lifting arm" embodiment that does *not*. *See* Exh. 3 at 5:66-6:7, 6:13-19, and Figs. 9-10. Toro's proposed interpretation thus conflicts with the scope of the patent disclosure.

Toro's proposed construction also improperly renders a number of other patent claims, such as '530 patent claim 17, superfluous. Claim 17 recites, in relevant part, "each of the deck assemblies being connected to the frame by a respective generally L-

28

shaped, horizontally-extending *lifting arm* operable to lift the associated deck assembly relative to the frame." Under Toro's interpretation, there would be no need to specifically recite that the "lifting arm" of claim 17 is "L-shaped" and "horizontally-extending," because these limitations would already exist in the term "lifting arm" and thus these recitations would be superfluous. *Phillips,* 415 F.3d at 1314-1315.

Toro also cites to the '530 patent prosecution history for alleged support for its tightly limited interpretation of the term "lifting arm." Specifically, Toro cites to Paper no. 4 at page 4, and Paper no. 6 at page 12.[10]  *See* JCCS, Exh. 13 at 28. It fact, however, these portions of the prosecution history relate to a 35 U.S.C. §112 rejection of original claims 7-9 and 11-17 based on the Examiner's interpretation of the term "cross member" — a term that does not appear in *any* of the asserted claims.[11]  None of original claims 7-9 and 11-17 even include the term "lifting arm," even after being amended. The term "lifting arm" actually appeared in original claim 10 of the applications leading to the '530 patent, but the Examiner *specifically excluded* this claim from the §112 rejection that Toro apparently contends supports its narrow claim interpretation. *See* Exh. 8 at 4. Toro's reliance upon the prosecution history is thus irrelevant to the proper interpretation of the term "lifting arm."

---

[10]  The Office Action dated April 13, 1998 (Exh. 8), and the Amendment dated July 13, 1998, respectively.

[11]  Claims 7 and 11 originally recited a respective "cross member" (*see* '530 Patent Fig. 2, part 128) that attached each deck assembly to the frame. The Examiner observed that the cross member itself did not attach to the frame, rather "another member (L-shaped arm) connects the cross member to the frame." Exh. 8 at 4. In response, the applicant amended original claims 7 and 11 to recite that the deck is connected to the frame "in part" by the cross member.

**H.    "Side Plates" Should Be Given Its Ordinary And Customary Meaning**

Various claims of the Textron Patents recite the claim term "side plates."[12]  Claim

4 of the '530 patent is exemplary:

> a pair of laterally-spaced, generally vertically-extending
> side plates having forward ends, a first front wheel
> supporting one of the side plates for movement over the
> ground, and a second front wheel supporting the other of
> the side plates for movement over the ground, wherein the
> rear roller extends between the side plates and supports the
> side plates for movement over the ground, wherein the
> associated deck is located between the side plates and in
> front of the roller and is mounted on the side plates such
> that the height of the deck relative to the ground
> is adjustable by changing the position of the deck relative to
> the side plates.

Exh. 1 at 5:11-22 (Claim 4).  Although the "side plate" limitation is claimed alongside

various specific structural features — namely, each "side plate" must be "generally

vertically-extending," and each "side plate" must have a "forward end" — this term is

simple to understand, used according to its ordinary and customary meaning, and does

not require any further clarification.  *See* Parish Decl., Exh. 4 at ¶ 57.  If further

clarification is required, in keeping with the ordinary and customary meaning, Textron

suggests that "side plates" be clarified as "plate-like components on each side of the deck

assembly."  *Id.*

Textron's interpretation is consistent with the manner in which this limitation is

used in the specification, and the ordinary and customary usage of "side plate."  *Id.* at ¶

58.  For example, the '530 patent illustrates "side plates" (46 and 48) formed as plate-like

components on each side of the deck assembly.  *See, e.g.*, Exh. 1 at 1:44-54; 1:65-2:3,

---

[12] '530 Patent claim 4; '311 Patent claims 4 and 12; and '312 Patent claim 19.

3:8-19, 3:22-44, and Figs. 2, 4 and 6. The center of each side plate is provided with mounts for the deck (38), and extensions of the side plate (not numbered) reach forward to the supporting wheels (50), and backward to the supporting roller (58). *Id.* at Figs. 2, 4 and 6.

Conversely, Toro seeks to construe "side plates" to mean "thin, flat pieces of metal laterally-spaced and generally vertically-extending from the rear roller to the front wheels." Toro's proposed interpretation is redundant to the extent that it calls for the side plates to be "laterally-spaced" and "generally vertically-extending," but further Toro seeks to limit the side plates as being "thin, flat pieces of metal" that are generally vertically-extending "from the rear roller to the front wheels."

Once again, Toro's proposed claim interpretation improperly limits the claims to a virtual photograph of the structure shown in the exemplary embodiments. While the exemplary embodiments show side plates that have extensions that reach to the front wheel and roller, the claims do not recite that the side plates must have a particular shape over a particular distance, or be made of a particular material as Toro contends. Rather, the claims more broadly recite that the front wheels and roller "support" the side plates. Any structural configuration in which the front wheels and roller support the side plates would satisfy this limitation, and there is no reason to narrowly construe this limitation to require that the side plates be "generally vertically-extending" the entire distance from the roller to the wheels.

Toro's proposed construction of "side plates" also seeks to restrict the "side plates" to being "flat," but the Textron Patents specifically disclose side plate structures that are not flat. *See* Parish Decl., Exh. 4 at ¶ 61. For example, the '530 patent side

31

plates include "generally horizontal, inwardly-extending ears 69 and 70." Exh. 1 at 3:27-31, and Figs. 2 and 5. The '312 patent also discloses numerous embodiments of side plates that are not "flat," but instead have pronounced curved or right-angle bends in them. *See*, *e.g.*, Exh. 3 at Figs. 14-19 and 23.

Finally, Toro's proposed construction adds confusion by adding the superfluous term "thin." The word "thin" does not appear in the specifications or claims of the Textron Patents.

I.    **"Rear Roller Extends Between The Side Plates And Supports The Side Plates For Movement Over The Ground" Should Be Given Its Ordinary And Customary Meaning**

The limitation "rear roller extends between the side plates and supports the side plates for movement over the ground" is used according to its ordinary and customary meaning, Parish Decl., Exh. 4 at ¶ 63, and a jury will be able to understand this term without further clarification by the Court. The patent specifications and Figures show a rear roller that extends substantially across the entire width of the deck, and is positioned such that the roller would support the side plates above the ground. *See, e.g.*, Exh. 1 at 1:44-56, 3:16-21, and Figs 2, 3 and 5; Exh. 3 at 5:60-65, 6:20-33, 6:66-7:5, 7:13-21, 7:53-58, 7:59-67, and Figs. 1-9, 11-20 and 22-23. If the Court believes further clarification is required, in keeping with the ordinary and customary meaning, Textron suggests interpreting this limitation to mean "the rear roller extends between the side plates in such a way to support them for movement over the ground." *See* Parish Decl., Exh. 4 at ¶ 63.

By contrast, Toro seeks to construe this term to mean "[e]ach end of the rear roller is connected to a respective side plate." *See* JCCS, Exh. 13 at 33. Toro's proposed construction completely eliminates the requirement that the roller "supports the side

32

plates for movement over the ground." According to Toro's proposed construction, any roller that is connected at its ends to the side plates would satisfy this limitation, regardless of whether the roller supports the side plates for movement over the ground or not. Toro's proposed construction also adds the results-oriented additional limitation that "each end" of the roller be connected to a side plate. While the rollers may be connected at their ends to the side plates, Toro's interpretation improperly imports limitations into the claims. *Phillips*, 415 F.3d at 1323.

Finally, Toro's proposed construction incorporates the term "connected to," which is not found anywhere in the limitation at issue. The term "connected to" broadly describes any sort of connection, and is used in the Textron Patents in this broad sense to encompass, for example, moveable connections, pivoting connections, direct connections, connections by way of intermediate parts, and so on. *See, e.g.,* Exh. 1 at 5:5-9 (decks "connected to" the frame by way of moveable lifting arms); 6:1-8 (end of the "cross member" being "connected to" the side plates for pivotal movement); 5:23-25 (hydraulic motor drivingly "connected to" spindle); 2:56-57 (hydraulic motors drivingly "connected to" wheels); and 5:62-64 (deck assembly "connected to" the frame "in part" by a cross member "connected to" the frame). "Connected to" should not be imported into a claim limitation that is already abundantly clear.

33

**J.**    **"Each Rear Deck Assembly Being Aligned With A Respective Gap Between Adjacent Front Deck Assemblies" Should Be Given Its Ordinary And Customary Meaning**

Toro also seeks an interpretation of the term "each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies."[13]  This is a simple term that has an ordinary and customary meaning.  *See* Parish Decl., Exh. 4 at ¶ 66.  As shown in the Textron Patents, the invention contemplates embodiments in which rear decks (30) are aligned with the gaps between adjacent front decks (26).  *See, e.g.,* Exh. 1, Abstract, and 2:64-3:5, and Fig. 1; Exh. 3 at 5:15-22, 6:54-65 and Figs. 1, 7, 8, 12, and 16-18.  It is also important to observe that the term "each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies" modifies and further defines "at least one rear rotary cutting deck assembly."  Claim 1 of the '530 patent is illustrative:

> *at least one rear rotary cutting deck assembly* mounted on the frame behind the front deck assemblies and between the front and rear wheels, *each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies,*

Exh. 1 at 4:54-58 (emphasis added).  The "rear rotary cutting deck assembl[ies]" are thus specifically defined as those that are "aligned with a respective gap between adjacent front deck assemblies."

The patent specifications show embodiments in which there are fewer rear decks than front decks, but the patent claims, which are written in the "open ended" format by using the transitional phrase "comprising" to introduce the body of the claim, would also

---

[13] This term appears in claim 1 of the '530 Patent, claims 1, 2 and 10 of the '311 Patent, and claims 1 and 24 of the '312 Patent.

cover products that have extra cutting decks (or other components) located elsewhere on

the device. *See, e.g., Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir.

1997) ("'Comprising' is a term of art used in claim language which means that the named

elements are essential, but other elements may be added and still form a construct within

the scope of the claim."); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir.

1983), *cert. denied*, 464 U.S. 1042 (1984) ("It is fundamental that one cannot avoid

infringement merely by adding elements if each element recited in the claims is found in

the accused device.") (citations omitted). Any additional rear cutting decks that are not

"aligned with a respective gap between adjacent front deck assemblies" are merely

additional elements that cannot be relied upon to avoid the scope of the claims. A mower

having *other* cutting decks that *do* satisfy the "rear rotary cutting deck assembly" would

fall within the scope of the claims.[14]

Nevertheless, Toro contends that this limitation must be clarified for the jury, but

proposes an interpretation that does not clarify the limitation so much as it simply

rewrites the limitation into something that it is not. Specifically, Toro seeks to rewrite

this limitation to read "*every* rear deck assembly is located behind a gap defined by two

adjacent front deck assemblies." In essence, Toro simply asks this Court to change the

word "each" to "every." The remainder of Toro's proposed construction essentially

repeats the original claim language and does not add to or clarify the meaning of the

claim in any way that would be necessary for the jury.

---

[14] Stated differently, the claims have no limitation that disallows other deck assemblies
from being mounted on the device in such a way that they are not aligned with gaps between
adjacent front deck assemblies.

Once again, Toro's request appears to be an attempt to improperly limit the claimed invention to precisely the embodiments disclosed in the patent specification, and should be denied. *Phillips*, 415 F.3d at 1323. Toro's results-oriented interpretation ignores the fact that the limitation modifies and further defines "rear rotary cutting deck assembly." And, Toro appears to attempt to rewrite the limitation "each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies" as a separate recitation that would require all of the deck assemblies behind the front deck assemblies to be located in gaps between the front deck assemblies — that is, to limit the claim such that a device having extra decks assemblies would not literally infringe the claim.

### K.    "Roller" Should Be Given Its Ordinary And Customary Meaning

The limitation "roller" is a simple limitation having a plain and ordinary meaning, and is used in the specification and claims consistently with this meaning. *See* Parish Decl., Exh. 4 at ¶ 69. As such, the jury needs no clarification of this limitation. If, however, the Court finds that additional clarification will be helpful, in keeping with the ordinary and customary meaning, Textron proposes that "roller" be interpreted as "a device that rolls." *Id.* This interpretation is consistent with the manner in which the limitation is used in the Textron Patents. *See, e.g.,* Exh. 1 at 1:44-56 ("…a rear roller extending between the side plates and supporting the side plates for movement over the ground…"), 3:16-19 ("A rear roller 58 extends between the side plates 46 and 48 and also supports the side plates 46 and 48 and the deck 38 for movement over the ground.") and Figs 2, 3 and 5; Exh. 3 at 5:60-65, 6:20-41, 6:42-53, 6:62-65, 6:67-7:12, 7:19-22, 7:23-33, 7:34-42, 7:53-58, 7:59-67, 8:7-9 and Figs. 1-9, 11-20 and 22-23 (describing and illustrating various rollers).

36

By contrast, Toro seeks to interpret the limitation "roller" to mean "a device that resists scalping and stripes the grass." Toro's proposed interpretation unduly narrows the claims in one sense, and inappropriately broadens them in another. On one hand, Toro's proposed interpretation narrows the interpretation of "roller" by reading into it the specific functional limitations from the specification of "striping" and resisting scalping. To the extent that Toro seeks to do so, this interpretation is contrary to the law of claim construction. *Phillips*, 415 F.3d at 1323. On the other hand, Toro's proposed construction actually broadens the interpretation of "roller" by entirely removing the requirement that the device actually rolls. Under Toro's construction *any* device that stripes grass and resists scalping would fall within Toro's definition, regardless of whether it falls under any plausible definition of "roller," and regardless of whether it even rolls. *See* Parish Decl., Exh. 4 at ¶ 70. For both of these reasons, Toro's proposed construction should be rejected.

## V.    CONCLUSION

Plaintiff respectfully requests that the Court adopt in its entirety the claim constructions Plaintiff has proffered in the Joint Claim Construction Statement. Further, the Court should reject Defendant's strained constructions which improperly seek to import limitations from the patent specifications into the claims. Defendant's claim constructions are the product of a results-oriented approach which find no basis in the law, and are intended solely for the purpose of escaping the consequences of their obvious infringement.

Dated: August 4, 2006

THE BAYARD FIRM

By: _____
Edmond D. Johnson (#2257)
Peter B. Ladig (#3513)
222 Delaware Avenue,
Suite 900
P.O. Box 25130
Wilmington, DE 19801
Telephone:  (302) 655-5000

Attorneys for Plaintiff
Textron Innovations Inc.

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone:  (202) 955-1500
Facsimile:   (202) 778-2201