**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 05-486 (GMS) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE TORO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**TORO'S OPENING CLAIM CONSTRUCTION BRIEF**

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000

OF COUNSEL:                          rhorwitz@potteranderson.com
                                     dmoore@potteranderson.com

Earl D. Reiland
Anthony R. Zeuli                     *Attorneys for Defendant*
Thomas J. Leach                      *The Toro Company*
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 332-5300

Dated:  August 4, 2006

## TABLE OF CONTENTS

I.    INTRODUCTION AND NATURE OF THE PROCEEDINGS ..................... 1

II.   BACKGROUND OF GANG-TYPE ROTARY LAWN MOWERS .............. 2

    A.    Lawn Mowers ........................................................................ 2

    B.    Rotary Lawn Mowers ............................................................. 2

    C.    Ganged Rotary Lawn Mowers ................................................ 3

    D.    Mowers on Golf Courses ....................................................... 4

    E.    Textron's Invention:  A Tri-Pivot Cutting Deck Assembly .................. 5

III.  ARGUMENT .................................................................................. 6

    A.    Claim Construction Law ......................................................... 6

    B.    Disputed Claim Terms ............................................................ 8

        1.    Gang-Type Rotary Lawn Mower ............................................ 8

            a.    The Preamble Phrase is Not a Limitation .................... 9

            b.    Alternatively, The Phrase Means at Least Two Rotary Cutters ........................................................... 13

        2.    Front and Rear Wheels .......................................................... 14

        3.    Rotary Cutting Deck Assemblies/Assembly .......................... 17

        4.    Deck Assembly Mounted on the Frame ................................. 21

            a.    The Summary of the Invention Supports Toro's Construction .............................................................. 22

            b.    The Rest of the Specification Supports Toro's Construction .............................................................. 23

        5.    Deck Defining a Downwardly Opening Space ...................... 25

            a.    The Claims Support Toro's Construction ................... 25

            b.    The Specification Supports Toro's Construction ........ 26

6.      Roller Extends Across Substantially the Entire Width
        of the Deck ............................................................. 27

        a.      The phrase is indefinite because it is impossible
                to determine when a roller is short enough not to
                extend across "substantially the entire width,"
                and therefore not infringe ........................................ 28

        b.      If capable of construction the phrase means
                "the roller extends slightly less than or the full
                width of the deck, but not beyond the width
                of the deck" ............................................................. 29

7.      Lifting Arm ............................................................. 30

        a.      The Summary of the Invention Supports Toro's
                Construction ............................................................. 31

        b.      The Rest of the Specification Supports Toro's
                Construction ............................................................. 31

8.      Side Plates ............................................................. 32

        a.      The Summary of the Invention Supports Toro's
                Construction ............................................................. 32

        b.      The Only Embodiment is Consistent with Toro's
                Construction ............................................................. 33

9.      Rear Roller Extends Between the Side Plates and
        Supports the Side Plates for Movement Over the
        Ground ............................................................. 34

        a.      The Claim Language Supports Toro's
                Construction ............................................................. 34

        b.      The Summary of the Invention Supports Toro's
                Construction ............................................................. 35

        c.      The Rest of the Specification Supports Toro's
                Construction ............................................................. 35

10.     Each Rear Deck Assembly Being Aligned With a
        Respective Gap Between Adjacent Front Deck
        Assemblies ............................................................. 36

           a.     All of the Embodiments Have Every Rear
                    Deck Aligned With a Gap Between
                    Adjacent Front Decks ................................................ 37

           b.     The Drawings Support Toro's Construction ........... 38

           c.     Dictionaries and Expert-Witness Testimony
                    Support Toro ............................................................ 38

      11.    Roller ................................................................................... 38

IV.    CONCLUSION ............................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

### CASES

*AstraZeneca AB v. Mut. Pharm. Co.*,
    384 F.3d 1333 (Fed. Cir. 2004) ..............................................................23

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ......................................................10, 13

*Data Line Corp. v. Micro Techs., Inc.*,
    813 F.2d 1196 (Fed. Cir. 1987) ............................................................12

*Elekta Inst. S.A. v. O.U.R. Scientific Int'l, Inc.*,
    214 F.3d 1302 (Fed. Cir. 2000) ............................................................34

*Honeywell, Int'l, Inc. v. ITT Indus. Inc.*,
    452 F.3d at 1318 (Fed. Cir. 2006) ....................................15, 18, 23, 24

*IMS Tech., Inc. v. Hass Automation, Inc.*,
    206 F.3d 1422 (Fed. Cir. 2000) ............................................................11

*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
    450 F.3d 1350 (Fed. Cir. 2006) ..............................................................7

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004) ..............................................................7

*Litton Sys., Inc. v. Whirlpool Corp.*,
    728 F.2d 1423 (Fed. Cir. 1984) ............................................................17

*Markman v. Westview Instr., Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)......................8

*Morton Int'l, Inc. v. Cardinal Chem. Co.*,
    5 F.3d 1464 (Fed. Cir. 1993) ................................................................28

*On Demand Mach. Corp. v. Ingram Indus. Inc.*,
    442 F.3d 1331 (Fed. Cir. 2006) ...................................................*passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed.Cir. 1999) ..............................................................9

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc),
      *cert. denied*, 126 S. Ct. 1332 (2006)............................................*passim*

*SciMed Life Sys., Inc. v. Advanced Cardio-Vascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ....................................................................19, 23

*Sentex Sys., Inc. v. Elite Access Sys., Inc.*,
  1999 U.S. App. LEXIS 3846 (Fed. Cir. Mar. 10, 1999)........................................13

*Storage Tech. Corp. v. Cisco Sys., Inc.*,
  329 F.3d 823 (Fed. Cir. 2003) ............................................................................12

*V-Formation, Inc. v. Benetton Group SpA*,
  401 F.3d 1307 (Fed. Cir. 2005) ............................................................................8

*Vitronics Corp.* v. *Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ..............................................................................6

*Wireless Agents LLC v. Sony Ericsson Mobile Comm'n.*, S. AB,
  2006 U.S. App. LEXIS 18933 (Fed. Cir. July 26, 2006)..........................15, 18, 23

## RULES AND STATUTES

35 U.S.C. §112....................................................................................................28

37 C.F.R. §1.73......................................................................................6, 15, 18

M.P.E.P. §2111.02 (2001) ...................................................................................9

## I.     INTRODUCTION AND NATURE OF THE PROCEEDINGS

Pursuant to the Court's Scheduling Order, Defendant The Toro Company ("Toro") submits this opening claim construction brief.  Each of these constructions had been previously proposed to Textron Innovations Inc. ("Textron") in the Joint Claim Construction Statement, filed on July 21, 2006 (D.I. #68), as corrected by errata.  The parties did not reach agreement on the construction of the terms in dispute.

At issue in this lawsuit are three related patents assigned to Textron: U.S. Pat. Nos. 6,047,530 ('530 patent); 6,336,311 ('311 patent); and 6,336,312 ('312 patent) (attached at Moore Decl.[1] Exs. 1, 3, 5, respectively).  All three of the patents generally relate to lawn mowers having multiple rotary cutting deck assemblies (a/k/a gang-type rotary lawn mowers).  However, gang-type rotary lawn mowers are not new.  "The invention," as defined in the patent, is a specifically constructed rotary cutting deck assembly having a rear roller and capable of pivoting about three mutually perpendicular axes – a tri-pivot cutting-deck assembly – suitable for close trimming and cutting the undulating terrain of golf course roughs.  The inventor made very clear that this rear-roller, tri-pivot cutting deck assembly carried on a ride-on mower was his invention.

Several of Toro's constructions, based on the inventor's definition of the invention in the patents and how those of ordinary skill in the turf-care art would understand theses terms and phrases, will resolve this case in its entirety through a subsequent motion for summary judgment of non-infringement.

---

[1] All exhibits are attached to the Declaration of David E. Moore in Support of Toro's Opening Claim Construction Brief, filed contemporaneously herewith.  For convenience, those exhibits are hereafter referred to as "Ex. __."

## II.     BACKGROUND OF GANG-TYPE ROTARY LAWN MOWERS

### A.     Lawn Mowers.

The lawn mower dates back to 1830.[2]  The original lawn mower included a rear roller and a cutting cylinder or reel – blades on a cylinder that turn.[3]  A picture of the original lawn mower (left) and a vintage reel mower (right) are below:

      

Ransomes, acquired by Textron in 1998, began making lawn mowers similar to the one shown above (left) as early as 1832 under license from the original inventors.[4]

### B.     Rotary Lawn Mowers.

Rotary mowers, having blades that rotate in a horizontal plane, were invented in 1929 and patented in a 1931 U.S. Patent.[5]

---

[2] http://www.oldlawnmowerclub.co.uk/mowinfo/mowhist.htm  "The lawn mower was invented in 1830 by Edwin Beard Budding, an engineer from Stroud, Gloucestershire, England."

[3] *Id.*  "These early machines were all made of cast iron and featured a **large rear roller** with a cutting cylinder (reel) in the front. Cast iron gear wheels transmitted power from **the rear roller** to the cutting cylinder. Overall, these machines were remarkably similar to modern mowers."  (Emphasis added.)

[4] *Id.* "Budding and Ferrabee were shrewd enough to allow other companies to build copies of their mower under license, the most successful of these being Ransomes of Ipswich which began making mowers as early as 1832."

[5] http://www.oldlawnmowerclub.co.uk/mowinfo/glossary.htm, Rotary Mower.

 

Importantly, the first rotary mower (right) also had a full-width rear roller (14) above.[6]

### C.    Ganged Rotary Lawn Mowers.

Ganged mowers were invented in 1914. The Worthington Mower Company patented a horse-drawn gang mower with three or more side-wheel cylinder (reel) mowers ganged on a frame.[7] Ransomes was also granted a license under this patent to manufacture gang mowers.[8] A tractor-pulled Worthington gang mower, taken from a 1926 patent, appears below:



Full-width rear rollers (6) are clearly shown on each of the cutting units.[9]

---

[6] U.S. Pat. No. 1827559, p.2, ll. 1-5. (Ex. 7.)
[7] Brian Bell, *Ransomes, Sims & Jeffries: A History Of Their Products* 101 (2001).
[8] *Id.*
[9] U.S. Pat. No. 1607378, p. 4, l. 31. (Ex. 8.)

One of the first gang-type *rotary* lawn mowers was patented in 1938 – it also had a rear roller (32) that extended across substantially the full width of the mower[10]:



### D.    Mowers On Golf Courses

Textron's Ransomes division traces the use of its lawn mowers on golf courses back to the late 1800's.[11]  A horse-drawn Ransomes' Ideal cylinder (reel) mower was used for cutting roughs in 1905.  The Ideal had hinged reels enabling it to follow the undulating terrain of the rough.[12]

Gang mowers were being used on golf course roughs by at least the late 1930's. The Ransomes' Overlawn 30in gang mower was used "for cutting around trees and other areas of rough grass . . . ."[13]

Ransomes introduced its first rotary mower, the Cyclone, in the mid-1950's, about the same time Jacobsen, now also part of Textron, did.[14]  Ransomes added a ride-on

---

[10] U.S. Pat. No. 2114096, p. 1.  (Ex. 9.)
[11] Brian Bell, *Ransomes Sims & Jefferies* 100 (2001).
[12] *Id.*
[13] *Id.* at 104.

rotary mower having a 61in cutting deck in 1978.[15]  Jacobsen's rotary mowers were used to cut golf course roughs in the 1980s – its HR-15 was a gang-type rotary mower used to cut golf course roughs.  (Ex. 10 at 2.)  In 1990, Toro also sold a ganged rotary mower, Model 580D, for use on golf course roughs. (Ex. 11 at 3.)

>     **E.     Textron's Invention: A Tri-Pivot Cutting Deck Assembly**

In 1997, the inventor, Richard D. Bednar ("Bednar"), filed the application that became the '530 patent.  (Ex. 2 at 3.)  That application is also the parent of the other two patents-in-suit.  Bednar did not claim to have invented the first lawn mower, the first ganged-mower, or even the first ganged-rotary lawn mower, each having been invented long before 1997 – as shown above.

Rather, Bednar claimed that "[t]he invention provides a gang-type rotary lawn mower suitable for cutting golf course roughs."  ('530 pat., col. 1, ll. 23-24.)  But not just any construction of a gang-type rotary lawn mower was suitable for cutting roughs: "Tow-behind gangs, whether reel or *rotary*, are generally undesirable for cutting a golf course rough because close trimming is difficult."  (*Id.* at ll. 15-17 (emphasis added).)

In the Summary of the Invention section of all three patents, Bednar described the construction of his tri-pivot deck-assembly invention – suitable for cutting roughs:

> The lawn mower has single-spindle cutting decks attached directly to the frame on which the operator rides, with a front row of two or more cutting decks in front of the front wheels, and with a rear row of the one or more cutting decks between the front and rear wheels.  The invention also provides an improved arrangement for mounting a rotary cutting deck on a lawn mower frame.  Each deck is mounted on its own lifting arm so that the deck can move vertically relative to the frame *and can pivot relative to the frame about three mutually perpendicular axes.*

---

[14] *Id.*

[15] *Id. at 116.*

('530 pat., col. 1, ll. 27-37 (emphasis added).)  Still within the Summary of the Invention,

Bednar explained that his tri-pivot deck assembly made it suitable for cutting roughs:

"*[t]his construction* enables the lawn mower to cut the undulating terrain of a golf course

rough and to be controlled for close trimming.  (*Id.* at col. 2, ll. 4-6 (emphasis added.))

## III.    ARGUMENT

### A.    Claim Construction Law.

Claims terms "are generally given their ordinary and customary meaning," that is,

"the meaning that the term would have to a person of ordinary skill in the art in question

at the time of the invention, i.e., as of the effective filing date of the patent application,"

unless the inventor has provided a special definition of the term. *Phillips v. AWH Corp.*,

415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 1332 (2006).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not

only in the context of the particular claim in which the disputed term appears, but in the

context of the entire patent, including the specification."  *Id.* at 1313.

"[T]he specification[16] 'is always highly relevant to the claim construction

analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed

term.'"  *Id.* at 1315 (quoting *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996)).  The Summary of the Invention portion of the specification, when set

forth, should "be commensurate with the invention as claimed and any object recited

should be that of the invention as claimed."  37 C.F.R. § 1.73 (2004).

---

[16] Technically, the "specification" consists of the written description, the drawings and at
least one claim.  Throughout this brief the term "specification" is used when referring to
the patent inclusive of the claims.  The term "written description" is used to distinguish
that part of the patent exclusive of the claims.

"Although claims need not be limited to the preferred embodiment when the invention is more broadly described, 'neither do the claims enlarge what is patented beyond what the inventor has described as the invention.'" *Inpro II Licensing, S.A.R.L.* v. *T-Mobile USA, Inc.*, 450 F.3d 1350, 1355 (Fed. Cir. 2006) (citation omitted). "In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp.* v. *Ingram Indus. Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006) (citation omitted). "[T]he claims cannot be of broader scope than the invention that is set forth in the specification." *Id.* at 1340*; see also Phillips*, 415 F.3d at 1315-16.

Moreover, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, e.g., general usage. In such cases, the inventor's lexicography governs." *Phillips,* 415 F.3d at 1316. "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." *Irdeto Access, Inc.* v. *Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (citations omitted).

"In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive." *Phillips,* 415 F.3d at 1316. "[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope." *On Demand Machine Corp.*, 442 F.3d at 1340.

The Court can also consider the patent's prosecution history if it is in evidence. *Phillips,* 415 F.3d at 1317.  Also, cited prior art (the references listed on the face of the patent) are intrinsic evidence.  *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("This court has established that prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence**.**'")

 "[E]xtrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises,'" may also be consulted.  Phillips, 415 F.3d at 1317 (quoting *Markman* v. *Westview Instr., Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)).  "[W]hile extrinsic evidence 'can shed useful light on the relevant art,' … it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'"  *Id.* (citation omitted).

### B. Disputed Claim Terms

#### 1. "Gang-Type Rotary Lawn Mower"

Claims: Preamble of '530 Patent, claim 1; Preamble of '311 Patent, claims 1, 2, and 10; Preamble of '312 Patent, claims 1, 19 and 24.

**Toro's Position:**

Toro's position is that this preamble phrase is not a limitation of the claims and, therefore, does not need construction.  In the alternative, Toro's proposed construction is: **a mower having at least two cutting devices of the rotary type.**

**Textron's Position:**

Textron's position is that this preamble phrase is a further limitation of the claims, but does not need construction.  However, if the Court construes the phrase, Textron's proposed construction is: **a lawn mower having a rotary gang-type mower configuration**.

### a.  The Preamble Phrase is Not a Limitation.

It is unusual that the patentee, here Textron, is arguing that its claims should be further limited by the preamble; Textron does so in an attempt to avoid case-ending prior art.  The preamble phrase "gang-type lawn mower" is not a limitation and is of no significance to claim construction because the claims in which it is a part fully set forth all of the limitations of the alleged invention.  The Manual of Patent Examining Procedure (MPEP), the manual used by the U.S. Patent Office to examine all patent applications, says this about preambles:

> If the body of a claim fully and intrinsically sets forth all of the limitations of the claimed invention, and the preamble merely states, for example, the purpose or intended use of the invention, rather than any distinct definition or any of the claimed invention's limitations, then the preamble is not considered a limitation and is of no significance to claim construction."  (M.P.E.P. § 2111.02 (2001) (citing *Pitney Bowes, Inc. v. Hewlett-Packard Co*., 182 F.3d 1298, 1305 (Fed.Cir. 1999)).

Each claim that employs the term "gang-type rotary lawn mower" in the preamble sets forth all of the limitations of the alleged invention in the body of the claim, and the preamble merely provide a descriptive phrase or states the purpose/intended use of the alleged invention.

A "gang" is more than one cutting deck assembly.  Textron has used the term "gang" or "gang-type" in this way.  For example, in the prosecution history, Textron contrasted "gang-type" mowers with mowers having "one reel/deck." (Ex. 2 at 89.)  In claim 2 of the '311 patent, only two decks are claimed – a front and a rear, the latter behind the front deck.  (Ex. 3 at col. 4, l.65 – col. 5, l. 17.)  Textron described this mower configuration as "gang-type." The claim bodies, which all include more than one rotary cutting deck assembly, define a gang-type rotary lawn mower. It would be redundant to

add as an additional limitation the preamble phrase "gang-type rotary lawn mower," which is nothing more than a descriptive term of the claimed limitations.

With the exception of claim 19 of the '312 patent, which is addressed separately below, claim 1 of the '530 patent is representative. ('530 pat., col. 4, ll. 41-67.) The claim provides significant detail about the structure claimed to be part of the alleged invention, to wit: a frame, wheels, a power source, a seat, a steering system and, importantly, three ganged rotary cutting deck assemblies – two side-by-side front deck assemblies and one rear deck assembly "behind the front deck assemblies . . . being aligned with a respective gap between adjacent front deck assemblies." (*Id.* at ll. 50-58.) The body of the claim fully and intrinsically limits the claim to a gang-type rotary lawn mower.

The Federal Circuit, in its leading case on this issue, *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002), reversed a trial court's decision that treated a similar preamble phrase as a claim limitation. After setting forth a succinct history of the law applicable to this issue, the Federal Circuit relied on three important facts in determining that the preamble phrase was not a limitation: (1) the applicant did not rely on the preamble phrase to define its invention nor was the phrase essential to understand limitations or terms in the claim body; (2) the applicants also did not rely on the preamble phrase to distinguish over the prior art; and (3) deletion of the disputed phrase from the preamble does not affect the structural definition or operation of the invention itself. The claim body defines a structurally complete invention. *Id.* at 811.

The same three facts are present in this case. Textron did not rely on the preamble phrase "gang-type rotary lawn mower" to define its invention and the phrase is

not essential to understand the limitations or terms in the claim body.  To the contrary, Textron could not define its invention as a "gang-type rotary lawn mower" because such mowers were old and well known in the prior art.  For example, "Pull-behind or tow-behind rotary gangs are also known."  ('530 pat., col. 1, ll.13-14.)  The generic term "gang-type rotary lawn mower" includes both pull-behind and tow-behind gang-type rotary lawn mowers, neither of which are defined as Textron's invention, which is frame mounted. (*Id*. at ll. 28-29.)

Further, Textron did not rely on the preamble to distinguish over the prior art.  For example, the application claim that became claim 1 of the '530 patent was rejected as obvious over two references: Smith (a gang-type *reel* lawn mower) and Mountfield (a *non*-gang-type rotary lawn mower).  (Ex. 2 at 83-84.)  Instead of arguing that the preamble phrase "gang-type rotary lawn mower" set its alleged invention apart for the two pieces of prior art, which Textron did not do, Textron amended the claim to add additional structural limitation.  (*Id*. at 86, adding "front and rear" wheels.)

Finally, deletion of the disputed phrase from the preamble of claim 1 does not affect the structural definition or operation of the alleged invention itself.  In other words, the claim body of Textron's claims define a structurally complete gang-type rotary lawn mower that is frame mounted, single-bladed (a/k/a single spindle) and has rear rollers. As explained above, the claim body is structurally detailed (right down to a seat) including a gang of three rotary cutting deck assemblies.  The preamble phrase "gang-type rotary lawn mower" is nothing more than a descriptive name for the limitations in the claim body. *See IMS Tech., Inc. v. Hass Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (reversing district court's construction that the preamble phrase "control apparatus"

11

was a claim limitation and holding that it was "a descriptive name to the set of limitations in the body of the claim that completely set forth the invention); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003) (holding "the term 'policy caching method' or 'policy cache' in the preamble of each claim serves as a convenient label for the invention as a whole," but is not a limitation).

Claim 19 of the '312 patent, which claims a cutting deck assembly (not connected to any mower) is not limited by the preamble for a slightly different reason. Instead of the preamble being a descriptive name for the set of limitations in the body, claim 19 uses the phrase "*for* a gang-type lawn mower having a frame" to describe an intended purpose: a type of machine on which the claimed cutting deck assembly could be used. ('312 pat., col. 9, l. 32 – col. 10, l. 5.)

The body of claim 19 does not include any structure that would limit this claim to a particular lawn mower configuration. For example, there is no seat, power source, steering system and, importantly, no "gang" of cutting deck assemblies – there is only one cutting deck described in the claim. The body of this claim includes only limitations to a particular cutting-deck construction, i.e., a deck, two front wheels, a blade, a rear roller and a lifting arm. None of these deck limitations have anything to do with the mower to which it is attached. The only relation to a "gang-type rotary lawn mower" is that it is one type of mower on which such a deck assembly could be used. In short, the preamble of this claim is a classic example of stating an intended purpose, not a further limitation. Use of the word "for" often introduces just such an intended purpose in a preamble. *See Data Line Corp. v. Micro Techs., Inc.*, 813 F.2d 1196, 1201 (Fed. Cir. 1987) (holding that the preamble phrase "automatic shunt system *for* bypassing a data

terminal" was not a limitation of the claim. "To the contrary, the preamble simply states that a system is being claimed and its purpose is to bypass a data terminal."); *Sentex Sys., Inc. v. Elite Access Sys., Inc.*, 1999 U.S. App. LEXIS 3846, *10-12 (Fed. Cir. Mar. 10, 1999) (Ex. 12) (affirming district court's construction that preamble phrase "telephone-entry system *for* use by a visitor to a facility having multiple individual-occupant entities" was not a claim limitation, but "merely states an intended purpose for the claimed device."). In other words, all of these claims can stand on their own without the preamble phrase; a phrase that does not "give life, meaning, and vitality" to the claims. *Catalina Mktg.*, 289 F.3d at 808.

### b. Alternatively, The Phrase Means at Least Two Rotary Cutters.

Toro and Textron agree that the phrase requires rotary cutting devices, i.e., decks or assemblies having at least one blade that rotates in a horizontal plane relative to the surface to be cut. As mentioned above, Textron has defined "gang" or "gang-type" as having more than one cutting unit. (Ex. 2 at 89.) Thus, the preamble phrase should be construed, if at all, as a mower having at least two cutting devices of the rotary type. Textron's definition, "a lawn mower having a rotary gang-type mower configuration," does not construe the phrase and does nothing more than rearrange the same words. One of skill in the art would not interpret the phrase as Textron advocates. (Skromme Decl., ¶ 24.)[17]

---

[17] The Declaratioin of Robert B. Skromme In Support of Toro's Opening Claim Construction Brief, is filed contemporaneously herewith.

2.     "Front and Rear Wheels"

Claims: '530 Patent, claim 1; and '311 Patent, claims 2 and 10.

**Toro's Proposed Construction:**

At least two front wheels and at least two rear wheels.

**Textron's Position:**

The phrase does not need construction.  But if the Court construes the term, Textron's proposed construction is: At least one front wheel and at least one rear wheel.

The relevant portion of representative claim 1 of the '530 patent is reproduced below:

1. A gang-type rotary lawn mower comprising

a frame supported by *front and rear wheels* for movement over the ground,

a power source which is mounted on the frame and *which drives at least two of the wheels*,

* * *

at least two side-by-side front rotary cutting deck assemblies mounted on the frame *in front of the front wheels*, the front deck assemblies defining a gap between adjacent front deck assemblies, and

at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies and *between the front and rear wheels*, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies, . . . .

('530 pat., col. 4, ll. 40-67, emphasis added.)

The claim language refutes Textron's proposed construction: at least one front wheel and at least one rear wheel, i.e., possibly a two-wheeled lawn mower.  The claim expressly states that there are at least two front wheels: "in front of *the front wheels*"; requiring that the disputed phrase includes at least two front wheels.  After expressly calling out two front wheels, the claim reverts to "the front and rear wheels" again in

14

relation to the location of the rear cutting deck assembly.  If Textron wanted its claim to cover a single rear wheel it would have written "between the front wheels and at least one rear wheel, " as Textron did in the '312 patent which discloses a three-wheeled vehicle. ('312 pat., col. 8, ll. 20-21.) (Ex. 5.)

Any doubt is resolved in the common patent specification of the '530 and '311 patents, the only patents the use this disputed claim phrase.  The Summary of the Invention expressly describes "the invention" as having front wheels and rear wheels:

> *the invention* provides a gang-type rotary lawn mower comprising a frame supported by *front and rear wheels*, an operator's seat mounted on the frame, at least two side-by-side front cutting deck assemblies mounted on the frame *in front of the front wheels*, and at least one rear cutting deck assembly mounted on the frame behind the front wheels and *in front of the rear wheels*.

('530 pat., col. 1, ll. 38-44.)   Textron defined the invention as having "front and rear wheels," and then went on to explain that the phrase meant two front wheels and two rear wheels.  Textron is not entitled to a broader construction.  *Wireless Agents LLC v. Sony Ericsson Mobile Comm'n.*, S. AB, 2006 U.S. App. LEXIS 18933, at *5 (Fed. Cir. July 26, 2006) (Ex. 13) (holding that the description of "the invention" in the Summary of the Invention limited an otherwise broader claim term because the description "as part of the 'Summary of the Invention, [] is 'commensurate with the invention as claimed.'" (citing 37 C.F.R. § 1.73 (2004) (A brief summary of the invention indicating its nature and substance . . . .  Such summary should, when set forth, be commensurate with the invention as claimed and *any object recited* should be that of the invention as claimed." (emphasis added.); *Honeywell Int'l, Inc. v. ITT Indus. Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006.)

The remainder of the written description is consistent. For example, the only embodiment described in both the '530 patent and the '311 patent has two front wheels and two rear wheels:

> The lawn mower 10 comprises a frame 12 (partially shown in FIGS. 2-5) supported by *front wheels 14* and *rear wheels 16* for movement over the ground." Col. 2, ll:45-48 (emphasis added).

> "More particularly, in the illustrated construction, the lawn mower 10 has three side-by-side front cutting deck assemblies 34 in front of the *front wheels 14*, and two rear cutting deck assemblies 34 behind the front wheels 14 and in front of the *rear wheels 16*." Col. 2, l. 65-Col. 3, l.3 (emphasis added).

The only drawing in the '530 patent and '311 patent that shows wheels supporting the frame shows four wheels: two front wheels and two rear wheels. (See Fig. 1.) Contrast that with the '312 patent, which includes a three-wheeled mower shown at Figure 12, but never uses the claim phrase "front and rear wheels." Instead, the '312 patent claims (1 and 24) use the following language: "a frame supported by front wheels and at least one rear wheel for movement over the ground." ('312 pat., col. 8, ll. 20-21.) When Textron added a three-wheeled mower to its '312 patent, it knew how to claim it. If Textron had consider a three-wheeled mower part of its alleged inventions in the '530 and '311 patents, it would have included at least one drawing, or a description, of a mower having less than four wheels and used claim language like that found in the '312 patent. Textron did not do so.

The prosecution history is also consistent with Toro's construction as is expert testimony. (Skromme Decl., ¶ 25.) During the prosecution of the application that became the '530 patent, the claims were amended to distinguish over prior art. The rejected claims included the broader term "wheels": "a frame supported by wheels for movement over the ground." (Ex. 2 at 86.) To avoid the prior art, Textron added the

words "front and rear" just before "wheels." (*Id.*) Given that the plural word "wheels"

was originally in the claim, the addition of the words "front and rear" before "wheels"

demonstrates that Textron narrowed its claim to a mower having both front wheels and

rear wheels. Textron cannot recapture in litigation what it gave up during prosecution.

*See Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1439 (Fed. Cir. 1984).

### 3.    "Rotary Cutting Deck Assemblies/Assembly"

**Claims: '530 Patent, claim 1; '311 Patent, claims 1, 2, and 10;
'312 Patent, claims 1 and 24**

**Toro's Proposed Construction:**

A cutting unit having laterally-spaced, generally vertically-extending side plates, a cross
member, front wheels supporting the side plates, a rear roller extending between and
supporting the side plates, and a single spindle rotary deck mounted between the side
plates.

**Textron's Position:**

The phrase does not need construction. But if the Court construes the term, Textron's
proposed construction is: A cutting deck assembly that has a rotary blade, as
distinguished from a reel blade.

Textron did not invent a rotary mower or even a gang-type rotary mower. Both

were old and in the prior art. ('530 pat., col. 1, ll. 1-20.) But the rotary mowers of the

prior art all suffered a shortcoming, claimed Textron, "rotary mowers have not been used

to cut golf course roughs, which require close trimming and the ability to cut undulating

terrain at a relatively short length."[18] (*Id.* at ll. 17-20.) Textron alleges that it invented a

gang-type rotary mower "suitable for cutting golf course rough." (*Id.* at ll. 23-24.)

However, a patent cannot claim a result, e.g., a mower suitable for cutting golf course

rough, so Textron described the construction of its rotary cutting deck assemblies that

---

[18] Exs. 10 and 11 show the falsity of this statement, which is the subject of a separate
motion.

enabled its gang-type rotary mower to cut golf course roughs in the Summary of the

Invention:

> *the invention* provides a gang-type rotary lawn mower comprising . . . cutting deck assemblies . . . . *Each* of the front and rear deck assemblies includes a pair of laterally-spaced, generally vertically-extending side plates, front wheels supporting the side plates for movement over the ground, and a rear roller extending between the side plates and supporting the side plates for movement over the ground. *Each* deck assembly also includes a single-spindle cutting deck located between the side plates and in front of the roller, the deck being mounted on the side plates such that the height of the deck relative to the ground is adjustable. The roller extends across substantially the entire width of the deck.

> \* \* \*

> A cross member is mounted on the outer end of the lifting arm for pivotal movement about a generally vertical axis and about a generally horizontal axis extending in the forward-rearward direction. One end of the cross member is connected to one of the deck assembly side plates for pivotal movement about a generally horizontal, laterally-extending axis adjacent the forward ends of the side plates, and the other end of the cross member is connected to the other side plate for pivotal movement about the same axis.

('530 pat., col. 1, ll. 38-55, l, 62 – col. 2, l. 3 (emphasis added.))  The ability of Textron's

rotary cutting deck assemblies to pivot about three mutually perpendicular axes was key

to the construction of its invention because it was this construction that made the mower

"suitable" for cutting roughs: "This construction enables the lawn mower to cut the

undulating terrain of a golf course rough and to be controlled for close trimming."  (*Id.* at

col. 2, ll.4-6.)  In doing so, Textron put the public and Toro on notice that it considered

its invention to have the rotary cutting deck assembly detailed in the Summary of the

Invention.  *See* 37 C.F.R. § 1.73 (2004) (Summary of the Invention – "any object recited

should be that of the invention as claimed.")

Recent Federal Circuit cases have held patentees to "their words" used in the

Summary of the Invention.  To do otherwise would injure the public's right to understand

what the patentee claimed as his invention.  *See Honeywell*, 452 F.3d at 1318; *Wireless*

*Agents*, 2006 U.S. App. LEXIS 18933, at *5; *SciMed Life Sys., Inc. v. Advanced Cardio-Vascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) (Summary of the Invention described a specific catheter configuration (coaxial lumens) and supported limiting an otherwise broader claim term to the configuration described in summary of the invention).

The rest of the specification is consistent with the Summary of the Invention. For example, the only embodiment described in the '530 and '311 patents describes all the cutting deck assemblies as having the construction set forth by Toro:

> Each of the cutting deck assemblies 34 includes (see FIGS. 2-5) a single-spindle mulching deck 38 defining a downwardly opening space 42 (FIG. 4). The deck 38 is located between and supported by a pair of laterally-spaced, generally  vertically-extending side plates 46 and 48. The term "lateral" is used herein to mean the direction from one side of the lawn mower to the other, i.e., perpendicular to the forward-rearward direction. Two front wheels 50 rotate about an axle 54 (FIGS. 2 and 3) extending between the side plates 46 and 48 in front of the deck 38, such that each front wheel 50 supports one of the side plates 46 and 48 and the deck 38 for movement over the ground. A rear roller 58 extends between the side plates 46 and 48 and also supports the side plates 46 and 48 and the deck 38 for movement over the ground. The roller 58 is behind the deck 38 and extends across substantially the entire width of the deck 38. The roller 58 resists scalping and stripes the grass.

('530 pat., col., 3, ll. 5-21.)

A cross member 128 is mounted on the outer end of the outer leg 124 for pivotal movement about a generally vertical axis 132 and about a generally horizontal

> axis 136 extending in the forward-rearward direction. Each of the opposite,
> laterally-spaced ends of the cross member 128 has thereon (see FIGS. 2, 3, 5 and
> 6) a downwardly and slightly rearwardly extending arm 140. The lower end of
> one arm 140 is connected to the side plate 46 for pivotal movement about a
> generally horizontal, laterally-extending axis 144 adjacent the forward ends of the
> side plates 46 and 48. The lower end of the other arm 140 is connected to the side
> plate 48 for pivotal movement about the axis 144.

(*Id.* at col. 4, 7-19.)  This is not simply a preferred embodiment, it is the only embodiment; it is the invention.  *See On Demand Mach. Corp.*, 442 F.3d at 1340 ("the claims cannot be of broader scope than the invention that is set forth in the specification.")  There is nothing else described or shown in the patents, other than this specifically constructed cutting deck assembly that accomplishes the purpose of the invention – to enable a gang-type rotary lawn mower to closely trim and cut undulating terrain.

The '312 patent defines the cutting deck assemblies in the same manner as the other two patents.  The Summary of the Invention is the same in all three patents.  The alternate embodiments that were added as new material in the '312 patent describe the cutting deck assemblies as having the same structure as the earlier embodiment:

> With reference to FIG. 7, an alternate lawn mower embodiment is depicted at
> reference numeral 150. It should be appreciated that lawn mower 150 includes
> common components and functions substantially similarly to lawn mower 10.
> Accordingly, similar components will be identified with like reference numerals.
> Lawn mower 150 preferably includes three side-by-side front cutting deck
> assemblies 34 in front of the wheels 14 and two rear cutting deck assemblies 152
> positioned between the front wheels 14 and in front of the rear wheels 16."

('312 pat., col. 5, ll.10-20.)

Textron's proposed construction conflicts with the way one of ordinary skill in the art would interpret the phrase after studying the patents.  (Skromme Decl., ¶ 26.)  Textron does little more than rearrange the words of the disputed phrase.  Cutting deck assemblies

having a rotary blade, and nothing more, were criticized in the patents as undesirable for

cutting golf course roughs.  ('530 pat., col. 1, ll. 15-20.)  The Summary of the Invention

teaches that the patentee's invention included more than just a rotary cutting deck; the

patentee said that "each" cutting deck assembly also included side plates to which the

deck is mounted, a rear roller between the side plates and supporting them to avoid

scalping, and a cross member to enable the tri-pivot movement necessary for

maneuvering undulating terrain and close trimming.  (*Id*. at 27-37.)  It was "this

construction," not the structure Textron proposes, that enabled the invention to "suitably"

cut golf course roughs.  (*Id*. at col. 2, ll. 4-8.)

### 4.    "Deck Assembly Mounted On The Frame"

**Claims: '530 Patent, claim 1; '311 Patent, claims 1, 2, and 10; '312 Patent, claims 1 and 24**

**<u>Toro's Proposed Construction:</u>**

Attached directly to the frame so that the deck can move vertically relative to the frame
and can pivot relative to the frame about three mutually perpendicular axes.

**<u>Textron's Proposed Construction:</u>**

Connected to the frame.

Toro's construction is consistent with how the term, as used in the patents-at-

issue, would be understood by persons of skill in the art – the legal standard set forth by

the Federal Circuit.  *Phillips*, 415 F.3d at 1312-13; see also Skromme Decl., ¶ 17.

Textron's construction advocates a broad, expansive use of the term. General usage is not

the test required by *Phillips*.  Moreover, Textron's general definition exceeds the scope of

the invention set forth in the specifications.  *Phillips*, 415 F.3d at 1312-13; On *Demand*

*Machine Corp.*, 442 F.3d at 1340 ("the claims cannot be of broader scope than the

invention that is set forth in the specification.")  Textron's construction suggests that any

type of connection to the frame, including prior art arrangements such as rigid or hinged

is covered.  But the patentee was clear that "the invention" was to "an improved

arrangement for mounting a rotary cutting deck on a lawn mower frame"; one that

permitted tri-pivotal movement of the deck assembly. ('530 pat., col. 1, ll. 31-37.) This is

the construction that enabled the lawn mower to cut the undulating terrain of a golf

course rough and the construction allowed by the Patent Office.  ('530 pat., col. 2, ll. 4-

6.)  The mounting of the deck assemblies is *never* described in any other way.

### a.  The Summary of the Invention Supports Toro's Construction

In the Summary of the Invention portion of the patents, the inventor told the

public *twice* that his invention included a specific deck-mounting construction:

> *Each* deck is mounted on its own lifting arm *so that the deck can move vertically relative to the frame and can pivot relative to the frame about three mutually perpendicular axes.*  (*Id.*, col. 1, ll. 31-37 (emphasis added.))

> *Each* deck assembly is connected to the frame by a generally L-shaped, horizontally-extending lifting arm operable to lift the deck assembly relative to the frame. Each deck assembly is connected to the frame by its own lifting arm. Each lifting arm has an inner end pivotally connected to the frame. A cross member is mounted on the outer end of the lifting arm *for pivotal movement about a generally vertical axis and about a generally horizontal axis extending in the forward-rearward direction. One end of the cross member is connected to one of the deck assembly side plates for pivotal movement about a generally horizontal, laterally-extending axis adjacent the forward ends of the side plates, and the other end of the cross member is connected to the other side plate for pivotal movement about the same axis*.

(*Id.*, col. 1, l. 57 - col. 2, l.3 (emphasis added).  No other mounting configuration is

described, shown or contemplated.  The Summary of the Invention also directly ties the

"improved arrangement for mounting" to the claimed advantages of the invention:

> *This construction* enables the lawn mower to cut the undulating terrain of a golf course rough and to be controlled for close trimming. (Id., col. 2, ll. 4-6 (emphasis added).)

The patentee's characterization of his invention in the "Summary of the Invention" is "strong evidence" of the scope of the invention. *See SciMed*, 242 F.3d at 1343 (Summary of the Invention described a specific catheter configuration (coaxial lumens) and supported limiting an otherwise broader claim term to the configuration described in summary of the invention); *Honeywell*, 452 F.3d at 1318; *Wireless Agents*, 2006 U.S. App. LEXIS 18933 at *5.

### b. The remainder of the specification also supports Toro's construction.

Other portions of the specification, including the drawings, also supports that the scope of the invention was a deck that can be lifted and pivot relative to the frame about three mutually perpendicular axes: "The connection of the deck 38 to the arm 112 via the cross member 128 *allows the deck 38 to pivot relative to the frame 12 about the three mutually perpendicular axes 132*, 136 and 144. This *mounting arrangement* enables the deck 38 to adjust to undulating terrain, thereby substantially avoiding scalping. ('530 pat., col. 4, ll. 26-31 (emphasis added).) There is no other mention of an alternate configuration. (*Id*. at col. 3, l. 66-col. 4, l.19 (emphasis added.))

Not only did Textron define the invention in the specification. It also described the specific configuration as an advantage: "*This construction* enables the lawn mower to cut the undulating terrain of a golf course rough and to be controlled for close trimming. (*Id*. at col. 2, ll. 4-6 (emphasis added) and col. 4, ll. 26-31.) *See On Demand Mach. Corp.*, 442 F.3d at 1340 citing *AstraZeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1339-40 (Fed. Cir. 2004).

The Federal Circuit recently addressed a very similar claim construction issue in *Honeywell*. In that case, the claim term in dispute was "fuel injection system component" in a patent having to do with fuel injection systems. Although the district court recognized that the general usage or "ordinary meaning" of the term "refers to any constituent part of the fuel injection system of a motor vehicle including, for example, fuel filters . . . " and that the patentee made statements during the prosecution of the [patents-in-suit] that could be interpreted to support the general usage, the district court construed the term to mean only fuel filters. The court's reasoning was that the specification "clearly limited" the term to a fuel filter because it was described as the invention, not merely a preferred embodiment. *Honeywell*, 452 F.3d at 1318. The Federal Circuit affirmed the trial judge's construction. *Id.* On at least four occasions, wrote the appellate court, the specification referred to fuel filter as the invention. *Id.* In affirming the trial judge, the court of appeals said: "The public is entitled to take the patentee at his word and the word was that the invention is a fuel filter." *Id.*

The public, including Toro, is entitled to take Mr. Bednar at his word. That word was that the invention is a deck assembly that can move vertically relative to the frame (i.e., up and down relative to the grass) and can pivot relative to the frame about three mutually perpendicular axes. This mounting configuration was described as the invention *twice* in the Summary of the Invention, it was the only configuration described in the drawings and the preferred embodiment. In short, the specification does not indicate that a tri-axial mounted deck is merely the preferred embodiment, it is the only configuration identified by the patentee as the invention. *Id.*

5.      "Deck Defining A Downwardly Opening Space"

Claims: '530 Patent: claim 1; '311 Patent: claims 1 and 2; '312
Patent claims 1, 19 and 24

**Toro's Proposed Construction:**

A deck defined by a continuous solid vertical wall of uniform height open on the bottom.

**Textron's Proposed Construction:**

The deck has a downwardly opening space.

Toro's proposed construction closely aligns with how one of skill in the art would interpret the phrase and with the scope of the invention as described and claimed by the inventor in his patents. The claims, written description, and drawings all support Toro's construction that Textron's invention is limited to only a mulching deck – a deck having a solid vertical wall of uniform height open on the bottom so that all of the grass clippings go down into the lawn, not any other place.

a.      The Claims Support Toro's Construction.

The relevant portion of claim 1 of the '530 patent is highlighted to show the disputed term in context:

1. A gang-type rotary lawn mower comprising

a frame supported by front and rear wheels for movement over the ground,

* * *

each of the front and rear deck assemblies including a single-spindle cutting *deck defining a downwardly opening space*, a single spindle mounted for rotation about a generally vertical axis within the space, at least one cutting blade mounted on the spindle for rotation therewith, and a rear roller supporting the deck for movement over the ground, the deck having a width such that the roller extends across substantially the entire width of the deck.

Claim 6, which is depends from claim 1, explains that the deck defines a downwardly opening space in which the spindle and blade rotates, i.e., "within the

25

space." ('530 pat., col. 5, ll. 26-30.) Claim 6 further specifies the purpose of the downwardly opening space: "the trailing blade extending at a non-perpendicular angle relative to the leading blade so that clippings coming off the trailing edge of the leading blade are cut immediately by the trailing blade *before the clippings start swirling around within the space*." (Id. at 34-36 (emphasis added).) Claim 6 is describing the "space" defined by the downwardly opening deck – it is not further narrowing that term. In describing the space it describes the ability of permitting the clippings to swirl around – a mulching deck. (*Id*. at col. 3, l. 62.) Decks with openings in the side (side discharge or rear discharge decks) do not permit clippings to swirl around. Such desks discharge the clippings horizontally.

In order to permit swirling around of clippings within the deck space, it must have a continuous solid wall of uniform height otherwise the clippings would be discharged from the space before swirling occurred. The notion of swirling clippings is a point of distinction between mulching decks and non-mulching decks such as rear- or side-discharge decks.

### b.    The Specification Supports Toro's Construction.

The description of the only embodiment makes clear that it is a mulching deck 38 that defines the downwardly opening space:   "*Each* of the cutting deck assemblies 34 includes (see FIGS. 2-5) a single-spindle *mulching deck 38* defining a downwardly opening space 42 (FIG. 4)." ('530 pat., col. 3, ll. 6-8 (emphasis added).)

Every single drawing graphically defines deck 38 as a mulching deck, i.e., a deck having a continuous solid vertical wall of uniform height open on the bottom:



Even the abstract on the cover page of the patents makes clear that the scope of the invention was a mulching deck: "each of the front and rear deck assemblies including a single-spindle *mulching* deck defining a downwardly opening space . . . ." ('530 pat., Abst. (emphasis added.)  One of ordinary skill in the art, after reviewing the patents, would understand the phrase "deck defining a downwardly opening space" to mean "a deck having a generally vertical wall of uniform height where the opening is only downward." (Skromme Decl., ¶ 18.)

### 6. "Roller Extends Across Substantially the Entire Width of the Deck"

**Claims: '530 Patent: claim 1; '311 Patent: claims 2 and 10**

**Toro's Proposed Construction**

This phrase is indefinite and not capable of construction.  However, if the Court finds that this phrase is capable of construction, Toro proposes the following construction: the roller extends slightly less than or the full width of the deck, but not beyond the width of the deck."

**Textron's Proposed Construction**

The roller extends across substantially the entire width of the deck, but is not required to be exactly as wide as the deck.

**a. The phrase is indefinite because it is impossible to determine when a roller is short enough not to extend across "substantially the entire width," and therefore not infringe.**

The claim phrase "roller extends across substantially the entire width of the deck" is indefinite because one skilled in the art could not determine what length of a roller becomes short enough such that it does not extend across substantially the entire width of the deck. The Patent Act charges inventors with "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. This requirement is significant in that it allows those in the relevant art to determine the scope of the claims and avoid infringement. A patent phrase is indefinite when those skilled in the art would not understand what is claimed when the claim is read in light of the specification. *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).

Expert witness Robert Skromme testified that one skilled in the art could not determine what this phrase means after reading the patents. (Skromme Decl. at ¶ 27.) In particular, Mr. Skromme testified that one skilled in the art could not determine at what length a roller become too short such that it does not extend across substantially the entire width of the deck. (*Id.*) Neither the claim language nor the specification answer this fundamental question essential to determine what is claimed: At what length does a roller become short enough such that it does not extend across substantially the entire width of the deck?

The specification is of no assistance. The specification states that the roller extends between the side plates, which also provides no guidance as to how short the roller must be to avoid infringing the claim. ('530 patent at Col. 1, ll. 48-49.) The only

example provided in the specification's preferred embodiment shows a roller that is the entire width of the deck ('530 at Figs. 3-5), which only adds confusion to claim's use of "substantial." The dictionary definition of "substantial" excludes the entire width: "being largely but not wholly that which is specified." *Merriam-Webster's Collegiate Dictionary* 1174 (10th ed. 1997) (Ex. 14.) Because one skilled in the art could not determine whether the claim means full-width or partial-width, this phrase is indefinite.

> **b.    If capable of construction the phrase means "the roller extends slightly less than or the full width of the deck, but not beyond the width of the deck"**

Should the Court find that the phrase is capable of construction, it should construe it to mean that "the roller extends slightly less than or the full width of the deck, but not beyond the width of the deck." The specification only repeats the phrase, without defining it. ('530 pat., col. 1, ll. 48-55; col. 3, ll. 16-20.) In the disputed phrase, the term "substantially" modifies "entire width of the deck." Substantially means "being largely but not wholly that which is specified" and "considerable in quantity." (Ex. 14.) Thus, the claim language suggests that the roller extends largely, but not wholly, across the width of the deck.

The specification's drawings only show the roller extending the full width of the deck. ('530 pat. at Figs. 3-5.) For example, Figure 5 shows, with the red arrows pointing to the ends of the roller, that the roller extends all the way across the width of deck (38):

 

The Patent Office rejected as obvious, a roller that extends across substantially the
entire width of the deck based on a patent reference and a mower brochure: U.S. Pat. No.
4,901,507 ("Cracraft") and Mountfield "Domestic Grass Machinery" ("Mountfield").
(Ex. 2 at 109.)  Arguing to overcome that rejection, the inventor stated: "Cracraft simply
has rollers that extend a small part of the distance across the deck and serve the same
function as wheels, *not the function of Applicant's wider roller*."  (*Id*. emphasis added.)
In doing so, the inventor fixed the scope of his invention to rollers that *both* resist
scalping and stripe the grass, but do not function simply as wheels.  The only type of
roller that can accomplish those functions is a roller that extends the full width of the
deck or slightly less, but not beyond the width of the deck.

7.    "Lifting Arm"

Claims: '530 Patent: claim 3; '311 Patent: claims 3 and 11; '312
Patent: claims 14 and 19

**<u>Toro's Proposed Construction:</u>**

A generally L-shaped, horizontally-extending device having inner and outer ends
operable to lift the deck assembly relative to the frame, the inner end pivotally connected
to the frame, the outer end pivotally connected to the deck assembly for pivotal
movement about a generally vertical axis and about a generally horizontal axis extending
in the forward-rearward direction.

30

**Textron's Proposed Construction:**

An arm that is operable to lift a cutting deck assembly.

Unlike the "mounted on the frame" limitation above, which focuses on the decks' ability to lift and pivot about three mutually perpendicular axes, regardless of structure, the "lifting arm" limitation is specific structure that achieves the claimed mounting on the frame that the inventor characterized as part of his invention. Once again, it was not just preferred structure – it was the structure described by the inventor as his invention.

### a. The Summary of the Invention Supports Toro's Construction

In the Summary of the Invention, the inventor stated that every deck assembly of his invention included a specific L-shaped, horizontally-extending lifting arm:

> *Each deck assembly is connected to the frame by a generally L-shaped, horizontally-extending lifting arm* operable to lift the deck assembly relative to the frame. Each deck assembly is connected to the frame by its own lifting arm.

('530 pat., col. 1, ll. 32-37 (emphasis added).) The inventor referred to his specifically shaped lifting arm as "an improved arrangement for mounting a rotary cutting deck on a lawn mower frame." (*Id*. at col. 1, 31-37.) The inventor defined this specifically shaped lifting arm as part of the invention. (*Id.*) The public should be able to take the inventor at his word as to the scope of the invention. *On Demand Mach. Corp.*, 442 F.3d at 1340.

### b. The Remainder of the Specification Supports Toro's Construction.

The remainder of the specification, including the drawings, supports that the scope of the invention as to the lifting arm is no broader than the generally L-shaped, horizontally extending lifting arm described in the Summary of the Invention. There is absolutely no mention of any other structure used to lift the decks relative to the frame

other than the generally L-shaped, horizontal arms.  The only description of the lift arms

in the written description describes each of them as generally L-shaped and horizontal.

('530 pat., col. 3, l. 66 – col. 4, l. 12 (emphasis added.))

### 8.    "Side Plates"

**Claims: '530 Patent: claim 4; '311 Patent: claims 4 and 12; '312 Patent: claim 19**

**Toro's Proposed Construction:**

Thin, flat pieces of metal laterally-spaced and generally vertically-extending from the
rear roller to the front wheels.

**Textron's Proposed Construction:**

Plate-like components on each side of the deck assembly.

Toro's construction uses the language that the inventor used to describe his

invention, not a preferred embodiment.  In contrast, Textron ignores the words the

inventor used and asks the Court to adopt a broad, unsupported general-use definition.

Textron's position conflicts with *Phillips* and several post-*Phillips* decisions that require

the scope of the claims be true to the invention as described in the specification.

### a.  The Summary of the Invention Supports Toro's Construction.

The inventor described, as part of his invention, side-plates that are both generally

vertically extending and supported by wheels attached to the front of each plate and a

roller between the back end of each plate.  "*Each* of the front and rear deck assemblies

includes a pair of *laterally-spaced, generally vertically-extending side plates, front

wheels supporting the side plates* for movement over the ground, and *a rear roller

extending between the side plates and supporting the side plates* for movement over the

ground.  ('530 pat., col. 1, ll. 45-47 (emphasis added).)  The inventor did not describe the side plates in any other manner.

### b.  The Only Embodiment Is Consistent With Toro's Construction.

The only embodiment described and shown in the patent includes side-plates that are thin, flat pieces of metal laterally-spaced and generally vertically-extending from the rear roller to the front wheels.  Two representative drawings illustrate that the inventor always showed the side-plates (48/162) as flat pieces extending from the front wheels (50/166) to the rear roller (58/174) and being supported by both:



The only descriptions in the patents are entirely consistent:

> "Two front wheels 50 rotate about an axle 54 (FIGS. 2 and 3) extending between the side plates 46 and 48 in front of the deck 38, such that each front wheel 50 supports one of the side plates 46 and 48 and the deck 38 for movement over the ground." ('530 pat., col. 3, ll. 13-18.)

> "A rear roller 58 extends between the side plates 46 and 48 and also supports the side plates 46 and 48 and the deck 38 for movement over the ground." (Id. at ll. 17-19.)

The specification of the '312, which added new drawings and description, continued to describe the side plates as generally vertical and extending from the rear roller to the front wheels.

"Deck 160 is supported by a pair of laterally spaced, generally vertically extending side plates 162 and 164. Two caster wheels 166 are pivotally coupled to a cross-arm 168 extending between side plates 162 and 164, such that each caster wheel 166 supports one of the side plates 162 and 164 and the deck 160 for movement over the ground." ('312 pat., col. 5, ll. 50-56.)

"A continuous, unitary roller 174 extends between side plates 162 and 164 and also supports side plates 162 and 164 and deck 160 for movement over the ground." ('312 pat., col. 5, ll. 60-63.)

The inventor never described or showed a side plate other than one extending from the front wheels to the rear roller with the roller between the rear ends of the side plates and supporting those ends.  Finally, Textron's proposed construction is not consistent with how one of ordinary skill in the art would understand the phrase; Toro's is. (Skromme Decl., ¶ 20.)

> **9.    "Rear Roller Extends Between The Side Plates And Supports The Side Plates For Movement Over The Ground"**
>
> **Claims: '530 Patent: claim 4; '311 Patent claims 4 and 12; '312 Patent: claim 19**

**Toro's Proposed Construction:**

Each end of the rear roller is connected to a respective side plate.

**Textron's Proposed Construction:**

The rear roller extends between the side plates in such a way to support them for movement over the ground.

Toro's proposed construction best fits with the language of the claim itself and the description by the inventor in the written description and drawings.

### a.  The Claim Language Supports Toro's Construction.

Claim 4 of the '530 patent is representative.  The disputed language illustrates that the inventor described the roller as connected between the side plates – not between

anything else: "wherein the rear roller extends between the side plates and supports the side plates for movement over the ground."  ('530 pat., col. 5, ll. 16-18.)

The words "extends between" inform the construction.  When something extends between two objects, it is within the space separating those objects, not something else. *Elekta Inst. S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("extending between" means "exclusively in the space separating.")  This is how one of ordinary skill in the art would understand the phrase.  (Skromme Decl., ¶ 21.)

### b.  The Summary of the Invention Supports Toro's Construction.

The Summary of the Invention also specifies the location of the rear roller – between the side plates – not any other place else on every deck:

> "*Each* of the front and rear deck assemblies includes a pair of laterally-spaced, generally vertically-extending side plates, . . . and a rear roller extending *between* the side plates and supporting the side plates for movement over the ground. ('530 pat., col. 1, ll. 44-56 (emphasis added.))

### c.  The Rest of the Specification Supports Toro's Construction.

All of the drawings show that the roller (58/174) is connected to the side plates, and extends between the side plates – nowhere else.



Consistent with the Summary of the Invention, there is no embodiment that has the roller between anything other than the side plates: "A rear roller 58 extends between the side plates 46 and 48 and also supports the side plates 46 and 48 and the deck 38 for movement over the ground." ('530 pat., col. 3, ll. 8-21.)  Similarly, in the '312 patent: "A continuous, unitary roller 174 extends between side plates 162 and 164 and also supports side plates 162 and 164 and deck 160 for movement over the ground."  ('312 pat., col. 5, ll. 50-65.) This is the only construction which makes sense given that the roller must also *support* the side plates.

> **10.    "Each Rear Deck Assembly Being Aligned With A Respective Gap Between Adjacent Front Deck Assemblies"**
>
> **Claims: '530 Patent: claim 1; '311 Patent: claims 1 and 8; '312 claims 1 and 24**

**Toro's Proposed Construction:**

Every rear deck assembly is located behind a gap defined by two adjacent front deck assemblies.

**Textron's Proposed Construction:**

Rear deck assemblies are aligned with the gaps between the front desk assemblies.

The issue is whether the term "each" as used in the claim term above means that "every" rear deck assembly must be aligned with a respective gap between adjacent front deck assemblies.  Textron contends that, "each" means that there are some rear deck assembly behind every gap regardless of how many rear decks there are.  In other words, a mower having a configuration of two adjacent front decks (defining one gap between them) and three rear deck assemblies (only one of which is aligned with the single gap) would satisfy the above limitation.

The inventor had the opportunity to choose his words. If he had meant what Textron now advocates, he could have easily written the claim as follows: "*at least one* rear deck assembly aligned with *each* respective gap between adjacent front deck assemblies." Or he could have written: "the respective gap between adjacent front deck assemblies is aligned with at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies." That is not what the inventor wrote, nor is it what he described. And not once in his three patents did he show or describe a mower having any rear deck(s) not aligned with a respective gap between adjacent front deck assemblies.

### a. All of the Embodiments Have Every Rear Deck Aligned With a Gap Between Adjacent Front Decks.

The written description always describes every rear deck assembly as being aligned with a respective gap. Never does the inventor suggest that his invention includes mowers that have rear decks *not* aligned with gaps.

> "The lawn mower 10 further comprises front and rear rows 26 and 30, respectively, of cutting deck assemblies 34. More particularly, in the illustrated construction, the lawn mower 10 has three side-by-side front cutting deck assemblies 34 in front of the front wheels 14, and two rear cutting deck assemblies 34 behind the front wheels 14 and in front of the rear wheels 16. *As is known in the art, each rear deck assembly 34 is aligned with the gap between two adjacent front deck assemblies 34.*" ('530 pat., col. 2, l. 64 - col. 3, l. 5 (emphasis added.))

The '312 patent specification further teaches that every rear deck is aligned with the gap created by adjacent front deck assemblies.

> "Lawn mower 150 preferably includes three side-by-side front cutting deck assemblies 34 in front of the wheels 14 and two rear cutting deck assemblies 152 positioned between the front wheels 14 and in front of the rear wheels 16. *Each of the rear cutting deck assemblies 152 is positioned within the gap between two adjacent front deck assemblies 34.*" ('312 pat., col. 4, ll. 15-22 (emphasis added.))

### b. The Drawings Also Support Toro's Construction.

The drawings, whether of a 5-deck configuration or a 3-deck configuration, also only show rear decks in the gaps – never outside of the front decks. ('530 pat., Fig. 1 and '312 pat., Fig. 12.)

### c. Dictionaries and Expert-Witness Testimony Support Toro.

The dictionary definition for "each" is consistent with "all" and "every." *Webster's Third New International Dictionary* 713 (1993) (Ex. 15). Those skilled in the art also would understand that Textron's use of the word "each" limited its invention to having every rear deck aligned with a gap between adjacent front decks. (Skromme Decl., ¶ 22.)

**11.    "Roller"**

> **Claims: '530 Patent: claim 1; '311 Patent: claims 2 and 10; '312 Patent: claims 1, 19 and 24**

**<u>Toro's Proposed Construction:</u>**

A rotating device that resists scalping and stripes the grass.

**<u>Textron's Proposed Construction:</u>**

A device that rolls.

The Background of the Invention section of the specification explains the problem allegedly solved by the invention: using rotary mowers to cut golf course roughs at a short length while not scalping the grass. ('530 pat., col. 1, ll.7-9.) "Thus, rotary mowers have not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length." (*Id*. at col. 1, ll.16-19.)

The Summary of the Invention describes the invention as including a roller which resists scalping and stripes the grass:

More particularly, the invention provides a gang-type rotary lawn mower comprising . . . . Each of the front and rear deck assemblies includes . . . a rear roller extending between the side plates and supporting the side plates for movement over the ground. . .The roller extends across substantially the entire width of the deck. The roller resists scalping and stripes the grass, both of which are aesthetically desirable." (*Id*. at col. 1, ll. 38-56.)

The written description of the invention never describes a roller having any function other than to stripe and resist scalping:

"A rear roller 58 extends between the side plates 46 and 48 and also supports the side plates 46 and 48 and the deck 38 for movement over the ground. The roller 58 is behind the deck 38 and extends across substantially the entire width of the deck 38. The roller 58 resists scalping and stripes the grass." ('530 pat., col. 3, ll. 16-21.)

The new portion of the '312 patent specification that was added also confirms that the roller is a device which resists scalping and stripes the grass. ('312 pat., col. 6, ll. 34-36, ll. 50-53, and 62-65; col. 7, ll. 47-53.)

The inventor's words, his drawings, and his characterization of "the invention" supports that a roller is a device that both resists scalping and stripes the grass.

## IV.    CONCLUSION

The public, including competitors, is entitled to rely on a patentee's definition of his invention. The summary of the invention is strong evidence of what the inventor considers to be the invention. The patent rules require that any object recited in the summary of the invention be that of the invention as claimed. Federal Circuit case law has enforced these rules, limiting otherwise broad claim terms and phrases to the objects described in the summary of the invention and elsewhere in the patent as "the invention."

Textron's patents describe in detail "the invention" that it claimed allowed a rotary gang mower to be suitable for cutting a golf course rough. The improved mounting arrangement and the structure of the cutting deck assemblies were touted as an

39

advantage over the prior art ganged rotary mowers.  Toro's proposed constructions take the inventors at their word – as the law provides.

|  | POTTER ANDERSON & CORROON LLP |
|--|--|
| OF COUNSEL: | |
| Earl D. Reiland | By:  _/s/ David E. Moore_____ |
| Anthony R. Zeuli | Richard L. Horwitz (#2246) |
| Thomas J. Leach | David E. Moore (#3983) |
| MERCHANT & GOULD P.C. | Hercules Plaza, 6th Floor |
| 3200 IDS Center | 1313 N. Market Street |
| 80 South 8th Street | Wilmington, Delaware 19899-0951 |
| Minneapolis, MN 55402 | (302) 984-6000 |
| (612) 332-5300 | rhorwitz@potteranderson.com |
|  | dmoore@potteranderson.com |
| Dated:  August 4, 2006 | |
|  | *Attorneys for Defendant* |
|  | *The Toro Company* |

744219

40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on August 4, 2006, the attached document

was electronically mailed and hand delivered to the following persons and was

electronically filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following and the document is available for viewing

and downloading from CM/ECF:

Edmond D. Johnson
Peter B. Ladig
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
tjohnson@bayardfirm.com
pladig@bayardfirm.com
KWright@bayardfirm.com

I hereby certify that on August 4, 2006, I have Electronically Mailed and Federal

Expressed the documents to the following non-registered participants:

Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC 20006-1109
srobertson@hunton.com
ccampbell@hunton.com
mlouey@hunton.com
lmarlatt@hunton.com
fmckeon@hunton.com
dmckim@hunton.com

Michael P. F. Phelps
David Young
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
mpphelps@hunton.com
dyoung@hunton.com

By: */s/ David E. Moore*
      Richard L. Horwitz
      David E. Moore
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, Delaware 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      dmoore@potteranderson.com