# EXHIBIT 6

LEXSEE

**SENTEX SYSTEMS, INC. (now Davthal Corporation), Plaintiff-Appellant, v. ELITE ACCESS SYSTEMS, INC., ELITE ENTRY PHONE, INC., ALEX PARSADAYAN, and WALTER PARSADAYAN, Defendants-Appellees.**

98-1165

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**1999 U.S. App. LEXIS 3846; 52 U.S.P.Q.2D (BNA) 1520**

**March 10, 1999, Decided**

**NOTICE:** [*1] RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: 1999 U.S. App. LEXIS 33717.

**DISPOSITION:** Affirmed

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company appealed from a judgment of the United States District Court for the Central District of California granting defendants' motion for summary judgment and holding plaintiff's patent claims invalid as obvious.

**OVERVIEW:** Plaintiff company's patent was directed to a telephone entry system for a liquid crystal display electronic directory Plaintiff admitted that the only difference between its claim and its own prior art was the used of a liquid crystal display for an electronic directory. Plaintiff claimed that defendant corporations were infringing its patent and defendants moved for summary judgment on the basis that plaintiff's patent claims were invalid as obvious On appeal, the court held that the trial court was correct in its finding of obviousness based on plaintiff's prior art and based on the fact that several other corporations were working on the same technology at the time plaintiff filed its patent The court affirmed

summary judgment in favor of defendants.

**OUTCOME:** Plaintiff company was not granted relief on appeal and the court affirmed dismissal of plaintiff's claim of patent infringement based on the holding that plaintiff's patent claims were invalid as obvious

**CORE TERMS:** display, directory, electronic, telephone-entry, patent, crystal, liquid, obviousness, invention, secondary, environmental conditions, environmental, occupant, written description, glare, teaching, visitor, skill, declaration, temperature, technology, preamble, code number, displaying, advertisement, severe, lobbies, summary judgment, subject matter, displayed

**JUDGES:** Before RICH, NEWMAN, and MICHEL, Circuit Judges

**OPINIONBY:** RICH

**OPINION:** RICH, Circuit Judge.

Decision

Sentex Systems, Inc. (Sentex) appeals from a judgment of the United States District Court for the Central District of California granting defendants' motion for summary judgment holding claims 1-11 and 14-15 of Sentex's U.S. Patent No. 5,475,741 ('741 patent) invalid as obvious We affirm.

Background

1999 U.S. App. LEXIS 3846, *1; 52 U.S.P.Q.2D (BNA) 1520

The '741 patent is directed to a telephone-entry system for a liquid crystal display (LCD) electronic directory. These systems are typically used in multi-occupant buildings or gated communities where a visitor uses the system to telephone an occupant by entering a code number which dials the occupant's telephone number. The code number with the associated occupant must be displayed to the visitor. Previously, telephone-entry systems used mechanical directories for displaying the occupants name and code number requiring time and labor to change names and codes as occupants moved in [*2] and out of a facility. The '741 patent, however, describes an electronic directory using an LCD display. An electronic directory can automatically alphabetize the names of occupants and provides access for remote site programming.

Of the asserted claims, there is only one independent claim, claim 1. Sentex admits that the only difference between claim 1 and its own prior art telephone-entry systems is the use and control of a liquid crystal display for an electronic directory. The liquid crystal display limitation requires "a liquid-crystal display, disposed for viewing by [a] visitor, and having a display medium and a structure for containing the display medium; said liquid-crystal display structure comprising a face, disposed in front of the medium for displaying the directory information." The district court focused on this limitation in its analysis of whether the claims at issue are obvious. n1

> n1 Because neither party argues to the contrary, we assume all of the asserted claims stand or fall together.

[*3]

Sentex argued to the district court that it would not have been obvious to use liquid crystal displays in the severe environment in which a telephone-entry system is used. Telephone-entry systems may be used, Sentex argues, outdoors or in lobbies that may experience extreme temperatures or excessive glare from sunlight. The district court noted, however, that claim 1 contains no environmental limitations.

The district court recited two articles that appeared in an industry magazine entitled the Alarm Installer and Dealer (AID) advertising Sentex's new Ultra System (which defendants (collectively "Elite") argue is Sentex's

Infinity System, an embodiment of the claimed invention of the '741 patent) that disclosed using an "electronic directory to display tenant names and codes." The district court also noted that the prior art teaches the use of liquid crystal displays in telephone entry systems. Therefore, the district court held, "the disclosure in Claim 1 that a liquid crystal display would perform the function of displaying names in a situation where there are not any particular environmental limitations would not provide one skilled in the art with any new information. The use [*4] of a liquid crystal display for the invention of Claim 1 is obvious." Sentex Sys., Inc. v. Elite Access Sys., Inc., No. SA CV 96-822-LHM (EEx), slip op. at 8 (C.D. Cal. Nov. 19, 1997).

The district court also addressed Sentex's evidence of secondary considerations of nonobviousness.

> Here, secondary considerations do not militate against the finding of obviousness. The undisputed evidence indicates that there existed a felt need to replace the unwieldy mechanical directory of telephone-entry systems past with an electronic directory. The evidence also demonstrates, however, that the incorporation of liquid crystal display technology into telephone-entry systems and the use of electronic directories to display information were well underway by Sentex' application date. Any long felt need to create an electronic directory was satisfied by the prior art and the evolving state of liquid crystal display technology. While Sentex submits evidence that its system met with commercial success, it fails to present evidence sufficient to establish a nexus between this commercial success and the claimed invention. . . . The evidence indicates that Sentex encountered some in the telephone-entry [*5] field - including its own consultant - who questioned whether its system would be feasible as it undertook its research into an electronic directory with liquid crystal display. However, the evidence also shows that liquid crystal display technology was evolving rapidly in the eighteen months prior to Sentex' application date and was being utilized to an increasing extent in

1999 U S App. LEXIS 3846, *5; 52 U S P Q 2D (BNA) 1520

telephone-entry systems. Finally, the evidence is undisputed that Sentex' competitors did not market a telephone-entry system with an electronic LCD directory which displayed occupant information until after Sentex began marketing its system. However, the evidence also demonstrates that the rapid development of liquid crystal display technology made its choice in an electronic directory for use in a telephone-entry system highly likely, if not inevitable. Thus, the secondary considerations present in the instant case are not sufficient to overcome the strong case for obviousness based on the prior art, a determination this Court is entitled to make.

Id. at 9-10

Discussion

Parties' Arguments

Sentex asserts that the district court incorrectly construed the claim because it did not view the [*6] invention as a whole. If the district court had done so, Sentex argues, it would have concluded that the ordinary and customary meaning of the term "telephone-entry system" as used in the preamble of claim 1 and when read in light of the written description requires the system to work under severe environmental conditions such as excessive glare and extreme temperatures from the out of doors. When construed in this way as requiring operation under severe environmental conditions, Sentex asserts that the prior art relied upon by the district court, such as the AID articles advertising its Ultra system, is not enabling, because none of the prior art addresses how to solve the problem of using an LCD display under such extreme environmental conditions. Sentex also asserts that the district court used a hindsight analysis and resolved factual issues when determining obviousness because it accepted Carl Muller's declaration concerning the advanced state of the LCD art in the face of conflicting declarations.

Finally, Sentex argues that the district court improperly analyzed its evidence of secondary considerations of nonobviousness because it first found the claims obvious and then determined [*7] whether the

secondary considerations would mitigate against such a finding. Sentex asserts that the law requires the district court to consider the prior art teachings and the secondary considerations together to determine the ultimate obviousness question. Had the district court done so, Sentex asserts, it would have determined that a nexus existed between the commercial success of the commercial embodiment of the '741 patented invention and the implementation of the LCD display in the telephone-entry system. After all, Sentex argues, the LCD display was the only admitted difference between the '741 claimed invention and Sentex's own prior art.

Elite counters Sentex's arguments by asserting that the written description cannot be used to add environmental limitations into the claims, and the ordinary meaning as described in the written description of the preamble term "telephone-entry system" does not include environmental limitations. For instance, the written description specifically addresses broader applications than outdoor use in extreme temperature and glare conditions. Also, claims 12 and 13 add limitations relating to severe environmental conditions such as a protective window [*8] to reduce glare. Therefore, Elite asserts, these limitations under the doctrine of claim differentiation should not be imported into claim 1. Also, Elite points out that the parent and grandparent applications of the '741 patent specifically claim temperature maintaining means.

When construed without the environmental limitations, Elite asserts, the prior art clearly renders the asserted claims of the '740 patent obvious. The two AID articles cited by the district court, which were not cited by Sentex to the examiner of the '741 patent application, clearly describe using an electronic directory in a telephone-entry system. The Amtel and Silent Knight prior art references, Elite argues, provide the suggestion to use an LCD display for such purposes.

For instance, in both Amtel and Silent Knight, LCD displays are used to provide visual information on operational features, to enter individual access codes of residents, and to assist a visitor in dialing the code number to reach a resident. Based on the combined teaching of these articles coupled with the fact that LCD displays were well known in the art to have good readability in direct sunlight, low power requirements, and good night [*9] luminescence, Elite asserts that using an LCD display for an electronic directory in a

telephone-entry system as in claim 1 of the '741 patent would have been obvious. Elite also dismisses Sentex's alleged evidence of secondary considerations by asserting that because Sentex was the market leader, the sales figures cannot be used in and of themselves to show a nexus between the commercial success and the use of an LCD display. Elite asks for an award of attorney fees under 35 U.S.C. § 285.

### Analysis

Summary judgment is properly rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Johnston v. IVAC Corp., 885 F.2d 1574, 1576-77, 12 U.S.P.Q.2D (BNA) 1382, 1383 (Fed. Cir. 1989). In deciding whether a genuine issue of material fact exists, any evidence must be viewed in favor of the nonmoving party with any doubts resolved in its favor. O.I. Corp. v. Tekmar Co., 115 F.3d 1576, 1580, 42 U.S.P.Q.2D (BNA) 1777, 1779 (Fed. Cir. 1997). A grant of summary judgment [*10] is reviewed de novo. Conroy v. Reebok Int'l, 14 F.3d 1570, 1575, 29 U.S.P.Q.2D (BNA) 1373, 1377 (Fed. Cir. 1994).

### Claim Construction

The first step in an invalidity analysis is claim construction. Rockwell Int'l Corp. v. United States, 147 F.3d 1358, 1362, 47 U.S.P.Q.2D (BNA) 1027, 1029 (Fed. Cir. 1998). Claim construction is a question of law that we review de novo. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456, 46 U.S.P.Q.2D (BNA) 1169, 1174 (Fed. Cir. 1998). There are no underlying factual disputes involving claim construction requiring denial of summary judgment as Sentex contends. In determining the meaning of a claim, the court considers the written description, the prosecution history, prior art, and other claims. Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1566, 24 U.S.P.Q.2D (BNA) 1321, 1335 (Fed. Cir. 1992) (citing Tandon Corp. v. United States Int'l Trade Comm'n, 831 F.2d 1017, 1021, 4 U.S.P.Q.2D (BNA) 1283, 1286 (Fed. Cir. 1987)).

The preamble of claim 1 calls for a "telephone-entry system for use by a visitor to a facility having multiple individual-occupant entities." Sentex asks us to construe the term "telephone-entry system" within [*11] this phrase as requiring operability of the system under harsh environmental conditions such as excessive glare and temperatures. The words in the preamble itself, however, militate against such a construction. The preamble recites a system for "a facility having multiple individual-occupant entities." During prosecution of the '741 patent, applicant defined "facility" as "a gated community as well as a multibuilding condo complex etc." Such facilities include apartment buildings with climate controlled lobbies that do not have excessive glare.

Although the written description addresses the problems associated with the use of LCD displays under extreme environmental conditions, it does not limit a "telephone-entry system" to such environments. For instance, in discussing the prior art, the written description states that "directories are commonly used in public lobbies of business buildings, apartment houses, multiple-building condominium complexes, and other multiple-occupant facilities." '741 patent, col 1, ll 21-24. In this recitation, the applicant does not exclude lobbies that are environmentally controlled without significant glare. Significantly, the applicant also states [*12] that "operation of large LCDs would be subject to temperature problems in lobbies and other indoor entryways, as well as outdoors, if the locations receive intense sunlight. Temperature rise in such areas sometimes outstrips the capabilities of a building air-conditioning system, and can be severe enough to degrade the performance of an LCD." '741 patent, col 3, ll 31-36 (emphasis ours). Although the '741 patent describes solving the problems of using a system in such extremes by using terms such as "if" and "sometimes," the applicant contemplated encompassing telephone-entry systems that would not experience such environmental extremes. We agree with the district court that "telephone-entry system" cannot be construed as limited to only those systems that can be used under extreme environmental conditions. Therefore, this preamble term does not add any limitations to the claim, but merely states an intended purpose for the claimed device. See Corning Glass Works v. Sumitomo Elec., Inc., 868 F.2d 1251, 9 U.S.P.Q.2D (BNA) 1962 (Fed. Cir. 1989).

### Obviousness

The standard for obviousness is set forth in the statute as follows:

A patent may not be obtained though the invention [*13] is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains

35 U.S.C. § 103(a) (1994)

A patent carries a presumption of validity. 35 U.S.C. § 282 (1994). We review the ultimate determination of invalidity of a patent for obviousness under a de novo standard. The ultimate determination of obviousness, however, has underlying factual inquiries. These underlying factual inquiries include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) the extent of any proffered objective indicia of nonobviousness or secondary considerations. Rockwell, 147 F.3d at 1362, 47 U.S.P.Q.2D (BNA) at 1029; see also Kahn v. General Motors, 135 F.3d 1472, 1479, 45 U.S.P.Q.2D (BNA) 1608, 1613 (Fed. Cir.), cert. denied, 119 S. Ct. 177 (1998). Such secondary considerations include commercial success, [*14] long felt need, and the failure of others to solve the problem. See Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 716, 21 U.S.P.Q.2D (BNA) 1053, 1055 (Fed. Cir. 1991). n2 If viewing the evidence of the underlying factual inquiries in a light most favorable to Sentex and drawing all reasonable inferences in Sentex's favor, Elite is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. Cable Elec. Prods., Inc. v. Genmark, Inc., 770 F.2d 1015, 1021, 226 U.S.P.Q. (BNA) 881, 884 (Fed. Cir. 1985).

n2 Neither party disputes the district court's assessment of the level of ordinary skill in the art or the differences between the claimed invention and the prior art. Also, neither party disputes that the art relied upon by the district court and argued to this court is analogous art.

1. Scope and Content of the Prior Art

Two advertisements in the AID magazine, one in April and one in May 1987 before the July 1987 critical date, advertising products to be displayed at a trade show in Atlanta in [*15] August 1987, described a new system to be introduced by Sentex with "an electronic directory to display tenant names and codes." As the district court noted, an LCD display was not specifically mentioned in the advertisements. The district court found, however, that the suggestion to use LCD displays for an electronic directory was provided by prior art references describing telephone-entry systems of Amtel and Silent Knight that used LCD displays, although not for an electronic directory.

In a 1985 advertisement, Amtel describes its T/E 2000 as having a "two line, backlit, alpha-numeric liquid crystal display. It's prompting messages (in up to two languages) make it the most user friendly system available at any price." Under the specifications, Amtel states "the Entry control unit shall use a two line alpha-numerical display that communicates to the user in English (and Spanish or French) and also gives prompting messages at every step during the programming mode." The Silent Knight system offers a similar LCD display with three selectable greeting messages and prompts to guide a visitor through the sequence for dialing a tenant code number.

Applicant cited the Amtel advertisements [*16] during prosecution of the '741 patent, but distinguished them by arguing to the examiner that the LCD display was redundant to instructions silk screened onto the face of the unit and could not support an electronic directory. Applicant stated:

The LCD display, although present and operating, was so inadequate in legibility (and perhaps in size, though some small LCD displays are quite adequate for electronic-directory use) that the Amtel company evidently could not expect customers to buy a unit using such a display for the primary purpose of displaying directory information. In short the LCD display is redundant with respect to the silkscreened instructions, and entirely superfluous - but quite expensive.

It serves no function but to give the device some sort of aura of modernity. Amtel's LCD display is a testimonial to

either (1) the very great difficulty, at the time, of finding practical solutions to the obstinate problems of making an LCD readable and otherwise practical in typical outdoor and facility-lobby environments or (2) the extreme unobviousness of using an LCD to display directory information

Sentex reargues these distinctions to this court on appeal. [*17]

In determining whether obviousness is established by combining the teachings of the prior art, "the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art." Furthermore, to invalidate claimed subject matter for obviousness, the combined teachings of the prior art references must suggest, expressly or by implication, the improvements embodied by the invention

In re GPAC, Inc., 57 F.3d 1573, 1581, 35 U.S.P.Q.2D (BNA) 1116, 1123 (Fed. Cir. 1995).

We disagree with Sentex that the prior art does not supply the suggestion that an LCD display may be used for an electronic directory. Both the Amtel and Silent Knight prior art would suggest to one of ordinary skill in the art the use of an LCD display to display information from an electronic directory when viewed with the AID advertisements describing an electronic directory and the state of the art of LCD displays at the time.

The type of information displayed by the LCD as described in the '741 patent comes from the EPROM nonvolatile memory. The only requirement of the LCD display is that it display the information. The arguments that the environmental considerations require [*18] us to find that it would not have been obvious to use an LCD is of no moment because we have agreed with the district court that no such environmental limitations exist in the claim. In fact, however, both the Silent Knight and the Amtel systems provide for the sale of heaters. The Silent Knight system boasts an operating temperature range of between -20F to +120F with the use of a cold weather heater kit. Therefore, we agree with the district court that the prior art provides the suggestion to use an LCD display for an electronic directory.

2. Secondary Considerations

Sentex argues that the evidence of secondary considerations when considered together with the teachings of the prior art should lead us to conclude that the claims of its '741 patent are not invalid for obviousness. We agree with the district court that the secondary considerations do not raise a triable issue of fact concerning obviousness.

Sentex argues that the district court resolved an issue of fact by accepting the declaration of Mr. Carl Muller, the vice-president of Sentex, and rejecting opposing declarations provided by Sentex concerning the state of the art of LCD technology. In the Muller declaration, [*19] he stated that

LCDs generally were cheaper, had longer life expectancies, and required a less complex interface, lower operating voltages and lower power consumption than alternative electronic flat-panel displays. As a result, the LCD was the display technology of choice for use in telephone entry systems as far as I was concerned. Those of ordinary skill in the art would have known of these same advantages of the LCD over the other alternative electronic displays.

The allegedly contradicting declarations by Mr. Don Janess and Mr. McKee, discussed the problems with using LCDs under harsh environmental conditions. Because such conditions are not limitations of the claim, these statements are not relevant for an obviousness determination.

Sentex also argues that mere sales of its product embodying the '741 claimed device establish commercial success. The district court found that Sentex had not established a nexus between the sales and the claimed invention. We agree Sentex was a leader in the market and did not provide evidence that the sales were a result of incorporation of an LCD for displaying information from an electronic directory.

Conclusion

We agree with [*20] the district court that no genuine issue of material fact exists and hold that claims 1-11 and 14-15 of the '741 patent are invalid as obvious

1999 U.S. App. LEXIS 3846, *20; 52 U.S.P.Q.2D (BNA) 1520

n3

exceptional case under § 285 and decline to award attorney fees on appeal

n3 We do not find that this is an

# EXHIBIT 7

LEXSEE

**WIRELESS AGENTS LLC, Plaintiff-Appellant, v. SONY ERICSSON MOBILE COMMUNICATIONS AB and SONY ERICSSON MOBILE COMMUNICATIONS (USA), INC., Defendants-Appellees.**

06-1054

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**2006 U.S. App. LEXIS 18933**

**July 26, 2006, Decided**

**NOTICE:** [*1] THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT PLEASE REFER TO THE RULES OF THE FEDERAL CIRCUIT COURT OF APPEALS FOR RULES GOVERNING

**PRIOR HISTORY:** Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communs. AB, 390 F. Supp. 2d 532, 2005 U.S. Dist. LEXIS 21325 (N.D. Tex., 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement case, appellant corporation challenged a judgment of a district court, which denied it a preliminary injunction to prevent appellee communications corporation from selling mobile phones, which appellant alleged infringed its hand-held, electronic computing device, whose patent was assigned to appellant

**OVERVIEW:** The district court found that appellant had not demonstrated a likelihood of success on the merits of its infringement claim under its construction of the term "alphanumeric keyboard" because appellee's devices did not have an "alphanumeric keyboard" like appellant's devices to render it liable for infringement. The court affirmed Because the phrase "alphanumeric keyboard" was not readily apparent, the court looked to the claim specification and agreed with the district court's interpretation The court opined that to allow appellant to claim a keyboard with less than a full set of keys, such as appellee's, would injure the public's right to take the patentee at his word. Although the claim specification contained boilerplate language that the claim's

description was not meant to be limited, the court saw nothing that contradicted its reading of the specification Additionally, because the claim specification was clear, expert testimony and extrinsic evidence could not be used to contradict it. Finally, the court ruled that the claim's specification made clear that the invention did not include the particular feature, a twelve-digit keypad, found on appellee's product

**OUTCOME:** The court affirmed the judgment

**CORE TERMS:** alphanumeric, keyboard, layout, specification, keypad, invention, twelve-digit, phone, embodiment, patent, display, mobile, alphabetic, preliminary injunction, quotation, fibers, disadvantage, alphabet, numeric, user, derogatory statements, regular arrangement, extrinsic evidence, readily apparent, configuration, modifications, hand-held, repeated, carbon, input

**JUDGES:** Before RADER, GAJARSA, and DYK, Circuit Judges.

**OPINIONBY:** DYK

**OPINION:** DYK, Circuit Judge.

In this patent infringement case, Wireless Agents LLC ("Wireless") appeals from the district court's denial of a preliminary injunction to prevent Sony Ericsson Mobile Communications (USA) Inc ("Sony") from selling the accused products We affirm

BACKGROUND

Wireless is the assignee of U.S. Patent No. 6,665,173 B2 (filed Dec. 20, 2000) ("the '173 patent"), entitled "Physical Configuration of a Hand-Held Electronic Communication Device." Claim 1, the sole independent claim of the '173 patent, recites:

> A hand-held, electronic computing device having a physical configuration comprising:
>
> a body portion;
> a display portion pivotally coupled to the body portion;
> a constantly visible display carried by the display portion;
> an alphanumeric keyboard carried by the body portion;
> wherein the alphanumeric keyboard is at least partially concealed by the display portion when not in use; and
> wherein the [*2] display portion pivots relative to the body portion in a plane that is generally parallel with the alphanumeric keyboard.

'173 patent, col. 13, ll. 30-41 (emphasis added).

On February 10, 2005, Wireless sued Sony n1 alleging that Sony's S700i and S710a mobile phones literally infringed claim 1 and several dependent claims. The accused phones have twelve keys - ten keys representing the numbers 0-9 as well as "*" and " # " keys. Each letter of the alphabet is assigned to one of the keys representing the numbers 2 to 9. Thus, approximately 3-4 alphabetic characters are associated with each number key. To select the alphabetic characters, the user switches to text-entry mode and presses a numeric key repeatedly until the desired alphabetic character is selected. The accused phones are also equipped with predictive text software which uses a built-in dictionary to predict common words' being entered by the user after a certain sequence of key presses.

> n1 Wireless included Sony Ericsson Mobile Communications AB (a Swedish company) in its infringement suit but not in its preliminary injunction motion.

On April 28, 2005, Wireless filed a motion for a preliminary [*3] injunction seeking to enjoin Sony from selling the accused products in the United States. The district court (Judge Sidney A. Fitzwater) denied Wireless's motion, finding that Wireless had not demonstrated a likelihood of success on the merits of its infringement claim under the district court's construction of the term "alphanumeric keyboard." Wireless Agents, LLC v. Sony Ericsson Mobile Commc'ns AB, 390 F. Supp. 2d 532, 540 (N.D. Tex. 2005). The district court construed "alphanumeric keyboard" to mean an "input device having a QWERTY, FITALY, or Dvorak layout or any other alphanumeric layout that includes a substantially full set of alphabetic and numeric keys." Id. at 538-39 (internal quotation marks omitted). The "QWERTY" layout is the standard keyboard arrangement which includes a key for each letter of the alphabet, and the "FITALY" and "Dvorak" layouts are other arrangements which also include a full set of keys. The district court concluded that "[t]he Sony devices do not have an 'alphanumeric keyboard,' as the term is properly construed." Id. at 539. Wireless timely appealed. We have jurisdiction pursuant to 28 U.S.C. §§ 1292(a)(1) [*4] and 1292(c)(1).

## DISCUSSION

This appeal turns entirely on the correct construction of the term "alphanumeric keyboard." We construe the term "alphanumeric keyboard" without deference to the district court's claim construction. Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1347 (Fed. Cir. 2005).

The scope of the term "alphanumeric keyboard" is not readily apparent from the face of the claim, and there is no common dictionary definition of this term. n2 However, the term "alphanumeric keyboard" "must be read in view of the specification, of which [it is] a part." Phillips, 415 F.3d at 1315 (internal quotation marks and citation omitted). The specification is "the single best guide to the meaning of a disputed term." Id. (internal quotation marks omitted). Here, it is clear to us, as it was to the district court, that an "alphanumeric keyboard' is an input device having a QWERTY, FITALY, or Dvorak layout or any other alphanumeric layout that includes a substantially full set of alphabetic and numeric keys, and that it does not include a twelve-digit keypad.

n2 See Phillips v. AWH Corp., 415

F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (noting that where the meaning of a claim term is readily apparent, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words" and, in such cases, "general purpose dictionaries may be helpful").

[*5]

First, the description of the invention in the "Summary of the Invention" section of the specification states:

> The keyboard may be a keyboard with a layout such as the common "QWERTY" layout, but need not be limited to this particular layout Other layouts may include the "FITALY" layout, the "Dvorak" layout or any other alphanumeric layout that includes a substantially full set of alphanumeric keys

'173 patent, col 5, ll 6-11 (emphasis added). The description clearly depicts the claimed invention as having "the common 'QWERTY' layout" or "any other alphanumeric layout that includes a substantially full set of alphanumeric keys." This description is not merely referring to a preferred embodiment; rather, as part of the "Summary of the Invention," it is "commensurate with the invention as claimed." 37 C.F.R. § 1.73 (2004). Therefore, to allow Wireless to claim a keyboard with less than a substantially full set of keys would injure the public's right "to take the patentee at [his] word " Honeywell Int'l, Inc. v. ITT Indus. Inc., 2006 U.S. App. LEXIS 15553, F.3d , No. 05-1407, 2006 WL 1703376, at *6 (Fed. Cir. June 22, 2006) [*6]

Wireless argues that the specification cannot be used to define the term "alphanumeric keyboard" because at the end of the specification the '173 patent contains the following boilerplate language:

> Although the invention has been described with reference to a particular embodiment, this description is not meant to be construed in a limiting sense. Various modifications of the disclosed embodiments as well as alternative embodiments of the invention will become apparent to persons skilled in the art    It is therefore contemplated that the appended claims will cover any such modifications or embodiments that fall within the scope of the invention

'173 patent, col. 13, ll 20-28  We see nothing in this language that contradicts our reading of the specification

Second, the specification explicitly references the disadvantages of keypads that have only twelve digits, such as the accused device. For example, in describing the disadvantage of the mobile phone twelve-digit keypad, the specification states:

> The mobile phone configuration has the following disadvantages    the keypad is typically a twelve-digit keypad designed for numeric data entry, although [*7] the keyboard usually supports alphanumeric character entry    whereby the commonly used method of accessing alphanumeric characters is to switch the device into a text entry mode, then press a key repeatedly to access a particular one of a subset of characters available for each key, this method being extremely slow, awkward, error prone, and not appropriate for a device intended to transfer textual data on a regular basis.

'173 patent, col 2, ll. 39-58 (emphasis added) Further, the specification distinguishes the "alphanumeric keyboard" from the keypads on most mobile phones by stating "[t]he alphanumeric keyboard is easier and faster to use and learn than the keypads and touch screens on most mobile phones and personal digital assistants " '173 patent, col 5, ll. 4-6

We have previously recognized that "[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question " Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001). [*8] In Honeywell Int'l, Inc., 2006 U.S. App. LEXIS 15553, F.3d , a case

involving similar circumstances, we found that the claim term "electrically conductive fibers" excluded carbon fibers because the specification's "repeated derogatory statements concerning one type of material [(carbon fibers)] [was] the equivalent of disavowal of that subject matter from the scope of the patent's claims." Id., 2006 U.S. App. LEXIS 15553, 2006 WL 1703376 at *7. Here too, the specification's repeated derogatory statements about the twelve-digit keypad convince us that the "alphanumeric keyboard" does not include a twelve-digit keypad. n3

> n3 This is not a case like Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352 (Fed. Cir. 2004), where the references to problems with the prior art appear only in the description of the preferred embodiment. Id. at 1365.

Wireless also urges that we look to extrinsic evidence, including a statement by its expert witness that "an 'alphanumeric keyboard' is a regular arrangement of keys." J.A. at 407 (emphasis added). Wireless's expert concluded that the accused device "includes a regular arrangement [*9] of keys, i.e., a keyboard, which allows users to generate all the letters of the alphabet and the numbers 0 through 9." J.A. at 415. We find that the expert's statement is conclusory and is unsupported by reference to any contemporaneous document and therefore of no value in our claim construction analysis. Phillips, 415 F.3d at 1318.

Wireless also points to the fact that the Patent and Trademark Office allowed certain claims of Wireless's related patent application ("the '802 application") to cover a twelve-digit keyboard. The allowed claims of the '802 application do not include an "alphanumeric keyboard." That allowance has no bearing on the construction of the term "alphanumeric keyboard." Wireless also cites to various patent applications filed by Sony, arguing that Sony's patents describe a twelve-digit keypad as an alphanumeric keyboard. None of the references cited by Wireless contains a definition of alphanumeric keyboard that is contrary to the district court's claim construction here. In any event, the specification here is clear and the expert testimony and other extrinsic evidence cannot be used to contradict it.

For the foregoing reasons, we conclude [*10] that the district court's claim construction was correct. The undisputed evidence established that the accused device utilized twelve keys rather than a substantially full set of alphanumeric keys. The preliminary injunction was therefore properly denied. We affirm.

No costs.

# EXHIBIT 8



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.



## A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1997 by Merriam-Webster, Incorporated

Philippines Copyright 1997 by Merriam-Webster, Incorporated

Library of Congress Cataloging in Publication Data
Main entry under title:

Merriam-Webster's collegiate dictionary. — 10th ed.
    p.    cm.
    Includes index.
    ISBN 0-87779-708-0 (unindexed : alk. paper). — ISBN 0-87779-709-9 (indexed : alk. paper). — ISBN 0-87779-710-2 (deluxe : alk. paper). — ISBN 0-87779-707-2 (laminated cover).
    1. English language—Dictionaries.    I. Merriam-Webster, Inc.
PE1628.M36    1997
423—dc20                                      96-42529
                                                CIP

Merriam-Webster's Collegiate® Dictionary, Tenth Edition principal copyright 1993

COLLEGIATE is a registered trademark of Merriam-Webster, Incorporated

All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.

Made in the United States of America

181920RMcN97

QUIOUS implies fawning or sycophantic compliance and exaggerated deference of manner ⟨waiters who are *obsequious* in the presence of celebrities⟩.

**sub·set** \'səb-ˌset\ *n* (1902) : a set each of whose elements is an element
⟨\in inclusive set

²**shrub** \-ˌshrub, *esp Southern* -ˌsrəb\ *n* (1851) : a perennial plant ⟨ing woody stems except for the terminal part of the new growth which is killed back annually⟩; *also* : a low shrub

**sub·side** \səb-'sīd\ *vi* **sub·sid·ed; sub·sid·ing** [L *subsidere*, fr. *sub-* + *sidere* to sit down, sink; akin to L *sedēre* to sit — more at SIT] (1607) **1** : to sink or fall to the bottom : SETTLE **2** : to tend downward : DE-SCEND: *esp* : to flatten out so as to form a depression **3** : to become quiet or less settle down : SINK ⟨*subsided* into a chair⟩ **4** : to become quiet or less ⟨as the fever ~⟩ ⟨my anger *subsided*⟩ *syn* see ABATE — **sub·si·dence** \səb-'sīd-ᵊn(t)s, 'səb-sə-dən(t)s\ *n*

**sub·sid·i·ar·i·ty** \ˌsəb-ˌsi-dē-'er-ə-tē, səb-ˌsi-\ *n* (1936) **1** : the quality or state of being subsidiary **2** : a principle in social organization: functions which subordinate or local organizations perform effectively belong more properly to them than to a dominant central organization

¹**sub·sid·i·ary** \səb-'si-dē-ˌer-ē, -'si-də-rē\ *adj* [L *subsidiarius*, fr. *subsidium* reserve troops] (1543) **1** a : furnishing aid or support : AUX-ILIARY ⟨~ details⟩ b : of secondary importance ⟨a ~ stream⟩ **2** : of, relating to, or constituting a subsidy ⟨a ~ payment to an ally⟩ — **sub·sid·i·ari·ly** \-ˌsi-dē-'er-ə-lē\ *adv*

²**subsidiary** *n, pl* **-ar·ies** (1603) : one that is subsidiary; *esp* : a company wholly controlled by another

**sub·si·dize** *Brit var of* SUBSIDIZE
**sub·si·dize** \'səb-sə-ˌdīz, -zə-\ *vt* **-dized; -diz·ing** (1795) : to furnish with a subsidy: as a : to purchase the assistance of by payment of a subsidy b : to aid or promote (as a private enterprise) with public money ⟨~ soybean farmers⟩ ⟨~ public transportation⟩ — **sub·si·di·za·tion** \ˌsəb-sə-də-'zā-shən, -ˌdī-\ *n* — **sub·si·diz·er** *n*

**sub·si·dy** \'səb-sə-dē, -zə-\ *n, pl* **-dies** [ME, fr. L *subsidium* reserve troops, support, assistance, fr. *sub-* near + *sedēre* to sit — more at SUB-SIT] (14c) **1** a : a grant or gift of money: as a : a sum of money formerly granted by the British Parliament to the crown and raised by special taxation b : money granted by one state to another c : a grant by a government to a private person or company to assist an enterprise deemed advantageous to the public

**sub·sist** \səb-'sist\ *vb* [LL *subsistere* to exist, fr. L, to come to a halt, remain. fr. *sub-* + *sistere* to come to a stand; akin to L *stare* to stand — more at STAND] *vi* (1549) **1** a : to have existence : BE b : PERSIST, CONTINUE **2** : to have or acquire the necessities of life (as food and clothing); *esp* : to nourish oneself ⟨~ing on roots, berries and grubs⟩ **3** a : to hold true b : to be logically conceivable as the subject of true statements ~ *vt* : to support with provisions

**sub·sis·tence** \səb-'sis-tən(t)s\ *n* [ME, fr. LL *subsistentia*, fr. *subsistent-, subsistens*, prp. of *subsistere*] (15c) **1** a (1) : real being : EXIS-TENCE (2) : the condition of remaining in existence : CONTINUATION, ￿RSISTENCE b : an essential characteristic quality of something that ￿ists c : the character possessed by whatever is logically conceivable ￿z : means of subsisting: as a : the minimum (as of food and shelter) necessary to support life b : a source or means of obtaining the neces-sities of life — **sub·sis·tent** \-tənt\ *adj*

**subsistence farming** *n* (1939) **1** : farming or a system of farming that provides all or almost all the goods required by the farm family usu. without any significant surplus for sale **2** : farming or a system of farming that produces a minimum and often inadequate return to the farmer — called also *subsistence agriculture* — **subsistence farmer** *n*

**sub·so·cial** \ˌsəb-'sō-shəl\ *adj* (ca. 1909) : incompletely social; *esp* : tending to associate gregariously but lacking fixed or complex social organization ⟨~ insects⟩

¹**sub·soil** \'səb-ˌsóil\ *n* (1799) : the stratum of weathered material that underlies the surface soil

²**subsoil** *vt* (1840) : to turn, break. or stir the subsoil of — **sub·soil·er** *n*

**sub·so·lar point** \ˌsəb-'sō-lər-\ *n* (ca. 1908) : the point on the surface of the earth or a planet at which the sun is at the zenith

**sub·son·ic** \ˌsəb-'sä-nik\ *adj* [ISV] (1937) **1** : of, relating to, or being a speed less than that of sound in air **2** : moving, capable of moving. or utilizing air currents moving at a subsonic speed **3** : INFRASONIC 1 — **sub·son·i·cal·ly** \-ni-k(ə-)lē\ *adv*

**sub·space** \'səb-ˌspās\ *n* (1927) : a subset of a space; *esp* : one that has the essential properties (as those of a vector space or topological space) of the including space

**sub spe·cie ae·ter·ni·ta·tis** \ˌsùb-'spe-kē-ˌä-ˌī-ˌter-nə-'tä-təs\ *adv* [NL, lit., under the aspect of eternity] (1895) : in its essential or universal form or nature

**sub·spe·cies** \'səb-ˌspē-shēz, -sēz\ *n* [NL] (1699) : a subdivision of a species: as a : a category in biological classification that ranks imme-diately below a species and designates a population of a particular geographical region genetically distinguishable from other such popu-lations of the same species and capable of interbreeding successfully with them where its range overlaps theirs b : a named subdivision (as a race or variety) of a taxonomic species c : SUBGROUP 1 ⟨~ of econ-omy fares —Michael DiPaola⟩ — **sub·spe·cif·ic** \ˌsəb-spi-'si-fik\ *adj*

**sub·stage** \'səb-ˌstāj\ *n* (1888) : an attachment to a microscope by means of which accessories (as mirrors, diaphragms. or condensers) are held in place beneath the stage of the instrument

**sub·stance** \'səb-stən(t)s\ *n* [ME, fr. MF, fr. L *substantia*, fr. *substant-, substans*, prp. of *substare* to stand under, fr. *sub-* + *stare* to stand — more at STAND] (14c) **1** a : essential nature : ESSENCE b : a funda-mental or characteristic part or quality ⟨*Christian Science* : GOD 1b **2** a : ultimate reality that underlies all outward manifestations and change b : practical importance : MEANING, USEFULNESS ⟨the . . . bill—which will be without ~ in the sense that it will authorize noth-ing more than a set of ideas —Richard Reeves⟩ **3** a : physical mate-rial from which something is made or which has discrete existence b : matter of particular or definite chemical constitution c : something (as drugs or alcoholic beverages) deemed harmful and usu. subject to legal restriction ⟨possession of a controlled ~⟩ ⟨has a ~ problem⟩ **4** : material possessions : PROPERTY ⟨a family of ~⟩ — **sub·stance·less** \-ləs\ *adj* — **in substance** : in respect to essentials : FUNDAMENTALLY

**substance abuse** *n* (1982) : excessive use of a drug (as alcohol, narcot-ics, or cocaine) : use of a drug without medical justification — **sub·stance abuser** *n*

**substance P** *n* (1934) : a neuropeptide that consists of 11 amino-acid residues, that is widely distributed in the brain, spinal cord, and pe-ripheral nervous system, and that acts across nerve synapses to pro-duce prolonged postsynaptic excitation

**sub·stan·dard** \ˌsəb-'stan-dərd\ *adj* (1897) : deviating from or falling short of a standard or norm: as a : of a quality lower than that pre-scribed by law b : conforming to a pattern of linguistic usage existing within a speech community but not that of the prestige group in that community c : constituting a greater than normal risk to an insurer

**sub·stan·tial** \səb-'stan(t)-shəl\ *adj* (14c) **1** a : consisting of or relat-ing to substance b : not imaginary or illusory : REAL, TRUE c : IMPOR-TANT, ESSENTIAL **2** : ample to satisfy and nourish : FULL ⟨a ~ meal⟩ **3** a : possessed of means : WELL-TO-DO b : considerable in quantity : significantly great ⟨earned a . ~ wage⟩ **4** : firmly constructed : STURDY **5** : being largely but not wholly that which is specified ⟨a ~ lie⟩ — **substantial** *n* — **sub·stan·ti·al·i·ty** \-ˌstan(t)-shē-'a-lə-tē, -ˌ -\ *n* — **sub·stan·tial·ly** \-'stan(t)-shə-lē\ *adv* — **sub·stan·tial·ness** \-'stan(t)-shəl-nəs\ *n*

**sub·stan·tia ni·gra** \səb-ˌstan(t)-shē-ə-'nī-grə, -'nī-\ *n, pl* **sub·stan·ti·ae ni·grae** \-ˌshē-ē-'nī-(ˌ)grē, -'nī-\ [NL, lit.. black substance] (1882) : a layer of deeply pigmented gray matter situated in the midbrain and containing the cell bodies of a tract of dopamine-producing nerve cells whose secretion tends to be deficient in Parkinson's disease

**sub·stan·ti·ate** \səb-'stan(t)-shē-ˌāt\ *vt* **-at·ed; -at·ing** (1657) **1** : to give substance or form to : EMBODY **2** : to establish by proof or com-petent evidence : VERIFY ⟨~ a charge⟩ *syn* see CONFIRM — **sub·stan·ti·a·tion** \-ˌstan(t)-shē-'ā-shən\ *n* — **sub·stan·ti·a·tive** \-'stan(t)-shē-ˌā-tiv\ *adj*

**sub·stan·ti·val** \ˌsəb-stən-'tī-vəl\ *adj* (ca. 1832) : of, relating to, or serving as a substantive — **sub·stan·ti·val·ly** \-və-lē\ *adv*
¹**sub·stan·tive** \'səb-stən-tiv, 2 *also* səb-'stan-\ *n* [ME substantif, fr. M.F., fr. L. *substantif*, adj., having or expressing substance, fr. LL *substantivus*] (14c) : NOUN; *broadly* : a word or word group functioning syntactically as a noun — **sub·stan·tiv·ize** \-ˌvīz\ *vt*
²**sub·stan·tive** \'səb-stən-tiv; 2c & 3 *also* səb-'stan-tiv\ *adj* [ME, fr. LL *substantivus* having substance, fr. L *substantia*] (14c) **1** : being a to-tally independent entity **2** a : real rather than apparent : FIRM b : PERMANENT, ENDURING b : belonging to the substance of a thing : ESSENTIAL c : expressing existence ⟨the ~ verb is the verb *to be*⟩ d : requiring or involving no mordant ⟨a ~ dyeing process⟩ **3** a : hav-ing the nature or function of a grammatical substantive ⟨a ~ phrase⟩ b : relating to or having the character of a noun or pronominal term in logic **4** : considerable in amount or numbers : SUBSTANTIAL **5** : creat-ing and defining rights and duties ⟨~ law⟩ — compare PROCEDURAL **6** : having substance : involving matters of major or practical impor-tance to all concerned ⟨~ discussions among world leaders⟩ — **sub·stan·tive·ly** *adv* — **sub·stan·tive·ness** *n*

**substantive due process** *n* (1954): DUE PROCESS 2
**substantive right** *n* (1939) : a right (as of life, liberty, property, or reputation) held to exist for its own sake and to constitute part of the normal legal order of society

**sub·sta·tion** \'səb-ˌstā-shən\ *n* (1881) : a subordinate or subsidiary station: as a : a branch post office b : a subsidiary station in which electric current is transformed c : a police station serving a particular area

**sub·stit·u·ent** \səb-'stī-chə-wənt, -'stich-wənt\ *n* [L *substituent-, sub-stituens*, prp. of *substituere*] (ca. 1896) : an atom or group that replaces another atom or group in a molecule — **substituent** *adj*

**sub·sti·tut·able** \'səb-stə-ˌtü-tə-bəl, -ˌtyü-\ *adj* (1805) : capable of being substituted — **sub·sti·tut·abil·i·ty** \ˌsəb-stə-ˌtü-tə-'bi-lə-tē, -ˌtyü-\ *n*

¹**sub·sti·tute** \'səb-stə-ˌtüt, -ˌtyüt\ *n* [ME, fr. L *substitutus*, pp. of *sub-stituere* to put in place of, fr. *sub-* + *statuere* to set up, place — more at STATUTE] (15c) : a person or thing that takes the place or function of another — **substitute** *adj*
²**substitute** *vb* **-tut·ed; -tut·ing** *vt* (1588) **1** a : to put or use in the place of another b : to introduce (an atom or group) as a substituent; *also* : to alter (as a compound) by introduction of a substituent ⟨a *sub-stituted* benzene ring⟩ **2** : to take the place of : REPLACE ~ *vi* : to serve as a substitute

**sub·sti·tu·tion** \ˌsəb-stə-'tü-shən, -'tyü-\ *n* [ME *substitucion*, fr. MF *substitution*, fr. LL *substitution-, substitutio*, fr. *substituere*] (14c) **1** a : the act, process, or result of substituting one thing for another b : replacement of one mathematical entity by another of equal value **2** : one that is substituted for another — **sub·sti·tu·tion·al** \-shnəl, -shə-nᵊl\ *adj* — **sub·sti·tu·tion·al·ly** *adv* — **sub·sti·tu·tion·ary** \-shə-ˌner-ē\ *adj*

**substitution cipher** *n* (1936) : a cipher in which the letters of the plaintext are systematically replaced by substitute letters — compare TRANSPOSITION CIPHER

**sub·sti·tu·tive** \'səb-stə-ˌtü-tiv, -ˌtyü-\ *adj* (1668) : serving or suitable as a substitute — **sub·sti·tu·tive·ly** *adv*

**sub·stra·ta** \ˌsəb-'strā\ *n* [ML *substratum*] (1807) **1** : SUBSTRATUM 2 : the base on which an organism lives (the soil is the ~ of most seed plants) **3** : a substance acted upon (as by an enzyme)

**sub·stra·tum** \'səb-ˌstrā-təm, -ˌstra-, -ˌsəb-'\ *n, pl* **-stra·ta** \-tə\ [NL, fr. L neut. of *substratus*, pp. of *substernere* to spread under, fr. *sub-* + *sternere* to spread — more at STREW] (1631) : an underlying support **1** : FOUNDATION: as a : substance that is a permanent subject of quali-ties or phenomena b : the material of which something is made and from which it derives its special qualities c : a layer beneath the sur-face soil; *specif* : SUBSOIL **2** : SUBSTRATE 2

**sub·struc·ture** \'səb-ˌstrək-chər\ *n* (1726) : an underlying or support-ing part of a structure — **sub·struc·tur·al** \-chə-rəl, -shrəl\ *adj*

**sub·sume** \səb-'süm\ *vt* **sub·sumed; sub·sum·ing** [NL *subsumere*, fr. L *sub-* + *sumere* to take up — more at CONSUME] (1825) : to include or place within something larger or more comprehensive : encompass as a subordinate or component element ⟨red, green, and yellow are *sub-sumed* under the term "color"⟩ — **sub·sum·able** \-'sü-mə-bəl\ *adj*

**sub·sump·tion** \səb-'səm(p)-shən\ *n* [NL *subsumption-, subsumptio*, fr. *subsumere*] (1651) : the act or process of subsuming

# EXHIBIT 9

REC'D APR 2 1 2003

# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

### *A Merriam-Webster*
REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

**PHILIP BABCOCK GOVE, Ph.D.**

AND

THE MERRIAM-WEBSTER

EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer ▪

*Merriam-Webster*™ is the name you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1993 BY MERRIAM-WEBSTER, INCORPORATED

PHILIPPINES COPYRIGHT 1993 BY MERRIAM-WEBSTER, INCORPORATED

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of the English language, unabridged: a Merriam-Webster/editor in chief, Philip Babcock Gove and the Merriam-Webster editorial staff.
    p.    cm.
  ISBN 0-87779-201-1

    1. English language—Dictionaries.    I. Gove, Philip Babcock, 1902–1972.    II. Merriam-Webster, Inc.
PE1625.W36 1993
423—dc20                                              93-10630
                                                          CIP

*All rights reserved. No part of this book covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA

5051 QP/H00



eagle 2d



ear: 1 pinna, 2 lobe, 3 tympanic membrane, 4 malleus, 5 incus, 6 stapes, 7 semicircular canals, 8 vestibule, 9 cochlea, 10 Eustachian tube, 11 auditory nerve, 12 auditory meatus