# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEXTRON INNOVATIONS INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C. A. No. 05-486 (GMS) |
| | ) |
| THE TORO COMPANY, | ) |
| | ) |
| Defendant. | ) |

**SUPPLEMENTAL DECLARATION OF RICHARD L. PARISH, PHD, PE, IN SUPPORT OF TEXTRON'S PROPOSED CLAIM CONSTRUCTION FOR CERTAIN CLAIM TERMS IN U.S. PATENT NOS. 6,047,530 6,336,311 AND 6,336,312**

I, Richard L. Parish, PhD, PE, declare, depose and state the following:

1. I am a Professor of Agricultural Engineering at the Louisiana State University Agricultural Center in Hammond, LA (LSU) and I am a consultant in agricultural engineering. My business address is 21135 Highway 16, Amite, LA 70422. I have been involved in the farm and maintenance machinery field for over thirty-five years. I am a registered Professional Engineer. I am over eighteen years of age and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial.

2. I have been retained by Hunton & Williams, L.L.P. on behalf of the Plaintiff, Textron Innovations Inc. ("Textron"), as a technical expert witness with respect to the proceedings currently before the Court in the above-captioned matter.

3. For purposes of this Declaration, I have been asked to provide an expert technical analysis as to the proper interpretation of certain terms in the claims of U.S. Patent No. 6,047,530 (the "'530 patent"), U.S. Patent No. 6,336,311 (the "'311 patent") and U.S. Patent No. 6,336,312 (the "'312 patent") (collectively the "Textron patents").

I.  **BACKGROUND AND EXPERIENCE**

4.  My Background and Experience are set forth in my Declaration dated August 4, 2006, which is incorporated herein by reference.

II.  **MATERIALS REVIEWED**

5.  In performing the analysis that is the subject of the Declaration, I have reviewed the '530 patent and its prosecution history, the '311 patent and its prosecution history, and the '312 patent and its prosecution history. I have also reviewed the prior art cited in the '530 patent, the '311 patent and the '312 patent, the Defendant's proposed constructions of certain claim terms, and the Defendant's Opening Claim Construction Brief.

III.  **UNDERSTANDING OF LAW TO BE APPLIED TO INTERPRET CLAIMS**

6.  In formulating my opinions and conclusions in this case, I have been provided with an understanding of the prevailing principles of U.S. patent law that govern the issues of patent claim interpretation.

7.  As a result, I understand that it is a basic principle of patent law that before analyzing the infringement or validity of a patent claim, the claim language must be properly construed to determine its scope and meaning.

8.  In performing my analysis of the proper interpretation to be given to the claims of the patents-in-suit, I have followed the Supreme Court's teaching in *Markman v. Westview Instruments*. I understand that *Markman* provides that when construing the terms of a patent claim, I should first look to the "intrinsic evidence" for their meaning, starting with the language of the claims themselves. As an initial matter, claim terms should be given their ordinary and customary meaning to a person of ordinary skill in the art.

9.  In addition, I understand that if a term used in a claim has a plain and ordinary meaning on its face, I am not to construe any special meaning for that claim term unless the

patentee provided a special meaning in the patent.

10. Moreover, because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.

11. Differences among claims can also be a useful guide in understanding the meaning of particular claim terms. For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.

12. I further understand that I may also consult the patent specification and drawings in formulating the proper construction to be accorded to particular claim terms since the patent claims should be read in view of the specification of which they are a part.

13. Moreover, the specification may reveal that the inventor gave a special definition to a claim term which differs from the ordinary and customary meaning of such terms, in which case, the inventor's lexicography governs. In other cases, the specification may reveal an intentional disavowal of claim scope by the inventor and, in such cases, the inventor's intention also governs.

14. However, it is my understanding that it is improper to limit the claims to specific embodiments described in the specification or to import limitations from the specification into the claims. That is because the claim terms mean what they say to a person of ordinary skill in the art, and it is improper to look first to the embodiments in the specification to interpret the terms of the claims. Moreover, I further understand that it is improper to limit the scope of the claims to the specific embodiments disclosed in the specification even if only one embodiment is described. This is because the specification does not delimit the patent owner's legal rights. That is the function and purpose of the claims.

15. In addition, it is my understanding that the issue of whether a patent claim meets the written description requirement of Section 112 of the Patent Act must be viewed from the standpoint of one of ordinary skill in the art. It is my understanding that to satisfy the written description requirement, a patent applicant must provide a disclosure such that one of ordinary skill in the art would believe that the inventor was in possession of the claimed invention at the time the patent application was filed.

16. I also understand that when a patent claim uses the term "comprising" in the transitional phrase, that is, the phrase connecting the preamble to the body of the claim, the claim is interpreted such that the named elements are essential, but other elements may be added and still form a device within the scope of the claim.

17. In addition to consulting the specification, I understand that the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the scope of the invention during prosecution, thereby making the claim scope narrower than it would otherwise be understood by a person of ordinary skill in the art. However, because the prosecution history represents an ongoing negotiation between the Patent Office and the inventor, rather than the final product of the negotiation which is the issued patent, it lacks the clarity of the specification and is therefore less useful for claim construction purposes.

18. I further understand that extrinsic evidence such as inventor testimony, dictionaries and learned treatises are less reliable than the intrinsic record in determining the meaning of claim language because such evidence often focuses the inquiry on the abstract meaning of the terms rather than on the meaning of such terms in the proper context of the claims and patent specification. Such evidence, however, may be useful to confirm that the inventor used a claim term in a manner consistent with its customary and ordinary meaning to

persons of ordinary skill in the art.

## IV. PERSON OF ORDINARY SKILL IN THE ART

19. It is my understanding that my analysis of the interpretation of the asserted claims of the patents-in-suit must be undertaken from the perspective of what would have been known or understood by someone of ordinary skill in the art of the patents-in-suit. From analyzing these patents (which share a common specification, except the '312 patent which has additional disclosure due to it being a continuation in part of the '311 patent), it is my opinion that they are directed to a person in the field of design of turf maintenance equipment with a Bachelor of Science degree in Agricultural or Mechanical Engineering and some practical engineering design experience involving agricultural or grounds maintenance equipment, perhaps about a year or two of experience, and having an understanding of basic principles of turf maintenance machinery in the 1997 to 2000 time frame when the inventors of the inventions claimed in the patents-in-suit conceived their inventions and reduced them to practice. With thirty nine years of experience in the agricultural engineering field, I am well acquainted with the level of ordinary skill required to design turf maintenance machinery. I have direct experience with engineering design and with turf equipment, and am capable of rendering an informed opinion on what the level of ordinary skill in the art was for such engineers in 1997-2000.

20. The level of technical specificity provided in the patent specification would have been sufficient for a person with a Bachelor of Science in Agricultural or Mechanical Engineering with some practical design experience or others of ordinary skill in the art at the time of the inventions to build and implement the mowers claimed in the patents-in-suit. Therefore, my analysis of the proper meaning of the terms and phrases used in the claims of the patents-in-suit will be undertaken from this perspective.

## V. PROPER INTERPRETATION OF THE CLAIM TERMS AT ISSUE

21. In my opinion, the terms used in the claims of the patents-in-suit are not words of

-5-

special or uncommon meaning, are readily understood by persons of ordinary skill in the art and do not require construction beyond their plain and ordinary meanings.

### "Front and Rear Wheels"

22. Riding lawnmowers have for many years been available in multiple configurations: two wheels in front, two wheels in the rear; one wheel in front and two wheels in the rear; two wheels in front, one wheel in the rear; and various combinations of dual wheels, front and rear. One skilled in the art at the time these patents were written would understand that the inventor was in possession of all of these configurations and that these configurations would have been available to a person building a mower based on these patents. The description of an embodiment using a two wheels front/two wheels rear configuration would certainly not have limited the scope of the invention in the mind of one skilled in the art; one of ordinary skill in the art at the time of the invention would readily recognize the more general application of the concepts in the patented invention to lawnmowers with other wheel configurations and that the inventor was in possession of these other mower configurations at the time of his invention.

### "Deck Defining A Downwardly Opening Space"

23. The term "deck defining a downwardly opening space" clearly refers to any conventional rotary mower deck, as would be understood by anyone skilled in the art at the time these patents were written. There is nothing in this term that implies a mulching deck. Even if one were to accept Toro's argument that a mulching deck is implied, mulching decks do not necessarily have uniform decks as claimed by Toro. A uniform deck (one "defined by a continuous solid vertical wall of uniform height open on the bottom") is a common configuration for dedicated mulching mowers (i.e. those intended only for mulching), but not all mulching mowers conform to this configuration. Many multi-function mowers that can operate in a mulching mode do not conform to this configuration. Mulching mowers can perform effectively

even if the walls of the deck are not continuous, solid, vertical, and of uniform height. Furthermore, virtually any rotary mower will cause the clipped grass to "swirl" above the rotating blade(s). Virtually all rotary mower blades, whether designed for mulching or not, include lift wings formed on the backside of the blades (opposite the cutting edges) to cause air and clippings to be blown upwards, where the clippings are then temporarily carried around in the resulting air stream. With a typical side or rear discharge mower, for instance, the clippings will be carried or "swirled" around for at least 90-180° before being discharged. Side discharge, rear discharge, and bagging decks typically do not have "a continuous solid vertical wall of uniform height" but are still "downwardly opening" for cutting, as would be clearly understood by anyone skilled in the art.

**"Roller Extends Across Substantially The Entire Width Of The Deck"**

24.     The defendant, Toro, contends in their brief that "This phrase is indefinite and not capable of construction" (p. 27), yet earlier in the Toro brief, Toro's attorneys used the term "…extended substantially the full width of the mower" in discussing a 1938 patent (p. 4) and apparently understood the meaning of the term at that time. It is my opinion that the term "roller extends across substantially the entire width of the deck" would have been a clearly understood statement to one skilled in the art at the time this patent was written. One skilled in the art would readily understand that the inventor was referring to a roller that could be the same width as the deck, but could also be somewhat wider or narrower, thus "substantially" the width of the deck. Rollers have been used for many years on lawnmowers to help support the cutting apparatus, to prevent or reduce scalping, and/or to stripe turfgrass by rolling after cutting. All of these functions can be achieved by a roller that is the exact width of the deck, or one that is somewhat wider or narrower. It should be obvious to anyone that the support and anti-scalping functions can be achieved with a roller that is somewhat wider or narrower, but it would also be obvious to

one skilled in the art that the striping function can be achieved by a roller that is somewhat wider or narrower. One skilled in the art would understand that any gang mower arrangement (or even in multiple passes of a single mower deck) there will necessarily be overlap between the adjacent decks. This overlap is obvious in Figure 1 of the '530 patent and Figure 12 of the '312 patent. This overlap is necessary on gang mowers to allow complete mowing without skipped areas when turning. Since the decks necessarily overlap, it will not detrimentally affect the function of the roller if the roller is somewhat longer or somewhat shorter than the exact width of the deck. A longer roller will just have slightly more overlap when striping, and a shorter roller will overlap less, but one skilled in the art would understand that the overall aesthetic effect would be the same.

### "Rear Roller Extends Between The Side Plates And Supports The Side Plates For Movement Over The Ground"

25. The Textron patents at issue in this case use the term "connected to" in a broad sense to include a range of types of connections, direct and indirect. For example, the term is used in the '530 patent several times: "Each deck assembly is connected to the frame..." (1:59-60), "Each lifting arm has an inner end pivotally connected to the frame" (1:61-62), "One end of the cross member is connected to one of the deck assembly side plates..." (1:65-66), "the other end of the cross member is connected to the other side plate..." (2:2-3), "...hydraulic motors...drivingly connected to the wheels..." (2:56-57), etc. One skilled in the art at the time these patents were written would have understood that "connected to" includes both direct and indirect connections, as used in these patents. Construing the term "...extends between... and supports..." to mean "connected to" would not make the language more clear to one skilled in the art. The term "...extends between... and supports..." is already clear to one skilled in the art, and the proposed replacement by "connected to" adds no clarity.

I declare under the penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.

August 18, 2006

_____
Richard L. Parish, PhD, PE