# EXHIBIT 3



US005305589A

# United States Patent [19]

## Rodriguez et al.

| | |
|---|---|
| [11] | Patent Number: **5,305,589** |
| [45] | Date of Patent: **Apr. 26, 1994** |

[54] **MULCHING DECK**

[75] Inventors: **Carlos Rodriguez**, Ft. Myers, Fla.; **C. Robert Christy**, 15421 River By Rd.; **Felipe Rodriguez**, 4619 New Haven Dr., both of, Ft. Myers, Fla. 33908

[73] Assignees: **C. Robert Christy; Felipe Rodriguez**, Ft. Myers, Fla

[21] Appl. No.: **891,957**

[22] Filed: **May 26, 1992**

[51] Int. Cl.⁵ .................. **A01D 34/66; A01D 34/73; A01D 34/82**

[52] U.S. Cl. ............................ **56/320.1; 56/2; 56/17.4; 56/17.5; 56/255**

[58] Field of Search ............ 56/320.1, 320.2, 13.6, 56/13.8, 2, 6, 255, 295, 17.4, 17.5, DIG. 9, DIG. 17, DIG. 20

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,685,774 | 8/1954 | Williams | |
| 2,836,024 | 5/1958 | Davis et al | 56/13.7 |
| 3,469,376 | 9/1969 | Bacon | 56/320.1 X |
| 3,797,212 | 3/1974 | Pursel | 56/255 |
| 3,959,954 | 6/1976 | Halsten | 56/12.8 |
| 4,055,036 | 10/1977 | Kidd | 56/13.6 |
| 4,083,166 | 4/1978 | Haas | 56/13.7 |
| 4,189,903 | 2/1980 | Jackson et al | 56/255 |
| 4,189,904 | 2/1980 | Paker | 56/255 |
| 4,205,512 | 6/1980 | Thorud | 56/13.4 |
| 4,226,074 | 10/1980 | Mullet et al | 56/320.2 |
| 4,318,268 | 3/1982 | Szymanis | 56/255 |
| 4,502,271 | 3/1985 | Hansen et al | 56/320.1 |
| 4,543,773 | 10/1985 | Reilly | 56/13.6 |
| 4,890,446 | 1/1990 | Israel | 56/17.5 |
| 4,916,887 | 4/1990 | Mullet et al | 56/13.8 |
| 4,938,011 | 7/1990 | Pernia | 56/255 |
| 4,951,449 | 8/1990 | Thorud | 56/2 |
| 5,035,108 | 7/1991 | Meyer et al | 56/320.2 X |
| 5,090,183 | 2/1992 | Thorud et al | 56/2 |
| 5,129,217 | 7/1992 | Loehr | 56/320.2 X |
| 5,133,176 | 7/1992 | Baumann et al | 56/320.1 X |

### OTHER PUBLICATIONS

1991 Toro Wheel Horse–Highly Maneuverable Mowing Machines Brochure.
1991 Toro Wheel Horse–Riding Mowers Brochure

*Primary Examiner*—Stephen J. Novosad
*Attorney, Agent, or Firm*—Saidman Design Law Group

[57] **ABSTRACT**

A mulching deck particularly designed to handle tall, thick grasses and weeds (dry or wet), and a kit for converting an existing mowing deck into such a mulching deck. The deck features the combination of a closed discharge chute in a multi-bladed rotary mower having a plurality of stationary cutting blades positioned within the rotary blade housing. Deflectors may be provided in the housing for helping to redirect the clippings back into the path of the rotary and stationary blades for further comminution.

**33 Claims, 2 Drawing Sheets**





## FIG.1
### (PRIOR ART)



## FIG.2



**FIG. 3**

5,305,589

1

# MULCHING DECK

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to rotary lawn or grass mowers, and more particularly, to mulching mowers having a plurality of rotary cutting blades, such as mowing decks commonly found on lawn tractors, garden tractors and commercial mowing tractors. The invention provides a new and improved mulching deck as well as a kit for converting an existing mowing deck into an improved mulching deck.

### 2. Description of Related Art

The conventional lawn tractor, garden tractor, or commercial mowing tractor has a plurality of rotary cutting blades, typically numbering from two to five, although larger commercial models may include many more. They are used to mow a variety of types of grass under a variety of conditions: household lawns, landscaping lawns adjacent public and corporate buildings, golf course fairways and roughs, fields, and weeds alongside roadways, to name a few.

The usual mowing tractor cuts the grass and discharges the clippings either into a grass collector or onto the grass beside the mowing deck's discharge chute. When the clippings are collected, frequent dumping of the grass collector, along with subsequent disposal of the clippings, entails a considerable cost in time and money, especially when the mowing has been commercially contracted.

In those instances in which the grass is not collected, other problems arise. Because of the danger of injury to people or damage to property caused by the forcible ejection of hard objects from the mowing deck, most mowing decks are installed with a spring-biased flap covering the discharge chute. As a result, the clippings are deposited in dense windows adjacent the discharge chute of the mowing deck. When the grass is heavy or wet, the clippings form grass-smothering clumps which often kill the underlying grass, producing bare spots which are unsightly and which promote erosion.

It is ecologically desirable, and more cost efficient, to mulch the clippings. As mulch, the clippings are directly absorbed into the lawn or field, returning to the soil the nutrients extracted therefrom for their growth, thus promoting lush growth as well as preventing the aforesaid erosion. Mulching the clippings also removes the necessity to bag and dispose of the clippings.

In the past, the conversion to mulching mowers of hand-propelled, discharge-type lawn mowers has received much attention as a field of invention.

Williams, U.S. Pat. No. 2,685,774, enclosed a reel-type lawnmower with a flexible screen having cutter ribs mounted internally therein. The reel blades coact with the ribs in the manner of scissors to mulch the clippings.

Davis et al, U.S. Pat. No. 2,836,024, provide a rotary cutting blade which cuts standing grass and lifts the clippings above the plane of the blade. A plurality of stationary blades are located immediately above the rotary blade which scissor the clippings into mulch.

Halsten, U.S. Pat. No. 3,959,954, lifts the clippings into an apertured housing having a plurality of free-swinging flails therein. The flails beat the clippings until they are comminuted sufficiently to pass through the apertures as mulch.

2

Hass, U S. Pat. No. 4,083,166, fixes a rotary disc with cutting blades coaxially above a rotary cutting blade. The rotary cutting blade cuts the grass and lifts the clippings through large openings in the disc into the path of the disc's cutting blades.

Jackson et al, U.S. Pat. No. 4,189,903, supplying a mulching attachment for single-bladed rotary mowers. The attachment comprises a linear mounted internally of the mower housing above the rotary blade. The liner is continuous around its periphery, thereby closing any discharge chute the mower may have. Guide vanes are located internally of the liner to deflect or direct the clippings inwardly and downwardly. A special rotary cutting blade has an outer region which cuts the grass and lifts the clippings upwardly into contact with the guide vanes. An inner region of the blade has a sharpened cutting edge for mulching the downwardly deflected clippings followed by a downwardly directed edge for blowing the twice-cut clippings into the grass.

Paker, U.S. Pat. No. 4,189,904, converts a conventional rotary mower into a mulching mower by covering the discharge chute with a plate. The plate has a plurality of tines and openings formed thereon to mulch grass or leaves.

Thorud, U.S. Pat. No. 4,205,512, like Jackson et al, provides guide vanes, "kickers", within the mower housing to direct clippings inwardly and downwardly into a sharpened edge of the rotary cutting blade.

Szymanis, U.S. Pat. No. 4,318,268, uses a compound blade, like Jackson et al, having an outer region which cuts and lifts the clippings and an inner region which further cuts and blows the clippings downwardly into the grass. Szymanis provides a toroidal chamber around the outer periphery of the housing to direct the clippings inwardly and downwardly into the compound blade.

Israel, U.S. Pat. No. 4,890,446, affixes a mulching plate upstream of the discharge chute which, with the rotary cutting blade, scissors the clippings prior to exiting through the discharge chute.

Thorud et al, U.S. Pat. Nos. 4,951,449, and 5,090,183, disclose a plurality of kickers which deflect the clippings inwardly and downwardly into secondary contact with the rotary cutting blade for mulching, in the general manner of Jackson et al and Thorud, above.

The above-noted mulching mowers were concerned with the problems of cutting and mulching lawns, such as household lawns. These are relatively small parcels of land with fine grass specially selected for their groomed, decorative look. Multi-bladed mowers, on the other hand, while also used in groomed lawn situations, are additionally required to handle more demanding conditions. Small fields, e.g., two to five acres, as would be found in mini-estates, government installations, golf courses, etc., have a variety of grasses and weeds which need mowing as well. Often, the cycle of mowing is interrupted by other duties or prolonged periods of rain, and the field's grass becomes tall and thick, often accompanied by moisture retained on the lower portions of the grass, even after a few days of sunshine. An added burden is thus placed on multi-bladed mowing machines which the average household lawn mower never faces.

Being tall and dense presents additional problems. Bagging acres of grass is clearly very time consuming and inordinately expensive. If the cut grass and weeds are simply discharged in windrows, they tend to stifle the growth beneath them. Mulching would be desirable,

5,305,589

3

if it could be attained under these extremely adverse conditions.

Multi-bladed mowers have been developed. To date, however, they have not been completely adequate for the task.

Some multi-bladed mowers concentrate on spreading the clippings more evenly. Examples include Bacon, U.S. Pat. No. 3,469,376, and Hansen et al, U.S. Pat. No. 4,502,271, both of which provide baffles and deflectors positioned to spread the discharge of the clippings over a wider area. Reilly, U.S. Pat. No. 4,543,773, places anti-blowout plates adjacent each rotary blade at the lower edge of the housing skirt to prevent windrowing due to clippings being blown out from under the housing upstream of the discharge chute.

Multi-blade mulching decks have been proposed. Exemplary are Mullet et al, U.S. Pat. No. 4,226,074, Mullet et al, U.S. Pat. No. 4,916,887, Pernia, U.S. Pat. No. 4,938,011, and the application of Thorud's concepts, discussed above, to multi-blade mowers by The Toro Company of Minneapolis, Minn.

Mullet et al ('074) provide manually operated gates which close exit channels from each of the rotary cutting blades, effectively isolating each blade in its own internal chamber. The clipped grass is recirculated within each individual chamber until comminuted into mulch by the blade which clipped it.

Mullet et al ('887) install baffles to guide all clippings from the plurality of rotary cutting blades into a separate set of mulching blades, the mulching blades being located immediately before the discharge chute.

Pernia closes the discharge chute with a panel having a plurality of fixed blades selectively mounted thereon. The clippings impact the fixed blades, are further cut, and fall to the ground.

And, The Toro Company shapes the housing to provide a separate chamber for each rotary blade to essentially isolate it from the others. Kickers, shaped and placed as described in the Thorud patents discussed above, are provided in each chamber to recirculate the clippings back into comminuting contact with the blade which initially cut the clippings.

These mulching mowers, while undoubtedly suitable for lawn-type environments, can be inadequate, when cutting tall or dense grass, especially if the grass is wet. Simply covering the discharge chute with a panel and fixed blades is often insufficient to completely mulch the volume of clippings produced by multi-bladed mowing decks. In like manner, individual blades which cut heavy weeds and subsequently chop the recirculated clippings for comminution can be overloaded. It is customary when mowing dense grass with a multi-bladed mower to use only one-third to one-half of the cutting width of the mowing deck for cutting a new path. The most upstream of the blades is the only one which is actually cutting grass. The remaining blades act principally to blow the dense clippings from the housing, while secondarily cutting grass remaining standing from the last pass. When too much grass is circulated adjacent any one blade, that blade becomes jammed and stops, causing the drive belt to pass over a stationary pulley creating heat which burns and severs the belt. Isolating each blade in its own chamber promotes blade overload.

There exists, therefore, a need for a mulching deck for multi-bladed mowers, which is capable of mulching grass under all conditions likely to be encountered, including very tall, dense, and wet grass or weeds.

4

## OBJECTS OF THE INVENTION

It is an object of the present invention to provide an efficient mulching deck for a multi-bladed mower.

It is a further object of the present invention to provide a method and means for converting the conventional multi-blade mowing deck into an efficient mulching deck.

Another object of the invention is to provide a mulching deck which is so similar to a conventional mowing deck that minimal modification of the conventional mowing deck is necessary to convert it into a mulching deck, thereby providing considerable savings in retooling for manufacturing the mulching deck or for retrofitting existing decks.

Other objects will become apparent to those skilled in the art from the following description of the invention.

## SUMMARY OF THE INVENTION

A mulching deck is disclosed which includes guide means for directing or deflecting clippings generated by one rotary cutting blade into the cutting path of an adjacent rotary cutting blade. Stationary cutting blades are fixed to the housing in locations such that they intercept clippings entrained in eddy currents created by the rotary cutting blades rotating within the housing.

Additionally, a mulching deck is disclosed in which a conventional mowing deck is modified to convert it into a mulching deck embodying the principles of the invention. The modifications comprise elimination of the conventional discharge chute and internal tunnel leading to the discharge chute.

In both embodiments, deflectors are mounted between adjacent pairs of rotary cutting blades to deflect the clippings from an upstream rotary cutting blade into the cutting path of the immediately adjacent, downstream rotary cutting blade. A stationary cutting blade is fixed to the mulching deck housing in the vicinity of the previously existent discharge chute to receive and comminute the clippings passed on downstream from the most downstream of the rotary cutting blades. Additional stationary blades are fixed to the housing in the paths of clippings entrained in air streams swirling around each of the rotary cutting blades.

A kit for converting a conventional mowing deck to a mulching deck is also provided. The kit comprises plates adapted to cover the discharge chute and tunnel of the conventional mowing deck, deflectors adapted to be mounted between adjacent rotary cutting blades for deflecting the clippings from each rotary cutting blade to the immediately adjacent, downstream rotary cutting blade, and stationary blades adapted to be affixed to the housing for comminuting clippings downstream of the most downstream of the rotary cutting blades and as well as clippings swirling around each rotary cutting blade.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a bottom perspective view of a conventional multi-bladed mowing deck.

FIG. 2 is a bottom perspective view of the multi-bladed mulching deck embodying the principles of the present invention.

FIG. 3 is an exploded perspective of the underside of the mulching deck of the kit embodiment of the present invention.

5,305,589

| 5 | 6 |

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 shows a typical mowing deck of a conventional tractor-type mower. Mowing deck 10 includes a housing 12 which comprises a top wall 14 (the underside of which is seen in the FIG s) and a skirt 16 depending from the periphery of top wall 14. Housing 12 defines an internal chamber 18 opening downwardly of the housing.

Three rotary cutting blades 20, 22 and 24 are rotatably mounted in chamber 18. Rotary cutting blades 20–24 are mounted on axles which are rotatably journaled in pedestals 26, 28 and 30, respectively. Pedestals 26–30 are fixedly mounted to the underside of top 14 by any appropriate means, such as by nuts and bolts. Drive means 32, partially shown, provides power to rotary cutting blades 20–24, rotating them in the counterclockwise direction, as viewed in FIG. 1.

In addition to cutting the grass, conventional rotary cutting blades 20–24 create wind currents which lift the clippings upwardly into chamber 18 above blades 20–24. The rotary motion of blades 20–24 also creates air currents tending to flow in a circular stream around each respective blade and in a linear stream in tunnel 34 moving in the direction of motion of the rotary cutting blades, i.e., from rotary cutting blade 20 toward discharge chute 36. Rotary cutting blade 22 is, therefore, located in housing 12 downstream from rotary blade 20, and rotary cutting blade 24 is located downstream from both rotary blades 20 and 22.

The internal structure of housing 12 is configured to guide and reinforce the aforementioned circular and linear air streams. Arcuate end wall portions 38 and 40 of skirt 16 and internal wall portions 42, 44 and 46 partially surround individual ones of rotary blades 20, 22 and 24. The arcuate walls are concentric with the path of the tips of the adjacent rotary blades and are located closely adjacent thereto. Tunnel 34 is formed by contouring the inner surface of top wall 14 to form an upper level 48, a lower level 50, and a step 52 connecting them. A relatively linear portion 54 of skirt 16 provides a third side to tunnel 34. The updraft created by the rotating blades 20–24 effectively provides a fourth side and confines the clippings to tunnel 34. An opening 56 in skirt 16 at one end of tunnel 34 completes the discharge chute 36. The aforesaid air streams tend to concentrate the clippings in tunnel 34 and forcibly eject them through discharge chute 36.

Internal wall portions 42–46 are traditionally made, as shown, by bending a single sheet of material 58 such that the three arcuate wall portions are formed. Two rounded bends 60 and 62 result where adjacent wall portions intersect and terminate. As shown, internal wall portions 42 and 44 intersect and terminate at bend 60 and internal wall portions 44 and 46 intersect and terminate at bend 62. The sheet of material 58 is conventionally permanently attached to housing 12 by welding. Wall portions 42–46 can also be individually made and separately attached to housing 12, if desired.

In operation, rotary cutting blades 20–24 cut the grass into clippings which are lifted above the rotary blades by the updraft created by the rotary cutting blades. Most of the clippings are densely concentrated in tunnel 34 and are forcibly expelled from mowing deck 10 through discharge chute 36. Some clippings are entrained in the circular streams and are forced to circle

the blades; they eventually escape into tunnel 34 or drop below housing 12 onto the ground.

Wheels 64 support the mowing deck on the ground, when the deck is in operation. Rollers 66 (only one of which is shown in FIG. 1) are usually off the ground when the deck is attached to a tractor. They support the deck when it is disconnected from the tractor.

Turning now to FIG. 2, a preferred embodiment of the present invention is shown. Reference numerals which designated previously discussed elements are not shown, for the most part, in order to simplify the drawings. Where referred to in the specification, however, like elements are designated by the same reference numerals incremented by 100. New elements are designated by 200-series numerals.

Mulching decks differ from discharge-type mowing decks in that in a mulching deck the clippings are confined within the housing chamber and continually recirculated until the clippings are comminuted finely enough to fall beneath the cutting blades as mulch into the grass below. In order to be able to provide the mulching function, the mowing deck of FIG. 1 must be modified slightly. For economic and aesthetic reasons, it is desirable to keep the modifications to a minimum. A comparison of the mulching deck of FIG. 2 with the mowing deck of FIG. 1 will show that the modifications are few and seemingly simple. The results of the modifications, however, are immense.

Mulching deck 100 as shown in the preferred embodiment in FIG. 2 has a housing 112 comprising a top wall 114 and a skirt 116 depending from the periphery of top wall 114. Housing 112 defines an internal chamber 118 opening downwardly of the housing. Unlike the mowing deck of FIG. 1, skirt 116 does not include a discharge chute. Rather, skirt 116 is imperforate. The grass clippings are thereby effectively confined to chamber 118. Otherwise, skirt 116 is shaped the same as skirt 16.

Since it is no longer desired to concentrate the grass clippings into a stream for ejection through a discharge chute, top wall 114 is not shaped to provide a tunnel. The internal surface of top wall 114 is substantially flat, except for the presence of a pair of deflectors 200 and 202. Deflector 200 is located between rotary cutting blade 120 and rotary cutting blade 122. Deflector 202 is located between rotary cutting blade 122 and rotary cutting blade 124. Deflectors 200–202 are shaped and located to deflect the clippings produced by one rotary cutting blade into the cutting path of an adjacent rotary cutting blade. In the drawings deflectors 200–202 are shown as triangles joined together to form a pyramid-like structure. They obviously can be otherwise contoured, such as rounded or spiral shaped, so long as they effect their function of deflecting the clippings toward the cutting path of the adjacent, downstream rotary cutting blade.

Rotary cutting blades 120–124, like their counterpart blades 20–24 in the conventional mowing deck, lift the clippings into chamber 118 above the rotary cutting blades and tend to drive the clippings into circular and linear streams. Some of these clippings from rotary cutting blade 120 are carried back into the cutting path of rotary cutting blade 120 by gravity or by the air currents in chamber 118 and are chopped into smaller pieces. Most, however, are blown downstream into contact with deflector 200 which deflects them into the cutting path of rotary cutting blade 122. There, they are further comminuted and either fall as mulch to the

5,305,589

7

ground or are themselves blown further downstream toward rotary cutting blade 124.

In like manner, grass originally cut by rotary cutting blade 122 is either partially recirculated through rotary cutting blade 122 or is deflected by deflector 202 into the cutting path of rotary cutting blade 124. In addition, the clippings originally cut by rotary cutting blade 120 and further cut by rotary cutting blade 122 will likewise be lifted by rotary cutting blade 122 and directed into deflector 202 for deflection into the cutting path of rotary cutting blade 124 for additional comminution.

Rotary cutting blade 124 also cuts the grass in its cutting path, lifts the clippings upwardly in chamber 118, and directs them further downstream. Since there is no rotary cutting blade downstream to receive the clippings passed on by rotary cutting blade 124, another type of cutting blade is provided. Stationary cutting blade 204 is fixed to housing 112 and is located such that its sharp edge 206 faces the stream of clippings being carried by the air currents prevalent in that part of housing 112. These currents include eddy currents created by the lack of a discharge chute and the presence of stationary cutting blade 204. The result is a swirling of the clippings into repeated contact with rotary cutting blade 124 and stationary cutting blade 204. Virtually complete mulching of the clippings occurs during this interaction of rotary cutting blade 124 and stationary cutting blade 204.

A noticeable quantity of clippings is carried in the circular currents travelling around the tips of the rotary cutting blades. By locating a stationary cutting blade in line with such currents, those clippings are also further comminuted sufficiently that they become mulch. Stationary blades 208, 210, and 212 are fixed within chamber 118 such that cutting edges 214, 216, and 218, respectively, face the predominant stream of clippings flowing around the tips of rotary cutting blades 120, 122, and 124. Again, clippings trapped in eddy currents adjacent stationary cutting blades 208–212 are further comminuted by these stationary cutting blades and the adjacent rotary cutting blades.

It has been found that the combination of rotary cutting blades and stationary cutting blades, as described, have been very efficient in mulching very tall and dense grass, even when wet. The effects are especially notable when a cutting path which is less than the width of the mulching deck is utilized. In that case the most upstream blade originally cuts the grass into clippings. The remaining blades relieve the cutting blade of any overload by receiving and finely cutting the clippings. Less strain on the mulching deck has the added benefit of increasing the life of the mowing mechanism.

The embodiment shown in FIG. 2 is a mulching deck manufactured as such. Existing decks, such as the one shown in FIG. 1, can easily and inexpensively be converted into a similar mulcher by means of the kit shown in FIG. 3.

FIG. 3 shows the mowing deck 10 of FIG. 1 plus, in exploded form, a kit for retrofitting mowing deck 10 to convert it into the mulching deck 100 of FIG. 2.

Kit 300 comprises a plate 302, a pair of deflectors 304 and 306, plate 308 and four stationary cutting blades 310, 312, 314 and 316.

Plate 302 is shaped and sized to cover tunnel 34. It is affixed by any convenient means to housing 12, such as by welding, if a permanent structure is desired, or by means of threaded fasteners or clips (not shown), should one prefer a removable structure.

8

Deflectors 304 and 306 can be manufactured integrally with plate 302, or alternatively can be separately fastened thereto. The latter permits adjustment of the deflectors for maximum effectiveness, taking into consideration the different conditions existent within different mowing decks.

Plate 308 is affixed by any convenient means to cover discharge chute 36.

Stationary cutting blades 314 and 316 are permanently or replaceably affixed to skirt 16 and top wall 14 by any suitable means, such as by welding or by threaded fasteners, respectively.

And, stationary cutting blades 310 and 312 are permanently or replaceably affixed to the aforesaid bends 60 and 62 of the strip of material 58.

With this kit, and by following the teachings of the present invention, a conventional mowing deck can be permanently or temporarily converted into an effective, efficient mulching deck.

It can be seen from the above that an invention has been disclosed which fulfills all the objects of the invention. It is to be understood, however, that the disclosure is by way of illustration only and that the scope of the invention is to be limited solely by the following claims.

We claim as our invention:

1. A mulching deck, comprising:

housing means;

cutting means in said housing means for cutting grass;

guide means for directing said cut grass from an upstream one of said cutting means to a downstream one of said cutting means;

wherein said cutting means includes a plurality of cutting blades and a drive means for driving at least some of said blades; and

wherein said cutting means comprises a plurality of rotary cutting blades for cutting said grass into clippings and for further cutting said clippings and a plurality of stationary cutting blades for further cutting said clippings;

wherein said stationary cutting blades includes a stationary cutting blade fixed to said housing downstream of the most downstream of said rotary cutting blades.

2. The mulching deck of claim 1 wherein said stationary cutting blades further includes a stationary blade fixed to said housing adjacent each of said rotary cutting blades for cutting clippings which are substantially swirling about the said adjacent each of said rotary cutting blades.

3. The mulching deck of claim 1 wherein said guide means comprises a deflector means fixed to said housing downstream of an upstream rotary cutting blade for deflecting the grass cut by said upstream rotary cutting blade into the cutting path of the adjacent downstream rotary cutting blade.

4. The mulching deck of claim 3 wherein said deflector means comprises a deflector mounted between each pair of rotary cutting blades.

5. A mulching deck for cutting and mulching grass, said mulching deck comprising:

(a) a housing comprising a top and a skirt peripherally connected to said top, said top and said skirt defining a downwardly opening chamber, said skirt including an imperforate side wall for confining the grass clippings thereto;

(b) a plurality of rotary cutting blades interiorly mounted for rotation in said chamber, said rotary cutting blades being adapted to cut grass into clip-

5,305,589

9
             10

pings and to create an updraft for lifting said clippings above said rotary cutting blades within said chamber, said rotary cutting blades further tending to create swirling and linear air streams within said chamber;

(c) drive means for rotating said rotary cutting blades;

(d) deflector means between a pair of said rotary cutting blades for deflecting at least some of the clippings entrained in at least some of said air streams into the cutting path of an adjacent rotary cutting blade; and

(e) stationary cutting blade means in said chamber for further comminuting at least some of the clippings entrained in at least some of said air streams.

6. A mulching deck as in claim 5 wherein said deflector means comprises a deflector mounted on the interior of said housing between each adjacent pair of said rotary cutting blades.

7. A mulching deck as in claim 6 wherein said deflector means are shaped to deflect the clippings entrained in said linear airstream into the cutting path of a downstream rotary cutting blade

8. A mulching deck as in claim 7 wherein said deflector means comprise a pair of triangularly shaped plates joined to form a pyramid-like structure.

9. A mulching deck as in claim 5 wherein said stationary cutting blade means comprises a first stationary cutting blade located downstream of the most downstream of said plurality of rotary cutting blades.

10. A mulching deck as in claim 9 wherein said first stationary cutting blade is mounted in said housing such that eddy currents are created tending to recirculate clippings into comminuting contact with said first stationary cutting blade and said most downstream of said rotary cutting blades.

11. A mulching deck as in claim 9 wherein additional stationary cutting blades are mounted in said housing adjacent said rotary cutting blades, each of said additional stationary cutting blades being positioned adjacent a respective one of said rotary cutting blades in the path of clippings entrained in an air stream swirling around said respective one of said rotary cutting blades.

12. A mulching deck as in claim 9 wherein the number of said rotary cutting blades and said additional stationary cutting blades is three.

13. A mulching deck for cutting and mulching grass, comprising:

(a) a housing;

(b) a plurality of rotary cutting blades in said housing for cutting said grass into clippings;

(c) means for driving at least some of said rotary cutting blades; and

(d) a plurality of stationary cutting blades in said housing for further cutting said clippings, wherein said plurality of stationary cutting blades includes a stationary cutting blade fixed to said housing downstream of the most downstream of said rotary cutting blades.

14. A mulching deck as set forth in claim 13, wherein said plurality of stationary cutting blades includes at least one stationary cutting blade positioned adjacent one of said plurality of rotary cutting blades.

15. A mulching deck as set forth in claim 13, wherein said plurality of stationary cutting blades includes additional stationary cutting blades positioned between adjacent rotary cutting blades

16. A mulching deck as set forth in claim 13, further comprising at least one deflector mounted in said housing between a pair of said rotary cutting blades.

17. A mulching deck as set forth in claim 13, further comprising a plurality of deflectors, each being mounted in said housing between an adjacent pair of said rotary cutting blades.

18. A mulching deck as set forth in claim 16, wherein said deflector comprises a pair of triangularly shaped plates joined to form a pyramid-like structure.

19. A mulching deck as set forth in claim 17, wherein said plurality of deflectors each comprise a pair of triangularly shaped plates joined to form a pyramid-like structure.

20. A mulching deck for cutting and mulching grass, comprising:

(a) a housing;

(b) a plurality of rotary cutting blades in said housing for cutting said grass into clippings;

(c) means for driving at least some of said rotary cutting blades; and

(d) a plurality of stationary cutting blades in said housing for further cutting said clippings; wherein said plurality of stationary cutting blades includes one stationary cutting blade positioned between adjacent ones of said plurality of rotary cutting blades.

21. A kit for converting a conventional multi-bladed mowing deck into a multi-bladed mulching deck, said mowing deck comprising a housing and a plurality of rotary cutting blades within said housing, said housing including a plurality of wall portions partially surrounding said rotary cutting blades, a tunnel, and a discharge chute, said kit comprising:

(a) first plate means adapted to cover said tunnel;

(b) second plate means adapted to close said discharge chute; and

(c) stationary cutting blade means adapted to be affixed to said housing for further cutting grass confined to said housing.

22. The kit of claim 21 wherein said stationary cutting blade means includes a plurality of additional stationary cutting blades, each of said additional stationary cutting blades being fixed to said housing and positioned to comminute clippings entrained in air streams swirling around an adjacent upstream rotary cutting blade.

23. A kit as set forth in claim 21, wherein said stationary cutting blade means includes a stationary cutting blade adapted to be affixed to said housing in the vicinity of said discharge chute.

24. A kit as set forth in claim 21, wherein said stationary cutting blade means includes a stationary cutting blade being fixed to said housing adjacent one of said rotary cutting blades.

25. A kit as set forth in claim 21, wherein said stationary cutting blade means includes a plurality of stationary cutting blades each being fixed to said housing between adjacent pairs of said rotary cutting blades

26. A kit as set forth in claim 21, further comprising deflector means adapted to be mounted on said first plate means

27. A kit as set forth in claim 26, wherein said deflector means includes a pair of deflectors mounted on said first plate, each of said deflector means being positioned between a pair of said rotary cutting blades.

28. A kit as set forth in claim 27, wherein said deflectors each comprise a pair of triangularly shaped plates joined to form a pyramid-like structure.

5,305,589

11

29. A mulching deck for cutting and mulching grass, comprising:

(a) a housing having an internal chamber opening downwardly;

(b) a plurality of rotary cutting blades in said chamber for cutting said grass into clippings;

(c) said housing including imperforate skit means surrounding said chamber for confining the grass clippings thereto;

(d) means for driving at least some of said rotary cutting blades; and

(e) stationary cutting blade means affixed to said housing in said chamber for further cutting said clippings confined to said housing.

30. A mulching deck as set forth in claim 29, wherein said stationary cutting blade means includes a stationary

12

cutting blade being fixed to said housing adjacent one of said rotary cutting blades.

31. A mulching deck as set forth in claim 29, wherein said stationary cutting blade means includes a plurality of stationary cutting blades each being fixed to said housing between adjacent pairs of said rotary cutting blades.

32. A mulching deck as set forth in claim 29, wherein said stationary cutting blade means includes a stationary cutting blade fixed to said housing downstream of the most downstream of said rotary cutting blades.

33. A mulching deck as set forth in claim 29, wherein said plurality of stationary cutting blades means includes one stationary cutting blade located downstream of the most downstream of said plurality of rotary cutting blades, and additional stationary cutting blades positioned between adjacent rotary cutting blades

* * * * *

# EXHIBIT 4

Price, David    8/31/2006

FOR THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------

TEXTRON INNOVATIONS, INC.,

                    Plaintiff,

     -vs-                         C.A. No. 05-486

THE TORO COMPANY,

                    Defendant.

-----------------------------------------------------------



          Video examination of DAVID PRICE, taken at
the instance of the Defendant, under and pursuant to the
Federal Rules of Civil Procedure, before MELISSA J.
STARK, a Certified Realtime Reporter, Registered
Professional Reporter and Notary Public in and for the
State of Wisconsin, at Michael, Best & Friedrich, LLP,

100 East Wisconsin Avenue, Milwaukee, Wisconsin, on

AUGUST 31, 2006, commencing at 8:59 a.m. and concluding

at 4:53 p.m.

Price, David    8/31/2006

## Page 106

1      issue.

2  Q   So your basis for your high degree of certainty

3      that you didn't have DDX-26. "Rotaries Take to

4      Golf Courses." is based on the fact that if you'd

5      had it. you would have cited it. correct?

6  A   That and the fact that I don't remember it. and

7      I'm pretty sure I didn't see it.

8  Q   All right. Anything else that you're relying on

9      for your high degree of certainty that you did not

10     have that article. "Rotaries Take to Golf

11     Courses." other than what you just mentioned?

12        MR CAMPBELL: Objection  Form

13        THE WITNESS: Nothing I can think of.

14     I'm making some assumption I'm not even conscious

15     of. but I think those are the main reasons.

16 BY MR ZEULI:

17 Q   If that ever changes. let Mr Campbell know and

18     let me know. if you would.

19        MR CAMPBELL: Is that a question?

20        MR ZEULI: No. a request

21        MR CAMPBELL: I'd like it stricken from

22     the record. We're here to ask questions. not

23     requests of the witness

24        (Exhibit No  DDX-27 was marked )

25 BY MR ZEULI:

## Page 107

1  Q   I'm handing to you what's been marked as DDX-27

2      It's a U S patent 5.305.509 to Rodriguez  Do you

3      recognize this document?

4  A   No.

5  Q   Turn. if you would. to the first column. column

6      number one. paragraph number two under description

7      of related art  That paragraph  and I'll just

8      read it. says. "The conventional lawn tractor.

9      garden tractor or commercial mowing tractor has a

10     plurality of rotary cutting blades typically

11     numbering from two to five. although larger

12     commercial models may include many more  They are

13     also used to mow a variety of types of grasses

14     under a variety of conditions: household lawns.

15     landscaping lawns adjacent public and corporate

16     buildings. golf course fairways and roughs. fields

17     and weeds along roadways to name a few " end

18     quote. Did I read that in right?

19 A   I believe so.

20 Q   This is a document that's dated April 26  1994

21     correct?

22 A   That's the date of the patent.

23 Q   And that's the date it would have been publicly

24     available  correct?

25 A   Yes

## Page 108

1  Q   And it is describing  is it not. using rotary

2      mowers to cut golf course roughs?

3        MR CAMPBELL: Objection  Form

4        THE WITNESS: Yes

5  BY MR ZEULI:

6  Q   And if you had had this  would you have considered

7      this possibly relevant to the 530 patent

8      application?

9  A   We certainly would have cited it.

10 Q   And it wasn't cited to the patent office in the

11     530 patent. correct?

12 A   I don't know.

13 Q   Okay  Can you just check?  It's Exhibit 2  I

14     believe. Mr  Price  the 530 patent

15 A   Anybody got it handy?  Mine are all shuffled.

16 Q   There you go

17 A   There it is.  It doesn't appear on the list of

18     references cited.

19 Q   Okay

20 A   The patent office makes mistakes sometimes. but

21     that probably means it wasn't cited.

22 Q   Okay  And you don't recall having the 509 patent

23     during the prosecution of the 530 patent. correct?

24 A   Correct.

25 Q   Okay  And the only way that you can be certain

## Page 10.

1      that you didn't have the 509 patent again is

2      because you didn't cite it  correct?

3  A   Oh. same thing again. in that effect I don't

4      remember it. I strongly believe I didn't have it:

5      and if we'd had it. we would have cited it.

6        (Exhibit No  DDX-28 was marked.)

7  BY MR ZEULI:

8  Q   I'm going to hand to you what's been marked as

9      DDX-28  Do you recognize that document?

10 A   Well. it looks familiar.  I see the firm's name is

11     on it.

12 Q   DDX-28 is patent 5.890.354. correct?

13 A   Yes.

14 Q   And it's to Mr  Bednar. the same inventor as the

15     530 patent  correct?

16 A   Yes.

17 Q   It was filed on January 22. that being the 354

18     patent  January 22 of 1997  just a couple days

19     before the 530 patent application was filed

20     correct?

21 A   It was filed January 22. 1997.  I don't remember

22     exactly what the filing date of the 530 patent

23     was.

24 Q   I'll represent it was February 3rd  1997.

25 A   February 3rd.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
**(Cite as: 2003 WL 1905637 (D.Del.))**

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available

United States District Court,
D. Delaware.
SYMBOL TECHNOLOGIES, INC., Plaintiff,
v.
PROXIM INCORPORATED, Defendant.
**No. 01-801-SLR.**

April 17, 2003.

Andre G. Bouchard, and Karen L. Pascale, of Bouchard, Margules & Friedlander, Wilmington, Delaware, for Plaintiff.

Eric J. Lobenfeld, Ira J. Schaefer, and Jonathan M. Sobel, of Clifford, Chance, US, LLP, New York, New York, of counsel.

Richard L. Horwitz, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware, for Defendant.

Harry J. Roper, George S. Bosey, Raymond N. Nimrod, Aaron A. Barlow, and Timothy J. Barron, of Roper & Quigg, Chicago, Illinois, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

## I. INTRODUCTION

**\*1** On December 4, 2001, plaintiff Symbol Technologies, Incorporated ("Symbol") filed this action against defendant Proxim, Incorporated ("Proxim") alleging infringement of four U.S. Patents owned by plaintiff. (D.I.1) On December 18, 2001, Proxim answered the complaint and asserted, *inter alia*, a counterclaim of infringement of one of its own patents. (D.I.6) On January 9, 2002, this court entered a scheduling order requiring all amendments to the pleadings to be submitted by August 1, 2002, with discovery to be concluded by January 31, 2003. Trial is currently scheduled to begin on September 8, 2003. Presently before the court is plaintiff's motion for leave to amend its complaint. (D.I.160) This court has jurisdiction pursuant to 28 U.S.C. § § 1331 and

1338. For the reasons that follow, plaintiff's motion to amend is granted.

## II. STANDARD OF REVIEW

"A party may amend the party's pleading once as a matter of course at anytime before a responsive pleading is served...." Fed.R.Civ.P. 15(a) "Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be given freely when justice so requires." Id. Courts may deny leave to amend where they find "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment...." Foman v. Davis, 371 U.S. 178, 182 (1962). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." Id.

## III. DISCUSSION

Plaintiff seeks leave of the court to amend its complaint to add additional allegations of inequitable conduct by defendant in procuring U.S. Patent No. 5,231,634 ("the '634 patent"), the patent asserted in defendant's counterclaim of infringement against plaintiff. (D.I.160) Plaintiff also seeks to re-style its prior request for declaratory relief of invalidity, non-infringement and unenforceability of the '634 patent as an affirmative count seeking a declaratory judgment of said requests. Finally, plaintiff seeks to amend its complaint to reflect the fact that it is no longer asserting one of its patents, U.S. Patent No. 5,688,803 ("the '803 patent"), in this case.

In support of its motion to amend, plaintiff contends that the facts supporting its inequitable conduct claims did not come to light until the end and beyond of discovery. Plaintiff states that although fact discovery ended on October 17, 2002, the parties have both been actively taking numerous fact discovery depositions into early December 2002. Based on these facts, plaintiff contends that it has not delayed in bringing its inequitable conduct allegations and defendant would not be unduly prejudiced by the amendment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
**(Cite as: 2003 WL 1905637 (D.Del.))**

Page 2

**\*2** Defendant opposes plaintiff's motion for leave to amend on a number of grounds. (D.I.161) First, defendant argues that plaintiff's motion is untimely. In support of this argument, defendant contends that at no time prior to December 2002 did plaintiff indicate that it would be pursing additional inequitable conduct claims. Furthermore, all the documents relied on by plaintiff for its inequitable conduct allegations were produced as early as May 24, 2002. Plaintiff also deposed numerous witnesses about many of these documents with regard to any potential inequitable conduct in September 2002. Thus, defendant argues plaintiff's delay is undue and solely the fault of plaintiff.

Next, defendant argues that allowing the amendment will prejudice it and burden the court. Defendant argues that allowing the amendment at this late date would require it to take additional discovery which would increase its costs and potentially delay the case. Furthermore, the inequitable conduct allegations would certainly be raised on summary judgment and, therefore, the amendment would delay this briefing as well.

Finally, defendant argues that plaintiff's amendment would be futile. In support of this argument, defendant asserts that plaintiff's inequitable conduct charge is legally deficient for at least two reasons. First, plaintiff alleges in its amended complaint that defendant committed inequitable conduct. As a matter of law, only a natural person, not a corporation, can commit inequitable conduct. Plaintiff's complaint fails to point to any specific person who committed inequitable conduct during the prosecution of the '634 patent. Second, plaintiff fails to properly plead inequitable conduct under Fed.R.Civ.P. 9(b).

Defendant's final concern is that plaintiff's amendment removing references to the now non-asserted '803 patent may curtail its unfair competition claims and claims for attorneys fees based on this patent.

In its reply, plaintiff argues that it did not delay seeking to amend and, additionally, delay alone is not the basis for denial of a motion for leave to amend. (D.I.166) It asserts that it conducted a reasonable and diligent investigation of the facts surrounding inequitable conduct despite defendant's efforts to hinder the investigation. The documents defendant produced in May 2002 were "buried among 200 boxes of documents" produced within a two-week period. The facts supporting its inequitable conduct

claims did not come to light until the September 2002 depositions and then plaintiff began conducting an investigation to confirm these facts. A key fact needed was the source code related to the charges which defendant delayed in providing until December 2002.

Next, plaintiff argues that allowing the amendment will not prejudice defendant or burden the court. In support of this argument, plaintiff contends that defendant has been on notice of its charges since December 2002 and its on-sale bar affirmative defense (related to the inequitable conduct charge) has been in the case since the beginning. Therefore, no extensive additional discovery will be required and all of the facts related to the conduct of the inventors is under the control of defendant.

**\*3** Finally, plaintiff argues that its amendment is not futile. It argues that its amended complaint names specific individuals who were aware of material references and failed to disclose them to the patent office. It also asserts that its complaint is properly pled under Rule 9(b).

Upon review of the parties' arguments and the amendments to the complaint, the court shall grant plaintiff's motion. The court agrees with plaintiff that allowing the amendment will not unfairly prejudice defendant or cause delay to the case. Plaintiff's proposed amendment is narrow and largely based on facts defendant has known throughout the case. Furthermore, based on the record, there is no evidence that the delay of plaintiff's amendment is undue or that it is being made in bad faith or for a dilatory motive.

The court does not believe the amendment will prolong discovery or delay trial. To the extent defendant needs to conduct any additional depositions related to the narrow issue of inequitable conduct, the court will allow the discovery and plaintiff shall produce any requested witness promptly. Furthermore, inequitable conduct is rarely appropriately decided on summary judgment so defendant's concerns about its ability to brief the issue are not persuasive.

Finally, defendant's concerns that plaintiff's amendments will curtail its unfair competition claims and claims for attorneys fees based on the '803 patent shall be assuaged. Defendant will still be entitled to pursue these claims against plaintiff at trial.

IV. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2003 WL 1905637 (D.Del.)
**(Cite as: 2003 WL 1905637 (D.Del.))**

 For the reasons stated, plaintiff's motion for leave to
amend its complaint  (D.I.160) is granted.  An
appropriate order shall issue.

ORDER

 At Wilmington this 17th day of April 2003,
consistent with the memorandum opinion issued this
same day;

 IT IS ORDERED that plaintiff's motion for leave to
amend its complaint  (D.I.160) is granted.

 Not Reported in F.Supp.2d, 2003 WL 1905637
(D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 24302583  (Expert Report and Affidavit)
Supplemental Expert Report of Dr. Izhakrubin (Mar.
2, 2003)Original Image of this Document (PDF)

• 2003 WL 24302584  (Partial Expert Testimony)
Deposition of Izhak Rubin (Mar. 2, 2003)Original
Image of this Document (PDF)

• 2003 WL 24307200  (Trial Pleading) Amended
Complaint (Jan. 2, 2003)Original Image of this
Document (PDF)

• 2002 WL 33003952  (Expert Report and Affidavit)
Rebuttal Expert Report of Joseph V. Colaianni (Dec.
24, 2002)Original Image of this Document (PDF)

• 2002 WL 33003953  (Expert Report and Affidavit)
Expert Report of Joseph V. Colaianni (Dec. 20,
2002)Original Image of this Document (PDF)

• 2002 WL 33003954  (Partial Expert Testimony)
Videotaped Deposition of Kurt F. Bauer (Dec. 4,
2002)

• 2002 WL 33006690  (Trial Motion, Memorandum
and Affidavit) Opening Brief in Support of Symbol's
Motion to Dismiss Proxim's Sixth, Seventh and
Eighth Counterclaims, and to Strike Proxim's Tenth
Affirmative Defense (Jan. 31, 2002)Original Image
of this Document (PDF)

• 1:01CV00801 (Docket) (Dec. 04, 2001)

• 2001 WL 34900760  (Partial Expert Testimony)
(Partial Testimony) (2001)Original Image of this
Document (PDF)

• 2001 WL 34900761  (Expert Report and Affidavit)
Expert Report of Joseph V. Colaianni (2001)Original
Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

# EXHIBIT 6

LEXSEE

**MARTEK BIOSCIENCES CORPORATION, Plaintiff, v. NUTRINOVA INC.,
NUTRINOVA NUTRITION SPECIALTIES & FOOD INGREDIENTS GMBH,
CELANESE VENTURES GMBH, and CELANESE AG, Defendants.**

**Civil Action No. 03-896 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 20469**

**October 8, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by <u>Martek
Biosciences Corp. v. Nutrinova, Inc., 2005 U.S. Dist.
LEXIS 14315 (D. Del., July 19, 2005)</u>

**DISPOSITION:** Plaintiff's motion to strike paragraph 26
of affirmative defenses denied. Plaintiff's motion to
dismiss paragraph 48 of Count I and Count III of
defendants' counterclaims granted in part and denied in
part. Plaintiff's motion for more definite statement
granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee filed
suit against defendants, alleging infringement of United
States Patent Nos. 6,607,900 and 6,451,567. The patentee
moved to strike defendants' affirmative defense of
inequitable conduct and to dismiss defendants'
counterclaim for a declaratory judgment.

**OVERVIEW:** The court found that defendants'
inequitable conduct pleadings failed to satisfy the
requirements of <u>Fed. R. Civ. P. 9(b)</u>. Although
defendants may not have been required to describe why
the data the patentee submitted to the United States
Patent and Trademark Office was false or to state why
that data was material, defendants should have identified
the data in their affirmative defense and counterclaim.
The proper remedy was to require defendants to provide a
more definite statement. The declaratory judgment claim
related to other patents that the patentee held. In
particular, the patentee sent defendants an e-mail that
included a list of 18 of its nearly 50 patents that it
selected as relevant to defendants' conduct. Although the

patentee did not explicitly threaten to bring an
infringement suit, the e-mail created a reasonable
apprehension in defendants that the patentee would sue.
Thus, while the district court agreed that defendants'
claim for non-liability as to "any valid and enforceable
claim of any issued United States patent owned by the
patentee" was too broad, the 18 patents referenced in the
e-mail were proper subjects for defendants' declaratory
judgment claim.

**OUTCOME:** The patentee's motion to strike defendants'
affirmative defense and to dismiss the counterclaims was
granted in part and denied in part. The court dismissed
defendants' counterclaim except for 18 specific patents.
The patentee's motion for a more definite statement was
granted.

**CORE TERMS:** patent, inequitable conduct,
counterclaim, email, apprehension, infringement,
declaratory judgment, actual controversy, definite,
subject matter jurisdiction, declaratory judgment action,
patentee, unenforceable, prosecuted, portfolio,
particularity, infringing, vague, motion to strike,
microalgae, intellectual property, affirmative defense,
responsive pleading, motion to dismiss, devoid of merit,
facial attack, insubstantial, declaration, ambiguous,
succeed

**COUNSEL:** [*1] For MARTEK BIOSCIENCES
CORPORATION, Plaintiff: Steven J. Balick, Ashby &
Geddes, Wilmington, DE.

For NUTRINOVA INC., NUTRINOVA NUTRITION
SPECIALTIES & FOOD INGREDIENTS GMBH,

2004 U.S. Dist. LEXIS 20469, *1

Defendants: George Pazuniak, Oleh V. Bilynsky, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For NUTRINOVA INC., NUTRINOVA NUTRITION SPECIALTIES & FOOD INGREDIENTS GMBH, Counter-Claimants: George Pazuniak, Oleh V. Bilynsky, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For MARTEK BIOSCIENCES CORPORATION, Counter-Defendant: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINION BY: Gregory M. Sleet

OPINION:

### MEMORANDUM

### I. INTRODUCTION

The plaintiff, Martek Biosciences Corporation ("Martek"), filed the above-captioned action against Nutrinova Inc. and Nutrinova Nutrition Specialties & Food Ingredients GMBH (collectively, "Nutrinova") on September 23, 2003. n1 In its complaint, Martek alleges that the defendant is infringing United States Patent Nos. 6,607,900 (the "900 patent") and 6,451,567 (the "567 patent").

> n1 Celanese Ventures GMBH and Celanese AG have been dismissed as defendants in this case.

[*2]

Presently before the court is Martek's motion to strike paragraph 26 of the affirmative defenses, and to dismiss paragraph 48 of Count I and Count III of Nutrinova's counterclaim. n2 For the following reasons, the court will deny Martek's motion to strike, but grant Martek's motion for a more definite statement. In addition, the court will grant in part and deny in part Martek's request to dismiss Count III of Nutrinova's counterclaim.

> n2 Martek titles its motion as a

motion to strike. However, in its Opening Brief in support of the motion (D.I. 12), Martek requests, in the alternative, that the court require Nutrinova to provide a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure. The court will consider both of Martek's motions.

### II. BACKGROUND

Martek is a Delaware Corporation that develops and sells products from microalgae, including nutritional fatty acids such as the omega-3 fatty acid, docosahexaenoic acid ("DHA"). This case involves two of Martek's patents [*3] relating to DHA. DHA is a major and essential structural fatty acid, necessary for the development of organs including the eye retina, the brain, and the heart. The human body produces DHA in only limited quantities, creating a need in the medical science community to find alternate sources of DHA or develop processes to produce it. Martek recognized this need and developed microalgae processes to make DHA and products relating to its processes. Its patent portfolio consists of nearly fifty United States patents as well as foreign patents, including many directed to its DHA products.

Nutrinova is a Delaware Corporation that developed a microalgae process to make DHA, and currently markets its product under the brand name DHActive TM. After Nurtinova began marketing DHActive TM, Martek initiated discussions with Nutrinova regarding its potentially infringing activities. On May 27, 2003, Martek sent an email to Nutrinova, citing its patent portfolio and requesting to discuss the situation. (D.I. 13, Exh. 2). Nutrinova replied, requesting information regarding the patents and claims that Martek believed Nutrinova was potentially infringing. On June 18, 2003, Martek responded, via email, [*4] citing eighteen specific patents from its portfolio that it believed were relevant to the discussions. (Id. Exh. 4). Nutrinova reviewed the list and concluded that the patents offered by Martek were either not infringed or were invalid. Nutrinova then requested a meeting with Martek to discuss the situation further. (Id. Exh. 5) According to Martek, the parties were unable to amicably settle the

Page 2

matter. On September 23, 2003, Martek filed its complaint.

## III. STANDARDS OF REVIEW

### A. Rule 12(f)

Rule 12(f) of the Federal Rules of Civil Procedure allows a court to strike "any insufficient defense" from any pleading. Motions to strike affirmative defenses are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc.*, 697 F. Supp. 1360, 1362 (D. Del. 1988). When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party . . . and deny the motion if the defense is sufficient under the law." *Id.* Furthermore, courts prefer not to grant a motion to strike "unless it appears to a certainty that . . . [the movant] would succeed despite any statement of the facts which could be proved in support of the defense." *Greiff v. T.J.C. Enterprises, L.L.C.*, 2004 U.S. Dist. LEXIS 680, No. Civ. 03-882, 2004 WL 115553 [*5] (D. Del. Jan. 9, 2004).

### B. Rule 12(e)

Rule 12(e) allows a party to move for a more definite statement when a pleading is "so vague or ambiguous that the party cannot reasonably be required to frame a responsive pleading." FED. R. CIV. P. 12(e); *see Schaedler v. Reading Eagle Publications, Inc.*, 370 F.2d 795, 798 (3d Cir. 1967) (same). Courts have interpreted this language to mean that the motion should only be granted where the pleading is unintelligible, see *CFMT, Inc. v. Yieldup Int'l Corp.*, 1996 U.S. Dist. LEXIS 22795, No.CIV.A.95-549, 1996 WL 33140642, at *1 (D. Del. Apr. 5, 1996); *United States v. Bd. of Harbor Comm'rs*, 73 F.R.D. 460, 462 (D. Del. 1997), or the issues cannot be determined. *See Fischer & Porter Co. v. Sheffield Corp.*, 31 F.R.D. 534, 536 (D. Del. 1962). Courts have also granted the motion where the pleading has failed to satisfy the heightened pleading requirements of Rule 9(b). *See EMC Corp. v. Storage Tech. Corp.*, 921 F. Supp. 1261 (D. Del. 1996).

### C. Rule 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), challenges the jurisdiction of the court [*6] to address the merits of a plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction can take

two forms: it can attack the complaint on its face (facial attack), or it can attack the existence of subject matter jurisdiction in fact (factual attack). *Mortensen v. First Federal Savings and Loan*, 549 F.2d 884, 891 (3d Cir. 1977). When reviewing a facial attack the court must consider the allegations of the complaint as true, making all reasonable inferences in the plaintiff's favor. *Id. See also Barrister v. Wendy's Int'l, Inc.*, 1993 U.S. Dist. LEXIS 10422, 1993 WL 293896, *3 (E.D. Pa. July 30, 1993).

When reviewing a factual attack, however, the court is free to weigh evidence outside the pleadings to resolve factual issues bearing on jurisdiction and to satisfy itself as to the existence of its power to hear the case. *Mortensen*, 549 F.2d at 891. Therefore, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims for itself. *Id.* The plaintiff bears the burden to prove that jurisdiction [*7] does in fact exist. *Id.* However, the plaintiff's burden is relatively light, since "dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy.'" *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666, 39 L. Ed. 2d 73, 94 S. Ct. 772 (1974)).

## IV. DISCUSSION

### A. Paragraph 26 of Nutrinova's Affirmative Defenses and Paragraph 48 of Nutrinova's Counterclaim n3

n3 Paragraph 26 of the affirmative defenses states:

26. The '567 patent is unenforceable, because of the applicants' inequitable conduct in the prosecution of the patent. In particular, Martek prepared, filed and prosecuted a patent application, Serial Number

07/580,778 filed on September 11, 1990, which issued as the Martek '567 patent. That application was prepared, filed and prosecuted with material false data. The applicants knew that the application contained false data, but nevertheless filed, continued to prosecute, and convinced the Patent Office to issue the '567 patent based on such material false data. Such misconduct constitutes inequitable conduct, and renders the '567 patent and all affiliated patents unenforceable.

Paragraph 48 of Count I of the counterclaim states:

48. The '567 patent is unenforceable, because the applicants' inequitable conduct in the prosecution of the patent. In particular, Martek prepared, filed and prosecuted a patent application, Serial Number 07/580,778 filed on September 11, 1990, (the "778 application"), which is a parent application from which Martek's '567 patent on its face claims priority. A claim for priority from the 778 application is also made in a declaration filed by the inventors in connection with the '567 patent. The 778 application was prepared, filed and prosecuted with material false data. The applicants knew that the application contained false data, but

nevertheless filed, continued to prosecute, and convinced the Patent Office to issue the '567 patent based on such material false data. Such misconduct constitutes inequitable conduct, and renders the '567 patent and all affiliated patents unenforceable.

[*8]

As one of its affirmative defenses, Nutrinova alleges that Martek engaged in inequitable conduct in acquiring the '567 patent. Martek moves to strike the defense, as well as paragraph 48 of Nutrinova's counterclaim, which is predicated on the inequitable conduct defense, on the grounds that they do not meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, Martek claims that the language in Nutrinova's affirmative defense and counterclaim fails to provide any specifics concerning Martek's inequitable conduct in obtaining the '567 patent. In response, Nutrinova asserts that its pleading is not "vague or conclusory." Further, Nutrinova asserts that there is no authority that requires a pleading that claims inequitable conduct to identify specific falsified data, describe why it is false, or state why it was material, as Martek suggests it should have done.

The parties do not dispute that the particularity requirement of Rule 9(b) applies to inequitable conduct charges. In the context of alleged inequitable conduct before the PTO during a patent prosecution, Rule 9(b) does not require that a party plead the "date, place or time" of the fraud, [*9] so long as that party uses an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert denied, 469 U.S. 1211, 84 L. Ed. 2d 327, 105 S. Ct. 1179 (1985); see EMC Corp. v. Storage Tech. Corp., 921 F. Supp. 1261, 1262-63 (D. Del. 1996). Nutrinova's pleadings do not pass the Seville test. Even if Nutrinova did not have to describe why the data Martek submitted to the Patent Office was false or state why that data was material, it should have identified the data in its affirmative defense and counterclaim. n4 The court, therefore, finds that Nutrinova has failed to plead facts with sufficient

particularity in paragraph 26 of its affirmative defenses and paragraph 48 of its counterclaim to establish a charge of inequitable conduct based on Martek's alleged submission of false data during the prosecution of the '567 patent. n5

> n4 The court notes that Nutrinova provided a more detailed description of its inequitable conduct claim in a letter to Martek, stating that Martek's patent application "contains examples which do not represent actual data, and they are written in past tense." (D.I. 13, Exh. 1). The court will not determine whether the information contained in Nutrinova's letter is sufficient to meet the Rule 9(b) pleading requirements. The court uses the letter only to point out that Nutrinova possesses more detailed information regarding Martek's alleged inequitable conduct.

[*10]

> n5 Because Nutrinova has not adequately pled its inequitable conduct claim, its pleading cannot be salvaged by future discovery. EMC Corp., 921 F. Supp. at 1264 (concluding that the plaintiff could not "use its interrogatory responses to fulfill the particularity requirements of Rule 9(b)").

In the present case, it does not appear to a certainty that Martek would succeed despite any statement of facts which could be proved in support of Nutrinova's inequitable conduct defense. Thus, the court does not conclude that the proper remedy in this case is to strike Nutrinova's pleadings. However, Martek has requested, in the alternative, that the court require Nutrinova to provide a more definite statement. The court finds that Nutrinova's inequitable conduct pleadings fail to satisfy the Rule 9(b) requirements in that they are so vague and ambiguous that Martek cannot draft a responsive pleading. Therefore, the court will grant Martek's request for a more definite statement.

**B. Count III of Nutrinova's Counterclaim**

Martek next asserts that the court should dismiss Count III [*11] of Nutrinova's counterclaim for lack of subject jurisdiction. In its motion, Martek attacks Nutrinova's complaint on factual grounds. Thus, the court will consider evidence outside of the pleadings to determine whether subject matter jurisdiction exists. Nutrinova has the burden of proving that jurisdiction exists and must demonstrate that its claim is not wholly insubstantial, frivolous, devoid of merit, or made for the purpose of obtaining jurisdiction. See Kulick, 816 F.2d at 899. Count III is a declaratory judgment claim. n6 Martek argues that the facts of the case do not give rise to declaratory judgment jurisdiction.

> n6 Martek reproduces all of Count III in its Opening Brief in support of its motion (D.I. 12, at 7). The court, however, will paraphrase the language. Count III entitled, Non-Liability as to DHActive TM and Nutrinova Process, essentially asks the court to conclude that Nutrinova's activities do not infringe and that it is not liable for infringement of any valid and enforceable right of Martek, including any valid and enforceable claim of any issued United States patent owned by Martek.

[*12]

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201 (a). The federal courts have jurisdiction over a declaratory judgment action only if an "actual controversy" exists between the parties at the time the plaintiff files its complaint and throughout the pending action. Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 887 (Fed. Cir. 1992). In the patent context, the United States Court of Appeals for the Federal Circuit has articulated a two-part test to determine whether an actual controversy

exists: (1) an explicit threat or other act by the patentee creating in the declaratory plaintiff a reasonable apprehension that the patentee will initiate suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to infringe. *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed. Cir. 1993). [*13] Martek asserts that Nutrinova does not satisfy the first prong of *BP Chemicals* because Nurtinova's broad claims do not cite the specific patents or rights at issue, and could potentially encompass all of Martek's intellectual property, including its nearly fifty U.S. patents and its non-patent intellectual property rights. In addition, Martek contends that Nutrinova has not alleged, and cannot allege, facts necessary to establish that Martek's conduct placed Nutrinova in reasonable apprehension of an infringement suit over such broad subject matter. Lastly, Martek asserts that even if the court determines that an actual controversy exists, considerations of justice and efficiency require the court to decline declaratory judgment jurisdiction over Count III. n7

> n7 The court's exercise of jurisdiction over a declaratory judgment action is discretionary. *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 634 (Fed. Cir. 1991).

Nutrinova argues that its declaratory judgment counterclaim is not [*14] broad and open-ended because it seeks a declaration only as to the one specific product, DHActive TM, made by the one specific process that is the subject of Martek's complaint. Nutrinova further argues that an actual controversy exists because Martek has already brought a suit for infringement against it for making DHActive TM. Moreover, Nutrinova contends that even if Martek had not initiated this lawsuit, its written assertions to Nutrinova constitute a basis for a declaratory judgment action under *Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266 (Fed. Cir. 1998) (affirming jurisdiction because a voice-mail to the defendant, stating that the patentee intended to protect its rights, created a reasonable apprehension in the defendant that the patentee would sue).

The parties do not dispute whether there is "present activity which could constitute infringement." n8 Thus, the court must determine whether Martek's conduct has been such that it caused Nutrinova to have an objectively

reasonable apprehension of being sued by Martek at the time the declaratory judgment action was filed. In making its determination, the court must consider the totality of the circumstances. [*15] *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed. Cir. 1992).

> n8 Nevertheless, the court finds that Nutrinova satisfies the "present activity" prong of *BP Chems. Ltd.* because it engages in the manufacture and production of DHActive TM, which is sufficiently similar to Martek's patents. See *Millipore Corp. v. Univ. Patents, Inc.*, 682 F. Supp. 227, 232 (D. Del. 1987).

The court agrees with Nutrinova that the litigious history between the parties and Martek's written assertions weigh in favor of a finding that Nutrinova has a reasonable apprehension of suit. The Federal Circuit has stated that "the question is whether the relationship between the parties can be considered a 'controversy,'" and that inquiry does not turn on whether the parties have used particular 'magic words' in communicating with one another." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996). The court also cautioned that the "test for finding a 'controversy' . . . is a pragmatic [*16] one and cannot turn on whether the parties use polite terms in dealing with one another or engage in more bellicose saber rattling." *Id*

In the present case, even though Martek did not explicitly threaten to bring an infringement suit in any correspondence with Nutrinova, the court concludes that Martek's June 18, 2003 email (D.I. 13, Exh. 4) created a reasonable apprehension in Nutrinova that Martek would sue. In fact, Martek filed its complaint on September 23, 2003, approximately three months after its email to Nutrinova and one month after Nutrinova's request for a meeting. Nevertheless, Martek's June 18, 2003 email included a list of eighteen of its nearly fifty U.S. patents that it selected as relevant to Nutrinova's conduct. Beyond that, the email discussed Martek's patents and patent portfolio in a general sense. Martek's email created a reasonable apprehension in Nutrinova that Martek only would sue for infringement of one or more of the eighteen listed patents, not "any" or all of its patents. Thus, Nutrinova's claim for non-liability as to "any valid and enforceable claim of any issued United States patent owned by Martek," and "any valid and enforceable right

of Martek" [*17] is too broad. Only those patents referenced in the June 18, 2003 email are proper subjects for Nutrinova's declaratory judgment claim. The court, therefore, will dismiss Count III of Nutrinova's counterclaim as it relates to Martek patents other than the eighteen listed in the June 18, 2003 email.

Dated: October 8, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum Opinion of this same date, IT IS HEREBY ORDERED that:

1. The plaintiff's Motion to Strike Paragraph 26 of the Affirmative Defenses and Dismiss Paragraph 48 of Count I and Count III of the Counterclaims by Nutrinova and Nutrinova Specialties & Food Ingredients GMBH (D.I. 11) is GRANTED in part and DENIED in part.

2. The plaintiff's Motion, in the alternative. For a More Definite Statement (D.I. 12) is GRANTED.

Dated: October 8, 2004

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT 7

LEXSEE

**SYNOPSYS, INC., Plaintiff, v. MAGMA DESIGN AUTOMATION, Defendant.
MAGMA DESIGN AUTOMATION, Counter Claimant, v. SYNOPSYS, INC.,
Counter Defendant.**

**C.A. No. 05-701 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2006 U.S. Dist. LEXIS 33751; 2006-1 Trade Cas. (CCH) P75,320**

**May 25, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff filed a suit against defendant alleging three counts of patent infringement in violation of 35 U.S.C.S. § 271. Defendant answered and asserted seven counterclaims against plaintiff. Plaintiff moved to dismiss all but defendant's patent infringement counterclaim, moved to bifurcate defendant's antitrust counterclaims, and moved for a stay. Defendant sought leave to file an amended answer to add four additional infringement counterclaims.

**OVERVIEW:** In addition to its patent infringement counterclaim, defendant asserted monopolization and attempt to monopolize counterclaims under § 2 of the Sherman Act, 15 U.S.C.S. § 2; product disparagement and trade libel, in violation of § 43(a) of the Lanham Act, 15 U.S.C.S. § 1125(a); unfair competition under the Delaware Deceptive Trade Practices Act, Del. Code. Ann. tit. 6, § 2531 et seq. (1999) and common law; and a tortious interference with business relations counterclaim. The court found that defendant asserted actionable counterclaims. Its allegations, that plaintiff owned a 91 % share in two relevant markets and was acting anti-competitively by using the patent system and exclusive-dealing contracts to drive it out of business, were sufficient to state a claim under 15 U.S.C.S. § 2. Fed. R. Civ. P. 9(b) heightened pleading requirements did not apply to the Lanham Act counterclaims; defendant sufficiently met Fed. R. Civ. P. 8 requirements as to those counterclaims. The court declined to exercise its discretion under Fed. R. Civ. P. 42(b) to bifurcate the trial; bifurcating the antitrust claims was not necessary to prevent jury confusion and would not promote efficiency.

**OUTCOME:** The court denied plaintiff's motions. It granted defendant's motion for leave to amend its answer. The court ordered the parties to meet and confer regarding an amendment to the court's scheduling order.

**CORE TERMS:** patent, antitrust, amended answer, infringement, Sherman Act, Lanham Act, discovery, patent infringement, motion to dismiss, monopolization, disparagement, bifurcation, scheduling, bifurcate, pleaded, motion to bifurcate, presentation, counterclaim, reputation, technology, heightened, decrease, campaign, testing, confer, subject matter jurisdiction, interstate commerce, unfair competition, evidentiary, bifurcating

**COUNSEL:** [*1] For Synopsys Inc., a Delaware corporation, Plaintiff: Karen Jacobs Louden, Morris, Nichols, Arsht & Tunnell, Wilmington, DE ; Leslie A. Polizoti, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE.

For Magma Design Automation, a Delaware corporation, Defendant: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE

For Magma Design Automation, a Delaware corporation, Counter Claimant: William J. Marsden, Jr., Fish & Richardson, P.C., Wilmington, DE

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

2006 U.S. Dist. LEXIS 33751, *1; 2006-1 Trade Cas. (CCH) P75,320

**OPINION:**

**MEMORANDUM**

## I. INTRODUCTION

In the above-captioned action, Plaintiff and Counter Defendant Synopsys, Inc. ("Synopsys") alleges three counts of patent infringement in violation of 35 U.S.C.A. § 271 (2001 & Supp. 2005) against Defendant and Counter Claimant Magma Design Automation ("Magma"). In its first amended answer, Magma alleges against Synopsys one count of monopolization (Count I) and one count of attempted monopolization (Count II), both in violation of Section 2 of the Sherman Act, 15 U.S.C.A. § 2 (Supp. 2005), one count of product disparagement and trade libel (Count [*2] III) in violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a) (1998 & Supp. 2005), one count of statutory unfair competition (Count IV) in violation of the Delaware Deceptive Trade Practices Act, Del. Code. Ann. tit. 6, §§ 2531, et seq. (1999), one count of unfair competition (Count V) and one count of tortious interference with business relations (Count VI), both in violation of Delaware common law, and one count of patent infringement (Count VII). Presently before the court are Synopsys' motion to dismiss Counts I-VI of Magma's first amended answer (D.I. 9), Synopsys' motion to bifurcate and stay (D.I. 31), and Magma's motion for leave to file a second amended answer to include four additional patent infringement counterclaims (D.I. 50).

## II. JURISDICTION

The court has subject matter jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1367 (1993).

## III. BACKGROUND

According to the first amended answer, the patents at issue in this case relate to improvements in computer software used to design extremely complex integrated circuits. In general, such software translates a user's [*3] high-level description of the circuit he or she has designed and wishes to implement into a low-level description of the necessary components. This translation process is known as logic synthesis. The software then engages in a process known as physical design, in which the actual circuit layout and interconnections are determined. Eventually (after several steps irrelevant to

this discussion) the newly-designed circuit is manufactured and ready for testing. The testing process typically requires the insertion of "scan chains" into the low-level description produced during logic synthesis. These scan chains consist of interconnected storage elements capable of being read from and written to during testing.

Magma alleges that Synopsys has a 91% share in both the logic-synthesis market and the scan-chain insertion market, which are monopolies Synopsys procured and maintains through anti-competitive conduct. More specifically, Magma contends that two of the patents asserted by Synopsys in this case were obtained by fraudulent means, and that Synopsys has attempted to create exclusive-dealing contracts with Magma's customers. Magma further alleges that Synopsys has engaged in a public [*4] campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot afford to both defend itself in court and remain solvent.

## IV. DISCUSSION

### A. Motion to Dismiss

"When considering a Rule 12(b)(6) motion, [the court is] required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005). "A Rule 12(b)(6) motion should be granted 'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" Id. at 351 (quoting D.P. Enter. Inc. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984)). "However, [the] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." Evancho, 423 F.3d at 351.

### 1. Sherman Act (Counts I & II)

Synopsys argues that Magma's monopolization and attempted monopolization claims under Section 2 of the Sherman Act should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) [*5] because they are unsupported by adequate factual allegations. In particular, Synopsys contends that the first amended answer fails to allege "antitrust injury," which, according to Synopsys, requires "harm to competition in the marketplace," and a causal connection between that harm and the anti-competitive

2006 U.S. Dist. LEXIS 33751, *5; 2006-1 Trade Cas. (CCH) P75,320

activities.

In *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, the Supreme Court explained:

> "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.

425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976). In this case, the clear import of Magma's allegations is that Synopsys, with a 91% share in both relevant markets, is acting anti-competitively by using the patent system and exclusive-dealing [*6] contracts to run a competitor, *i.e.*, Magma, out of business. If Synopsys is successful, Magma contends that there will be a decrease in competition because significant barriers to entry prevent would-be competitors from replacing the void left by Magma. These allegations are sufficient to state a claim under Section 2 of the Sherman Act. *Gill v. Del. Park, L.L.C.*, 294 F. Supp. 2d 638, 644 (D. Del. Dec. 2, 2003) (explaining that "the anti-trust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market").

## 2. Lanham Act (Count III)

Synopsys argues that Magma's Lanham Act claim is subject to the heightened pleading requirements of Rule 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). However, the "state of the law [is unsettled] as to whether Rule 9(b) was intended to incorporate claims brought under the Lanham Act." *H.H. Fluorescent Parts, Inc. v. DM Tech. & Energy, Inc.*, No. 04-1997, 2005 U.S. Dist.

LEXIS 26699, [*7] at *13 (E.D. Pa. Nov. 3, 2005). If Count III is not subject to the heightened pleading requirements of Rule 9(b), then Magma's allegations need only satisfy the notice pleading requirements of Rule 8(a).

The purpose of "Rule 9(b) [is] to give defendants 'notice of the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements.'" *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). Here, none of these purposes would be served by requiring Magma to satisfy the pleading requirements of Rule 9(b). The Lanham Act claim in this case is one of seven claims Magma brought in response to a suit originally filed by Synopsys. Thus, this is not a case in which the court must protect Synopsys against a "frivolous suit brought *solely* to extract a settlement." Moreover, the need to provide increased protection for Synopsys' reputation is not as crucial in this case because Count III was brought as a means of protecting Magma's reputation. [*8] Finally, even if Magma's pleadings do not specify the "who, when, and where" of Synopsys' allegedly damaging statements, that problem is easily cured in discovery. Therefore, the court holds that the heightened pleading requirements of Rule 9(b) are not applicable in this context.

"Under the Lanham Act a plaintiff must allege that: (1) defendant made false or misleading statements as to its product, or those of the plaintiff; (2) there was actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception was material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Enzo Life Scis., Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 427 (D. Del. Mar. 31, 2003). However, the required level of specificity with which each element must be pleaded is not high because Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The first two elements [*9] are adequately pleaded by the allegation that Synopsys, knowing its patents were obtained by fraudulent means, engaged in a public campaign of disparagement by falsely claiming that Magma sells infringing products, and that Magma cannot

2006 U.S. Dist. LEXIS 33751, *9; 2006-1 Trade Cas. (CCH) P75,320

afford to both defend itself in court and remaining solvent. The third element (materiality) and the fifth element (injury) are adequately pleaded by the allegation that Synopsys' campaign of disparagement has damaged Magma. And the fourth element (interstate commerce) is explicitly pleaded in paragraph 156 of the first amended answer. Thus, Magma has met the requirements of Rule 8 with regard to its Lanham Act claim.

### 3. State Law Claims (Counts IV, V & VI)

Synopsys argues that the court has no subject matter jurisdiction pursuant to 28 U.S.C.A. § 1367 over Magma's state law claims if Counts I-III are dismissed. However, because those counts will not be dismissed at this time, the court retains jurisdiction over Counts IV-VI.

### B. Motion to Bifurcate and Stay

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate [*10] trial of any claim, cross-claim, counterclaim, or third-party claim . . . ." Fed. R. Civ. P. 42(b). "[T]he decision to bifurcate *vel non* is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir. 1978).

Synopsys argues that the court should bifurcate the antitrust claims from the infringement claims because other courts routinely do so. This argument runs contrary to the guiding principle enunciated in *Lis*. There, the district court had simply followed its customary practice of separating the liability and damages phases in negligence cases without considering the unique circumstances of the negligence case at bar. On appeal, the Third Circuit held that this methodology ran afoul of Rule 42(b): "A general policy of a district judge bifurcating all negligence cases offends the philosophy that the decision must be made by a trial judge only as a result of an informed exercise of discretion *on the merits of each case*." *Lis*, 579 F.2d at 824 (emphasis added). Therefore, although [*11] the routine practice of other courts may indicate that "experience has demonstrated [the] worth" of bifurcation in these circumstances, Fed. R. Civ. P. 42 advisory committee's note, the court's decision in this case will be guided first and foremost by the merits of this case.

With that principle in mind, the court is not convinced that bifurcation of the antitrust claims from the infringement claims is necessary to prevent jury confusion. In this court's experience, jurors are quite adept at comprehending and adhering to the instructions they are given, even in the most complex factual and legal scenarios. Therefore, the court will not pre-judge the yet-unnamed jurors by assuming they are unable to digest the facts and law in this case. Moreover, the court is confident that the experienced attorneys handling this case will craft cogent presentations to aid the jury in this process. The court is further unpersuaded by Synopsys' contention that bifurcation would serve the interest efficiency. Magma's antitrust claims are based in part on the allegation that Synopsys fraudulently-obtained two of its patents and asserted them against Magma in [*12] violation of Section 2 of the Sherman Act. Synopsys' alleged fraud is also a centerpiece of Magma's invalidity claims. Thus, were the court to bifurcate, the evidentiary presentation in one case would likely be substantially duplicative of the evidentiary presentation in the other. In addition, bifurcation would likely create further duplication of evidence because both juries would need to be educated in the same relevant technology. Accordingly, the court concludes that neither jury confusion nor efficiency weigh in favor of bifurcating the antitrust claims from the infringement claims.

Synopsys also argues that the antitrust claims should be stayed until the infringement claims are resolved mainly because resolution of the infringement claims could streamline subsequent adjudication of the antitrust claims. Assuming *arguendo* that the litigation could be streamlined in this way, it is telling that Synopsys does not propose to shorten the number of days allocated for trial in the event that a stay is granted. Thus, even if the court stays the antitrust claims, the minimum amount of time allocated to try this case does not decrease. Consequently, it appears that a stay only has [*13] the potential to consume *more* of this court's valuable time. Therefore, the court will not stay the antitrust portion of this action.

For similar reasons, the court also declines to stay Synopsys' infringement claims pending re-examination by the PTO. The validity of the asserted patents will be litigated regardless of whether a stay is granted because that issue is relevant to Magma's Sherman Act claims. The most efficient course of action, then, is to also litigate infringement in order to capitalize on the jury's

understanding of the relevant technology. Thus, the court will deny Synopsys' motion in its entirety.

**C. Motion to Amend**

Pursuant to the court's scheduling order of December 28, 2005, the deadline for amended pleadings is March 24, 2006. On that date -- March 24 -- Magma timely filed a motion for leave to amend its first amended answer to include four additional counterclaims for patent infringement. "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "In the absence of any apparent [*14] or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

Synopsys' primary basis for opposing Magma's motion is that fact discovery is scheduled to close on September 26, 2006, thus giving the parties less than six months to both conclude discovery on the claims already in the case, and to conduct full discovery on the four additional patent infringement claims. However, trial in this case is not scheduled to begin until June 11, 2007, which should give the parties ample time to conduct additional discovery beyond September 26 without disturbing the trial date. Thus, the court will grant the motion and order the parties to meet and confer regarding an amendment to the court's scheduling order. n1

n1 Synopsys claims that Magma's four additional patents are not sufficiently similar to the technology at issue in this case to justify their inclusion. However, Synopsys merely proposes that "a review

of the patents quickly reveals that there is little similarity" among the patents. (D.I. 63 at 8.) In this lay court's opinion, a review of the patents quickly reveals enough similarity among the patents to justify including them in this lawsuit.

[*15]

**V. CONCLUSION**

For the reasons stated, the court will deny the motion to dismiss, deny the motion to bifurcate and stay, and grant the motion to amend. The court will further order the parties to meet and confer to regarding an amendment to the court's scheduling order.

Dated: May 25, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The motion to dismiss (D.I. 9) be DENIED;

2. The motion to bifurcate and stay (D.I. 31) be DENIED;

3. The motion to amend (D.I. 50) be GRANTED; and

4. The parties MEET and CONFER regarding the scheduling order.

Dated: May 25, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE