# EXHIBIT A

Price, David     8/31/2006

FOR THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---

TEXTRON INNOVATIONS, INC.,

        Plaintiff,

-vs-                          C.A. No. 05-486

THE TORO COMPANY,

        Defendant.

---

        Video examination of DAVID PRICE, taken at the instance of the Defendant, under and pursuant to the Federal Rules of Civil Procedure, before MELISSA J. STARK, a Certified Realtime Reporter, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at Michael, Best & Friedrich, LLP, 100 East Wisconsin Avenue, Milwaukee, Wisconsin, on AUGUST 31, 2006, commencing at 8:59 a.m. and concluding at 4:53 p.m.

Price, David          8/31/2006

Page 2

```
 1            APPEARANCES
 2  HUNTON & WILLIAMS, by
    MR. CHRISTOPHER C. CAMPBELL,
 3  1751 Pinnacle Drive, Suite 1700,
    McLean, Virginia 22102,
 4    appeared on behalf of the Plaintiff.
 5  MERCHANT & GOULD, by
    MR. ANTHONY R. ZEULI and MR. THOMAS J. LEACH,
 6  3200 IDS Center
    80 South Eighth Street,
 7  Minneapolis, Minnesota 55402-2215,
      appeared on behalf of the Defendant.
 8
 9         ALSO PRESENT
10  Mr. Dean VanHoogen, Videographer.
11              * * * * *
12
             INDEX
13
    Examination By:              Page
14
    Mr. Zeuli............. 5
15  Mr. Campbell.................. 216
    Mr. Zeuli.................. 255
16
17
18  Exhibits:              ID
19  DDX-1 -Notice Of Deposition......... 5
    DDX-2 -Patent Number 6,047,530............ 10
20  DDX-3 -Patent Number 6,336,311............ 11
    DDX-4 -Patent Number 6,336,312............ 11
21  DDX-5 -Plaintiff Textron's Brief In Support Of
         Its Proposed Claim Construction.......... 18
22  DDX-6 -Pages From Webster's Dictionary........... 23
    DDX-7 -Piece Of Cited Prior Art In The 530 Patent. 26
23  DDX-8 -Toro Brochure For A Groundsmaster 455-D.... 30
    DDX-9 -Patent Number 5,280,695............ 34
24  DDX-10-Toro Brochure For A Groundsmaster 580-D.... 41
    DDX-11-Jacobsen Manual For The HR-15............ 45
25  DDX-12-Three Photographs.......... 47
```

Page 3

```
 1         INDEX CONT'D
 2
    DDX-13-Patent Number 3,236,034............ 49
 3  DDX-14-Brochure By Risboro Turf Entitled R.T.S.
         Rotary Cutters............ 50
 4  DDX-15-Nunes Brochure............ 52
    DDX-16-1991 Nunes Brochure............ 53
 5  DDX-17-Grasscare Major Brochure............ 54
    DDX-18-Brochure And Web Page Printout Regarding
 6       The Groundsmajor Rollermower............ 56
    DDX-19-1993 Nunes Brochure............ 59
 7  DDX-20-Nunes Brochure............ 60
    DDX-21-Photograph Of A Mower............ 61
 8  DDX-22-File History Copy Of The 530 Patent........ 66
    DDX-23-Turf Management For Golf Courses........... 80
 9  DDX-24-1993 Document From Turf Management......... 87
    DDX-25-Article Called "Cheap And Careful"......... 92
10  DDX-26-Article Entitled "Rotaries Take To Golf
         Courses"................ 97
11  DDX-27-Patent Number 5,305,589............ 107
    DDX-28-Patent Number 5,890,354............ 109
12  DDX-29-CFR Regulations For Patents............ 109
    DDX-30-Privileged Log............ 151
13  DDX-31-Two-Page IDS Form............ 182
    PDS-1  Form PTO 1449............ 217
14
15     (Original Exhibits DDX-1 Through DDX-31
        And PDS-1 Were Attached To The Original
16      Transcript.)
17
18
19
20
21
22
23
24
25
```

Page 4

 1         TRANSCRIPT OF PROCEEDINGS
 2         (Exhibit Nos. DDX-1 through DDX-5
 3  were marked.)
 4         THE VIDEOGRAPHER: We are officially
 5  on the record at 8:59 a.m. The date today is
 6  August 31st, 2006. This is tape number one of the
 7  deposition of David Price. This is being taken in
 8  the matter of Textron Innovations, Incorporated,
 9  versus The Toro Company. This is pending in the
10  United States District Court for the District of
11  Delaware, Case No. 05-486. The deposition is
12  taking place at the offices of Michael, Best &
13  Friedrich, located at 100 East Wisconsin Avenue,
14  Milwaukee, Wisconsin.
15         My name is Dean VanHoogen, videographer
16  on behalf of Pro-Systems Court Reporting, and the
17  court reporter is Melissa Stark. Will counsel
18  please state their appearances and whom they
19  represent, beginning with plaintiff's counsel, and
20  then the reporter will swear in the witness.
21         MR. CAMPBELL: Christopher C. Campbell
22  for Textron Innovations, Inc., and David Price.
23         MR. ZEULI: Tony Zeuli for The Toro
24  Company and with me today is Tom Leach.
25         DAVID PRICE, called as a witness herein,

Page 5

 1  having been first duly sworn on oath, was examined
 2  and testified as follows:
 3              EXAMINATION
 4  BY MR. ZEULI:
 5  Q  Good morning, Mr. Price.
 6  A  Good morning.
 7  Q  I've put in front of you Deposition Exhibit No. 1.
 8     It's the notice of your deposition today. Do you
 9     see that?
10  A  I do.
11  Q  You're here voluntarily, correct; in other words,
12     not under a subpoena?
13  A  That's correct.
14  Q  When did you become represented by Mr. Campbell
15     and his firm Hunton & Williams?
16  A  I don't technically know the answer to that. I
17     guess it would be sometime within the last few
18     weeks.
19  Q  But you are represented by Mr. Campbell today?
20  A  Yes.
21  Q  Can you tell me whether you are planning to
22     testify in the trial in this matter if it goes to
23     trial?
24  A  I haven't spoken to anybody about that.
25  Q  Because there may be issues concerning subpoenas

2 (Pages 2 to 5)

Pro-Systems Court Reporting          612.823.2100

332f4823-03dc-413e-a2ce-1d45a2c8d981

Price, David     8/31/2006

Page 106

1    issue.
2  Q  So your basis for your high degree of certainty
3     that you didn't have DDX-26, "Rotaries Take to
4     Golf Courses," is based on the fact that if you'd
5     had it, you would have cited it, correct?
6  A  That and the fact that I don't remember it, and
7     I'm pretty sure I didn't see it.
8  Q  All right. Anything else that you're relying on
9     for your high degree of certainty that you did not
10    have that article, "Rotaries Take to Golf
11    Courses," other than what you just mentioned?
12        MR. CAMPBELL: Objection. Form.
13        THE WITNESS: Nothing I can think of.
14    I'm making some assumption I'm not even conscious
15    of, but I think those are the main reasons.
16 BY MR. ZEULI:
17 Q  If that ever changes, let Mr. Campbell know and
18    let me know, if you would.
19        MR. CAMPBELL: Is that a question?
20        MR. ZEULI: No, a request.
21        MR. CAMPBELL: I'd like it stricken from
22    the record. We're here to ask questions, not
23    requests of the witness.
24        (Exhibit No. DDX-27 was marked.)
25 BY MR. ZEULI:

Page 107

1  Q  I'm handing to you what's been marked as DDX-27.
2     It's a U.S. patent 5,305,589 to Rodriguez. Do you
3     recognize this document?
4  A  No.
5  Q  Turn, if you would, to the first column, column
6     number one, paragraph number two under description
7     of related art. That paragraph, and I'll just
8     read it, says, "The conventional lawn tractor,
9     garden tractor or commercial mowing tractor has a
10    plurality of rotary cutting blades typically
11    numbering from two to five, although larger
12    commercial models may include many more. They are
13    also used to mow a variety of types of grasses
14    under a variety of conditions: household lawns,
15    landscaping lawns adjacent public and corporate
16    buildings, golf course fairways and roughs, fields
17    and weeds along roadways to name a few," end
18    quote. Did I read that in right?
19 A  I believe so.
20 Q  This is a document that's dated April 26, 1994,
21    correct?
22 A  That's the date of the patent.
23 Q  And that's the date it would have been publicly
24    available, correct?
25 A  Yes.

Page 108

1  Q  And it is describing, is it not, using rotary
2     mowers to cut golf course roughs?
3         MR. CAMPBELL: Objection. Form.
4         THE WITNESS: Yes.
5  BY MR. ZEULI:
6  Q  And if you had had this, would you have considered
7     this possibly relevant to the 530 patent
8     application?
9  A  We certainly would have cited it.
10 Q  And it wasn't cited to the patent office in the
11    530 patent, correct?
12 A  I don't know.
13 Q  Okay. Can you just check? It's Exhibit 2, I
14    believe, Mr. Price, the 530 patent.
15 A  Anybody got it handy? Mine are all shuffled.
16 Q  There you go.
17 A  There it is. It doesn't appear on the list of
18    references cited.
19 Q  Okay.
20 A  The patent office makes mistakes sometimes, but
21    that probably means it wasn't cited.
22 Q  Okay. And you don't recall having the 589 patent
23    during the prosecution of the 530 patent, correct?
24 A  Correct.
25 Q  Okay. And the only way that you can be certain

Page 109

1     that you didn't have the 589 patent again is
2     because you didn't cite it, correct?
3  A  Oh, same thing again, in that effect I don't
4     remember it, I strongly believe I didn't have it;
5     and if we'd had it, we would have cited it.
6        (Exhibit No. DDX-28 was marked.)
7  BY MR. ZEULI:
8  Q  I'm going to hand to you what's been marked as
9     DDX-28. Do you recognize that document?
10 A  Well, it looks familiar. I see the firm's name is
11    on it.
12 Q  DDX-28 is patent 5,890,354, correct?
13 A  Yes.
14 Q  And it's to Mr. Bednar, the same inventor as the
15    530 patent, correct?
16 A  Yes.
17 Q  It was filed on January 22, that being the 354
18    patent, January 22 of 1997, just a couple days
19    before the 530 patent application was filed,
20    correct?
21 A  It was filed January 22, 1997. I don't remember
22    exactly what the filing date of the 530 patent
23    was.
24 Q  I'll represent it was February 3rd, 1997.
25 A  February 3rd.

28 (Pages 106 to 109)

Pro-Systems Court Reporting         612.823.2100

Price, David        8/31/2006

Page 110

1  Q  Did you work on this patent application, the
2     application that became the 5,890,354 patent?
3  A  Yes.
4  Q  Okay. And do you see that listed on the list of
5     documents that were part of the file history of
6     the 354 patent is U.S. 5,305,589 to Rodriguez?
7  A  Yes.
8  Q  So with respect to the Rodriguez patent, you had
9     the Rodriguez patent during the prosecution of the
10    530 patent application; isn't that correct?
11 A  It doesn't necessarily mean I ever saw it. It
12    means that it's on the front of the patent as
13    having been cited, which is again probably true.
14    I don't know when it was cited, assuming it was
15    cited, and it doesn't mean that -- I don't know
16    who cited it and if it was cited by the patent
17    office, I don't know that I ever got a copy of it.
18 Q  Are you telling me that -- well, if there was an
19    IDS that bears your signature or Mr. Fieldhack's,
20    then we can assume that you had the 589 patent,
21    correct?
22 A  Well, you can assume it was in our possession,
23    yeah.
24 Q  And at some time you would have had the file
25    history of the 354 patent, which would have

Page 111

1     included the 589 patent, correct?
2        MR. CAMPBELL: Objection. Form.
3        THE WITNESS: Well, again, I don't know
4     if a copy of that patent was ever in our file.
5  BY MR. ZEULI:
6  Q  If the examiner cited the 589 reference, you would
7     have eventually received a copy of it, correct?
8  A  Not necessarily.
9  Q  Okay. Do you still have the 354 file?
10 A  No.
11 Q  That was also transferred?
12 A  Yes.
13 Q  Now, if the file history shows that the 589 patent
14    was submitted in IDS by you or your firm, this
15    would be an instance where your knowledge of a
16    piece of relevant prior art was not cited in the
17    530 patent, correct?
18       MR. CAMPBELL: Objection. Form.
19       THE WITNESS: Well, I don't know what
20    you mean by "a piece of relevant prior art." This
21    patent wasn't cited apparently in the 530 patent.
22 BY MR. ZEULI:
23 Q  And again, assuming that the file history of the
24    354 shows that you had a copy of the 589 patent,
25    this would be a situation in which your basis for

Page 112

1     being certain that you didn't have a reference in
2     the 530 patent because you didn't submit it would
3     be incorrect, correct?
4  A  No, because what -- if we saw this patent in
5     connection with the 354 application, that doesn't
6     mean we had any understanding that it had any
7     relevance whatsoever with respect to the 530
8     patent. They're directed towards different
9     inventions, and you can have a reference in one
10    file and only be looking at a small part of it
11    because of its relevance to that file and not
12    appreciate its relevance to another matter.
13 Q  Earlier you testified that with respect to prior
14    art that you're aware of, you always cite anything
15    that's possibly relevant, correct?
16 A  Anything that we have with respect to that file.
17 Q  And when we were talking about the Rodriguez
18    patent, DDX-27, you said you would have submitted
19    that into the 530 patent application, correct?
20 A  If it had been connected in any way with that
21    patent application, but its mere existence in
22    another file doesn't make that connection, and it
23    could be in that other file and we'd have no idea
24    it had any relevance whatsoever to the 530 patent.
25 Q  You know, the -- I believe you -- I believe your

Page 113

1     testimony was that if you had known of the
2     Rodriguez patent, DDX-27, during the prosecution
3     of the 530 patent, that you would have cited it
4     and that the reason you knew that you didn't know
5     of it was because you didn't cite it?
6  A  Implicit in that statement is know of it in
7     connection with the 530 patent. There's thousands
8     of patents I know about and I haven't cited
9     because I wasn't looking at them in connection
10    with the 530 patent.
11 Q  So what is your criteria for determining of these
12    thousands of patents that you know which ones
13    you're going to cite to the patent office and
14    which ones you are not?
15 A  Well, it's either ones I know have some relevance
16    with respect to the invention in question or ones
17    that are brought to my attention in connection
18    with that file, which is typically during a prior
19    art search or cited by the client.
20 Q  In this instance you -- strike that. If the file
21    history of the 354 patent shows that you submitted
22    the 589 patent, that obviously shows that you were
23    aware of it, correct, because you submitted it?
24 A  It means I knew it existed and I had looked at it
25    in connection with the 354 patent.

29 (Pages 110 to 113)

Price, David          8/31/2006

Page 114

1  Q  And you said that with respect to the 589 patent,
2     you knew that you weren't aware of it because it
3     wasn't cited in the 530 patent application?
4        MR. CAMPBELL: Objection. Form. Asked
5     and answered.
6        THE WITNESS: Again, I was not aware of
7     it in connection or of its having any relevance
8     with respect to the 530 patent. Okay. Just like
9     I'm -- my statement didn't mean I wasn't aware of
10    every other U.S. patent I've ever seen in my
11    career. It means I wasn't aware of its relevance
12    in connection with the 530 patent.
13 BY MR. ZEULI:
14 Q  And is that because you didn't study the 589
15    sufficient to know whether it was --
16 A  I had no idea if I ever saw the 589 patent.
17 Q  But a moment ago you took a look at column one and
18    its reference to rotary cutting blades and cutting
19    golf course roughs and you said yes, that's
20    possibly relevant to the 530 and I would have
21    submitted it?
22 A  I see that today.
23 Q  So it just --
24 A  I'm quite sure I didn't see that language during
25    prosecution of the 530 patent.

Page 115

1  Q  Okay. If you knew of the 589 patent in connection
2     with work for Mr. Bednar, how is it that you
3     wouldn't have noticed what you've called, you
4     know, important information?
5  A  Because it wasn't important in that context, in
6     the context of the 354 patent. References are in
7     files all the time and we don't read every single
8     word of them. We read the parts that are relevant
9     to the invention in question. Now, I'm saying to
10    you I didn't read that paragraph during
11    prosecution of the 530 or I would have made the
12    connection.
13 Q  Do you think you should have read that paragraph
14    looking at it now --
15 A  No.
16 Q  -- giving its statement about using rotary motors?
17 A  No. Why would I do that?
18 Q  Because the patent in the 530 talks on and on
19    about the lack of use of rotary mowers on a golf
20    course.
21 A  But I don't read and I have no obligation to read
22    through every patent that I see to find out if
23    there's something in it that's relevant to some
24    other patent application I'm prosecuting.
25 Q  During the '97 to 1999 time frame, do you recall

Page 116

1     how many patents you were prosecuting that
2     involved Mr. Bednar?
3  A  I don't.
4  Q  Okay. With respect to the 589 patent, DDX-27, the
5     Rodriguez reference, did Mr. Bednar provide that
6     to you?
7  A  Provide what to me?
8  Q  The Rodriguez reference.
9  A  I don't know where the Rodriguez reference came
10    from.
11 Q  Let's go back to the 530 patent, which is Exhibit
12    2. Let me direct your attention to the background
13    of the invention, column one, JA-0007. Would you
14    just take a minute, Mr. Price, and just read that
15    short paragraph.
16 A  The entire background?
17 Q  Yeah. Lines about one through 20.
18 A  Okay.
19 Q  Did you write lines one through 20 for the
20    background of the invention?
21 A  I don't know what role I had in writing that.
22 Q  Do you recall whether Mr. Fieldhack wrote all or a
23    portion of that background of the invention?
24 A  I don't -- I don't know what role he played
25    either. I don't know who helped me write this

Page 117

1     patent application.
2  Q  Do you recall any input from Mr. Bednar into the
3     background of the invention section of the 530
4     patent?
5  A  I don't specifically recall, but that's where we
6     likely would have gotten this information because
7     we don't know this.
8  Q  And you've told me over and over and over today
9     that you're not one in the skill of the art with
10    lawn mowers, correct?
11 A  Right.
12 Q  And this background of the invention has a lot of
13    information about --
14 A  Yes.
15 Q  So this really couldn't have come from you even if
16    you typed it up, correct?
17 A  Correct.
18 Q  How about Mr. Fieldhack, was he one skilled in the
19    art of lawn mowers?
20 A  I don't think so.
21 Q  All right. So it either came from Mr. Bednar or
22    some other source, correct?
23 A  Yes.
24 Q  Do you remember any other sources, other than
25    Mr. Bednar, who could have provided to you the

30 (Pages 114 to 117)

Price, David        8/31/2006

### Page 206

1  MR. CAMPBELL: Objection. Form.
2  BY MR. ZEULI:
3  Q   But then you're saying in the same vein if he had
4      submitted this as prior art, it wouldn't
5      invalidate the claims. How can that be?
6  MR. CAMPBELL: Objection. Form.
7  THE WITNESS: Well, there's at least two
8      things. One, I don't know if the claims were the
9      same at the time. I don't know -- secondly, he
10     certainly could have been wrong about whether
11     these infringed. Obviously he believed they did.
12 BY MR. ZEULI:
13 Q   On the first point -- there's just a few pages
14     left in the prosecution history. Would you just
15     flip through it just to satisfy yourself that
16     there were no further changes to the claims after
17     Mr. Bednar's declaration?
18 A   Well, if that's true, then they're the same
19     claims.
20 Q   I'll represent to you that they are.
21 A   But again, the fact that he believed that those
22     devices infringed his claims doesn't necessarily
23     make them invalidating prior art if they were
24     prior art.
25 Q   Because he could have been wrong?

### Page 207

1  A   Yes, for one thing.
2  Q   And the patent office would have no way of knowing
3      if he was wrong in his statements, correct?
4  A   True.
5  Q   Let's go to JA-0173. The fourth IDS submission,
6      it attaches a Nunes brochure dated 1993, correct?
7  A   I'm trying to find a date.
8  Q   Lower left-hand corner.
9  A   That may say that.
10 Q   Anyway, it was submitted as prior art, correct?
11 A   Well, it was submitted.
12 Q   It was submitted incorrectly, wasn't it?
13 A   No, I can't say that.
14 Q   Well, isn't that what the patent office said,
15     JA-0176, first paragraph?
16 A   No. It says that we didn't meet the requirements
17     for having it considered by the examiner, but
18     that's not incorrectly. That's exactly what we
19     intended to do. We got it in the file. We met
20     our duty of candor.
21 Q   Okay. The -- Ms. Stevens helped you file this,
22     correct?
23 A   Yes.
24 Q   You testified earlier that she knew how to use a
25     PTO 149 --

### Page 208

1  A   Correct.
2  Q   -- form? You hadn't had any trouble with her with
3      respect to IDSs, correct?
4  A   Right.
5  Q   Did you tell her not to use a 149?
6  A   I don't recall what we -- what anybody told her to
7      do.
8  Q   It's 1449.
9  A   I don't think it mattered if a 1449 was used.
10 Q   It seemed to matter to the patent office, didn't
11     it, JA-0176?
12 A   Again, this is the patent office being
13     bureaucratic. They're saying you didn't submit a
14     1449. Fine, that's true, but that doesn't make
15     what we did incorrect.
16 Q   But --
17 A   In fact, it says, "Did not include the necessary
18     petition or fee to have it considered." Well, we
19     didn't expect to have it considered, and we said
20     we believe it's cumulative to information already
21     of record but we're filing it to assure compliance
22     with their duty of candor. It's in the file. The
23     public knows about it. We met our duty of candor.
24 Q   What was this cumulative to?
25 A   I certainly don't recall that at this point.

### Page 209

1  Q   Because here you've got multiple single spindle
2      decks, correct?
3  MR. CAMPBELL: Objection. Form.
4  THE WITNESS: Do we have to go through
5      all of those definitions again? I can't tell
6      what's in this. It's a terrible picture.
7  BY MR. ZEULI:
8  Q   You know --
9  A   It says five deck. It says blades, so they said
10     it had five decks. They say it has blades, but I
11     can't tell what's in this thing.
12 Q   So let me just make sure I understand you
13     correctly. You didn't want the patent office to
14     examine the JA-0174?
15 MR. CAMPBELL: Objection. Form.
16     Mischaracterizes his testimony.
17 THE WITNESS: I knew that they wouldn't
18     examine it.
19 BY MR. ZEULI:
20 Q   Because you didn't submit the 1449 form?
21 A   We didn't follow the procedures to get it -- and I
22     don't know when this was. If it was after the
23     case had been allowed or -- we might have had no
24     choice but to withdraw it from issue to get it
25     considered. We didn't feel that was necessary.

53 (Pages 206 to 209)

Pro-Systems Court Reporting        612.823.2100

332f4823-03dc-413e-a2ce-1d45a2c8d981

Price, David    8/31/2006

Page 210

1  We felt it was cumulative, but in order to meet
2  our duty of disclosure, we submitted it.
3  Q  So in other words, in order to have the Nunes
4  brochure and JA-0174 considered by the patent
5  office, you would have had to withdraw the 530
6  application from its notice of allowability,
7  correct?
8  A  That's my guess.
9  Q  And you didn't want to do that, correct?
10 A  That's correct.
11 Q  And you can't recall what the Nunes rotary mower
12 was cumulative to; is that your testimony?
13 A  That's correct.
14 Q  All right.
15 A  But at the time I believed it was cumulative, and
16 there's absolutely nothing wrong with what I did.
17 Q  You believed it was cumulative, not Mr. Fieldhack?
18 A  Actually, it says, "Applicant believes," but I bet
19 I believed that, too.
20 Q  So you and Mr. Bednar?
21 A  (Witness nods head.)
22 Q  But you can't -- you can't tell me sitting here
23 today what it is you believe that's cumulative to?
24 A  Well, I believe I said that to you twice already.
25 You're trying to make something out of nothing

Page 211

1  here. I did absolutely nothing wrong.
2  Q  Well, why do you keep saying that, that you did
3  absolutely nothing wrong?
4  A  Because that's what you're insinuating.
5  Q  I'm not.
6  A  I must be awfully stupid then.
7  Q  The patent office said that you did not include
8  the necessary petition, necessary petition.
9  A  In order to have it considered.
10 Q  Yes.
11 A  Again, I said we knew that when we filed it.
12 Q  So you intentionally --
13 A  We intentionally followed this procedure because
14 we did not want to withdraw it from issue, but we
15 wanted to get it in the file in order to comply
16 with our duty of disclosure. We did that.
17 There's no problem here.
18 Q  Do you know where the Nunes brochure came from?
19 A  I don't.
20 Q  Do you know who gave it to you?
21 A  No, I don't, but I would like to note that earlier
22 during the prosecution of this application we did
23 effectively withdraw it from issue in order to get
24 the Mountfield brochure before the examiner, so
25 we -- in that case we felt that was necessary.

Page 212

1  Q  And that's --
2  A  In this case we didn't feel it was necessary.
3  Q  And that's the heart of the nub. I'm trying to
4  figure out why you didn't feel it was necessary
5  and you've said because you thought it was
6  cumulative.
7  A  That's exactly right.
8  Q  I want to know what it's cumulative to because
9  frankly I don't see anything in the prior art
10 submitted in the 530 application that's anywhere
11 near as good as the Nunes brochure.
12 A  That's your opinion. My opinion at the time was
13 it was cumulative.
14 Q  But you can't recall with what?
15 A  No, I don't recall the specific references.
16 Q  It -- JA-0174 mentions page two of two, and any
17 idea what page one was?
18 A  Where is page two of two?
19 Q  Top right.
20 A  That looks like it's page two of two of a fax.
21 This was probably faxed to me, and page one of two
22 was the cover sheet of the fax.
23 Q  You don't know how long Mr. Bednar had this in his
24 possession before he provided it to you, do you?
25 A  No.

Page 213

1       MR. ZEULI: Why don't we take a short
2  break, see what I have left and we'll wrap it up.
3       THE VIDEOGRAPHER: We are off the record
4  at 3:44 p.m.
5       (Recess taken.)
6       THE VIDEOGRAPHER: We are back on the
7  record at 3:56 p.m.
8  BY MR. ZEULI:
9  Q  Mr. Price, I'd like you to tell me the substance
10 of the conversations that you've had with the
11 lawyers from Hunton & Williams about this case.
12      MR. CAMPBELL: The witness is instructed
13 not to answer the question.
14      MR. ZEULI: Do you abide by --
15      THE WITNESS: I will follow that
16 instruction.
17      MR. ZEULI: Now, what privilege are you
18 relying on, the one between Hunton and Mr. Price
19 as your client or the one between Hunton and
20 Textron?
21      MR. CAMPBELL: There are two privileges.
22 I represent Mr. Price individually as well as the
23 law firm of Michael, Best & Friedrich pursuant to
24 the agreement I have with the general counsel of
25 this law firm, and I represent Textron