# EXHIBIT 1

# Manual of PATENT EXAMINING PROCEDURE

Original Eighth Edition, August 2001
Latest Revision August 2006



## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

Rev. 5, Aug. 2006

The U.S. Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions, or change of address of those on the subscription list. Correspondence relating to existing subscriptions should be sent to the Superintendent of Documents at the following address:

Superintendent of Documents
Mail List Section
Washington, DC 20402

Telephone:   202-512-2267

Inquiries relating to purchasing the Manual should be directed to:

Superintendent of Documents
United States Government Printing Office
Washington, DC 20402

Telephone:   202-512-1800

Orders for reproduced copies of individual replacement pages or of previous revisions of the Manual should be sent to the following address:

Mail Stop Document Services
Director of the U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

Telephone:   1-800-972-6382 or 571-272-3150

Previous editions and revisions of the Manual are available on microfilm in the Patent Search Room. The Manual is available on CD-ROM and on diskette from:

U.S. Patent and Trademark Office
Office of Electronic Information Products
MDW 4C18, P.O. Box 1450
Alexandria, VA 22313-1450

Telephone:   571-272-5600

Employees of the U.S. Patent and Trademark Office should direct their requests for the Manual, replacement pages, notices, and revisions to the Office of Patent Training.   Telephone:   571-272-7222

Pursuant to the Patent and Trademark Office Efficiency Act (PTOEA) (Pub. L. 106-113, 113 Stat. 1501A-572), the head of the United States Patent and Trademark Office (USPTO) is the "Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office." The Director is assisted by the "Deputy Under Secretary of Commerce for Intellectual Property and Deputy Director of the United States Patent and Trademark Office." The patent operations of the USPTO are now headed by the "Commissioner for Patents." The trademark operations of the USPTO are now headed by the "Commissioner for Trademarks." Under section 4741(b) of the PTOEA, any reference to the Commissioner of Patents and Trademarks, the Assistant Commissioner for Patents, or the Assistant Commissioner for Trademarks is deemed to refer to the Director, the Commissioner for Patents, or the Commissioner for Trademarks, respectively. See "Reestablishment of the Patent and Trademark Office as the United States Patent and Trademark Office" published in the *Federal Register* at 65 FR 17858 (Apr. 5, 2000), and in the *Official Gazette of the United States Patent and Trademark Office* at 1234 O.G. 41 (May 9, 2000).

Additions to the text of the Manual are indicated by arrows (><) inserted in the text. Deletions are indicated by a single asterisk (*) where a single word was deleted and by two asterisks (**) where more than one word was deleted. The use of three or five asterisks in the body of the laws, rules, treaties. and administrative instructions indicates a portion of the law, rule, treaty, or administrative instruction which was not reproduced.

First Edition, November 1949
Second Edition, November 1953
Third Edition, November 1961
Fourth Edition, June 1979
Fifth Edition, August 1983
Sixth Edition, January 1995
Seventh Edition, July 1998
Eighth Edition, August 2001
  Revision 1, February 2003
  Revision 2, May 2004
  Revision 3, August 2005
  Revision 4, October 2005
  Revision 5, August 2006

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

37 CFR 1.56 defines the duty to disclose information to the Office.

## 2001.01  Who Has Duty To Disclose

*37 CFR 1.56  Duty to disclose information material to patentability.*

*****

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) Each inventor named in the application;

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

*****

Individuals having a duty of disclosure are limited to those who are "substantively involved in the preparation or prosecution of the application." This is intended to make clear that the duty does not extend to typists, clerks, and similar personnel who assist with an application.

The word "with" appears before "the assignee" and "anyone to whom there is an obligation to assign" to make clear that the duty applies only to individuals, not to organizations. For instance, the duty of disclosure would not apply to a corporation or institution as such. However, it would apply to individuals within the corporation or institution who were substantively involved in the preparation or prosecution of the application, and actions by such individuals may affect the rights of the corporation or institution.

## 2001.03  To Whom Duty of Disclosure Is Owed  [R-2]

37 CFR 1.56(a) states that the "duty of candor and good faith" is owed "in dealing with the Office" and that all associated with the filing and prosecution of a

patent application have a "duty to disclose to the Office" material information. This duty "in dealing with" and "to" the Office extends, of course, to all dealings which such individuals have with the Office, and is not limited to representations to or dealings with the examiner. For example, the duty would extend to proceedings before the Board of Patent Appeals and Interferences and the Office of the * Commissioner for Patents.

## 2001.04  Information Under 37 CFR 1.56(a) [R-2]

*37 CFR 1.56  Duty to disclose information material to patentability.*

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and

(2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

*****

The language of 37 CFR 1.56 (and 37 CFR 1.555) has been modified effective March 16, 1992 to emphasize that there is a duty of candor and good faith which is broader than the duty to disclose material information. 37 CFR 1.56 further states that "no

patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct."

The Office strives to issue valid patents. The Office has both an obligation not to unjustly issue patents and an obligation not to unjustly deny patents. Innovation and technological advancement are best served when an inventor is issued a patent with the scope of protection that is deserved. The rules as adopted serve to remind individuals associated with the preparation and prosecution of patent applications of their duty of candor and good faith in their dealings with the Office, and will aid the Office in receiving, in a timely manner, the information it needs to carry out effective and efficient examination of patent applications.

The amendment to 37 CFR 1.56 was proposed to address criticism concerning a perceived lack of certainty in the materiality standard. The rule as promulgated will provide greater clarity and hopefully minimize the burden of litigation on the question of inequitable conduct before the Office, while providing the Office with the information necessary for effective and efficient examination of patent applications. 37 CFR 1.56 has been amended to present a clearer and more objective definition of what information the Office considers material to patentability. The rules do not define fraud or inequitable conduct which have elements both of materiality and of intent.

The definition of materiality in 37 CFR 1.56 does not impose substantial new burdens on applicants, but is intended to provide the Office with the information it needs to make a proper and independent determination on patentability. It is the patent examiner who should make the determination after considering all the facts involved in the particular case.

37 CFR 1.56 states that each individual associated with the filing and prosecution of a patent application has a duty to disclose all information known to that individual to be material to patentability as defined in the section. Thus, the duty applies to contemporaneously or presently known information. The fact that information was known years ago does not mean that it was recognized that the information is material to the present application.

The term "information" as used in 37 CFR 1.56 means all of the kinds of information required to be disclosed and includes any information which is

"material to patentability." Materiality is defined in 37 CFR 1.56(b) and discussed herein at MPEP § 2001.05. In addition to prior art such as patents and publications, 37 CFR 1.56 includes, for example, information on >enablement,< possible prior art uses, sales, offers to sell, derived knowledge, prior invention by another, inventorship conflicts, and the like >"Materiality is not limited to prior art but embraces *any* information that a reasonable examiner would be substantially likely to consider important in deciding whether to allow an application to issue as a patent." *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1234, 66 USPQ2d 1481, 1486 (Fed. Cir. 2003) (emphasis in original) (finding article which was not prior art to be material to enablement issue) <

The term "information" is intended to be all encompassing, similar to the scope of the term as discussed with respect to 37 CFR 1.291(a) (see MPEP § 1901.02). 37 CFR 1.56(a) also states: "The Office encourages applicants to carefully examine: (1) prior art cited in search reports of a foreign patent office in a counterpart application, and (2) the closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office." The sentence does not create any new duty for applicants, but is placed in the text of the rule as helpful guidance to individuals who file and prosecute patent applications.

It should be noted that the rules are *not* intended to require information *favorable* to patentability such as, for example, evidence of commercial success of the invention. Similarly, the rules are not intended to require, for example, disclosure of information concerning the level of skill in the art for purposes of determining obviousness.

37 CFR 1.56(a) states that the duty to disclose information exists until the application becomes abandoned. The duty to disclose information, however, does not end when an application becomes allowed but extends until a patent is granted on that application. The rules provide for information being considered after a notice of allowance is mailed and before the issue fee is paid (37 CFR 1.97(d)) (see MPEP § 609, paragraph B(3)). The rules also provide for an application to be withdrawn from issue

(A) because one or more claims are unpatentable (37 CFR 1 313(c)(1));

(B) for express abandonment so that information may be considered in a continuing application before a patent issues (37 CFR 1 313(c)(3)); or

(C) for consideration of a request for continued examination (RCE) under 37 CFR 1.114 (37 CFR 1.313(a) and (c)(2)). Note that RCE practice does not apply to utility or plant applications filed before June 8, 1995 or to design applications. See MPEP § 706 07(h).

See MPEP § 1308 for additional information pertaining to withdrawal of an application from issue

In a continuation-in-part application, individuals covered by 37 CFR 1.56 have a duty to disclose to the Office all information known to be material to patentability which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application. See 37 CFR 1.56(e)

37 CFR 1.56 provides that the duty of disclosure can be met by submitting information to the Office in the manner prescribed by 37 CFR 1.97 and 1.98. See MPEP § 609. Applicants are provided certainty as to when information will be considered, and applicants will be informed when information is not considered. Note, however, that the Office may order or conduct reexamination proceedings based on prior art that was **>cited/considered< in any prior related Office proceeding. See MPEP § 2242 >and MPEP § 2258.01<.

The Office does not believe that courts should, or will, find violations of the duty of disclosure because of unintentional noncompliance with 37 CFR 1.97 and 1.98. If the noncompliance is intentional, however, the applicant will have assumed the risk that the failure to submit the information in a manner that will result in its being considered by the examiner may be held to be a violation.

The Office does not anticipate any significant change in the quantity of information cited to the Office. Presumably, applicants will continue to submit information for consideration by the Office in applications rather than making and relying on their own determinations of materiality. An incentive remains to submit the information to the Office because it will result in a strengthened patent and will avoid later questions of materiality and intent to deceive. In addition, the new rules will actually facilitate the filing of

information since the burden of submitting information to the Office has been reduced by eliminating, in most cases, the requirement for a concise statement of the relevance of each item of information listed in an information disclosure statement. It should also be noted that 37 CFR 1 97(h) states that the filing of an information disclosure statement shall not be considered to be an admission that the information cited in the statement is, or is considered to be, material to patentability as defined in 37 CFR 1.56.

## 2001.05  Materiality  Under  37  CFR 1.56(b)

*37 CFR 1.56. Duty to disclose information material to patent ability.*

\*\*\*\*\*

(b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and

(1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or

(2) It refutes, or is inconsistent with, a position the applicant takes in:

(i) Opposing an argument of unpatentability relied on by the Office, or

(ii) Asserting an argument of patentability.

A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

\*\*\*\*\*

Under the rule, information is not material unless it comes within the definition of 37 CFR 1.56(b)(1) or (2). If information is not material, there is no duty to disclose the information to the Office. Thus, it is theoretically possible for applicants to draft claims and a specification to avoid a *prima facie* case of obviousness over a reference and then to be able to withhold the reference from the examiner. The Office believes that most applicants will wish to submit the information, however, even though they may not be required to do so, to strengthen the patent and avoid the risks of an incorrect judgment on their part on materiality or that it may be held that there was an intent to deceive the Office.

## 2001.06   Sources of Information   [R-2]

All individuals covered by 37 CFR 1.56 (reproduced in MPEP § 2001.01) have a duty to disclose to the U.S. Patent and Trademark Office all material information they are *aware* of regardless of the source of or how they become aware of the information. >See *Brasseler, U.S.A. I. L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383, 60 USPQ2d 1482, 1490 (Fed. Cir. 2001) ("Once an attorney, or an applicant has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her duty to disclose.")< Materiality controls whether information must be disclosed to the Office, not the circumstances under which or the source from which the information is obtained. If material, the information must be disclosed to the Office. The duty to disclose material information extends to information such individuals are aware of prior to or at the time of filing the application or become aware of during the prosecution thereof.

Such individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties, related foreign applications (see MPEP § 2001.06(a)), prior or copending United States patent applications (see MPEP § 2001.06(b)), related litigation (see MPEP § 2001.06(c)) and preliminary examination searches.

## 2001.06(a)   Prior Art Cited in Related Foreign Applications   [R-2]

Applicants and other individuals, as set forth in 37 CFR 1.56, have a duty to bring to the attention of the Office any material prior art or other information cited or brought to their attention in any related foreign application. The inference that such prior art or other information is material is especially strong ** where it has been used in rejecting the same or similar claims in the foreign application >or where it has been identified in some manner as particularly relevant< See *Genveto Jewelry Co. v. Lambert Bros., Inc.*, 542 F. Supp. 933, 216 USPQ 976 (S.D. N.Y. 1982) wherein a patent was held invalid or unenforceable because patentee's foreign counsel did not disclose to patentee's United States counsel or to the Office prior

art cited by the Dutch Patent Office in connection with the patentee's corresponding Dutch application. The court stated, 542 F. Supp. at 943, 216 USPQ at 985:

> Foreign patent attorneys representing applicants for U.S. patents through local correspondent firms surely must be held to the same standards of conduct which apply to their American counterparts; a double standard of accountability would allow foreign attorneys and their clients to escape responsibility for fraud or inequitable conduct merely by withholding from the local correspondent information unfavorable to patentability and claiming ignorance of United States disclosure requirements.

## 2001.06(b)   Information Relating to or From Copending United States Patent Applications   [R-2]

The individuals covered by 37 CFR 1.56 have a duty to bring to the attention of the examiner, or other Office official involved with the examination of a particular application, information within their knowledge as to other copending United States applications which are "material to patentability" of the application in question. As set forth by the court in *Armour & Co. v. Swift & Co.*, 466 F.2d 767, 779, 175 USPQ 70, 79 (7th Cir. 1972):

> [W]e think that it is unfair to the busy examiner, no matter how diligent and well informed he may be, to assume that he retains details of every pending file in his mind when he is reviewing a particular application ... [T]he applicant has the burden of presenting the examiner with a complete and accurate record to support the allowance of letters patent.

See also MPEP § 2004, paragraph 9.

Accordingly, the individuals covered by 37 CFR 1.56 cannot assume that the examiner of a particular application is necessarily aware of other applications which are "material to patentability" of the application in question, but must instead bring such other applications to the attention of the examiner. >See *Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1365-69, 66 USPQ2d 1801, 1806-08 (Fed. Cir. 2003).< For example, if a particular inventor has different applications pending in which similar subject matter but patentably indistinct claims are present that fact must be disclosed to the examiner of each of the involved applications. Similarly, the prior art references from one application must be made of record in

2001.06(c)                MANUAL OF PATENT EXAMINING PROCEDURE

another subsequent application if such prior art references are "material to patentability" of the subsequent application.>See *Dayco Prod.*, 329 F.3d at 1369, 66 USPQ2d at 1808.<

**>If< the application under examination is identified as a continuation>, divisional,< or continuation-in-part of an earlier application, the examiner will consider the prior art cited in the earlier application.>See MPEP § 609.< The examiner must indicate in the first Office action whether the prior art in a related earlier application has been reviewed. Accordingly, no separate citation of the same prior art need be made in the later application.

## 2001.06(c) Information From Related Litigation [R-2]

Where the subject matter for which a patent is being sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the U.S. Patent and Trademark Office. Examples of such material information include evidence of possible prior public use or sales, questions of inventorship, prior art, allegations of "fraud," "inequitable conduct," and "violation of duty of disclosure." Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner. *Environ Prods., Inc. v. Total Containment, Inc.*, 43 USPQ2d 1288, 1291 (E.D. Pa. 1997). Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony.

Where a patent for which reissue is being sought is, or has been, involved in litigation which raised a question material to examination of the reissue application, such as the validity of the patent, or any allegation of "fraud," "inequitable conduct," or "violation of duty of disclosure," the existence of such litigation must be brought to the attention of the Office by the applicant at the time of, or shortly after, filing the application, either in the reissue oath or declaration, or in a separate paper, preferably accompanying the application, as filed. Litigation begun after filing of the reissue application should be promptly brought to the attention of the Office. The details and documents from the litigation, insofar as they are "material to patentability" of the reissue application as defined in 37 CFR 1.56, should accompany the application as filed, or be submitted as promptly thereafter as possible. See *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1258, 1259, 43 USPQ2d 1666, 1670-71 (Fed. Cir. 1997) (patent held unenforceable due to inequitable conduct based on patentee's failure to disclose a relevant reference and for failing to disclose ongoing litigation).

For example, the defenses raised against validity of the patent, or charges of "fraud" or "inequitable conduct" in the litigation, would normally be "material to the examination" of the reissue application. It would, in most situations, be appropriate to bring such defenses to the attention of the Office by filing in the reissue application a copy of the court papers raising such defenses. At a minimum, the applicant should call the attention of the Office to the litigation, the existence and the nature of any allegations relating to validity and/or "fraud," or "inequitable conduct" relating to the original patent, and the nature of litigation materials relating to these issues. Enough information should be submitted to clearly inform the Office of the nature of these issues so that the Office can intelligently evaluate the need for asking for further materials in the litigation. See MPEP § 1442.04.

>If litigation papers of a live litigation relating to a pending reissue application are filed with the Office, the litigation papers along with the reissue application file should be forwarded to the Solicitor's Office for processing. If the litigation is not live, the litigation papers are processed by the Technology Center assigned the reissue application.<

## 2001.06(d) Information Relating to Claims Copied From a Patent [R-2]

Where claims are copied or substantially copied from a patent, 37 CFR 1.607(c) requires applicant shall, at the time he or she presents the claim(s), identify the patent and the numbers of the patent claims. **Clearly, the information required by 37 CFR 1.607(c) as to the source of copied claims is material information under 37 CFR 1.56 and failure to inform the USPTO of such information may violate the duty of disclosure.

# EXHIBIT 2

Price, David    8-31-2006

FOR THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------

TEXTRON INNOVATIONS, INC.,

        Plaintiff,

    -vs-                        C.A. No. 05-486

THE TORO COMPANY,

        Defendant.

-----------------------------------------------------------


        Video examination of DAVID PRICE, taken at

the instance of the Defendant, under and pursuant to the

Federal Rules of Civil Procedure, before MELISSA J.

STARK, a Certified Realtime Reporter, Registered

Professional Reporter and Notary Public in and for the

State of Wisconsin, at Michael, Best & Friedrich, LLP,


100 East Wisconsin Avenue, Milwaukee, Wisconsin, on


AUGUST 31, 2006, commencing at 8:59 a.m. and concluding


at 4:53 p.m.

Price, David        8-31-2006

---

Page 2

1
2          A P P E A R A N C E S
   HUNTON & WILLIAMS, by
   MR. CHRISTOPHER C. CAMPBELL,
3  1751 Pinnacle Drive, Suite 1700,
   McLean, Virginia 22102,
4  appeared on behalf of the Plaintiff.
5  MERCHANT & GOULD, by
   MR. ANTHONY R. ZEULI and MR. THOMAS J. LEACH,
6  3200 IDS Center
   80 South Eighth Street,
7  Minneapolis, Minnesota 55402-2215,
   appeared on behalf of the Defendant
8
9        ALSO PRESENT
10 Mr. Dean VanHoogen, Videographer
11
                * * * * *
12
              I N D E X
13
   Examination By:                   Page
14
   Mr. Zeuli . . . . . . . . . . . . . . .   5
15 Mr. Campbell . . . . . . . . . . .  ...216
   Mr. Zeuli . . . . . . . . . . . . .  ...
16
17
18 Exhibits:                          ID
19 DDX-1 -Notice Of Deposition ......   5
   DDX-2 -Patent Number 6,047,530 . . . .  10
20 DDX-3 -Patent Number 6,336,311  . . . .  11
   DDX-4 -Patent Number 6,336,312  . . . . .. 11
21 DDX-5 -Plaintiff Textron's Brief In Support Of
          Its Proposed Claim Construction . .  18
22 DDX-6 -Pages From Webster's Dictionary. . . .  23
   DDX-7 -Piece Of Cited Prior Art In The 530 Patent. 26
23 DDX-8 -Toro Brochure For A Groundsmaster 455-D .  30
   DDX-9 -Patent Number 5,280,695 . . . . . . . . . .  34
24 DDX-10-Toro Brochure For A Groundsmaster 580-D.... 41
   DDX-11-Jacobsen Manual For The HR-15  . . . . . . 45
25 DDX-12-Three Photographs........................... 47

---

Page 3

1        INDEX CONT'D
2
   DDX-13-Patent Number 3,236,034..... . . . ....49
3  DDX-14-Brochure By Risboro Turf Entitled R.T.S.
          Rotary Cutters . . . . . . . . .   50
4  DDX-15-Nunes Brochure . . . . . . . .   52
   DDX-16-1991 Nunes Brochure . . . . . . .  53
5  DDX-17-Grasscare Major Brochure.. . . . .  54
   DDX-18-Brochure And Web Page Printout Regarding
6         The Groundsmajor Rollermower . .  56
   DDX-19-1993 Nunes Brochure  . . . . . . .  59
7  DDX-20-Nunes Brochure. . . . . . . . . . .  60
   DDX-21-Photograph Of A Mower . . . . . .  61
8  DDX-22-File History Copy Of The 530 Patent  . .  66
   DDX-23-Turf Management For Golf Courses  . .  80
9  DDX-24-1993 Document From Turf Management. . . . .  87
   DDX-25-Article Called "Cheap And Careful". .  92
10 DDX-26-Article Entitled "Rotaries Take To Golf
          Courses" . . . . . . . . . . . . . .  97
11 DDX-27-Patent Number 5,305,589. . . . . . .  107
   DDX-28-Patent Number 5,890,354 . . . . .  109
12 DDX-29-CFR Regulations For Patents . . . .  109
   DDX-30-Privileged Log.... . . . . . .  151
13 DDX-31-Two-Page IDS Form. . . . . . . . . .  182
   PDS-1  Form PTO 1449 . . . . . . . .  217
14
15      (Original Exhibits DDX-1 Through DDX-31
         And PDS-1 Were Attached To The Original
16      Transcript.)
17
18
19
20
21
22
23
24
25

---

Page 4

1      TRANSCRIPT OF PROCEEDINGS
2      (Exhibit Nos. DDX-1 through DDX-5
3  were marked.)
4      THE VIDEOGRAPHER:  We are officially
5  on the record at 8:59 a.m.  The date today is
6  August 31st, 2006.  This is tape number one of the
7  deposition of David Price.  This is being taken in
8  the matter of Textron Innovations, Incorporated,
9  versus The Toro Company.  This is pending in the
10 United States District Court for the District of
11 Delaware, Case No. 05-486.  The deposition is
12 taking place at the offices of Michael, Best &
13 Friedrich, located at 100 East Wisconsin Avenue,
14 Milwaukee, Wisconsin.
15     My name is Dean VanHoogen, videographer
16 on behalf of Pro-Systems Court Reporting, and the
17 court reporter is Melissa Stark.  Will counsel
18 please state their appearances and whom they
19 represent, beginning with plaintiff's counsel, and
20 then the reporter will swear in the witness.
21     MR. CAMPBELL:  Christopher C. Campbell
22 for Textron Innovations, Inc., and David Price.
23     MR. ZEULI:  Tony Zeuli for The Toro
24 Company and with me today is Tom Leach.
25     DAVID PRICE, called as a witness herein,

---

Page 5

1  having been first duly sworn on oath, was examined
2  and testified as follows:
3              EXAMINATION
4  BY MR. ZEULI:
5  Q   Good morning, Mr. Price.
6  A   Good morning.
7  Q   I've put in front of you Deposition Exhibit No. 1.
8      It's the notice of your deposition today.  Do you
9      see that?
10 A   I do.
11 Q   You're here voluntarily, correct; in other words,
12     not under a subpoena?
13 A   That's correct.
14 Q   When did you become represented by Mr. Campbell
15     and his firm Hunton & Williams?
16 A   I don't technically know the answer to that.  I
17     guess it would be sometime within the last few
18     weeks.
19 Q   But you are represented by Mr. Campbell today?
20 A   Yes.
21 Q   Can you tell me whether you are planning to
22     testify in the trial in this matter if it goes to
23     trial?
24 A   I haven't spoken to anybody about that.
25 Q   Because there may be issues concerning subpoenas

---

Price, David    8-31-2006

Page 106

1    issue.
2  Q   So your basis for your high degree of certainty
3      that you didn't have DDX-26, "Rotaries Take to
4      Golf Courses," is based on the fact that if you'd
5      had it, you would have cited it, correct?
6  A   That and the fact that I don't remember it, and
7      I'm pretty sure I didn't see it.
8  Q   All right. Anything else that you're relying on
9      for your high degree of certainty that you did not
10     have that article, "Rotaries Take to Golf
11     Courses," other than what you just mentioned?
12         MR. CAMPBELL: Objection. Form.
13         THE WITNESS: Nothing I can think of.
14     I'm making some assumption I'm not even conscious
15     of, but I think those are the main reasons.
16 BY MR. ZEULI:
17 Q   If that ever changes, let Mr. Campbell know and
18     let me know, if you would.
19         MR. CAMPBELL: Is that a question?
20         MR. ZEULI: No, a request.
21         MR. CAMPBELL: I'd like it stricken from
22     the record. We're here to ask questions, not
23     requests of the witness.
24         (Exhibit No. DDX-27 was marked.)
25 BY MR. ZEULI:

Page 107

1  Q   I'm handing to you what's been marked as DDX-27.
2      It's a U.S. patent 5,305,589 to Rodriguez. Do you
3      recognize this document?
4  A   No.
5  Q   Turn, if you would, to the first column, column
6      number one, paragraph number two under description
7      of related art. That paragraph, and I'll just
8      read it, says, "The conventional lawn tractor,
9      garden tractor or commercial mowing tractor has a
10     plurality of rotary cutting blades typically
11     numbering from two to five, although larger
12     commercial models may include many more. They are
13     also used to mow a variety of types of grasses
14     under a variety of conditions: household lawns,
15     landscaping lawns adjacent public and corporate
16     buildings, golf course fairways and roughs, fields
17     and weeds along roadways to name a few," end
18     quote. Did I read that in right?
19 A   I believe so.
20 Q   This is a document that's dated April 26, 1994,
21     correct?
22 A   That's the date of the patent.
23 Q   And that's the date it would have been publicly
24     available, correct?
25 A   Yes.

Page 108

1  Q   And it is describing, is it not, using rotary
2      mowers to cut golf course roughs?
3         MR. CAMPBELL: Objection. Form.
4         THE WITNESS: Yes.
5  BY MR. ZEULI:
6  Q   And if you had had this, would you have considered
7      this possibly relevant to the 530 patent
8      application?
9  A   We certainly would have cited it.
10 Q   And it wasn't cited to the patent office in the
11     530 patent, correct?
12 A   I don't know.
13 Q   Okay. Can you just check? It's Exhibit 2, I
14     believe, Mr. Price, the 530 patent.
15 A   Anybody got it handy? Mine are all shuffled.
16 Q   There you go.
17 A   There it is. It doesn't appear on the list of
18     references cited.
19 Q   Okay.
20 A   The patent office makes mistakes sometimes, but
21     that probably means it wasn't cited.
22 Q   Okay. And you don't recall having the 589 patent
23     during the prosecution of the 530 patent, correct?
24 A   Correct.
25 Q   Okay. And the only way that you can be certain

Page 109

1      that you didn't have the 589 patent again is
2      because you didn't cite it, correct?
3  A   Oh, same thing again, in that effect I don't
4      remember it, I strongly believe I didn't have it;
5      and if we'd had it, we would have cited it.
6         (Exhibit No. DDX-28 was marked.)
7  BY MR. ZEULI:
8  Q   I'm going to hand to you what's been marked as
9      DDX-28. Do you recognize that document?
10 A   Well, it looks familiar. I see the firm's name is
11     on it.
12 Q   DDX-28 is patent 5,890,354, correct?
13 A   Yes.
14 Q   And it's to Mr. Bednar, the same inventor as the
15     530 patent, correct?
16 A   Yes.
17 Q   It was filed on January 22, that being the 354
18     patent, January 22 of 1997, just a couple days
19     before the 530 patent application was filed,
20     correct?
21 A   It was filed January 22, 1997. I don't remember
22     exactly what the filing date of the 530 patent
23     was.
24 Q   I'll represent it was February 3rd, 1997.
25 A   February 3rd.

28 (Pages 106 to 109)

332f4823-03dc-413e-a2ce-1d45a2c8d981

Price, David    8-31-2006

Page 110

1  Q  Did you work on this patent application, the
2     application that became the 5,890,354 patent?
3  A  Yes.
4  Q  Okay. And do you see that listed on the list of
5     documents that were part of the file history of
6     the 354 patent is U.S. 5,305,589 to Rodriguez?
7  A  Yes.
8  Q  So with respect to the Rodriguez patent, you had
9     the Rodriguez patent during the prosecution of the
10    530 patent application; isn't that correct?
11 A  It doesn't necessarily mean I ever saw it. It
12    means that it's on the front of the patent as
13    having been cited, which is again probably true.
14    I don't know when it was cited, assuming it was
15    cited, and it doesn't mean that -- I don't know
16    who cited it and if it was cited by the patent
17    office, I don't know that I ever got a copy of it.
18 Q  Are you telling me that -- well, if there was an
19    IDS that bears your signature or Mr. Fieldhack's,
20    then we can assume that you had the 589 patent,
21    correct?
22 A  Well, you can assume it was in our possession,
23    yeah.
24 Q  And at some time you would have had the file
25    history of the 354 patent, which would have

Page 111

1     included the 589 patent, correct?
2        MR. CAMPBELL: Objection. Form.
3        THE WITNESS: Well, again, I don't know
4     if a copy of that patent was ever in our file.
5  BY MR. ZEULI:
6  Q  If the examiner cited the 589 reference, you would
7     have eventually received a copy of it, correct?
8  A  Not necessarily.
9  Q  Okay. Do you still have the 354 file?
10 A  No.
11 Q  That was also transferred?
12 A  Yes.
13 Q  Now, if the file history shows that the 589 patent
14    was submitted in IDS by you or your firm, this
15    would be an instance where your knowledge of a
16    piece of relevant prior art was not cited in the
17    530 patent, correct?
18       MR. CAMPBELL: Objection. Form.
19       THE WITNESS: Well, I don't know what
20    you mean by "a piece of relevant prior art." This
21    patent wasn't cited apparently in the 530 patent.
22 BY MR. ZEULI:
23 Q  And again, assuming that the file history of the
24    354 shows that you had a copy of the 589 patent,
25    this would be a situation in which your basis for

Page 112

1     being certain that you didn't have a reference in
2     the 530 patent because you didn't submit it would
3     be incorrect, correct?
4  A  No, because what -- if we saw this patent in
5     connection with the 354 application, that doesn't
6     mean we had any understanding that it had any
7     relevance whatsoever with respect to the 530
8     patent. They're directed towards different
9     inventions, and you can have a reference in one
10    file and only be looking at a small part of it
11    because of its relevance to that file and not
12    appreciate its relevance to another matter.
13 Q  Earlier you testified that with respect to prior
14    art that you're aware of, you always cite anything
15    that's possibly relevant, correct?
16 A  Anything that we have with respect to that file.
17 Q  And when we were talking about the Rodriguez
18    patent, DDX-27, you said you would have submitted
19    that into the 530 patent application, correct?
20 A  If it had been connected in any way with that
21    patent application, but its mere existence in
22    another file doesn't make that connection, and it
23    could be in that other file and we'd have no idea
24    it had any relevance whatsoever to the 530 patent.
25 Q  You know, the -- I believe you -- I believe your

Page 113

1     testimony was that if you had known of the
2     Rodriguez patent, DDX-27, during the prosecution
3     of the 530 patent, that you would have cited it
4     and that the reason you knew that you didn't know
5     of it was because you didn't cite it?
6  A  Implicit in that statement is know of it in
7     connection with the 530 patent. There's thousands
8     of patents I know about and I haven't cited
9     because I wasn't looking at them in connection
10    with the 530 patent.
11 Q  So what is your criteria for determining of these
12    thousands of patents that you know which ones
13    you're going to cite to the patent office and
14    which ones you are not?
15 A  Well, it's either ones I know have some relevance
16    with respect to the invention in question or ones
17    that are brought to my attention in connection
18    with that file, which is typically during a prior
19    art search or cited by the client.
20 Q  In this instance you -- strike that. If the file
21    history of the 354 patent shows that you submitted
22    the 589 patent, that obviously shows that you were
23    aware of it, correct, because you submitted it?
24 A  It means I knew it existed and I had looked at it
25    in connection with the 354 patent.

29 (Pages 110 to 113)

Price, David    8-31-2006

Page 206

1          MR. CAMPBELL: Objection. Form
2    BY MR. ZEULI:
3    Q   But then you're saying in the same vein if he had
4       submitted this as prior art, it wouldn't
5       invalidate the claims. How can that be?
6          MR. CAMPBELL: Objection Form
7          THE WITNESS: Well, there's at least two
8    things. One, I don't know if the claims were the
9       same at the time. I don't know -- secondly, he
10      certainly could have been wrong about whether
11      these infringed. Obviously he believed they did.
12   BY MR. ZEULI:
13   Q   On the first point -- there's just a few pages
14      left in the prosecution history. Would you just
15      flip through it just to satisfy yourself that
16      there were no further changes to the claims after
17      Mr. Bednar's declaration?
18   A   Well, if that's true, then they're the same
19      claims.
20   Q   I'll represent to you that they are.
21   A   But again, the fact that he believed that those
22      devices infringed his claims doesn't necessarily
23      make them invalidating prior art if they were
24      prior art.
25   Q   Because he could have been wrong?

Page 207

1    A   Yes, for one thing.
2    Q   And the patent office would have no way of knowing
3       if he was wrong in his statements, correct?
4    A   True.
5    Q   Let's go to JA-0173. The fourth IDS submission,
6       it attaches a Nunes brochure dated 1993, correct?
7    A   I'm trying to find a date.
8    Q   Lower left-hand corner.
9    A   That may say that.
10   Q   Anyway, it was submitted as prior art, correct?
11   A   Well, it was submitted.
12   Q   It was submitted incorrectly, wasn't it?
13   A   No, I can't say that.
14   Q   Well, isn't that what the patent office said,
15      JA-0176, first paragraph?
16   A   No. It says that we didn't meet the requirements
17      for having it considered by the examiner, but
18      that's not incorrectly. That's exactly what we
19      intended to do. We got it in the file. We met
20      our duty of candor.
21   Q   Okay. The -- Ms. Stevens helped you file this,
22      correct?
23   A   Yes
24   Q   You testified earlier that she knew how to use a
25      PTO 149 --

Page 208

1    A   Correct.
2    Q   -- form? You hadn't had any trouble with her with
3       respect to IDSs, correct?
4    A   Right.
5    Q   Did you tell her not to use a 149?
6    A   I don't recall what we -- what anybody told her to
7       do.
8    Q   It's 1449.
9    A   I don't think it mattered if a 1449 was used.
10   Q   It seemed to matter to the patent office, didn't
11      it, JA-0176?
12   A   Again, this is the patent office being
13      bureaucratic. They're saying you didn't submit a
14      1449. Fine, that's true, but that doesn't make
15      what we did incorrect.
16   Q   But --
17   A   In fact, it says, "Did not include the necessary
18      petition or fee to have it considered." Well, we
19      didn't expect to have it considered, and we said
20      we believe it's cumulative to information already
21      of record but we're filing it to assure compliance
22      with their duty of candor. It's in the file. The
23      public knows about it. We met our duty of candor.
24   Q   What was this cumulative to?
25   A   I certainly don't recall that at this point.

Page 209

1    Q   Because here you've got multiple single spindle
2       decks, correct?
3          MR. CAMPBELL: Objection. Form
4          THE WITNESS: Do we have to go through
5       all of those definitions again? I can't tell
6       what's in this. It's a terrible picture.
7    BY MR. ZEULI:
8    Q   You know --
9    A   It says five deck. It says blades, so they said
10      it had five decks. They say it has blades, but I
11      can't tell what's in this thing.
12   Q   So let me just make sure I understand you
13      correctly. You didn't want the patent office to
14      examine the JA-0174?
15         MR. CAMPBELL: Objection. Form
16      Mischaracterizes his testimony.
17         THE WITNESS: I knew that they wouldn't
18      examine it.
19   BY MR. ZEULI:
20   Q   Because you didn't submit the 1449 form?
21   A   We didn't follow the procedures to get it -- and I
22      don't know when this was. If it was after the
23      case had been allowed or -- we might have had no
24      choice but to withdraw it from issue to get it
25      considered. We didn't feel that was necessary.

53  (Pages 206 to 209)

Pro-Systems Court Reporting    612.823.2100

332f4823-03dc-413e-a2ce-1d45a2c8d981

Price, David    8-31-2006

Page 210

1    We felt it was cumulative, but in order to meet
2    our duty of disclosure, we submitted it.
3    Q   So in other words, in order to have the Nunes
4    brochure and JA-0174 considered by the patent
5    office, you would have had to withdraw the 530
6    application from its notice of allowability,
7    correct?
8    A   That's my guess.
9    Q   And you didn't want to do that, correct?
10   A   That's correct.
11   Q   And you can't recall what the Nunes rotary mower
12   was cumulative to; is that your testimony?
13   A   That's correct.
14   Q   All right.
15   A   But at the time I believed it was cumulative, and
16   there's absolutely nothing wrong with what I did.
17   Q   You believed it was cumulative, not Mr. Fieldhack?
18   A   Actually, it says, "Applicant believes," but I bet
19   I believed that, too.
20   Q   So you and Mr. Bednar?
21   A   (Witness nods head.)
22   Q   But you can't -- you can't tell me sitting here
23   today what it is you believe that's cumulative to?
24   A   Well, I believe I said that to you twice already.
25   You're trying to make something out of nothing

Page 211

1    here. I did absolutely nothing wrong.
2    Q   Well, why do you keep saying that, that you did
3    absolutely nothing wrong?
4    A   Because that's what you're insinuating.
5    Q   I'm not.
6    A   I must be awfully stupid then.
7    Q   The patent office said that you did not include
8    the necessary petition, necessary petition.
9    A   In order to have it considered.
10   Q   Yes.
11   A   Again, I said we knew that when we filed it.
12   Q   So you intentionally --
13   A   We intentionally followed this procedure because
14   we did not want to withdraw it from issue, but we
15   wanted to get it in the file in order to comply
16   with our duty of disclosure. We did that.
17   There's no problem here.
18   Q   Do you know where the Nunes brochure came from?
19   A   I don't.
20   Q   Do you know who gave it to you?
21   A   No, I don't, but I would like to note that earlier
22   during the prosecution of this application we did
23   effectively withdraw it from issue in order to get
24   the Mountfield brochure before the examiner, so
25   we -- in that case we felt that was necessary.

Page 212

1    Q   And that's --
2    A   In this case we didn't feel it was necessary.
3    Q   And that's the heart of the nub. I'm trying to
4    figure out why you didn't feel it was necessary
5    and you've said because you thought it was
6    cumulative.
7    A   That's exactly right.
8    Q   I want to know what it's cumulative to because
9    frankly I don't see anything in the prior art
10   submitted in the 530 application that's anywhere
11   near as good as the Nunes brochure.
12   A   That's your opinion. My opinion at the time was
13   it was cumulative.
14   Q   But you can't recall with what?
15   A   No, I don't recall the specific references.
16   Q   It -- JA-0174 mentions page two of two, and any
17   idea what page one was?
18   A   Where is page two of two?
19   Q   Top right.
20   A   That looks like it's page two of two of a fax.
21   This was probably faxed to me, and page one of two
22   was the cover sheet of the fax.
23   Q   You don't know how long Mr. Bednar had this in his
24   possession before he provided it to you, do you?
25   A   No.

Page 213

1         MR. ZEULI: Why don't we take a short
2    break, see what I have left and we'll wrap it up.
3         THE VIDEOGRAPHER: We are off the record
4    at 3:44 p.m.
5         (Recess taken.)
6         THE VIDEOGRAPHER: We are back on the
7    record at 3:56 p.m.
8    BY MR. ZEULI:
9    Q   Mr. Price, I'd like you to tell me the substance
10   of the conversations that you've had with the
11   lawyers from Hunton & Williams about this case.
12        MR. CAMPBELL: The witness is instructed
13   not to answer the question.
14        MR. ZEULI: Do you abide by --
15        THE WITNESS: I will follow that
16   instruction.
17        MR. ZEULI: Now, what privilege are you
18   relying on, the one between Hunton and Mr. Price
19   as your client or the one between Hunton and
20   Textron?
21        MR. CAMPBELL: There are two privileges.
22   I represent Mr. Price individually as well as the
23   law firm of Michael, Best & Friedrich pursuant to
24   the agreement I have with the general counsel of
25   this law firm, and I represent Textron

# EXHIBIT 3

United States District Court,
D. Delaware.
INLINE CONNECTION CORPORATION,
Plaintiff,

v.

AOL TIME WARNER INCORPORATED, et
al., Defendants.
Inline Connection Corporation, Plaintiff,

v.

EarthLink, Inc., Defendant.
**Nos. CIV.A. 02-272-MPT, CIV.A. 02-477-MPT.**

Aug. 23, 2006.

**\*362** Thomas C. Grimm, Esquire and Julia Heaney, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, (John R. Ferguson, Esquire, Ky E. Kirby, Esquire, and C. Joël Van Over, Esquire, Bingham McCutchen LLP, Washington, D.C., of Counsel), for Plaintiff Inline Connection Corporation.

Frederick L. Cottrell, III, Esquire and Kelly E. Farnan, Esquire, Richards, Layton & Finger, P.A., One Rodney Square, Wilmington, DE (Robert J. Gunther, Jr., Esquire and Kurt M. Rogers, Esquire, Latham & Watkins LLP, New York, New York, David A. Nelson, Esquire, Latham & Watkins LLP, Chicago, Illinois, of Counsel), for Defendant America Online, Inc.

Gary W. Lipkin, Esquire, Duane Morris LLP, Wilmington, DE (L. Norwood Jameson, Esquire and Matthew C. Gaudet, Esquire, Duane Morris LLP, Atlanta, Georgia, Mark Comtois, Esquire, Duane Morris LLP, Washington, D.C., of Counsel), for Defendant EarthLink, Inc.

### *MEMORANDUM OPINION*

THYNGE, United States Magistrate Judge.

**\*\*1** Currently pending is America Online Inc.'s ("AOL") and EarthLink, Inc.'s ("EarthLink") Motion For Leave to File Third Amended and Supplemental Answer and Counterclaims ("Third Amended Answers").

### I. FACTUAL BACKGROUND

This is a patent infringement case. Inline Communication Corporation ("inline") [FN1] sued AOL [FN2] and AOL Time Warner Incorporated ("Time Warner") [FN3] on April 12, 2002, and EarthLink [FN4] on June 4, 2002, alleging infringement of U.S. Patent Nos.

5,844,596 ("the '596 patent"), 6,243,446 ("the '446 patent"), and 6,236,718 ("the '718 patent"). On June 24, 2002, AOL filed its Answer and Counterclaims, [FN5] raising various defenses and counterclaims, including prosecution laches. On August 23, 2002, EarthLink filed its Answer and Counterclaims, [FN6] raising various defenses and counterclaims, including prosecution laches.

> FN1. Inline is a Virginia corporation with its principal place of business in Virginia.

> FN2. AOL is a Delaware corporation with its principal place of business in Virginia.

> FN3. AOL Time Warner Incorporated is a Delaware corporation with its principal place of business in New York.

> FN4. EarthLink is a Delaware corporation with its principal place of business in Georgia.

> FN5. D.I. 10.

> FN6. D.I. 8 (docket for civil action number 02-447-MPT, subsequently consolidated with lead case number 02-272-MTP).

The original scheduling order in this case set a deadline for amendment of pleadings on March 28, 2003. [FN7] Defendants moved for an extension of the amendment deadline to April 18, 2003, which motion was granted on March 27, 2003. [FN8]

> FN7. D.I. 28 (Sched. Order Oct. 28, 2002).

> FN8. D.I. 92 (Mot. & Order Mar. 27, 2003).

On April 18, 2003, Inline moved for leave to file amended complaints against AOL and Time Warner, [FN9] and against EarthLink, [FN10] to add newly-issued U.S. Patent No. 6,542,585 ("the '585 patent") to this litigation, [FN11] which was granted on May 1, 2003 and which order also extended the time for defendants to file **\*363** amended pleadings [FN12] On May 15 and 16, 2003, EarthLink and AOL,

respectively, filed their Second Amended Answer and Counterclaims ("Second Amended Answers"), [FN13] asserting various affirmative defenses and counterclaims, including inequitable conduct and prosecution laches. Fact discovery was already near conclusion at the time of these pleadings, and closed shortly thereafter. [FN14]

> FN9. D.I. 102.

> FN10. D.I. 103.

> FN11. The '585 patent issued on April 1, 2003

> FN12. D.I. 128 (Rev. Stip. & Order May 1, 2003).

> FN13. D.I. 137; D.I. 138.

> FN14. D.I. 128 (extending discovery cut-off to June 27, 2003).

On April 23, 2004, the Court entered the parties' Joint Stipulation and Order of Dismissal, dismissing Time Warner from the case. [FN15]

> FN15. D.I. 266 (Joint Stip. & Order Apr. 23, 2004).

The court conducted a *Markman* hearing on August, 28 2003, [FN16] and ruled on claims construction, cross-motions for summary judgment, and motions for reconsideration in 2004 and 2005. [FN17]

> FN16. D.I. 207.

> FN17. D.I. 239 (opinion; claim construction); D.I. 284, 285 (opinion & order; claim construction motion for reconsideration); D.I. 296, 297 (opinion & order; cross-motions for summary judgment); D.I. 319, 320 (opinion & order; summary judgment motions for reconsideration)

On February 9, 2006, defendants provided supplemental interrogatory responses to Inline which included most of the factual information concerning the prosecution laches and inequitable conduct allegations that is the subject of their proposed amended pleadings. [FN18] On February 15, 2006, AOL provided Inline a copy of its draft Third Amended Answer,

advised Inline that EarthLink sought to amend and supplement its answer and counterclaims to include the same supplemental allegations as AOL regarding inequitable conduct and prosecution laches, and requested Inline's consent to the filing of those amended pleadings. [FN19] On February, 22, 2006, the parties met and conferred to discuss, among other issues, the filing of defendants' Third Amended Answers. [FN20] During the meet and confer, Inline refused to consent to the filing of defendants' proposed amended pleadings, except with respect to the amendment and supplementation pertaining to the dismissal of Time Warner. [FN21]

> FN18. D.I. 383 at 5.

> FN19. D.I. 368 at 1-2 (Decl. of Kurt M. Rogers, Esq.).

> FN20. *Id.* at 2.

> FN21. *Id.*

\*\*2 On April 19, 2006, defendants filed their motion, pursuant to Federal Rule of Civil Procedure 15 and Delaware Local Rule 15.1, for an order granting them leave to each file their Third Amended Answer. [FN22] Defendants assert that the purpose of its proposed amendments is to conform the pleadings to the evidence adduced in discovery

> FN22. D.I. 367 (America Online Inc.'s and EarthLink, Inc.'s Motion for Leave to File Third Amended and Supplemental Answer and Counterclaims).

Inline opposes defendants' motion on Rule 15 grounds arguing undue delay on the part of defendants in seeking leave to file the Third Amended Answers and prejudice to Inline should defendants' motion be granted. Inline also opposes defendants' motion alleging a failure to establish good cause to modify the court's scheduling order as required by Federal Rule of Civil Procedure 16(b).

This opinion is the court's ruling on defendants' motion.

## II. DISCUSSION
First, AOL asserts that its proposed Third Amended Answers reflect the fact that Inline has

dismissed defendant Time Warner from the suit with prejudice and states that all allegations against Time Warner are therefore moot. Because there does not appear to be a dispute over this issue, [FN23] the court grants defendants' motion on this issue.

> FN23. Defendants state that at the February 22, 2006 meet and confer that Inline consented to the amendment regarding Time Warner, which applies only to AOL's proposed Third Amended Answer and does not apply to EarthLink. D.I. 367 at 2 n2; D.I. 368 at 2.

*364 Next the court considers defendants' proposed amended pleadings as they concern prosecution laches and inequitable conduct allegations. The court ordinarily considers motions to amend pleadings under Rule 15(a), which states that "[a] party may amend the party's pleading by leave of the court ... and leave shall be freely given when justice so requires." [FN24] Although the determination of whether to grant or deny a motion to amend is within the discretion of the court, the Supreme Court of the United States has instructed that leave to amend should be freely given "[i]n the absence of ... undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." [FN25]

> FN24. Fed.R.Civ.P. 15(a).

> FN25. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Inline argues that the court should first consider whether defendants have met the "good cause" standard of Rule 16(b) because the court's original scheduling order set a deadline to amend pleadings by March, 28, 2003 and that deadline was only extended until May 2003 following Inline's amendment of its complaints to include the '585 patent. [FN26] Inline contends that, pursuant to Rule 16(b), the court's scheduling order should not be "modified except upon a showing of good cause." [FN27] Inline also contends that defendants' motion should be denied under Rule 15(a) as a result of undue delay on the part of defendants and prejudice to

Inline should the motion be granted.

> FN26. *See* D.I. 128 (Apr. 18, 2003 Rev. Stip. and Order for Extension of Time).

> FN27. Fed.R.Civ.P. 16(b).

For the reasons explained below, the court determines that defendants have met the standard under Rule 15(a) to amend and supplement their pleadings with regard to their prosecution laches defenses and counterclaims but have failed to meet that standard with regard to their additional inequitable conduct theories.

**3 [1] With regard Inline's Rule 15(a) opposition to defendants' prosecution laches, undue delay and prejudice, Inline argues that defendants' Second Amended Answers include a "generic" affirmative defense of prosecution laches and "conclusory" counterclaims including allegations of "unreasonable delay in prosecuting" the patents-in-suit. [FN28] Although directed at defendants' proposed amendments with regard to both prosecution laches and inequitable conduct, Inline argues that the proposed amendments "add substantive claims not previously pled, despite two opportunities to cure the defects in the pleadings [and that] Inline would be prejudiced by the amendments, which add new theories to the case years after discovery has closed and in the middle of expert reports." [FN29]

> FN28. D.I. 279 at 1.

> FN29. *Id.* at 2.

Inline contends that defendants' prosecution laches counterclaims add two new factual allegations. First, defendants' purported prejudice by the lapse of time between Inline's original patent application and the issuance of the patents-in-suit. [FN30] Second, that the lapse in time was due to a deliberate plan by inventor David Goodman to delay prosecution of the patents-in-suit until " 'he had sufficient knowledge of ADSL to attempt to draft claims that might cover ADSL.' " [FN31] Inline also argues that it would be prejudiced "in the form of significant additional time, cost and effort to prepare to meet claims not previously advanced ... [and that] to add new theories seven months before trial and in the middle of expert reports would be highly prejudicial." [FN32]

FN30. *Id.* at 4-5.

FN31. *Id.* at 5 (quoting defendants' Third Amended Answers; Counterclaims ¶ 19).

FN32. D.I. 279 at 12.

The court is unpersuaded by Inline's arguments as they relate to supplementation of defendants' prosecution laches defenses and counterclaims. This court has previously stated that " 'the clearest cases for leave to \*365 amend [include] ... amplification of previously alleged claims or defenses.' " [FN33]. Here, the court deems defendants' proposed amendments on this issue to be supplementation of a previously pled defense rather than "claims not previously advanced," as Inline argues.

FN33. *Pegasus Dev. Corp. v. DirecTV, Inc.*, Civ. A. No. 00-1020- GMS. 2002 WL 598457, at \*1, 2002 U.S. Dist. LEXIS 6825, at \*4 (D.Del.2002) (quoting *U.S. v. Teeven*, Civ. A. No. 92-418 LON. 1992 U.S. Dist. LEXIS 22189, 1992 WL 683682, at \*7 (D.Del. Oct.27, 1992)).

Defendants each included a defense of prosecution laches in their original pleadings, filed in June and August 2002, and in their Second Amended Answers filed in May 2003. Furthermore, AOL represents that it presented its prosecution laches contentions to Inline on June 17, 2002, prior to filing its original Answer and Counterclaims on June 24, 2002. [FN34] Part of that presentation, submitted as an exhibit to defendants' reply brief and titled "Prosecution Laches Renders Inline's '596, '446 and '718 Patents Unenforceable," includes a flow chart of multiple continuation applications filed and abandoned throughout the 1990s and the final continuation applications that resulted in the issued patents which are the subject of this suit. [FN35] Defendants' proposed Third Amended Answers include reference to these same applications in describing what defendants characterize as a "keep it alive" strategy. [FN36]

FN34. D.I. 383 at 6.

FN35. *See id.*, Ex. A.

FN36. *See, e.g.*, D.I. 367, Ex. A; Counterclaims ¶ ¶ 20-26 (AOL's

proposed Third Amended Answer).

\*\*4 Furthermore, defendants' original pleadings and Second Amended Answers recite, "[b]y reason of Plaintiff's unreasonable delay in prosecuting and/or seeking the issuance of the [patents-in-suit], including Plaintiff's scheme of repeatedly delaying and then abandoning the same patent applications, with the same patent claims, during the course of patent prosecutions, [the patents-in-suit] each should be declared unenforceable." [FN37] Also, Inline does not dispute defendants' assertion that all of the evidence concerning their prosecution laches arguments are the custody and control of Inline. Relatedly, Inline has not articulated what additional discovery would be warranted by defendants' prosecution laches supplementation and the court would be highly skeptical of such request.

FN37. *See, e.g.*, D.I. 10; Counterclaims ¶ 14 (AOL's original Answer and Counterclaims); D.I. 138; Counterclaims ¶ 30 (AOL's Second Amended Answer).

In light of the above, Inline cannot be surprised by defendants' supplementation in this regard and the court disagrees with Inline's contention that it will be unduly prejudiced "in the form of significant additional time, cost and effort" to defend against defendants' supplemented prosecution laches defenses and counterclaims. Additionally, the court does not agree that with regard to these defenses and counterclaims that defendants' delay in seeking leave to amend amounts to *undue* delay warranting denial of their motion. [FN38]

FN38. *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir.2001) ("[D]elay alone is an insufficient ground to deny leave to amend.").

[2] The court is also unpersuaded by Inline's Rule 16 arguments that defendants' motion should be denied. The court notes that its original October 28, 2002 Scheduling Order tentatively set March 1, 2004 for the beginning of trial in this matter. [FN39] and that under the court's May 18, 2006 Amended Scheduling Order trial is now scheduled to start on February 5, 2007. [FN40] Between those two orders, the court has modified the schedule in this case

*multiple* times. [FN41] The parties are presently briefing their final summary judgment motions and the court does not plan to further amend the schedule of this case as set forth in its May 18, 2006 order. Since defendants did not request to submit a summary judgment motion directed at prosecution laches by the time permitted in the *366 May 18, 2006 order, there will be no briefing on such motion and no associated additional time and expense. Defendants' supplementation of their prosecution laches counterclaims to specifically recite alleged prejudice suffered as a result of the time lapse before the patents-in-suit issued is not prejudicial to Inline. Rather, that supplementation provides additional information concerning defendants' positions on a legal theory that was set forth in defendants' previous pleadings which Inline would, therefore, have to address in any event.

> FN39. D.I. 28.
>
> FN40. D.I. 392
>
> FN41. *See* D.I. 383 at 4 n1 (defendants' reply brief listing scheduling order modifications)

In light of the history of multiple changes to the scheduling orders in this case; the fact that prosecution laches is not a new legal theory being added to the case-and which Inline was on notice of prior to defendants' initial answers; and the court's finding of no undue delay by defendants and no undue prejudice to Inline, the court determines defendants' supplementation of their pleadings regarding prosecution laches satisfies the "good cause" requirement of Rule 16(b), despite the lapse of time in requesting such supplementation.

**\*\*5 [3]** With regard to defendants' proposed amendments of their inequitable conduct allegations, the court reaches a different conclusion. Here, although their Second Amended Answers include allegations of "inequitable conduct," defendants' proposed Third Amended Answers add three entirely new factual theories under the "inequitable conduct" umbrella. Defendants' Second Amended Answers included only allegations concerning inequitable conduct with regard Inline's purported failure to disclose Robert Domnitz as a co-inventor of the patents-in-suit. [FN42] Through their Third Amended Answers defendants seek to add allegations purporting to

show inequitable conduct during the prosecution of the patents in suit by: (1) failing to disclose to the Patent & Trademark Office ("PTO") information concerning this litigation during the prosecution of the '585 patent; [FN43] (2) failing to disclose to the PTO prior art relating to ADSL; [FN44] and (3) misrepresenting Goodman's reduction to practice. [FN45]

> FN42. *See, e.g.,* D.I. 138; Counterclaims ¶ ¶ 33-38 (AOL's Second Amended Answer)
>
> FN43. *See, e.g.,* D.I. 367, Ex. A; Counterclaims ¶ ¶ 60-75 (AOL's proposed Third Amended Answer)
>
> FN44. *See, e.g., id.,* Ex. A; Counterclaims ¶ ¶ 76-85
>
> FN45. *See, e.g., id.,* Ex. A; Counterclaims ¶ ¶ 86-94

Inline contends that defendants knew of the "bulk" of the evidence cited in support of these three new theories when they filed their Second Amended Answers on May 15 and 16, 2003; "in most cases" by the end of Goodman's final day of deposition on July 2, 2003; and knew of "every piece of information" cited by the end of 2003. [FN46] Inline argues that defendants' failure to seek leave to amend to include those theories in 2003, 2004, and 2005 constitutes undue delay warranting denial of the motion.

> FN46. D.I. 279 at 5.

Defendants argue that the amendment of their inequitable conduct allegations is warranted by Federal Rule of Civil Procedure 9(b), which requires that fraud, including inequitable conduct, be pled with particularity. Defendants assert they did not have all the information necessary to plead their inequitable conduct claims with the required particularity when they filed their Second Amended Answers in May 2003. Examples of this later-obtained information are: "numerous excerpts from ... Goodman's June 30, July 1 and July 2, 2003 depositions"; [FN47] "numerous documents" produced by Inline in December 2003; [FN48] prosecution files produced by Inline on February 24, 2006 and March 8, 2006; [FN49] and an undated letter from Goodman to Domnitz produced by Inline on June 1, 2006 [FN50]

FN47. D.I. 383 at 8.

FN48. *Id.*

FN49. *Id.* at 3, 8.

FN50. D.I. 399 at 2 (June 8, 2006 letter to court from defendants submitted after briefing their motion to amend was completed).

The court recognizes that defendants must plead inequitable conduct with particularity \*367 under Rule 9(b). [FN51] The court also acknowledges that defendants did not have all of the information cited in their Third Amended Complaint at the time they filed their Second Amended Answers. The court will also accept, for the sake of argument, that defendants did not have all of the information necessary to properly plead the new inequitable conduct theories cited in their Third Amended Answers until the end of 2003. Defendants' own actions, however, demonstrate that documents produced by Inline on February, 24, 2006, March, 8, 2006, and June 1, 2006 were not necessary for defendants properly to plead their new inequitable conduct theories.

> FN51. *See McKesson Info. Solutions, LLC v. The Trizetto Group, Inc.,* Civ. A. No. 04-1258-SLR, 2005 WL 914776, at \*3, 2005 U.S. Dist. LEXIS 6733, at \*7 (D.Del. Apr. 20, 2005) ("A claim of patent unenforceability is premised upon inequitable conduct before the Patent & Trademark Office ('PTO'), which is a claim sounding in fraud. A plaintiff alleging unenforceability, therefore, must plead with particularity those facts which support the claim the patent holder acted fraudulently before the PTO.") (citing *Ferguson Beauregard/Logic Controls v. Mega Sys., L.L.C.,* 350 F.3d 1327, 1343-44 (Fed.Cir.2003))

\*\*6 Defendants trumpet the fact that they "submitted supplemental contention interrogatory responses on February 9, 2006 ... [and that] [s]hortly thereafter, on February 15, Defendants ... submitted proposed amended answers and counterclaims containing this *same* updated information." [FN52] On February 22, 2006 the parties met and conferred regarding, among other issues, the filing of defendants'

Third Amended Answers, to which Inline objected. [FN53] On February 23, 2006, defendants sent Inline's counsel a letter confirming their understanding that Inline refused to consent to defendants' filing of the Third Amended Answers [FN54] These events all preceded the Inline's subsequent production of documents on February 24, 2006, March 8, 2006, and June 1, 2006

> FN52. D.I. 383 at 2 (emphasis added). Three pages later in their reply brief, defendants change this assertion to state that their February 9, 2006 supplemental interrogatory responses "included *most* of the factual information concerning the prosecution laches and inequitable conduct defenses," *id.* at 5 (emphasis added), and that additional documents were produced by Inline thereafter. *Id.* at 5 n2.

> FN53. D.I. 368 at 2.

> FN54. *Id.* at 2 & Ex. A

Defendants cite no evidence or information they received from Inline's December 2003 production until February 24, 2006 pertaining to their Third Amended Answers. Despite the fact that they may have augmented the February 15, 2006 draft of their proposed amended pleadings with later-received information, defendants had no way of knowing when they submitted that draft to Inline and requested consent to file that additional potentially relevant documents would be subsequently produced. The only conclusion that can reasonably be drawn from these facts is that, by the end of 2003, defendants had all the information they believed necessary to plead with particularity their inequitable conduct allegations concerning non-disclosure of this litigation, purportedly relevant prior art, and Goodman's date of conception.

Defendants acknowledge that their motion should be granted "*absent* a showing of undue delay *or* undue prejudice to Inline ..." [FN55] Thus, the court must determine whether defendants' waiting until 2006 to move to amend their pleadings, rather than promptly following the end of 2003 when they had the adequate relevant information, was undue delay

> FN55. D.I. 383 at 7 (emphasis added).

In *Cureton v. National Collegiate Athletic Ass'n,* [FN56] the Third Circuit addressed the issue of delay in seeking leave to amend, stating:

> FN56. 252 F.3d 267 (3d Cir. 2001).

> The mere passage of time does not require that a motion to amend ... be denied on grounds of delay.... In fact, delay alone is an insufficient ground to deny leave to amend ... However, at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party ... Thus, while bearing in mind the liberal pleading philosophy of the federal rules, the question of undue delay requires that we focus on *368 the movant's reasons for not amending sooner. [FN57]

> > FN57. *Id.* at 273 (internal citations and quotation marks omitted).

Initially, the court notes that defendants' position seems to be that they need not offer no explanation for the April 19, 2006 filing date of their motion to amend. They argue that "Inline asserts, without explanation, that Defendants have delayed in bringing their Third Amended Answers. This assertion is flat wrong and ignores the history of the case." [FN58] In support of this argument, defendants point to evidence obtained in 2003 after their Second Amended Answers were filed in May of that year, and those additional documents Inline produced in 2006.

> FN58. D.I. 383 at 7.

\*\*7 As discussed above, the court will accept that defendants did not have all the evidence necessary to plead their inequitable conduct allegations with particularity until the end of 2003, and, therefore, the absence of defendants' three new inequitable conduct theories from the Second Amended Answers is not determinative. However, defendants' drafting of their Third Amended Answers, and request for Inline's consent to file those amended pleadings prior to the receipt of the documents produced later in 2006, demonstrates that defendants had all the information they deemed necessary to seek leave to amend by December 2003. The court concludes, therefore, that the documents produced to defendants in 2006 provides no

explanation at all, much less a reasonable explanation, why defendants did not file their motion in early 2004.

Next, defendants attempt to explain their delay in filing with the argument that "for the period between the August 2003 *Markman* hearing and the Court's decision on Defendants' motion for reconsideration on October 18, 2005, the focus of this litigation was on non-infringement of the patents-in-suit relating to the 'signal interface' claim term. All other aspects of this case, including invalidity and unenforceability ... were *essentially* held in abeyance." [FN59] Defendants state that during a status conference, held on November 9, 2005 shortly after the October 18, 2005 opinion issued, the court "directed all parties to supplement their discovery responses, including their responses to contention interrogatories," which defendants supplemented on February 9, 2006. [FN60]

> > FN59. *Id* at 2 (emphasis added); *see also id* at 9 (asserting that "aspects of this case other than infringement were essentially held in abeyance from the August [28], 2003 *Markman* hearing until the November [9], 2005 conference, when the Court ordered the parties to supplement their prior discovery").

> > FN60. *Id* at 2.

First, despite defendants' characterization that the all non-infringement aspects of this litigation were "essentially held in abeyance" for some period of time, they do not point to any instance where the parties raised supplementation of the pleadings or any suggestion by the court in connection therewith during that period. It is not for a party to unilaterally determine that it may delay moving to amend its pleadings when it has access to the information necessary for such amendment. Moreover, defendants certainly could have taken this period to reexamine their pleadings and the information in their possession and timely-filed any motion to amend they deemed warranted. The issue of amending pleadings could also have been raised at one of the "several conferences with [the parties and] the Court, which ... substantially changed the case schedule" [FN61] that defendants reference in their reply brief, but defendants cite no instance where they did so.

FN61. *Id.* at 4

Second, during the November 9, 2005 conference, the court reminded the parties that "Rule 26 requires supplementation . . Supplementation requires everything to be supplemented  Not just certain interrogatories or certain requests  Everything including your initial disclosures." [FN62]  This comment by the court does not "clearly supercede[ ]" the court's scheduling order as suggested by defendants. [FN63]

FN62. D.I. 326 at 31

FN63. *See* D.I. 383 at 11.

*369 **8 The court finds defendants' arguments concerning the status of the case do not constitute reasonable explanation for waiting over two years to move for leave to amend their pleadings  Therefore, the court determines this was undue delay with regard to their new inequitable conduct allegations.

Case law indicates that this finding, alone, could justify denial of defendants' motion to amend to include their new inequitable conduct allegations.  For example, Inline contends that this court's discussion in *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.* [FN64] is applicable to defendants' current motion.  The court agrees.  The *Rose Hall* court stated:

FN64. 93 F.R.D. 858 (D.Del.1982).

An amendment should be denied, *without requiring defendants to demonstrate prejudice,* when the amendment is grounded on "bad faith or dilatory motive, truly undue or unexplained delay . . ." *Heyl & Patterson International, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.,* 663 F.2d 419, 425 (3d Cir.1981), a decision based upon *Foman v. Davis, supra.*  In the instant case it is not necessary for the court to find that plaintiff has acted in bad faith in seeking the amendment.  It is clear that plaintiff has provided no satisfactory explanation for its long delay in filing its motion to amend  Undue delay which is not satisfactorily explained is equivalent to bad faith. [FN65]

FN65. *Id.* at 865 (emphasis added).

In *Lorenz v. CSX Corp.,* [FN66] the Third

Circuit also affirmed denial of a motion to amend where the district court made no findings of prejudice to the movant and leave to amend was filed almost two years after the prior amendment. [FN67]  More recently, in 2004, the Third Circuit affirmed denial of a motion to amend on the ground of unreasonable delay where the movant had sufficient knowledge more than a year before seeking leave to amend. [FN68]

FN66. 1 F.3d 1406 (3d Cir.1993)

FN67. *Id.* at 1414.  ("In the absence of substantial or undue prejudice, denial instead must be based on bad faith or dilatory motives, truly undue or unexplained delay, repeated failures to cure the deficiency by amendments previously allowed, or futility of amendment . .  Because of [movant's] unreasonable delay in requesting leave to amend, and because of the futility or her proposed amendment, we hold that the district court did not abuse its discretion in denying her Rule 15(a) motion.").

FN68. *USX Corp. v. Barnhart,* 395 F.3d 161 (3d Cir.2004) (The District Court denied leave to amend based on futility and unreasonable delay-with no finding of prejudice to non-movant.  The Third Circuit determined district court was incorrect in its futility analysis but affirmed on unreasonable delay.)

[4]  Nevertheless, the court will address the parties' contentions regarding prejudice to Inline were defendants permitted to amend their pleadings to include their new inequitable conduct allegations  Inline contends it would suffer prejudice "in the form of significant additional time, cost and effort to meet claims not previously advanced" if defendants' motion were granted. [FN69]  Inline maintains that it has relied upon defendants' current pleadings, prepared its case in accordance with those pleadings, and that to add new theories at this late date-and during the preparation of expert reports-would be highly prejudicial. [FN70]  According to Inline, where, as here, a proposed amendment to the pleadings "substantially changes the theory of a party's claim . . , thereby requiring the responding party to engage in 'significant new preparation,' " the court may

deny a motion to amend due to prejudice to the non-movant. [FN71]

FN69. D.I. 279 at 12.

FN70. *Id.* at 12. Expert reports were being prepared during the parties' briefing on this motion. The parties' expert reports, and rebuttal reports, were to have been completed by June 30, 2006. Expert depositions were to have been completed by July 21, 2006. *See* D.I. 392 (Amended Sched. Order May 18, 2006).

FN71. D.I. 279 at 12.

Defendants argue that Inline would suffer no prejudice should their motion be granted because "[a]ll of the information supporting these defenses ... is and had been in Inline's possession, custody or control." [FN72] Defendants *370 contend that "Inline therefore cannot argue that it requires any additional discovery to respond to these supplemental allegations." [FN73] Defendants argue further that there can be no surprise to Inline since inequitable conduct was pled in their Second Amended Answers. [FN74]

FN72. D.I. 383 at 9; *see also* D.I. 399 at 1.

FN73. D.I. 399 at 1; *see also* D.I. 408 at 1 (stating that Inline does not argue that it requires "new discovery to respond to Defendants' supplemental allegations regarding inequitable conduct ...").

FN74. D.I. 383 at 9-10.

**9 The court disagrees with defendants' assertion, as it pertains to inequitable conduct, that they do not seek to add new defenses and counterclaims but, rather, to supplement those previously pled. Unlike defendants' proposed amendment concerning prosecution laches, that the court agrees supplements previously pled allegations of which Inline was certainly on notice, the proposed amendments concerning inequitable conduct goes far beyond mere supplementation. Defendants are not requesting leave to supplement their previously pled inequitable conduct allegations concerning inventorship. Defendants seek, through the guise of supplementation, to add three new distinct factual inequitable conduct theories against which plaintiffs would now have to prepare to defend.

[5] The court also disagrees that there is no surprise to Inline as a result of defendants' new inequitable conduct allegations and that Inline will not be unduly prejudiced were defendants permitted to amend their answers to include them. "A party is unduly prejudiced if amendment would cause surprise, result in additional discovery, or add cost in the preparation to defend against new facts or theories." [FN75] The court determines that Inline would be surprised by these amendments and unduly prejudiced by having to defend against these new theories were they introduced at this stage of an already lengthy litigation. [FN76]

FN75. *Amquip Corp. v. Admiral Ins. Co.*, 231 F.R.D. 197, 199 (E.D.Pa.2005) (granting motion to amend in light of court permitting additional discovery which cured prejudice to non-movant and requiring movant to pay for the additional cost and attorneys' fees incurred as a result of movant's delay); *see also McLaughlin v. Diamond State Port Corp.*, Civ. A. No. 03-617(GMS), 2004 WL 2958664, *4 (D.Del. Dec.21, 2004) ("The purpose of a scheduling order is to provide concrete deadlines on which the parties can rely in planning their respective litigation strategies. If the court were to permit parties to ignore these deadlines, unfair surprise would abound.")

FN76. In light of the court's denial of defendants' motion to amend its inequitable conduct defenses and counterclaims under Rule 15(a), it is unnecessary to address Inline's Rule 16(b) arguments as they relate to this issue.

Although there may, or may not, be additional discovery needed in connection with defendants' new inequitable conduct allegations (neither party explicitly argued their need for such), the history of this case makes the court wary that such request shall nevertheless arise. Moreover, the trial in this matter is currently scheduled for six days beginning on February 5, 2007, which

the court has sharply advised shall proceed at that time. Since this matter has passed its fourth birthday, further delay for possible additional discovery is disfavored

### III. CONCLUSION

For the reasons stated above, defendants' motion is granted in part and denied in part. The court grants defendants' motion to amend AOL's pleadings to reflect the dismissal of Time Warner. The court also grants defendants' motion to amend their respective pleadings with regard to their prosecution laches defenses and counterclaims. The court denies defendants' motion to amend their pleadings with regard to their three additional inequitable conduct allegations

237 F.R.D. 361, 2006 WL 2440822 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2385481 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Aol's Motion for Reconsideration of the Court's April 13, 2005 Order (Jul. 29, 2005)Original Image of this Document (PDF)

• 2005 WL 2385624 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Aol's Motion for Reconsideration of the Court'S April 13, 2005 Order (Jul. 29, 2005)Original Image of this Document (PDF)

• 2005 WL 2385479 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Defendants' Motion for Reconsideration and/or Clarification of the Court's April 13, 2005 Order (Jul. 28, 2005)Original Image of this Document (PDF)

• 2005 WL 2385480 (Trial Motion, Memorandum and Affidavit) Inline Connection Corporation's Sur-Reply to Defendants' Motion for Reconsideration and/or Clarification of the Court's April 13, 2005 Order (Jul. 28, 2005)Original Image of this Document (PDF)

• 1:02cv00477 (Docket) (Jun. 4, 2002)

• 1:02cv00272 (Docket) (Apr. 12, 2002)

END OF DOCUMENT