# EXHIBIT 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                      -  -  -

 4   TEXTRON INNOVATIONS INC.,      :      Civil Action
                                    :
 5              Plaintiff,          :
                                    :
 6        v.                        :
                                    :
 7   TORO COMPANY,                  :
                                    :
 8              Defendant.          :    No. 05-486-GMS

 9                      -  -  -

10                   Wilmington, Delaware
                   Tuesday, September 19, 2006
11                      10:00 a.m.

12                      -  -  -

13
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
     APPEARANCES:
15
                EDMOND D. JOHNSON, ESQ.
16              The Bayard Firm
                      -and-
17              SCOTT L. ROBERTSON, ESQ.,
                CHRISTOPHER C. CAMPBELL, ESQ., and
18              MICHAEL P.F. PHELPS, ESQ.
                Hunton & Williams
19              (Washington, D.C.)

20                             Counsel for Plaintiff

21              RICHARD L. HORWITZ, ESQ.
                POTTER Anderson & Corroon, LLP
22                      -and-
                EARL D. REILAND, ESQ., and
23              ANTHONY R. ZEULI, ESQ.
                Merchant & Gould
24              (Minneapolis, Minnesota)

25                             Counsel for Defendant
```

1    cutting deck assembly entail?

2            Now, the defendants are quick to argue, it

3    doesn't simply say rotary cutting deck.  It says assembly.

4    And assembly suggests that it's made up of a number of

5    components.  And so the defendants look at this and say, it

6    should be defined as a cutting unit having five separate

7    elements.  So it includes five limitations from the summary

8    of the invention.  A laterally-spaced, generally-vertically

9    extending side plates, it should have a second element, a

10    cross member, the assembly should include front wheels

11    supporting the side plates, it should have a fourth element,

12    a rear roller extending between and supporting the side

13    plates, and should have a fifth element, a single-spindle

14    rotary deck mounted between the side plates.

15            What it does is goes through the specification

16    and imports all of that structure and says, this must make

17    up the cutting deck assembly.

18            Now, to be sure, the specification discusses an

19    exemplary embodiment that says it can have this structure.

20    And indeed, the Court will see, there are other claims that

21    in fact specifically do claim certain elements of that

22    structure.  But with respect to Claim 1, we could go to the

23    last element of Claim 1, if you could blow up that, what

24    Claim 1 does is indeed specifically and expressly recite

25    what the assembly includes.  It says, each of the front and

26

1  rear deck assemblies including, and here is where it tells

2  you the structure, a single-spindle cutting deck defining a

3  downwardly opening space.  That is the first part of the

4  assembly.

5          No. 2.  A single spindle mounted for rotation

6  about a generally vertical axis within the space.  It's the

7  second part of the assembly.

8          No. 3.  At least one cutting blade mounted on

9  the spindle for rotation therewith.

10          No. 4.  A rear roller supporting the deck for

11  movement over the ground.

12          Then it provides essentially some spatial

13  relationship for that rear roller, the deck having a width

14  such that the roller extends substantially across the entire

15  width of the deck.

16          That is the structure of the assembly, Your

17  Honor.

18          It is not, if we could go back to 461, the

19  structure that the defendants have called completely from

20  the specification, rewriting that claim.  So they are

21  essentially asking, ignore the structure that is disclosed

22  as specifically being the deck assemblies that is recited

23  expressly in Claim 1 and rewrite the claim to include these

24  five elements.  I would suggest to Your Honor that that

25  would be pure error, for the Court to rewrite those claims,

35

1    first, this is the rear discharge rotary cutting deck for a

2    mower.  In fact, this is one of the cutting decks that is

3    accused of being infringed.  This is the patent that covers

4    the Toro commercial embodiment.  Of course, this was issued

5    in 2002.  But if you go to Claim 3, I thought it was

6    interesting that there is an almost identical type of

7    limitation to describe the spatial relationship, whereas the

8    ramp spans across substantially the entire width of the

9    grass discharge channel.

10            I raise this point only because I think a person

11   of ordinary skill in the art certainly readily apprehends,

12   and in fact when Toro applied for patents they knew how to

13   describe something that had a spatial relationship that was

14   spanning substantially across the width of something.

15            If I could, Your Honor, just to use the Figure 3

16   drawings, if we could go to Figure 3 first, and show --

17   Figure 3 of the '530 patent.  What I am trying to illustrate

18   here, Your Honor, I have superimposed over this rotary

19   cutting deck a red circle.  Then I have traced extending on

20   from the rollers a blue line, which shows the width of the

21   roller.  And now what I would like to do, Your Honor, is

22   remove the figure, but maintain the lines.  And as you will

23   see here, indeed, the figures, which I would remind the

24   Court are only exemplary and not to be controlling, but at

25   least it demonstrates that a person of ordinary skill in the

1    art was contemplating that this roller might, for example,

2    not extend to one edge of the rotary cutting deck, and

3    extend perhaps a little further beyond the rotary cutting

4    deck.

5            That's just one example.  What I would like to

6    show Your Honor now, if we could go to Claim 10 of the '311

7    patent, this limitation was described with respect to the

8    rotary cutting deck.  But it also was described with respect

9    to the roller and the cutting path.  I think this is going

10   to be very illustrative, Your Honor.

11           Claim 10 of the '311 patent specifically, you

12   will see the very last, said roller, last element, last

13   fragment, said roller extending substantially across the

14   entire width of said cutting path.  The cutting path is

15   obviously the path that is created when the blade cuts the

16   grass.

17           If we could go back to Figure 3 again.  What I

18   have done here, Your Honor, is you will note the blade is

19   the dashed line that is illustrated under the cutting deck.

20   I have taken where the end of that blade is and I have

21   superimposed a red circle.  That would be the diameter of

22   the cutting path.  And again, the green lines here are where

23   the blue lines were positioned in the prior figure, that is

24   illustrating the ends of the roller.  Now I am going to

25   remove the figure again.

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|                                   |   |                        |
|-----------------------------------|---|------------------------|
| TEXTRON INNOVATIONS INC.,         | ) |                        |
|                                   | ) |                        |
| Plaintiff,                        | ) |                        |
|                                   | ) |                        |
| v.                                | ) | C. A. No. 05-486 (GMS) |
|                                   | ) |                        |
| THE TORO COMPANY,                 | ) |                        |
|                                   | ) |                        |
| Defendant.                        | ) |                        |

**PLAINTIFF TEXTRON INNOVATIONS INC.'S CORRECTED[1]
OPENING *MARKMAN* BRIEF IN SUPPORT OF ITS
PROPOSED CLAIM CONSTRUCTION**

THE BAYARD FIRM
Edmond D. Johnson   (#2257)
Peter B. Ladig (#3513)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19801
Telephone : (302) 655-5000
Facsimile:  (302) 658-6395

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone:  (202) 955-1500

Attorneys for Plaintiff
Textron Innovations Inc.

---

[1] Corrected to include citations to the Joint Appendix.

assemblies are "mounted on the frame," '530 patent at 5:47-48 (JA 0009), and 5:51-52 (JA 0009), then *further* recites that the deck assemblies are mounted with structure to provide pivotal movement about "a generally vertical axis," "a generally horizontal axis extending in the forward-rearward direction," and "a generally horizontal, laterally-extending axis" — that is, about three mutually perpendicular axes. *Id.* at 5:62-6:16 (JA 0009). Because Toro's interpretation of "mounted on the frame" would already require these three pivoting relationships, the portions of claim 7 that recite pivotal movement about the three perpendicular axes would be superfluous and unnecessary. For this additional reason, Toro's interpretation is legally incorrect. *See Phillips*, 415 F.3d at 1314-1315.

### E.    "Deck Defining A Downwardly Opening Space" Should Be Given Its Ordinary And Customary Meaning

Toro also asks the Court to interpret the limitation "deck defining a downwardly opening space." Once again, this limitation is simple, straightforward, and used consistently with its ordinary and customary meaning, and no further clarification is required by the Court. *See* Parish Decl., Exh. 1 at ¶ 51. If interpretation is required, in keeping with the ordinary and customary meaning, Textron proposes to interpret this limitation as "the deck has a downwardly opening space." This is consistent with the manner in which this limitation is used in the patent specifications: "Each of the cutting deck assemblies 34 includes (see FIGS. 2-5) a single spindle mulching deck 38 defining a downwardly opening space 42 (FIG. 4)." '530 patent at 3:6-8 (JA 0008), 3:45-47 (JA 0008) ("A single spindle 84 (FIG. 4) is mounted for rotation about a generally vertical axis within the space 42 defined by the deck 38.") and Figs. 2-4 (JA 0003-0004); '312 patent at 5:48-50 (JA 0044).

24

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TEXTRON INNOVATIONS INC.,     )
                                   )
        Plaintiff,         )
                                   )
      v.                )     C. A. No. 05-486 (GMS)
                                   )
THE TORO COMPANY,       )
                                   )
        Defendant.      )

## DECLARATION OF RICHARD L. PARISH, PHD, PE, IN SUPPORT OF TEXTRON'S PROPOSED CLAIM CONSTRUCTION FOR CERTAIN CLAIM TERMS IN U.S. PATENT NOS. 6,047,530 6,336,311 AND 6,336,312

I, Richard L. Parish, PhD, PE, declare, depose and state the following:

1.     I am a Professor of Agricultural Engineering at the Louisiana State University Agricultural Center in Hammond, LA (LSU) and I am a consultant in agricultural engineering. My business address is 21135 Highway 16, Amite, LA 70422. I have been involved in the farm and maintenance machinery field for over thirty-five years. I am a registered Professional Engineer. I am over eighteen years of age and I would otherwise be competent to testify as to the matters set forth herein if I am called upon to do so at trial.

2.     I have been retained by Hunton & Williams, L.L.P. on behalf of the Plaintiff, Textron Innovations Inc. ("Textron"), as a technical expert witness with respect to the proceedings currently before the Court in the above-captioned matter.

3.     For purposes of this Declaration, I have been asked to provide an expert technical analysis as to the proper interpretation of certain terms in the claims of U.S. Patent No. 6,047,530 (the "'530 patent"), U.S. Patent No. 6,336,311 (the "'311 patent") and U.S. Patent No.

deck 38."), and Figs. 2-4; *and* '312 patent at 5:48-50.

52.    In contrast, Toro seeks to interpret this simple term to mean "[a] deck defined by a continuous solid vertical wall of uniform height open at the bottom." Toro's proposed construction adds a number of extraneous limitations to the claim language, such as the requirement of a "solid vertical wall" and the wall being "of uniform height." A person of ordinary skill in the art would not understand the term "deck defining a downwardly opening space" to require these limitations. The patent specifications do not use Toro's proposed interpretation to describe the decks. In fact, I observe that the words "solid" and "uniform" do not appear in any of the patents in suit, and the word "continuous" appears only three times in the '312 patent to describe a continuous roller and a continuous roller stripe. *See* '312 patent at 5:60-65, 7:29-33, and 7:36-38.

### "Roller Extends Across Substantially The Entire Width Of The Deck"

53.    In my opinion, this term should be interpreted in accordance with its ordinary and customary meaning, namely, the roller extends across substantially the entire width of the deck, but is not required to be exactly as wide as the deck. The patent specifications disclose a roller (58) that extends across substantially the entire width of a cutting deck (38). *See, e.g.,* '530 patent at 1:54-56; *id.* at 3:16-21; *id.* at Figs. 2, 3 and 5; '312 patent at 5:60-65 (describing '312 patent Fig. 9). I understand that Toro believes the use of the word "substantially" renders the claims indefinite. I respectfully disagree. Those of ordinary skill in the art at the time of the invention would understand that the '530 patent and '311 patent disclose a roller that extends across the width of the deck to provide a continuous striping effect behind the cutting deck. *See, e.g.,* '530 patent at 1:54-56. Such a person of ordinary skill in the art would further understand that to provide this continuous striping effect, the roller must extend across substantially the

-17-

entire width of the deck, but is not required to be exactly as wide as the deck.

**"Lifting Arm"**

54.     In my opinion, "lifting arm" is used in accordance with its ordinary and accustomed meaning. It means "an arm that is operable to lift at least one cutting deck assembly." For example, the '530 patent describes a "lifting arm" that is used to lift the decks vertically relative to the frame. *See* '530 patent at 1:34-37, 1:57-62, 3:66-4:7, 4:20-31, and Figs. 1-5. While the embodiment of the lifting arm shown in the '530 patent is L-shaped and is attached by various pivots, the embodiment is exemplary, *see* '530 patent at 2:25-34, and the claims specifically omit recitation of such features. The '312 patent further describes another exemplary embodiment of a "lifting arm" that lifts the a deck relative to the frame, but this additional embodiment has a different shape and various different mounting and pivoting features than the embodiment of the '530 and '311 patents. *See* '312 patent at 5:66-6:7, 6:13-19, and Figs. 9-10. In addition, '530 patent claim 3 recites simply that the "lifting arm" is "operable to lift the associated deck assembly relative to the frame." '530 patent at 5:5-9.

55.     I understand that Toro contends that "lifting arm" means "[a] generally L-shaped, horizontally-extending device having inner and outer ends operable to lift the deck assembly relative to the frame, the inner end pivotally connected to the frame, the outer end pivotally connected to the deck assembly for pivotal movement about a generally vertical axis and about a generally horizontal axis extending in the forward-rearward direction. I respectfully disagree.

56.     Toro's proposed construction renders a number of other patent claims, such as '530 patent claim 17, redundant. Claim 17 recites, in relevant part "each of the deck assemblies being connected to the frame by a respective generally L-shaped, horizontally-extending *lifting arm* operable to lift the associated deck assembly relative to the frame." Under Toro's

-18-

# EXHIBIT 5



Deck

Rollers

FIG. 6

# EXHIBIT 6

# EXHIBIT 7

argument is specious in this crowded art in which lawn mower manufacturers patent every little improvement made.)  In this case, Applicant has made a significant improvement that was not obvious to those of ordinary skill in the art.

Applicant has invented a lawn mower that is, as explained in the Summary of the Invention portion of Applicant's specification, a tremendous improvement over the known prior art, because a rotary mower typically requires substantially less maintenance than a reel mower.  Applicant has invented the first rotary mower that is suitable for cutting a golf course rough.  Applicant's invention is not just an arbitrary, minor improvement over the prior art.  Applicant's invention is a significant step forward in the art, as has been demonstrated by the commercial success of Applicant's lawn mower, which has now been copied by at least two competitors.

Accordingly, claim 1 and dependent claims 2, 4-6 and 10 are allowable.

In view of the foregoing, entry of the above amendment and allowance of claims 1, 2, 4-6 and 10, in addition to the previous allowance of claims 7-9 and 11-20, are respectfully requested.

The undersigned is available for telephone consultation at any time.

Respectfully submitted,

David R. Price
Reg. No. 31,557

File No. 7E209/9009

Michael Best & Friedrich LLP
100 East Wisconsin Avenue
Milwaukee, WI  53202-4108
(414) 271-6560

7

JA - 0141

and a publication. With the vast number of mower designs and mower manufacturers in the industry, any obvious combination of features that might give a company a competitive edge has likely been tried. Rotary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length, because nobody prior to me has recognized the desirability of using, or figured out how to use, gang-type rotary mowers to cut golf course roughs. Conventional wisdom in the art of gang-type mowers held that rotary mowers could not be used to cut golf course roughs. My invention of individual cutting units with the addition of rear rollers, however, made the use of gang-type rotary mowers possible to cut golf course roughs. To the best of my knowledge, gang-type rotary mowers have never had such rear rollers.

5.    My Gang-type Rotary Mower invention, which was unknown in the industry only a few years ago, is now worth millions of dollars in annual sales to my company and to the companies that copied my invention.

6.    For many years, the mower industry had unsuccessfully sought a solution to the problem of scalping grass while mowing over undulating terrain. Previous rotary mowers are ineffective in compensating for elevation changes in the turf being mowed, resulting in uneven cut height. This is particularly problematic when the turf is cut at or below ground level, leaving barren spots.

7.    My invention provides a solution to this problem by teaching an apparatus with excellent ground-following and anti-scalp characteristics.

8.    The effectiveness of my invention as a solution to this long-term problem is evidenced by the extraordinary commercial success of my invention. Annual sales of my company's previous gang-type mower averaged approximately $4.5 million over the years 1995 to 1997, with no significant increases or decreases from year to year. Our new model embodying my invention was introduced in 1997. The addition of my invention was the only significant change from the prior model. Sales of the new model totaled $1.3 million in 1997, jumped to $2.5 million in 1998, and are projected to be $10 million in 1999. The addition of my invention has more than doubled our mower sales, as compared to our previous model. Because market demand for gang-type mowers remained relatively constant between 1997

-2-

JA - 0151

Declaration and Power of Attorney For Patent Application

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below next to my name.

I believe I am the original, first and sole inventor of the subject matter which is claimed and for which a patent is sought on the invention entitled "GANG-TYPE ROTARY LAWN MOWER" (Attorney Docket No. 78209/9009), the specification of which is attached hereto.

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims.

I acknowledge the duty to disclose to the Patent and Trademark Office all information known to me to be material to patentability as defined in Title 37, Code of Federal Regulations, §1.56.

And I hereby appoint JOSEPH A. GEMIGNANI, (Reg. No. 19,482), ROBERT E. CLEMENCY (Reg. No. 19,287), DAVID B. SMITH (Reg. No. 27,595), GLENN A. BUSÉ (Reg. No. 24,217), FRED WIVIOTT (Reg. No. 19,158), DAVID R. PRICE (Reg. No. 31,557), ROBERT S. BEISER (Reg. No. 28,607), BAYARD H. MICHAEL (Reg. No. 15,974), CASIMIR F. LASKA (Reg. No. 30,862), KENT S. BARZA (Reg. No. 29,042), DAVID L. DE BRUIN (Reg. No. 35,489), TIMOTHY M. KELLEY (Reg. No. 34,201), ELIZABETH HUNT SCHOETTLY (Reg. No. 36,922), BILLIE JEAN STRANDT (Reg. No. 36,940), THOMAS A. MILLER (Reg. No. 36,871), KEVIN P. MORAN (Reg. No. 37,193) and WITOLD A. ZIARNO (Reg. No. 39,888), 100 East Wisconsin Avenue, Milwaukee, Wisconsin 53202-4108, Telephone (414) 271-6560, and each or any of them, my attorneys or agents, with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected therewith.

ADDRESS ALL COMMUNICATIONS IN OR PERTAINING TO THIS APPLICATION TO:

                    David R. Price
                    MICHAEL, BEST & FRIEDRICH
                    100 East Wisconsin Avenue
                    Milwaukee, WI   53202-4108

JA - 0072

# EXHIBIT 8

Price, David   8/31/2006

FOR THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------

TEXTRON INNOVATIONS, INC.,

Plaintiff,

-vs-                        C.A. No. 05-486

THE TORO COMPANY,

Defendant.

------------------------------------------------------------



Video examination of DAVID PRICE, taken at the instance of the Defendant, under and pursuant to the Federal Rules of Civil Procedure, before MELISSA J. STARK, a Certified Realtime Reporter, Registered Professional Reporter and Notary Public in and for the State of Wisconsin, at Michael, Best & Friedrich, LLP,

100 East Wisconsin Avenue, Milwaukee, Wisconsin, on

AUGUST 31, 2006, commencing at 8:59 a.m. and concluding

at 4:53 p.m.

Price, David   8/31/2006

## Page 82

```
1       have cited it, assuming we determined it was prior
2       art.
3   BY MR. ZEULI:
4   Q   Because you always cite anything that's possibly
5       relevant, correct?
6   A   Yes.
7   Q   Turn, if you would, to the third page, which is
8       248. I'll direct your attention to the third full
9       paragraph. Strike that. Turn to page 247. I'll
10      direct you to the paragraph that begins, "Mowing,"
11      and then you'll see underneath it that there is a
12      paragraph that talks about primary rough, correct?
13  A   Yes.
14  Q   Okay. Now turn to the next page, if you would,
15      please. Second sentence of the third paragraph
16      reads, "In contrast, bunch type species are
17      commonly mowed at a higher cutting height with
18      tractor mounted rotary or vertical mowers." Do
19      you see that?
20  A   Yes.
21  Q   From this can you understand that as of 1982 it
22      was known to use rotary mowers to cut golf course
23      roughs?
24          MR. CAMPBELL: Objection. Form.
25          THE WITNESS: If this was, in fact,
```

## Page 83

```
1       published in 1982, then it appears to say -- it
2       says that certain species of grass were cut with
3       rotary mowers.
4   BY MR. ZEULI:
5   Q   Not just grass, grass in a golf course rough?
6   A   That's how I read it.
7   Q   During your representation of Mr. Bednar, did you
8       inform him of his duty of candor to the patent
9       office?
10  A   I don't recall what conversations we had about his
11      duty of candor.
12  Q   So it's possible that you did not, correct?
13  A   I don't know what informing him of his duty of
14      candor means.
15  Q   Did you at any time tell Mr. Bednar that he had an
16      obligation to provide any possibly relevant prior
17      art?
18  A   I probably did, but I don't recall whether I did.
19  Q   It would be your practice to have done so?
20  A   Yes.
21  Q   And would you have helped him understand what you
22      meant by possibly relevant prior art?
23  A   That would depend on whether I felt based on
24      knowing him that was necessary. I don't recall.
25  Q   All right. And do you recall or would it have
```

## Page 84

```
1       been your practice to have told Mr. Bednar that he
2       would need to identify as possibly prior art
3       industry texts, such as this Turf Management text?
4   A   I don't know that I would have specifically
5       mentioned industry texts. We usually just talk in
6       terms of printed publications and patents.
7   Q   Have you ever in your 23 years as a patent lawyer
8       provided to the patent office prior art that came
9       from industry texts?
10  A   Probably, but I don't have any specific
11      recollection.
12  Q   Going back to DDX-23, page 251, I'll direct your
13      attention to the paragraph dealing with leaf
14      removal. Please take a moment to look at that and
15      let me know whether you agree that it's talking
16      about using tractor mounted rotary mowers on golf
17      course roughs to not only cut but to remove
18      leaves?
19  A   I see the statement that dry leaves can also be
20      pulverized with a tractor mounted rotary mower.
21  Q   And the dry leaves that they're talking about are
22      the dry leaves that drop on a golf course rough,
23      correct?
24  A   I don't see anything that specifically mentions a
25      golf course rough.
```

## Page 85

```
1   Q   Let me direct your attention to the first two
2       sentences under leaf removal, and then I'll ask
3       you again this paragraph on leaf removal on page
4       251 of DDX-23 is talking about using tractor
5       mounted rotary mowers to not only cut roughs but
6       to remove leaves, correct?
7   A   It -- I assume there's a statement down below that
8       refers back to roughs, so it says, "Dry leaves can
9       be pulverized with a tractor mounted rotary
10      mower." It doesn't say anything about cutting the
11      rough with the rotary mower.
12  Q   Okay. Then you would read this paragraph under
13      leaf removal to be talking about using a tractor
14      mounted rotary mower to pulverize leaves on a golf
15      course rough as of 1982?
16  A   If that's the date of the -- this was actually
17      published, yes.
18  Q   Pulverizing leaves can be done while also cutting
19      the rough, correct?
20          MR. CAMPBELL: Objection. Form.
21          THE WITNESS: I'm not an expert. I
22      don't know.
23  BY MR. ZEULI:
24  Q   I imagine in your yard using your rotary mower,
25      you're --
```

22  (Pages 82 to 85)

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY