# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 05-486 (GMS) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE TORO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT TORO COMPANY'S FIRST SET OF INTERROGATORIES TO PLAINTIFF TEXTRON INNOVATIONS INC.

Defendant, The Toro Company, ("Toro"), requests that Plaintiff Textron Innovations Inc., ("TII"), answer the following interrogatories in writing, under oath, in accordance with Rule 33 of the Federal Rules of Civil Procedure.

If any interrogatory, or portion of interrogatory, is unclear, please contact the undersigned counsel and, if possible, the interrogatory or portion thereof will be clarified in a reply letter. Any such reply may be treated as a modification of the interrogatory or portion thereof.

### TERMS AND CONDITIONS

In the Interrogatories below, the following definitions shall apply:

Accused Products. The term "Accused Products" means any Toro product that TII alleges infringes any claim of the patents-in-suit.

All/Each. The terms "all" and "each" shall be construed as all and each.

And/Or. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all information or material that might otherwise be construed to be outside of its scope.

Communication. The term "communication" means the transmittal of information in the form of facts, ideas, inquiries or otherwise.

Concerning. The term "concerning" means relating to, referring to, pertaining to, describing, evidencing, or constituting.

Defendant. The term "Defendant" as used in these Interrogatories, refers to The Toro Company.

Describe. The term "describe" means to provide a narrative statement or description, phrased in specifics, of the facts or matters to which the interrogatory refers, including, but not limited to, an identification of all persons, communications, acts, transactions, events, agreements, recommendations, and documents used, necessary or desirable to make such statement or description complete.

Document. The term "document" is defined to be synonymous in meaning and equal in scope with the broadest usage of such term in Federal Rule of Civil Procedure 34. Such term includes, without limitation, any writing and each original, master and every copy of the following items, however produced or reproduced, namely: books, accounting records of any nature whatsoever, agreements, communications, correspondence, telegrams, cables, telexes, facsimile documents, memoranda, recordings, studies, summaries or records of telephone conversations, summaries or records of personal conversations or interviews, diaries, letters, forecasts, statistical statements, graphs, laboratory or engineering reports or records, notebooks, charts, plans, sketches, drawings, information-bearing photographic products of any nature whatsoever, phonograph records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or

2

conferences, reports or summaries of interviews, reports or summaries of investigations, opinions or reports of consultants, patent appraisals, opinions of counsel, records, reports or summaries of negotiations, sales literature of any nature whatsoever, brochures, catalogues, catalogue sheets, price lists, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, reprints, drafts of any documents, working papers, indices, notes of any nature whatsoever, marginal notes appearing on any documents, computer printouts, computer disks, computer memory files, and other data compilations from which information can be obtained or translated, if necessary, by Plaintiff through detection devices into reasonably usable form. The sources, sources, or derivation of each document identified shall be specifically identified. Where a copy contains any marking not appearing on the original or is altered from the original, then such items shall be considered to be a separate original document.

Gang-Type Rotary Lawn Mower. The term "gang-type rotary lawn mower" means gang-type lawn mowers having multiple single spindle cutting decks.

Gender. The terms "he," "his, or "him" are generic terms that shall mean any person as defined herein, whether natural or otherwise, and whether masculine, feminine or neutral.

Identify. The term "identify" shall mean:

(a)    When used with respect to an individual or natural person, to state:
(1) his name; (2) any other name used by him presently or in the past; (3) his present or last known business address, residence address and telephone numbers; and (4) the corporation, partnership, association, foundation, trust, organization or other entity, and the functional division thereof, with which he is now associated,

3

and his title, status, position, rank or classification with such entity at the present and throughout the time period specified.

(b)     When used with respect to a person other than a natural person, including, but not limited to, any corporation, partnership, association, foundation, trust, organization, or other entity or functional division thereof, to state: (1) its full name; (2) the address of its principal office or place of business; (3) all names under which it is doing business or ever has done business; (4) the nature of the venture (e.g., sole proprietorship, partnership, corporation, etc.); and (5) the identities of its officers, directors, partners or administrators.

(c)     When used with respect to a communication to: (1) state the dates and places of origin and reception of such communication; (2) identify each person who was present at or participated in such communication; (3) identify the type of communication (e.g., letter, facsimile transmission, face-to-face conversation, telephone conversation, etc.); (4) describe the substance of each such communication; and (5) identify each document which records, shows, or refers to such communication.

(d)     When used with respect to a document or tangible thing, to state: (1) the type of document or tangible thing (e.g., letter, memoranda, computer disk, etc.); (2) the date it was created; (3) its author and signatories; (4) its addressees and all other persons receiving copies; (5) the nature and substance of the document with sufficient particularity to enable it to be identified; and (6) its location and its custodian (or if it is no longer within your possession, custody or

4

control, state what disposition was made of it; state the date of such disposition; identify every person who participated in or approved such disposition; and identify the person or persons having knowledge of its contents). In lieu of identifying documents in the foregoing manner, defendants may identify them by document number and produce such documents for inspection pursuant to Federal Rule of Civil Procedure 33(c).

(e)    When used with respect to a fact to: (1) describe the fact; (2) state when it became known to Plaintiff; (3) identify the source from which Plaintiff learned it; (4) identify the documents that record, show or refer to the fact; and (5) state why it is believed that the fact is true.

(f)    When used with respect to a patent or patent application, to state: (1) its country, patent number and application number; (2) its dates of filing, publication and issuance; (3) the names of all patentees, applicants or inventors; (4) its title; (5) the identity of each counterpart (United States or foreign) application and patent; (6) its status; and (7) the docket number of other designation thereof used by Defendants to identify it in its files.

Number. The use of the singular form of any word includes the plural and vice versa.

Patent Office. The term "Patent Office" shall mean the United States Patent and Trademark Office, unless otherwise indicated.

Patents-in-Suit. The term "Patents-in-Suit" means U.S. Patent No. 6,047,530; U. S. Patent No. 6,336,311; and U.S. Patent No. 6,336,312.

5

Person. The term "person" means any natural person or any business, legal or governmental entity or association, and any functional division thereof.

Plaintiff. The term "Plaintiff," or a pronoun referring to said party, as used in these interrogatories means TII, as defined above.

Related Patent or Application. The term "Related Patent or Application" means any U.S. patent, foreign patent, U.S. application, or foreign application that is a continuation, continuation-in-part, divisional of, or otherwise related to, the patents-in-issue.

State. The term "state" means to express the particulars in writing or set down and set forth in detail.

TII. The term "TII" means the Plaintiff Textron Innovations, Inc., Textron, Inc., including but not limited to Jacobsen, A Textron Company, Ransomes Inc., Cushman, Inc, and their officers, directors, employees, partners, past or present corporate parents, subsidiaries, affiliates, divisions, predecessors, and agents of any of the forgoing. The terms "director, " "officer," "employees," or "agent" means any individual serving as such and any individuals serving at any relevant time in such capacity, even though no longer serving in such capacity.

TII's Patented Products. The phrase "TII's Patented Products" or "TII Patented Products" means any product made by TII (including Textron, Inc.) or licensed under the patents-in-suit.

Toro. The term "Toro" means the Defendant, The Toro Company.

'530 Patent. The term "the "'530 Patent means U.S. Patent No. 6,047,530.

'311 Patent. The term "the "'311 Patent" means U.S. Patent No. 6,336,311.

'312 Patent. The term "the "'312 Patent" means U.S. Patent No. 6,336,312

## INSTRUCTIONS

1.    You are required to answer the following interrogatories separately and fully in writing and under oath, within (30) days from the date of service.  When answering the interrogatories, you are required to furnish such information as is available to you, including but not limited to information known to your officers, employees, agents or anyone acting for or on your behalf.

2.    If you have no information about the subject of a particular interrogatory or if for some other reason you are unable to answer it, the response to that interrogatory should specifically so state, and no interrogatory should be without some response.

3.    If you cannot answer an interrogatory completely, answer as fully as you can and specify the ways in which your response may be incomplete because of your lack of knowledge. If you do not know exact dates, amounts, or other facts with certainty, but you have information from which you can make an appropriate or estimated answer, do so, and indicate that the answer is appropriate or estimated because you lack more precise information.

4.    If you have previously provided information requested in an interrogatory in an answer to a preceding interrogatory, or in documents filed in this action (including answers to interrogatories or depositions), you may answer such interrogatory by specific reference to the documents (including document production numbers) or answer to a preceding interrogatory providing the information requested.  But, to the extent that the referenced document or answer to a preceding interrogatory does not provide all of the information which is known to you (including, but not limited to, specific details, the identity and location of persons, the description

7

and location of documents or tangible things, etc.) that is called for by the interrogatory, state all such information in your answer to the interrogatory.

5.    It will be a sufficient answer to an interrogatory calling for you to identify documents to state either (a) that such documents already have been produced in this action and have been specifically identified on record, provided that you reference the documents, production number or the record identifying the documents, or (b) that such documents will be produced in accordance with the request for production of documents served upon you, if you actually produce such documents. Any documents that you have been requested to identify that you cannot or will not produce must be identified as requested, to the extent possible, whether or not they are in your possession, custody, or control.

6.    Documents pursuant to Federal Rule of Civil Procedure 34, or in lieu of answering pursuant to Federal Rule of Civil Procedure 33(c), should be expressly identified by the interrogatory to which they pertain.

7.    Except as otherwise expressly directed herein, each paragraph and subparagraph of the interrogatories should be construed independently and not by reference to any other paragraph or subparagraph herein for the purpose of limiting the scope of the interrogatory being answered.

8.    If the original of a document is within your possession, custody or control, produce it; if not, produce such copy of it as is in your possession, custody or control. Any copy of a document on which any notation, addition, alteration or change has been made is to be treated as an additional original document.

9.    Included in the definition of documents as used herein are files, file folders, books, etc. and their contents.  Accordingly, produce files, file folders, books, etc. together with the documents they contain.

10.    If any of the documents requested have been destroyed, identify each such document, state the date upon which the document was destroyed, and state the reason it was destroyed.

11.    If you assert a claim of privilege or work product protection in objection to any interrogatory or request for production of documents or tangible things, identify with respect to each communication, document, or tangible thing the nature and basis of the privilege claimed, and provide as much of the following information as is not encompassed by the privilege: its type; its general subject matter and purpose; its date; the names of persons making or receiving the communication, document, or tangible thing or a copy thereof or, if the communication was oral, of those present when it was made; their relationship to the author or speaker; and any other information upon which you may rely to support your claim of privilege or other immunity from discovery.

12.    In answering any interrogatory which specifies the identification of a person or persons having knowledge of a circumstance, matter, event, document, procedure, determination, product, etc., where the number of people having the knowledge exceeds three, identify the three persons having the most knowledge of the circumstances, matter, event, documents, procedure, determination, product, etc.

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify by product name, general description, manufacturer, and model number all TII Patented Products. In answering this Interrogatory, identify all documents and the three most knowledgeable people concerning the information requested by this Interrogatory.

### INTERROGATORY NO. 2:

Describe in detail the events leading up to and including the conception and first reduction to practice of each alleged invention disclosed or claimed in the patents-in-suit, including the date(s), circumstances, and people involved in such conception, acts of diligence, and reduction to practice, and identify the three persons most knowledgeable about the facts supporting TII's response to this interrogatory.

### INTERROGATORY NO. 3:

Describe all facts, if any, that you believe constitute "objective evidence" or "secondary considerations" of the non-obviousness of the alleged invention of each claim that you contend is infringed by Toro and describe the nexus between such facts and the subject matter of the claim. In answering this Interrogatory, identify all documents and the three most knowledgeable people concerning the information requested by this Interrogatory.

### INTERROGATORY NO. 4:

Describe the factual basis for TII's allegation that the alleged infringement by Toro was willful, identify the three person(s) most knowledgeable thereof, describe the substance of the

10

alleged knowledge of each such person, and identify all documents concerning such allegations.

**INTERROGATORY NO. 5:**

Identify by product name, general description, manufacturer, and model number all Accused Products and other third-party products that TII alleges or believes are covered by any claim of the patents-in-suit. In answering this Interrogatory, identify all documents and the three most knowledgeable people concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 6:**

Identify which claims of the patents-in-suit that TII alleges Toro infringes. For each claim identified, state which Toro product(s) TII alleges infringes that claim. In answering this Interrogatory, identify all facts, documents, and the three most knowledgeable people concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 7:**

For each claim identified in response to Interrogatory No. 6, (a) fully explain your interpretation of the claim on an element-by-element basis, including any special or uncommon meaning you attribute to any claim term; (b) identify the portions of the specification and prosecution history that you contend support your interpretation of each claim element or term; and (c) identify all extrinsic evidence that you contend supports your interpretation of each claim element or term. In answering this Interrogatory, identify all facts, documents, and the three most knowledgeable people concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 8:**

For each asserted claim identified in response to Interrogatory No. 6, provide a detailed claim chart including an element-by-element comparison specifying each component or part of Toro's allegedly infringing product that corresponds to each element of the patent claim; if TII contends that a claim element is met under the doctrine of equivalents, identify the claim element that is not, or may not be, literally present and the corresponding equivalent component or part of such product; and state the factual basis for TII's contentions related to this interrogatory, identify all documents concerning this Interrogatory, and identify the three most knowledgeable persons concerning the information requested by this interrogatory.

**INTERROGATORY NO. 9:**

Describe the circumstances, including the date(s), in which any alleged invention disclosed or claimed in the patents-in-suit was first offered for sale, sold, publicly used, and/or publicly disclosed in the United States, and the circumstances, including the date(s), in which any alleged invention disclosed or claimed in the patents-in-suit was first described in a printed publication anywhere in the world, and identify all documents and the three persons most knowledgeable about the facts concerning TII's response to this interrogatory.

**INTERROGATORY NO. 10:**

Identify all prior art to the patents-in-suit that TII is or was aware of at any time; and identify the date that TII became aware of the prior art; the person(s) who became aware of the prior art; and whether the prior art was disclosed to or already known by the Patent Office during prosecution of the patents-in-suit. For any prior art that TII did not disclose to the Patent Office,

state the basis for TII's reasons therefore, including without limitation, any contention that the undisclosed prior art was not relevant, was not material, and/or was cumulative of other prior art before the Patent Office. Identify all facts, documents, and the three most knowledgeable people concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 11:**

If TII contends that it is entitled to damages in this case, please identify all categories of damages that TII contends it is entitled to, including but not limited to, a reasonable royalty, TII's lost profits, Toro's profits, TII's costs, and/or TII's attorneys' fees; identify the amount of damages sought (if any) and describe in detail the factual basis therefore; and identify the three persons most knowledgeable about TII's damages contentions.

**INTERROGATORY NO. 12:**

Describe in detail any communications that TII has had with third parties regarding this lawsuit or TII's claims that Toro has infringed one or more claims of the patents-in-suit, and identify the person(s) most knowledgeable about any such communications.

**INTERROGATORY NO. 13:**

For each witness (expert or fact) that the TII expects it may call to testify at trial or at any hearing, either by deposition or in person:

    a.    state the name, address, and telephone number of each such witness;

    b.    state the subject matter on which the witness is expected to testify; and

    c.    with respect to expert witnesses, provide the information required by Fed. R. Civ. P. 26(a)(2)(B).

13

**INTERROGATORY NO. 14:**

Describe in detail the factual circumstances concerning TII's decision to file suit against Toro for allegedly infringing the patents-in-suit, including the substance of any discussions, analysis, or strategy concerning that decision. In answering this Interrogatory, identify all facts, documents, and the three most knowledgeable people concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 15:**

Describe in detail the factual circumstances concerning TII's communications with Toro or any of Toro's officers, directors, employees, attorneys, representatives, or agents occurring before TII filed its complaint against Toro concerning Toro's alleged infringement of any of the patents-in-suit. In answering this Interrogatory, identify all facts, documents, and the three most knowledgeable persons concerning the information requested by this Interrogatory.

**INTERROGATORY NO. 16:**

Identify the three most knowledgeable people for each of the following categories:

a.      The design, development, and testing of TII's Patented Products;

b.      Sales and marketing of TII's Patented Products;

c.      The decision to file each patent application with the Patent Office that lead to the issuance of the patents-in-suit;

d.      The prosecution of each of the patents-in-suit;

14

e.    The record keeping concerning the patents-in-suit, including, but not limited to,

records concerning the conception, design, development, testing, marketing and sales of the

patents-in-suit;

f.    Licensing of the patents-in-suit;

g.    The facts and circumstances surrounding the decision to transfer the patents-in-

suit to Textron Innovations, Inc; and

h.    The validity or enforceability of the patents-in-suit.

OF COUNSEL:

Earl D. Reiland
Thomas R. Johnson
Thomas J. Leach
MERCHANT & GOULD P.C.
3200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
(612) 332-5300

Dated:  January 6, 2006
713968

POTTER ANDERSON & CORROON LLP

By: _____

Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant The Toro Company*

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 6, 2006, a true and correct copy of

the within document was caused to be served on the following counsel of record, in the manner

indicated below:

### VIA HAND DELIVERY

Edmond D. Johnson
Peter B. Ladig
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801


### VIA FEDERAL EXPRESS

Scott L. Robertson
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC 20006-1109

David E. Moore

# EXHIBIT B

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT C

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT D

Knurr, Randal S.   11/15/2006

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------

TEXTRON INNOVATIONS, INC.,

                Plaintiff,

        -vs-                        Case No. 05-486 (GMS)

THE TORO COMPANY,

                Defendant.

-------------------------------------------------------------

                VIDEO examination of RANDAL S. KNURR,

taken at the instance of the Defendant, under and

pursuant to the Federal Rules of Civil Procedure, before

KATHLEEN E. CARTER, a Certified Realtime Reporter,

Registered Merit Reporter and Notary Public in and for

the State of Wisconsin, at Whyte Hirschboeck Dudek,

S.C., 555 East Wells Street, Suite 1900, Milwaukee,

Wisconsin, on November 15, 2006, commencing at 9:07 a.m.

and concluding at 6:16 p.m.

Pro-Systems Court Reporting     612.823.2100

Knurr, Randal S.   11/15/2006

## Page 18

1    Tri-King, when you were a project engineer?
2  A   I worked on some current production issues on
3    products, but I don't recall what other ones it
4    would have been on.  It could have been on reels or
5    anything.  But the main project that I worked on
6    was the Tri-King.
7  Q   Is it fair to say that you were developing a new
8    product that became the Tri-King?
9  A   No.  Well -- No.  We were doing an update to an
10   existing model, which, like I said, we put a larger
11   engine on it, power steering, and some ergonomic
12   improvements.
13  Q   What projects did you work on as a product engineer
14   other than the Tri-King?
15  A   Okay.  As a product engineer, I was responsible for
16   the current maintenance of the 50-horsepower and
17   up, and also a tow-behind reel unit called the
18   Ranger, and also the F10 at that time, which was a
19   reel -- a large tractor with reels on it, similar
20   to an HR-15, which was also product we were in
21   charge of.
22       We did current maintenance on all
23   products.  We did some model year updates on 5111
24   units.  The HR-15, F10, Ranger, all those were just
25   maintenance.  There was no model updates on those.

## Page 19

1        The major -- major projects were updates
2    on the HR-5111, and then we developed a replacement
3    for the HR-15, which was an HR-9016, is how it was
4    modelled and sold initially, and I'm not sure what
5    it's called right now.
6  Q   Did you say HR-90 --
7  A   9016.
8  Q   And that was the replacement, if you will, for the
9    HR-15?
10  A   Correct.
11  Q   Any other projects that you recall when you were a
12   product engineer?
13  A   Well, those projects were extensive, working on all
14   the different products.  We also handled additional
15   attachments to the products, snowblowers, which
16   were outsourced, but we were in charge of that.  So
17   anything related to the products we took care of.
18  Q   What was the next position that you held, if any,
19   at Jacobsen/Textron after product engineer?
20  A   Well, what -- what happened, in end of '97,
21   beginning of '98, when Textron purchased Ransomes,
22   then there was the strike that followed in the
23   spring of '98 in Racine.  And during that time, the
24   company was restructured and changed quite a bit,
25   and what came out of that was they were going to

## Page 20

1    close the Racine plant.
2        They wanted me to stay with the company,
3    and asked wherever I would like to go, whatever
4    plants, and I chose to go to Johnson Creek.  So I
5    transferred over to Johnson Creek, but that was not
6    a clean transfer.  I worked between Racine and
7    Johnson Creek for probably a year, almost a year,
8    and then -- between -- '98, beginning of '99, is
9    when I was trans -- working between the two plants,
10   because I was responsible for product down at the
11   Charlotte plant, responsible for product that we
12   transferred over to Johnson Creek, and then I was
13   starting to work on some of the products at Johnson
14   Creek.
15  Q   Did you say there was a strike?
16  A   Yeah, there was a union strike at the plant in
17   Racine.  And during that time frame is when there
18   were a lot of changes made, because of the problem
19   we weren't being able to produce product for our
20   distribution, so the -- and the strike was going on
21   a little bit longer than expected, and they also
22   had decided that at that time, and it wasn't my
23   decision, I was just part of it, that we were to
24   look at how we could move product to the different
25   plants.

## Page 21

1  Q   How long did the strike last?
2  A   Hmm.  If I remember right, it was a month or so.
3  Q   How long did it take to get back up to capacity?
4        MR. CAMPBELL:  Objection, foundation.
5        THE WITNESS:  Yeah, I -- To get back up
6    to capacity?
7        MR. CAMPBELL:  Vague.
8        THE WITNESS:  I don't think we really
9    did.
10 BY MR. ZEULI:
11  Q   Okay.  What do you mean by that, that you never
12   really got back to capacity?
13       MR. CAMPBELL:  Same objection.
14       THE WITNESS:  What happened --
15       MR. CAMPBELL:  Foundation and it's vague.
16       THE WITNESS:  What happened was, is
17   because of the strike, and because of trying to
18   produce product, move product or transfer it to
19   another plant, there was -- there was work, and
20   some of the equipment or tooling that was required
21   to manufacture the equipment could not be in two
22   sites, so the way that I understand it, and I was
23   not totally involved with all the product lines, it
24   was very difficult for a year to even get product
25   back up to the volume that we were prior to the

Pro-Systems Court Reporting     612.823.2100

Knurr, Randal S.   11/15/2006

---

### Page 22

```
1         strike.
2    BY MR. ZEULI:
3    Q    When did the strike begin?
4    A    And, again, this is a guess.  May.  May of that
5         year.  Because I believe the -- It was April, May,
6         sometime in that time frame.
7    Q    May of '98?
8    A    Of '98, yes.
9    Q    What was the next -- Actually, let me take a step
10        back.  When you took this transfer from Racine to
11        Johnson Creek --
12   A    Um-hum.
13   Q    -- did your title change or were you still --
14   A    I was still a product engineer, if I remember.  I
15        don't -- Like I said, titles didn't mean a lot.
16   Q    Prior to leaving the company in 2001, did you have
17        any other positions?
18   A    No.  It stayed as -- as the position that I went
19        over to Johnson Creek.
20   Q    What projects, other than the ones that you've
21        already listed, did you work on after the transfer
22        to Johnson Creek?
23   A    Well, during the transfer was the 9016, because it
24        was going into production that summer of '98 at the
25        Charlotte plant.
```

### Page 23

```
1         The KR-5111 -- MR-5111, we were getting
2         that up into production volume at Johnson Creek.  I
3         worked with that, along with manufacturing, to do
4         whatever it took to get that into production and
5         the way we needed it.
6              And then what I did start working on was
7         the AR-250.  And I was doing a -- Excuse me.  The
8         AR-250, we had customers that wanted to use that up
9         on golf courses that were at ski lodges, and there
10        was an issue with power in high altitude.
11             So what we did, is we brought in a
12        turbocharged engine, and that was my first big
13        project at Johnson Creek, was to apply a
14        turbocharged engine, which required a new cooling
15        system, a new hood, shrouding, everything else
16        along with it.  Along with that update is when we
17        started to address the possible uncut strips that
18        were left when turning.
19   Q    Any other projects that you recall working on after
20        you transferred to Johnson Creek other than the
21        9016, the 5111 and the AR-250 upgrade?
22   A    Okay.  I did work on -- Well, with the current
23        products that they had there, I believe I worked on
24        some small improvements or possibly re-sourced
25        purchased items for the -- the rotary, the 11-foot
```

### Page 24

```
1         rotary that Ransomes had at the time, a 951 or
2         something like that.
3              And also I worked on the ZTR.  I forgot
4         what the name -- It's the Bobcat line.  I worked on
5         that to bring to market a low-end unit, which was
6         still a commercial unit, but it had a Briggs engine
7         on it instead of the Kawasaki, or Kohler, and it
8         had a few other modifications.  I don't recall what
9         all -- Putting a new engine on required new
10        exhaust, and shrouding, and things like that.  But
11        that was one of the other -- more of a major
12        project that I worked on.
13   Q    Any others that you recall?
14   A    Not -- Not other than the current product
15        maintenance work.
16   Q    And when you say "current product maintenance
17        work," what do you mean by that?
18   A    What I mean by that is when you develop a product
19        and put it into production, there's always work
20        required by engineering and manufacturing to keep
21        that product in current production.  Purchased
22        items change from sources, if there are any
23        improvements that we need to make on them, that's
24        current products maintenance, what I call it.
25   Q    Does that include warranty issues as well?
```

### Page 25

```
1    A    It could include warranty if there was warranty
2         issues.
3    Q    Upgrades for cost savings, for example --
4    A    Yep.
5    Q    -- might that be included?
6    A    Yes.
7    Q    Is it fair to say that maintenance of a
8         currently-produced product continues as long as the
9         product is being produced?
10   A    Yes.  Full product life, and it also continues when
11        you're servicing it after the end of production
12        life.  Because of service parts, can't source some
13        of them again, and then we have to come back and
14        work on getting replacements to serve the customer,
15        so they can service what we do not produce anymore
16        but what they purchased.
17   Q    For ease of our discussions today, is it all right
18        if I refer to the merged company, if you will, of
19        Jacobsen, Ransomes and Textron as Textron?
20   A    That's fine.
21   Q    All right.  And if I'm talking about presacquisition
22        of Ransomes, I'll try to refer to them as Ransomes,
23        all right?
24   A    Or Jacobsen.  Because I did not work for Ransomes
25        prior to the acquisition.
```

7 (Pages 22 to 25)

Pro-Systems Court Reporting    612.823.2100

# EXHIBIT E

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
Thomas J. Leach
tleach@merchant-gould.com

October 9, 2006

**Via Facsimile and Electronic Mail**

Christopher C. Campbell
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102

**Re:**    ***Textron Innovations Inc. v. The Toro Company***
***M&G Reference No. 06372.0149-US-ZA***
***Court File No. 05-486 (MJD/SRN)***

Dear Chris:

We learned in the deposition of Peter Whurr that Textron, Inc. recently sold the
Steiner, Ryan, Bunton, Brouwer, and Bob-Cat entities. Please confirm that Textron has
fully searched each of these entities for documents responsive to Toro's document requests.

Sincerely,

Thomas J. Leach

TJL:aer

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# EXHIBIT F

1

1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                              -  -  -

4    TEXTRON INNOVATIONS INC.,      :        Civil Action
                                    :
5              Plaintiff,           :
                                    :
6         v.                        :
                                    :
7    TORO COMPANY,                  :
                                    :
8              Defendant.           :     No. 05-486-GMS

9                              -  -  -

10                      Wilmington, Delaware
                     Thursday, November 9, 2006
11                          9:15 a.m.
                       Telephone Conference
12
                               -  -  -
13
     BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
     APPEARANCES:
15
              EDMOND D. JOHNSON, ESQ.
16            The Bayard Firm
                   -and-
17            SCOTT L. ROBERTSON, ESQ., and
              DAVID M. YOUNG, ESQ.
18            Hunton & Williams
              (Washington, D.C.)
19
                           Counsel for Plaintiff
20
              DAVID E. MOORE, ESQ.
21            Potter Anderson & Corroon, LLP
                   -and-
22            EARL D. REILAND, ESQ.
              ANTHONY R. ZEULI, ESQ., and
23            THOMAS J. LEACH, ESQ.
              Merchant & Gould
24            (Minneapolis, Minnesota)

25                         Counsel for Defendant

1   these five mower companies was not done and it should have

2   been done.  It's not going to be that arduous for Mr.

3   Robertson to do that.  He can do it or he can allow us

4   access to either Textron -- so would be happy to do an

5   on-site inspection down in Charlotte or Johnson Creek if he

6   can make that happen, so that we can see for ourselves that

7   a proper search for the mowers we are looking for have in

8   fact occurred.

9          THE COURT:  Are you willing to do that, Mr.

10  Robertson?

11          MR. ROBERTSON:  I told Mr. Zeuli in our

12  conference call I was going to facilitate that, Your Honor.

13  I think it's going to be looking for a needle in a haystack.

14          THE COURT:  If he wants to look --

15          MR. ROBERTSON:  These are all the documents that

16  were relevant to running this company.  To the extent I can

17  identify the documents that may have -- and I emphasize may

18  because no one has looked at these for a long time, may

19  have -- he is free to have at it.

20          Let me just emphasize, we told them about these

21  companies being sold I believe in March.  We told them what

22  our position was.  The document requests -- the companies

23  were sold in August, or at least two of them were.  And the

24  document requests we got specifically requesting a number of

25  these types of mowers, we didn't receive that until

1    September 22nd.

2            Obviously, there are going to be reasonable

3    constraints put on searches. For example, Brouwer did not

4    make --

5            THE COURT: Mr. Robertson, I think the issue has

6    been resolved. I think you and Mr. Zeuli can arrange his

7    access, and if he wants to look for that proverbial needle,

8    let him do it.

9            MR. ROBERTSON: Thank you, Your Honor.

10           THE COURT: Let's go to Bullet No. 2, Mr. Zeuli.

11           MR. ZEULI: One question and clarification. I

12   was suggesting that Mr. Robertson make available to us the

13   Johnson Creek facility and the Charlotte facility.

14           THE COURT: I think he said that he was willing

15   to do that.

16           MR. ZEULI: Thank you very much.

17           Bullet No. 2 --

18           MR. ROBERTSON: We don't own the Johnson Creek

19   facility.

20           THE COURT: Are you able to arrange access?

21           MR. ROBERTSON: We searched Johnson Creek

22   ourselves and already produced the documents from Johnson

23   Creek.

24           THE COURT: Are you able to arrange access to

25   Johnson Creek for Mr. Zeuli?

```
 1              MR. ROBERTSON:  I don't know the answer to that
 2     question.  I can call my client and inquire.  As I said, my
 3     client doesn't own that facility anymore.
 4              THE COURT:  Understood.  But I am going to
 5     require that you make every effort to have your client
 6     arrange access.  And that, coupled with the representation
 7     you have just made that you have searched the Johnson Creek
 8     facility pursuant to your obligations under the Federal
 9     Rules, that should be adequate for Mr. Zeuli's request.
10              Let's go to Bullet No. 2.
11              MR. ZEULI:  Your Honor, this is just general
12     nonresponsiveness, I guess, to our document requests.  As I
13     mentioned, Textron is a huge company.  We have only received
14     2500, maybe 3500 documents, the vast majority of them pulled
15     off websites or a lot of them are Toro's own brochures.
16     Here is really what we haven't received, Your Honor, that
17     ought to be out there.  There are four products that are
18     allegedly covered by the patents, products that the
19     plaintiff or its licensee manufacture.  We don't have
20     engineering documents establishing how those machines are
21     made but for a few miscellaneous documents.  We have very
22     few marketing documents.
23              The four machines they claim that are covered
24     under the patents are the AR250, the 2500, the AR5 and the
25     AR3.  Yet all we have are a few miscellaneous drawings from
```

# EXHIBIT G

1

1      IN THE UNITED STATES DISTRICT COURT

2      IN AND FOR THE DISTRICT OF DELAWARE

3        - - -

4  TEXTRON INNOVATIONS INC.,  :  Civil Action
                       :

5      Plaintiff,   :
                       :

6     v.        :
                       :

7  TORO COMPANY,       :
                       :

8      Defendant.  :  No. 05-486-GMS

9        - - -

10       Wilmington, Delaware
        Thursday, January 11, 2007
11       9:30 a.m.
        Telephone Conference
12

13        - - -

  BEFORE: HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14

  APPEARANCES:
15

      EDMOND D. JOHNSON, ESQ.
16     Pepper Hamilton LLP
       -and-
17     SCOTT L. ROBERTSON, ESQ.
     Hunton & Williams
18     (Washington, D.C.)

19       Counsel for Plaintiff

20    RICHARD L. HORWITZ, ESQ., and
     DAVID E. MOORE, ESQ.
21     Potter Anderson & Corroon, LLP
       -and-
22     ANTHONY R. ZEULI, ESQ., and
     THOMAS LEACH, ESQ.
23     Merchant & Gould
     (Minneapolis, Minnesota)
24
       Counsel for Defendant
25

5

1          Then I am turning to Page 25, and I say, "One

2    question and clarification. I was suggesting that Mr.

3    Robertson make available to us the Johnson Creek facility

4    and the Charlotte facility."

5          Your Honor said, "I think he said that he is

6    willing to do that."

7          On Page 26 finally the Court says, "But I am

8    going to require that you" -- and you are referring to

9    Textron" -- "make every effort to have your client arrange

10   access."

11         THE COURT: Let's find out from Textron why that

12   hasn't been done.

13         MR. ROBERTSON: Your Honor, thank you.

14         It has been done, sir. Let me tell you the

15   efforts that have been made.

16         Just to refresh the Court, you recall, we no

17   longer control this company. It is now a new company called

18   I think Commercial Grounds Care. It is not under our

19   control. It is not owned by us. What we did shortly after

20   that call is called our point of contact there, a gentleman

21   by the name of Mark Wegner, again, no longer our employee,

22   and said, look, we would like to gain access to this

23   facility to make it available for an inspection.

24         Your Honor may also recall, we already inspected

25   it and produced responsive documents. But notwithstanding

12

1  satisfactory to both of you, I will sign it. But as you

2  know, it's without any legal -- it is not going to have any

3  legal impact out there in Wisconsin.

4         MR. ZEULI: Are you agreeable to that, Scott?

5         MR. ROBERTSON: Your Honor, your order said they

6  are going to require me to make every effort to have your

7  client arrange access to the Johnson Creek facility.

8         Coupled with that, you said the representation

9  that you searched Johnson Creek yourself pursuant to your

10  obligation under the Federal Rules, that should be adequate.

11         I have done that, Your Honor. Now there is a

12  process, Mr. Zeuli wants to pursue the subpoena with

13  Commercial Grounds Care, he should go ahead and do that.

14         THE COURT: I am not ordering you to do anything

15  else, Mr. Robertson. I offered a possible solution to Mr.

16  Zeuli's apparent problem.

17         I think you need to prosecute a motion to compel

18  in Wisconsin, Mr. Zeuli. I am not going to tell you how to

19  practice law.

20         MR. ZEULI: I will do that.

21         THE COURT: Let's go to the second issue.

22         MR. ZEULI: Similarly, from the November

23  conference call, Your Honor, you had directed Textron to

24  identify the individuals that might have had access to or

25  generated certain prior art.

# EXHIBIT H

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TEXTRON INNOVATIONS INC.,
Plaintiff,

v.

THE TORO COMPANY,
Defendant.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER : 05-486 (GMS)
(Venued in the District of Delaware)

TO:   Commercial Grounds Care, Inc., Affiliate of
      Schiller-Pfeiffer, Inc.
      Valley Forge Corporate Center
      2661 Audobon Road
      Valley Forge, Pennsylvania  19403-0000

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below:

See attached Schedule A

| PLACE<br>Schiller-Pfeiffer, Inc.<br>Valley Forge Corporate Center, 2661 Audobon Road<br>Valley Forge, Pennsylvania  19403-0000 | DATE AND TIME<br>Monday, November 6, 2006<br>10:00 am |
|---|---|

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>*[signature]*<br>Attorney for Defendant The Toro Co. | DATE<br><br>October 18, 2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Anthony R. Zeuli, Esq.
MERCHANT & GOULD P.C.
3200 IDS Center, 80 South Eighth Street
Minneapolis, MN  55402      Phone: 612-332-5300

(See Rule 45, Federal Rules of Civil Procedure Parts C & D on Reverse)

# SCHEDULE A

## DEFINITIONS

The following definitions are to be applied with regard to the subpoena:

<u>Communication.</u> The term "communication" means the transmittal of information in the form of facts, ideas, inquiries or otherwise.

<u>Concerning:</u> The term "concerning" means relating to, referring to, pertaining to, describing, evidencing, or constituting.

<u>Document</u>. The term "document" is defined to be synonymous in meaning and equal in scope with the broadest usage of such term in Federal Rule of Civil Procedure 34.

## DOCUMENTS AND THINGS REQUESTED

1.  All documents (including electronic documents and email) pertaining to all rotary mowers made, sold, or offered for sale by Steiner, Ryan, Brouwer, Bob-Cat, and Bunton before 1997.

2.  All documents (including electronic documents and email) pertaining to the use of rotary mowers to cut golf course roughs.

3.  All documents (including electronic documents and email) pertaining to the use of rollers on rotary mowers, including, but not limited to, full-width rollers.

4.  All documents (including electronic documents and email) sent to, received from, or pertaining to Richard Bednar.

5.  All documents (including electronic documents and email) pertaining to Risboro Turf.

6.  All documents (including electronic documents and email) pertaining to Lesco.

7. All documents (including electronic documents and email) pertaining to Nunes Manufacturing.

8. All documents (including electronic documents and email) pertaining to the publications Grounds Maintenance and Turf Management, including, but not limited to, copies of the May 1994 Turf Management and January 1991 Grounds Maintenance.

9. All documents (including electronic documents and email) pertaining to The Toro Company and any Toro products.

10. All documents (including electronic documents and email) pertaining to the AR250, AR2500, AR5 and AR3.

2

# EXHIBIT I

## COMMERCIAL GROUNDS CARE, INC.'S OBJECTIONS TO THE TORO COMPANY'S SUBPOENA DUCES TECUM

Non-party Commercial Grounds Care, Inc. ("Commercial Grounds Care"), pursuant to Rules 26 and 45 of the Federal Rules of Civil Procedure, sets forth the following objections to the subpoena *duces tecum* of The Toro Company dated October 18, 2006:

The following objections apply to each request within Schedule A of the subpoena:

1.  Commercial Grounds Care objects to the subpoena on the ground that it was not served properly pursuant to the Federal Rules of Civil Procedure.

2.  Commercial Grounds Care objects to the subpoena as improper and in violation of Rule 45 of the Federal Rules of Civil Procedure on the ground that, *inter alia*, Commercial Grounds Care, Inc. is a company located in Johnson Creek, Wisconsin. Nonetheless, The Toro Company issued this subpoena from the United States District Court for the Eastern District of Pennsylvania and asks that Commercial Grounds Care comply with the subpoena in that jurisdiction, ostensibly on the ground that it is affiliated with Schiller-Pfeiffer, Inc. in Valley Forge, Pennsylvania. Commercial Grounds Care does not maintain any business offices or facilities within this jurisdiction. Rule 45 does not permit a party to

subpoena a non-party in a district where it does not reside simply because it is affiliated with another corporation in that district.

3.  Commercial Grounds Care objects to the subpoena, and all of the definitions and specific document requests thereto, on the ground that the requests are: (A) overbroad and not calculated to lead to admissible evidence; (B) unduly burdensome; and (C) irrelevant to the underlying litigation. In addition, Commercial Grounds Care objects to producing any information responsive to the subpoena to the extent such information is protected from discovery by the attorney-client privilege, the work product doctrine, or any other applicable privilege, protection, or immunity.

4.  Commercial Grounds Care objects to providing any information responsive to the subpoena to the extent it requires disclosure of proprietary or confidential information, or documents and information restricted from dissemination pursuant to Court order, case law, statute, regulation, or applicable operating agreements.

5.  Commercial Grounds Care objects to the subpoena to the extent it requires production of documents that are not within its possession, custody or control.

6.  Commercial Grounds Care objects to the subpoena to the extent the requests, instructions and definitions are unreasonably broad, vague, ambiguous and/or unduly burdensome. For example, many

of the requests in the subpoena are not restricted by either date or subject matter and seek all documents pertaining to identified persons or companies, regardless whether such documents are relevant to the underlying proceeding or designed to lead to the discovery of relevant evidence in that proceeding. By way of further example, among other things the subpoena requests all documents pertaining to "Risboro Turf," "Lesco," "Toro," and "Nunes Manufacturing," without any limitation as to subject matter and regardless whether such documents have any relevance to the underlying litigation. Other requests ask that Commercial Grounds Care produce all documents pertaining to "all rotary mowers," any "use of rotary mowers to cut golf course roughs," "all documents pertaining to the publications Grounds Maintenance and Turf Management," again without any limitation as to subject matter or relevance to the underlying litigation. All of the requests are overbroad, unduly burdensome, and not reasonably limited to documents relevant to the claims or defenses in the underlying litigation.

7.    If for any reason the subpoena is deemed by this Court to require production of any documents whatsoever, Commercial Grounds Care objects to the subpoena as unduly burdensome and expensive. Should production of any documents be required, Commercial

Grounds Care demands that Toro pay all reasonable

paralegal/attorney fees/costs incurred in reviewing, compiling,

bates numbering, copying, or preparing a privilege/redaction log

for any such documents.  See In Re: Subpoena Duces Tecum Served

on Duke Energy Corp. in the matter of Calpine Corp. Securities

Litigation, 2005 U.S. Dist. LEXIS 25391 (W.D.N.C. Oct. 18, 2005)

(Requestor has to pay fees of attorneys reviewing documents for

production by third-party).

8.    Commercial Grounds Care objects to the subpoena to the extent it

attempts to impose obligations on Commercial Grounds Care other

than or beyond those imposed or authorized by the Federal Rules of

Civil Procedure.

COMMERCIAL GROUNDS CARE, INC.

By _____
    Vickie Waitsman
    Vice President – General Counsel

# EXHIBIT J



HUNTON & WILLIAMS LLP
1751 PINNACLE DRIVE
SUITE 1700
MCLEAN, VIRGINIA 22102

TEL   703 • 714 • 7400
FAX   703 • 714 • 7410

CHRISTOPHER C. CAMPBELL
Direct Dial: 703-714-7553
EMAIL:  CCAMPBELL@HUNTON.COM

FILE NO: 66866.000002

February 20, 2007

**Via E-Mail and Facsimile**

Anthony Zeuli, Esq.
MERCHANT & GOULD P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

Re:    Textron Innovations Inc. v. The Toro Company
       Civil Action No. 05-486 (GMS)

Dear Tony:

In response to your letter of February 14, 2007 regarding Toro's amended prior art statement, Textron does not consent to Toro's amendment.

Very truly yours,

Christopher C. Campbell

CCC/dpm

cc:    Textron/Toro Correspondence List (via e-mail)

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
|  | ) | C. A. No. 05-486 (GMS) |
| Plaintiff, | ) | |
|  | ) | (Jury Trial Demanded) |
| v. | ) | |
|  | ) | |
| THE TORO COMPANY, | ) | |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

## TORO'S SECOND AMENDED PRIOR ART STATEMENT

In compliance with the Court's Scheduling Order, Defendant, The Toro Company
("Toro"), provides the following Amended Prior Art Statement to Plaintiff, Textron
Innovations, Inc. ("Textron").

The asserted claims of U.S. Patent Nos. 6,047,530 ("the '530 patent"); 6,336,311
("the '311 patent"); and 6,336,312 ("the '312 patent") (hereinafter the "patents-in-suit")
are all invalid as anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103, or
both, in view of the following list of prior art and as detailed in the attached invalidity
charts Exhibits A-F:

**A.    Gang-Type Rotary Mowers**

| | |
|---|---|
| 1. | Lesco 500 Rotary |
| 2. | Deere with Nunes 355 |
| 3. | Deere 3235A with Nunes Brochure |
| 4. | R.T.S. Rotary Cutters (Risboro Turf Brochure) & Hayter Bever T24 |
| 5. | Picture of Deere 3235A with Nunes rotary decks |
| 92. | Groundsmaset® with Countour 66 |
| 93. | January 1988 Newspaper Article |
| 99. | Wulff Mower Brochure |
| 100. | Middlesworth 72RR |

**B.    Gang-Type Rotary Mowers**

6.    Jacobsen HR-5111
7.    Golf and Sports Turf, March 1990
8.    Howard Price 1280
9.    Howard Price 1260
10.   Howard Price Hydro-Power 180
11.   Befco
12.   Las Tec—Articulator  (Model 425-D, 325-ER, M 325-E)
13.   Cream of The Crop Turf Management, April 1993
14.   Nunes 317, 490, 426
15.   Land Pride Turf—All-Flex Mowers
16.   Nunes 5.5 Vacuum Plus
17.   Hustler Range Wing
18.   U.S. Pat. 4,926,621
19.   U.S. Pat. 5,280,695
20.   U.S. Pat. 3,135,079
21.   EU 342 700 B1
22.   Nunes 3235A
23.   U.S. Pat. 4,308,713
24.   Rotaries take to golf courses, Grounds Maintenance, January 1991.
25.   Toro 455-D
26.   Out-Front Rotary Mowers, Grounds Maintenance, May 1991
27.   Problem Solver, Parks & Sport Grounds, March 1992
88.   Canadian Pat. No. 1,115,067 to Ransomes
89.   Canadian Pat. No. 1,141,177 to Brouwer

**C.    Gang Rotary with Roller**

28.   Major-Groundsman
29.   Major-GroundsMajor
30.   Howard—Stealth
31.   Howard—TrailMaster
32.   Cheap & Careful
33.   United Equipment—Uni-Cut (see Tab 1)
34.   Relying On a Rotary (Turfmech-- Tri-Deck TD65-2
35.   U.S. Pat. No. 3,236,034
36.   U.S. Pat. No. 3,650,098
37.   U.S. Pat. No. 4,304,086
38.   Trimax Pegasus

**D.    Rotary with Roller (including Interchangeability of Roller and Casters Wheels)**

1

39. Kilworth's Sovema optional Rear Roller.
40. Port Agric Cutlass Pro/AM.
41. U.S. Patent No. 3,802,172
42. Australian Patent No. 11,914/70
43. Australian Patent No. 50523/64
44. Honda HR 173, HR 194, HR 214, and HR 216
45. Cheap And Careful
46. Simplicity Mowers
47. Mountfield Empress
48. Steiner 80-81 Owners Manual
49. South African Patent App. No. 924978
50. South African Patent App. No. 942089
51. Teagle Topper 5.
52. Attack Engineering 150 Rollermower / Falcon Rollermowers 40/150R and 50/150R (40)
53. Dowdeswell Rollermowers
54. Sod Harvester by Nunes
55. Choosing the right cutting mechanism
90. Steiner Boom Mower
94. Simplicity Manuals
95. Simplicity Mower
96. Machinery For Horticulture, Chapter 14
97. Hayter Contour 120
101. Mountfield Lawnrider
102. Turftrack Rotary Mower
103. Douglas Products Rollers
104. Quad Cycling Mower
106. Turf Star Electra Model 2000
107. Stiga Park Rotary Mower
108. Deutz-Allis Rotary Mower

**E.    Gang of Single Spindle Rotary Decks**

56. Australian 13463/70
57. Deere with Nunes 355
58. Deere 3235A with Nunes

**F.    Height Adjustment**

59. U.S. Patent No. 1, 954,579
60. U.S. Patent No. 3,537,720
61. U.S. Patent No. 3,611,684
62. Australian Patent No. 11,914/70
63. Howard--Rollamowa (1979) Owners Manual
64. U.S Patent No. 3,802,172
65. Votex Rotary Cutters (U.S. Patent No. 1,212,353)

2

66.    South African Pat. App. No. 924978

**G.   Ganged Reel Mowers**

67.    U.S. Patent No. 5,297,378
68.    U.S. Patent No. 5,293,729
69.    U.S. Patent No. 5,343,680
70.    U.S. Patent No. 5,497,604
71.    U.S. Patent No. 5,406,778
72.    British Pat. No. 1,273,760
73.    U.S. Patent No. 4,878,338
74.    U.S. Patent No. 5,293,729
75.    British Pat. No. 1,544,914
76.    U.S. Patent No. 3,616,626
<u>105.</u>   <u>Ransomes 250 Lightweight Fairway Mower</u>

**H.   Rotaries on Golf Course/ Roughs**

77.    Equipment Preview 1987, p. 37.
78.    1986: The Season In Review, p. 10
79.    Course gets a manicure
80.    Choosing the right cutting mechanism
81.    Mowing Large Areas, Grounds Maintenance, July 1989
82.    Cutting a Systematic Swathe, The Groundsman, July 1993
83.    Rotaries take to golf courses, Grounds Maintenance, January 1991. (See No. 24)
84.    Cheap And Careful (see No. 45)
91.    Spring 1992 Jacobsen "NEWSREEL" magazine
95.    Machinery For Horticulture, Chapter 14
98.    U.S. Pat. No. 5,305,589

**I.   Segmented Rollers**

85.    U.S. Patent No. 3,654,749
86.    U.S. Patent No. 3,754,385
87.    U.S. Patent No. 4,416,109
92.    Groundsmaset® with Countour 66
94.    Simplicity Manuals
95.    Simplicity Mower
99.    Wulff Mower Brochure
<u>102.</u>   <u>Turftrack Rotary Mower</u>
<u>104.</u>   <u>Quad Cycling Mower</u>
<u>106.</u>   <u>Turf Star Electra Model 2000</u>
<u>107.</u>   <u>Stiga Park Rotary Mower</u>
<u>108.</u>   <u>Deutz-Allis Rotary Mower</u>

The following attached Exhibits A-F provide a detailed explanation of how the asserted claims of the patents-in-suit are invalid under 35 U.S.C. §§ 102 and 103:

1. Exhibit A:  Invalidity of Asserted Claims of The '530 Patent Under 35 U.S.C. §102;

2. Exhibit B:  Invalidity of Asserted Claims of The '530 Patent Under 35 U.S.C. §103;

3. Exhibit C:  Invalidity of Asserted Claims of The '311 Patent Under 35 U.S.C. §102;

4. Exhibit D:  Invalidity of Asserted Claims of The '311 Patent Under 35 U.S.C. §103;

5. Exhibit E:  Invalidity of Asserted Claims of The '312 Patent Under 35 U.S.C. §102; and

6. Exhibit F:  Invalidity of Asserted Claims of The '312 Patent Under 35 U.S.C. §103.

The references to the various prior art teachings in the above Exhibits A-F are exemplary only, and other portions of the references, other combinations of references, and other evidence of commercial embodiments and/or published literature may provide additional evidence of invalidity.  Any and all commercial embodiments and/or published literature relating to any of the prior art listed above are incorporated into this Prior Art Statement.

As specifically detailed in the attached §102 invalidity charts (Exhibits A, C, and E), the asserted claims of the patents-in-suit are invalid under 35 U.S.C. § 102 as being anticipated by various prior art references, including, but not limited to, the Lesco 500 Rotary mower, the Risboro Turf Brochure (R.T.S. Rotary Cutters), and the John Deere Mowers with Nunes decks products and brochures.  In addition, as specifically detailed in

4

the attached §103 invalidity charts (Exhibits B, D, and F)[1], it would have been obvious under 35 U.S.C. §103 to a person of ordinary skill in the art, as of the filing date of the patents-in-suit, in view of the prior art alone or in combination with the listed prior art references.

The prior art listed above would have also informed one of skill in the art regarding the state of the art at the time of filing of the application. Toro intends to rely upon these and any other references reflecting the state of the art that may be found during discovery, as well as all prior art identified in the file histories and specifications of the patents-in-suit, and all prior art identified or cited in the references disclosed in this Prior Art Statement.

The information provided in Toro's Prior Art Statement is preliminary in nature and subject to modification and supplementation. Toro anticipates that discovery from Textron and others will likely lead to additional prior art relevant to the invalidity of the patents-in-suit, which will need to be added to Toro's Prior Art Statement. Toro may continue to refine and supplement its understanding of the prior art as additional relevant information is acquired during the course of discovery. Toro will supplement this Prior Art Statement in a timely matter as their understanding of the scope, content, and meaning of the prior art develops as discovery progresses.

Toro's application of its prior art is based on its current understanding of how Textron is applying the claim terms in its infringement analysis of Toro's products. The prior art references provided herein represent those that Toro has acquired sufficient

---

[1] Toro's 35 U.S.C. §103 invalidity charts, Exhibits B, D, and F, include two columns of prior art descriptions. The prior art description in the first prior-art column discloses the claimed element alone or in combination with the description in the second prior-art column that corresponds to the prior art description in the first column.

5

information to assess their relevance with respect to the patents-in-suit, as currently understood.

To date, Textron has also not produced any evidence to establish that the patents-in-suit are entitled to a priority date earlier than the filing dates. Thus, the patentability of the patents-in-suit must be assessed in light of the state of the relevant art as of the patent filing dates. Should evidence of an earlier priority date be produced, Toro reserves the right to modify and supplement this Prior Art Statement.

Dated: _____    By: _____
                                        Richard L. Horwitz (#2246)
                                        David E. Moore (#3983)
                                        POTTER ANDERSON & CORROON LLP
                                        Hercules Plaza
                                        1313 N. Market Street
                                        P.O. Box 951
                                        Wilmington, DE 19801
                                        (302) 984-6027
                                        rhorwitz@potteranderson.com
                                        dmoore@potteranderson.com

                                        AND

                                        Earl D. Reiland
                                        Anthony R. Zeuli
                                        Thomas J. Leach
                                        MERCHANT & GOULD P.C.
                                        3200 IDS Center
                                        80 South 8th Street
                                        Minneapolis, MN 55402
                                        (612) 332-5300

                                        **ATTORNEYS FOR DEFENDANT
                                        THE TORO COMPANY**

K:\CLIENTS\06\06372\149USZA\Pleadings\Prior Art Statement\Toro's Second Prior Art Statement.doc

6

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEXTRON INNOVATIONS INC., ) | |
| ) | C. A. No. 05-486 (GMS) |
| Plaintiff, ) | |
| ) | (Jury Trial Demanded) |
| v. ) | |
| ) | |
| THE TORO COMPANY, ) | |
| ) | |
| Defendant. ) | |

**EXHIBIT B:  INVALIDITY OF ASSERTED CLAIMS OF THE '530 PATENT
UNDER 35 U.S.C. §103**

| CLAIMS | PRIOR ART | |
|---|---|---|
| **CLAIM 1: A gang-type rotary lawn mower comprising** | | |
| | Claim 1 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.  Specifically, each reference of Category A combined with each reference of Category D renders this claim obvious.<br><br>Further, each reference of Category G combined with any reference of Categories C, D or E also renders this claim obvious. | |
| a frame supported by front and rear wheels for movement over the ground, | Categories A and G disclose mowers that include a frame supported by wheels for movement over the ground. | |
| a power source which is mounted on the frame and which drives at least two of the wheels, | Categories A and G disclose mowers that include an engine mounted on the frame for driving the wheels. | |

| | | |
|---|---|---|
| an operator's seat mounted on the frame, | Categories A and G disclose mowers having an operator's seat on the frame. | |
| a steering system enabling the operator to steer the lawn mower, | Categories A and G disclose steering systems. | |
| at least two side-by-side front rotary cutting deck assemblies mounted on the frame in front of the front wheels, the front deck assemblies defining a gap between adjacent front deck assemblies, and | Using the interpretation Textron adopted to accuse Toro's products of infringement, an interpretation that Toro disputes, each reference of Category A art includes two side-by-side front cutting decks mounted on the frame in the configuration required. Category G art discloses reel mowers having the claimed configuration. | Categories C, D and E art teach rotary cutting decks. |
| at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies and between the front and rear wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies, | Using the interpretation Textron adopted to accuse Toro's products of infringement, an interpretation that Toro disputes, each reference of Category A art includes a rotary cutting deck mounted behind the front deck assemblies and aligned with the respective gap. Category G art discloses reel mowers having the claimed configuration. | Categories C, D and E art teach rotary cutting decks. |
| each of the front and rear deck assemblies including a single-spindle cutting deck defining a downwardly opening space, a single spindle mounted for rotation about a generally vertical axis within the space, at least one cutting blade mounted on the spindle for rotation therewith, and a rear roller supporting the | The Lesco 500, the Deere with Nunes 355 decks, and the Deere 3235A of Category A art with Nunes disclose single-spindle cutting decks, as interpreted by Textron, with at least one cutting blade mounted on the spindle. | For those Category A references lacking a full-width rear roller, Category D art provides the teaching of a full width rear roller. For example, the Deere units with Nunes rotary mowers (Category A) combined with the rollers of the Port Agric reference (Category D). |

| | | |
|---|---|---|
| deck for movement over the ground, the deck having a width such that the roller extends across substantially the entire width of the deck. | The Lesco 500 and the Risboro reference include full width rear rollers supporting the decks. | For the Risboro reference, which is lacking single spindle decks, the other Category A references teach single-spindle decks. |
| | The Category G art discloses full width rear rollers supporting a reel mower. | Category E art teaches single-spindle rotary cutting decks. Category C and D art teach single-spindle rotary cutting decks with full width rollers. |
| **CLAIM 2** | | |
| A lawn mower as set forth in claim 1 wherein the front deck assemblies are mounted on the frame in front of the front wheels, and the rear deck assembly is mounted on the frame behind the front wheels and in front of the rear wheels. | Claim 2 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Category A and Category G art disclose mowers having the front decks in front of the front wheels and at least one rear deck between the front and rear wheels. | |
| **CLAIM 3** | | |
| A lawn mower as set forth in claim 1 wherein each deck assembly is connected to the frame by a respective lifting arm operable to lift the associated deck assembly relative to the frame, such that each of the deck assemblies is connected by its own lifting arm to the frame. | Claim 3 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Categories A and G include mowers that have deck assemblies connected to the frame by individual lift arms. | |
| **CLAIM 4** | | |
| A lawn mower as set forth in claim 1 wherein each of the front and rear deck assemblies includes a pair of laterally-spaced, generally | Claim 4 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination. | |

3

| | | |
|---|---|---|
| vertically-extending side plates having forward ends, | The Risboro reference of Category A includes a pair of laterally-spaced, vertically extending side plates, as Textron has used that term. | In addition, the other Category A mowers combined with Categories D and F art discloses the side-plate feature. |
| a first front wheel supporting one of the side plates for movement over the ground, and a second front wheel supporting the other of the side plates for movement over the ground, | The Category A references, except Risboro, include front wheels. | Category A mowers combined with Category D and F art teach side plates. |
| wherein the rear roller extends between the side plates and supports the side plates for movement over the ground, wherein the associated deck is located between the side plates and in front of the roller and is mounted on the side plates such that the height of the deck relative to the ground is adjustable by changing the position of the deck relative to the side plates. | The Risboro reference of Category A includes a rear roller between the side plates | In addition, it would have been obvious to combine the other Category A art with the Category D art, especially the Attack Engineering reference. |
| **CLAIM 5** | | |
| A lawn mower as set forth in claim 1 wherein each deck assembly also includes a hydraulic motor which is mounted on the deck and which is drivingly connected to the spindle. | Claim 5 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Category A mowers teach a hydraulic motor mounted on the decks to drive the spindle.<br><br>In addition, the Jacobsen HR-5111, Howard Price mowers and the Hustler Range Wing all teach a hydraulic motor mounted on the decks. | |

4

# EXHIBIT M

HIGH CONCRETE STRUCTURES, INC., Plaintiff, v. NEW ENTERPRISE STONE & LIME CO., INC. and ROBBINS MOTOR TRANSPORTATION, INC., Defendants.

Civ. No. 02-CV-0086

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2003 U.S. Dist. LEXIS 6605*

March 27, 2003, Decided

**SUBSEQUENT HISTORY:** Amended by, Summary judgment granted, in part, summary judgment denied, in part by, Judgment entered by *High Concrete Structures, Inc. v. New Enter. Stone & Lime Co., 2003 U.S. Dist. LEXIS 7744 (E.D. Pa., Apr. 16, 2003)*

**DISPOSITION:** [*1] Plaintiff's Motions in Limine were denied; Plaintiff's Motion for Summary Judgment was denied; and Motion of Defendants/Counterclaim Plaintiffs, New Enterprise Stone and Lime Co., Inc. and Robbins Motor Transportation, Inc. for Leave to File a Sur-Reply and Motion of Plaintiff for Leave to File Responses to Defendants/Counterclaim Plaintiffs' Sur-Reply Memoranda were denied as moot.

**COUNSEL:** For HIGH CONCRETE STRUCTURES, INC., PLAINTIFF: MANNY D. POKOTILOW, CAESAR, RIVISE, BERNSTTEIN, COHEN & POKOTILOW, LTD., BRUCE J. CHASAN, CAESAR, RIVISE, BERNSTEIN, COHEN & POKOTILOW, [*2] LTD., PHILADELPHIA, PA USA.

For NEW ENTERPRISE STONE & LIME CO., INC., ROBBINS MOTOR TRANSPORTATION, INC., DEFENDANTS: NICOLE D. GALLI, BARBARA L. DELANEY, PEPPER HAMILTON, LLP, ERIK N. VIDELOCK, PEPPER, HAMILTON & SCHEETZ, PHILADELPHIA, PA USA.

**JUDGES:** Franklin S. Van Antwerpen, U.S.D.J.

**OPINION BY:** Franklin S. Van Antwerpen

**OPINION:**

MEMORANDUM AND ORDER

Van Antwerpen, J.

March 27, 2003

In this patent dispute, High Concrete Structures, Inc. ("High Concrete," "Plaintiff") has filed a motion in limine seeking an order limiting Defendants New Enterprise Stone & Lime Co., Inc. ("New Enterprise") and Robbins Motor Transportation, Inc. ("Robbins") (collectively, "Defendants") to offering as prior art, only evidence timely identified in expert reports and during fact discovery. High Concrete has filed a second motion in limine seeking exclusion of expert testimony offered by Defendants. In addition to the evidentiary motions, High Concrete moves for summary judgment, seeking a determination that Defendants have infringed its patent for a tilting "double tee" trailer, *U.S. Patent No. 5,947,665* (the "'665 patent"). We now deny both of High Concrete's evidentiary motions in their entirety. [*3] We also deny its motion for summary judgment. Because this is an action for patent infringement under *35 U.S.C. § 271*, we have original subject matter jurisdiction under *28 U.S.C. § 1338(a)*.

BACKGROUND

Plaintiff High Concrete operates a business involving pre-stressed, pre-formed concrete for use in construction projects. One common form is the "double tee." Used to construct overpasses, parking garages, and floors, among other structures, the double tee takes it names from its cross-section, which consists of a horizontal member with two vertical stems extending downward. Double tees can be as wide as fifteen feet, subjecting them to certain restrictions when they are transported. Often, the travel restrictions include the need for road and bridge permits, escort vehicles, and a limitation to daylight hours. High Concrete was the first company in the pre-formed concrete industry to use tilt frame trailers to transport double tees, in an effort to avoid the travel restrictions. It obtained two patents on these trailers, U.S. Patent Number 5,683,213 (the "'213 patent") and U.S. Patent Number 5,909,989 (the "'989 patent"). Both patents [*4] identify their field of invention with

2003 U.S. Dist. LEXIS 6605, *

the same language: "This invention relates to fixtures for restraining large bulky objects for transport over land, rail, or waterways, and in particular to fixtures that can reduce the effective width of bulky loads so as to minimize travel restrictions." (App. of Exs. to Mem. of Law of Defs.' [in opp. of Pl.'s Mot. for Summ. J.], filed Jan. 17, 2002, Ex. A, col. 1, ll. 5-8; Ex. B, col. 1, ll. 10-13). Significantly, both patents describe rotating tilt frame trailers, alternately referred to as swiveling trailers. The rotating feature allows cargo to be loaded in a horizontal position upon the trailer. Once in place, a double tee may then be moved to an inclined position for transport. Both patents reference U.S. Patent Number 2,903,274 (the "'274 patent"), which pertains to a trailer for transporting ship propellers in a tilted position for the purpose of minimizing the width of the trailer load.

Defendant New Enterprise also operates a preformed concrete business. Prior to 1998, New Enterprise began using a trailer similar to the rotating tilt trailers used by High Concrete. One important distinction was that the New Enterprise trailer always [*5] remained fixed in the tilted position and had no ability to rotate. In November 1998, a representative of New Enterprise met with a representative of High Concrete seeking an agreement that the fixed trailer did not infringe upon the patents for the rotating trailers. New Enterprise asserts that it provided a "detailed verbal description" of the trailer and later forwarded pictures of it. High Concrete responded in December 1998 by letter, indicating that it would consult with legal counsel.

On December 7, 1998, High Concrete filed the '665 application, approximately three weeks after the November meeting. Like the '213 and '989 patents, the '665 patent claims a loading fixture mounted on a tractor-truck trailer. This tilt trailer does not rotate the cargo from a horizontal position to an inclined one; instead, like the New Enterprise device, it is fixed in the inclined position. Nevertheless, the '665 patent announces a nearly identical field of invention as the '213 and '989 patents. Specifically, the fixed tilt trailer assists in the transportation of large concrete forms by tilting the cargo, reducing the effective width of the load on the trailer. As a result, shipping companies [*6] may avoid travel restrictions such as road and bridge permits or escorts, and transporting wider loads only during daylight hours. (App. of Exs. to Mem. of Law of Defs.' [in opp. of Pl.'s Mot. for Summ. J.], filed Jan. 17, 2002, Ex. C, col. 1, ll. 13-16). The '665 patent also references the '274 patent for transportation of propellers in a tilted position.

Approximately one year after the November 1998 meeting between the two parties, a High Concrete representative contacted New Enterprise, advising the company that the '665 patent had issued on September 7, 1999. New Enterprise claims that it did not know about the '665 patent prior to this notice. At a meeting arranged in September 2001, representatives of High Concrete requested that New Enterprise stop using its tilting trailer because in High Concrete's view, the device infringed the subject matter of the '665 patent. Discussions between the parties did not resolve the dispute.

On January 2, 2002, New Enterprise filed a complaint against High Concrete in the United States District Court for the Western District of Pennsylvania seeking a declaratory judgment invalidating the '665 patent. High Concrete responded on January 7, 2002 by [*7] initiating the action now before this court for infringement of the '665 patent. Following the submission of the initial pleadings and after the denial of Defendants' Joint Motion to Dismiss and/or Transfer by order of this court dated February 28, 2002, New Enterprise voluntarily withdrew its complaint filed in the Western District of Pennsylvania. The original discovery schedule for this action was modified by a stipulation approved by this court on May 8, 2002. Under the terms of the stipulation, the parties would complete fact discovery by September 16, 2002; they would submit expert reports by October 1, 2002 and prepare rebuttal reports by November 1, 2002; all expert depositions were to be completed by December 13, 2002; finally, per the terms of the stipulation, the case would be ready for trial on January 1, 2003. Subsequent modifications to this discovery schedule extended the deadline for rebuttal expert reports to November 8, 2002 and changed the trial-ready date to March 1, 2003, and the present motions are now before this court.

For the reasons stated below, both of High Concrete's motions in limine are denied, as is its motion for summary judgment.

DISCUSSION

A. [*8] Motion in Limine Regarding Evidence of Prior Art

High Concrete's first motion in limine seeks to prevent New Enterprise and Robbins from entering into evidence any prior art that was not identified during fact discovery or previously submitted in expert reports. To support this motion, High Concrete asserts that Defendants offered evidence of tilting hydroplane boat trailers after the close of fact discovery and once the deadline to submit expert reports had passed. Consequently, High Concrete maintains that to allow new evidence of prior art at this stage of litigation would be unfairly prejudicial to its case. In addition, High Concrete argues that allowing the defendants to submit all instances of prior art that it wishes would be needlessly cumulative and therefore excludable under Federal Rule of Evidence 403. We address each of these arguments in turn.

First, we consider whether High Concrete's assertion of unfair prejudice has merit. In support of its assertion, High Concrete cites *Rule 37 of the Federal Rules of Civil Procedure* for the proposition that a court must exclude evidence when an opponent fails to disclose it within the discovery deadlines set by the court. See [*9] (Pl.'s Mem. of Law in Supp. of its Mot. in Limine [regarding prior art], filed December 6, 2002, 10-11). This reading of the Federal Rules is plainly wrong. *Rule 37(c)(1)* provides that when without substantial justification a party fails to disclose information as required by *Rule 26*, a party may be precluded from using that evidence at trial. *Fed.R.Civ.P. 37(c)(1)*. *Rule 26*, more specifically, requires that a party shall supplement or correct prior disclosures made in response to an interrogatory or request for production. *Fed.R.Civ.P. 26(e)(2)*. To prevent unfair surprise, a party must make all pretrial disclosures at least thirty days before trial, unless otherwise directed by the court. *Fed.R.Civ.P. 26(a)(3)*. The Federal Rules therefore accord a district court discretion over the discovery process. See *Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 90 (3d Cir. 1987)* ("The conduct of discovery is a matter for the discretion of the district court and its decisions will only be disturbed upon a showing of an abuse of this discretion."); *Borden Co. v. Sylk, 410 F.2d 843, 845 (3d Cir. 1969)* ("It is a well-established principle that the scope and conduct [*10] of discovery are within the sound discretion of the trial court.").

In this case Defendants do not dispute that they submitted evidence of tilting hydroplane boat trailers after the close of fact discovery. But contrary to Plaintiff High Concrete's stated position, see (Pl.'s Rep. Mem. in Supp. of its Mot. in Limine [regarding prior art], filed Jan. 3, 2003, 3-5), these late disclosures were not without substantial justification. Defendants have provided copies of an ongoing e-mail exchange between their expert, Dr. James A. Kirk, and the crew chief of a boat using a tilting trailer, from July 5, 2002 through September 10, 2002. (Mem. of Law of Defs. [in opp. to Pl.'s Mot. in Limine regarding prior art], Decl. of James M. Singer, filed Dec. 20, 2002, Ex. D). That e-mail exchange details Dr. Kirk's repeated requests for photographs and the delays he encountered in obtaining them. Dr. Kirk received the photographs of a "hydroplane tilt frame trailer" on September 16, 2002 and forwarded electronic versions to counsel for Defendants that same day. Id. at 2-3. Once counsel for Defendants had obtained instances of what they believed to be prior hydroplane trailer art, they expeditiously [*11] disclosed those instances to High Concrete. In any event, all of these pretrial disclosures have occurred well within the guidelines established by *Rule 26(a)(3)*. High Concrete received notice of the evidence on October 1, 2002, more than a month before the original trial ready date of January 1, 2003 and several months before the revised date of March 1, 2003. n1

n1 The trial ready date for this case was extended from January 1, 2003 to March 1, 2003, with the agreement of the parties and by order of this court on December 12, 2002.

Because the trial ready date in this matter was set for March 1, 2003 at the earliest, there is also no conflict with *35 U.S.C. § 282*. *Section 282* provides that in patent actions, a party asserting noninfringement shall give the opposing party at least thirty days notice of any evidence of prior art. The provision aims "to prevent unfair and prejudicial surprise by the production of unexpected and unprepared-for prior art references at trial." *ATD Corp. v. Lydall, Inc., 159 F.3d 534, 551 (Fed. Cir. 1998)*. [*12] Read in conjunction with *Federal Rule of Civil Procedure 26*, the provision indicates Congress's intent that courts be permissive in the introduction of relevant evidence. See *Eaton Corp. v. Appliances Valves Corp., 790 F.2d 874, 879 (Fed. Cir. 1986)*. Nothing within *§ 282* requires that we exclude the evidence offered by Defendants.

Our opinion remains unchanged despite High Concrete's contention that "a specific judicial directive for the timing of discovery establishes the procedures to which the parties are bound." (Pl.'s Mem. of Law in Supp. of its Mot. in Limine [regarding prior art], filed Dec. 6, 2002, 12) (quoting *ATD Corp., 159 F.3d at 551*). In *ATD Corp.*, the district court refused to allow the defendant Lydall to present evidence of a prior patent as evidence of the invalidity of the plaintiff's patent. The court made this evidentiary ruling because Lydall did not produce the patent reference during the designated discovery period. *Id. at 550*. Ultimately, the Federal Circuit upheld the district court's evidentiary ruling. The *ATD Corp.* case is irrelevant to the present matter because disclosure with at least thirty [*13] days before a trial date is consistent with guidelines established by *Fed.R.Civ.P. 26* and *35 U.S.C. § 282*. In addition, that case in no way limits the discretion a district court has over the management of the discovery process. The facts of *ATD Corp.* and this case are not comparable either. *ATD Corp.* involved a patent that had been filed and that was available as a matter of public record. In this case we are concerned with actual tilting trailers and delays associated in communicating with the party in possession of the first trailer disclosed. No such delays were cited by the Federal Circuit in its *ATD Corp.* decision.

Similarly, we are not persuaded by High Concrete's citation of a partial transcript of a bench ruling made in the District Court for the Eastern District of Virginia.

2003 U.S. Dist. LEXIS 6605, *

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge, GMBH v. Dana Corp.*, 133 F. Supp. 2d 843 (E.D.Va. Jan. 9, 2001). That ruling, like the ATD Corp. case, concerned the exclusion of a published patent document, and no excuse for the failure to cite it in a timely manner was offered. By contrast, in this case the evidence that Defendants seek to admit is not a publicly [*14] filed patent, and Defendants have given substantial justification for the delay in notifying High Concrete. Specifically, Defendants have provided copies of e-mail communications detailing the delays involved in obtaining photographs of the initial hydroplane tilt trailer.

Second, we consider High Concrete's argument that prior art of hydroplane trailers should be excluded as needlessly cumulative. See *Fed.R.Evid. 403*. The application of "*Rule 403* necessarily requires that the District Court engage in balancing to determine whether the probative value of the evidence is outweighed by the negative factors listed in *Rule 403*." *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1344 (3d Cir. 2002) (concerning factors such as the danger of unfair prejudice, confusion of the issues, potential for misleading the jury, and considerations of undue delay, waste of time, and needless presentation of cumulative evidence). The Circuit Court explained further that, "there is a strong presumption that relevant evidence should be admitted, and thus for exclusion under *Rule 403* to be justified, the probative value of the evidence must be "substantially outweighed" by the problems in [*15] admitting it." *Id. at 1343-44.*

Based upon the arguments advanced to date, we do not find exclusion of the hydroplane trailer evidence warranted. High Concrete has not established that the additional trailers disclosed by Defendants are identical to the trailer described in Kenneth Muscatel's report, disclosed on October 1, 2002. When compared to the potential probative value of the five additional trailers disclosed on November 22, 2002 and the sixteen different boats on trailers disclosed on November 25, 2002, Plaintiff's concern for needless cumulation is outweighed. We therefore will not exclude the additional evidence of hydroplane trailers as needlessly cumulative under *Rule 403*.

B. Motion in Limine Regarding Expert Testimony

In support of excluding the testimony offered by Defendants' expert Richard D. Grauer, Esq., High Concrete asserts that his proposed testimony merely offers legal arguments and conclusions, exceeding the proper scope of opinion testimony, as allowed under *Rule 702 of the Federal Rules of Evidence*. In addition, High Concrete asserts that Mr. Grauer's testimony should be excluded under *Rule 403* because it will prompt High Concrete to [*16] respond with its own expert, Ronald L. Panitch,

Esq., misleading the jury and leading to confusion of the issues.

As a preliminary matter, we note that in the original memorandum in support of this motion in limine, High Concrete requested that we preclude Defendants' expert from presenting any testimony or evidence. Its reply memorandum adopts a more moderate position, undoubtedly in response to Defendants' argument that the motion in limine is "overreaching."(Mem. of Law of Defs. [in opp. to Pl.'s Mot. in Limine regarding expert testimony], filed January 17, 2003, 4). High Concrete now seeks an order precluding testimony from Mr. Grauer *"to the extent that it extends beyond an objective, factual presentation of the practices and procedures before the United States Patent and Trademark Office."* (Pl.'s Reply Mem. of Law in Supp. of its Mot. in Limine [regarding prior art], filed Feb. 10, 2003, 12) (emphasis added). Given this concession by High Concrete, we now only consider whether this court should now preclude Mr. Grauer from offering testimony on subjects other than matters regarding the practices and procedures of the United States Patent and Trademark Office.

*Rule 702* [*17] allows for qualified expert testimony in cases where scientific or technical knowledge will assist the trier of fact in understanding evidence or determining a fact at issue. *Fed.R.Evid. 702*. A trial court has broad discretion as to whether expert testimony will be helpful to the trier of fact; and while an expert witness may not testify as to the governing law because that is the province of the court, the Third Circuit has allowed expert testimony concerning business customs and practices. See *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991).

Defendants suggest that within the patent context, courts in other jurisdictions relax the usual rules prohibiting expert testimony directed to legal opinions or conclusions. n2 See *Beckman Instruments, Inc. v. LKB Produktur AB*, 892 F.2d 1547 (Fed. Cir. 1989). In Beckman Instruments, according to Defendants, the absence of criticism of the district court's decision amounted to tacit approval from the Federal Circuit for allowing testimony regarding legal opinions or conclusions. Defendant's view is certainly open to debate; High Concrete cites equally persuasive authority noting that "an expert's [*18] opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." *Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991).

n2 Regarding ultimate factual issues, as distinguished from legal issues, *Federal Rule of Evidence 704* provides that "testimony in the form of an opinion or inference otherwise admis-

sible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

Given the lack of clear precedent and our desire to avoid precluding potentially probative evidence, we will entertain any objections to the proffered testimony at the time of trial. "The best safeguard against impermissible encroachment of the trial judge's function of instructing the jury on the law is not the blunt exclusionary order [sought] by the instant motion, but narrowly focused, specific objections made at the time of the proffered testimony." *Olin Corp. v. Chase Brass & Copper Co., Civ. No. N-79-153, 1982 U.S. Dist. LEXIS 18347, at *18 (D.Conn. October 4, 1982)* [*19] . Consistent with that view, we do not find that Mr. Grauer should be precluded from testifying based on *Rule 702* at this time.

High Concrete's argument that Mr. Grauer should be precluded from testifying because of *Rule 403* lacks any serious merit. As noted by Defendants, High Concrete offers no support for its assertion that the probative value of any evidence offered by Mr. Grauer is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See *Fed.R.Evid. 403*. Reading High Concrete's memorandum, it in fact appears to suggest that rebuttal testimony by its own expert will be the source of the undesirable confusion:

> High Concrete respectfully submits that, if Mr. Grauer's testimony is allowed, it will then need to present the testimony of Ronald L. Panitch, Esq. to respond to Mr. Grauer's legal opinions and interpretations of patent law. Such evidence, in turn, will confuse the jury, by improperly shifting the jury's focus from deciding the ultimate issues of fact in this case.

(Pl.'s Mot. in Limine to Preclude Defs. from Offering Expert Test or Evidence of Richard D. Grauer, Esq., filed December 12, 2002, 16). [*20] Although we suspect that High Concrete intended the phrase, "such evidence," to refer to the combined effect of expert testimony from both parties, rather than only Mr. Panitch's response, its argument based upon *Rule 403* does not address the substance of Mr. Grauer's proposed testimony. We therefore do not find that precluding Mr. Grauer from testifying, for the reasons cited by High Concrete, is warranted at this time.

Accordingly, we will deny High Concrete's Motion in Limine to preclude the testimony of Mr. Grauer. We nevertheless remind Defendants that High Concrete may object to testimony at trial if it merely offers legal con-

clusions and its probative value is so low as to be outweighed by countervailing factors listed in *Federal Rule of Evidence 403*.

C. Motion for Summary Judgment

In addition to filing its evidentiary motions, High Concrete moves for summary judgment in this patent action for infringement filed pursuant to *35 U.S.C. § 271*.

1. Standard of Review

With respect to the summary judgement motion, the court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with [*21] the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id. at 248, 106 S. Ct. 2505*. All inferences must be drawn, and all doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir.1985)*, cert. denied, *474 U.S. 1010, 106 S. Ct. 537, 88 L. Ed. 2d 467 (1985)*.

On a motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. To [*22] defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id. at 321 n.3, 106 S. Ct. 2548* (quoting *Fed.R.Civ.P. 56(e)*); see *First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987)*. The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. See *Anderson, 477 U.S. at 248-49, 106 S. Ct. 2505*.

2. Whether Defendants' Obviousness Defense Fails as a Matter of Law

High Concrete first argues that the obviousness defense raised by New Enterprise and Robbins fails as a matter of law because photographs of the tilt trailer for a hydroplane boat are not prior art. Because we have denied High Concrete's motion in limine regarding the submission of additional instances of prior art, we also

Case 1:05-cv-00486-GMS     Document 227-2     Filed 03/22/2007     Page 67 of 83

Page 6
2003 U.S. Dist. LEXIS 6605, *

consider the whole of the evidence referred to by Defendants.

*Section 102 of the Patent Act* provides that a "public use" may qualify as prior art. n3 *35 U.S.C. § 102. Section 103* adds the further requirement that the subject matter of a patent [*23] must be non-obvious. *35 U.S.C. § 103.* Although the ultimate question of obviousness is one of law, such determinations are made against a background of several factual inquiries, one of which is the scope and content of the prior art. See *In re Clay, 966 F.2d 656, 658 (Fed. Cir. 1992).* Whether prior art pertains to the subject matter sought to be patented is often framed as an issue of whether the art is sufficiently "analogous." Id. A prior art reference is analogous if it is from the same "field of endeavor," even if it addresses a different problem, or, if not within the same field, if the reference is "reasonably pertinent to the particular problem with which the inventor is involved." *Id. at 658-59.*

n3 *Section 102* reads as follows:

A person shall be entitled to a patent unless—

(a) The invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ...

*35 U.S.C. § 102.*

[*24]

In opposition to High Concrete's Motion for Summary Judgment, Defendants argue that the *'665 patent* is invalid for obviousness, based upon the combined teachings of the hydroplane trailer prior art and the '274 patent. (Mem. of Law of Defs.' [in Opp. of Pl.'s Mot. for Summ. J.], filed Jan. 17, 2002, 39). High Concrete's originally denied that the hydroplane boat trailer photograph qualified as prior art under the definition of *35 U.S.C. § 103(b).* But as Defendants point out, High Concrete failed to consider the "public use" definition of prior art in making its argument, and even went so far as to misquote the statute in the text of its memorandum.

(Mem. of Law in Supp. of Pl.'s Mot. for Summ. J., filed Dec. 12, 2002, 8).

Responding to Defendants' memorandum, High Concrete now adopts the position that the trailer evidence does not fall within the "public use" definition, first, because Defendants'have not met their burden of establishing that the purported prior art was "an embodiment of the claimed invention." *Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 737 (Fed. Cir. 2002)* (citing *Scaltech Inc. v. Retec/Tetra, L.L.C., 178 F.3d 1378, 1383 (Fed. Cir. 1999)).* [*25] To support this contention, High Concrete states that the first hydroplane trailer disclosed in Dr. Kirk's report does not have "corner supports," whereas the *'665 patent* describes such perpendicular supports. We need not consider whether this additional feature would materially distinguish the hydroplane trailer from the trailer described by the *'665 patent,* though it is far from clear that such a modification is material. The additional evidence of hydroplane trailer examples that Defendants may now submit could very well disclose a similar feature; therefore, granting summary judgment for High Concrete based on the record now before us is not appropriate.

Second, High Concrete argues that evidence of the hydroplane trailers is not sufficiently analogous to the subject matter of the *'665 patent* to qualify as prior art. As discussed above, prior art may qualify as sufficiently analogous in one of two ways. The reference must be within the same field of endeavor, regardless of the problem addressed, or the reference must be reasonably pertinent to the particular problem with which the inventor is involved. *In re Clay, 966 F.2d 656, 659 (Fed. Cir. 1992).* To determine [*26] whether a reference is within the same field of endeavor, a court must make a factual comparison of its function and structure to the subject matter of the patent. *In re Deminski, 796 F.2d 436, 442 (Fed. Cir. 1986).*

The *'665 patent* states that its field of invention is "related to fixtures for restraining large bulky objects for transport over land, rail, or waterways, and in particular to fixtures that can reduce the effective width of bulky loads so as to minimize travel restrictions." (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], filed Jan. 3, 2003, Ex. C, col. 1, ll. 13-16). In addition, under the heading "Detailed Description of the Invention," the patent states, "this invention provides improved methods for transporting large bulky items such as I-beams, double tees and prefabricated housing units over water or land." Id. at col. 3, ll. 25-28. Defendants argue that based on the structural similarities and functional overlap between the hydroplane trailer prior art and the *'665 patent's* subject matter, the prior art is sufficiently analogous. Both hydroplane trailers and double tee trailers are loading devices for transporting [*27]

Case 1:05-cv-00486-GMS    Document 227-2    Filed 03/22/2007    Page 68 of 83

Page 7
2003 U.S. Dist. LEXIS 6605, *

large, bulky cargo in a tilted position to reduce the effective width of the load. High Concrete would have us construe the field of endeavor more narrowly as the "transportation and erection of prestressed concrete building structures, especially double tees." (Pl.'s Rep. Brief in Supp. of Its Mot. for Summ. J., filed Feb. 10, 2003, 25). But that construction plainly is narrower than the stated field of invention of the '665 patent. We are satisfied that the trailer disclosed in the '665 patent is similar enough, structurally and functionally, to the hydroplane trailers for them to qualify as analogous prior art.

As an alternative test to determine whether prior art is analogous, courts ask whether the prior art is reasonably pertinent to the particular problem that the new invention addresses. In re Clay, 966 F.2d at 659.

> A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem. Thus, the purposes of both the invention and the prior art are important [*28] in determining whether the reference is reasonably pertinent to the problem the invention attempts to solve. If a reference disclosure has the same purpose as the claimed invention, the reference relates to the same problem, and that fact supports use of that reference in an obviousness rejection.

Id. at 656; see also In re Paulsen, 30 F.3d 1475, 1481 (Fed. Cir. 1994). In the case of In re Paulsen, the Federal Circuit reviewed a rejection of claims related to the widely-used "clam-shell" configuration for laptop computers. The court held that the claims concerning the hinge and latch mechanism of a computer's housing were sufficiently informed by problems encountered in other fields. The court cited analogous hinge and latch devices used in a desktop telephone directory, a piano lid, a kitchen cabinet, a washing machine cabinet, a furniture cabinet, and a storage unit for audio cassettes. Id. In reaching its decision, the court cautioned against adopting too narrow a view as to what constitutes pertinent prior art. Id.

High Concrete relies on the case of In re Oetiker, 977 F.2d 1443 (Fed. Cir. 1992), which offers [*29] somewhat contrary guidance as to which subjects are reasonably pertinent to a given claim. That case concerned whether a hook and eye fastener used for gar-

ments was analogous prior art applicable to a hose clamp incorporating a disengageable clasp. 977 F.2d at 1447. The Federal Circuit reversed the Board of Patent Appeals and Interferences' rejection of Oetiker's hose clamp claim. Id. In doing so, the court recognized that a disengageable clasp is a common mechanical concept used in door latches and electrical switches, but stated that the lack of citation to specific references for those devices rendered the Board's decision erroneous. Id. at 1446-47. Explaining further, the court wrote, "it has not been shown that a person of ordinary skill, seeking to solve a problem of fastening a hose clamp, would reasonably be expected or motivated to look at fasteners for garments." Id. at 1447. The Oetiker decision apparently imposed a heightened standard for a claim of obviousness based upon a combination of references than Paulsen did.

The tension between the Paulsen and Oetiker decisions is apparent, but the cases may be [*30] reconciled. As Defendants have argued in their sur-reply memorandum, the Oetiker court did not specifically determine that the garment fastener in question was non-analogous prior art. (Sur-Reply Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], 10). Instead, the court found that the Commissioner failed to cite any references to door latches, electrical switches, or other common mechanical devices. In addition, the Commissioner did not explain why those references rendered Oetiker's hose clamp obvious. 977 F.2d at 1446-47. By contrast, in Paulsen the court received the required citations and explanations needed to determine that the computer latch mechanism at issue was sufficiently informed by analogous references from several diverse applications. See 30 F.3d at 1481-83. Moreover, a concurring opinion to the Oetiker decision casts doubt upon its discussion of obviousness and analogous prior art. n4

> n4 That concurrence bluntly states that the court's "restrictive understanding of the concept of obviousness is clearly wrong." Oetiker, 977 F.2d at 1448 (Nies, C.J., concurring) (interpreting the majority decision to "mean that an invention cannot be held to have been obvious unless something specific in a prior art reference would lead an inventor to combine the teachings therein with another piece of prior art."). Chief Judge Nies took issue with the majority opinion because he believed it read the language of 35 U.S.C. § 103 too literally.

[*31]

We find that Paulsen provides a better standard for determining whether the hydroplane trailer reference involved here is reasonably pertinent to the particular

problem addressed by the *'665 patent*. The problems confronted by both are similar. The *'665 patent* aims to reduce the effective width of bulky cargo, easing transport by minimizing travel restrictions. (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], filed Jan. 17, 2003, Ex. C, col. 1, ll. 13-16). Likewise, the hydroplane boat trailer seeks to reduce the width of its cargo from up to fourteen feet down to eight and a half feet. (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], filed Jan. 17, 2003, Ex. Q, Expert Rep. of Kenneth Muscatel, 4). Even though the objectives are different and the cargoes are different, the function and structure of the trailers are sufficiently similar for the hydroplane trailer to qualify as prior art. Both hydroplanes and double tees have roughly comparable widths as well. Reducing the width of cargo for transport is a generalized problem that arises for double tees and hydroplane boats alike. Defendants argue that a person of ordinary [*32] skill would consult the mechanical arts for tilting transporting devices to solve this problem. In accordance with *Paulsen*, we follow its broader view of what constitutes valid prior art and agree with Defendants.

High Concrete's argument that the failure of Defendants' experts to discover the hydroplane trailer art more quickly demonstrates that one of ordinary skill in the art would not have considered that prior art lacks merit. A court should resolve issues of obviousness with reference to a hypothetical person having ordinary skill in the art; and that person is "presumed to be aware of all the pertinent prior art." *Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 454 (Fed. Cir. 1985)*. In Standard Oil, the court explained as follows:

> The actual inventor's skill is irrelevant to the inquiry, and this is for a very important reason. The statutory emphasis is on a person of ordinary skill, and one should not go about determining obviousness under *§ 103* by inquiring into what patentees (i.e. inventors) would have known or would likely have done, faced with the revelations of references.

*Id.*

Accordingly, we will not grant summary [*33] judgment for High Concrete on the issue of obviousness. We also emphasize that all motions in the future should include memoranda that fully state the moving party's argument. Using a reply brief to raise new arguments in response to arguments of the opponent's memorandum is an inefficient way to proceed. This is especially true in

the patent context, where the issues are often familiar to counsel on both sides. Here the court had to specifically request a supplemental response from Defendants when Plaintiff's counsel presented a simple argument in its initial memorandum and reserved a more sophisticated argument for its reply. We insist that all parties raise their strongest arguments immediately and use reply briefs, when necessary, judiciously and concisely.

### 3. Enablement

To meet the requirements of *35 U.S.C. § 112*, a patent must describe its subject matter well enough to enable one skilled in the art to make and use the claimed invention. *Atlas Powder Co. v. E.I. DuPont de Nemours & Co., 750 F.2d 1569, 1576 (Fed. Cir. 1984)*. "That some experimentation is necessary does not preclude enablement; the amount of experimentation, however, [*34] must not be unduly extensive." Id. To determine what constitutes an undue amount of experimentation, courts will apply a standard of reasonableness, keeping in mind the nature of the invention and the state of the art. *In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988)*. To aid this determination, courts will consider several factors. These factors include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims. *Wands, 858 F.2d at 737*.

Courts review enablement as a matter of law, see id., but as with other issues involved in patent law, there may often be underlying factual issues. *Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1533 (Fed. Cir. 1987)*. For example, when deciding an issue of enablement, courts will often "require a factual inquiry into the knowledge of persons of ordinary skill in the particular art." *In re Bowen, 492 F.2d 859, 861 (C.C.P.A. 1974)*. [*35] The inquiry depends on the state of knowledge of those skilled in the art as of the claimed priority date of the application, not on the state of knowledge after that date. *In re Wright, 999 F.2d 1557, 1563 (Fed. Cir. 1993)*.

Defendants first argue that because the claims of the *'665 patent* include a fixed tilt trailer and a swivelling tilt trailer, the specifications must enable one skilled in the art to use both. See *Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1374 (Fed. Cir. 1999)* (affirming district court's finding of no enablement with respect to a genetic process where specifications provided adequate instructions for prokaryotes but not eukaryotes). To support their claim of no enablement, Defendants state that the *'665 patent* does not describe how to load and unload a fixed tilted device. They rely upon the opinion of their

2003 U.S. Dist. LEXIS 6605, *

expert, Dr. Kirk, to establish that one skilled in the art of concrete form transportation and manufacturing would have difficulty loading a fixed tilt trailer device. Defendants also reference cracking difficulties experienced by High Concrete when loading double tees onto fixed tilt trailers, which allegedly were [*36] known at the time of the '213 patent application, well before it filed the '665 application.

High Concrete responds that because patents are written to enable those skilled in an art, it is unnecessary to disclose what is already well known in the art. *In re Wands, 858 F.2d 731, 735 (Fed. Cir. 1988)* (citing *Lindemann Maschinenfabrik GMBH v. American Hoist and Derrick Co., 730 F.2d 1452, 1463 (Fed. Cir. 1984)).* Loading a double tee onto a fixed tilt trailer with the appropriate crane would be well known in the industry, according to High Concrete. For support it cites an industry publication, the PCI Design Handbook, Precast and Prestressed Concrete (4th Ed. 1992; 5th Ed. 1999). (Pl.'s Rep. Br. in Supp. of Its Mot. for Summ. J., filed February 10, 2003, Exs. 13 & 14). High Concrete also argues that Defendants' own expert, Dr. Kirk, has acknowledged that both editions of the PCI Design Handbook include material that demonstrates how to lift and rotate precast concrete structures with crane setups typical in the industry. (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], filed Jan. 17, 2003, Ex. J, Dep. of James Kirk, 59-65). [*37]

As Defendants have noted, High Concrete has not thoroughly addressed the factors that courts consider when determining what is a reasonable amount of experimentation. Defendants have at least alleged that High Concrete experienced difficulties with rotating double tees without cracking, which is relevant to the quantity of experimentation necessary and the presence or absence of working examples, two of the factors listed by the *Wands court. 858 F.2d at 737.* High Concrete dismisses the relevance any cracking problems in a footnote. (Pl.'s Rep. Br. in Supp. of Its Mot. for Summ. J., 3 n.1). But the cracking difficulties suggest that at least some degree of experimentation was needed before one skilled in the art could make and use the claimed invention. Defendants also challenge High Concrete's assertion that one skilled in the relevant art would know how to load a double tee onto a fixed tilt trailer with a crane. See *In re Bowen, 492 F.2d 859, 861 (C.C.P.A. 1974)* (recognizing need for preliminary factual inquiry into the knowledge of persons of ordinary skill in the particular art before resolving issue of enablement). High Concrete's citations to [*38] the fourth and fifth editions of the PCI Design Handbook, Precast and Prestressed Concrete do suggest that a person of ordinary skill in the relevant art would know to use a crane to rotate a precast structure. But whether a person of ordinary skill would be able to load

a double tee onto a specialized fixed tilt trailer is a more specific issue. Accordingly, we decline to grant summary judgment for High Concrete on the issue of enablement before resolving underlying factual issues regarding the knowledge of a person of ordinary skill in the art of loading double tees.

### 4. Best Mode Disclosure

As a defense to High Concrete's infringement claim, Defendants argue that the *'665 patent* is invalid because the inventors failed to describe the best mode by which they intended to load cargo onto the tilt trailer. Defendants also maintain that High Concrete violated the best mode disclosure requirement by not specifying the amount by which the inventors preferred to offset the center of gravity of the trailer cargo from the point of rotation. Whether a patent holder has satisfied the best mode requirement is a question of fact, and that question contains two "subsidiary factual inquiries. [*39] " *Bayer AG & Bayer Corp. v. Schein Pharms., Inc., 301 F.3d 1306, 1320 (Fed. Cir. 2002).* First, the factfinder must decide whether the inventor preferred one mode of practicing the invention over others, a subjective inquiry. Id.; *Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1535 (Fed. Cir. 1987)* (explaining that because the language of *35 U.S.C. § 112* focuses on the best mode as "contemplated by the inventor," whether a patent holder has satisfied the best mode requirement is a subjective matter). Second, the factfinder must decide whether the inventor's disclosure is adequate to enable one of ordinary skill in the art to practice the best mode of the invention. *Bayer, 301 F.3d at 1320.* High Concrete does not dispute that the inventors of the *'665 patent* preferred one mode of practicing the invention over others. We therefore focus on the second part of the test.

Because the language of *35 U.S.C. § 112* focuses on the best mode as "contemplated by the inventor," whether a patent holder has satisfied the best mode requirement is a subjective matter. *Spectra-Physics, 827 F.2d at 1535;* [*40] see also *Bayer, 301 F.3d at 1314* ("Because the existence of a best mode of carrying out the invention is by definition known only to the inventor, *section 112* demands actual disclosure regardless of whether, as an abstract matter, practicing that mode would be within the knowledge of one of ordinary skill in the art."). Consequently, to judge the adequacy of a best mode disclosure, a court will consider only evidence of concealment on the part of the patent holder. *Spectra-Physics, 827 F.2d at 1535; DeGeorge v. Bernier, 768 F.2d 1318, 1324 (Fed. Cir. 1985).* The specificity required for a disclosure varies with the knowledge of the inventor at the time of the filing of the application. *Spectra-Physics, 827 F.2d at 1535; United States Dep't of*

*Energy v. Daugherty, 687 F.2d 438, 446 (C.C.P.A. 1982).*

The scope of the best mode disclosure requirement is limited to the invention defined by the particular claims of a given patent. *Bayer, 301 F.3d at 1315.* Relying on this precedent, High Concrete first argues that because the inventors of the '213 and '665 patents did not claim a method of [*41] rotation, their failure to disclose a preferred method of rotation does not violate the best mode disclosure requirement. Claims 19 through 22 of the *'665 patent* relate to "a method for loading a double-tee for transport, comprising the steps of: placing the double-tee on a loading fixture ...." (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], filed Jan. 17, 2003, Ex. C, col. 5, ll. 11-18; col. 6, ll. 1-16). Claim 22 specifically references a method "wherein the step of tilting the double tee includes swivelling the double-tee about a pin of the loading fixture positioned at approximately the center of gravity of the double-tee." Id. at col. 6, ll. 13-16. We fail to see the distinction between claiming a method of rotation and claiming a method of swiveling the double tee cargo.

High Concrete makes a second argument for the absence of any best mode disclosure violation. It states that the specification of the '213 patent specifically teaches the use of a crane to load and unload cargo and that a person of ordinary skill in the art would know how to use a crane to rotate the cargo onto a loading fixture. High Concrete is correct only to the extent [*42] that both patents mention using a crane to load and unload cargo from the horizontal position. As Defendants have noted, the '213 patent only discusses rotating the trailer cargo manually. While we would avoid any reference to "teaching away" from a preferred embodiment to avoid confusion with considerations of obviousness under § 103, one may reasonably argue that mentioning only manual rotation and omitting the use of a crane amounts to some evidence of concealment. See *Spectra-Physics, 827 F.2d at 1535.*

Third, High Concrete argues that no best mode violation occurred because manual rotation is feasible and not dangerous, although less efficient than using a crane. This argument ignores the purpose of best mode disclosure, "to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived." *In re Gay, 50 C.C.P.A. 725, 309 F.2d 769, 772, 1962 Dec. Comm'r Pat. 737 (C.C.P.A. 1962).* In fact, High Concrete concedes the possibility of a best mode disclosure violation, to the extent that it recognizes that manual rotation may be more time-consuming than rotation by crane. [*43]

Defendants offer an additional reason as to why best mode disclosure was insufficient, related to the center of gravity for the trailer cargo and its offset from the point of rotation. The *'665 patent* claims a method of loading cargo "wherein the step of swivelling the loading fixture includes swivelling the loading fixture about an axis near a center of gravity of the cargo." (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], Ex. C, col. 5, ll. 5-7). Notably, Dr. Kirk's expert report regarding best mode disclosure was limited to the method of rotation and the use of a crane in comparison to manual methods. See (App. of Exs. to Mem. of Law of Defs.' [in Opp. to Pl.'s Mot. for Summ. J.], Ex. P, Expert Report of Dr. James A. Kirk, 5-8). For this reason, High Concrete explains that it never addressed Defendants' argument concerning offset. A reading of Dr. Kirk's report shows that he did not assert the existence of a best mode violation based on a failure to pinpoint the cargo's center of gravity. High Concrete therefore argues that Defendants are attempting to expand Dr. Kirk's report with legal arguments contained in their opposition brief.

Contrary [*44] to High Concrete's view however, Defendants do not base their argument regarding offset on a legal interpretation of Dr. Kirk's expert report. Rather, Defendants point to the specific claims of the *'665 patent,* coupled with testimony from the inventors, particularly Kenneth Baur, that emphasized the stabilizing effects caused by an appropriate offset distance. In addition, both of the cases cited by High Concrete in support of precluding the Defendants' argument concern far more severe discovery deficiencies than the matter raised here. See *Cummins v. Lyle Industries, Inc., 93 F.3d 362, 371 (7th Cir. 1996)* (affirming exclusion of testimony not contained in expert report); *Dunkin' Donuts, Inc. v. Patel, 174 F. Supp.2d 202, 211, 213-14 (D.N.J. 2001)* (excluding expert report on basis of Fed.R.Civ.P. 26 and Fed.R.Evid. 702); but see *Discovision Assocs. v. Disc Mfg., Inc., 25 F. Supp.2d 301, 350 n.57 (D.Del. 1998)* (declining to preclude testimony absent from expert report in patent context). We are satisfied that Defendants have managed to raise a genuine issue of material fact regarding the disclosure of offset distance and find that the [*45] issue is not suitable for summary judgment despite High Concrete's arguments to the contrary.

Based on the foregoing, summary judgment for High Concrete is not merited with respect to the best mode disclosure requirement of 35 U.S.C. § 102.

5. Introduction of New Matter

As a defense to High Concrete's claim of patent infringement, Defendants assert that the *'665 patent* contains new matter that invalidates all of the asserted claims of the patent. New matter may not be introduced

into the disclosure of an invention after its original filing date. See *35 U.S.C. § § 112, 132*. Here, the '665 application was filed on December 7, 1998. Its inventors claimed it was a continuation of the '989 application, filed November 7, 1997, and the '213 application, filed April 29, 1996. Based on these dates, the '665 application received an effective filing date of April 29, 1996.

High Concrete argues that the *'665 patent* does not contain new matter because a patent holder is entitled to obtain broader claims in a reissue application in comparison to the claims of the original patent, by omitting unnecessary limitations. See *In re Peters, 723 F.2d 891, 893-94 (Fed. Cir. 1983)* [*46] (allowing reissue application involving non-tapered support tip, where original patent concerned a tapered tip, but the feature was not critical to the claim). Specifically, High Concrete's position is that a fixed tilt trailer does not constitute new matter in the *'665 patent* because its ancestors claimed a method for fixing the rotating tilt frame in place by means of a locking pin. Additionally, it argues that the description of numerous "boots" in the *'665 patent*, which includes the possibility of fixed boots, adds no new matter because the swiveling boots of the '213 patent could be welded or bolted in place.

Defendants respond that a claim in a continuation application must be supported by the original disclosure from which it claims priority. See *Tronzo v. Biomet, Inc., 156 F.3d 1154, 1158 (Fed. Cir. 1998)*; *Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1480 (Fed. Cir. 1998)* (noting that claims can be no broader than the supporting disclosure and consequently, that a narrow disclosure will limit claim breadth). Both the '213 and '989 patents refer to devices that are rotated from a horizontal loading position to a tilted transport position. [*47] But, as Defendants point out, the patents do not suggest a claimed device that can be loaded or unloaded from the tilted position, arguably a very different claim. Likewise with respect to the fixed boots claimed by the *'665 patent*, Defendants assert that nothing in the '213 patent supports the claim of a fixed boot. Indeed, based on the evidence provided, it is not clear that a person having ordinary skill in the art would know that the invention disclosed in the '213 patent could be used in a fixed tilt position and with fixed boots. While performing the physical modifications such as bolting and welding would be quite simple, using such a trailer with fixed features could be a more complicated proposition.

Defendants have therefore provided some evidence that new matter exists in the *'665 patent* and on that basis, we will deny High Concrete's motion for summary judgment on this issue.

6. Inequitable Conduct

Finally, Defendants' contend that the *'665 patent* is invalid because of High Concrete's inequitable conduct. The Federal Circuit has established a two-part inquiry for questions of inequitable conduct. First, the court determines whether a patent holder's conduct meets [*48] a threshold level of materiality; then the court turns to whether the evidence demonstrates a threshold level of intent to deceive the Patent Office. *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc., 225 F.3d 1315, 1318-19 (Fed. Cir. 2000)*. If the court finds the requisite threshold levels satisfied, it then "weighs" the materiality and intent. In practical terms, this means that "the more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Id. at 1319*. Finally, taking all circumstances into account, the court determines whether a patent holder is culpable enough to preclude enforcement of its patent. Id.

The failure to disclose known material prior art may support a finding of inequitable conduct, depending on its severity. See *Gardco Mfg. v. Herst Lighting Co., 820 F.2d 1209, 1211 (Fed. Cir. 1987)* (upholding district court's finding of inequitable conduct when a patent holder failed to disclose several light fixtures in its application). In the present case, Defendants have alleged that High Concrete failed to disclose the existence of New Enterprise's [*49] trailer, one which followed the '213 patent application, but preceded the filing of the '665 application. Defendants concede that the *'665 patent* must contain new matter for the New Enterprise trailer to be prior art. Given that qualification, Defendants also assert that the '665 application was filed shortly after High Concrete learned of the existence of the New Enterprise trailer. Defendants have therefore raised the issue of whether High Concrete has withheld material information from the Patent Office. Based upon the timing of the application, there is at least some evidence of intent. We therefore decline to grant summary judgment to High Concrete on the issue of inequitable conduct.

CONCLUSION

For the reasons discussed above, we deny both of High Concrete's motions in limine in their entirety. We also deny High Concrete's motion for summary judgment.

**ORDER**

AND NOW this 27th day of March 2003, upon consideration of Plaintiff High Concrete Structures, Inc.'s Motion in Limine to Limit Defendants to Offering as Prior Art the Evidence Identified in Their Expert Reports and During Fact Discovery, filed December 6, 2002 [18-1], Defendants New Enterprise Stone & [*50] Lime Co., Inc. and Robbins Motor Transportation, Inc.'s memorandum of law in opposition to Plaintiff's motion

2003 U.S. Dist. LEXIS 6605, *

in limine, filed December 20, 2002 [25-1], and Plaintiff's reply thereto and supplemental letter, filed January 3, 2003 [29-1] and submitted January 6, 2003, respectively; Plaintiff High Concrete Structures, Inc.'s Motion in Limine to Preclude Defendants from Offering Expert Testimony or Evidence of Richard D. Grauer, Esq., filed December 12, 2002 [21-1], Defendants New Enterprise Stone & Lime Co., Inc. and Robbins Motor Transportation, Inc.'s memorandum of law in opposition to Plaintiff's motion in limine, filed January 17, 2003 [31-1], and Plaintiff's reply thereto, filed February 10, 2003 [37-1]; Plaintiff High Concrete Structures, Inc.'s Motion for Summary Judgment on Defendants' Patent Invalidity and Unenforceablility Contentions, filed December 12, 2002 [22-1], Defendants New Enterprise Stone & Lime Co., Inc. and Robbins Motor Transportation, Inc.'s memorandum of law in opposition to Plaintiff's summary judgment motion, filed January 17, 2003 [30-1], and Plaintiff's reply thereto, filed February 10, 2003 [36-1], and Defendants' sur-reply memorandum thereto, [*51] consistent with the foregoing memorandum, it is hereby **ORDERED** as follows:

1. Plaintiff High Concrete Structures, Inc.'s Motion in Limine to Limit Defendants to Offering as Prior Art the Evidence Identified in Their Expert Reports and During Fact Discovery, filed December 6, 2002 [18-1], is **DENIED**;

2. Plaintiff High Concrete Structures, Inc.'s Motion in Limine to Preclude Defendants from Offering Expert Testimony or Evidence of Richard D. Grauer, Esq., filed December 12, 2002 [21-1], is **DENIED**;

3. Plaintiff High Concrete Structures, Inc.'s Motion for Summary Judgment on Defendants' Patent Invalidity and Unenforceablility Contentions, filed December 12, 2002 [22-1], is **DENIED**; and

4. Motion of Defendants/Counterclaim Plaintiffs, New Enterprise Stone and Lime Co., Inc. and Robbins Motor Transportation, Inc. for Leave to File a Sur-Reply Memorandum of Law [regarding enablement], filed February 21, 2003 [41-1], and Motion of Plaintiff High Concrete, Inc. for Leave to File Responses to Defendants/Counterclaim Plaintiffs' Sur-Reply Memoranda, filed February 26, 2003 [44-1], are **DENIED as MOOT**.

BY THE COURT:

Franklin S. [*52] Van Antwerpen, U.S.D.J.

# EXHIBIT N

**Microsoft Corporation, a Washington Corporation, Plaintiff, vs. Multi-Tech Systems, Inc., a Minnesota corporation, Defendant.**

**Civ. No. 00-1412 (ADM/RLE)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2001 U.S. Dist. LEXIS 23155*

**December 14, 2001, Decided**
**December 14, 2001, Filed**

**SUBSEQUENT HISTORY:** Adopted, objection denied, motion denied, *Microsoft Corp. v. Multi-Tech Sys., 2002 U.S. Dist. LEXIS 3291* (D. Minn. Feb. 26, 2002)

**DISPOSITION:** [*1] Plaintiff's Motion to File an Amended Answer GRANTED. Plaintiff's Motion to Supplement Its Prior Art Statement GRANTED. Plaintiff's Motion to Compel Discovery DENIED. Plaintiff's Motion to Take Additional Depositions GRANTED. Defendant's Motion to Compel Discovery GRANTED, in part.

**COUNSEL:** For MICROSOFT CORPORATION, plaintiff: Douglas Bruce Greenswag, David R Crosby, Leonard Street and Deinard, Mpls, MN.

For MICROSOFT CORPORATION, plaintiff: David T Pritikin, Richard A Cederoth, Douglas I Lewis, Sidley Austin Brown & Wood, Chicago, IL.

For MICROSOFT CORPORATION, plaintiff: T Andrew Culbert, Not Admitted.

For MULTI-TECH SYSTEMS, INC, defendant: Kevin D Conneely, Ronald J Schutz, Kenneth Richard Hall, Darren Brayer Schwiebert, Misti Nelc, Joseph A Mandernach, Robins Kaplan Miller & Ciresi, Mpls, MN.

For MULTI-TECH SYSTEMS, INC, counter-claimant: Kevin D Conneely, Ronald J Schutz, Darren Brayer Schwiebert, Misti Nelc, Robins Kaplan Miller & Ciresi, Mpls, MN.

For MICROSOFT CORPORATION, counter-defendant: Douglas Bruce Greenswag, David R Crosby, Leonard Street and Deinard, Mpls, [*2] MN.

For MICROSOFT CORPORATION, counter-defendant: David T Pritikin, Richard A Cederoth, Douglas I Lewis, Sidley Austin Brown & Wood, Chicago, IL.

For MICROSOFT CORPORATION, counter-defendant: T Andrew Culbert, Not Admitted.

**JUDGES:** Raymond L. Erickson, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** Raymond L. Erickson

**OPINION:**

ORDER

At Duluth, in the District of Minnesota, this 14th day of December, 2001.

I. Introduction

On November 15, 2001, the Court heard argument on the Defendant's Motion to Compel Discovery, as well as the Plaintiff's Motions to File an Amended Answer, to Supplement Its Prior Art Statement, to Compel Discovery, and to Take Additional Depositions. At the time of the Hearing, the Plaintiff Microsoft Corporation ("Microsoft") appeared by David T. Pritikin, Douglas I. Lewis, and David R. Crosby, Esqs.; and the Defendant Multi-Tech Systems, Inc. ("Multi-Tech") appeared by Kevin D. Conneely, Esq. For reasons expressed at the Hearing, and briefly reiterated below, we grant, in part, Multi-Tech's Motion to Compel Discovery. We further grant Microsoft's Motion to File an Amended Answer, to Supplement its Prior Art Statement, and to Take Additional Depositions. We deny, [*3] however, Microsoft's Motion to Compel.

II. Discussion

We will briefly address each of the Motions as they were presented at the Hearing.

2001 U.S. Dist. LEXIS 23155, *

A. Microsoft's Motion to Supplement its Prior Art Statement.

Microsoft seeks leave to supplement its Prior Art Statement with the Micom Marathon 5K prior art reference ("Marathon 5K"). This reference was previously the subject of a similar Motion by Dialpad.com ("Dialpad"), which is a defendant in a companion case, in August of 2001, in which we allowed Dialpad to add the particular reference to its prior art statement. See, *Multi-Tech Systems, Inc. v. Dialpad.com, Inc., 2001 U.S. Dist. LEXIS 23575,* Civ. No. 00-1540, Order (D. Minn. August 28, 2001)[Docket No. 48]. As Multi-Tech points out, however, Microsoft's proposed reference adds considerably more information concerning the Marathon 5K than Dialpad had previously sought to add. n1

> n1 In particular, Dialpad's proposed reference was only a couple written materials describing the Marathon 5K, while Microsoft seeks to add a reference which comprises nearly 180 pages, including deposition testimony, written descriptions, and other documents.

[*4]

In accordance with our Pretrial Scheduling Order, Microsoft served its Prior Art Statement on March 19, 2001. Thus, in order to supplement its Prior Art Statement, Microsoft was required to make the following showing:

> Plaintiff can add prior art to its original Statement only by leave of court, upon a showing:
>
> a. that it was not and could not reasonably have been located earlier by plaintiff; and
>
> b. that it is not merely cumulative of prior art already listed, and
>
> c. how plaintiff will be prejudiced if leave is denied, and defendant will not be prejudiced if leave is given.

Microsoft Corp. v. Multi-Tech Systems, Inc., Civ. No. 00-1412, Pretrial Scheduling Order (D. Minn. October 19, 2000) [Docket No. 23].

According to Microsoft, in July of 2001, Multi-Tech provided it, for the first time, with "extensive" documentation and articles relating to the Marathon 5K, even though Microsoft had served Multi-Tech, in September

of 2000, with a request for "all documents, information and things comprising, referring, or relating to prior art." Prior to July of 2001, Multi-Tech had only provided a single document making any mention to the Marathon 5K. [*5]

After Microsoft reviewed the new documentation, which comprised over 1000 pages relating to the Marathon 5K, it deemed the Marathon 5K potentially significant prior art, as the product had been on sale, and in the public use, for more than one year before Multi-Tech's pertinent patent applications were filed. Thus, Microsoft sought more information on the product, including the deposition of two individuals who worked for Micom, and who were familiar with the Marathon 5K. Those depositions were taken in mid-August of 2001. Further, during the beginning of September of 2001, Multi-Tech belatedly acknowledged, in discovery, that it still owned two Marathon 5K units, both of which were purchased in April of 1992, prior to Multi-Tech's first application for the patents-in-suit. According to Microsoft, since it did not possess such information prior to the deadline for filing its Prior Art Statement, it could not have included the prior art in its previous reference.

Multi-Tech advances two arguments opposing Microsoft's attempt to supplement its Prior Art statement. First, it contends that, unlike Dialpad, Microsoft did indeed know about the Marathon 5K prior to Multi-Tech's production [*6] of the additional information in July and September of 2001, and that Microsoft simply deemed the reference to not be relevant prior art. Second, Multi-Tech contends that it would be prejudiced by the proposed supplemental reference.

Multi-Tech's first argument is that Microsoft initiated a presuit investigation, through which it located and examined various references to the Marathon 5K. In particular, Multi-Tech points out that prior to the lawsuit, Microsoft hired a firm to prepare an opinion regarding the scope and validity of Multi-Tech's patents, at which time the firm located articles regarding the Micom Corporation. Those articles specifically mentioned the Marathon 5K. Thereafter, there may have been further discussions regarding the Micom Corporation, or the Marathon 5K, although the precise nature of any such discussions are not known. Multi-Tech also contends that Microsoft could have uncovered the Marathon 5K reference sooner, as Multi-Tech's patents-in-suit list a patent which was assigned to the Micom Corporation, and essentially described the Marathon 5K. n2

> n2 In particular, a Micom employee stated as follows:

Q. Mr. Guy, does the patent in Guy Exhibit 3 describe a -- at some level of detail, a real Micom product?

* * *

A. Well, yes. We were doing fax demod/remod in the -- in the product, and we were doing it in a way that would work with -- with our voice card and our state mux, our Marathon. So patents are written in a way that make it hard to understand what you're doing. You have to sit down with a magnifying glass and read it. Yeah, I remember this.

Q. Okay. Is the system described in Guy Exhibit 3 what later came out and was called the Marathon 5K?

A. This is a piece of it.

Q. A piece of the Marathon 5K?

A. The patent was -- yeah, the practical implication of this was the Marathon 5K.

Deposition of Kenneth Ralph Guy, at 62-63, Exhibit 4 attached to Declaration of Kevin D. Conneely.

[*7]

In contrast, Microsoft points out that, while there was an almost one and one-half hour Dialog search regarding the Micom Corporation, on March 31, 2000, there was not a specific search on the Marathon 5K, and the one abstract specifically mentioning the Marathon 5K was dated November of 1993, while the patents-in-suit were filed on January 8, 1993. Thus, as the abstract postdated the filing of the patents, Microsoft contends that there was no reason it should have known that this was prior art. Consequently, Microsoft contends that it did not, and could not have fully learned of the Marathon 5K prior to Multi-Tech's belated disclosure. We agree.

Although Microsoft may have had some superficial knowledge of the Marathon 5K prior to the deadline for serving its Prior Art Statement, we believe it had no reason to know that the Marathon 5K was relevant prior art, or even prior art, as the abstract Multi-Tech points to post-dated the filing of the patents-in-suit. As for Multi-

Tech's remaining arguments, regarding prejudice arising from the proposed supplementation, we note that we previously rejected the same arguments in regard to the Dialpad's Motion, and we conclude that the same [*8] contentions should be rejected here. Briefly, Multi-Tech contends that it will be prejudiced by the addition of this reference, although it does not specify how.

Rather, it simply notes that the proposed reference includes a lot more information than Dialpad had referenced. We will not limit Microsoft's prior art reference to that made by Dialpad, however, not only because some of the information advanced by Microsoft was not even known by Dialpad, but also because we can perceive no prejudice in providing Multi-Tech more than the cursory information supplied by Dialpad. Further, it appears that the exclusion of this reference could well prejudice Microsoft if the Marathon 5K, and Multi-Tech's patents, are as close as Microsoft contends, since such a reference would clearly provide insight regarding the validity of Multi-Tech's patents. See, In re GPAC, Inc., 57 F.3d 1573, 1579 (Fed. Cir. 1995).

Finally, we acknowledge Multi-Tech's concern that, even though the discovery deadline in this case has passed, it will need to conduct additional discovery regarding the Marathon 5K. Specifically, Multi-Tech believes that it will need to conduct the depositions of the Micom [*9] employees, who were previously deposed by Microsoft, as it did not have the opportunity to conduct the depositions with Microsoft's prior art reference in its possession. We agree that limited, focused discovery is necessary on this supplemental reference and, therefore, we will allow Multi-Tech to conduct such deposition discovery. We caution the parties, however, that they should not attempt to engage in a whole new wave of discovery, but should limit their questioning to this specific reference. Therefore, we grant Microsoft's Motion to Supplement its Prior Art Statement.

B. Microsoft's Motion to File an Amended Answer.

Microsoft's Motion to file an Amended Answer is largely based on the same factual circumstances as outlined in its Motion to supplement its Prior Art Statement. Microsoft seeks to add an affirmative defense of inequitable conduct based on the intentional concealment, by Multi-Tech, of two pieces of material prior art, including United States Patent No. 5,463,616 ("616 Patent"), and the Marathon 5K. In regard to the Marathon 5K, Microsoft argues that Dr. Raghu Sharma ("Sharma"), Multi-Tech's president and one of the inventors in this case, knew of the Marathon [*10] 5K while the patents-in-suit were pending, and that three of the other inventors also knew of Micom, and the Marathon 5K, while the patents-in-suit were pending. Moreover, Microsoft contends that, during the prosecution of the patents-in-suit, Multi-

Tech's Marathon 5K-related documentation was available to the inventors, and was stored on the same floor as four of the inventors' offices. Finally, Microsoft also points out that Multi-Tech purchased two of the Marathon 5Ks in April of 1992, prior to its filing of the patents-in-suit, and that Sharma testified that he would have had to approve the requisition requests on those products. Therefore, based on the above information, Microsoft argues that, in spite of Multi-Tech's clear knowledge of the Marathon 5K, neither the company, the inventors, or the company's attorney, disclosed this material prior art to the United States Patent and Trademark Office ("PTO"), as required.

Further, Microsoft notes that Multi-Tech cited United States Patent No. 5,187,591 ( 591 Patent"), which is owned by Micom, and translates into the Marathon 5K, in its patent applications, but distinguished the patent by stating that the 591 Patent's disclosure lacked [*11] one of the features Multi-Tech was claiming in its patent application -- namely, compression. Microsoft argues further, that Multi-Tech had the two Marathon 5Ks, and the accompanying documentation in its possession, and that the Marathon 5K did in fact have the compression feature. Thus, Microsoft asserts that Multi-Tech unlawfully attempted to distinguish its patent applications, even though it knew that the purportedly distinguishing feature was available on the applicable patent.

Finally, Microsoft claims that Multi-Tech knew about, and failed to disclose, the 616 Patent -- a patent which disclosed a voice/data system containing each of the elements of the 649 Patent's claims, in connection with the patent prosecution of the 649 patent-in-suit. In particular, Microsoft contends that Sharma, and Multi-Tech's patent attorney, knew about the 616 Patent, and that Multi-Tech did cite the 616 Patent in regard to some of its narrower patent applications pending at the same time at the 649 Patent but, nevertheless, failed to advise the PTO about the 616 Patent in its 649 Patent application. Microsoft further points out that it learned, in October of 2001, that Multi-Tech purchased the [*12] 616 Patent in late 1996, allegedly without an acknowledged business purpose, which, Microsoft contends, evidences Multi-Tech's intent to ensure that the owners of the 616 Patent did not bring the patent's existence to the attention of the PTO. Based on the above allegations, Microsoft seeks to assert the affirmative defense of inequitable conduct before the PTO.

Although the deadline to amend the pleading was set by our Pretrial Scheduling Order for April 30, 2001, and Microsoft does not specifically assert that there is "good cause" to amend the Pretrial Order in order to allow the belated amendment, it is clear that there is good cause based on Multi-Tech's late production of information, including the information that Multi-Tech still owns two

Marathon 5Ks, which it purchased prior to the prosecution of the patents-in-suit, and that Multi-Tech purchased the 616 Patent in late 1996. Therefore, the only question that remains is whether the proposed amendment is futile. See, Helleloid v. Independent School Dist. No. 361, 149 F. Supp. 2d 863, 877 n. 7 (D. Minn. 2001) ("Although we begin with a presumption of liberality, the right to amend is not absolute * * *, as an [*13] amendment to a pleading can be successfully challenged on the grounds of futility if the claims created by the amendment would not withstand a Motion to Dismiss for the failure to state a claim upon which relief can be granted."), citing Becker v. Univ. of Nebraska at Omaha, 191 F.3d 904, 908 (8th Cir. 1999).

A patent applicant commits inequitable conduct when, with the intent to deceive, it conceals information from the PTO that the patent examiner would have found important in deciding whether to allow the claims being prosecuted. See, Li Second Family Ltd. Partnership v. Toshiba Corp., 231 F.3d 1373, 1379 (Fed. Cir. 2000). Thus, to sustain an inequitable conduct defense, Microsoft must show two things: the materiality of the conduct to patentability, and the patentee's specific intent to deceive the PTO. See, Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 719 (Fed. Cir. 1998). Courts should be wary of inequitable conduct claims, however, lest they be plead in any patent case. See, Molins PLC v. Textron, Inc., 48 F.3d 1172, 1182 (Fed. Cir. 1995)("Unjustified accusations [of inequitable conduct] may deprive patentees [*14] of their earned property rights and impugn fellow processionals."); Burlington Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. Cir. 1988) ("The habit of charging inequitable conduct in almost every major patent case has become an absolute plague."). In the absence of direct proof, the requisite intent can be proved by circumstantial evidence, Molins PLC v. Textron, Inc., supra 48 F.3d at 1180-81, although "intent to deceive can not be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent," Hebert v. Lisle, 99 F.3d 1109, 1116 (Fed. Cir. 1996).

While Multi-Tech does cite to deposition testimony of the inventors which shows that they may not have had clear knowledge of the patents, or the prior art at issue, or that the prior art was not cumulative, since the Motion to Amend is reviewed under a Motion to Dismiss standard, we cannot consider such evidence. n3 Rather, taking Microsoft's facts as true, we conclude that the allegations of inequitable conduct should proceed. In relevant part, the Marathon 5K is allegedly prior art, and Microsoft claims that it is [*15] highly material "because it embodies all the elements of Multi-Tech's asserted claims." Moreover, Multi-Tech had the actual Marathon 5K on the same floor of its office as the inventors of the

2001 U.S. Dist. LEXIS 23155, *

patents-in-suit, as well as the documentation for the Marathon 5K. Further, some of the inventors admitted that they knew about the Marathon product prior to, or during the prosecution of, the patents-in-suit. Microsoft also underscores that, for Multi-Tech to have purchased the Marathon 5K units, Sharma would have had to have signed off on any requisitions. Nonetheless, even though Multi-Tech may have known about the Marathon 5K, Multi-Tech failed to disclose it to the PTO. Accordingly, looking at the facts as espoused by Microsoft, we find there is a sufficient allegation of inequitable conduct concerning the Marathon 5K.

> n3 In considering a Motion to Dismiss under *Rule 12(b)(6), Federal Rules of Civil Procedure*, we accept as true, in a hypothetical sense, all of the factual allegations of the claim, and we view those allegations in a light most favorable to the nonmoving party. See, *Anderson v. Franklin County, Mo., 192 F.3d 1125, 1131 (8th Cir. 1999); Riley v. St. Louis County of Missouri, 153 F.3d 627, 630 (8th Cir. 1998); Springdale Educ. Ass'n v. Springdale School Dist., 133 F.3d 649, 651 (8th Cir. 1998).*

[*16]

The same is true for the 616 Patent. Although Multi-Tech has found case authority which summarily concludes that the failure to disclose prior art in one application does not rise to inequitable conduct when the prior art was disclosed in another patent application that was pending before the same patent examiner at the very same time, see, *FMC Corp. v Hennessy Indus., Inc., 836 F.2d 521, 526 (Fed. Cir. 1987)*, there is contrary authority, from the same Court, which states that "burying a particularly material reference in a prior art statement containing a multiplicity of other references can be probative of bad faith," *Molins PLC v. Textron, Inc., supra at 1184*. Thus, we cannot conclude that, as a matter of law, the circumstances, as plead by Microsoft, cannot lead to a finding of inequitable conduct. Microsoft may well be able to argue that Multi-Tech attempted to hide the reference, first by not citing it in the broader 649 Patent, while citing it for the more narrow patent applications, and then by buying the patent, in an attempt to prevent the patent owners from contacting the PTO. Thus, we conclude that Microsoft can likewise go forward with [*17] the inequitable conduct claim regarding the 616 Patent. Therefore, we grant Microsoft's Motion to Amend, in its entirety.

C. Microsoft's Motion To Compel Discovery.

By this Motion, Microsoft seeks to compel Multi-Tech to produce its files regarding its prosecution of

pending or abandoned patent applications, as they relate to the patents-in-suit. Microsoft previously requested, on September 22, 2000, "the prosecution histories of all continuations, divisions, continuations-in-part, reissues, reexaminations, foreign applications, or applications that otherwise resulted from, or claimed any benefit of priority based on the Multi-Tech Patents, where issued or pending," as well as "all pending, issued or abandoned patent applications, both United States and foreign." Multi-Tech initially objected to the first request based on privilege, and upon the burdensomeness of the request, although it agreed to provide all non-privileged copies of the prosecution history of the patents-in-suit, as well as any other responsive, non-privileged documents. Multi-Tech answered the second request, and listed its pending, abandoned, and issued patent applications, including seven pending and abandoned [*18] United States applications, and ten pending and abandoned foreign applications. Multi-Tech did not produce the files on those patents, however. Moreover, in a recent communication, Multi-Tech now asserts that the application files are not relevant.

We have previously dealt with the issue of pending and abandoned applications in *Cordis Corp v. Scimed Life Sys., 982 F. Supp. 1358 (D. Minn. 1997)*, and will not fully reiterate the contours of the law here, as we find that the standard we previously detailed still controls our analysis. None of the case law that Multi-Tech cites represents a "sea change" regarding the propriety of ordering the disclosure of pending patent applications. Rather, we conclude that we are still obligated to apply a balancing test, which has been summarized as follows:

> The question of whether disclosure should be ordered requires a balancing of competing policy and litigation interests. Disclosure of file wrappers of pending and abandoned applications should be ordered when the necessity for disclosure outweighs the desirability of maintaining the secrecy of data in the file wrapper, especially if protective measures can be fashioned [*19] to minimize the intrusion or to prevent excessive dissemination of the revealed material. Conversely, if the need to examine the file wrapper is less than the interest served in protecting secrecy, or if confidentiality could not be effectively protected by other means, disclosure should not be ordered.

*Id., at 1361,* citing *Ideal Toy Corp. v. Tyco Indus., Inc., 478 F. Supp. 1191, 1193 (D. Del. 1978).*

"Direct relevancy weighs on disclosure's side, whereas direct competition in the relevant marketplace by the parties weighs on secrecy's side." *Central Sprinkler Co. v. Grinnell Corp., 897 F. Supp. 225, 227 (E.D. Pa. 1995).*

Multi-Tech argues first that Microsoft has not shown how the applications are relevant to this case, and it also urges that the information may not be protected if disclosed to Microsoft. As we agree with Multi-Tech's first contention, we need not reach the second. As Multi-Tech argues, Microsoft has not made a particular showing of relevance. Rather, Microsoft has simply alleged that the statements made in pending or abandoned applications, which are related to the patents-in-suit, may be important to claim [*20] construction, and may also be relevant under the doctrine of equivalents. Microsoft further contends that the parties are not direct competitors. In contrast, Multi-Tech asserts that the parties do directly compete for intellectual property rights in the same technological areas.

We agree with Multi-Tech. First, the parties most certainly compete in some sense, as it appears that their patents overlap on a number of fronts. Moreover, unlike the situation in Cordis, Microsoft has not cited instances in which Multi-Tech's previous patent applications have contained significant admissions. *982 F. Supp. at 1362.* Thus, in that case, although the parties were direct competitors, there was more than a mere bald proclamation of relevance. In contrast here, Microsoft has pointed to nothing other than the potential for relevance. While we understand that it is difficult for Microsoft to specifically identify how the applications are relevant, it has not even attempted to make a showing of something other than the potential that all "related" patent applications may be relevant because they may contain admissions. Nonetheless, they cite no authority for such a proposition, and we have been unable [*21] to find any. Moreover, were we to allow such discovery, on such a meager showing, then the balancing test would be unavailing, as pending and abandoned applications for related patents would always be relevant for, as a theoretical proposition, they could always contain admissions. Accordingly, we deny Microsoft's Motion to Compel this discovery.

D. Microsoft's Motion for Leave to Take Additional Depositions.

In this Motion, Microsoft seeks leave to take the depositions of Darrel Dehmer ("Dehmer"), and Daniel Kluth ("Kluth"), even though discovery has closed. The close of fact discovery occurred on August 31, 2001, although the parties had previously agreed, by a stipulation signed by the Court, to allow depositions to be taken up to October 31, 2001, if they were noticed before Au-

gust 31, 2001. Even though these two depositions were not noticed prior to August 31, 2001, Microsoft asks to be allowed to note them as the factual bases, which lead it to conclude that these depositions were necessary, were not discovered, through no fault of their own, until after August 31, 2001.

With regard to Dehmer, Microsoft claims that his testimony is necessary to remedy Multi-Tech's inadequate [*22] response to Microsoft's Rule 30(b)(6) deposition notice, which asked about Multi-Tech's knowledge, between 1989 and 1998, concerning Micom Communications Corporation and its products. Moreover, Microsoft contends that it did not know of Dehmer until after August 31, 2001.

As for the Micom topic, Multi-Tech produced Hari Arimilli ("Arimilli") for a deposition which took place on September 11, 2001. According to Microsoft, Arimilli's knowledge on the topic was limited, and he was unable to identify most of the Micom-related documents produced by Multi-Tech, and was unable to answer questions about where Multi-Tech obtained the documents. While Arimilli stated that he did not know what Multi-Tech had done with the two Marathon 5K units it owned, he identified Dehmer as someone who had worked with the units. Arimilli did not know what type of work or testing Dehmer had performed on the units, though.

We will allow the late deposition of Dehmer, as Dehmer appears to have additional knowledge regarding the Marathon 5K units that Multi-Tech owned, which goes to its assertion of inequitable conduct, as Microsoft did not have that knowledge until after the close of fact discovery. We note, [*23] however, that this deposition should not consume much time, as Microsoft only needs to question Dehmer about the testing he did on the Marathon 5K, and what he said about the Marathon 5K to the other inventors. To that extent, we grant Microsoft' Motion to depose Dehmer.

As for Kluth, he is a patent attorney who prosecuted the patents-in-suit. Microsoft claims that the Rule 30(b)(6) deposition of Multi-Tech's witness, Sharma, took place on October 2, 2001, and was about Multi-Tech's patent licensing policies or licenses in which Multi-Tech has participated. At that time, Sharma first produced a copy of a 1996 assignment of the 616 Patent to Multi-Tech. Sharma could not provide any substantive knowledge regarding that Patent, however, and had not even read the Patent. He further testified that he could not remember any business reason for Multi-Tech's decision to purchase that Patent. Sharma stated that Kluth was the individual who brought the 616 patent to his attention.

As Multi-Tech's reason for purchasing that Patent goes to Microsoft's assertion of inequitable conduct, Mi-

crosoft claims it should be able to depose Kluth, especially since the purchase of the 616 Patent was not [*24] made known to Multi-Tech until early October of 2001. In particular, Microsoft seeks the information provided to, and from Kluth, in his negotiations with the prior 616 Patent holders. At the Hearing, Multi-Tech agreed to allow the deposition of Kluth to go forward, due to the limited nature of the questioning that Microsoft has identified. Therefore, we grant Microsoft's Motion to take Kluth's deposition but, as with Dehmer, we caution that we grant no leave to conduct a new wave of discovery in this deposition. Rather, the deposition should focus on the limited areas we have identified. Thus, we grant Microsoft's Motion to Take Additional Depositions in its entirety.

E. Multi-Tech's Motion to Compel Documents.

Multi-Tech seeks to compel Microsoft to produce the following documents: the software source code underlying the operation of the accused products; a screen call memo written by Microsoft founder Bill Gates; n4 marketing, consumer usage reports, and budgetary information for NetMeeting, and the other accused products; documents relating to Microsoft's voice.net code; NetMeeting documents not produced by Microsoft; and documents relating to Multi-Tech's claims for reasonable [*25] royalty damages. We will briefly discuss each of the issues as they were raised at the Hearing.

n4 Microsoft has agreed to produce the screen call memo written by Bill Gates. As such, we deny that portion of Multi-Tech's Motion, as moot.

1. Source Code.

Multi-Tech seeks the source code reflecting the operation of the accused products, n5 as it asserts that the code is the "best, objective indication[] of how the accused products actually operate." Moreover, the source code is a "critical piece of information to Multi-Tech's experts." For its part, Microsoft does not appear to contend that the source code is irrelevant but, rather, it argues that it has already produced a "plethora of documents to show how the accused products operate," and that the source code, which is highly confidential, is not necessary to Multi-Tech. We agree that the source code is relevant, and is therefore discoverable, although subject to the parties' confidentiality agreement. Nonetheless, Multi-Tech is not entitled to the whole [*26] universe of source code for the products at issue because, as Microsoft explains, there are many functions within the relevant products which have no bearing on this case. Therefore, we direct the parties to conduct a "meet and

confer" to determine which portions of the source code for the products at issue are relevant to this case. Therefore, to that extent, we grant Multi-Tech's Motion to Compel with regard to the source code.

n5 To the extent that Multi-Tech's request may have reached beyond the accused products, it is only entitled to the source code on the accused products, which are NetMeeting, MSN Messenger, and Game Voice.

2. Documents Relating to Microsoft's Voice.net Code.

According to Multi-Tech, MSN Messenger, which is one of the accused products, uses a plug-in to power its voice capabilities. Microsoft has allegedly developed voice.net to replace the plug-in. Multi-Tech has requested, therefore, any documents relating to the voice.net team, or the voice.net source code. It contends that, "even [*27] if Microsoft has not yet publicly released or otherwise introduced voice.net, [it] may still be guilty of infringement," which goes to the issue of damages or willfulness.

Microsoft counters by stating that voice.net is not a product, but rather a team of individuals who are designing next generation voice products at Microsoft, and that the documents concerning the voice.net team cannot, therefore, be responsive to Multi-Tech's document request concerning the accused products. Moreover, Microsoft contends that Multi-Tech is seeking information regarding a product that is under development and, consequently, that there is no basis for such discovery.

We agree with Microsoft. The voice.net team, and potential product, may be a continuation of the accused product, but such future expansion is irrelevant at this point. Multi-Tech's assertion that Microsoft "may" be infringing on its Patent is merely supposition, to support a treasure hunt. Multi-Tech should not be allowed, on this scant showing, to rifle though Microsoft's files in the hopes of uncovering potential future lawsuits, which have yet ripened into a claim, given the fact that Microsoft may never launch the product in [*28] the marketplace. Thus, as we conclude that the requested information is irrelevant, we deny Multi-Tech's Motion to Compel with regard to the voice.net technology.

3. NetMeeting Documents.

As for the NetMeeting documents, it appears that this issue was generated by litigation, which is proceeding in a District Court in Illinois, and which involves Microsoft. Although Multi-Tech is not involved in that case, the Robins, Kaplan, Miller & Ciresi Law Firm

2001 U.S. Dist. LEXIS 23155, *

("Robins Kaplan"), which here represents Multi-Tech, also represents the plaintiff in the Illinois action. Multi-Tech argues that, through that simultaneous representation, attorneys for Robins Kaplan have recognized some documents that were produced in the Illinois case, which, in Multi-Tech's view, should have been produced here. Microsoft has taken issue with that disclosure by Robins Kaplan, and has brought a Motion in the Illinois Court, to enforce the Protective Order entered in that case, and to secure an award of sanctions. In this Motion, though, Multi-Tech asks us to require Microsoft to produce the documents on a date certain after the District Court in Illinois rules on Microsoft's Motions, but irrespective of how that [*29] Court should rule.

There is no dispute that the documents at issue are relevant to this case, and that they should have been produced to Multi-Tech. As such, in our view, the issue before us is not the means by which the documents were discovered, or whether those means require an exercise of the Illinois Court's sanction powers but, rather, whether the documents should here be produced. Necessarily, we leave matters of enforcing a Court Protective Order to the Court which issued the Order, and we find no excuse, arising from the means by which the documents were uncovered, to excuse their lack of production in this action. As is the case before the Illinois Court, we here seek the truth and, if the documents in question are relevant to that search, then they should be produced posthaste. Accordingly, we grant Multi-Tech's Motion to Compel which relates to the NetMeeting documents.

4. Documents relating to Multi-Tech's Claim for Reasonable Royalty Damages.

At the Hearing, the parties advised that they are largely in agreement as to the damages issues raised by Multi-Tech's Motion to Compel. Nonetheless, as we noted at the Hearing, if, after the agreed upon supplementation, the [*30] parties are still at an impasse, they should immediately return to the Court.

The only other issue raised by this portion of Multi-Tech's Motion to Compel pertains to licensing rates that Microsoft has paid for use of other patents in comparable technologies, as well as the nature and scope of other Microsoft licenses, which are relevant as the information goes to a "royalty rate." See, *Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).* Although Microsoft contends that they pay no running royalties on any licenses, there are potentially lump sum royalties which Microsoft has paid, and which may be relevant to this case. Therefore, we direct Microsoft to produce any information on royalties or licenses which include the same or similar features, or functions, as the operating systems which are at issue in this case. We further direct Microsoft to provide such

supplementation by December 17, 2001. n6 To that extent, therefore, we grant Multi-Tech's Motion to Compel.

> n6 We designated this date for supplementation of discovery, and for other discovery production, at the time of the Hearing.

[*31]

5. Marketing, Consumer Usage Reports, and Budgetary Information.

Through a number of requests, Multi-Tech has sought information concerning Microsoft's marketing, consumer usage, and budget. However, according to Multi-Tech, Microsoft has not produced all responsive marketing and promotional materials. For example, Multi-Tech is aware of at least two television advertisements, which promote the accused products, and for which Microsoft has not produced information. Moreover, Microsoft has allegedly not produced total NetMeeting budgets. Multi-Tech specifically requests that, "to ensure against piecemeal production, Microsoft should provide to Multi-Tech and to the Court a detailed description of the steps taken to locate and identify all responsive documents in the nature of marketing, consumer usage and budgeting on each of the accused products."

Microsoft contends that it has looked for, and produced, all documents responsive to these requests. As such, we can do nothing more than take the word of Microsoft, and its officers, as officers of the Court, at face value. As we have often advised the parties, the remedy in a circumstance where a party has failed fully disclosed [*32] information is a spoilation instruction. See, e.g., *Lumber v. PPG Industries, Inc., 168 F.R.D. 641, 643 n. 1 (D. Minn. 1996).* Therefore, as Microsoft contends that it has fully produced all of the relevant documents, we deny this aspect of Multi-Tech's Motion to Compel. n7

> n7 There were some other discovery issues raised by Multi-Tech in its Motion to Compel, but the parties advised the Court, at the Hearing, that they have reached an accord as to those issues, or that they need a further "meet and confer" so as to determine which issues involve claim construction, and which do not. To the extent that the remaining issues do not involve claim construction, the parties are instructed to serve their formal responses and objections on the opposing party by December 17, 2001.

NOW, THEREFORE, It is --

2001 U.S. Dist. LEXIS 23155, *

ORDERED:

1. That the Plaintiff's Motion to File an Amended Answer [Docket No. 52] is GRANTED.

2. That Plaintiff's Motion to Supplement Its Prior Art Statement [Docket No. 52] is GRANTED. [*33]

3. That Plaintiff's Motion to Compel Discovery [Docket No. 52] is DENIED.

4. That the Plaintiff's Motion to Take Additional Depositions [Docket No. 52] is GRANTED.

4. That Defendant's Motion to Compel Discovery [Docket No. 49] is GRANTED, in part, as more fully detailed in the text of this Order.

BY THE COURT:

Raymond L. Erickson

UNITED STATES MAGISTRATE JUDGE