# EXHIBIT I

Nov-04-99  03:59pm  From-MICHAEL BEST
Nov-04-99  02:16PM  FROM-MILAAEL                    T-140  P.08/11  F-859

#14

11/19/89

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
Group Art Unit 3616

In re

Patent Application of

Richard D. Bednar

Serial No. 08/794,141

Filed: February 3, 1997

Examiner: Pezzuto, R.

GANG-TYPE ROTARY LAWN MOWER

I, Mary K. Vuk, hereby certify that this correspondence is being sent by facsimile transmission addressed to Assistant Commissioner for Patents, Washington, D.C. 20231, on the date of my signature.

_Mary K. Vuk_
Signature

_November 4, 1999_
Date of Signature

Assistant Commissioner for Patents
Washington, D.C  20231

### DECLARATION UNDER RULE 132

I, Richard D. Bednar, do hereby declare that:

1.    I am an adult citizen of the United States, residing in Lake Mills, Wisconsin.

2.    I am the inventor of the invention claimed in the above-referenced patent application (hereinafter the "Gang-type Rotary Mower").

3.    As one skilled in the art of mowers and their design and construction, I conclude that my invention would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. My invention provides a unique solution to a long-term mower problem, as described herein. With the extensive knowledge base in the mower industry of mowers and their shortcomings, my invention would have been made long ago if it had been obvious. In fact, conventional wisdom, as described herein, steered manufacturers away from my invention as a solution to existing problems with mowers.

4.    I am told that some of the claims of my patent application have been rejected as being obvious based on a combination of features found in a number of patent applications

JA - 0150

Nov-04-99  03:58pm  From-MICHAEL BEST
Nov-04-99  02:18pm  From-MICHAEL :                                    T-140  P.07/11  F-858

and a publication. With the vast number of mower designs and mower manufacturers in the industry, any obvious combination of features that might give a company a competitive edge has likely been tried. Rotary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length, because nobody prior to me has recognized the desirability of using, or figured out how to use, gang-type rotary mowers to cut golf course roughs. Conventional wisdom in the art of gang-type mowers held that rotary mowers could not be used to cut golf course roughs. My invention of individual cutting units with the addition of rear rollers, however, made the use of gang-type rotary mowers possible to cut golf course roughs. To the best of my knowledge, gang-type rotary mowers have never had such rear rollers.

5.    My Gang-type Rotary Mower invention, which was unknown in the industry only a few years ago, is now worth millions of dollars in annual sales to my company and to the companies that copied my invention.

6.    For many years, the mower industry had unsuccessfully sought a solution to the problem of scalping grass while mowing over undulating terrain. Previous rotary mowers are ineffective in compensating for elevation changes in the turf being mowed, resulting in uneven cut heights. This is particularly problematic when the turf is cut at or below ground level, leaving barren spots.

7.    My invention provides a solution to that problem by teaching an apparatus with excellent ground-following and anti-scalp characteristics.

8.    The effectiveness of my invention as a solution to this long-term problem is evidenced by the extraordinary commercial success of my invention. Annual sales of my company's previous gang-type mower averaged approximately $4.5 million over the years 1995 to 1997, with no significant increases or decreases from year to year. Our new model embodying my invention was introduced in 1997. The addition of my invention was the only significant change from the prior model. Sales of the new model totaled $1.3 million in 1997, jumped to $8.5 million in 1998, and are projected to be $10 million in 1999. The addition of my invention has more than doubled our mower sales, as compared to our previous model. Because market demand for gang-type mowers remained relatively constant between 1997

JA - 0151

Nov-04-05  03:50am    From-MICHAEL BEST
Nov-04-05  02:15am    From-MICHAEL B

T-140  P.03/71  F-850

and 1999, the doubling of our mower sales and the nearly tenfold increase in sales of the new
model itself can only be attributed to the addition of my invention to my company's mowers.

    9.    The effectiveness of my invention as a solution to the long-term problem
previously described is also evidenced by the prompt copying of my invention by competitors.
Following public disclosure of my invention in 1997, at least two major competing mower
manufacturers, Nunes and Toro, realized the efficacy of my solution to the problem. These
two companies copied my invention by altering their previous designs to produce and market
mowers embodying my invention. These two companies now enjoy significant sales of the
models incorporating my invention.

    10.    I enclose as Appendix A a copy of a Toro advertisement from 1999
highlighting a gang-type single-spindle rotary mower in which the mower decks include rear
rollers. These Toro units were new in 1999 and were not previously available.

    11.    I enclose as Appendix B copies of Nunes advertisements from 1999
highlighting gang-type single-spindle rotary mowers, including rear rollers, as replacements
for Toro and John Deere units. These Nunes replacement units were new in 1999 and were
not previously available.

    12.    I understand the scope of pending Claim 1 of my application and conclude that
Claim 1 covers the features of my invention that have resulted in the mower's commercial
success and copying by competitors. In other words, it is the invention as claimed that
produced the mower's success and copying.

    13.    I believe that the success of the Gang-type Rotary Mower embodying my
invention demonstrates that this Gang-type Rotary Mower fulfills a long-felt need for a
solution to the problems encountered in mowing undulating terrain. The substantial recent
sales of the Gang-type Rotary Mower and the prompt copying by competitors indicate that
consumers and the mower industry, respectively, see my Gang-type Rotary Mower as a
previously-unknown solution to their mowing problems

    14.    I hereby declare that all statements made herein of my own knowledge are true
and that all statements made on information and belief are believed to be true; and further that
these statements were made with the knowledge that willful false statements and the like so

JA - 0152

made are punishable by fine or imprisonment, or both, under Section 1001 of the Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Richard D. Bednar                        11-4-99

Richard D. Bednar                        Date

-4-

JA - 0153

No.~04-00  04:00am  From-MICHAEL BES*

T-148  P.10/11  F-090

APPENDIX A

# Groundsmaster® with Contour™ 66 Deck 



◆ Patent pending Sidewinder™
system slides decks 24" (61 cm)
left and right for overhang and
varying tire tracks

◆ Powerful 35 hp Kubota
Turbo Diesel

◆ HOC range of 1"-4"
(2.5-10 cm) in ¼"
(.64 cm) increments



◆ 3 full floating 25" (64 cm)
mulching decks follow
ground contours superbly

◆ 66" (168 cm)
width of cut



◆ Rear rollers provide
attractive striping

◆ Patented Series/
Parallel 3-wheel drive
traction minimizes
spin-outs

  

*Product Preview*

TORO IS PROUD TO SUPPORT THE NATION'S TURF PROFESSIONALS
WITH TOP QUALITY EQUIPMENT, SERVICE AND PARTS

Visit Toro on the World Wide Web at www.toro.com

JA - 0154

Nov-04-98  04:08pm  From-MICHAEL BE?    T-140  P.11/11  F-698

**APPENDIX B**





Nunes Manufacturing is proud to introduce to you the newest hydraulic rotary mower with 22 ½" decks for the John Deere Model 3235A. The mower can be mounted in place of the reel mower with no modification to the power unit. Each deck has one high efficiency hydraulic motor, with special bearings to provide excellent support for blades. For more information please call our sales department and they will be happy to answer any questions.

**Nunes**
Manufacturing, Inc

1707 Magnolia Ave
Patterson, CA 95363
(209) 892-8773 or
Fax (209) 892-5627

*Innovative use improves more employment needs*

"Specializing in adapting rotary mowers to fit most traction units"



Nunes Manufacturing is proud to introduce to you our newest hydraulic rotary mower with 22 ½" decks for the Toro Model 6500 or the Toro Model 6700. The mower can be mounted in place of the reel mower with no modification to the power unit. Each deck has one high efficiency hydraulic motor, with special bearings to provide excellent support for blades. For more information please call our sales department and they will be happy to answer any questions.

**Nunes**
Manufacturing, Inc

1707 Magnolia Ave
Patterson, CA 95363
(209) 892-8773 or
Fax (209) 892-5627

*Innovative use improves more employment needs*

"Specializing in adapting rotary mowers to fit most traction units"

JA - 0155

# EXHIBIT J

LEXSEE 2006 U.S. DIST. LEXIS 57469

**ABBOTT DIABETES CARE, INC., Plaintiff, v. DEXCOM, INC., Defendants.**

**C.A. No. 05-590 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 57469*

**August 16, 2006, Decided**

**COUNSEL:** [*1] For Abbott Diabetes Care Inc. a Delaware corporation, Plaintiff: Mary B. Graham, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; James F. Hurst, Stephanie S. McCallum, Pro Hac Vice; James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For DexCom Inc. a Delaware corporation, Defendant: John W. Shaw, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE; Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Morgan S. Adessa, Pro Hac Vice.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On August 11, 2005, Abbott Diabetes Care, Inc. ("Abbott") brought this declaratory judgment (Count I) and patent infringement (Count II) action against DexCom, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's Motion to Dismiss Abbott's Complaint (D.I. 5); (2) DexCom's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I. 61); and (3) DexCom's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I. 25). For the reasons that follow, the court will grant in part and deny in part DexCom's

motion [*2] to dismiss. The court will grant the motion to dismiss Abbott's declaratory judgment count and will deny the motion to dismiss the infringement count. Additionally, the court will grant DexCom's motion to strike the "amended complaint," deny the renewed motion to dismiss the complaint as moot, and grant the motion to stay pending reexamination of Abbott's patents.

**II. BACKGROUND**

Abbott owns *U.S. Patent Nos. 6,175,752* (the "'752 patent"), 6,284,478 (the "'478 patent"), 6,329,161 (the "'161 patent"), and 6,565,509 (the "'509 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed to methods, systems, and devices for continuously monitoring glucose levels in humans. (Compl. P 7.) The patented technology at issue offers an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (D.I. 32, at 3; see '752 patent, Col. 1, ll. 21-26; '509 patent Col. 1, ll. 21-26.) According to the background of the invention sections of the '752 and '509 patents, the pricking technique does not permit the continuous monitoring of glucose, is painful and inconvenient, and results [*3] in inconsistencies in monitoring among individuals with diabetes. (See '752 patent, Col. 1, ll. 26-38; '509 patent, Col. 1. ll. 26-38.) Therefore, the technology described in the patents-in-suit was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for days at a time, while permitting a patient to engage in normal activities. ('752 patent, Col. 2, ll. 1-4; '509 patent, Col 2., ll. 5-8.) Each of the patents-in-suit relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of

2006 U.S. Dist. LEXIS 57469, *3

the sensor. n1 (D.I. 32, at 3.) The monitoring device provides patients with feedback regarding their glucose levels, and may even include an alarm to warn patients of dangerous glucose levels. (Id. at 3-4.)

> n1 The '752 and '509 patents relate to glucose monitoring devices and their methods of use, while the '478 and '161 patents relate to subcutaneous glucose sensors.

Abbott alleges that DexCom [*4] intends to market its STS<TM> Continuous Glucose Monitoring System, which will infringe one or more claims of the patents-in-suit. The complaint states that DexCom filed a premarket approval application with the Food and Drug Administration (the "FDA") in March 2005, seeking approval to sell its product. (Compl. P 12.) The complaint further states that DexCom expects FDA approval by the second quarter of 2006. n2 (Id. P 15.) In Count I, Abbott seeks declaratory relief in the form of a judicial declaration that DexCom's product will infringe one or more claims of each of the patents-in-suit. (Id. P 25.)

> n2 As previously mentioned, Abbott filed its complaint on August 11, 2005. The FDA subsequently approved DexCom's glucose monitoring product, in March 2006.

Further, Abbott alleges that, prior to filing its premarket approval application with the FDA, DexCom attended two "trade shows" where it publicized and displayed its glucose monitoring product. (Compl. P 16.) The complaint alleges that the products DexCom [*5] displayed at the trade shows were manufactured for the purpose of showcasing rather than for gathering information for submission to the FDA. (Id. P 17.) Abbott alleges that DexCom's manufacture and display of its product constitutes an act of patent infringement. (Id. P 28.)

On August 31, 2005, DexCom filed a motion to dismiss Abbott's complaint for lack of subject matter jurisdiction and failure to state a claim. Additionally, on February 22, 2006, DexCom filed a motion to stay the litigation pending reexamination of the patents-in-suit. On June 27, 2006, Abbott filed an amended complaint, which alleges further infringing acts on the part of

DexCom and adds several patents to the suit. On July 12, 2006, DexCom filed a motion to strike the "amended complaint" and renewed motion to dismiss.

## III. DISCUSSION

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dexcom first contends that the court should dismiss Abbott's declaratory judgment claim because there is currently no "accused device" to compare against the claims of the patents-in-suit and, therefore, Abbott's claim is premature. In other words, DexCom contends the court lacks subject matter jurisdiction [*6] over Count I of Abbott's Complaint.

A motion to dismiss under *Rule 12(b)(1) of the Federal Rules of Civil Procedure* contests the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual contest to subject matter jurisdiction. *See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).* When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. *Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000).* The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. *See id.* Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. *Lang v. Pacific Marine and Supply Co., 895 F.2d 761, 764 (Fed. Cir. 1990).*

The Declaratory Judgment Act (the "Act") provides that "[i]n [*7] a case of actual controversy . . . [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *28 U.S.C. § 2201(a).* Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an "actual controversy between the parties." *Medimmune, Inc. v. Centocor, Inc., 409 F.3d 1376, 1378-79 (Fed. Cir. 2005)* (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1331 (Fed. Cir. 2005)).* "If the controversy requirement is met by a sufficient allegation of immediacy and reality . . . . a

patentee [is able] to seek a declaration of infringement against a future infringer . . . [just as] a future infringer is able to maintain a declaratory judgment action of noninfringement under the same circumstances." *Telectronics Pacing Sys., Inc. v. Ventritrex, Inc., 982 F.2d 1520, 1526 (Fed. Cir. 1992)* (citing *Lang, 895 F.2d at 764*).

However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H.B. Fuller Co., 940 F.2d 631, 634 (Fed. Cir. 1991), [\*8] cert. denied, 502 U.S. 1013, 112 S. Ct. 658, 116 L. Ed. 2d 749 (1991)*. Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics, 982 F.2d at 1526* (citations omitted).

Two elements must be present in order to meet the controversy requirement in a declaratory judgment action brought by a patentee against an alleged future infringer: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under *35 U.S.C. § 271(a)*, or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming. *Lang, 895 F.2d at 764*. In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc., 742 F.2d 1388, 1399 (Fed. Cir. 1984)*.

Applying the [\*9] above-discussed elements to the present case, it is clear to the court from the record before it that Abbott's complaint did not present an actual controversy under the Act at the time it was filed. That is, Abbott has not demonstrated that DexCom produced or has prepared to produce a product that would be subject to an infringement charge under *35 U.S.C. § 271*. At the time Abbott filed its complaint, the FDA had not approved DexCom's product and Abbott could not predict when, or if, the FDA would approve the product. Indeed, Abbott states as much in its complaint, alleging that "DexCom . . . *expects* FDA approval for marketing by the second quarter of 2006. . . ." (Compl. P 15) (emphasis added). n3 Additionally, Abbott did not, and could not, allege with any certainty that "the device when approved would be the same device that began clinical trials[,]" as

"product changes during testing are contemplated by statute, *21 U.S.C. § 360j(g)(2)(C)(iii) (1988)*." *Telectronics, 982 F.2d at 1527*. Most important, Abbott did not allege nor does it now contend that DexCom has distributed sales literature, prepared to solicit [\*10] orders, or engaged in any sales or marketing activity with regard to its glucose monitoring product. *See Lang, 895 F.2d at 765; Benitec Australia Ltd. v. Nucleonics, Inc., Civil Action No. 04-0174 JJF, 2005 U.S. Dist. LEXIS 22008, at \*9 (D. Del. Sept. 29, 2005); Interdigital Tech. Corp. v. OKI Am., Inc., 845 F. Supp. 276, 284 (E.D. Pa. 1994)* ("Activity directed towards advertising or marketing the accused device is particularly important to a finding of a justiciable controversy.") Therefore, the court concludes that no controversy of sufficient immediacy and reality existed, at the time Abbott filed its complaint, to support declaratory judgment jurisdiction in the present case. As such, the court will dismiss Count I of Abbott's complaint.

> n3 The court agrees with the argument Abbott makes in its answering brief, namely that FDA approval is not the standard by which it should evaluate whether an actual controversy existed at the time the complaint was filed. However, the court finds that the absence of FDA approval is evidence that the dispute between the parties is neither real nor immediate.

[\*11]

**B. Motion to Strike Abbott's "Amended Complaint"**

DexCom next argues that the court should strike the "Amended Complaint" because Abbott failed to seek leave of court to file what correctly should be termed a "supplemental pleading." Conversely, Abbott asserts that it properly amended its complaint under *Federal Rule of Civil Procedure 15(a)* to allege additional acts of infringement that occurred prior to and after it filed the initial complaint. The court is unpersuaded by Abbott's argument and will, therefore, strike its "Amended Complaint."

As Abbott points out in its briefing, "[a]n amended pleading generally is a modification to incorporate events that were unknown but occurred *prior* to the filing of the original pleading." (D.I. 66, at 7) (emphasis added) (citing 3 James Wm. Moore et al., *Moore's Federal*

*Practice § 15.02* (3d ed. 1999)). On the other hand, "a supplemental pleading refers to additions to include transactions or occurrences that take place after the filing of the original pleading." (D.I. 66, at 7.) By Abbott's own words, it amended its complaint "to allege additional acts of infringement that occurred prior to and *after*" its initial complaint. [*12] (Id.) Because Abbott's "Amended Complaint" contains allegations regarding events that occurred after August 11, 2005 -- the filing date of the original complaint -- it is governed by *Federal Rule of Civil Procedure 15(d)*. Pursuant to *Rule 15(d)*, "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. *Fed. R. Civ. P. 15(d)*; *see GAF Bldg. Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479, 483 (Fed. Cir. 1996)* (holding that district court did not abuse its discretion when "adhering to the motion requirement of *Rule 15*"); *Bronson v. Horn, Civil Action No. 02-663, 2006 U.S. Dist. LEXIS 38791, at *5 (W.D. Pa. June 12, 2006)* (dismissing supplemental complaint because it was not filed pursuant to a motion). Accordingly, because Abbott did not file a motion to supplement its complaint in the present case, the court will strike it from the docket for failure to comply with *Rule 15(d)*.

**C. Motion to Dismiss for Failure to State a Claim** [*13]

Finally, with respect to dismissal, DexCom contends that Count II of Abbott's complaint fails to state a claim for which relief can be granted. According to DexCom, its display of glucose monitoring products at two scientific conferences is exempt under *35 U.S.C. § 271(e)(1)*. n4 Therefore, DexCom argues that Abbott has failed to state a claim for patent infringement.

n4 *Section 271(e)(1)* states, in pertinent part:

It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture,

use, or sale of drugs or veterinary biological products.

*35 U.S.C. 271(e)(1)*.

The purpose of a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)* is to test the sufficiency of a complaint, not to resolve disputed facts or decide [*14] the merits of the case. *See Kost v. Kozakiewicz, 1 F.3d 183 (3d Cir. 1993)*. Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery, 117 F.3d 723, 726 (3d Cir. 1997); Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)*. In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir.1988)*. However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3rd Cir.1997)*. A court should dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves, 117 F.3d at 726; Nami, 82 F.3d at 65* (both citing *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*). Thus, in order to prevail, a moving party must show "beyond [*15] doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley, 355 U.S. at 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*).

After having reviewed Abbott's complaint, the parties'. submissions and relevant case law, the court concludes that DexCom cannot show that "beyond doubt" there exists "no set of facts" in support of Abbott's patent infringement claim. The language of *section 271(e)(1)* exempts potentially infringing activities "if performed solely for uses reasonably related to the development of information for FDA approval." *Telectronics, 982 F.2d at 1523*. Here, Abbott's complaint alleges that "[u]pon information and belief, the [DexCom] products displayed at the [two] trade shows were manufactured for the purpose of showcasing at the trade shows rather than for the purpose of gathering information." (Compl. P 17.) Abbott's complaint, therefore, alleges that DexCom's manufacture and display of products at scientific conferences or trade shows falls outside the safe harbor

of *section 271(e)(1)*. Based upon this allegation, and viewing the complaint in the light most favorable to Abbott, the court is unwilling to conclude [*16] at this juncture that no relief could be granted under any set of facts that Abbott could prove consistent with its patent infringement allegations. n5 Therefore, the court will deny DexCom's motion to dismiss Count II of the complaint.

> n5 DexCom contends that the facts of the present case are on "all fours" with the facts of *Telectronics*. The court, however, finds that DexCom's reliance is misplaced because, in *Telectronics*, the Federal Circuit reviewed a district court's grant of summary judgment for the defendant, while here the court must decide a motion to dismiss. As DexCom well knows, the standard for granting a motion to dismiss is markedly different from the summary judgment standard. When deciding a *Rule 56* motion, the court reviews "the pleadings, *depositions, answers to interrogatories,* and *admissions on file,* together with [any] affidavits," to determine whether "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)* (emphasis added). In contrast, when deciding a motion to dismiss, the scope of the court's review is limited to the complaint. *See Pryor v. NCAA, 288 F.3d 548, 560 (3d Cir. 2002)* ("As a general rule, the court may only consider the pleading that is attacked by an *FRCP 12(b)(6)* motion in determining its sufficiency.") Therefore, *Telectronics* is distinguishable in that the court made its determination after reviewing a more complete record than that which the court is permitted to review here. That is not to say that DexCom could not successfully attack Abbott's claim at a later stage of these proceedings. For example if, through discovery, DexCom adduces facts indicating that its conduct at the scientific conferences or trade shows falls within the *section 271(e)(1)* safe harbor, the court will likely entertain a motion for summary judgment at the appropriate time.

[*17]

**D. Motion to Stay**

DexCom has also filed a motion to stay the litigation pending reexamination of the patents-in-suit by the Patent and Trademark Office (the "PTO"). The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co., 760 F.2d 58, 60 (3d Cir. 1985)*. This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)* (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co., 766 F. Supp. 212, 217 (D. Del. 1991)* [*18] (stating a similar test).

In opposing DexCom's motion, Abbott maintains that a stay would prevent it from seeking a preliminary injunction and enforcing its patent rights, thereby unduly prejudicing it and presenting it with a clear tactical disadvantage in the marketplace. The court is not persuaded. First, Abbott's argument is premised on its filing of a motion for preliminary injunction. Abbott, however, did not, and has not, filed any such motion, even though the FDA has recently approved DexCom's glucose monitoring product for marketing. Because Abbott has not filed a motion for preliminary injunction, its arguments relating to the court's rendering of an opinion on such a motion are moot. As such, the only other argument Abbott asserts with respect to undue prejudice is that it will be unable to enforce its patents while in reexamination. Abbott's position, however, assumes that the PTO will leave all of the more than 200 claims of the four patents-in-suit unaltered after reexamination. *See Applera Corp. v. Thermo Electron Corp.*, No. C.A. 04-1230 GMS, (D. Del. Dec. 28, 2005) (04-1230 D.I. 81 P 6). Further, while Abbott may suffer some prejudice from a stay, the court is [*19] not persuaded that a stay would *unduly* prejudice Abbott, or present any clear tactical disadvantage. Accordingly, the first factor militates in favor of granting the requested stay.

With respect to the second factor, Abbott argues that a stay will not simplify the issues, but prolong the litigation. According to Abbott, the only way to avoid prolonging the litigation would be if the reexamination resulted in the PTO invalidating all of the asserted claims of all of the patents-in-suit. The court cannot agree. Contrary to Abbott's position, the court finds that granting the stay will simplify the issues and focus the litigation. For example, if the PTO determines that some or all of the claims of the of the four patents undergoing reexamination are invalid, then many of the issues in the litigation will become moot. Additionally, it is beyond dispute that the court, as well as the parties, would benefit from a narrowing of the variety of complex issues relating to the numerous claims at issue, which, if clearly defined, would streamline the discovery process and the remainder of the litigation. A stay, therefore, will conserve the resources of the parties and the court, thereby [*20] promoting efficiency. Moreover, the court would not run the risk of inconsistent rulings or issuing advisory opinions. See *Gioello Enters. Ltd. v. Mattel, Inc.*, No. C.A. 99-375 GMS, 2001 WL 125340, at *1 (D. Del. Jan. 29, 2001). The second factor, therefore, weighs in favor of granting the motion to stay.

Finally, the court finds that the third factor it must consider in its determination, i.e. whether discovery is complete and whether a trial date has been set, weighs in favor of granting the motion. In the present case, fact discovery is not scheduled to close until January 31, 2007 and, although already set, the trial is not scheduled to begin until October 9, 2007. n6 Thus, given its findings with respect to the first two factors, the court concludes that the balance of harms weighs in favor of granting a stay of this action. Accordingly, the court will grant DexCom's motion to stay.

n6 See Amended Scheduling Order, D.I. 71 PP 2, 8.

Dated: August 16, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT [*21] JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Abbott's Complaint (D.I. 5) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Count I of Abbott's complaint and DENIED with respect to Count II of Abbott's complaint.

2. The court shall dismiss Count 1 of Abbott's complaint without prejudice.

3. The plaintiff's Motion For Limited Jurisdictional Discovery and for a Corresponding Extension of the Briefing Schedule on DexCom's Motion to Dismiss (D.I. 9) is DENIED as moot.

4. The defendant's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I. 61) is GRANTED in part and DENIED in part. The motion to strike the "amended complaint" is GRANTED and the renewed motion to dismiss is DENIED as moot.

5. The plaintiff's Amended Complaint (D.I. 55) shall be stricken from the court's docket.

6. The defendant's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I. 25) is GRANTED.

Dated: August 16, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT K

LEXSEE 2000 US DIST LEXIS 4254



Caution
As of: Mar 23, 2007

**SOFTVIEW COMPUTER PRODUCTS CORP. and ERGO VIEW TECHNOLOGIES CORP., Plaintiffs, -against- HAWORTH, INC., Defendant.**

**97 Civ. 8815 (KMW)(HBP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 4254; 58 U.S.P.Q.2D (BNA) 1422*

**March 31, 2000, Decided
March 31, 2000, Filed**

**DISPOSITION:** [*1] Motion to compel the production of documents which defendant Haworth, Inc. ("Haworth") has designated as protected by the attorney-client privilege and the work-product doctrine granted in part and denied in part.

**COUNSEL:** For SOFTVIEW COMPUTER PRODUCTS CORP., ERGO VIEW TECHNOLOGIES CORP., plaintiffs: Philippe Bennett, Coudert Brothers, New York, NY.

For HAWORTH, INC., defendant: Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

For ERGO VIEW TECHNOLOGIES CORP., SOFTVIEW COMPUTER PRODUCTS CORP., counter-defendants: Philippe Bennett, Coudert Brothers, New York, NY.

For HAWORTH, INC., counter-claimant: Stuart I. Friedman, Friedman, Wittenstein & Hochman, New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge.

**OPINION BY:** HENRY PITMAN

**OPINION:**

OPINION AND ORDER

PITMAN, United States Magistrate Judge.

I. Introduction

Plaintiffs Softview Computer Products Corp. and Ergo View Technologies (collectively, "Softview") move to compel the production of documents which defendant Haworth, Inc. ("Haworth") has designated as protected by the attorney-client privilege and the work-product doctrine. For the reasons discussed below, the motion is granted in part [*2] and denied in part.

II. Facts

Both Softview and Haworth manufacture and sell adjustable computer keyboard support mechanisms. In 1986, Haworth obtained U.S. Patent No. 4,616,798 ("the '798 patent") for its mechanism. Softview introduced its accused mechanism in 1997.

Softview commenced this action seeking a declaratory judgment that (1) its mechanism does not infringe the '798 patent; (2) the '798 patent is invalid; (3) Haworth engaged in inequitable conduct in obtaining the

2000 U.S. Dist. LEXIS 4254, *2; 58 U.S.P.Q.2D (BNA) 1422

'798 patent; (4) Haworth misused the '798 patent, and (5) Haworth has violated antitrust laws. In addition to denying the material allegations in Softview's complaint, Haworth has asserted a counterclaim alleging that Softview has willfully infringed the '798 patent. Haworth seeks injunctive relief and damages.

In response to Softview's discovery requests, Haworth initially produced a privilege log which listed five hundred and twenty documents that Haworth believed were protected by the attorney-client privilege and/or the work-product doctrine (see Memorandum of Law in Support of Plaintiff's Motion to Compel dated May 11, 1999 ("Pltf. Mem. of Law"), Ex. A ("Pltf. Ex. A")). On February 2, 1999, Haworth [*3] produced seventy of those documents to Softview (Affidavit of Dale H. Thiel, sworn to June 18, 1999 ("Thiel Aff."), P 3 n.1). n1 In addition, Haworth no longer maintains a privilege with respect to thirty-seven of the documents listed on the original log (Thiel Aff. P 3 n.1). n2 By order dated February 29, 2000, I directed Haworth to submit those documents still in dispute to my chambers for an in camera review. n3

> n1 The following documents were produced by Haworth on February 2, 1999: 18-24, 28, 46-48, 59-60, 67, 72-74, 88, 91-94, 117, 120-21, 128, 131-32, 134, 144, 150-59, 174-76, 181, 188-89, 193, 227, 256, 261, 272-73, 280, 329, 336, 344, 346, 350, 377, 395, 404, 418, 471-73, 481-82, 486-88 (Thiel Aff. P 3 n.1).

> n2 Haworth no longer maintains a privilege with respect to the following documents: 2, 8, 10, 25, 26, 30, 32, 33, 40, 41, 45, 86, 119, 143, 147, 148, 163, 170, 185, 186, 279, 306, 309-11, 314, 376, 383, 399, 408, 411, 419, 424, 446, 452, 503, 514 (Thiel Aff. P 3 n.1).

> n3 By letter dated March 6, 2000, Haworth has advised the Court that there is no document corresponding to its entry number 520 on its privilege log, and that number 520 is a duplicate entry for document 513.

[*4]

Softview challenges Haworth's assertions of privilege as to the four hundred and twelve (412) documents remaining on a number of grounds. Softview

first challenges the sufficiency of Haworth's privilege log under *Fed.R.Civ.P. 26(b)(5)* and Local Civil Rule 26.2 (Pltf. Mem. of Law at 8-9). Softview also argues that the Crime-Fraud exception operates to vitiate Haworth's assertions of privilege. Finally, Softview advances specific arguments directed to individual documents, or groups of documents. I shall address Softview's general objections first and then discuss Softview's specific objections.

III. Analysis

A. Standards

"'The burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship.'" *von Bulow v. von Bulow, 811 F.2d 136, 144 (2d Cir. 1987)*, quoting *In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224 (2d Cir. 1984).* Thus, the party seeking to invoke the privilege must establish all elements of the privilege. *Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470 (S.D.N.Y. 1993)* (citing cases).

In this action, [*5] Haworth asserts that both the attorney-client privilege and the work-product doctrine protect the majority of the documents on its privilege log. n4

> n4 Haworth asserts both the attorney client privilege and the work-product doctrine for two hundred and eighty-six (286) of the four hundred and twelve (412) disputed documents (Defendant Haworth, Inc.'s Memorandum of Law in Opposition, dated June 21, 1999 ("Def. Mem. of Law"), Ex. A).

1. Attorney-Client Privilege

The elements of the attorney-client privilege are well settled:

> "The [attorney-client] privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom communication was made (a) is a member of the bar of a

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 18 of 53

Page 3
2000 U.S. Dist. LEXIS 4254, *5; 58 U.S.P.Q.2D (BNA) 1422

court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) [*6] an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995),* quoting *United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358-59 (D. Mass. 1950); see United States v. Davis, 131 F.R.D. 391, 398 (S.D.N.Y. 1990).* The privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn Co. v. United States, 449 U.S. 383, 390, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981).* Therefore, "it is now also well established that the privilege attaches not only to communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client." *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., supra, 160 F.R.D. at 441-42;* [*7] *see also O'Brien v. Board of Educ., 86 F.R.D. 548, 549 (S.D.N.Y. 1980); SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 520-22 (D. Conn. 1976).*

Despite the fact that Softview and Haworth agree on the elements of the privilege, n5 they disagree on whether the privilege should apply to communications regarding the patent application process. The Federal Circuit's recent decision in *In re Spalding Sports Worldwide, Inc., 203 F.3d 800 (Fed. Cir. 2000),* is instructive in this regard.

n5 Both sides agree on the applicability of the definition of the privilege set forth in *United States v. United Shoe Mach. Corp., supra, 89 F. Supp. at 358-59* (Pltf. Mem. of Law at 5; Def. Mem. of Law at 9). Although both sides agree on the applicability of the United Shoe definition, it now appears that the scope of the attorney-client

privilege in patent cases is governed by Federal Circuit standards and not the standards ordinarily applied by the regional circuit. *In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 803 (Fed. Cir. 2000).* However, there does not appear to be a material difference between the United Shoe definition and the definition applied by the Federal Circuit. See *Shearing v. Iolab Corp., 975 F.2d 1541, 1546 (Fed Cir. 1992); American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734, 745 (Fed. Cir. 1987).*

[*8]

In Spalding, the Court addressed the scope of the attorney-client privilege in connection with an invention record submitted by the inventor to Spalding's corporate legal department. The Court granted mandamus and vacated the District Court's order to produce the invention record, holding that, although the record contained technical information relating to the subject matter of the patent, it was submitted for the purpose of obtaining legal advice and was, therefore, a privileged communication. *In re Spalding Sports Worldwide, Inc., supra, 203 F.3d at 806.*

The Spalding Court relied in part on *Knogo Corp. v. United States, 1980 U.S. Ct. Cl. LEXIS 1262, 213 U.S.P.Q. 936, 940 (Ct. Cl. 1980),* an opinion in which the Court of Claims rejected the contention that patent attorneys are mere conduits of information to the patent office. The line of cases that follow Knogo stand for the proposition that the attorney-client privilege may attach to communications regarding patent prosecution, so long as those communications meet the other criteria of the privilege. See *Sperry v. Florida, 373 U.S. 379, 383, 10 L. Ed. 2d 428, 83 S. Ct. 1322 (1963)* [*9] ("The preparation and prosecution of patent applications for others constitutes the practice of law."); *Hydraflow, Inc. v. Enidine Inc., 145 F.R.D. 626, 632 (W.D.N.Y. 1993)* ("The same considerations which justify applying the privilege to the typical communications between clients and their attorneys also warrant that the privilege be applied appropriately to the exchanges between clients and patent counsel incident to the patent application process."); *Laitram Corp. v. Hewlett-Packard Co., 827 F. Supp. 1242, 1246-47 (E.D. La. 1993)* ("The approach adopted under Knogo . . . appears to be more consistent with the professional realities of the patent attorney-client relationship and less open to error."); *Stryker Corp. v.*

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 19 of 53

Page 4

2000 U.S. Dist. LEXIS 4254, *9; 58 U.S.P.Q.2D (BNA) 1422

*Intermedics Orthopedics, 145 F.R.D. 298, 302 (E.D.N.Y. 1992); Advanced Cardiovascular Systems, Inc. v. C.R. Bard, Inc., 144 F.R.D. 372, 375 (N.D. Cal. 1992)* ("The view once held by several courts . . . that the attorney-client privilege cannot attach to communications or documents generated in connection with proceedings before the PTO has clearly been rejected."); *In re Minebea Co., Ltd., 143 F.R.D. 494, 502 (S.D.N.Y. 1992)* [*10] ("The privilege will apply to communications seeking or conveying a legal opinion on the patentability or infringement of an invention . . . ."); *Cuno Inc. v. Pall Corp., 121 F.R.D. 198, 202 (E.D.N.Y. 1988).*

Thus, the fact that a communication between a lawyer and his or her client relates to patent prosecution and contains technical information does not make it ineligible for protection by the attorney-client privilege. *In re Spalding Sports World-wide, Inc., supra, 203 F.3d at 806; see also Messagephone, Inc. v. SVI Systems, Inc., 1998 U.S. Dist. LEXIS 18471, *3, No. 3- 97-1813 H, 1998 WL 812397 at *1 (N.D. Tex. 1998)* (the "current and more widely accepted view is that communications between an inventor and his attorney are privileged to the same extent as other attorney-client communication."); *Applied Telematics, Inc. v. Sprint Communications Co., 1996 U.S. Dist. LEXIS 13782, *7, Civ. A. No. 94-4603, 1996 WL 539595 at *2 (E.D.P.A. Sept. 18, 1996)* ("The majority of courts . . . recognize that attorneys render legal advice in the traditional sense when helping inventors apply for patents.").

2. Work-Product Doctrine

The scope of the work-product doctrine is set forth in Fed. [*11] R.Civ.P. 26(b)(3):

> [A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared for litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other

means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

In contrast to the attorney-client privilege, which is intended to encourage full disclosure by the client, the work-product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by [*12] his adversaries." *United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998); Genentech, Inc. v. United States Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997)* ("'The work product privilege protects the attorney's thought processes and legal recommendations.'"), quoting *Zenith Radio Corp. v. United States, 764 F.2d 1577, 1580 (Fed. Cir. 1985).* Like the attorney-client privilege, the party asserting the protection of the work-product doctrine bears the burden of proof. *In re Grand Jury Subpoena Dated Dec. 19, 1978, 599 F.2d 504, 510 (2d Cir. 1979).*

"Three conditions must be met in order to earn work product protection. The material must (1) be a document or tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative." *In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)* (McLaughlin, J.). Accord *Weinhold v. Witte Heavy Lift, Inc., 1994 U.S. Dist. LEXIS 4559, 90 Civ. 2096 (PKL), 1994 WL 132392 at *2* (S.D.N.Y. April 11, 1994); 2 M.Silberberg, Civil Practice in the Southern [*13] District of New York, § 15.04 at 15-11 (2d ed. 1999).

The Second Circuit has explained that the second element of this test does not limit the doctrine to documents prepared primarily or exclusively to assist in litigation:

> The text of Rule 26(b)(3) does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the Rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents "prepared . . . for

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 20 of 53

Page 5

2000 U.S. Dist. LEXIS 4254, *13; 58 U.S.P.Q.2D (BNA) 1422

trial" but also those prepared "in anticipation of litigation." If the drafters of the Rule intended to limit its protection to documents made to assist in preparation for litigation, this would have been adequately conveyed by the phrase "prepared . . . for trial." The fact that documents prepared "in anticipation of litigation" were also included confirms that the drafters considered this to be a different, and broader category. Nothing in the Rule states or suggests that documents prepared "in anticipation of litigation" with the purpose of assisting in the making of a business decision do not fall within its scope.

*United States v. Adlman, supra, 134 F.3d at 1198-99.* [*14] Thus, the appropriate inquiry regarding the second element of the test is whether "'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *United States v. Adlman, supra, 134 F.3d at 1202*, quoting 8 C. Wright, A. Miller & R. Marcus, Federal Practice & Procedure § 2024 at 343 (1994).

As to the third element, the language of Rule 26(b)(3) itself grants protection to documents and tangible things prepared "by or for another party or by or for the other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." As the Supreme Court noted in *United States v. Nobles, 422 U.S. 225, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975):*

> The [work-product] doctrine is an intensely practical one, grounded in the realities of litigation on our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the [*15] doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*422 U.S. at 238-39.*

Finally, where the applicability of the work-product doctrine has been established, factual material may, nevertheless, be ordered produced "upon a showing of substantial need and inability to obtain the equivalent without undue hardship." *Upjohn Co. v. United States, supra, 449 U.S. at 400.* However, where the material in issue discloses the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of the party, a far greater showing is required to pierce the doctrine's protection, and there is some authority that the protection afforded such opinion work product may be absolute. See generally *Upjohn Co. v. United States, supra, 449 U.S. at 400-02; Hickman v. Taylor, 329 U.S. 495, 510-13, 91 L. Ed. 451, 67 S. Ct. 385 (1947); United States v. Adlman, supra, 134 F.3d at 1204.*

Documents that are generated in connection with a patent application are not protected by the work-product doctrine simply because an issued patent may [*16] give rise to an infringement action. See *Stryker Corp. v. Intermedics Orthopedics, supra, 145 F.R.D. at 302; Status Time Corp. v. Sharp Electronics Corp., 95 F.R.D. 27, 29 (S.D.N.Y. 1982).* However, documents pertaining to the patent application process which were also prepared because of actual or anticipated litigation may be protected by the work-product doctrine. See *In re Minebea Corp., supra, 143 F.R.D. at 500-01 (S.D.N.Y. 1992).*

B. Softview's Challenges

1. The Sufficiency of Haworth's Privilege Log

Softview's first general challenge is directed to the adequacy of Haworth's privilege log. Softview argues that the log is insufficient under *Fed.R.Civ.P. 26(b)(5)* and Local Civil Rule 26.2.

*Fed.R.Civ. 26(b)(5)* provides that:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that,

Page 6

2000 U.S. Dist. LEXIS 4254, *16; 58 U.S.P.Q.2D (BNA) 1422

without revealing information itself privileged or protected, will [*17] enable other parties to assess the applicability of the privilege or protection.

Local Rule 26.2 provides that an attorney asserting the privilege for documents shall identify the type of document; the "general subject matter of the document"; the date of the document, and "such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other." Local Civil Rule 26.2(a)(2)(A).

A party may support its claims of privilege by the submission of "affidavits or equivalent statements that address each document in issue," *Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 473*, or by the submission of an "adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." *150 F.R.D. at 474*.

In addition to its privilege log, Haworth has submitted the affidavit of Dale H. Thiel, Esq., Haworth's outside patent counsel (Thiel Aff. P 2). In his affidavit, [*18] counsel supplements the document descriptions contained in the privilege log and sets forth specific facts surrounding the creation of individual documents and groups of documents. Read together, the privilege log and the Thiel Affidavit provide descriptions which meet the requirements of *Fed.R.Civ.P. 26(b)(5)* and Local Civil Rule 26.2. See *CSC Recovery Corp. v. Daido Steel Co., 1997 U.S. Dist. LEXIS 16346, *7, 94 Civ. 9214 (LAP)(THK), 1997 WL 661122 at *2* (S.D.N.Y. Oct. 22, 1997) ("Courts . . . may rely upon privilege logs supplemented by attorney affidavits."). Accordingly, Softview's motion to compel production on this ground is denied.

## 2. The Crime-Fraud Exception

As a second general objection, Softview challenges every document on Haworth's privilege log on the basis of the crime-fraud exception.

Softview alleges that Haworth committed fraud on the Patent and Trademark Office (the "PTO") by failing to inform it that the European Patent Office (the "EPO") considered a German patent ("the Siemans Patent") to be

relevant prior art in connection with Haworth's European patent application, which was pending at the same time as Haworth's United States patent application. Softview does not dispute [*19] that Haworth submitted the Siemans Patent to the PTO, but argues that intent to commit fraud can be inferred from Haworth's failure to inform the PTO of the EPO's position with regard to the Siemans patent and Haworth's failure to provide an English-language translation of the Siemans patent to the PTO. Softview also alleges that Haworth committed fraud on the PTO by claiming in 1984 that its invention had enjoyed substantial commercial success without a sufficient basis for the claim (Pltf. Mem. of Law at 21).

Analysis of Softview's argument requires a basic understanding of the difference between inequitable conduct before the Patent Office, on the one hand, and common law fraud, also known as Walker Process fraud, n6 on the other.

> n6 The term "Walker Process fraud" is derived from *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965)*, in which the Supreme Court held that proof that a patentee has obtained a patent by "knowingly and willfully misrepresenting facts to the Patent Office" deprives a patentee of the antitrust immunity it would otherwise enjoy. *382 U.S. at 177*.

[*20]

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the [Patent] Office all information known to that individual to be material to patentability . . . ." *37 C.F.R. § 1.56(a)*. See *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995)*. A violation of this duty of candor is commonly referred to as "inequitable conduct." *J.P. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553, 1559 (Fed. Cir. 1984)*. Although inequitable conduct encompasses traditional, common law fraud, it is broader than common law fraud. *Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1069 (Fed. Cir. 1998); J.P. Stevens & Co. v. Lex Tex Ltd., supra, 747 F.2d at 1559*, citing *Norton v. Curtiss, 57 C.C.P.A. 1384, 433 F.2d 779, 793 (C.C.P.A.*

2000 U.S. Dist. LEXIS 4254, *20; 58 U.S.P.Q.2D (BNA) 1422

*1970)*. The effect of inequitable conduct on the enforceability of the patent is determined by weighing the materiality of the misrepresented or omitted information in conjunction with the intent of the applicant. *Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998);* [*21] *Halliburton Co. v. Schlumberger Technology Corp., 925 F.2d 1435, 1439 (Fed. Cir. 1991).*

The term "Walker Process fraud", on the other hand, is usually used to describe a knowing or intentional misrepresentation or omission in the patent prosecution process, coupled with actual reliance by the Patent Office. Walker Process fraud is more serious misconduct and may result in a patentee being found liable for antitrust violations. See generally *Nobelpharma AB v. Implant Innovations, Inc., supra, 141 F.3d at 1069-70.*

In *In re Spalding Sports Worldwide, Inc., supra, 203 F.3d 800,* the Federal Circuit expressly addressed whether a prima facie showing of inequitable conduct alone was sufficient to pierce the attorney-client privilege, and answered that question in the negative. After discussing the difference between inequitable conduct and common law, or Walker Process fraud, the Court noted that the latter required "'higher threshold showings of both intent and materiality . . . .'" *203 F.3d at 807,* quoting *Nobelpharma AB v. Implant Innovations, Inc., supra, 141 F.3d at 1070.* The Court then went [*22] on to hold that the absence of any evidence of fraudulent intent in the case before it precluded a finding of common law fraud sufficient to pierce the privilege:

> We conclude that [defendant] has not made a prima facie showing that the invention record was made in furtherance of fraud during the prosecution of the '178 patent. Although the party seeking to overcome the attorney-client privilege need not conclusively prove fraud, or necessarily submit direct evidence to make a prima facie showing of fraud, [defendant's] mere allegation of [patentee's] failure to cite a reference to the PTO will not suffice. See *Nobelpharma, 141 F.3d at 1071, 46 U.S.P.Q.2D (BNA) 1097, 1107.* In actuality, a citation of prior art in an invention record in the absence of evidence of a purpose to conceal that art

would seem to be the opposite of furthering fraud; it informs the patent attorney or agent of the closest prior art. What the attorney then does with that information is another matter, but inclusion of the closest prior art in an invention record does not alone provide evidence of furthering a fraud. Because [defendant] failed to provide any evidence of fraudulent [*23] intent, we conclude that the crime-fraud exception does not apply, and that [patentee's] invention record is protected by the attorney-client privilege.

*In re Spalding Sports Worldwide, Inc., supra, 203 F.3d at 808.* See also *McCook Metals L.L.C. v. Alcoa Inc., 192 F.R.D. 242, 2000 U.S. Dist. LEXIS 2309, 2000 WL 246213* at *14 (W.D. Ill. 2000); *Monon Corp. v. Stoughton Trailers, Inc., 169 F.R.D. 99, 101-02 (N.D. Ill. 1996); Laser Industries, Ltd. v. Reliant Technologies, Inc., 167 F.R.D. 417, 425 (N.D. Cal. 1996); American Optical Corp. v. United States, 179 U.S.P.Q. 682, 684 (Ct. Cl. 1973)* ("In order to pierce the privilege, it is not enough to show merely inequitable conduct before the Patent Office.").

In light of Spalding, Softview's claim that Haworth failed to inform the PTO of the EPO's view of the Siemans Patent and failed to provide an English translation of the Siemans Patent is not sufficient to pierce the privilege.

Turning first to Softview's claim that Haworth failed to inform the PTO of the EPO's assessment of the Sieman's Patent, The Federal Circuit has stated [*24] "the details of foreign prosecution are not an additional category of material information." *ATD Corp. v. Lydall, Inc., 159 F.3d 534, 547 (Fed. Cir. 1998).* Thus, Haworth's alleged failure to inform the PTO of the EPO's evaluation of the Sieman's patent cannot constitute fraud, because it does not meet the materiality requirement for a showing of fraud.

Turning next to Softview's claim that Haworth failed to submit an English translation of the Sieman's patent to the PTO, the Federal Circuit's recent opinion in *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co., 204 F.3d 1368, 2000 WL 233253 (Fed. Cir. 2000),* is instructive.

2000 U.S. Dist. LEXIS 4254, *24; 58 U.S.P.Q.2D (BNA) 1422

In *Semiconductor Energy*, the patentee submitted a twenty-nine (29) page Japanese reference to the PTO in the original Japanese, accompanied by "a concise explanation of its relevance, and an existing one-page partial English translation from a prior unrelated patent application." *204 F.3d 1368, 2000 U.S. App. LEXIS 3164, *4, 2000 WL 233253 at *2*. In the ensuing infringement action, the District Court found the patent unenforceable for inequitable conduct, holding that "by submitting a concise explanation [*25] and a one-page partial translation of the [Japanese] reference that were accurate but misleadingly incomplete, [the patentee] had intentionally with-held the [Japanese] reference from the PTO." *204 F.3d 1368, 2000 U.S. App. LEXIS 3164, *7, 2000 WL 233253 at *2*. The Federal Circuit affirmed, finding that:

> By submitting the entire untranslated [Japanese] reference to the PTO along with a one-page, partial translation focusing on less material portions and a concise statement directed to these less material portions, [the patentee] left the examiner with the impression that the examiner did not need to conduct any further translation or investigation. Thus, [the patentee] deliberately deceived the examiner into thinking that the [Japanese] reference was less relevant than it really was, and constructively withheld the reference from the PTO.

> * * *

> The duty of candor does not require that the applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching.

*204 F.3d 1368, 2000 U.S. App. LEXIS 3164, *22-25, 2000 WL 233253 at *8-*9*.

In this case, Softview [*26] alleges that Haworth failed to provide any translation of the Sieman's Patent to the PTO, not that Haworth submitted a partial translation that it knew would mislead the examiner. Thus, the facts

here are materially different from those presented in *Semiconductor Energy*.

The regulations in effect at the time Haworth was prosecuting its patent application required the applicant to submit a translation of foreign documents only where one was "readily available." *37 C.F.R. § 1.98(b) (1983)*. n7 Haworth has submitted evidence that a translation of the Siemans Patent was not readily available at the time it submitted its application to the PTO, see Thiel Aff. P 109, and, thus, Haworth's failure to submit a translation does not, by itself, constitute evidence of fraudulent intent. n8

> n7 Title 37 was amended in 1992 to require the submission of a "concise explanation of the relevance . . . of each patent . . . that is not English language[,]" and any translation of a non-English language document, or portion thereof, which is "within the possession, custody or control" the applicant, or "readily available." *37 C.F.R. § 1.98(a)(3)* and (c) (2000).

[*27]

> n8 Haworth's position that submitting the untranslated patent was not intended as an attempt to defraud the PTO is also supported by Section 901.05(d) of the Manual of Patent Examining Procedure, which provides that: "Examiners may consult the translators in the Translation Branch of the Scientific and Technical Information Center (STIC) for oral assistance in translating foreign patents or literature that are possible references for an application being examined." Section 901.5(d) also provides that examiners may request written translations of pertinent portions of references from the Translation Branch.

Softview's allegation that Haworth committed fraud on the PTO by overstating the commercial success of its device is also insufficient to pierce the privilege. Haworth argued to the PTO that its adjustable keyboard support mechanism ("AKP") enjoyed commercial success, and cites deposition testimony to demonstrate that, by 1983, its AKP had won an industry design award, been imitated by competitors, and had generated a great deal of customer interest (Def. Mem. of Law at 21). Softview,

Page 9

2000 U.S. Dist. LEXIS 4254, *27; 58 U.S.P.Q.2D (BNA) 1422

however, [*28] has not shown that Haworth's claim that its product enjoyed "substantial and significant commercial success" induced the PTO to issue a patent which it would not otherwise have issued. See *Nobelpharma, supra, 141 F.3d at 1071* (a finding of fraud "must be based on independent and clear evidence of deceptive intent together with a clear showing of reliance, i.e., that the patent would not have issued but for the misrepresentation or omission."). Thus, Softview's argument in this regard is also insufficient to pierce the privilege.

Softview challenges a number of Haworth's documents on the crime-fraud exception alone (see Pltf. Ex. A). Because I find that Softview's allegations of fraud are insufficient to pierce Haworth's claims of privilege, Softview's motion to compel production is denied as to documents 281, 282, 283, 284, 285, 286, 287, 288, 294, 298, 299, 300, 301, 303, 304, 307, 315, 317, 318, 319, 320, 321, 322, 324, 325, 327, 328, 330, 331, 333, 334, 337, 338, 340, 341, 342, 343, 345, 348, 351, 354, 356, 357, 358, 360, 465, 467, 468, 469, 470, 475, 483, 484 and 485.

C. Particular Objections

1. Transmittal Letters and Cover Sheets

Haworth has [*29] designated as privileged a number of transmittal letters and fax cover sheets. Upon in camera inspection, these documents are clearly not protected by either the attorney-client privilege or the work-product doctrine. These documents do not contain confidential factual communications made by Haworth for the purpose of securing legal advice, nor do they contain any legal advice, opinions or analysis from counsel which would reveal such communications. Such documents are not protected by the attorney-client privilege. See *Burroughs Wellcome Co. v. Barr Laboratories, Inc., 143 F.R.D. 611, 615 (E.D.N.C. 1992); P & B Marina Ltd. Partnership v. Logrande, 136 F.R.D. 50, 54 (E.D.N.Y. 1991)*, aff'd mem., *983 F.2d 1047 (2d Cir. 1992)*. Furthermore, these documents do not contain any information which indicates that they were created because of any pending or anticipated litigation. See *United States v. Adlman, supra, 134 F.3d at 1202* ("It should be emphasized that the 'because of' formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been [*30] created in essentially similar form irrespective of the litigation.").

Upon review, I find that documents 16, 44, 53 n9, 85, 101, 108, 109, 130, 160, 162, 184, 197, 209, 217, 218 n10, 225, 226, 259, 260, 265, 266, 274, 275, 289, 297, 355, 370, 372, 379, 386, 392, 393, 397, 402, 407, 409, 410, 421, 427, 428, 431, 433, 436, 444, 453, 456 and 478 are cover letters or facsimile transmittal cover sheets and are not entitled to protection by the attorney-client privilege or the work-product doctrine.

> n9 Document 53 should be produced without attachments. See Section III.C.5, below.

> n10 The draft letters attached to document 218 are privileged. See Section III.C.15, below. Therefore, document 218 should be produced without attachments.

2. U.S. Patent Prosecution Documents

Softview argues that documents relating to Haworth's United States patent application are not protected by the attorney-client privilege or the work-product doctrine, relying upon *Detection Systems, Inc. v. Pittway Corp, 96 F.R.D. 152, 154-55 (W.D.N.Y. 1982)*. [*31] n11 As noted above, however, such documents may be protected by the attorney-client privilege or the work-product doctrine in appropriate circumstances, and the view espoused in Detection Systems has been criticized by more recent authority. See *In re Spalding Sports Worldwide, Inc., supra, 203 F.3d at 806 n.3; Hydraflow, Inc. v. Enidine, Inc., supra, 145 F.R.D. at 631; Cuno, Inc. v. Pall Corp., supra, 121 F.R.D. at 201*. Accordingly, to the extent that the challenged documents contain confidential information communicated by Haworth for the purpose of securing counsel's advice and assistance in obtaining the '798 patent, those documents are privileged.

> n11 Softview challenges documents 1, 3, 5, 6, 7, 9, 11, 37, 39, 55, 56, 58, 61, 62, 63, 64, 65, 66, 68, 79, 105, 114, 118, 172 and 183 on this basis.

However, upon in camera review, I find that documents 3, 37, 39, 58, 64, 65, 66, 68, 79, 114, 118 and 183 do not contain such information and are not protected [*32] by the attorney-client privilege or the work-product doctrine. Document 3 is an authorization

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 25 of 53

Page 10

2000 U.S. Dist. LEXIS 4254, *32; 58 U.S.P.Q.2D (BNA) 1422

from Haworth to counsel to file a patent application, and contains no confidential information. Document 37 is a memorandum of a conference with the patent examiner, which does not contain confidential communications or advice or any information to indicate that it was created because of anticipated litigation. Documents 39 and 79 are status reports regarding Haworth's patent application which do not reveal any client confidences or legal analysis. Document 58 is a cryptic memorandum of a patent search that counsel conducted at the PTO; it does not reveal any client confidences, and nothing about it suggests that it was prepared in anticipation of litigation. Document 64 is a status report from counsel to Haworth regarding the progress of its patent application.

Document No. 65 is a response to counsel's request to another attorney to order patents which "may have been potentially pertinent prior art" (Thiel Aff. P 23). Although Haworth claims that this document is protected by both the attorney-client privilege and the work-product doctrine, this letter does not reveal any client confidences [*33] or attorney thought processes. To the extent the patents requested reflect patent counsel's thought process, that aspect of counsel's analysis is already a matter of public record inasmuch as the two patents requested were disclosed to the Patent Office (see document 64).

Document 66, which Haworth designated as protected by both the work-product and attorney-client privilege, is an authorization from Haworth directing counsel to file a continuation application with the PTO, which contains no other information. Document 68 is counsel's handwritten notes of a conference which do not reveal any client confidences or contain any information which suggests that they were prepared because of any actual or anticipated litigation. Document 114 is counsel's notification that the '798 Patent was about to issue and instructions to Haworth to mark its device with the patent number. Document 114 contains no client confidences, nor does it reflect counsel's opinions regarding any actual or anticipated litigation. Document 118 is a cover letter from counsel to Haworth enclosing a copy of the '798 patent. Document 183 is a patent search report conducted by another law firm and sent to counsel. [*34] These documents do not reveal any information, technical or otherwise, communicated from Haworth to counsel, nor were they prepared because of actual or anticipated litigation.

3. Correspondence with or Notes of Haworth's Domestic Counsel Concerning Foreign Patent Applications

Softview objects to Haworth's withholding a number of documents to, from or by its domestic counsel, concerning Haworth's European and Japanese patent applications, and argues that communications in furtherance of foreign patent applications are not privileged (Pltf. Mem. of Law at 12). n12 Again, to the extent that these documents reflect confidential information communicated by Haworth for the purpose of obtaining legal services in connection with its foreign patent applications, or were prepared because of pending or anticipated litigation, they are protected as discussed above.

n12 Softview objects to the following documents still in issue on the ground that they are improperly withheld foreign prosecution documents: 12, 13, 14, 15, 17, 38, 42, 50, 57, 70, 77, 81, 83, 89, 90, 96, 97, 98, 99, 102, 107, 136, 139, 140, 145, 149, 165, 169, 180, 187, 203, 308 and 335.

[*35]

However, certain of these documents do not meet the criteria for either privilege. Document 12 is a letter from counsel informing Haworth of the expiration of the period for filing its European patent application. Documents 42 and 139 are letters discussing the anticipated cost of translating Haworth's patent and pursuing the EPO application. Documents 50, 90, 96, 97, 102, 107, 145 and 149 are status reports regarding the progress of Haworth's European application. Document 57 is a search request from counsel to the EPO. Document 77 is a set of claims that was submitted to the EPO, and, therefore, is not protected by the attorney-client privilege. n13 Document 98 is Haworth's direction to discontinue pursuit of the EPO application, and document 140 is Haworth's direction to resume. Documents 165 and 203 are status reports regarding Haworth's Japanese patent application. Documents 169 and 335 are Haworth's authorizations to proceed with the Japanese application. None of these documents reveal any confidential communication from Haworth for the purpose of obtaining legal advice or services, nor were they prepared because of any pending or anticipated litigation. They are business documents [*36] created

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 26 of 53

Page 11

2000 U.S. Dist. LEXIS 4254, *36; 58 U.S.P.Q.2D (BNA) 1422

incident to Haworth's foreign applications. Therefore, Haworth is directed to produce documents 12, 42, 50, 57, 77, 90, 96, 97, 98, 102, 107, 139, 140, 145, 149, 165, 169, 203, and 335.

> n13 Haworth does not claim work-product protection for this document (Def. Mem. of Law, Ex. A).

### 4. Foreign Agents

Softview objects to Haworth's designation of communications between its United States counsel and the German patent agents involved in prosecuting the EPO application, arguing that Haworth has not demonstrated that German law protects such communications. n14

> n14 Softview objects on this ground to the following documents which are still in issue: 29, 36, 43, 69, 71, 75, 76, 78, 80, 82, 84, 87, 95, 100, 104, 135, 137 and 142.

"If a communication with a foreign patent agent involves a foreign patent application, then as a matter [*37] of comity, the law of that foreign country is considered regarding whether that law provides a privilege comparable to the attorney-client privilege." *Bristol-Myers Squibb v. Rhone-Poulenc Rorer, Inc., 1998 U.S. Dist. LEXIS 4213, *2, 95 Civ. 8833 (RPP), 1998 WL 158958 at *1* (S.D.N.Y. Apr. 2, 1998); see also *McCook Metals L.L.C. v. Alcoa Inc., supra, 2000 WL 246213* at *11; *Advertising to Women, Inc. v. Gianni Versace S.p.A., 1999 U.S. Dist. LEXIS 12263,* No. 98 C 1553, *1999 WL 608711* at *2 (N.D. Ill. Aug. 4, 1999); *Saxholm AS v. Dynal, Inc., 164 F.R.D. 331, 337 (E.D.N.Y. 1996); Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 520 (S.D.N.Y. 1992).* German law protects communications between a patent agent and his or her clients. *Golden Trade, supra, 143 F.R.D. at 524.* n15 Accordingly, communications to Haworth's German patent agents are protected by the attorney-client privilege to the same extent as communications to domestic attorneys.

> n15 The German Penal Code provides for a fine or term of imprisonment of up to one year for

patent agents who disclose clients' business or trade secrets. § 203(1) Nr.3 StGB.

[*38]

Upon in camera review, however, it appears that certain of these documents are not eligible for attorney-client protection because they do not reflect client confidences. Documents 36, 87, 95 and 104 are status reports regarding Haworth's EPO application. Document 43 is an instruction to the German agent not to obtain a translation of certain documents. Document 80 is counsel's authorization to the German agents to proceed with drafting claims for submission to the EPO. Documents 135 and 137 concern the expected cost of filing for patent protection in certain European countries. Accordingly, Haworth is directed to produce documents 36, 43, 80, 87, 95, 104, 135 and 137.

### 5. Documents Created Before the Issuance of the '798 Patent

Softview next argues that the work-product doctrine cannot protect any documents that were prepared before the issuance of the '798 patent, because, until that time, Haworth had no patent to form the basis of an infringement action or to defend (Pltf. Mem. of Law at 15). n16 However, documents prepared in connection with a patent application may be eligible for work-product protection even before the issuance of the patent. See *In re Minebea Corp., supra, 143 F.R.D. at 500-01 (S.D.N.Y. 1992).* [*39]

> n16 Softview objects to Haworth's claim of work-product protection for the following documents still in issue: 17, 55, 56, 61, 62, 63 and 105.

In Minebea, the patent holder sought work-product protection for information concerning its patent application, asserting that it anticipated litigation regarding the patent as early as eleven months before the patent was issued. *143 F.R.D. at 500.* The court noted that:

> Generally, work performed by an attorney to prepare and prosecute a patent application does not fall within the

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 27 of 53

Page 12

2000 U.S. Dist. LEXIS 4254, *39; 58 U.S.P.Q.2D (BNA) 1422

parameters of the work-product protection . . . since the prosecution of [a] patent application is a non-adversarial, ex parte proceeding. Thus, work done to that end is not "in anticipation of" or "concerning" litigation. This rule does not, however, preclude application of the work product protection to work performed to prosecute a patent application if it was also performed in anticipation of or concerning litigation.

*143 F.R.D. at 499.* [*40] Accord *Bristol-Myers Squibb v. Rhone-Poulenc Rorer Inc., 1998 U.S. Dist. LEXIS 12, 45 U.S.P.Q.2D (BNA) 1775, 1779-80 (S.D.N.Y. 1998).*

The Minebea Court went on to hold that information pertaining to the patent prosecution was protected work-product if produced on or after the date upon which the patent holder anticipated litigation, regardless of the fact that the patent did not issue until almost a year later. *143 F.R.D. at 501.* Thus, in assessing claims of work-product protection, the crucial date is the date upon which the party asserting the work-product doctrine anticipated litigation regarding the patent, not when the patent was actually issued.

In this case, Haworth claims that competitors introduced AKP models at a trade show in June 1983, one week after Haworth filed a patent application for its AKP, and that Haworth believed these AKP models would infringe its patent once issued (Thiel Aff. P 4, 9). Therefore, Haworth maintains that it contemplated the possibility of litigation with these competitors as early as June 1983, and all of the documents pertaining to its application for the '798 patent were prepared with subsequent litigation in mind [*41] (Def. Mem. of Law at 18). In camera review confirms that the challenged documents still in issue in this category reflect that counsel's claim drafting and prosecution of the patent application were informed by Haworth's anticipation of litigation against its competitors once the '798 patent issued.

Softview also objects to documents 27 and 53, both correspondence sent from Haworth to counsel regarding competitive AKP mechanisms, on the ground that they pre-date the issuance of the '798 patent and Haworth has not shown that either contains communications seeking or providing legal advice.

As noted above, 53 is a cover letter, to which documents 51 and 52 are attached. Although I find that documents 51 and 52 are privileged (see Section III.C.8, below), document 53, to the extent that it is a cover letter, is not, and it should be produced without attachments.

However, document 27 is a confidential communication from Haworth seeking counsel's advice, and, as such, is protected.

6. Documents Created After The Issuance of the '798 Patent

Softview also objects to Haworth's claim of work-product protection for certain documents prepared after the issuance of the '798 patent. [*42] However, Haworth has dropped its claim of work-product protection for all of the challenged documents except 114, 118, 183 and 492. Documents 114, 118 and 183 are discussed in Section III.C.2, above, and were not prepared because of anticipated litigation. Document 492 is a draft EPO patent application with counsel's handwritten notes. In his affidavit, counsel does not assert that this document was created because of pending or anticipated litigation. However, Haworth also claims that this draft patent application is protected by the attorney-client privilege. As discussed more fully below in Section III.C.12, I find that document 492 is protected by the attorney-client privilege.

7. Third Party Licensing Agreements

Softview objects to the designation of a number of documents related to Haworth's licensing agreements with third parties. n17 Softview argues that Haworth has not met its burden of showing that these documents are protected by either the work-product doctrine or the attorney-client privilege. Haworth argues that these documents are covered by both the attorney-client privilege and the work-product doctrine because they contain confidential communications from Haworth [*43] to counsel, made to obtain legal advice regarding negotiations with competitors, and were created in anticipation of litigation with these same competitors if negotiations were unsuccessful.

n17 Softview objects to the designation of the following documents which are still in issue on the ground that they are improperly withheld third party licensing documents: 103, 123, 125, 126,

2000 U.S. Dist. LEXIS 4254, *43; 58 U.S.P.Q.2D (BNA) 1422

127, 129, 138, 141, 146, 161, 166, 167, 257, 305, 361, 385, 387, 388, 391, 394, 396, 398, 401, 405, 412, 413, 415, 417, 420, 422, 425, 430, 432, 434, 437, 438, 439, 442, 445, 450, 455, 459, 460, 462, 466, 502, 507, 508 and 512.

To a large extent, I find that the challenged documents are protected by the work-product doctrine, the attorney-client privilege, or both, insofar as they are communications regarding negotiations and anticipated litigation strategy, and contain client confidences. Upon in camera review, however, documents 126, 127, 388, 391, 434, 450, 459 and 502 do not fall under either category of protection.

Documents [*44] 126 and 127 are Haworth's request for and counsel's transmittal of the '798 patent number, and do not disclose any confidential information or legal analysis. Document 388 is a handwritten note from counsel to a "Berta", directing her to "set up a file for Haworth".

Document 391 consists of a transmittal memorandum informing counsel that two letters to be sent to competing companies are acceptable. The letters are attached, and advise the competitors that Haworth believes one to be infringing its '798 patent and that Haworth intends to investigate possible infringement by the other. The only markings on the letters are spelling corrections.

Document 434 is an authorization from Haworth to counsel to send a letter to a competitor. Document 450 is a facsimile message which contains the address of a company interested in licensing Haworth's AKP. Documents 459 and 502 are telephone message slips which do not contain any confidential communications or concern any pending or anticipated litigation.

These documents do not reveal confidential communications from Haworth, nor is there any basis to conclude that they were prepared because of pending or anticipated litigation. Accordingly, [*45] Haworth is directed to produce documents 126, 127, 388, 391, 434, 450, 459 and 502.

8. Documents 51 and 52

Softview argues that documents 51 and 52, internal engineering reports regarding competitors' keyboard mechanisms, which were produced by a Haworth employee and submitted to both his superior and counsel, are not entitled to work-product protection because they were not prepared by or for an attorney. However, as the Thiel Affidavit makes clear, these documents were intended to provide information to counsel, and that information was to provide the basis of counsel's evaluation of possible infringement by competitors (Thiel Aff. P 14). As such, they are protected work-product notwithstanding the fact they were not prepared by an attorney. *Fed.R.Civ.P. 26(b)(3)*.

9. Handwritten Notes

Softview argues that Haworth has not carried its burden of showing that the work-product doctrine or the attorney-client privilege protects any of counsel's handwritten notes. n18 Several of the documents from this category have been discussed above in connection with Softview's other objections, and I have conducted an in camera review of each document still in dispute.

n18 Softview objects to the following handwritten notes still in issue: 1, 4, 5, 7, 13, 17, 34, 54, 61, 62, 122, 124, 164, 172, 192, 196, 204, 214, 234, 252, 255, 277, 290, 291, 292, 293, 326, 352, 447, 464 and 493.

[*46]

Most of these documents reveal either counsel's thought processes regarding pending or anticipated litigation or refer to confidential facts communicated from Haworth for the purpose of securing his advice, or both. However, Haworth has designated certain documents in this category which do neither.

Document 192 contains only possible dates for a planned meeting between counsel and a Haworth representative. Document 214 is counsel's notes of a conference with a Haworth official reflecting certain terms of Haworth's proposed licensing agreement with a competitor, and reflects only business and financial information, not legal advice or litigation strategy. Document 493 is an address and contact information for a Haworth licensee. Accordingly, Haworth is directed to produce documents 192, 214, and 493.

10. Documents 31, 35, 108, 297, 490 & 491

2000 U.S. Dist. LEXIS 4254, *46; 58 U.S.P.Q.2D (BNA) 1422

Softview also objects to Haworth's withholding of documents 31, 35, 108, 297, 490 and 491 on the ground that Haworth has not indicated that they were intended to seek or give legal advice and that they predate the '798 patent.

Document 31 contains legal advice from counsel, and on its face appears to have been prepared in anticipation [*47] of litigation. Document 35, however, is a status report relating the fact that counsel had a conference with the patent examiner on August 17, 1983, and does not reveal any confidential communications or relate to any pending or anticipated litigation.

Documents 490 and 491 contain sales figure information which was specifically prepared to assist in the present dispute with Softview, and, as such, are protected work-product. As noted above at Section III.C.1, documents 108 and 297 are cover letters only, which do not reveal any confidential information.

Accordingly, Haworth is directed to produce documents 35, 108 and 297.

### 11. Press Release Documents

Softview also objects to the designation of documents 110, 111, 112, 113, 115 and 116, which are all related to the issuance of a press release by Haworth. Softview argues that communications addressing public relations are not privileged, relying on *Burroughs Wellcome Co. v. Barr Lab., Inc., 143 F.R.D. 611 (E.D.N.C. 1992)*. However, the document which the court held discoverable in Burroughs "[was] an internal memorandum . . . concerning internal communications problems. The memorandum appeared to be wholly [*48] unsolicited." *143 F.R.D. at 613*. By contrast, the documents in issue here are requests for advice from Haworth regarding the timing and content of its contemplated press release, and the attorney's response. Furthermore, these documents contain discussions of Haworth's then-ongoing litigation with a competitor and reflect counsel's views concerning that litigation. Therefore, Softview's motion is denied as to these documents.

### 12. Draft Documents

Softview maintains that Haworth has improperly withheld documents that are drafts of documents intended for disclosure to third parties or the patent office. n19

n19 Softview challenges document nos. 6, 9, 173, 177, 178, 244, 247, 249, 251, 253, 254, 262, 263, 267, 268, 269, 271, 353, 362, 364, 366, 367, 368, 371, 373, 374, 382, 389, 390, 403, 426, 429, 435, 451, 454, 457, 458, 479, 499, 505 and 511 on this basis (Pltf. Mem. of Law at 18).

Drafts of documents prepared by an attorney for transmission to third parties are protected by the attorney-client [*49] privilege only where the draft document contains confidential information communicated by the client to the attorney that is maintained in confidence. *In re Grand Jury Subpoena, 731 F.2d 1032, 1037 (2d Cir. 1984); Asset Value Fund Ltd. Partnership v. Care Group, Inc., 1997 U.S. Dist. LEXIS 17968, 97 Civ. 1487 (DLC)(JCF), 1997 WL 706320 at *6 (S.D.N.Y. Nov. 12, 1997); In re Kidder Peabody Sec. Litig., 168 F.R.D. 459, 474 (S.D.N.Y. 1996); Sequa Corp. v. Gelmin, 1994 U.S. Dist. LEXIS 14005, 91 Civ. 8675 (CSH), 1994 WL 538124 at *3 (S.D.N.Y. Oct. 3, 1994); United States Postal Serv. v. Phelps Dodge Refining Corp., 852 F. Supp. 156, 162-63 (E.D.N.Y. 1994); Bowne of New York City, Inc. v. AmBase Corp., supra, 150 F.R.D. at 490*.

In this case, the majority of the draft documents challenged by Softview contain attorney's notes and confidential communications from the client, and are therefore protected.

However, documents 263, 269, 271, 373 and 374 are either cover letters transmitting drafts of other documents, and not the drafts themselves, or documents which contain no confidential information or legal advice. Accordingly, those portions of documents [*50] 263, 269, 271, 373 and 374 which are transmittal letters or cover sheets should be produced, without the attached drafts.

Document 367 consists only of a facsimile cover sheet and transmittal letter. It contains no confidential information or advice, and does not appear to have been prepared because of pending or anticipated litigation. Accordingly, document 367 should be produced in its entirety.

Documents 173, 177, 178 are cover letters addressed to co-counsel which transmit drafts of letters intended for Haworth's competitor, Webber Knapp. Although the draft letters reveal counsel's thought processes, the cover

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 30 of 53

Page 15

2000 U.S. Dist. LEXIS 4254, *50; 58 U.S.P.Q.2D (BNA) 1422

letters do not. Therefore, the cover pages of documents 173, 177 and 178 should be produced to Softview, without attachments.

Softview also seeks the production of documents 6 and 9, which are drafts of the patent application that Haworth submitted to the PTO. There is a split of authority on the issue of whether draft patent applications are protected by the attorney-client privilege. Compare, e.g., *Saxholm AS v. Dynal, Inc., supra, 164 F.R.D. at 335* ("The weight of authority favors disclosure of draft patent applications."), with *McCook Metals, LLC* [*51] *v. Alcoa, Inc., 192 F.R.D. 242, 2000 U.S. Dist. LEXIS 2309, *19, 2000 WL 246213* at *7 (N.D. Ill. 2000) ("A draft [patent application] necessarily reflects the communications between a client and his attorney . . . . A patent draft implicitly contains the legal opinion and advice of the attorney.").

In Saxholm, the Court found that "two considerations favor a finding that, at least to the extent it finds its way into a draft application, information communicated to an attorney by his client should not be protected by the privilege." *164 F.R.D. at 335.* "First, although the client makes the communication of such information to seek advice and services, the advice and services sought are not purely, or even primarily, legal." *164 F.R.D. at 335.* Second, client communications concerning a draft patent application "are made with the distinct understanding that the information conveyed may well be revealed." *164 F.R.D. at 336.*

However, the view that a patent attorney's services in connection with a patent application are not legal in nature was recently rejected by the Federal Circuit in *In re Spalding Sports Worldwide, Inc., supra, 203 F.3d 800,* [*52] in which the Court held that an invention record submitted by the inventors to Spalding's legal department for the purpose of making a patentability determination was a privileged communication "made for the purpose of obtaining legal advice." *203 F.3d at 805.* "Since Spalding's invention record was prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal services in preparing a patent application, we conclude that it is privileged in its entirety." *203 F.3d at 806.* See also *Sperry v. Florida, supra, 373 U.S. at 383* ("The preparation and prosecution of patent applications for others constitutes the practice of law."); *Knogo Corp. v. United States, supra, 213 U.S.P.Q. at 940.* Furthermore, the Court in Spalding held

that the invention record was protected notwithstanding the fact that it contained information which would ultimately be disclosed to the patent office.

> "The fact that much of the technical information in one form or another finds its way into the patent application, to be made public when the patent issues, should not preclude the assertion of the privilege [*53] over the communication in which that information was disclosed to the attorney. If an attorney-client communication could be discovered if it contained information known to others, then it would be the rare communication that would be protected and, in turn, it would be the rare client who would freely communicate to an attorney."

*In re Spalding Sports Worldwide, Inc., supra, 203 F.3d at 806,* quoting *Knogo Corp. v. United States, supra, 1980 U.S. Ct. Cl. LEXIS 1262, 313* U.S.P.Q. at (BNA) 941. See also *Messagephone, Inc. v. SVI Systems, Inc., supra, 1998 U.S. Dist. LEXIS 18471, *5, 1998 WL 812397* at *2; ("The argument that there is no reasonable expectation of confidentiality in communications the inventor knows will be disclosed to the patent office fails . . . . Not every communication the inventor has with his attorney will be passed on the patent office.").

In light of the Federal Circuit's decision in Spalding, I believe that the better rule is one which extends the privilege to draft patent applications. See *McCook Metals L.L.C. v. Alcoa, supra, 2000 WL 246213* at *3-*4, *7 (analyzing Knogo and Spalding and holding that draft patent applications are privileged); [*54] see also *Conner Peripherals Inc. v. Western Digital Corp., 1993 U.S. Dist. LEXIS 20149, 31 U.S.P.Q.2D (BNA) 1042, 1046 (N.D. Cal. 1993)* (draft patent applications "reflect the complex discourse between an inventor and his patent attorney and their efforts to obtain the strongest permissible patent protection for the invention."); *Rohm & Haas Co. v. Brotech Corp., 815 F. Supp. 793, 796-97 (D. Del. 1993)* (draft patent applications "often contain information and communications . . . which are intended to be considered confidential between attorney and client" and are therefore privileged), aff'd mem., *19 F.3d 41 (Fed. Cir. 1994); Ball Corp. v. American National*

2000 U.S. Dist. LEXIS 4254, *54; 58 U.S.P.Q.2D (BNA) 1422

*Can Co., 1993 U.S. Dist. LEXIS 19537, 27 U.S.P.Q.2D (BNA) 1958, 1959 (S.D. Ind. 1993)* ("This Court . . . joins with those others which have recognized that the attorney-client privilege attaches to draft patent applications.").

Accordingly, Haworth is directed to produce documents 173, 177, 178, 263, 269, 271, 373 and 374, without attachments. Document 367 should be produced in its entirety. Softview's motion is denied as to documents 6 and 9. n20

> n20 For the foregoing reasons, Softview's motion is also denied as to document 492, another draft patent application. See Section III.C.6, above.

[*55]

13. Communications Between Counsel for Adverse Parties

Softview objects to the work product designation for documents 219, 243, 245, 384, and 500, arguing that these draft letters are communications between counsel and attorneys for Haworth's competitors. Upon review, the only privileged portions of documents 243, 245, 384 and 500 are counsel's handwritten notes. Accordingly, these documents should be produced to Softview with the handwritten notes redacted. Document 219 does not contain any handwritten notes, and should be produced in its entirety.

14. Notes of Telephone Conversations

Softview challenges documents 480, 489, 513, 515, and 516, arguing that Haworth has not shown that these notes of telephone conversations contain client confidences. Upon review, however, these documents either contain confidential information communicated from Haworth to its attorney, or reveal litigation strategy, or both. Therefore, Softview's motion is denied as to these documents.

15. Documents Relating to Haworth's Negotiations With Competitors

Softview challenges a number of documents related to Haworth's negotiations with competitors, arguing that, in the context of negotiations, [*56] communications conveyed from client to attorney are intended to be relayed to third parties. n21 Some of these documents are protected attorney-client communications insofar as they contain confidential information and advice regarding possible infringement by Haworth's competitors. Others are protected work-product which reflect counsel's thought processes regarding litigation in the event that negotiations break down.

> n21 Softview challenges the following documents still in issue on this ground: 171, 179, 190, 200, 210, 212, 213, 215, 216, 218, 222, 223, 224, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 239, 240, 241, 242, 248, 262, 264, 270, 349, 363, 365, 375, 400, 406, 447 and 448.

However, certain of these documents are not entitled to protection by either privilege.

Documents 200 and 216 are telephone message slips which do not contain any confidences or advice.

Furthermore, certain of the documents in this category are documents that reflect business advice from counsel as opposed to legal advice, [*57] or communications between Haworth and counsel which contain only business information. The attorney-client privilege attaches to communications seeking legal advice, not business advice, see *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1037 (2d Cir. 1984)*, and, accordingly, these documents are not protected by the attorney-client privilege. Furthermore, there is nothing about these documents that suggests they were prepared in anticipation of litigation rather than as a part of Haworth's license negotiation process. See *United States v. Adlman, supra, 134 F.3d at 1202.*

Document 231 is a letter from counsel which summarizes the terms of Haworth's settlement offer to a competitor. Document 237 is counsel's report of a meeting with a competitor's attorney and summarizes the licensing terms offered to the competitor by Haworth.

Certain other documents in this category are cover letters which do not contain protected communications, but are attached to protected draft documents which contain confidential communications and/or attorney work-product. Document 218 is a cover letter from counsel to co-counsel enclosing two draft [*58] letters.

Page 17

2000 U.S. Dist. LEXIS 4254, *58; 58 U.S.P.Q.2D (BNA) 1422

Although the cover letter is not protected, see Section III.C.1, above, I find that the draft letters are protected. See Section III.C.12, above. Accordingly, that portion of document 218 which is a cover letter should be produced, without the enclosed draft letters. Similarly, documents 210, 213, 224, 228, 232 and 233 each consist of a transmittal letter and a draft letter. The transmittal letter portion of documents 210, 213, 224, 228, 232 and 233 should be produced, without the attached drafts. Document 229 is a cover fax sheet and draft letter with handwritten notations. Although the cover sheet contains no confidential information or attorney thought processes, upon in camera review I find that the attached draft is privileged. Accordingly, only that portion of document 229 which is a cover sheet should be produced, without attachments. Document 239 is a cover letter enclosing a draft licensing agreement. Although the draft is protected, that portion of document 239 which is a cover letter should be produced.

Certain other documents in this category do not contain protected communications, advice or work product. Document 349 is a facsimile cover sheet and [*59] counsel's notes of the financial terms of a proposed settlement. This document reflects business, not legal, advice. Accordingly, it should be produced in its entirety. Document 264 is a cover letter summarizing that an opposing attorney will be unavailable on certain dates. Document 363 is a facsimile transmission which contains royalty payment information regarding Haworth's licensees. It is solely business information, and nothing about it suggests that it was prepared because of actual or anticipated litigation. Furthermore, it appears from the document itself that the information was disclosed to counsel for a Haworth licensee. Document 365 is a duplicate of document 363. Accordingly, documents 363 and 365 should be produced in their entirety. Document 235 is a letter from counsel to Haworth advising that an opposing attorney will be unavailable on certain dates. Document 270 is a brief facsimile message indicating that a proposed letter is acceptable and should be sent to opposing counsel. The facsimile message does not reveal the contents of the letter or any confidential material. Document 375 is a letter from Haworth advising counsel that a proposed letter is acceptable, [*60] and contains no other information.

Accordingly, Haworth is directed to produce documents 200, 216, 231, 235, 237, 270 and 375 in full. That portion of documents 210, 213, 224, 228, 229, 232,

233 and 239 which is a transmittal letter or cover sheet should be produced without attachments.

### 16. Work Product Not Prepared By Attorney or Representative

Finally, Softview objects to a number of documents for which Haworth asserts work-product immunity on the ground that they were not prepared by an attorney or his agent, or that they are undated. n22 It is clear, however, that work-product immunity extends not only to documents prepared by an attorney, but also to all documents "prepared for litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." *Fed.R.Civ.P. 26(b)(3)*. The documents Softview challenges fall within the rule. Furthermore, Softview cites no authority, and this court's research has discovered none, for the proposition that undated documents cannot be protected by the work-product doctrine. Those opinions which address the subject suggest the [*61] contrary. See, e.g., *Doe v. Meachum, 126 F.R.D. 437, 437 (D. Conn. 1988); Kemelhor v. Penthouse Int'l, Ltd., 1986 U.S. Dist. LEXIS 28978, 85 Civ. 0002 (CBM), 1986 WL 15698* at *2 (S.D.N.Y. Feb. 24, 1986)* (undated attorney notes were clearly exempt from discovery under the work-product doctrine). In any event, in camera review of the undated documents indicates that they were prepared because of specific pending or anticipated litigation.

N22 Softview objects to the following documents still in issue on the ground that they were not prepared by an attorney: 27, 51, 52, 83, 110, 125, 141, 146, 161, 166, 180, 278, 316, 323, 359, 385, 387, 401, 405, 420, 422, 425, 455, 474, 476, 477, 480, 489, 490, 492, 494, 495, 496, 497, 498, 499, 501, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 516, 517, 518 and 519.

### D. Other Claims

Softview also raises two other arguments with regard to Haworth's third party licensing documents. First, Softview argues that it is entitled to Haworth's licensing agreements because [*62] Haworth has counterclaimed against Softview for patent infringement and alleges that the agreements support the validity of its '798 patent. Second, Softview argues that it has a "substantial need"

2000 U.S. Dist. LEXIS 4254, *62; 58 U.S.P.Q.2D (BNA) 1422

for these documents as defined by *Fed.R.Civ.P. 26(b)(3)*, because it has no other means by which to discover evidence of Haworth's alleged patent misuse (Pltf. Mem. of Law at 19 & 20).

Initially, I note that Softview does not specifically identify which documents it believes to be improperly withheld third-party licensing documents. Therefore, the Court is unable to assess the merit of Softview's arguments through an in camera review. More fundamentally, however, Softview has not established that it is unable without undue hardship to discover evidence of Haworth's alleged patent misuse by other means. Haworth's licensees themselves are available for deposition regarding licensing agreements. See *Tribune Co. v. v. Purcigliotti, 1998 U.S. Dist. LEXIS 5155, *18 & *24, No. 93 Civ. 7222 (LAP), 1998 WL 175933 at *4* (S.D.N.Y. April 14, 1998) ("'Substantial need' cannot be shown where persons with equivalent information are available for deposition."), citing *Horn & Hardart Co. v. Pillsbury Co., 888 F.2d 8, 12 (2d Cir. 1989).* [*63] Accordingly, this aspect of Softview's motion is denied.

### E. No Specific Objection

Finally, I note that Softview does not raise any specific objection in its memorandum of law to Haworth's assertion of privilege with regard to the following documents: 49, 106, 133, 168, 182, 191, 194, 195, 198, 199, 201, 202, 205, 206, 207, 208, 211, 220, 221, 238, 246, 250, 258, 276, 295, 296, 302, 312, 313, 332, 339, 347, 369, 378, 380, 381, 414, 416, 423, 440, 441, 443, 449, 461 and 463. Because I have denied Softview's general objection to the sufficiency of Haworth's privilege log and its general objection based on the crime-fraud exception, Softview's motion to

compel is denied as to these documents.

### IV. Conclusion

Accordingly, for all the foregoing reasons, Haworth is directed to produce the following documents in their entirety: 3, 12, 16, 35, 36, 37, 39, 42, 43, 44, 50, 57, 58, 64, 65, 66, 68, 77, 79, 80, 85, 87, 90, 95, 96, 97, 98, 101, 102, 104, 107, 108, 109, 114, 118, 126, 127, 130, 135, 137, 139, 140, 145, 149, 160, 162, 165, 169, 183, 184, 192, 197, 200, 203, 209, 214, 216, 217, 219, 225, 226, 231, 235, 237, 259, 260, 264, 265, 266, 270, 274, 275, 289, 297, 335, 349, 355, [*64] 363, 365, 367, 370, 372, 375, 379, 386, 388, 391, 392, 393, 397, 402, 407, 409, 410, 421, 427, 428, 431, 433, 434, 436, 444, 450, 453, 456, 459, 478, 493 and 502.

Those portions of the following documents which are transmittal letters or cover sheets are to be produced without attachments: 53, 173, 177, 178, 210, 213, 218, 224, 228, 229, 232, 233, 239, 263, 269, 271, 373, 374.

The following documents are to be produced with hand-written notes redacted: 243, 245, 384 and 500.

Softview's motion is otherwise denied.

Dated: New York, New York

March 31, 2000

SO ORDERED

HENRY PITMAN

United States Magistrate Judge

# EXHIBIT L

Farella, Braun + Martel

# Patent Litigation - Patent Infringement - Trademark Litigation - Trademark Infringement - Copyright Infringment

- Attourney Bloggers
- News
- Speaking Engagements
- Publications
- Representative Clients
- Notable Engagements

/ IP BLAWG HOME /



« Comments on the Northern District's Local Patent Rules? | Main | EUROPEAN PATENT COURT DELAYED AGAIN »

**November 30, 2006**

# Teleflex v. KSR: The TSM Obviousness Test Argued At The Supreme Court – Is It Really "Gobbledygook?"

One of the highly-anticipated oral arguments of the patent bar season took place this week when the Supreme Court considered the test for obviousness in *Teleflex Inc. v. KSR International*. Although the U.S. District Court in Detroit granted summary judgment of invalidity, *see Teleflex Inc v. KSR International*, 298 F.Supp.2d 581 (E.D. Mich. 2003), the Federal Circuit vacated the judgment. In an unpublished decision (available at 119 Fed.Appx. 282), the Federal Circuit held that the district court had made "incomplete" findings on the additional test for obviousness: that some "teaching, suggestion or motivation" must be shown, by clear and convincing evidence, "that would have led a person of ordinary skill in the art to combine the relevant prior art teachings in the manner claimed."

The Supreme Court granted certiorari to decide whether this TSM test, imposed by the Federal Circuit but not found in the statutes, is really the law or not. KSR insists that TSM, which has been criticized in the literature, is an unauthorized interpolation which lowers the standard of patentability and needlessly complicates determinations of obviousness; the Solicitor General agrees it "imposes significant burdens." Teleflex, joined by such amici as the ABA, AIPLA, the Intellectual Property Owners Association and the Federal Circuit Bar Association, defends the test and the Federal Circuit's decision below as both authorized by precedent and necessary to avoid hindsight bias – what seems obvious in retrospect may not have been so at the time. (AIPLA's brief begins by quoting Ecclesiastes 1:9-10: "What has been is what will be, and what has been done is what will be done; there is nothing new

under the sun. Is there a thing of which it is said 'See, this is new'; It has already been, in the ages before us.")

The case (No. 04-1350) was argued on November 28, 2006. The justices' questioned the supporters of the test in sharp and sometimes scornful language. Justice Breyer said he didn't understand it, Chief Justice Roberts called it "worse than meaningless," and Justice Scalia said it was "gobbledygook." Even before the argument many observers expected the Supreme Court to replace TSM with a new test for obviousness – that result seems even more likely now. *KSR* is the first obviousness case the Court has heard since before the Federal Circuit was established, when it reiterated in *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976) that a combination which "only unites old elements, with no change in their functions," is unpatentable. A similar finding now would defeat Teleflex's patent and could draw into question countless others already upheld under the current standard. (Justice Souter wondered "Are there going to be 100,000 cases filed tomorrow morning?") Whatever the Court decides will be of high importance not only for the IP bar but for business, technology and research in every field. The Court's decision will be reported in this space.

Today's Blogger:  Nan Joesten

Posted in Patent | Permalink

# TrackBack

TrackBack URL for this entry:
http://www.typepad.com/t/trackback/6997635

Listed below are links to weblogs that reference Teleflex v. KSR: The TSM Obviousness Test Argued At The Supreme Court – Is It Really "Gobbledygook?":

# Comments

# Post a comment

Name:
_____

Email Address:
_____

☐ Remember personal info?

Comments:

Comments to the IP Blawg are welcome; however, such communications must be considered NON-CONFIDENTIAL and do not create any attorney-client relationship. Accordingly, please refrain from including confidential information in any comment or question. Feel free to read the full disclaimer and terms of use.

[ Preview ]    [ Post ]

**SYNDICATE SITE (RSS/XML)**    **RECEIVE EMAIL ALERTS**

## Recent Posts

- Music Copyrights Being Enforced On Campus
- Microsoft v. AT&T Argued in the High Court
- DISTRICT COURT PATENT PILOT PROGRAM

## Calendar Archive

March 2007

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
|     |     |     |     | 1   | 2   | 3   |
| 4   | 5   | 6   | 7   | 8   | 9   | 10  |
| 11  | 12  | 13  | 14  | 15  | 16  | 17  |
| 18  | 19  | 20  | 21  | 22  | 23  | 24  |
| 25  | 26  | 27  | 28  | 29  | 30  | 31  |

## Categories

- Copyright
- Life Sciences
- Patent
- Trademark
- Trade Secrets
- Uncategorized (Other)

## IP Resource Links

- ABA Section of Intellectual Property Law

- AIPLA | Home
- BIO | Biotechnology Industry Organization
- California Institute for Regenerative Medicine
- International Trade Commission Homepage
- Patent Reference
- Supreme Court of the United States
- U.S. Patent and Trademark Office
- United States Court of Appeals for the Federal Circuit
- US Copyright Office

## Favorite Blogs

- William Patry
- Wall Street Journal
- Patent Infringement Updates
- JD Bliss

© 2005 FARELLA BRAUN + MARTEL LLC
235 MONTGOMERY STREET / SAN FRANCISCO, CA 94104 / TEL: (415) 954-4400
PRIVACY POLICY / TERMS OF USE

# EXHIBIT M

Press Release, 05-38                                                    Page 1 of 2

 **United States Patent and Trademark Office**                    **NEWS**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

Press Releases > USPTO Improves Process for Reviewing Patents

**PRESS RELEASE**                                    **July 29, 2005**
Contact:                                              #05-38
Ruth Nyblod
571-272-8400
ruth.nyblod@uspto.gov


### USPTO IMPROVES PROCESS FOR REVIEWING PATENTS

The U.S. Department of Commerce's United States Patent and Trademark Office (USPTO) has implemented new processes for handling reexamination proceedings to improve timeliness and quality. Patent reexamination is a valuable, low-cost alternative to litigation for determining the patentability of the claims in an issued patent. Requests for the USPTO to reexamine a patent can be made as long as written evidence is presented that raises a substantial new question of patentability.

"Timeliness and correctness of decisions in reexamination proceedings are important to providing certainty for all users of the patent system," noted Under Secretary of Commerce for Intellectual Property and Director of the USPTO Jon Dudas. "We have a duty to the American public to get reexaminations right and to conduct them with dispatch so they remain an effective tool."

The USPTO's goal is that reexaminations that have been pending with an examiner more than two years now will be resolved by October 1, 2005. In addition, all future reexamination proceedings will be completed within a specific timeframe, which is expected to be less than two years. In March 2005 there were over 420 reexaminations that had been pending more than two years and that number would have grown to over 600 by the end of September 2005. Today, fewer than 360 cases remain, with nearly half in the final stages. To ensure the quality of these proceedings, all reexamination decisions now require a thorough review by a panel of supervisors and senior patent examiners. Reexaminations where an initial decision has been made will remain with the examiner originally assigned to the reexamination. All other reexaminations will be reassigned to a newly formed central reexamination unit.

Prior to the new initiative, reexamination cases were assigned to examiners according to technology. Under the new initiative, 20 highly skilled primary examiners who have a full understanding of reexamination practice and relevant case law will concentrate solely on reexamination. The 20-examiner unit began operation earlier this week and all new requests for reexamination will be assigned to them. Using skilled examiners assigned to a single unit will enhance the quality and reduce the time of reexaminations by allowing the USPTO to monitor more effectively the reexamination operations.

### # # #

Last Modified: 07.29.2005 15.11.4-


http://www.uspto.gov/web/offices/com/speeches/05-38.htm                10/12/200(

# EXHIBIT N

LEXSEE 2006 US DIST LEXIS 46623



Positive
As of: Mar 23, 2007

**BROADCAST INNOVATION, L.L.C., and IO RESEARCH PTY, LTD., Plaintiffs and Counter-Defendants, v. CHARTER COMMUNICATIONS, INC., Defendant and Counter-Plaintiff,**

**Civil Action No. 03-cv-2223-ABJ-BNB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO**

*2006 U.S. Dist. LEXIS 46623*

**July 11, 2006, Decided**
**July 11, 2006, Filed**

**PRIOR HISTORY:** *Broadcast Innovation, L.L.C. v. Charter Communs., Inc., 420 F.3d 1364, 2005 U.S. App. LEXIS 17587 (Fed. Cir., 2005)*

**COUNSEL:** [*1] For Broadcast Innovation, L.L.C., Plaintiff: Barry Alan SchwartzBarry Alan SchwartzBarry Alan Schwartz, Kamlet, Shepherd, & Reichert, LLP, Denver, CO U.S.A; Corby R. VowellCorby R. VowellCorby R. Vowell, Edward W. GoldsteinEdward W. GoldsteinEdward W. Goldstein, Goldstein & Faucett, LLP, Houston, TX U.S.A; Edward R. Nelson, IIIEdward R. Nelson, IIIEdward R. Nelson, III, Jonathan Tad SuderJonathan Tad SuderJonathan Tad Suder, Friedman, Suder & Cooke, Fort Worth, TX U.S.A.

For Io Research, Ltd., Plaintiff: Barry Alan Schwartz, Kamlet, Shepherd, & Reichert, LLP, Denver, CO U.S.A.

For Charter Communications, Inc., Defendant: David C. DoyleDavid C. DoyleDavid C. Doyle, Jose L. PatinoJose L. PatinoJose L. Patino, John A. ScottJohn A. ScottJohn A. Scott, M. Andrew WoodmanseeM. Andrew WoodmanseeM. Andrew Woodmansee, Morrison & Foerster, LLP, San Diego, CA U.S.A; J. Eric ElliffJ. Eric Elliff, Morrison & Foerster, LLP, Denver, CO U.S.A; Robert M. HarkinsRobert M. HarkinsRobert

M. Harkins, Morrison & Foerster, San Francisco, CA U.S.A.

For Comcast Corporation, Defendant: J. Eric Elliff, Morrison & Foerster, LLP, Denver, CO U.S.A; Robert M. Harkins, Morrison & Foerster, San Francisco, CA U.S.A.

For Comcast Corporation, Counter Claimant: J. Eric Elliff, Morrison & Foerster, LLP, Denver, CO U.S.A.

For Broadcast Innovation, L.L.C., Counter Defendant: Barry Alan Schwartz, Kamlet, Shepherd, & Reichert, LLP, Denver, CO U.S.A; Corby R. Vowell, Edward W. Goldstein, Goldstein & Faucett, LLP, Houston, TX U.S.A; Edward R. Nelson, [*2] III, Jonathan Tad Suder, Friedman, Suder & Cooke, Fort Worth, TX U.S.A.

For Charter Communications, Inc., Counter Claimant: David C. Doyle, Jose L. Patino, M. Andrew Woodmansee, Morrison & Foerster, LLP, San Diego, CA U.S.A; J. Eric Elliff, Morrison & Foerster, LLP, Denver, CO U.S.A; Robert M. Harkins, Morrison & Foerster, San Francisco, CA U.S.A.

For Io Research, Ltd., Counter Defendant: Barry Alan Schwartz, Kamlet, Shepherd, & Reichert, LLP, Denver,

Case 1:05-cv-00486-GMS    Document 230-3    Filed 03/23/2007    Page 43 of 53

Page 2
2006 U.S. Dist. LEXIS 46623, *2

CO U.S.A.

JUDGES: ALAN B. JOHNSON, UNITED STATES DISTRICT JUDGE.

OPINION BY: ALAN B. JOHNSON

OPINION:

**ORDER GRANTING DEFENDANT'S MOTION FOR STAY PENDING REEXAMINATION OF U.S. PATENT 6,076,094 BY UNITED STATES PATENT AND TRADEMARK OFFICE**

The above-captioned matter comes before the Court on Defendant Charter Communications, Inc.'s Motion to Stay Pending Reexamination of the U.S. Patent 6,076,094 By United States Patent and Trademark Office. Plaintiffs Broadcast Innovation, LLC and IO Research Pty, Ltd. have resisted this motion, timely filing a response on June 29, 2006. After careful consideration of the motion, briefs and governing authorities, and being otherwise fully advised in the premises, the Court **FINDS** and **ORDERS** [*3] as follows:

**Background**

**I. Procedural History**

In this patent infringement and validity action, Plaintiffs Broadcast Innovation, L.L.C. and IO Research Pty, Ltd. (hereinafter "Plaintiffs") allege that Charter Communications, Inc. (hereinafter "Charter") infringed directly or indirectly claims 8, 15, 22, 29 of *United States Patent No. 6,076,094* (hereinafter *"'094 patent"*), a patent Charter claims is invalid for numerous reasons, not the least of which being anticipation and obviousness based on prior art. n1 The *'094 patent* claims a complex distributed database system with applicability to data broadcasting and data casting communications media. n2

> n1 The Court also notes that Charter has joined in and adopted a host of pleadings filed both in the present action and in the case of *Broadcast Innovation, L.L.C. v. Echostar Communication Corp.*, 240 F. Supp. 2d 1127 (D. Colo 2003), a case also involving the *'094 patent* which has been stayed pending final resolution of the present case.

> n2 The Court eschews an exhaustive recitation of the adjudicative facts surrounding the merits of this case, focusing instead on the posture of the present motion and response.

[*4]

On June 8, 2006, Charter requested that the United States Patent and Trademark Office (PTO) reexamine the *'094 patent* to determine whether the four asserted claims in the present case--claims 8, 15, 22 and 29--are invalid. The information provided to the PTO as a basis for reexamination includes, among other materials, three prior art references that form the basis of Charter's summary judgment motion before this Court: (1) the 1989 World System Teletext and Data Broadcasting Technical Specification; (2) a 1986 article entitled *"BBC Datacast -- A New Generation of Data Transmission Networks Using Broadcast Video"*; and (3) a 1988 article authored by John Lilley entitled *"Can Data Broadcasting Actually Sell Itself?"* It is undisputed that this art was not before the PTO during its original examination of the application that eventually issued the *'094 patent*. Unsurprisingly, Charter asks this Court to stay the case awaiting the fully-informed, expert view of the PTO.

**II. Patent Reexamination**

**A. Overview**

Reexamination is a procedure by which any person can request that the PTO reexamine or reevaluate the patentability of an unexpired U.S. patent. *35 U.S.C. § 302* [*5] . A request for patent reexamination must be based upon prior art patents or publications which raise "a substantial new question of patentability." *Id. § 303(a)*. Typically, the cited prior art patents or printed publications upon which such a request is based were not considered by the patent examiner during the processing of the patent application that resulted in the patent-in-suit. Once a reexamination request is granted, a patent examiner who is familiar with the technology involved with the patent conducts the reexamination. The examiner is obligated to do so "with special dispatch." *35 U.S.C. § 305; 37 C.F.R. § 1.550(a)*.

Within approximately three months of the filing of the reexamination petition, the PTO will determine whether the request raises a "substantial new question of patentability" affecting any claim or claims of the patent. *Kaufman Co. v. Lantech Inc., 807 F.2d 970, 976 (Fed.*

*Cir. 1986)*. The examiner, utilizing his expertise, determines if such a "new question" exists by comparing the prior art of record in the original patent application with the prior art cited in the request for reexamination [*6] (although the examiner is not limited to that information). *35 U.S.C. § 303(a)*. If the prior art patents and/or printed publications are "material" to the reexamination of at least one claim of the patent, a substantial new question of patentability exists. n3 Thereafter, the parties are given the opportunity to provide position statements to the PTO, and the PTO reexamines the patent claims in *ex parte* fashion. If the Commissioner decides *not* to institute a reexamination proceeding, the decision is final and nonappealable.

> n3 The materiality standard is fairly deferential to the PTO. Prior art is "material" to the examination of a claim of the patent if "there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication *important* in deciding whether or not the claim is patentable." UNITED STATES PATENT AND TRADEMARK OFFICE, *Manual of Patent Examination Procedure* § 2294 (8th ed., rev. 1, October 2005) (emphasis added).

[*7]

Importantly, a decision by the Patent Office that the reexamined claims of an issued patent are canceled as unpatentable renders the claims unenforceable in the pending litigation and in any future disputes. *35 U.S.C. § 307(a)*. Cancellation through reexamination, however, is available only when the claims at issue are unpatentable over prior art patents and publications. *35 U.S.C. §§ 301-02*. Although not binding, a decision by the PTO upholding the validity of reexamined patent claims is strong evidence that a district court must consider in assessing whether the party asserting invalidity has met its burden of clear and convincing evidence. *Custom Accessories, Inc. v. Jeffery-Allan Indus., Inc., 807 F.2d 955, 961 (Fed. Cir. 1986)*. After a decision sustaining the validity of the claims, this burden becomes more difficult to satisfy. *Id.* n4

> n4 Relevant are the Federal Circuit's comments in *American Hoist v. Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350 (Fed. Cir. 1984)*:

> [I]t is clearly appropriate that the jury be instructed that because the PTO has now held the claims in suit patentable in light of the additional art discovered by Sowa, its burden of proof of unpatentability has become *more difficult* to sustain--a fact likewise to be taken into account by the trial judge.

> *Id. at 1354.*

[*8]

During the course of a stay, the court retains jurisdiction to respond to changing factual circumstances with appropriate orders. Thus, if a stay is granted prior to the decision from the Patent Office as to whether a substantial new question of patentability exists, the court can issue an order lifting the stay upon a negative determination, thereafter deciding all pending motions and, if necessary, proceeding to trial. *See, e.g., Grayling Indus. v. GPAC Inc., 19 U.S.P.Q.2d 1872, 1874 (N.D. Ga. 1991); Brown v. Shimano American Corp., 18 U.S.P.Q.2d 1496, 1496 (C.D. Cal. 1991)*. Similarly, the court may dissolve the stay when preliminary reports from the Patent Office reveal that some of the claims at issue will survive reexamination. The court would then await the PTO's decision for guidance on pending motions and, if necessary, trial. *See, e.g., Purolite Int'l, Ltd. v. Rohm & Haas Co., 24 U.S.P.Q.2d 1857, 1860 (E.D. Pa. 1992); Rohm and Haas Co. v. Brotech Corp., 24 U.S.P.Q.2d 1369, 1372 (D. Del. 1992)*. If no claims survive, neither does the court's work.

**B. Scope and Purpose: Expertise**

"Congress instituted [*9] the reexamination process to shift the burden or reexamination of patent validity from the courts to the PTO. Patent validity is a commonly asserted defense in litigation and courts are cognizant of Congress's intention of utilizing the PTO's specialized expertise to reduce costly and timely litigation." *Canady v. Erbe Elektromedizin GmbH, 271 F. Supp. 2d 64, 78 (D.D.C. 2002)* (citing H.R. REP. No. 1307, 96th Cong., 2d Sess., pt. 7 at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460)); *see also* Wayne O. Stacy, *Reexamination Reality: How Courts Should Approach A*

2006 U.S. Dist. LEXIS 46623, *9

*Motion to Stay Litigation Pending the Outcome of Reexamination, 66 GEO. WASH.L.REV. 172, 172 (1997)* ("Congress decided that the often-asserted validity issue, which can involve intricate technological questions, deserved special treatment. Thus, Congress established a patent reexamination procedure that allows the Patent and Trademark Office, instead of a district court, to consider validity issues that the PTO overlooked during the initial examination.").

Shifting the patent validity issue to the PTO has many advantages, including:

> 1. All prior art presented to the Court will have [*10] been first considered by the PTO, with its particular expertise.

> 2. Many discovery problems relating to prior art can be alleviated by the PTO examination.

> 3. In those cases resulting in effective invalidity of the patent, the suit will likely be dismissed.

> 4. The outcome of the reexamination many encourage a settlement without the further use of the Court.

> 5. The record of reexamination would likely be entered at trial, thereby reducing the complexity and length of the litigation.

> 6. Issues, defenses, and evidence will be more easily limited in final pretrial conferences after a reexamination.

> 7. The cost will likely be reduced both for the parties and the Court.

*Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co., 3 U.S.P.Q.2d 1889, 1890 (N.D. Ill. 1987).*

Early drafts of the reexamination statute expressly provided for a stay of court proceedings during all reexamination proceedings. *See* S. REP. 1679, 96th Cong., 1st Sess. § 310 (1979); H.R. REP. 5075, 96th Cong., 1st Sess. § 310 (1979); S. REP. 2446, 96th Cong., 2d Sess. § 310 (1980). However, an express provision

was ultimately deemed unnecessary because courts already had [*11] the power to stay civil actions "to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure." *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir.), cert. denied, 464 U.S. 935, 104 S. Ct. 343, 78 L. Ed. 2d 310 (1983).* n5 "When a district court stays patent validity proceedings before it until completion of a reexamination proceeding, that stay must be accepted if the purpose of the reexamination statute is to be preserved." *Id.* To no surprise, courts frequently note that "[t]he legislative history surrounding the establishment of the reexamination proceeding evinces congressional approval of district courts liberally granting stays." *Robert H. Harris Co. v. Metal Mfg. Co., 19 U.S.P.Q.2d 1786, 1788 (E.D. Ark. 1991).*

> n5 The pertinent House report explained as follows:

>> The bill [*35 U.S.C. §§ 301-07*] does not provide for a stay of court proceedings. It is believed by the committee that stay provisions are unnecessary in that such power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure. It is anticipated that these measures provide a useful and necessary alternative for challengers and for patent owners to test the validity of United States patents in an efficient and relatively inexpensive manner.

> H.R. REP. No. 1307 Part I, 96th Cong., 2d Sess. 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460-6463).

[*12]

**C. Relevant Factors Weighing For Or Against A Stay**

"A motion to stay an action pending the resolution of a reexamination proceeding in the United States Patent and Trademark Office is directed to the sound discretion of the court." *Braintree Laboratories, Inc. v.*

*Nephro-Tech, Inc., 1997 U.S. Dist. LEXIS 2372, 1997 WL 94237 (D. Kan. 1997); see also Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988)* ("Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). As mentioned above, there exists a "liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings." *Whatley v. Nike, 54 U.S.P.Q.2d 1124, 1125 (D. Or. 2000); see also In re Laughlin Products, Inc., 265 F. Supp. 2d 525, 530 (E.D. Pa. 2003)* (same).

"In deciding whether to grant a stay, the court must weight the benefits of the stay against the costs." *Motson v. Franklin Covey Co., 2005 U.S. Dist. LEXIS 34067, 2005 WL 3465664, *1 (D.N.J. 2005).* Courts consider a number of factors in determining whether to stay [*13] litigation pending PTO reexamination, including: (1) whether a stay will simplify the issues in question and streamline the trial; (2) whether discovery is complete and whether a trial date has been set; (3) whether a stay would unduly prejudice the nonmoving party or present a clear tactical advantage for the moving party; and (4) "whether it will reduce the burden of litigation on the parties and on the court." *Tap Pharm. Prods. Inc. v. Atrix Labs., Inc., 70 U.S.P.Q.2d 1319, 1320 (N.D. Ill. 2004); Nexmed Holdings, Inc. v. Block Inv., Inc., 2006 U.S. Dist. LEXIS 3150, 2006 WL 149044, *1 (D. Utah Jan. 19, 2006)* (citing *In re Laughlin Prods., 265 F. Supp. 2d at 530); Brown, 18 U.S.P.Q.2d at 1496* (detailing the expertise factor). n6 No one factor is controlling--the totality of the circumstances governs.

> n6 While the *Tap Pharmaceuticals* court created a fourth category examining the "burden of litigation on the parties and on the court," *see 70 U.S.P.Q.2d at 1320,* most courts merge this inquiry with the "simplification of issues" factor. *Accord Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)* (collecting cases); *Versa Corp. v. Ag-Bag Intern. Ltd., 2001 U.S. Dist. LEXIS 14657, 2001 WL 34046241, *1 (D. Or. 2001)* (describing this factor as "the orderly course of justice measured in terms of the *simplifying or complicating of issues,* proof, and questions of law which could be expected to result from a stay") (emphasis added).

[*14]

**Analysis**

**I. Will A Stay Simplify the Issues Before the Court?**

Courts routinely consider the expertise of the Patent Office, under which claim validity will be rigorously reevaluated, as an important factor in determining whether to stay its proceedings. *Accord Gould, 705 F.3d at 1342; Middleton, Inc. v. Minn. Mining & Mfg. Co., 2004 U.S. Dist. LEXIS 16812, 2004 WL 198669, at *3 (S.D. Iowa 2004); GPAC Inc. v. D.W.W.Enter. Inc., 144 F.R.D. 60, 23 U.S.P.Q.2d 1129, 1134 (D.N.J. 1992); see also Bausch & Lomb, Inc. v. Alcon Lab., Inc., 914 F. Supp. 951, 953 (W.D.N.Y. 1996)* ("Because the PTO is considered to have expertise in deciding issues of patentability[,] many courts have preferred to postpone making final decisions on infringement until the PTO rules on issues before it."). The technical nature of the patent claims in question increases the utility of PTO expertise, which is further amplified by the need to examine prior art and publications not before the PTO during its original patent examination. *See Brown, 18 U.S.P.Q.2d at 1496* ("[R]eexamination by the PTO when issues relevant to prior art are involved is especially [*15] helpful given the PTO's expertise."). In turn, patent cases *not* hinging upon the consequences of prior art references have less of a need for the PTO's expertise. *See Emhart Indus., Inc., 3 U.S.P.Q.2d at 1892 n.3* (distinguishing the matter before it on such grounds, explaining that if "the issue of prior art was involved, the PTO's opinion [would] be invaluable.") (quotation omitted).

Confronted with a motion to stay pending PTO reexamination after significant discovery, pretrial conference and trial dates set, a neighboring district court concluded as follows:

> The technical expertise provided by the reexamination proceeding . . . will be extremely helpful to this Court should further consideration of this matter be necessary. Indeed, the Court invites a final determination by the PTO as to the validity of plaintiff's patent claims. The reexamination procedure has the potential to eliminate trial on the issue of patent infringement, should all of the patent's claims be cancelled. It is equally possible

for all of the claims in plaintiff's patent to be upheld, or to be narrowed in some degree. In any event, the expert view of the Patent Office examiner [*16] will certainly benefit this Court. Thus, the Court is of the opinion that a stay of the trial of this matter should be granted to allow the PTO to complete the reexamination proceeding.

*Loffland Bros. Co. v. Mid-Western Energy Corp., 225 U.S.P.Q. 886, 887 (W.D. Okla. 1985)* (staying trial pending conclusion of the reexamination proceedings). n7

Indeed, some courts consider this factor of primary importance. *See, e.g., Dresser Indus., Inc. v. Ford Motor Co., 530 F. Supp. 303, 307 (N.D. Tex. 1981)* ("The major benefit of staying litigation pending reconsideration of a patent under [reexamination] is that it affords the Court the assistance of the Patent Office's specialized expertise on technical questions of validity."); *cf. Pegasus Development Corp. v. Directv, Inc., 2003 U.S. Dist. LEXIS 8052, 2003 WL 21105073, *2 (D. Del. 2003)* (deciding that by staying a highly technical case involving computer programming communication systems, "the court will gain the benefit of the PTO's particular expertise, in that all prior art presented to the court will have been first considered by that agency").

n7 Also interesting to note is that the patent at issue in *Loffland* appears quite simple when compared to the *'094 patent* presently before the Court--the technology in *Loffland* consisted of patent covering an elevating catwalk used on drilling rigs. *See Loffland Bros., 225 U.S.P.Q. at 886.*

[*17]

The *Loffland Bros.* court also understood the PTO's expertise to have benefits beyond educating the court. That is, simplification may occur by the very nature of the reexamination procedure itself, as claims, arguments and defenses can be narrowed or entirely disposed of, preserving the resources of the parties and the court. The Federal Circuit has explained that a major "purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or facilitate trial of that issue

by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceedings)." *Gould, 705 F.2d at 1342 (Markey, C.J.)*; *see also Canady, 271 F. Supp. 2d at 68* ("[C]ourts often stay proceedings, such as in the instant case, to wait for reexamination results that will simplify litigation by eliminating, clarifying, or limiting the claims."). "If not found invalid, the reexamination will at least likely result in a narrowing and simplifying of the issues before the Court." *Middleton, Inc., 2004 U.S. Dist. LEXIS 16812, 2004 WL 1968669 at *3.* "This is because the scope of the patent claims, which the PTO may narrow [*18] or otherwise limit, controls the outcome of any subsequent infringement analysis." *Id.; see also, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1344 (Fed. Cir. 2002).*

Combining these benefits, countless courts have touted the value of streamlining voluminous and complicated patent cases. For example, the court in *Motson* found that the benefits derived from the PTO's reexamination outweighed the fact that much effort had already been expended by the parties:

> [E]ntry of a stay, pending reexamination by the PTO, may simplify or even eliminate the need for trial on the remaining validity challenge in this matter. The reexamination procedure has the potential to either uphold or narrow the claims in the plaintiff's patent. In any event, the technical expertise of the PTO examiner may be helpful to the Court should further consideration of the matter be necessary after reexamination. . . . Although discovery and briefing expenses have already been incurred, a trial at this point on the sole remaining issue in the case may compound those costs unnecessarily if the PTO reexamination eliminates the need for a trial or creates a need to relitigate [*19] other issues.

*Motson, 2005 U.S. Dist. LEXIS 34067, 2005 WL 3465664 at *1-2.*

Despite being less than two-and-a-half months from trial and despite the substantial monetary expenditures by each party, the court in *Gioello Enterprises* provided a

similar explanation for granting a stay:

> Presently, this case is scheduled for trial on April 13, 2001. According to the PTO's order granting the request for reexamination, it is possible that submission of statements will not be complete until April 12, 2001. Additionally, the outstanding motions for summary judgment by Mattel claim invalidity and non-infringement--two issues the PTO's decision could render moot. Since the court must decide the summary judgment motions well in advance of trial, it would have to address the arguments raised before the PTO. Such a situation raises resource questions.

*Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1.

This question of "resources" was detailed by the Southern District of New York in *Softview Computer Products Corp. and Ergo View Technologies Corp. v. Haworth, Inc., 56 U.S.P.Q.2d 1633 (S.D.N.Y. 2000)*, a case bearing many resemblances to the [*20] matter *sub judice*. There, the court addressed a stay pending PTO reexamination of allegedly relevant prior art. While the motion was brought by the *plaintiff* in that case, the instructiveness of the court's language applies equally to the present matter:

> Although [defendant] correctly notes that plaintiffs have not acted with dispatch in seeking reexamination and that plaintiffs have pursued an extremely burdensome discovery program, the cost to [defendant] of the litigation to date will not be affected by the grant or denial of a stay; denying the stay will not, without more, entitle [defendant] to recover fees it has already spent litigating this case. In addition, if the parties continue to litigate the validity of the claims in this Court, and the PTO subsequently finds that some or all of the claims in issue here are invalid, the Court will have wasted time and the parties will have spent additional funds addressing an invalid claim or claims. Thus, although the

> denial of a stay can have no effect whatsoever on past events, the grant of a stay will maximize the likelihood that neither the Court nor the parties expend their assets addressing invalid claims. [*21]

> Second, although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed, extremely voluminous summary judgment motions have been served . . . and the Pretrial Order has not yet been prepared. I[t] would be a serious waste of both the parties' and the Court's resources if the . . . summary judgment proceedings went forward and the claims were subsequently declared invalid or were amended as a result of the reexamination proceeding.

> Third, a stay will necessarily simplify the issues. If the reexamination proceeding invalidates or narrows a claim or claims, the issues at trial will be simplified. Similarly, if the reexamination proceeding reaffirms all the claims as issued, the Court will then have the benefit of the PTO's expert analysis of the prior art that allegedly invalidates or limits the claims.

*Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636; see also Bausch & Lomb Inc., 914 F. Supp. at 953* ("If this Court were to deny the stay and proceed to trial, it is possible that the time, resources, and significant efforts of [*22] all those involved in such a trial would be wasted. Because a finding by this Court that the '607 patent is not invalid would not bind the PTO, the PTO could reach the opposite conclusion at any time thereafter. Not only would such a scenario cause Alcon significant harm[,] but it also would be a tremendous waste of the time and resources of all those involved in a trial before me. Such an outcome is unacceptable. Because the reexamination is to be conducted "with special dispatch" (*35 U.S.C. § 305*), I find that a stay of the proceedings before me will not greatly prejudice any party and will serve to promote judicial economy.").

In the present matter, Charter argues that a stay "will simplify the issues, avoid inconsistent rulings and conserve the resources of the Court and the parties." *Defendant's Motion,* at 7. Broadcast and IO Research, on the other hand, summarily state that the possibility of simplification is "equivocal." *Plaintiff's Response,* at 3. For the reasons detailed above as well as those to follow, the Court finds that this factor weighs heavily in favor of granting a stay.

The heart of this complicated patent case involves the impact [*23] of several prior art references--an issue the PTO is far better suited to address given the technology at issue in this case. *Ethicon, Inc., 849 F.2d at 1427.* Moreover, because this prior art was not before the PTO during its original patent examination, the Court would benefit immensely from the PTO analysis of it. *Accord Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636; Emhart Indus., Inc., 3 U.S.P.Q.2d at 1890, 1892 n.3; Indust Wireless Spectrum Techs., Inc. v. Motorola Corp., 57 U.S.P.Q.2d 1662, 1663 (N.D. Ill. 2001); Brown, 18 U.S.P.Q.2d at 1496* (noting that "[t]he PTO is in a better position than the Court to evaluate the validity of the patent [at issue] in view of the prior art references.").

Judged solely by this factor, a stay would further the interests of judicial economy and the conservation of the parties' resources, as well as that of the court. Charter's pending reexamination petition involves the same issues currently before this Court. If the PTO, utilizing its unique expertise, determines that all or some of the '094 claims are invalid, that determination will either dispose [*24] of this litigation entirely or at least aid the Court in adjudicating this case. *See In re Cygnus Telecomms. Tech., LLC, Patent Litig., 385 F. Supp. 2d 1022, 1023 (N.D. Cal. 2005)* ("A stay is particularly justified where the outcome of the reexamination would be likely to assist the court in determining patent validity and, if the claims were canceled in the reexamination, would eliminate the need to try the infringement issue."). Moreover, "[s]ince the PTO cannot stay the reexamination once a request has been granted, the court's issuance of a stay is the only way to avoid the potential for conflict." *Gioello Enterprises, Ltd., 2001 WL 125340 at *2; see also Bayer AG v. Novartis Crop Prot. Inc., 55 U.S.P.Q.2d 1509, 1511 (M.D. La. 2000)* (holding that simultaneous litigation of patent issues "would create an economic hardship on the parties and also result in the ineffective administration of justice");

*Hewlett-Packard Co. v. Acuson Corp., 1993 U.S. Dist. LEXIS 6449, 1993 WL 149994, *2 (N.D. Cal. 1993)* ("Ordinarily, courts need not expend unnecessary judicial resources by attempting to resolve claims which may be amended, eliminated, or lucidly [*25] narrowed by the patent reexamination process and the expertise of its officers."); *Childers Foods, Inc. v. Rockingham Poultry Mktg. Co-op., Inc., 203 F. Supp. 794, 796 (D. Va. 1962)* (noting that simultaneous proceedings in federal district court and the PTO are "wasteful and extravagant" where issues to be decided are very similar). The Court, unlike the PTO, can exercise its direction to avoid this conflict and potential for waste. n8

> n8 The Court is also cognizant of the fact that the PTO grants more than nine of every ten petitions for reexamination. *See* UNITED STATES PATENT AND TRADEMARK OFFICE, *Ex Parte Reexamination Filing Data,* at 1, P5 (Sept. 30, 2005) (noting 91% acceptance out of 7,510 requests). If and when the PTO grants Charter's petition, history also teaches that there is a 74% likelihood that the PTO will eliminate, amend or otherwise limit the claims at issue, which will significantly alter the nature and amount of work for the attorneys, the court and the jury. *See id.* at 2, P9; *Tap Pharm. Prods. Inc., 70 U.S.P.Q.2d at 1320.*

[*26]

## II. Time and Timing

Broadcast and IO Research argue that this factor "is decidedly pro-Plaintiffs," as "[t]rial is less than three months away. *Plaintiffs' Response,* at 5. n9 Charter acknowledges the trial setting, but insists that the proximity of trial, standing alone, is not a reason to blindly deny an otherwise appropriate stay.

> n9 Indeed, Plaintiffs' entire argument regarding this factor consists of that single statement.

This factor, at first glance, likely weighs in favor of the Plaintiffs and thus against a stay. Although discovery is not complete, see *Stipulation Regarding Additional*

*Discovery* at 2, a trial date has been set for September 11, 2006. If these two litigation aspects were all that courts considered when assessing this factor, it might lean towards Broadcast and IO Research. However, courts considering this factor do not stop at discovery and trial settings, but rather, routinely inquire as to the occurrence summary judgment arguments, rulings on summary judgment, and [*27] the status of the final pretrial order, among other elements. *See, e.g., Gioello Enterprises, Ltd.,* 2001 WL 125340 at *1 (noting trial was set, but expressing concern for pending summary judgment motions); *Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636* (same concern as to "extremely voluminous summary judgment motions" and unfinished final pretrial order); *Bausch & Lomb Inc., 914 F. Supp. at 953* (same); *Middleton, Inc., 2004 U.S. Dist. LEXIS 16812, 2004 WL 198669 at *4* (same).

In sum, the proximity of the trial date does not preclude entry of a stay. "Courts have granted stays even where discovery has been completed, and even when a trial date has been scheduled or is forthcoming." *Ralph Gonnocci Revocable Living Trust v. Three M Tool & Mach. Inc.,* 68 U.S.P.Q.2d 1755, 1757 (E.D. Mich. 2003); *see also Perricone v. Unimed Nutritional Services, Inc.,* 2002 U.S. Dist. LEXIS 17613, 2002 WL 31075868, *3 (D. Conn. 2002)* (noting that courts "have granted stays pending re-examination proceedings notwithstanding the well-developed posture of the litigation"). For every court that yields to completed discovery and a looming trial date, another [*28] court finds these dates outweighed by other factors--be it the complexity of the suit, the value of PTO expertise, simplification of the issues, lack of hardship to the nonmovant, or the overall burden of duplicitous litigation on the parties and on the court. Put simply, trial time doesn't always tell the tale. *See, e.g., Gould, 705 F.2d at 1342* (order granting motion to stay proceedings five years into litigation and twenty days before scheduled trial date); *Middleton, Inc., 2004 U.S. Dist. LEXIS 16812, 2004 WL 198669 at *10* (granting motion to stay proceedings eight years after start of litigation and less than two months before trial); *Loffland Bros., 225 U.S.P.Q. at 887* (order granting motion to stay proceedings after significant discovery, rulings on dispositive motions, pretrial conference and setting of initial trial date); *see also Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636* (granting stay; noting that "although there has been a great deal of activity in this litigation to date, much remains to be done before the case is ready for trial. Discovery is not yet completed,

extremely voluminous summary judgment motions have been [*29] served . . . and the Pretrial Order has not yet been prepared."); *Robert H. Harris Co., 19 U.S.P.Q.2d at 1789* (granting stay despite the fact that case was set for trial in less than a month); *Motson, 2005 U.S. Dist. LEXIS 34067, 2005 WL 3465664 at *2* (granting stay despite discovery being complete and summary judgment decided). n10

> n10 A more detailed balancing process was explained by the court in *Ralph Gonnocci Revocable Living Trust,* who ultimately ruled in favor of a stay:
>
>> Undoubtably the parties have spent considerable time and resources thus far--substantial discovery has been conducted and the parties have submitted witness lists and three lengthy summary judgment motions. Yet far more time and resources remain to be spent before this matter is concluded. Two responses to motions for summary judgment must be submitted, the Court has not begun to review those motions, and much remains to be done by the parties and the Court to prepare this case for trial.
>
> *Id. at 1758.*

In the [*30] present case, although trial is set for mid-September, significant work remains for the parties and the Court. First, numerous voluminous dispositive motions are pending, including, but not limited to, Broadcast and IO Research's motion for summary judgment of infringement, Charter's motion for summary judgment of non-infringement and Charter's motion for summary judgment of invalidity. Furthermore, the parties have recently stipulated to additional discovery, including supplemental document production, supplemental responses to written discovery, supplemental expert reports, rebuttal expert reports, and expert depositions related to those supplemental expert reports. *Stipulation Regarding Discovery And Expert Report Supplementation,* at 2 (filed June 22, 2006). According to this stipulation, the parties hope to conclude this work in

late August. *Id.* n11 In addition to preparing their final pretrial memorandums and other trial presentations, numerous pretrial filings remain for both parties, including submission of deposition designations, oppositions to more than forty motions *in limine* (according to Charter, and not disputed by Broadcast or IO Research), as well as proposed [*31] jury instructions and special verdict forms. Charter argues that

> Neither the Court nor the parties should expend additional resources when it is uncertain which, if any, of the four asserted claims will survive the reexamination process. The reexamination proceedings before the PTO may well [alter], moot or resolve the issues set for trial in less than three months, and staying the trial pending conclusion of the PTO's review will eliminate the . . . additional expense of trial preparation [and the] risk of inconsistent rulings.

*Defendant's Motion,* at 13.

The Court agrees. *See Tap Pharm. Prods. Inc., 70 U.S.P.Q.2d at 1320* (noting similarly, i.e., "There is a significant chance that the PTO will either invalidate this patent or drastically decrease its scope. This creates a very real possibility that the parties will waste their resources litigating over issues that will ultimately be rendered moot by the PTO's findings. Simplification of the issues will allow both parties to conserve time and resources."). A more detailed glance at the timing factor reveals, beyond any peradventure of doubt, that a stay is appropriate in this case.

n11 To this end, the Court fails to see the significance of Plaintiffs' argument that *Charter* acted as the initiator of the stipulation, for the fact remains that *both* parties stipulated to additional discovery.

[*32]

**III. Will A Stay Unduly Prejudice the Nonmoving Party or Present a Clear Tactical Advantage for the Moving Party?**

This factor is best summarized by one question: *do the Plaintiffs have an adequate remedy at law?* Because they do, this factor weighs heavily in favor or staying the case. The Plaintiffs seek *only* monetary damages and for that reason, have an adequate remedy at law should they prevail on the merits. *See, e.g., Robert H. Harris Co., 19 U.S.P.Q.2d at 1788.*

Plaintiffs make the vague argument that a delay in trial is unfair. However, this argument fails to address the crucial question of the prejudice factor--i.e., will a stay unduly prejudice the legal remedy sought by the nonmovants? *Softview Computer Prods. Corp., 56 U.S.P.Q.2d at 1636; Ingro v. Tyco Indus., Inc., 227 U.S.P.Q. 69, 70 (N.D. Ill. 1985).* Clearly it will not. If the PTO does not invalidate or otherwise alter the claims of the *'094 patent,* the Plaintiffs' legal remedy remains unaffected, and they will have over a decade to exploit the *'094 patent.* Moreover, if the claims are narrowed, *both* sets of parties will have benefitted by avoiding [*33] the needless waste of resources before this Court, and again, the Plaintiffs will be able to pursue their claim for money damages at trial. Finally, if the claims are strengthened, the Plaintiffs' position will be as well, and their likelihood of monetary damages will increase. *See, e.g., Motson, 2005 U.S. Dist. LEXIS, 2005 WL 3465664 at *1* ("[I]f the PTO upholds the validity of plaintiff's patent, 'the plaintiff's rights will only be strengthened, as the challenger's burden of proof becomes more difficult to sustain.'") (quoting *Pegasus Dev. Corp., 2003 U.S. Dist. LEXIS 8052, 2003 WL 21105073 at *2*). Indeed, the only possibility of irreparable harm to Broadcast and IO Research would exist if the Court chose *not* to stay the case. That is, if the Court finds that the *'094 patent* is valid and that Charter has infringed it, and orders Charter to pay damages to Broadcast and IO Research, then Broadcast and IO Research "would have no ability to recover those damages if at a later date the PTO determine[s] that the ['094] patent is invalid." *Bausch & Lomb Inc., 914 F. Supp. at 952.* The Court finds such a possibility unacceptable.

In sum, this factor weighs in favor staying the [*34] case because monetary relief--the only relief Plaintiffs seek--is fully capable of restoring Plaintiffs to the *status quo ante. Accord Brown, 18 U.S.P.Q.2d at 1496* ("While the Court recognizes that the reexamination could cause significant delay in the proceedings, the complexity of the case and the fact that Mr. Brown can be fully compensated should he prevail at the reexamination and

trial support staying this action."). n12

> n12 Moreover, a stay would not affect the issue of damages accruing during the pendency of the reexamination period should Plaintiffs ultimately prevail at trial. The Federal Circuit has considered the impact of a completed reexamination upon the viability of infringement claims relating to the reexamined patent. *See, e.g., Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1346 (Fed. Cir. 1998)*. The general rule is that the owner of a reexamined patent "is entitled to infringement damages, *inter alia,* for the period between the date of issuance of the original claims and the date of issuance of the reexamined claims if the original and reexamined claims are 'identical.'" *Id.* (citing *35 U.S.C. §§ 252* and *307(b); Tennant Co. v. Hako Minuteman, Inc., 878 F.2d 1413, 1417, (Fed. Cir. 1989))*.

[*35]

**IV. Conclusion**

A future trial date, standing alone, does not obviate otherwise unassailable reasons to stay these proceedings. At the very least, awaiting outcome of reexamination will facilitate motion disposition and trial, as valuable efficiencies will be gained by awaiting the input of the PTO on the scope of the claims in light of the prior art that will be considered during the reexamination proceedings.

The Court's decision mirrors, in many respects, that made in *Middleton* by the Honorable James E. Gritzner of the United States District Court for the Southern District of Iowa. By the time Judge Gritzner ruled on the defendant's motion to stay, the "long and convoluted" case before him was eight years old--"proceeding from the United States District Court for the Northern District of Illinois to the Federal Circuit and back multiple times." *Middleton, Inc., 2004 U.S. Dist. LEXIS 16812, 2004 WL 1968669 at *1*. Like this Court, Judge Gritzner was faced with the choice of ruling on numerousmotions for summary judgment--in fact, three motions presenting legal questions nearly identical to the motions presently before this Court--or staying the case pending PTO reexamination. [*36] *Id.* The case was set for trial in less than two months. *Id.* The plaintiff in *Middleton*--much

like Broadcast and IO Research--resisted the motion to stay "based primarily on the short time left before trial and the delay in seeking reconsideration." *Id.* Judge Gritzner's thorough and thoughtful explanation warrants repeating:

> In the present case, the litigation has been ongoing for over eight years. The trial date is set and is scheduled for the week of October 12, 2004 [i.e., less than two months away]. In addition, several motions for summary judgment remain pending that may be dispositive of some or all of the issues remaining in the case. Discovery is completed, and the parties are most likely well into their trial preparation. Thus, the parties have already spent a considerable amount of time and money on the pending litigation. On its face, these facts seem to weigh against granting a stay.
>
> However, these facts should be weighed against the benefits of issuing a stay. As argued by [the defendant], the following factors weigh in favor of issuing a stay: (1) a stay will be the most efficient use of judicial resources by preventing duplication of effort; [*37] (2) the reexamination may simplify and narrow the issues in the case; and (3) the Court will be able to benefit from the expertise of the PTO. Moreover, a stay issued pending reexamination "is not for such a protracted or indefinite period" as reexamination proceedings are to "'be conducted with special dispatch.'" *Gould, 705 F.2d at 1341* (quoting *35 U.S.C. § 305)*. Thus, while some courts have denied a stay based on the end of discovery and the proximity of trial, *see Toro Co. [v. L.R. Nelson Corp.], 223 U.S.P.Q. [636,] 638 [(C.D. Ill. 1984)]*; the ultimate determination is within the Court's discretion based on a weighing of the benefits of issuing a stay versus any added expenses resulting from the stay.
>
> In the present action, the Court finds the element of judicial economy does in fact

weigh in favor of granting the motion to stay. First, a stay would preserve the costs of a trial on the merits that may be obviated by the results of the reexamination. Second, even if a trial is ultimately required, the Court can have all issues heard in one trial on the proper scope of the patent claims. In addition to limiting the [*38] issues at trial, the reexamination decision may also limit the issues in the currently pending dispositive motions. Finally, the Court will be able to use the expertise of the PTO in making further determinations as related to the proper patent claims. In that regard, the Court is influenced by the breadth of the reexamination and the number of prior art references under active review.

The Court acknowledges the considerable expense already endured by the parties in the present action but notes that these costs will not be recouped by denying a stay and proceeding to a trial. This may actually compound the parties' expenses if some or all of the issues need to be retried later as a result of the reexamination. In addition, the Court disagrees with [Plaintiff's] contention that only incremental resources will be expended if the action proceeds to trial. It is simply not efficient to rule on three motions for summary judgment, complete pretrial, and hold a full jury trial if all or part have to be redone. The apparent scope of the reexamination, the technical expertise of the PTO, and the relationship to the issues in this case suggest to the Court a great likelihood that the [*39] continuing work of this Court would be impacted by the reexamination. The judicial efforts that a stay would preserve outweigh any additional cost in staying the proceedings even at this late juncture.

*2004 U.S. Dist. LEXIS 16812, [WL] at *5-6.*

This Court finishes where the Southern District of Iowa did two short years ago.

Accordingly, and for the foregoing reasons, it is hereby

**ORDERED** that Defendant Charter Communications, Inc.'s Motion to Stay Pending Reexamination of the U.S. Patent *6,076,094* By United States Patent and Trademark Office shall be, and now is, **GRANTED**. It is further

**ORDERED** that the proceedings in the above-captioned case are **STAYED** from the date of this Order until further notice. It is further

**ORDERED** that the parties shall immediately advise the Court of the PTO's decision to grant or deny Defendant's petition for reexamination of the *'094 patent*, this Court continuing or lifting the present stay pending that initial determination. It is further

**ORDERED** that the parties shall advise the Court of any final decision that results from the PTO's reexamination of the *'094 patent*.

Dated this 11th day of July, 2006.

ALAN B. JOHNSON

UNITED [*40] STATES DISTRICT JUDGE

SITTING BY DESIGNATION