# TAB 1

**Toro's Limine Motion to Preclude DOE Infringement**

## INTRODUCTION

The day before discovery closed, Textron amended its 26(a)(1) Initial Disclosures adding

<u>38</u> previously undisclosed and un-deposed witnesses it may call at trial. Textron also withheld its

doctrine of equivalents ("DOE") infringement contentions until just 31 days before the close of

discovery—*despite fact discovery being open for 13 months*. Toro was stunned when Textron's

expert disclosed (for the first time) over 10 new theories of infringement under the DOE, which,

for the 4 accused products, implicates over 62 patent claims.

Textron has no excuse—let alone substantial justification—for waiting until the close of

discovery to identify 38 new witnesses, or for withholding its DOE contentions. Textron's late

disclosures severely harmed Toro by preventing it from defending against the new theories of

DOE infringement with only 31 days of discovery left. Discovery, under the Federal Rules, aims

to prevent such surprise.[1] Textron should be precluded from presenting evidence and argument

on DOE infringement and from relying on any of the 38 newly disclosed witnesses at trial.

## BACKGROUND

On January 6, 2006, Toro served its first set of interrogatories on Textron. Toro's

Interrogatory No. 8 specifically requested Textron's literal and DOE infringement contentions.

On February 6, 2006, Textron answered Toro's infringement contention interrogatory No. 8

alleging only literal infringement and providing no information concerning the DOE: Textron

"further objects to the request that it identify doctrine of equivalents contentions, in that this

request is premature at least until [Textron] has had discovery from Toro and Toro shows why its

accused products do not literally infringe." (Ex. 1 at 16-17.)

The Court's Scheduling Order required Textron to serve on Toro by April 3, 2006, a

Claim Chart identifying both literal and DOE contentions, including addressing function, way,

result and insubstantial differences. (Ex. 22 at 3.) On April 3, 2006, Textron served its Claim

Chart on Toro again alleging *only* literal infringement. In its Claim Chart, Textron reserved the

---

[1] *Wright v. Touhy*, No. 97 C 742, 2003 U.S. Dist. LEXIS 19167, at *11 (N.D. Ill. Oct. 27, 2003) (Ex. 23); *Erskine v. Consolidated Rail Corp.*, 814 F.2d 266, 272 (6th Cir. 1987)

"right to supplement and modify its infringement contentions to the extent that the Defendant and/or the Court adopts a construction of the claims that differs from Plaintiff's current understanding." (Ex. 2 at 2.) Textron also stated to the "extent that Defendant identifies any allegedly missing elements in the claims enumerated in Plaintiff's Claim Chart, Plaintiff reserves the right to assess infringement under the doctrine of equivalents *and to supplement Plaintiff's Claim Chart accordingly*." (*Id.*) (emphasis added)

The parties thought it made sense for each to provide its DOE contentions, *if any*, for only those claim elements the opposing party alleged were missing. Toro's counsel wrote Textron on April 19, 2006, asking it to agree that "if Textron asserts infringement under the doctrine of equivalents for any claim in which Toro has alleged no literal infringement, Toro will have an opportunity to respond to such allegations of equivalency." (Ex. 3.) Textron agreed, "provided that the same qualification applies in the Minnesota action." (Ex. 4.)

Toro served its non-infringement Claim Chart on May 3, 2006, identifying numerous claim elements missing in the accused products. Despite the parties' agreement, Textron never supplemented its Claim Chart to provide any DOE Contentions. In the Minnesota case, however, pursuant to the parties' agreement, Toro provided Textron with its updated Claim Chart disclosing its DOE infringement contentions for those claim elements Textron alleged were missing.[2] (Ex. 5.) Months after Toro identified several missing elements, on July 17, 2006, Textron supplemented its interrogatory response to incorporate its April 3, 2006 Claim Chart, which asserted only literal infringement. Textron disclosed no DOE theories. (Ex. 6 at 19.)

Between August 31, 2006 and November 15, 2006, Toro took depositions of Textron's fact witnesses, including Textron's engineers and one of the inventors. (Ex. 7, Ex. 8, Ex. 9, Ex. 10, and Ex. 11.) Toro also re-noticed a 30(b)(6) deposition of Textron concerning infringement.

---

[2] In the Minnesota case, Toro disclosed its DOE contentions on June 23, 2006, just a few months after Textron alleged elements missing in its responsive claim charts. (Ex. 14.) Discovery in the Minnesota case remains open until July 2, 2007, giving Textron more than a year to discover facts and develop its defenses to Toro's claims of DOE infringement.

(Ex. 12 at 2.) Textron refused to designate a witness on infringement arguing it was "an improper 'contention' topic inappropriate for a Rule 30(b)(6) deposition. This, topic is more appropriately addressed through *interrogatories, mandatory disclosures of claim charts*, and expert disclosures." (Ex. 13 at 6 (emphasis added).) Textron relied on its allegations of literal infringement: Textron *"has already provided Toro with claim charts setting forth its infringement allegations."* (*Id.* (emphasis added).) Textron's Claim Charts alleged only literal infringement. (Ex. 2 at 2.) Because Textron did not allege DOE infringement or provide any DOE contentions, despite the parties' agreement to an orderly disclosure of DOE contentions, Toro did not inquire into the highly factual matters of DOE[3] infringement during fact depositions.

On October 20, 2006, the Court issued its claim construction Order. This Order made clear that many claim elements were not literally present in Toro's accused devices.[4] A month later, Textron again supplemented its interrogatory responses but did not supplement its response to Toro's infringement contention interrogatory No. 8. (Ex. 15 at 20.) Textron remained mute about its DOE theories through November, December and most of January despite significant discovery being undertaken by both parties.[5]

With just 31 days left in discovery (*out of 13 months*), Toro received Textron's expert report on infringement. Much to Toro's surprise, Textron's expert opined that more than 10 claim limitations were *equivalently* present, implicating about 62 claims for the four accused products. (Ex. 16 at 204-205.) This disclosure, if Textron was now alleging DOE infringement, changed the entire case—it went from exclusively a literal infringement case—to largely a DOE

---

[3] *See Jeneric/Pentron, Inc. v. Dillon Co., Inc.*, 205 F.3d 1377, 1384 (Fed. Cir. 2000) (Federal Circuit characterizing the doctrine of equivalents as "highly factual").

[4] For example, the Court construed the term "front and rear wheels" to mean "at least two front wheels and at least two rear wheels." (Ex. 14 at 8.) Two of Toro's accused products are only three-wheeled vehicles and thus do not literally meet this claim limitation.

[5] In fact, Textron continued to withhold its DOE contentions despite Toro again raising the issue in its summery judgment request: "Although Textron has not disclosed any theory of equivalence to date . . .." (Ex. 24 at 3.) While Textron disputed Toro's DOE legal analysis to prevent summary judgment, its summary judgment letter did not disclose its DOE contentions. (Ex. 25 at 3-4.)

case. This was the *first* time Toro received *any* of Textron's DOE contentions. In fact, until the summary judgment letters in mid December 2006, Textron led Toro to believe that it did not allege DOE infringement: up to then Textron never contended DOE infringement in its interrogatory response or in its Claim Chart, despite the parties' agreement to do so, if alleged. Textron also stated that it "*has already provided Toro with claim charts setting forth its infringement allegations,*" which included only allegations of literal infringement. (Ex. 13 at 6.)

During this final month of discovery, Toro could not retake depositions of fact witnesses concerning these new DOE theories. Moreover, because Textron delayed in producing relevant documents[6], Toro had to take prior art depositions in this last month. (Ex. 17, Ex. 18, and Ex. 19.) Toro also had to prepare for and depose all three of Textron's experts and defend Toro's experts. Toro had to complete the 30(b)(6) depositions of Textron unrelated to infringement and take six depositions. Despite its expert's DOE surprise, Textron still had not supplemented its Claim Chart or its response to Textron's interrogatory on infringement to even mention DOE. On February 27, 2007—the day before discovery closed—Textron supplemented its response to Toro's interrogatory on infringement simply incorporating by reference its expert's report. (Ex. 20 at 22.) That day, Textron also supplemented its initial disclosures to add <u>38</u> new and never deposed witnesses that might be called at trial. (Ex. 21.) Discovery closed the next day.

## ARGUMENT

Textron had a duty to seasonably supplement its 26(a) initial disclosures and its response to Toro's infringement contention interrogatory. Fed. R. Civ. P. 26(e)(1), (2). The day before discovery closed, Textron (without any justification) supplemented its 26(a)(1) Initial Disclosures adding 38 new and never deposed witnesses it may call at trial. (Ex. 21.) Textron also waited until just 31 days before discovery closed to disclose more than 10 new theories of DOE infringement in its expert reports. Textron withheld its DOE contentions for more than 12

---

[6] Textron's late disclosure of some 6,000 boxes in its Charlotte warehouse and its inadequate search of its former Johnson Creek facility, forced Toro to delay depositions until February 2007, to ensure Toro had all the evidence of invalidity.

months—despite Toro's infringement contention interrogatory served over a year ago; the Courts Order requiring Textron to serve its Claim Charts on April 3, 2006; and the parties' agreement to disclose DOE contentions, *if any*, after the opposing party alleges that claim elements were not literally present, which Toro did on May 3, 2006.

Because Textron waited until the day before discovery closed to supplement its 26(a) disclosures and withheld its DOE contentions until just 31 discovery days remained, it should be precluded from calling any of the 38 newly added witnesses at trial or presenting evidence concerning DOE infringement.[7] Textron has no substantial justification for its delay in providing this information. Textron could have provided Toro with its DOE contentions in its Claim Charts on April 3, 2006. Pursuant to the parties' agreement, it certainly should have after Toro alleged numerous missing elements in its responsive Claim Chart of May 3, 2006. After the Court's claim construction, Textron knew for certain that many elements were not literally met, yet Textron continued to disclose only literal infringement theories.

This delay is not harmless. After 12 months of discovery on literal infringement, Textron attempts to force Toro to switch gears and defend itself against 10 new theories of DOE infringement. Textron's unjustified delay precluded Toro from developing facts related to function, way, result and insubstantial difference of the now many allegedly equivalent structures. Toro should not be forced to defend itself against such easily disclosable DOE contentions because Textron chose to withhold its contentions until the end of discovery.

## CONCLUSION

Because of Textron's harmful, unjustified delay in disclosing important allegations and contentions of DOE infringement, it should be precluded from presenting any evidence or argument concerning DOE infringement. Moreover, Textron should be precluded from calling any of the 38 witnesses it disclosed the day before discovery closed.

---

[7] Fed. R. Civ. P. 37(c)(1); *See Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 166 F. Supp. 2d 1008, 1034-35 (D. Del. 2001) (precluding evidence not seasonably supplemented); *See also Praxair, Inc. v. ATMI, Inc.*, 445 F. Supp. 2d 460, 469-70 (D. Del. 2006) (precluding 50 new prior art references disclosed on the last day of discovery).

# TAB 2

**Toro's Motion in Limine to Exclude Testimony of Plaintiff's
Patent Law Expert Harry Manbeck**

## INTRODUCTION

Defendant, The Toro Company ("Toro"), moves to exclude the testimony of Harry Manbeck, Plaintiff's, Textron Innovations Inc.'s ("Textron"), patent law expert. At trial, Mr. Manbeck intends to testify that Toro is a willful infringer and that Textron did not commit inequitable conduct. Such determinations are for the jury or judge to decide, not an expert. Experts are prohibited from opining on the ultimate question of whether a party is a willful infringer or whether a party committed inequitable conduct. Therefore, Mr. Manbeck's testimony should be excluded.

## ARGUMENT

### I.      MR. MANBECK IMPERMISSIBLY OPINES ON WILLFULNESS.

"Willfulness is a question of fact, which must be proved by clear and convincing evidence." *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 442 (D. Del. 2004) (citing *Shatterproof Glass Corp v. Libby-Ownes Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985)) (internal cites omitted). The evidence is "evaluated and weighed by the trier of fact" to determine whether the accused infringer acted reasonably. *Id.* at 442, 443 (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1343 (Fed. Cir. 2004)). Federal Rule of Evidence 702 prohibits experts from usurping this function. *Oxford Gene Tech. Ltd.*, 345 F. Supp. 2d at 435. Specifically, Rule 702 prohibits experts testifying about willful infringement from opining about the intentions or motives behind a party's behavior or whether a party's behavior met the standard for reasonableness. *Id.* Those determinations are "equally within the competence of the jurors to understand and decide." *Id.* (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1273 (6th Cir. 1988)).

#### A.      Mr. Manbeck Impermissibly Opines on Whether Toro's Conduct Met the Standard for Reasonableness.

This Court has excluded expert testimony about "whether [a party's] behavior met the standard of reasonableness" as prohibited under Rule 702. *Oxford Gene Tech.*, 345 F. Supp. 2d at

443. Mr. Manbeck was "requested by Textron to provide expert analysis and testimony concerning whether Toro's infringement of the Textron patents has been willful." (Expert Report of Harry F. Manbeck, Jr., Jan. 26, 2007, at 1, 18 (Ex. 26).)  Furthermore, he states in his report that "[b]ased on my review of the evidence presently known to me in light of these factors, it is my opinion that Toro did not act reasonably and prudently after becoming aware of the Textron patents." (*Id.* at 19, 27.)  Mr. Manbeck's opinions are the very types that this Court has previously excluded as invading the province of the trier of fact. *Oxford Gene Tech.*, 345 F. Supp. 2d at 443-44.

### B.     Mr. Manbeck Impermissibly Opines on Toro's State of Mind.

This Court has also excluded expert testimony about a party's "intent, motive, or state of mind, or evidence by which such state of mind may be inferred" because this also invades the province of the trier of fact. *Id.* at 443. In excluding this testimony, this Court specifically considered the phrases "'recognizing' that its business activities might infringe," "'feel' that a license may have been necessary," "may have been 'concerned'," and "'concluded' whether it infringed or not" to impermissible opine on a party's state of mind. *Id*. at 443 n. 9. Mr. Manbeck makes the same impermissible presumptions.

Throughout his report, Mr. Manbeck opines on Toro's state of mind. He uses the same suspect language previously excluded by this Court: "Toro *recognized* the desirability of this feature . . .;" and "[Toro] *felt* that the individual rotary decks with roller did a super job . . .." (Manbeck Report at 21, 22 (emphasis added).) He also uses other language indicating state of mind: ". . . Toro *deliberately* copied the patented features into Toro's product;" ". . . the Ransomes AR-250 product was *considered* to be the market leader by Toro personnel;" ". . . Toro's employees *chose to ignore* the possibility . . .;" ". . . Toro *paid no attention* to whether Ransomes/Textron has applicable patents;" "[t]he marketing function at Toro was likewise *uninterested* . . .;" "rather it is only a statement of position *intended* to scare off the patent owner;" among others. (Manbeck Report at 19-20, 23-25 (emphasis added).) On nearly every

page of his report pertaining to willfulness, Mr. Manbeck impermissibly opines on Toro's state of mind. His testimony should be excluded.

## II.     MR. MANBECK IMPERMISSIBLY OPINES ON INEQUITABLE CONDUCT.

Inequitable conduct is 'an affirmative misrepresentation of material facts, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Revlon Consumer Prods. Corp. v. L'Oreal S.A.*, Civil No. 96-192 MMS, 1997 U.S. Dist. LEXIS 4117, *4 (D. Del. March 26, 1997) (quoting *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 103 F.3d 1538, 1549 (Fed. Cir. 1997)) (Ex. 27). Once the threshold findings of materiality and intent are proven, the district court weighs the threshold findings to determine whether inequitable conduct occurred. *Id.* "As the determination of the Court consists of a 'weighing' of the factual findings, . . . it follows that the jury will act as the sole fact-finder on the issue of inequitable conduct." *Id.* at *9-*10. Thus, experts are prohibited from testifying on whether a party committed inequitable conduct because "to do otherwise would usurp the respective functions of the jury and the Court." *Id.*

Mr. Manbeck wants to do just that. Textron wants Mr. Manbeck to opine on whether Textron committed inequitable conduct, impermissibly usurping the functions the Court. He would testify that "[b]ased on my review of the record and the relevant law, I believe that each of [Toro's inequitable conduct] theories to be inadequate." (Rebuttal Report of Harry F. Manbeck, Jr., Feb. 20, 2007, at 3 (Ex. 28).) However, "the ultimate determination of inequitable conduct is committed to the discretion of the trial court." *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1584 (Fed. Cir. 1995). Mr. Manbeck is impermissibly offering a conclusion based on *his* review of the facts, a conclusion reserved for the Court and a review reserved for the jury.

In reviewing the record, Mr. Manbecks makes factual conclusions reserved for the jury. For example, he testifies that "the statement made to the [PTO] during the prosecution of the '530 patent were not false." (Manbeck Rebuttal Report at 4.) Falsity is a question of fact

3

for the jury. *See Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 797 (3rd Cir. 2000) ("The truth or falsity of several of the allegedly defamatory statements . . . are disputed issues of fact and these too are questions of the jury.")

Mr. Manbeck would also testify that "evidence in the record confirms [the] conclusion that the Nunes Brochure was not material." (Manbeck Rebuttal Report at 11.) Materiality is also a question of fact for the jury. *Revlon Consumer Prods.*, 1997 U.S. Dist. LEXIS 4117, *9-*10.

He would further testify that "I thus find no basis for concluding that Mr. Bednar had any knowledge whatsoever of the Buchanan Article." (Manbeck Rebuttal Report at 5.) Knowledge is a question of fact for the jury. *ISCO Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 502 (D. Del. 2003) (quoting *Baxter Int'l v. McGaw, Inc.*, 149 F.3d 1321, 1330 (Fed. Cir. 1998) ("The jury was entitled to infer from all of this evidence . . . that the inventor had knowledge of the report and its materiality," and that "the drawing of such inferences 'is peculiarly with the province of the fact finder.'")

Finally, Mr. Manbeck wants to testify that "I see no evidence that [Textron] intended to deceive the PTO in any of these matters." (Manbeck Rebuttal Report at 12.) Intent too is a question of fact for the jury. *Molins PLC v. Textron*, 48 F.3d 1172, 1181 (Fed. Cir. 1995) ("The drawing of inferences, particularly in respect of an intent-implicating question . . . is peculiarly within the province of the fact finder.")

Mr. Manbeck's testimony on inequitable conduct is based entirely on with impermissible factual conclusions reserved for the jury and conclusions reserved for the Court. His testimony should be excluded.

## CONCLUSION

For the reasons stated above, Toro's motion to exclude all testimony of Mr. Manbeck should be granted.

# TAB 3

**Toro's Motion in Limine to Preclude Textron From Denying that it
Possessed Risboro Cutting Units and Disposed of them During
this Litigation After Toro Requested them**

## INTRODUCTION

More than one year after Toro had been aggressively seeking information from Textron concerning prior art by the Risboro' company, Toro independently discovered that Textron's Ipswich facility disposed of three prior art Risboro' cutting units through a scrap yard. Textron confirmed this. Textron alleges it was an accident.

Toro immediately demanded that Textron produce all documents concerning the Risboro cutting units and a witness to testify about Textron's acquisition, use, and recent disposal of the cutting units. Textron maintained that it had no documents concerning Risboro' and refused to produce a witness—claiming that no one knew anything about it. On February 20, 2007—just eight days before the close of all discovery—Textron produced a self serving document allegedly supporting its claim that the Risboro cutting units were accidentally discarded during a facility cleaning. Textron continued its refusal to produce a witness claiming no one knew anything about the Risboro cutting units.

Toro requests the following: (1) that Textron be precluded from attempting to explain away its disposal of the three prior art Risboro cutting units; (2) that the Risboro cutting units, that Textron discarded and now in Toro's possession, be admitted into evidence over any of Textron's objections; and (3) that the jury be instructed that Textron had the Risboro prior art in its possession at least during the prosecution of the '311 and '312 patents and during this litigation, did not provide it to the Patent Office or Toro, but instead disposed of it to a scrap yard.

## BACKGROUND

Textron filed suit against Toro in July of 2005. Toro sent its first discovery requests seeking prior art on January 6, 2006. (Ex. 29 at Nos. 8, 16, 17, and 28.) Toro identified the Risboro prior art and its significance in its June 1, 2006 Prior Art Statement. (Ex. 30. (attaching only relevant portions of the 746 page document)) Thereafter, Toro aggressively sought information and documents concerning Textron's knowledge of the Risboro prior art. (Ex. 31,

Ex. 32 at 3, and Ex. 33 at 2.)  Toro repeatedly asked Textron to search its Ipswich facility[8].  (Ex. 34 at 2; Ex. 35 at 2.)  Toro specifically requested documents concerning the Risboro prior art. (Ex. 34 at 2.)  Toro brought this issue to the Court.

Textron represented to this Court that it had searched the Ipswich facility (Ex. 36 at 22 (Mr. Robertson: "the two companies that continue to exist, Ransomes and Jacobsen, those are the companies I searched to find relevant documents"; Ex. 37 at 27.)  Textron refused to answer any interrogatories, produce relevant documents, or produce a 30(b)(6) witness concerning the Risboro prior art. (Ex. 38 at 2-4; Ex. 14 at 7-8; Ex. 39 at 2-4.)  In meet and confers to obtain answers to Toro's discovery and a 30(b)(6) witness concerning Risboro', Textron repeatedly represented that it had no documents and knew nothing about the Risboro prior art[9].  Given Textron's representations, Toro had nothing to bring to the Court.

Then more than a year into this litigation Toro independently discovered that Textron's Ipswich facility disposed of a set of the Risboro prior art (Ex. 44 at ¶ 9)—well after Textron knew Risboro was important prior art.  When Toro confronted Textron with this information, Textron demanded that Toro tell it everything Toro knew about this situation.  Toro did so. [10]  On February 8, 2007, Textron's counsel confirmed that the Risboro cutting units had been in Textron's possession and had been disposed of during this litigation.  (Ex. 45.)

Toro considered bringing what appeared to be spoliation to the Court. (Ex. 52.)  Textron's response portion of the draft joint letter referenced a PowerPoint document that

---

[8] Textron's Ipswich facility, like its former Johnson Creek facility, also manufactured Textron's products alleged to be covered by the patents-in-suit.

[9] Despite Textron's representations, Toro found in its inspection of Textron's Charlotte document warehouse photographs of the Risboro prior art in an envelope entitled "Bob Krick—Europe 9/95 COMPETITIVE EQUIP." (Ex. 40.)  Toro also found at an empty Redrope labeled Risboro Turf. (Ex. 41.)  Toro also located a magazine article stating that Risboro was the "Best Jacobsen Dealer in 1991-1994. (Ex.42.)  Mr. Crawforth, a former Risboro' employee, testified that Textron's Ipswich facility approached Risboro to buy the Risboro prior art technology and obtained a set of the Risboro cutting units for testing and analysis. (Ex. 43 at 143:21 to 148:25.)

[10] Toro independently learned that Textron's Ipswich facility discarded these three Risboro' cutting units to a scrap yard named KT Dennison. (Ex. 44 at ¶ 5-9.)  KT Dennision placed them on e-Bay in January of 2007. (Ex. 44 at ¶ 4.)  Mr. Garwood purchased these Risboro cutting units from KT Dennison and has since sold them to Toro.

allegedly explains that the Risboro prior art was "inadvertently" discarded in a facility housekeeping effort cleaning out tons of rusted scrap metal. (Ex. 53.) Toro again demanded that Textron produce all documents concerning the Risboro' prior art and provide a witness to testify about the acquisition, use, and disposal of the Risboro prior art. (Ex. 46.) On February 20, 2007, Textron provided Toro with a self serving PowerPoint it alleged supported its allegations that the Risboro cutting units were inadvertently disposed of (Ex. 48) but continued to assert no other documents exist. In a subsequent meet and confer, Textron again refused to produce a witness claiming no one knew anything about the Risboro prior art or its disposal. Toro again threatened to bring the matter to the Court. (Ex. 47.)[11] Yet Textron insisted that no one at Textron knew anything about this, precluding Toro from taking the matter to the Court.

When Toro received the Risboro prior art formerly in Textron's possession, the Risboro' cutting units were not rusted scrap metal as alleged by Textron. (Ex. 49.) And all three are clearly marked with a large sticker reading "RISBORO' TURF." (Ex. 50.)

### ARGUMENT

A party aware of evidence that might be relevant to pending or future litigation has an affirmative duty to preserve this material. *Mosel Vitelic Corp. v. Micron Tech., Inc.*, 162 F. Supp. 2d 307, 310-11 (D. Del. 2000). Textron's duty was solidified at least in July of 2005, when Textron sued Toro. Or on January 6, 2006, when Toro served its first set of discovery requests seeking all gang-type mower prior art. (Ex. 29 at 6.) Certainly on June 1, 2006, when Toro disclosed Risboro and its significance. (Ex. 30.) Textron knew Risboro was prior art before Textron's Ipswich facility disposed of the Risboro cutting units to a scrap yard. (Ex. 30, 45, 48.)

The Court has the power to impose an adverse inference where a party or its counsel fail to preserve relevant evidence. *Mosel Vitelic Corp.*, 162 F. Supp. 2d at 311. Courts consider three

---

[11] In Textron's portion of a draft Joint discovery letter to the Court, Textron tried to shift blame to Toro. Textron alleged that a work-product declaration of Bruce Crawforth, a former Risboro' employee, was improperly withheld and that had it been disclosed Textron would have discovered these Risboro' cutting units. However, Toro disclosed to Textron the Risboro prior art and its significance just 5 days after receiving Mr. Crawforth's declaration.

factors: (1) the culpability of the party who destroyed or failed to preserve the evidence; (2) the degree of prejudice suffered by the innocent party; (3) and the availability of less severe sanctions that would avoid unfairness to this party while at the same time deterring similar misconduct in the future. *Id.* Moreover, "Delaware law does not require that the spoliation of evidence be intentional for an adverse inference to be drawn." *Burris v. Kay Bee Toy Stores*, No. 96C-01-036, 1999 Del. Super. LEXIS 536, *3 (Sept. 17, 1999) (Attached hereto at Ex. 51.).

Textron and its attorneys are, at a minimum, culpable of failing to preserve[12] evidence highly relevant to Toro's defenses. Textron knew that the Risboro cutting units were a key piece of prior art. Well after Toro requested it, Textron's Ipswich facility disposed of three such cutting units to a scrap yard. Textron now argues that it was rusted scrap metal and no one knows anything about it. Photos of this Risboro prior art shows it is not "rusted scrap metal." (Ex. 49.) Each of the Risboro prior art cutting units are clearly marked "Risboro' Turf." (Ex. 50.)

Textron claims that Toro suffers no prejudice because it now has the Risboro cutting units. However, Toro expects that Textron will object to these Risboro cutting units being admitted at trial and attempt to explain away its behavior. After refusing to produce a witness— claiming that no one at Textron knew anything about this prior art, Textron should not be allowed to preclude it from evidence and explain away its disposal. After all, Textron's counsel confirmed that its Ipswich facility had disposed of the Risboro cutting units during this litigation. The jury should also be informed as to Textron's behavior.

Finally the evidentiary rulings and instructions requested by Toro are the least severe sanctions that will avoid unfairness and at the same time deter similar misconduct in the future.

---

[12] Textron told this Court that before it sold its Johnson Creek facility to a non-party, it searched that facility and produced all relevant documents. (Ex. 36 at 25 ("we searched Johnson Creek ourselves and already produced the documents from Johnson Creek.")) Toro subsequently subpoenaed the new owners and in less than half a day found more than *eight boxes* of highly relevant documents, including the inventors' binders of tradeshow literature and photos of prior art Toro had specifically requested.

Textron should not be allowed to dispose of evidence, claim no knowledge of it, and then explain it away to the jury.

## CONCLUSION

Toro requests that the Court order the following for Textron's disposal of important prior art in this case: (1) that Textron be precluded from attempting to explain away its disposal of this prior art as it refused to produce any witness concerning this matter and only one somewhat self serving document; (2) that the Risboro cutting units that Textron discarded be admitted into evidence; and (3) that the jury be instructed that Textron had the Risboro prior art in its possession at least during the prosecution of the '311 and '312 patents and during this litigation, did not provide it to the Patent Office or Toro, but instead disposed of it to a scrap yard.

# TAB 4

**Toro's Motion in Limine to Exclude Plaintiff's Claim for
Damages Prior to July 13, 2005**

## INTRODUCTION

Defendant, The Toro Company ("Toro"), moves to exclude evidence of damages asserted by Plaintiff, Textron Innovations Inc. ("Textron"), before July 13, 2005 (the date the Complaint was served). The amount of damages Textron can recover is statutorily limited to those acts of infringement occurring after Toro received "notice of infringement" under 35 U.S.C. § 287(a).

Notice of infringement can be accomplished in two ways: (1) constructive notice, i.e., by continuously marking substantially all the patented products with the patent number(s); or (2) actual notice, i.e., the patent owner specifically accuses a product(s) of infringement. *Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993)

Here, neither method of notice was accomplished prior to serving the complaint. Nearly 50 percent of the allegedly patented products manufactured by Textron's affiliates were unmarked. Moreover, to the extent marking did occur, there were significant gaps in that marking (at times over a year) with hundreds of products sold that were not marked at all. As a matter of law, Textron's failure to continuously mark substantially all the patented products mean there was no constructive notice. Nor did Textron provide actual notice of infringement until it served its Complaint on July 13, 2005. Therefore, any evidence of purported infringing sales of the accused products before July 13, 2005, must be excluded.

## I.   TEXTRON FAILED TO SATISFY THE STATUTORY NOTICE REQUIREMENTS OF 35 U.S.C. § 285 PRIOR TO JULY 13, 2005.

As a general matter, patentees must comply (or ensure compliance) with the marking statute in order to recover damages for infringement. The statute provides in pertinent part:

> [p]atentees, and persons *making, offering for sale, or selling* within the United States any patented article for or under them . . . may give notice to the public that the same is patented by fixing thereon the word "patent" or the abbreviation "pat.," together with the number of the patent . . . *In the event of failure to do so,* no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(b)(5)(A) (1994) (emphasis added). To comply with § 287(a) notice, other than by marking, the patent owner must affirmatively communicate to the alleged infringer a specific charge of infringement by a specific accused product. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001).

### A.    Products Manufactured by Plaintiff's Affiliates were not Substantially and Continuously Marked.

Ransomes America Corp. and Jacobson were Plaintiff's affiliates authorized to make products using the technology covered by the patents-in-suit. These two companies jointly made four (4) products that incorporated the technology of the patents-in-suit, the AR-250, the AR-2500, the AR-3, and the AR-5. (*See* Ex. 54.) About ▮▮▮ total patented products were sold from the date that the first patent issued through 2006. Id. While some of these products were marked with the patent number, marking was neither substantial nor continuous as required by law. *See Nike Inc. v. Wal-Mart Stores*, 138 F.3d 1437, 1446 (Fed. Cir. 1998).



The first products made under the patents-in-suit were the AR-250 and the AR-2500.



Moreover, once marking has begun, it must be continuous in order for the party to avail itself of the constructive notice provisions of the statute. *Am. Med. Sys.*, 6 F.3d at 1537. Here, there were gaps in marking by over a year where products were sold with no patent numbers on them. (Ex. 59.)

Marking approximately 50 percent of the allegedly patented products is per se insubstantial marking. *See Maxwell v. K Mart Corp.*, 880 F. Supp. 1323, 1336 (D. Minn. 1995) ("substantially all means that all but a few of the patented articles sold by the patentee or her licensee were marked with the patent number"); *Hazeltine Corp. v. Radio Corp. of Am.*, 20 F. Supp. 668, 671-672 (S.D.N.Y. 1937) (holding that "there must be marking of <u>every</u> patented article sold" subject to a de minimis exception in which a patentee may still satisfy the marking requirements by marking all but "a <u>few</u> articles in hundreds of thousands made and sold" (emphasis added)). The lowest percentage of marking ever found to satisfy the statute was 95%, well above Plaintiff's 50% marking.

Similarly, gaps of a year over a six-year period are per se non-continuous marking. *See Oreck Holdings, L.L.C. v. Minuteman Int'l, Inc.*, 2003 U.S. Dist. LEXIS 20114, at *9 (D. La. Nov. 7, 2003) (holding that "a six year hiatus in marking does not constitute 'substantially consistent and continuous marking'"). (Ex. 60.) Consequently, Textron can not use marking to satisfy the notice required under 35 U.S.C. § 287.

**B.      Plaintiff Never Provided Actual Notice of Infringement Until it Served Toro with its Complaint.**

If a patentee has not provided actual notice by marking products in compliance with 35 U.S.C. § 287, it cannot recover damages until it provides actual notice of infringement.[13]  Actual notice is an affirmative communication by the patentee of a specific charge of infringement against a specific accused product or device. *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1345 (Fed. Cir. 2001).  The letter must come from the patent owner and specifically charge infringement.

Toro received two pre-suit letters from Plaintiffs' affiliates; however neither letter satisfied § 287.  The first letter is defective because it does not come from the owner of the patent, Ransomes America Corporation at that time.  *See Lans v. Digital Equip. Corp.,* 252 F.3d 1320, 1327-1328 (Fed. Cir. 2001).  The second letter is defective because it does not charge infringement. *Amsted Indus. Inc. v. Buckeye Steel Castings, Co.,* 24 F.3d 178, 187 (Fed. Cir. 1994).

The first letter was sent on September 5, 2000. (Ex. 61.) ██████████████████ ████████████████████████████████████████████████████

██████ It is undisputed that at the time this letter was sent, Ransomes America Corporation was the owner of the '530 patent.  (Ex. 62.) ████████████████████████████████ Corp. was a subsidiary of Textron, Inc.  *See Lans,* 252 F.3d at 1327-1328 (holding that notice must come from the patentee because "knowledge of the patentee's identity facilitates avoidance of infringement with design changes, negotiations for licenses, and even early resolution of rights in a declaratory judgment proceeding" and that "notice from someone closely associated with the patentee does not satisfy §287(a)").

A second letter was sent on February 5, 2002. (Ex. 63.) ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████  *See Gart,* 254

---

[13] Toro does not dispute that it received actual notice when it was served with Textron's Complaint on July 13, 2005.

F.3d at 1346-47. The Textron letter merely offered a licensing opportunity to practice the

technology:

> Textron and RAC believe that its patents provide broad coverage in the area of gang-type rotary lawn mowers. Textron and RAC further believe that this broad coverage translates into a significant commercial opportunity. Textron and RAC would like to explore with Toro a license agreement which enables Toro to practice the technology covered by these patents for a fee, thus extending this significant commercial opportunity to Toro. Textron and RAC would be willing to discuss such an agreement.

The letter does not mention infringement; it does accuse not accuse any particular product of

infringing or state that Toro needs a license to continue to make its now-accused gang-type rotary

mowers. The letter merely offers Toro a "commercial opportunity" for products that Toro may

consider making, rather than those already in production. The Federal Circuit has held that such a

letter does not satisfy the actual notice requirements of 35 U.S.C. § 287. *Id.*

In any event, the only product ever identified by "actual notice" was Toro's 3500-D.

Thus, there was no actual notice for Toro's 3505-D, 4500-D or 4700-D. *See Gart*, 254 F.3d at

1347 (holding that actual notice for products not specifically identified in a letter to the

defendants did not occur until the plaintiffs filed their complaint).

## CONCLUSION

Because the products manufactured under the patents-in-suit were not substantially and

continuously marked with the patent numbers, and because the letters sent to Toro did not provide

Toro with actual notice of infringement, the first date of notice was July 13, 2005. Under 35

U.S.C. § 287, Textron may not recover damages prior to this date.

# TAB 5

**Toro's Motion in Limine to Preclude Textron from Using
Toro's Patents as Evidence of Infringement**

## INTRODUCTION

The patents that Toro holds on its lawnmowers should be ruled inadmissible under Fed. R. Evid. 402 or 403 for the purpose of proving that Toro's accused lawnmowers infringe Textron's patents. Toro's patents are not relevant to the infringement analysis that this jury will undertake, and Textron's threatened use of Toro's patents as evidence of infringement will confuse this jury. An infringement analysis is well defined as a comparison of the asserted claims of Textron's patents to the accused Toro products. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)(en banc). That analysis does not entail a comparison of Textron's patent claims to Toro's patents, issued years later, to describe Toro's separately patented inventions. Such a comparison defies long-established principles of patent law, will confuse this jury, and should not be allowed.

## FACTUAL BACKGROUND

In what promises to be a relatively complex trial, Textron asserts that four models of Toro's Groundsmaster® lawnmower line infringe numerous claims from three separate patents, U.S. Patent Nos. 6,047,530; 6,336,311; and 6,336,312. (Exs. 64, 65 & 66.) Two of Textron's patents stem from a common application filed on February 3, 1997. Those two patents, the '530 patent and the '311 patent, include claims defining a roller that "extends across substantially the entire width of the deck." ('530 Pat: cl. 1-5 (Ex.64) and '311 Pat: cl. 2-5; 7-8; and 10-12 (Ex. 65).)

The Court construed this limitation to mean "the roller extends *largely but not wholly* across the entire width of the deck, *and does not extend beyond the width of the deck.*" (Markman Order at p. 8)(emphasis added). (Ex. 14.) The Court did not construe the term "deck," as used in the Textron patents, but did order that the limitation "deck defining a downwardly opening space" as a limitation to be given "its plain and ordinary meaning." (*Id.*, p. 8, ¶ 5.)

The plain and ordinary meaning ascribed by Textron to the term "deck" in its patents does not include an entire cutting deck assembly. To the contrary, as used in the '530 and '311

patents, the cutting deck assembly is separately defined in Textron's patents. The "deck" and the "downwardly opening space" defined by the "deck" are most clearly illustrated by Figure **6** of the '530 patent:



In the above figure, the "deck" is the portion of the structure highlighted in red resembling an upside-down salad bowl that houses the cutting blade (not shown). This "deck" is part of the "deck assembly." ('530 pat., col. 3, ll. 6-7)(Ex. 64). The claims at issue correlate the roller in relation to the deck **38**, not the deck assembly: "roller extends across substantially the entire width of the deck." (*Id.*) Indeed, Textron's claims do not recite a roller that extends across "substantially the entire width of the <u>cutting deck assembly</u>."

Toro's accused lawnmowers do not have a roller that "extends across substantially the entire width of the deck," as claimed in Textron's '530 and '311 patents. The rear roller in each of Toro's lawnmowers extends *beyond* the width of the decks, and its front rollers extend over only a small portion (18.9%) of the deck width. So Textron wants to use Toro's patents to confuse the jury into believing that Toro's cutting deck assembly is the deck across which the roller extends substantially the entire width.

Textron, in a recent letter to the Court, reads from one of Toro's patents[14] to suggest a different meaning for the term "deck," than used in Textron's patents. (Textron 12/7/06 Letter, p.

---

[14] Toro holds at least two patents covering various components of its accused lawnmowers, both of which are the subject of this motion. One patent, drawn to a "Rear Discharge Rotary Cutting Deck For Mower," issued on October 29, 2002, from an application filed on February 6, 2001. (U.S. Pat. No. 6,470,663)(Ex. 68). The other is a patent focused on a rotary cutting unit "with

6)(referring specifically to U.S. Pat. No. 6, 470,663, col. 4, ll. 24-26)(Ex. 67). According to Textron's logic, the "deck," as described in Toro's patent, is not limited to the structure defined in Textron's patents. Rather, as Textron reads one of Toro's patents, a "deck" also includes the roller, wheels and other structure defined in Textron's patent as the "deck assembly," not the "deck." (*Id.*) Textron's argument is that Toro's description of a preferred embodiment in Toro's patent defines a "deck" to include the entire assembly, not only the "deck" carried by that assembly. (*Id.*) Textron asserts, therefore, that Toro's rear roller does not extend beyond the "deck" as described in Toro's patent.

## ARGUMENT

### A.    Toro's Patents Are Not Relevant To Textron's Infringement Claims.

Toro's patents are properly excluded from evidence as not relevant to any fact issue this jury may be asked to resolve. Fed. R. Evid. 402. A patent infringement analysis is not a semantics game, where a patent holder can pick and choose the words used to describe the corporeal structure of an accused device. To the contrary, the analysis involves two well defined steps: defining the meaning of the patent claims and determining whether "the properly construed claim[s] encompasses the accused structure." *Bai v. L & L Wings*, 160 F.3d 1350, 1535 (Fed. Cir. 1998). This jury will be tasked with performing the second step, which is to apply the claims of Textron's <u>patents</u> to Toro's <u>lawnmowers</u>, not to match the language between Textron's patents and Toro's patents. Toro's patents and the manner in which the structure of its lawnmowers are described in those patents have no bearing on whether Textron's patents are infringed by Toro's products, and are properly excluded from evidence as irrelevant. Fed. R. Evid. 402.

### B.    Toro's Patents Have Nothing To Do With The Ordinary And Customary Meaning Of Textron's Patent Claims.

Toro's patents also have no relevance to the plain and ordinary meaning of the term "deck" in Textron's patents because Toro's patents came much later in time. This Courts'

ovate rollers and front corner cut-outs," which issued on November 26, 2002 from an application filed on January 21, 2000. (U.S. Pat. No. 6,484,481)(Ex. 69).

*Markman* Order advises that the term "deck defining a downwardly opening space" is to be given its plain and ordinary meaning. (Markman Order, p.8, ¶ 5)(Ex. 67). The Federal Circuit has recently made clear that the ordinary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., *as of the effective filing date of the patent application.*" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (emphasis added). Textron's '530 and '311 patents stem from a single patent application that was filed on February 3, 1997, so the "time of the invention" of each of Textron's alleged claims of the '530 and '311 patents prior to February 3, 1997. ('530 Pat., p.1 (Ex. 64); '311 Pat., p.1 (Ex. 65); '312 Pat., p.1 (Ex. 66).) Toro's applications for its patents were filed on January 21, 2000, and February 6, 2001, respectively, nearly four years after Textron's application was filed. ('663 Pat., p.1 (Ex. 68); '481 Pat., p.1 (Ex. 69)). Toro's use of the term "deck" in its 2000 and 2001 patents cannot logically have any relevance to the ordinary meaning of the term "deck" in February of 1997. Therefore, Toro's patents are properly excluded from evidence under Rule 402 on this basis as well.

    **C.**    **The Introduction Of Toro's Patents At Trial Would Unfairly Confuse And Mislead The Jury.**

Toro's patents should alternatively be excluded from evidence under Rule 403. The introduction of both patents before this jury will be confusing, and could mislead the jury into believing that Toro has conceded in some way that its entire cutting deck assembly is, in fact, a "deck" as alleged by Textron. Nothing, however, could be further from the truth. It is axiomatic that the specification of a patent is "the single best guide" to the meaning of the terms used by the patentee in the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). Textron's specifications, and claims, very clearly distinguish between a "deck" and a "deck assembly." Toro's patents merely describe Toro's inventions, they do not describe Toro's lawnmowers. If Toro's patents are presented to this jury, they will have to be instructed that the Textron patents inform the meaning of the term "deck," but Toro's patents do not. Such an instruction is likely to

be lost on the jury, who will treat the Toro patents as an admission. Toro's patents are therefore appropriately excluded, in the alternative, under Rule 403.

## **CONCLUSION**

For the foregoing reasons, Toro's '663 and '481 patents should be ruled inadmissible as evidence of infringement at this trial.