# EXHIBIT 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TEXTRON INNOVATIONS INC.,    )
                           )
                           )    C. A. No. 05-486 (GMS)
        Plaintiff,       )
                           )
        v.              )
                           )
THE TORO COMPANY,          )
                           )
                           )
        Defendant.      )

## EXPERT REPORT OF HARRY F. MANBECK, JR.

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

## I.    INTRODUCTION

1.    My name is Harry F. Manbeck, Jr. I have been retained by counsel for Plaintiff Textron Innovations Inc. ("Textron") as a consultant and possible testifying expert witness with respect to the proceedings currently before the Court in the above-captioned matter. I have been asked by Textron to provide expert analysis and testimony on the procedures of the United States Patent and Trademark Office ("PTO") as they specifically pertain to the prosecution of U.S. Patent No 6,047,530 ("the '530 patent"), U.S. Patent No. 6,336,311 ("the '311 patent), and U.S. Patent No. 6,336312 ("the '312 patent")(collectively "the Textron patents"), which are owned by Textron. I have also been asked by Textron to describe the significance of the events that took place during the prosecution of each of the three Textron patents at issue in this case. Finally, I have been asked by Textron to provide expert analysis and testimony concerning whether The Toro Company's ("Toro") infringement of the Textron patents has been willful. I may also be asked to provide expert testimony in rebuttal to any expert opinions rendered by the patent

prosecution of the '311 patent. This was followed by a Preliminary Amendment filed February 26, 2001 which changed the title of the application to Gang-Type Rotary Lawn Mower with Multiple Rear Rollers, and then by a number of papers filed on March 9, 2001 which resulted in Randal S. Knorr being added as an inventor. The papers included a new inventors' Declaration and Power of Attorney signed by both Mr. Bednar and Mr. Knorr.

52.    The Examiner acted on the merits of the application on September 21, 2001, issuing a Notice of Allowability as of that date. At no time did the Examiner reject any claim of the application for any reason. The final fee was paid on November 27, 2001 and the '312 patent issued January 8, 2002.

## VI.    THE WILLFULNESS OF TORO'S INFRINGEMENT OF THE TEXTRON PATENTS

53.    I have been requested by Textron to provide expert analysis and testimony concerning whether Toro's infringement of the Textron patents has been willful. I am guided in that analysis by the decisions of the United States Court of Appeals for the Federal Circuit which hold that the determination of whether infringement has been willful is governed by a "totality of the circumstances" test. These decisions generally hold that the totality of the relevant circumstances should be considered in order to evaluate whether the infringer acted reasonably, and with due care. Evidence showing that under a "totality of the circumstances" Toro acted in knowing disregard of Textron's patent rights when engaging in, or continuing to engage in the accused infringing conduct, may establish that Toro's conduct was willful.

54.    When a company such as Toro becomes aware of a U.S. Patent, and the possible applicability of that patent to an existing or planned product, the company has an affirmative duty to proceed with due care, and to act reasonably and prudently in respect to that patent. If

18

the company does not act reasonably and prudently, and engages in or continues to engage in the infringing conduct in disregard of the patent, it is said to have acted willfully.

55.    The Court of Appeals for the Federal Circuit has identified a number of factors to consider in determining when an infringer has acted willfully. These factors include, among others: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) any remedial action by the infringer to avoid further infringement; (4) the closeness of the case; (5) the infringer's behavior as a party to the litigation; (6) the infringer's size and financial condition relative to the patent owner; and (7) the duration of infringer's misconduct. Based on my review of the evidence presently known to me in light of these factors, it is my opinion that Toro did not act reasonably and prudently after becoming aware of the Textron patents.

56.    In the case of the patents-in-suit, there are a number of documents and much deposition testimony from the defendant's employees establishing that Toro deliberately copied the patented features into Toro's products. The patents-in-suit came from development activities by the Ransomes Company, which in the nineteen nineties was a manufacturer of golf course mowing equipment. I am informed that Ransomes, then an independent company, became part of Textron about 2001, and its developments as covered by the patents-in-suit continue to be utilized in products provided by the Jacobsen division of Textron.

57.    The Ransomes mowers embodying the inventions of the patents-in-suit were known as the Ransomes AR-250 product. The AR-250 product had strengths which proved desirable in the golf course market. These strengths included no scalping when mowing uneven terrain and striping of the mowed area (Toro 014123). These strengths were important enough

that, as of May 1999, the Ransomes AR-250 product was considered to be the market leader by

Toro personnel. The competing Toro product, Toro Contour 82, didn't meet the no scalp need as

well as the AR-250 and didn't provide striping, a benefit strongly desired by end users (Toro

014101).

     58.     By October 1999 Toro had embarked on a Contour Rough Mowing Project

(Project C610). As indicated by Toro's own words taken from a document dated October 18,

1999 (Toro 013199).

> The initial object of this project was to determine what it would
> take to succeed in the individual deck, rotary rough mowing
> market. The Ransomes AR-250 was becoming a concern as it was
> having considerable success in many markets.
>
>      *    *    *    *    *
>
> After reviewing the AR-250 we learned that it was being used as
> both a rough and trim mower. Customers were purchasing the unit
> feeling it could do jobs eliminating a machine on their course.
> They also liked the ground following characteristics and the
> striping.
>
> We also learned that although the product provided a unique
> advantage for the customer, the actual execution of the product by
> the manufacturer was poor.
>
>      *    *    *    *    *
>
> Despite these shortcomings, customers where [sic] indicating they
> were very satisfied with the performance of the AR-250. It was
> later determined that they were satisfied with the performance as it
> compared to those other available options.... They also liked the
> use of rotaries that followed contour and provided striping.

     59.     The project C610 document also notes the following as "Perceived Advantages of

the AR-250" (Toro 013204).

       a.     Productivity
       b.     Ability to mow surrounds
       c.     Excellent ground following advantages
       d.     Gentle on Turf (what is good for fairways must be good for
              roughs?)

60.    Also, the document acknowledges that a golf course superintendent, Mr. Gary Shetler, who demoed the AR-250 was very impressed and felt it was the way to go. He felt that the individual rotary decks with rollers did a super job of following undulations and had no concerns for the trimability of the unit. (Toro 013205). Mr. Shetler was, in fact, somewhat prescient in that he is cited as thinking that "Toro will/should copy the concept."

61.    Toro did not just talk to others about the Ransomes AR-250 product. It obtained one in June 1999 for use as part of the field evaluation on the ground following products it was developing (Toro 028438). What the AR-250 could do given its individual rotary decks with rollers became part of the strategic plan for new product development at Toro. Toro's success in adopting Ransomes product improvements even led to the obsolescence of a prior Toro product offering. Mr. Tim Koch, Toro's marketing manager – riding rotaries, put it this way in a bulletin dated May 29, 2001 (Toro 023019).

> End user benefits such as ability to stripe, better ground following at lower heights of cut...have been in our strategic sights during new product development in recent years. The introduction of the Groundmaster 3500-D, which delivers extremely well on these desired benefits, has impacted your Groundmaster 3000-D sales this year. It is our strong belief that in F02, with the introduction of the Groundmaster 4500-D we will have "enveloped" the Contour 82 business, and the market niche the Groundmaster 3000-D fulfilled will be eliminated. [2]
>
> For these reasons, the Groundmaster 3000-D product will be discontinued later this year.

---

[2] The Groundmaster 3500-D and the Groundmaster 4500-D are both designated as infringing products in the instant litigation.

62.   Toro's reasons for copying from the Ransomes AR-250 are also expressed, succinctly and forcefully, in a document entitled Creative Direction (Toro 008809). As stated in this document by Mr. Koch:

> Primary competitor is Ransomes AR-250 with a five deck rotary that first hit the market in F'97. They have had a lot of sales success based on two attributes: decks follow contours of the turf and rear rollers stripe the turf. These two attributes truly excite the golf course superintendent and are the primary reason this product has been purchased so heavily....

63.   Toro's documents thus evidence that it developed its accused products in light of the improvements provided by the Ransomes AR-250 and its commercial success. Toro utilized the novel patented features of the Ransomes AR-250, copying from the Ransomes in order to compete with Ransomes and now Jacobsen. The copying was done without contact with Ransomes or Textron and certainly without their permission or authorization.

64.   I am informed that Textron's proofs will show that Toro considered additional desirable features of the Ransomes AR-205 and incorporated those features into Toro products, including the Groundsmaster 3500. (Langworthy dep. 84/5 – 89/12). I have been informed, for example, that the hydraulic circuit in the AR-250 included a hydraulic check valve to allow the rear wheels to free-wheel in turns. Toro recognized the desirability of this feature and implemented it in the hydraulic circuit for the Reelmaster 3100 and Groundsmaster 3500. Included among the development documents for the Reelmaster 3100 is a copy of the hydraulic schematic for the AR-250 with a note from Brad Hamilton to Donald Lackner, now Senior Engineering Manager for Toro, stating, "Hope this helps." (TORO 1012258). The Toro development documents also include further copies of the AR-250 schematic with enlarged views of Ransomes' hydraulic drive system including annotations added by Toro personnel (TORO 1012261-62).

22

65.     The present record also indicates that Toro's employees chose to ignore the possibility that Ransomes or Textron might have patents which cover the feature copied from the AR-250. In that regard, Mr. Benjamin Street has testified that he is a principal design engineer in the CATT Group of Toro. CATT is an acronym for Center for Advanced Turf Technology. Mr. Street's role is usually to go out and explore new opportunities for the Toro Company (Street dep. 4/11 – 14/16). From 1998 to 2000 he was assigned the contour rough mowing opportunity which led to the introduction of the Groundmaster 3500 product. During that period he was not aware of any patents by Textron, and the CATT Group made no investigations as to whether the design(s) emanating from the contour rough mower opportunity might impact on infringe the intellectual property rights of a third party. This was so even though there were times when just such an investigation had been done with respect to other new product developments (Street dep. 48/15 – 49/17). The contour rough mowing opportunity was apparently referred to at least at times as the AR-250 opportunity (Street dep. 136/7 – 136/16), which, in my opinion, would suggest to a reasonable person that it would be wise to investigate whether Ransomes or Textron held any applicable patents. If a company is exploring an opportunity based on and named after another company's product, common prudence would indicate that there is possibility, even a likelihood, that the other company would have an applicable patent or patents.

66.     Mr. David Stanley Klis is currently the director of technical operations for the commercial division at Toro. He leads the design group for the commercial division in both new products and the maintenance of current products. At the time the Groundmaster 3500 was developed, he was the senior engineering manager in charge of the group in which that development occurred. Also, the Groundmaster 3505 and the Groundmaster 4500 were released under his responsibility as director of technical operations (Klis dep. 10/9 – 10/21).

23

67.    Mr. Klis reviews patents if the Toro legal department sends them to him. However, he has not reviewed them specifically for the reason that Toro is about to release a product and it has been brought to his attention that there might be an issue with respect to a patent. He has reviewed the patents-in-suit but he can't recall how long he spent in that review. He thinks an hour might be about right. He was aware that Textron had sent a letter to Toro about its intellectual property rights but when he heard about the letter, he probably did not specifically go to review the patent. He has testified that he is not aware of any design modifications that have been made by Toro as a result of the patents-in-suit (Klis dep.50/9 – 57/13).

68.    Thus, both at the level of the responsible development engineer and at the level of engineering management, Toro paid no attention to whether Ransomes/Textron had applicable patents. Also, when Textron's attorney called Toro's attention to the '530 patent, the responsible engineering manager appears to have paid no attention to the matter. No effort was made then or at any later time to redesign or modify the Toro products so that they would not infringe the Textron patents.

69.    The marketing function at Toro was likewise uninterested as to whether the Toro Groundmaster products might be infringing the Textron patents. Mr. Kevin Thomas Conry is Toro's marketing manager for the Groundmaster product line (Conry dep. 8/12 – 9/8). Mr. Conry himself had never seen the '530 patent before he was deposed and "did not see the need to review the patent" (Conry dep. 42/18 – 45/3).

He was asked the following question concerning Toro's practice in respect to new products:

> Well, do you ever conduct a review before launching a product to
> ensure that that particular product will not be infringing on any
> third party – any rights owned by parties other than Toro?

24

His response was:

> As I said, the only – with a new product launch, the only things
> that I have questioned is have we reviewed to see what innovations
> could be patented.

70.     The practice at Toro marketing thus appears to be that it will look at new products
to determine whether there are any new features that can be patented for Toro's benefit.
However, no attention will be given as to whether the features it is copying from a competitor
may be covered by patents of that competitor.

71.     The '530 patent and its infringement by the Groundmaster 3500-D were
specifically called to Toro's attention by a letter dated September 5, 2000 from Robert S. Nolan,
Esq. of Harness, Dickey & Pierce, P.L.C., to the President of Toro (TORO 014632). Mr. R.
Lawrence Buckley, a Division Counsel of Toro responded to this letter on November 3, 2000
(TORO 014679). In his response, Mr. Buckley stated:

> We've studied the patent and its file wrapper.  For the following
> reasons, among others, we have concluded that no valid and
> enforceable claims cover Toro's Groundmaster 3500-D mower.

72.     Mr. Buckley's letter continues with arguments intended to support his position,
but the letter gives no indication that a legal opinion was obtained from competent patent counsel
supporting his position.  In fact, I am informed that Toro has not produced any opinion of
counsel in this litigation, let alone an opinion of disinterested outside counsel, advising it that it
is justified in making and selling the Groundmaster products in the face of the patents-in-suit.
Mr. Buckley's letter is, of course, not an opinion; rather it is only a statement of position
intended to scare off the patent owner.

73.     A competent opinion from qualified counsel obtained by an accused infringer
advising the infringer that it is justified in proceeding in the face of the patent can be presented as

1.  Toro's development of the accused mowers was triggered by the commercial success that the Ransomes AR-250 enjoyed in the market.

2.  Toro deliberately copied the features of the AR-250 mower that resulted in no scalping when mowing uneven ground and provided striping of the mowed area. These features met a need important to golf course superintendents and thus were commercially significant.

3.  No investigation was made at Toro as to whether Ransomes/Textron had patents directed to the features which Toro was copying. The possibility of applicable Ransomes/Textron patents was simply ignored.

4.  No efforts were made to modify the Toro products to render them non-infringing once Textron brought its patents to Toro's attention.

5.  No opinion of qualified counsel was obtained by Toro, which would justify either its original or continued infringement.

78.    Considering these circumstances it is my opinion that Toro has not acted reasonably and prudently in respect to Textron's patents. Therefore, if infringement is found at trial, I believe that Toro may be properly found to be a willful infringer.

Dated: January 26, 2007

_Harry F. Manbeck Jr._
Harry F. Manbeck, Jr.

27

# EXHIBIT 27

REVLON CONSUMER PRODUCTS CORPORATION, Plaintiff, v. L'OREAL
S.A., COSMAIR, INC., MAYBELLINE, INC., and MAYBELLINE SALES, INC.,
Defendants.

Civil Action No. 96-192 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*1997 U.S. Dist. LEXIS 4117*

March 26, 1997, Decided

NOTICE: [*1]   FOR ELECTRONIC PUBLICATION
ONLY

COUNSEL: Jack Blumenfeld, Esq., and Jon E.
Abramczyk, Esq., of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; Of Counsel: Daniel J. Leffell,
Esq., Elizabeth J. Holland, Esq., and Douglas A. Berman,
Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New
York, New York; and John W. Behringer, Esq., of
Fitzpatrick, Cella, Harper & Scinto; attorneys for
plaintiff.

Rudolph E. Hutz, Esq., and Stanley C. Macel, III, Esq., of
Connolly, Bove, Lodge & Hutz, Wilmington, Delaware;
Of Counsel: Norman H. Stepno, Esq., Frederick G.
Michaud, Jr., David M. Schlitz, Esq., and Ronni S.
Jillions, Esq., of Burns, Doane, Swecker & Mathis,
L.L.P., Alexandria, Virginia; and Norman F. Oblon, Esq.,
Richard D. Kelly, Esq., Jean-Paul Lavalleye, Esq., and
Frank J. West, Esq., of Oblon, Spivak, McClelland,
Maier & Neustadt, P.C., Arlington, Virginia; attorneys
for defendants.

JUDGES: Murray M. Schwartz, Senior District Judge

OPINION BY: Murray M. Schwartz

OPINION:

MEMORANDUM OPINION

Submitted on Briefs
Dated: March 26, 1997
Wilmington, Delaware

Schwartz, Senior District Judge

INTRODUCTION

Revlon Consumer Products Corp. ("Revlon") filed
this lawsuit against [*2] L'Oreal S.A., Cosmair Inc.,
Cosmair Canada, Inc., n1 Maybelline, Inc. and
Maybelline Sales, Inc. (collectively "defendants")
alleging infringement of Revlon's patented composition
for transfer resistant lipstick. See Docket Item ("D.I.") 61
(Amended Complaint). Three defendants, Cosmair Inc.,
Maybelline Inc., and Maybelline Sales Inc., asserted a
counterclaim seeking a declaratory judgment that
Revlon's patent is invalid and they have not infringed nor
induced infringement.

        n1 Cosmair Canada, Inc. has since been
    dismissed as a defendant. D.I. 24.

Before the Court is Revlon's motion to preclude the
testimony of defendants' patent law expert, John
Witherspoon. D.I. 147. According to his report, Mr.
Witherspoon proposes to offer opinions on a wide range
of issues, including Patent and Trademark Office
("PTO") practice and procedure as well as many
substantive areas of patent law. n2 Id., Exh. A at 2. The
parties agree Mr. Witherspoon may testify as to PTO
practice and procedure. D.I. 154, at 1; D.I. 157 [*3] at 2.
Revlon asserts, however, the remainder of Mr.
Witherspoon's proposed testimony goes to topics
inappropriate for expert testimony in a patent case. D.I.
157, at 2. In their answer to Revlon's motion, defendants

1997 U.S. Dist. LEXIS 4117, *3

indicate other than PTO practice and procedure, they wish only to introduce Mr. Witherspoon's testimony on the issue of inequitable conduct. D.I. 154, at 1. Thus, to resolve Revlon's motion, the Court must decide whether to admit testimony by a proffered patent law expert on the topic of inequitable conduct.

> n2 Specifically, these areas are: "patent infringement, both literal and under the doctrine of equivalents; principles of claim construction and interpretation; prosecution history estoppel; conditions for patentability, including novelty, utility and nonobviousness under *35 U.S.C. §§ 101*, 102 and 103; requirements for and purposes of patent specifications and claims under *35 U.S.C. § 112*; the prohibition regarding the addition of new matter under *35 U.S.C. § 132*; duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO; and the prosecution history of the patent in suit." D.I. 147, Exh. A, at 2.

[*4]

## DISCUSSION

### I. Inequitable Conduct

Inequitable conduct has been defined by the Federal Circuit Court of Appeals as "an 'affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 103 F.3d 1538, 1549 (Fed Cir. 1997)* (citation omitted); accord *Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576 (Fed Cir. 1996)*. "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Refac International,81 F.3d at 1581*.

The proponent of a claim of inequitable conduct must prove "the threshold elements of materiality and intent by clear and convincing evidence." *Micro Chemical, Inc., 103 F.3d at 1549*. "The district court must then weigh the threshold findings of materiality and

intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred." Id. "A determination of inequitable [*5] conduct is committed to a district court's discretion." Id.

### II. Expert Testimony

Defendants assert Mr. Witherspoon's testimony as to inequitable conduct may assist the trier of fact and thus is admissible under *Federal Rule of Evidence 702*. That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

*Fed. R. Evid. 702*.

Because the admission of expert testimony is a "procedural matter" not unique to patent issues, the law of the Third Circuit Court of Appeals governs this motion, as opposed to the law of the Federal Circuit. *Panduit Corp. v. All States Plastic Manufacturing Co., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984)*; accord *National Presto Industries, Inc. v. The West Bend Co., 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996)*.

The decision whether to admit expert testimony is committed to the discretion of the district court. *United States v. Velasquez, 33 V.I. 265, 64 F.3d 844, 847-48 (3d Cir.* [*6] *1995)*. As might be gleaned from the rule, several bases exist for excluding expert testimony. They are: "(1) if the testimony will not assist the trier of fact; (2) if scientific [or technical or other specialized] evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993)*; see also *Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777, 781 (3d Cir. 1996)*.

The Third Circuit Court of Appeals has adopted a broad interpretation of Rule 702; close calls on the admission of expert testimony are to be resolved in favor of admissibility. *Dunn v. Hovic, 28 V.I. 526, 1 F.3d*

1997 U.S. Dist. LEXIS 4117, *6

*1362, 1367 (3d Cir. 1993).* However, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury ...." *United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991).* As relevant to Revlon's motion, Mr. Witherspoon's testimony will be inadmissible either if it is not helpful to the trier of fact, or if it constitutes impermissible testimony before the jury [*7] as to the governing law.

Defendants have not provided the details of Mr. Witherspoon's proposed testimony on inequitable conduct, beyond the sentence: "Defendants request that Mr. Witherspoon be allowed to testify as to the inequitable conduct issue if the Court determines that Mr. Witherspoon's testimony as a legal expert would assist in its determination." D.I. 154, at 2. Defendants' answer to Revlon's motion places into issue the currently unsettled question of whether, in this case, the judge or the jury will act as fact-finder on the issue of inequitable conduct.

With respect to that question, the Federal Circuit recently explained:

> There are a variety of ways in which the district court may choose to handle the issue of inequitable conduct during a jury trial ... Some courts have reserved the entire issue of inequitable conduct unto themselves; some have submitted special interrogatories to the jury on the facts of materiality and intent; and some instructed the jury to find and weigh the facts of materiality and intent and decide the ultimate question of inequitable conduct ... Absent a clear showing of prejudice, or failure to achieve a fair trial, the district [*8] court's choice of procedure will not be disturbed.

*Hebert v. Lisle Corp., 99 F.3d 1109, 1114 (Fed. Cir. 1996).* The court noted in the last instance the parties agreed to submit the entire issue of inequitable conduct to the jury. Id.

Failing to achieve similar agreement of the parties in the present case, the Court will opt to submit to the jury special interrogatories on the facts of materiality and intent. The Court will then weigh the findings on these two elements "in light of all the circumstances," and

decide the ultimate question of inequitable conduct. See *Micro Chemical, Inc., 103 F.3d at 1549;* see also *Akzo N.V. v. U.S. International Trade Commission, 808 F.2d 1471, 1481-82 (Fed. Cir. 1986)* ("Materiality and intent must ... be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct.")

As the determination of the Court consists of a 'weighing' of the factual findings on materiality and intent, and then a determination in light of all the circumstances whether inequitable conduct occurred, see *Micro Chemical, Inc., 103 F.3d at 1549,* it follows that [*9] the jury will act as the sole fact-finder on the issue of inequitable conduct. The Court therefore cannot permit Mr. Witherspoon to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court. n3

> n3 The Federal Circuit recently noted one of the hazards of permitting expert testimony on patent law:
>
> > We take note of the extent to which . . . incorrect law was announced by a patent law expert witness. We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts . . . markedly incorrect law.
>
> *Hebert, 99 F.3d at 1117.*

In accordance with the other cases in this District, the Court holds defendants' expert John Witherspoon may testify only as to matters of PTO practice and procedure. See Lucas Aerospace, Ltd. v. Unison Industries, L.P., No. 93-525 (D. Del. March, 9, 1995); *General Battery Corp. v. Gould, Inc., 545 F. Supp. 731, 758 n.30 (D. Del. 1982);* see also Thorn EMI North [*10] America Inc. v. Micron Technology, Inc. No. 92-673 (D. Del. Nov. 23, 1993) (McKelvie, J.) (hearing transcript); The Read Corporation v. Portec, Inc., No. 88-29 (D. Del. March 9, 1990) (Roth, J.) (hearing transcript); RCA Corp. v. Data General Corp., No. 84-270 (D. Del. Dec. 17, 1986) (Farnan, J.) (hearing transcript); Guidelines: Legal Expert Testimony in Patent Cases (Robinson, J.). n4 Mr. Witherspoon may not testify as to substantive issues of

1997 U.S. Dist. LEXIS 4117, *10

patent law, including inequitable conduct. For purposes of clarity, it is noted this holding precludes, among other things, Mr. Witherspoon's proposed testimony regarding the "duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO ...." D.I. 147, Exh. A, at 2.

      n4 While this rule regarding patent experts is followed in this District, it is not uniform throughout the country. Several Federal Circuit cases refer, in passing, to expert testimony that was permitted on the topic of inequitable conduct, see *Hebert, 99 F.3d at 1115; Kingsdown Medical Consultants Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988)*.

[*11]

An order will issue consistent with this opinion.

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
| | ) | |
| | ) | C. A. No. 05-486 (GMS) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE TORO COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REBUTTAL REPORT OF HARRY F. MANBECK, JR.

This rebuttal report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

### I.    INTRODUCTION

1.    My name is Harry F. Manbeck, Jr.  I have been retained by counsel for Plaintiff Textron Innovations Inc. ("Textron") as a consultant and possible testifying expert witness with respect to the proceedings currently before the Court in the above-captioned matter.  I have previously submitted an expert report in this case concerning the procedures of the United States Patent and Trademark Office ("PTO") as they specifically pertain to the prosecution of U.S. Patent No 6,047,530 ("the '530 patent"), U.S. Patent No. 6,336,311 ("the '311 patent), and U.S. Patent No. 6,336,312 ("the '312 patent")(collectively "the Textron patents"), which are owned by Textron.  My previously submitted expert report also included my expert analysis concerning whether Toro's infringement of the Textron patents has been willful.

2.    I have been asked by Textron to provide expert analysis and testimony in rebuttal to the Rule 26(a)(2) expert opinion report of Charles Van Horn.  In particular, I have been asked

Textron's claims for infringement. Also, I became informed of facts that are relevant to Textron's claim that Toro's infringement has been willful.

7.     In preparation for this Rebuttal Expert Report, I have further considered the documents set forth in the attached Exhibit A. I have become familiar with the bases for the affirmative defense and counterclaim made by Toro that the Textron patents are allegedly unenforceable due to inequitable conduct by Mr. Bednar and his attorneys. I have reviewed the expert report submitted by Mr. Van Horn in this case, and I have reviewed Defendant's Second Amended Answer and Counterclaims, Toro's Motion for Leave to File a Second Amended Answer and Counterclaims; Defendant's Third Amended Answer and Counterclaims, and Toro's Motion for Leave to File a Third Amended Answer and Counterclaims.

## VI.    INADEQUACY OF TORO'S THEORIES OF INEQUITABLE CONDUCT

8.     I have been requested by Textron to provide expert analysis and testimony concerning Mr. Van Horn's expert report and Toro's theories regarding alleged inequitable conduct. Based on this review, it is my understanding that Toro proposes the following three theories of inequitable conduct:

1.     False statements were allegedly made to the Patent Office during prosecution of the '530 patent. Defendant's Third Amended Answer and Counterclaims, ¶ 53.

2.     Mr. Bednar's attorney, Mr. Price, allegedly breached the duty of disclosure to the Patent Office by not disclosing U.S. Patent No. 5,305,589 to Rodriguez et al. (Apr. 26, 1994) ("the Rodriguez patent"). *Id.* at ¶ 58.

3.     Mr. Price allegedly breached the duty of disclosure to the Patent Office by not properly disclosing the 1993 Nunes Rotary Mower, John Deere 3364 Deck Attachment brochure ("Nunes Brochure"). *Id. at* ¶ 63.

Based on my review of the record and the relevant law, I believe each of these theories to be inadequate.

3

9.     It is my opinion that Toro's first theory of inequitable conduct is inadequate because the statements made to the Patent Office during prosecution of the '530 patent were not false. In support of it's theory, Toro relies on several statements made by Mr. Bednar or Mr. Price during prosecution of the '530 patent.  In a Declaration under Rule 132 ("Bednar Declaration"), Mr. Bednar stated that "[r]otary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length, because nobody prior to me has recognized the desirability of using, or figured out how to use, gang-type rotary mowers to cut golf course roughs." Bednar Declaration at JA 0151.

10.     Mr. Bednar further stated in the same Rule 132 declaration that:

Conventional wisdom in the art of gang-type mowers held that rotary mowers could not be used to cut golf course roughs. My invention of individual cutting units with the addition of rear rollers, however, made the use of gang-type rotary mowers possible to cut golf course roughs. To the best of my knowledge, gang-type rotary mowers have never had such rollers.

*Id.*

11.     Mr. Price, acting as Mr. Bednar's attorney, stated in an amendment dated April 29, 1999 that "rotary mowers have typically not been used to cut golf course roughs, which require close trimming and the ability to cut undulating terrain at a relatively short length." Amendment B at JA 0139. Additionally, Mr. Price stated in the April 29, 1999 amendment, in a Response to Final Rejection dated November 4, 1999, and in a Supplemental Response to Final Rejection dated December 1, 1999 that, "Applicant has invented the first rotary mower that is suitable for cutting a golf course rough." (JA 0141, 0159, 0169).

12.     Toro relies on a 1991 article by David Buchanan, entitled *Rotaries take to golf courses* ("the Buchanan Article"), to show that these statements were allegedly false and

4

intended to mislead the Examiner. However, Mr. Bednar testified in his deposition that he had never seen the Buchanan Article, Richard Bednar Dep. Tr. 252:7, and I am unaware of any evidence in the record that would refute Mr. Bednar's testimony. While Toro alleges that the article was published by a "one of Textron's own employees," Toro's Motion for Leave to File a Second Amended Answer and Counterclaims at 5, I am informed that the article was published several years before Ransomes, Mr. Bednar's employer, became part of Textron. I thus find no basis for concluding that Mr. Bednar had any knowledge whatsoever of the Buchanan Article. Mr. Price also testified that he did not recall ever seeing the Buchanan Article. David Price Dep. Tr. 106:6-7. While Mr. Van Horn indicates in his Expert Report that, "Affidavits are inherently material . . . ," Mr. Van Horn expresses no opinion that the statements made by Mr. Bednar in his declaration and by Mr. Price in the course of prosecution are false. Van Horn Report, ¶ 37, citing *Refac Int'l, Ltd. v. Lotus Devel. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996).

13. Additionally, I believe that Toro misconstrues the statements made by Mr. Bednar and Mr. Price. During prosecution, the applicant does not attempt to argue that no one has ever used a rotary mower on a golf course rough. In fact, in his Rule 132 declaration, Mr. Bednar states that "[r]otary mowers have *typically* not been used to cut golf course roughs . . . ." (JA 0151, emphasis added). Mr. Bednar does not say that rotary mowers have *never* been used to cut golf course roughs. Mr. Bednar's statements in his declaration must be viewed on context of the entire declaration. The paragraph in which the allegedly false statements are found begins, "I am told that some of the claims of my patent application have been rejected as being obvious based on a combination of features found in a number of patent applications and a publication." Bednar Declaration at JA 0150-51. Mr. Bednar's continuing statements regarding the prior art

5

submitted the Nunes Brochure, he did not consider it material. When submitting the Nunes Brochure in the application for the '530 patent, Mr. Price wrote that "Applicant believes that *this reference is not material because it is cumulative to information already of record*, but Applicant is filing this paper to assure compliance with Applicant's duty of candor." Information Disclosure Statement at JA 0173 (emphasis added). Mr. Price knew that the Nunes Brochure would not be considered in the '530 patent prosecution and did not believe that it needed to be considered. David Price Dep. Tr. 207:10-20. Mr. Price later testified, "[W]e didn't expect to have it considered, and we said we believe that it's cumulative to information already of record but we're filing it to assure compliance with their duty of candor. It's in the file. The public knows about it. We met our duty of candor." *Id.* at 208:18-23. It seems unlikely that someone intending to deceive the Patent Office would make sure that their "deception" was included in the permanent record. In the Nunes Brochure, Mr. Price appears to have had a document that he did not consider material, but did not want to be accused of hiding it. Mr. Price disclosed the reference, knowing that it wouldn't be considered, in an effort to ensure that the information was available to the public.

28.     Additionally, evidence in the record confirms Mr. Price's conclusion that the Nunes Brochure was not material. The Nunes Brochure was disclosed to the Patent Office during prosecution of '311 patent, and the Examiner initialed an Information Disclosure Statement certifying that the Patent Office had considered the brochure. Information Disclosure Statement at JA 0238. Yet, the Examiner did not reject the claims of the '311 or '312 patents even though claim 1 of the '311 patent is broader than claim 1 of the '530 patent. David Price Dep. Tr. 225:17-226:1. Specifically, claim 1 of the '530 patent contains limitations that are wholly absent from claim 1 of the '311 application. If the Nunes Brochure "was not cumulative

11

to information already of record" in the '530 patent, and if it "established, either by itself or in combination with other information, a prima facie case of unpatentability" of the claims of the '530 patent, or if the Nunes Brochure "refuted or was inconsistent with a position taken by the applicant in arguing for the patentability of a claim" of the '530 patent, I would certainly expect the Examiner to have rejected the broader claims of the '311 patent using the brochure. Yet, the Examiner did not use the Nunes Brochure to reject any claims in the '311 patent, indicating to me that the Examiner did not consider the Nunes Brochure to be material to the claims of the '311 patent and thereby would not have considered it material to the claims of the '530 patent.

29.    In sum, the record does not establish by clear and convincing evidence that Mr. Bednar or Mr. Price made false statements to the Patent Office during prosecution of the '530 patent when those statements are examined in context. The record also does not present clear and convincing evidence that Mr. Bednar or Mr. Price breached the duty of disclosure to the Patent Office by not disclosing U.S. Patent No. 5,305,589 to Rodriguez et al. (Apr. 26, 1994) or by not disclosing the Nunes Brochure in the fashion Toro contends was required. Also, I see no evidence that they intended to deceive the PTO in any of these matters.

## V.    ADDITIONAL EVIDENCE RELATINHG TO COPYING, UNCLEAN HANDS AND WILLFULNESS

30.    On February 16, 2007, subsequent to my prior expert report, Mr. Richard Bednar, the inventor of the '530 and '311 patents and the co-inventor of the '312 patent, was deposed. During that deposition, counsel for Toro questioned Mr. Bednar with regard to statements in his declaration that Toro had copied Mr. Bednar's invention. Richard Bednar Dep. Tr. 308:10-310:17. I have been requested by Textron to provide additional analysis and testimony concerning evidence that Toro copied patented aspects of Ransomes' AR-250 mower, the commercial embodiment of the patented invention.

12

# EXHIBIT 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEXTRON INNOVATIONS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C. A. No. 05-486 (GMS) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| THE TORO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant, The Toro Company ("Toro") requests that Plaintiff Textron Innovations Inc., ("Textron"), produce each and every document or thing in its possession, custody, or control, requested herein at the offices of Merchant & Gould, 3200 IDS Center, 80 South Eighth Street, Minneapolis, Minnesota 55402, within thirty (30) days of service of this request.

If Textron withholds from production any of the requested documents on any ground (for example, on a claim of attorney-client privilege or work product immunity), Toro requests that Textron provide within thirty (30) days of service of this request a schedule identifying withheld documents as provided in ¶ 11 of the Instructions.

## TERMS AND DEFINITIONS

The Terms and Definitions set forth in Defendant's First Set of Interrogatories to Plaintiff shall apply and are incorporated herein by reference.

## INSTRUCTIONS

The Instructions set forth in Defendant's First Set of Interrogatories to Plaintiff shall apply and are incorporated herein by reference.

## REQUESTS

### DOCUMENT REQUEST 1:

All documents and things concerning the preparation, filing, and prosecution of (a) the patents-in-suit, (b) any related patent or application, or (c) any patent or application naming, Richard D. Bednar and/or Randal S. Knurr as inventors.

### DOCUMENT REQUEST 2:

All documents and things concerning interviews conducted with U.S. Patent and Trademark Office personnel relating to the applications leading to any of the patents-in-suit or related patents including test results, presentations, demonstrations and proposed claims.

### DOCUMENT REQUEST 3:

All documents and things concerning communications relating to the preparation, filing, or prosecution of the patents-in-suit or any related patent or application including, without limitation, communications between and among TII, the inventors named on the patents-in-suit, any third party, and/or any agent or attorney that prosecuted such patents or applications.

**DOCUMENT REQUEST 7**:

All documents and things concerning any diligence exercised in reducing to practice the subject matter claimed in the patents-in-suit and/or in preparing, filing, or prosecuting the patent applications leading to the patents-in-suit.

**DOCUMENT REQUEST 8**:

All prior art concerning the subject matter that is disclosed or claimed in the patents-in-suit or that is described or claimed in any related patent or application, including without limitation, prior art that discloses or embodies less than all features that are described or claimed in such patents and/or applications.

**DOCUMENT REQUEST 9**:

All documents and things concerning or comprising papers, talks or presentations relating to gang-type rotary lawn mowers made or authored by or on behalf of TII or any of the inventors named on the patents-in-suit, or past or present employees, officers, or agents of TII.

**DOCUMENT REQUEST 10**:

All documents and things concerning the meaning, construction, or interpretation of any term, limitation, or element of any claim in the patents-in-suit, or of any corresponding term, limitation, or element of any claim in any related patent or application.

4

**DOCUMENT REQUEST 16**:

    All documents and things concerning gang-type rotary lawn mowers and prior art described in the "Background of the Invention" section of the patents-in-suit.

**DOCUMENT REQUEST 17**:

    All documents and things concerning the validity or enforceability of the patents-in-suit or of any related patent or application, including all opinions of counsel.

**DOCUMENT REQUEST 18**:

    All documents and things concerning any objective indicia of non-obviousness of the alleged inventions claimed in the patents-in-suit.

**DOCUMENT REQUEST 19**:

    All documents and things concerning whether or not the alleged inventions claimed in the patents-in-suit satisfied a long-felt need.

**DOCUMENT REQUEST 20**:

    All documents and things concerning whether or not others in the field copied the alleged inventions claimed in the patents-in-suit.

**DOCUMENT REQUEST 26**:

All documents and things concerning any comparison between any accused product and any claim in the patents-in-suit or any claim in any related patent or application.

**DOCUMENT REQUEST 27**:

All documents and things concerning any comparison between any third-party product and any claim in the patents-in-suit or any claim in any related patent or application.

**DOCUMENT REQUEST 28**:

All documents and things concerning communications between TII and/or any other entity relating to the patents-in-suit or the subject matter disclosed or claimed therein, or relating to any related patent or application or the subject matter disclosed therein.

**DOCUMENT REQUEST 29**:

All documents and things concerning your contention that Toro has infringed any claim of the patents-in-suit.

**DOCUMENT REQUEST 30**:

All documents and things concerning your contention that any third party has infringed any claim of the patents-in-suit.

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on January 6, 2006, a true and correct copy of

the within document was caused to be served on the following counsel of record, in the manner

indicated below:

### VIA HAND DELIVERY

Edmond D. Johnson
Peter B. Ladig
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

### VIA FEDERAL EXPRESS

Scott L. Robertson
Christopher C. Campbell
Hunton & Williams LLP
1900 K Street, N.W.
Washington, DC 20006-1109

David E. Moore

# EXHIBIT 30

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEXTRON INNOVATIONS INC., ) | |
| ) | C. A. No. 05-486 (GMS) |
| Plaintiff, ) | |
| ) | (Jury Trial Demanded) |
| v. ) | |
| ) | |
| THE TORO COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## TORO'S PRIOR ART STATEMENT

In compliance with the Court's Scheduling Order, Defendant, The Toro Company

("Toro"), provides the following Prior Art Statement to Plaintiff, Textron Innovations,

Inc. ("Textron").

The asserted claims of U.S. Patent Nos. 6,047,530 ("the '530 patent"); 6,336,311

("the '311 patent"); and 6,336,312 ("the '312 patent") (hereinafter the "patents-in-suit")

are all invalid as anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103, or

both, in view of the following list of prior art and as detailed in the attached invalidity

charts Exhibits A-F:

A.    **Gang-Type Rotary Mowers**

1.    Lesco 500 Rotary
2.    Deere with Nunes 355
3.    Deere 3235A with Nunes Brochure
4.    R.T.S. Rotary Cutters (Risboro Turf Brochure) & Hayter Bever T24
5.    Picture of Deere 3235A with Nunes rotary decks

B.    **Gang-Type Rotary Mowers**

6.    Jacobsen HR-5111
7.    Golf and Sports Turf, March 1990

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TEXTRON INNOVATIONS INC., ) | |
| ) | C. A. No. 05-486 (GMS) |
| Plaintiff, ) | |
| ) | (Jury Trial Demanded) |
| v. ) | |
| ) | |
| THE TORO COMPANY, ) | |
| ) | |
| Defendant. ) | |

## EXHIBIT B:  INVALIDITY OF ASSERTED CLAIMS OF THE '530 PATENT
## UNDER 35 U.S.C. §103

| CLAIMS | PRIOR ART | |
|---|---|---|
| **CLAIM 1: A gang-type rotary lawn mower comprising** | | |
| | Claim 1 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination. Specifically, each reference of Category A combined with each reference of Category D renders this claim obvious.<br><br>Further, each reference of Category G combined with any reference of Categories C, D or E also renders this claim obvious. | |
| a frame supported by front and rear wheels for movement over the ground, | Categories A and G disclose mowers that include a frame supported by wheels for movement over the ground. | |
| a power source which is mounted on the frame and which drives at least two of the wheels, | Categories A and G disclose mowers that include an engine mounted on the frame for driving the wheels. | |

| | | |
|---|---|---|
| an operator's seat mounted on the frame, | Categories A and G disclose mowers having an operator's seat on the frame. | |
| a steering system enabling the operator to steer the lawn mower, | Categories A and G disclose steering systems. | |
| at least two side-by-side front rotary cutting deck assemblies mounted on the frame in front of the front wheels, the front deck assemblies defining a gap between adjacent front deck assemblies, and | Using the interpretation Textron adopted to accuse Toro's products of infringement, an interpretation that Toro disputes, each reference of Category A art includes two side-by-side front cutting decks mounted on the frame in the configuration required.<br><br>Category G art discloses reel mowers having the claimed configuration. | Categories C, D and E art teach rotary cutting decks. |
| at least one rear rotary cutting deck assembly mounted on the frame behind the front deck assemblies and between the front and rear wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies, | Using the interpretation Textron adopted to accuse Toro's products of infringement, an interpretation that Toro disputes, each reference of Category A art includes a rotary cutting deck mounted behind the front deck assemblies and aligned with the respective gap.<br><br>Category G art discloses reel mowers having the claimed configuration. | Categories C, D and E art teach rotary cutting decks. |
| each of the front and rear deck assemblies including a single-spindle cutting deck defining a downwardly opening space, a single spindle mounted for rotation about a generally vertical axis within the space, at least one cutting blade mounted on the spindle for rotation therewith, and a rear roller supporting the | The Lesco 500, the Deere with Nunes 355 decks, and the Deere 3235A of Category A art with Nunes disclose single-spindle cutting decks, as interpreted by Textron, with at least one cutting blade mounted on the spindle. | For those Category A references lacking a full-width rear roller, Category D art provides the teaching of a full width rear roller. For example, the Deere units with Nunes rotary mowers (Category A) combined with the rollers of the Port Agric reference (Category D). |

2

| | | |
|---|---|---|
| deck for movement over the ground, the deck having a width such that the roller extends across substantially the entire width of the deck. | The Lesco 500 and the Risboro reference include full width rear rollers supporting the decks. | For the Risboro reference, which is lacking single spindle decks, the other Category A references teach single-spindle decks. |
| | The Category G art discloses full width rear rollers supporting a reel mower. | Category E art teaches single-spindle rotary cutting decks. Category C and D art teach single-spindle rotary cutting decks with full width rollers. |
| **CLAIM 2** | | |
| A lawn mower as set forth in claim 1 wherein the front deck assemblies are mounted on the frame in front of the front wheels, and the rear deck assembly is mounted on the frame behind the front wheels and in front of the rear wheels. | Claim 2 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Category A and Category G art disclose mowers having the front decks in front of the front wheels and at least one rear deck between the front and rear wheels. | |
| **CLAIM 3** | | |
| A lawn mower as set forth in claim 1 wherein each deck assembly is connected to the frame by a respective lifting arm operable to lift the associated deck assembly relative to the frame, such that each of the deck assemblies is connected by its own lifting arm to the frame. | Claim 3 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Categories A and G include mowers that have deck assemblies connected to the frame by individual lift arms. | |
| **CLAIM 4** | | |
| A lawn mower as set forth in claim 1 wherein each of the front and rear deck assemblies includes a pair of laterally-spaced, generally | Claim 4 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination. | |

3

| | | |
|---|---|---|
| vertically-extending side plates having forward ends, | The Risboro reference of Category A includes a pair of laterally-spaced, vertically extending side plates, as Textron has used that term. | In addition, the other Category A mowers combined with Categories D and F art discloses the side-plate feature. |
| a first front wheel supporting one of the side plates for movement over the ground, and a second front wheel supporting the other of the side plates for movement over the ground, | The Category A references, except Risboro, include front wheels. | Category A mowers combined with Category D and F art teach side plates. |
| wherein the rear roller extends between the side plates and supports the side plates for movement over the ground, wherein the associated deck is located between the side plates and in front of the roller and is mounted on the side plates such that the height of the deck relative to the ground is adjustable by changing the position of the deck relative to the side plates. | The Risboro reference of Category A includes a rear roller between the side plates | In addition, it would have been obvious to combine the other Category A art with the Category D art, especially the Attack Engineering reference. |
| **CLAIM 5** | | |
| A lawn mower as set forth in claim 1 wherein each deck assembly also includes a hydraulic motor which is mounted on the deck and which is drivingly connected to the spindle. | Claim 5 is invalid under 35 U.S.C. §103 in view of various prior art references, alone or in combination.<br><br>Category A mowers teach a hydraulic motor mounted on the decks to drive the spindle.<br><br>In addition, the Jacobsen HR-5111, Howard Price mowers and the Hustler Range Wing all teach a hydraulic motor mounted on the decks. | |

# R.T.S. ROTARY CUTTERS

The RTS Rotary cutters have been designed to fit the Beaver T24 and T224 models They are a direct replacement for the 1030 and MK2 and MK2A cylinder cutter units. These units are a standard fit across the Beaver range of ride-on, trailed and linkage mounted grass cutting equipment. Although these rotary cutters may fit physically on these other machines it must be stressed that these units are not approved for fitment to these other machines nor have they been tested to CE standards on these machines. In this instance the owner and operator must take the necessary steps to satisfy themselves of their safe operation.



The design brief of these units was to provide an easy way of changing the type of cut on Beaver triple mowers from cylinder to rotary. The rotary-cutting head was to be of a simple robust design with minimum maintenance requirements.

The bases of most cutting cycles is the cylinder cut which provides a good quality finish in areas of medium growth of a good sward of grass. However with the increase of the Greenhouse effect on the climate and the reduction of maintenance budgets an alternative method is sometimes required. In hotter weather bentgrass will flourish, the majority of the grass will stop growing whereas the weeds will continue to grow leaving a difficult plant to cut and consequently an unsightly appearance. Because on the rotary cutter the cutting action is horizontal rather than vertical this makes these units ideal for these alternative conditions. They can be fitted to the Beaver triple in approximately 1/2 an hour per unit. On the first occasion there are some modifications to the hydraulic pipe-work (the necessary parts are supplied). This should be carried out in a workshop to ensure correct alignment of the hydraulic pipes, the drive coupling and tightness of the fasteners prior to use. These modifications will allow for the subsequent change back to cylinder units. The old units are removed by the 4 top mounting plate bolts and the 4 screws retaining the main hydraulic pump. The rotary units are a direct replacement to these same positions. The hydraulic motor is placed vertically in the drive plate, ensuring a vertical alignment of the drive gear and coupling. There may be some fittings that need loosening to ensure the hydraulic pipes are not stressed, run true, and do not catch with anything in their movement arc. Once fitted the units enjoy exactly the same controls and operation and adjustments. Major benefits are the increased productivity due to the increased cutting width, power available, better finish due to the ground following contours of 3 30" units against the rigidity of a conventional 60 or 72" rotary deck, and reduction on plant costs due to minimising the number of plant items used and the simple robust design of the decks which are maintained simply and easily using standard parts.

The blade incorporates a slipping disc to minimise damage to the unit, to set merely tension the centre bolt to the correct torque. Remote greasing is provided to the rear of the front 2 units and to one side of the centre unit. After the initial set up these grease-nipples need just 2 pumps of grease each day. This provides the lubrication to the main rotors, they cannot be overgreased due to relief valves built in the housings. Each rotor has 2 roller bearings which are rubber sealed at each end as well as a steel shield at the blade and for further protection. The blades are driven by a double sided B section belt around the top cast iron pulleys with a tensioning adjuster fitted at one end of the deck. (This is the same adjuster bolt as fitted to the beaver cylinder to bottom blade adjustment bolt.) You will need to remove the safety cover to do this. The hydraulic motor gear drives a female coupling which in turn drives to the outer rotor shaft on each unit. This coupling is secured with 4 high tensile cap head screws giving a further stage of protection against striking an immovable object with the blades. There is also a degree of belt slip available at the top drive pulley. Ht of cut adjustment is identical to the Beaver cylinder unit by 2 adjusters at the end of the rear roller. (Height of cut 1/2" to 2.3/8") A cable roller scraper is also incorporated to ensure the correct cutting height is maintained. These parts are all standard Beaver spare parts. The main deck is constructed of 6mm steel plate, the sides are 4mm thick at the bottom of the skirt is a solid 20mm bar for maximum rigidity.



The cutting width remains at 86". Cutting speed will remain approximately as the standard cylinder variant up to 5 mph to suit conditions. An anti scalp roller is provided as standard to minimise damage in undulating and rough terrain. There are 2 grease nipples on each unit. (3 remote greasers to the main rotors. 1 each end on the rear roller and ht of cut adjuster.) Warranty is limited to defects in design manufacturing and materials only for 12 months.



**Suppliers of Turf and Turf care equipment**

# RISBORO' TURF

CHINNOR ROAD, BLEDLOW, PRINCES RISBOROUGH,
AYLESBURY, BUCKS HP27 9PH ENGLAND
TEL: (01844) 274127
FAX: (01844) 274191

E MAIL: 100344. 3667@ COMPUSERVE. COM

DEALER:

# EXHIBIT 31

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
tleach@merchantgould.com

September 21, 2006

**<u>VIA FACSIMILE</u>**

David M. Young, Esq.
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102

*Re:     Textron Innovations Inc. v. The Toro Company*
*Our Ref: 6372.149USZA*

Dear Dave:

Textron has not produced any documents concerning Risboro Turf or Hayter's Beaver T24. Such documents are covered at least by Toro's Document Requests Nos. 8, 16, 17, and 28 in Toro's First Set of Document Requests to Textron. Please produce all documents concerning Risboro Turf or the Beaver T24, as well as all other responsive documents, before the end of this month. If Textron does not have any documents concerning Risboro Turf or the Beaver T24, please state so in writing.

Very truly yours,

Thomas J. Leach

TJL:cmf

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

# MEMORY TRANSMISSION REPORT

```
PAGE       : 001
TIME       : SEP-22-06  10:38AM
TEL NUMBER1: 6123329081
TEL NUMBER2: 6123329081
NAME       : Merchant & Gould
```

FILE NUMBER          :   521

DATE                 :   SEP-22 10:36AM

TO                   : ☎917037147410

DOCUMENT PAGES       :   002

START TIME           :   SEP-22 10:36AM

END TIME             :   SEP-22 10:38AM

SENT PAGES           :   002

STATUS               :   OK

FILE NUMBER     : 521          *** SUCCESSFUL TX NOTICE ***

## Merchant & Gould
### An Intellectual Property Law Firm

Merchant & Gould P.C.
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-
2215

TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

## Fax Transmission  |  September 22, 2006

| To: | David M. Young, Esq. | From: | Thomas J. Leach, Esq. |
|---|---|---|---|
| Company: | Hunton & Williams | Our Ref.: | 06372.0150-US-ZA |
| Your Ref: | Court File No. 05-1835 (MJD/SRN) | Fax No.: | 612.332.9081 |
| | | Phone No.: | 612.332.5300 |
| Fax No.: | 703.714.7410 | Total Pages: | 2 |
| Phone No.: | 703.714.7400 | E-Mail: | tleach@merchant-gould.com |
| State/Country: United States | | Return Fax To: | SGL |
| Confirmation Via Mail: ☐ Yes ☒ No | | | |

Document Transmitted: Correspondence dated September 22, 2006.

This transmission contains information that is confidential and/or legally privileged.  It is intended for use only by the person to whom it is directed.  If you have received this telecopy in error, please notify us by telephone immediately so that we can arrange for the return of the original documents to us.

If you did NOT receive all of the pages, please call us in the U.S.A. at 612.332.5300 or fax us at 612.332.9081.

# EXHIBIT 32

# Merchant & Gould

### An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact  |  612.371.5208
tzeuli@merchantgould.com

October 31, 2006

*Via Facsimile & U.S. Mail*

David M. Young, Esq.
Hunton & Williams
1900 K Street N.W.
Washington, D.C. 20006

      *Re:*    ***Textron, Inc. et al. v. The Toro Company***
             *Our Ref:*  *06372.0149USZA*

Dear David:

      In response to your letter of October 25, 2006, the bottom line is that Textron's failure to produce the documents to which Toro is entitled has prevented Toro from taking meaningful depositions and is delaying Toro's ability to take additional depositions.

      We do not wish to continue to argue whether Textron's production is unacceptable -- we simply want the documents. However, in the hope that one last explanation will cause Textron to produce the documents requested by Toro, the following discussion addresses Textron's excuses for not producing documents.

      First, you state that Textron has produced some Jacobsen and Ransomes documents and if Toro identifies other specific documents, then you will provide them to us. First, the specific documents we are looking for are those that we asked for in our document requests. Second, asking us to identify what specific documents we want and then you will search for them on a case-by-case basis is an unreasonable requirement. How does Toro know what specific documents to ask for when we do not know what documents your affiliates and prior affiliates have or had.

      Textron had an obligation to search its affiliates for responsive documents. What appears to have happened is that Textron slow rolled any significant production and now the affiliates are no longer under Textron's control. To protect Toro from responsive documents having been left at prior affiliates or lost, we continue to require a written statement that Textron searched the affiliates for responsive documents, and if not to explain why not.

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

David M. Young, Esq.
October 31, 2006
Page 2

Your statement about our subpoena to Commercial Grounds Case is self-serving. Based on Textron's unwillingness to verify its search for responsive documents, Toro was compelled, in an abundance of caution, to subpoena the entity that purchased those affiliates to hopefully prevent any loss of responsive documents. The subpoena was considerably narrower compared to Toro's document requests.

Third, because of your production to date we do not feel confident that you have searched for responsive emails from those employees most likely to have information relating to the products and issues involved in the case. We satisfied our part of the parties agreement and searched the emails of Larry Buckley, Kevin Burke, Rick Cairns, Kevin Conry, Jeff Drake, Tony Ferguson, Jerry Gorman, Mike Hall, Brad Hamilton, Julie Holthus, David Klis, Tim Koch, Don Lackner, Tom Langworthy, Chad Moe, Walt Petersen, Jerry Pomerening, David Rud, Steve Sallstrom, Gordy Schmidt, Don Schnotola, Ben Street, Dan Treu, Helmut Ullrich, and John Wright. We were compelled to provide you a list of Textron's key employees to search because your email document production to date indicates that a proper search for responsive emails has not occurred. We searched 25 individuals email and only asked you to search 14. If anything, you should search the 14 identified plus another eleven more to include Brian Hoff and Mark Buchanan. This is not an electronic discovery issue, but a major lack of document production by Textron.

Fourth, your argument that the documents Toro is requesting are only "tangentially" relevant is meaningless. We are entitled to these documents and continue to request that Textron provide them. If nothing else, the requests are relevant, and not tangential, to Textron's claim for lost profit damages.

In summary, Toro continues to request the following categories of documents:

1. For the products that Textron alleges uses the alleged invention (all variations of the AR3, AR5, AR 250 and AR2500) we require:

        a. Complete set of Product Definition documents;
        b. Short form Product Definition document;
        c. Project Review document;
        d. Complete engineering drawing sets including drafts;
        e. Engineering change orders;
        f. Bill of materials;
        g. Repair information documents;
        h. Documents concerning product returns;
        i. Warranty claim documents;
        j. Marketing brochures;

David M. Young, Esq.
October 31, 2006
Page 3

      k.  Sales/Marketing review documents;
      l.  Marking documents for the '311 and '312 patent;
      m. Operations and safety Manuals;
      n.  Engineering logs/notebooks;
      o.  Setup, parts & maintenance documents; and
      p.  Product Review documents.

2. Financial documents related to damages to include: price lists for the years 1997-04; sales history documents; licenses; and profit and loss statements.

3. Documents related to the validity or invalidity of the patents-in-suit which would include:

    a. Engineering documents, owner's manuals, parts list, marketing documents and any documents showing the first offer for sale or public use of the following products:

      1.  Multi-mower (Mark 1, 2 and 3);
      2.  Westword and/or Westfield mower;
      3.  Jacobsen HR 15 and HR 5111 mowers;
      4.  Ransomes Winged Rotary Mower; Two-Meter Mower; 951 rotary mower; TR 18 rotary mower; T-26D rider rotary mower; T51D rider rotary mower; 6000 Series 61" and 72" mower; Jaguar 4000 tractor or any other tractor that the above decks fit on, to include the T24N/24HP(Air Cooled), T-28 and T-35 tractors; and walk behind rotary mowers;
      5.  Simplicity mowers that included a Mountfield deck having a roller;
      6.  Roller attachment kits;
      7.  Steiner Decks with rollers; and
      8.  Risboro Turf rotary mowers or Beaver Mowers with rotary mowers.

    b. Documents sufficient to determine when Textron became aware of "Rotaries Take to Golf Courses," in Grounds Maintenance Magazine, January 1991; 1993 Nunes Rotary Mower Brochure; U.S. Patent No. 4,854,112; and "Turf Management for Golf Courses," by James B. Beard.

4. Correspondence regarding the '530, '311 and '312 patents or this litigation with anyone other than Toro and Nunes.

5. Foreign prosecution files related to the '530, '311, and '312.

6. All record retention policy documents for the years 1997 until the present, except for 2002 and 2005 which were produced.

3

David M. Young, Esq.
October 31, 2006
Page 4

7.  Product Planning Committee Meeting Minutes (PPC Meeting minutes) and PPC
agendas for the years 1987 through 2002.

8.  Also we are entitled to know from whose files TEXD 002679 (1993 Nunes Rotary
Mower) and the produced U.S. Pat. No. 4,854,112 came from.

    Textron's trickling document production must be rectified immediately.  Toro does
not desire going to the court for assistance, but without your cooperation we will be forced
to do so.

                Very truly yours,

                Anthony R. Zeuli

ARZ:KMS:ajm

cc:    Christopher Campbell
       Scott Robertson
       Lindsey Marlatt
       David McKim
       Betsy Green

4

# EXHIBIT 33

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.371.5208
tzeuli@merchant-gould.com

November 3, 2006

**VIA FAX**

Scott Robertson, Esq.
Hunton & Williams
1900 K Street N.W.
Washington, D.C. 2006

*Re:*    ***Textron Innovations Inc. v. The Toro Company***
***Court File No. C. A. No. 05-486 (GMS)***
***Our Ref: 6372.149USZA***

Dear Scott:

Thank you for your candid discussion today of the numerous outstanding discovery issues.
This letter will memorialize what the parties have agreed to. If I have misstated the
agreements, please let me know right away.

Foreign prosecution of the patents-in-suit. You have agreed to produce the foreign
prosecution files related to the patents-in-suit. Thank you for being candid in your
explanation that these were in your possession but accidentally not earlier produced to us.

Correspondence regarding patents-in-suit. You confirmed that other than letters to Toro
and Nunes, and after a searching, you did not locate any other correspondence regarding
the patents-in-suit or this litigation.

Record retention policies. You agreed to provide what you believe to be a third (and most
recent) record retention policy.

Financial documents. You represented that financial information other than for 1997-2000
has been sent to us as of yesterday and that information should include units sold, gross
sales, costs, and profit/loss figures. I don't recall that we discussed licenses; however, if
TII or Ransomes or Jacobsen has patent licenses other than the two you provided, please
produce them.

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

Scott Robertson
Page 2


<u>Product Planning Committee Meeting (PPC) Minutes and Agendas</u>.  You confirmed that
you have located some of these documents.  We look forward to receiving them next week.
You also agreed to look for additional PPC documents.  I recommended that you contact
David Legg, a person who may have such documents, know of their location, or have other
helpful information to this lawsuit.

<u>Nunes Brochure (TEXD 002679)</u>.  You agreed to locate the source of this document.

<u>Documents pertaining to AR5, AR3, AR250, AR2500</u>.  You stated that you would search
for complete Product Definition (or the like under a different title) documents for the AR5,
AR3, and AR2500.  We already have the Product Definition for the AR250.

We agreed that a bill of materials is not necessary, but Toro again requests the other basic
documents that should be maintained by Ransomes or Jacobsen, including engineering
documents, warranty information, and marketing brochures.  These basic documents are no
different than the documents you requested of Toro.  Please confirm when we can expect
these materials.

<u>Prior art documents</u>.
I believe we agreed that you would search for documents sufficient to show (1) the
structure and (2) the date of first sale or public use if in the U.S. and the date of first
publication if abroad for the following mowers manufactured by Textron entities:
- Multi-Mower
- Westword or Westfield
- Jacobsen HR15 and HR5111
- Ransomes Winged Rotary
- Ransomes Two-Meter Rotary
- Ransomes 951 mower
- Ransomes TR18/T-26D, T51D
- Ransomes 6000 Series rotary mowers
- Ransomes Jaguar 4000
- Mountfied mowers sold on Simplicity tractors
- Steiner rotary mowers having rollers, including Rotary Mowers (48", 60" and 72")
  and Boom Mower
- Risboro Turf cutting units obtained or inspected by Ransomes

I made you aware that, while a start in the right direction, searching for and locating
documentation regarding the above mowers (the identity of which Toro located on its own)

Scott Robertson
Page 3

does not absolve Textron of its duty to perform a search for other rotary mowers that were manufactured by Textron, Jacobsen, Steiner, Brouwer, Bunton, Ryan and Cushman.

Finally, we continue to have serious concerns about the sufficiency of Textron's search for responsive information from Jacobsen, Ransomes, Steiner, Brouwer, Bunton, Ryan and Cushman. You mentioned some 1000 boxes of documents that are located in Charlotte that may contain responsive documents. This was the first time Toro has been aware of such a depository. I request an index of those documents and the opportunity to inspect those documents this month.

Sincerely,

Anthony R. Zeuli

ARZ:can
cc:    David Young, Esq. (via e-file and facsimile)

# EXHIBIT 34

# Merchant & Gould

### An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | Anthony R. Zeuli, Esq.
612.371.5208
tzeuli@merchant-gould.com

December 20, 2006

Scott L. Robertson                                          <u>**Via Email**</u>
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109

Re:    Textron Innovations Inc. v. The Toro Company
Civil Action no. 05-486
M&G No. 6372.149USZA

Dear Scott:

This letter will confirm our telephone conversation of today in which we discussed
numerous discovery issues.

## Toro's Issues.

1.    <u>Outstanding category #2 from original 30(b)(6) notice.</u>

Textron will make a witness available on this topic and provide dates when that witness is
available for a deposition.  You suggested that Textron will likely designate Mr. Bednar for
this topic and that you wanted to have us take his personal deposition at the same time.  We
will not agree at this time whether we will take Mr. Bednar's personal deposition then or
not.

2.    <u>Second 30(b)(6) notice.</u>

You agreed to provide a date when a designee(s) will be available to testify on topics 1-4,
11-13, 14 and 15.  With respect to Categories 5-10, your position is that those categories
are overly broad.  Toro's position is that Textron should be able to track down through
discussions with employees and former employees knowledge of those six prior art

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

December 20, 2006
Page 2

references. As to number 16, we agreed that we would both look into Mr. Knurr's testimony on this point. It is Toro's position that if Mr. Knurr testified that someone other than himself determined he should be added as a joint inventor, Toro will want to explore that through deposition testimony. You said that if Mr. Knurr's testimony explained why he was added as an inventor, you would stand on that as the testimony of the company. With respect to Topic 17, the authentication of Textron documents, you represented that you will stipulate that Textron documents produced by Textron are authentic.

      3.    <u>Prior art letter of 11/10/06.</u>

You agreed to provide a written response by next Tuesday.

      4.    <u>Johnson Creek inspection.</u>

You agreed to provide a written response by next Tuesday.

      5.    <u>Search of Ipswich and Oracle.</u>

Below please find a short list of those items we would like to have you search for at Ipswitch before we move forward with additional depositions.

1. Product Planning Committee Meeting notes and agendas (for GCSAA, Saltex and possibly others);
2. Trade Show attendance documents for the 1995 Saltex tradeshow and possibly 1988 GCSAA shows, such as, tradeshow booth manning reports (Liz Fenn might have these), travel reports, memos, show registration documents, etc;
3. Documents regarding Risboro Turf, such as, what products they produced; investigation of Risbor's RTS Rotary Cutting Units, memos or reports on Ransomes' inspection/analysis of the Risboro Rotary Decks, documents evidencing who knew of the Risboro Rotary Cutting Units, correspondence between Dick Bednar and Steve Chicken regarding Risboro's Rotary Cutting Decks;
4. Drawings and marketing literature regarding rotary mowers prior to 1999.
5. Documents concerning the AR250/2500.

      6.    <u>Updated privilege log and log from Charlotte.</u>

You represented that we can expect an updated privilege log and log from Charlotte by January 4, 2007.

December 20, 2006
Page 3

    7.    <u>Email search of key employees and former employees.</u>

Please provide us with a list of those employees and former employees whose emails you have searched, will search or have determined for which emails no longer exist.

    8.    <u>Complete set of eng'g drawings for AR250/AR2500/AR3/AR5.</u>
You represented that we have a complete set of engineering drawings for the AR250, AR3 and AR5. You further represented that the AR2500 is only different in that the paint color changed from the AR250.

    9.    <u>Warranty info for same products.</u>

You agreed to look into whether a summary concerning warranty information for the AR250, AR2500, AR3 and AR5 exist and provide the same if it does. If it does not, we will need to discuss how Toro will obtain information comparable to what was provided to you concerning warranties.

    10.    <u>PPC meeting Notes and Agendas.</u>

Please contact David Legg, who I understand is still with Textron, and Brian Hoff, who is now a part of Commercial Grounds Care to determine the location of these documents.

    11.    <u>Risboro documents – 1994 to 2004 – No. 1 dealer in UK.</u>

You agreed you would inquire as to the location of documents concerning Risboro being the No. 1 dealer in the U.K. for Jacobsen in 1994-2004 and produce documents relevant to this litigation including documents concerning the RTS cutters.

    12.    <u>Mr. Knurr's representation agreement.</u>

You agreed to produce a copy of this document.

    13.    <u>Legible copies of:</u>
            TEXD 1965-66
            TEXD 1968-70
            TEXD 1972-74
            TEXD 1977-78
            TEXD 1995

You represented that we have the best copies available.

December 20, 2006
Page 4

**TII's Issues**

    1.    <u>Outstanding topics for TII's Rule 30(b)(6) notice.</u>

We agreed to provide Mike Hall for the remaining financial topics and will do so as soon as his health is better.

    2.    <u>Issues with Toro's second 30(b)(6) notice.</u>

See No. 2.

    3.    <u>Toro's responses to second set of document requests.</u>

We agreed that I would provide you an email before the week's end as to whether the newly produced documents are responsive to the second set of document requests by Textron.

    4.    <u>Toro's recent production of 40,000 pages of documents.</u>

See No. 3.

    5.    <u>Toro's responses to second set of interrogatories.</u>

We agreed that I would determine whether the second set of interrogatories are answered in the recently produced financial information labeled Toro 071774-93 and if not discuss with you providing additional information from Toro's database.

    6.    <u>Documents pertaining to international sales of accused products.</u>

See No. 5.

    7.    <u>Documents pertaining to Toro's sales of replacement parts and accessories for accused products.</u>

We agreed that if information concerning replacement parts and accessories is not contained in the documents referenced above, that we would determine whether the Toro database has this information and can provide a summary of the same for you.

December 20, 2006
Page 5

    8.    <u>Documents pertaining to Toro's direct sales of accused products (as opposed to sales through distributors).</u>

Same as No. 7.

    9.    <u>Updated privilege log.</u>

We agreed to try to produce an updated privilege log by the end of the first week in January, although I did mention that my paralegal is out of the office with pneumonia.

    10.    <u>Engineering drawings relating to accused products and deck designs, including prototypes.</u>

We agreed to look for additional engineering drawings concerning the accused products and that you would provide a list of the drawings you believe are missing.

    11.    <u>Toro responses to requests for proposals (RFPs) and related contracts.</u>

I agreed I would email you the Bates range of the RFP information already provided and that after looking at the same you would contact me to see if additional information needs to be produced. I agreed that I would contact Toro to determine if there were any RFP's directed to Toro, rather than through a dealer.

    Finally, you told me that you would be sending me a letter concerning resetting the schedule to which I am not opposed discussing with you in advance of the January 11 status conference with the Court. You also mentioned that you may object as untimely as to Toro's discovery, served today, to which I responded that the close of fact discovery, which determines the deadline for discovery requests has been suspended by the Court and therefore Toro's discovery is timely.

                Very truly yours,

                Anthony R. Zeuli

ARZ:cmf

# EXHIBIT 35

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | Anthony R. Zeuli, Esq.
612.371.5208
tzeuli@merchant-gould.com

January 5, 2007

Scott L. Robertson                                    **Via Email**
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109

     Re:    Textron Innovations Inc. v. The Toro Company
            Civil Action no. 05-486
            M&G No. 6372.149USZA

Dear Scott:

      This letter is in follow up to my letter of December 20, 2006.

## Toro's Issues.

    1.    <u>Outstanding category #2 from original 30(b)(6) notice.</u>

Please confirm that Mr. Bednar will be available on January 18 or 19 as Textron's witness for category 2 of the original 30(b)(6) deposition notice. As I stated in my earlier letter, Toro will not agree at this time to take Mr. Bednar's personal deposition at the same time due to the numerous outstanding discovery issues.

    2.    <u>Second 30(b)(6) notice.</u>

Please provide a date and the name of a designee(s) for at least Topics 1-4, 11-13, 14 and 15.

    3.    <u>Prior art letter of 11/10/06.</u>

I still have not received your response concerning this topic which was promised by Tuesday, December 26, 2006.

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

January 5, 2007
Page 2

4.    <u>Johnson Creek Inspection.</u>

I still have not received a response concerning this topic which was promised by Tuesday, December 26, 2006.

5.    <u>Search of Ipswich and Oracle.</u>

We still have not received confirmation that you have searched Ipswich or your Oracle database for any of the documents listed in my earlier letter.

7.    <u>Email search of key employees and former employees.</u>

We still have not received a list of those employees and former employees whose emails you have searched.  Please provide that list no later than January 10, 2007.

8.    <u>Complete set of eng'g drawings for AR250/AR2500/AR3/AR5.</u>

Textron still has not produced complete sets of engineering drawings for the AR3 or AR250/2500, including no drawings similar to TEXD 009770.  Importantly, we have no drawings of the cutting deck assemblies for the AR250 and AR3.  Please provide a drawing set similar to the AR5 for the AR250/2500 and AR3.

9.    <u>Warranty info for same products.</u>

Please let me know by January 10, 2007 whether you can provide a summary concerning warranty information for the products requested.

10.    <u>PPC meeting Notes and Agendas.</u>

We still have not received any PPC meeting notes or agendas.  Please provide all such documents by January 10, 2007.

11.    <u>Risboro documents - 1994 to 2004 - No. 1 dealer in UK.</u>

We still have not received any documents from you regarding Risboro.  Please provide such documents no later than January 11, 2007.

12.    <u>Mr. Knurr's representation agreement.</u>

We still have not received Mr. Knurr's representation agreement.

January 5, 2007
Page 3


## TII's Issues.

1.    Outstanding topics for TII's Rule 30(b)(6) notice.

Mr. Hall will not be returning to Toro until early February. Please let me know how you want to handle this.

3.    Toro's responses to second set of document requests.

The newly-produced documents do contain responsive information to Textron's second set of document requests, however, by and large the recent set of documents produced by Toro are responsive to earlier document requests of Textron.

5.    Toro's responses to second set of interrogatories.

We served supplemental answers to Textron's second set of interrogatories on January 2, 2007.

6.    Documents pertaining to international sales of accused products.

We served supplemental answers to Textron's second set of interrogatories on January 2, 2007.

7.    Documents pertaining to Toro's sales of replacement parts and accessories for accused products.

Toro does not maintain records that correlates replacement parts, accessories and services by product.

8.    Documents pertaining to Toro's direct sales of accused products (as opposed to sales through distributors).

Toro has produced all such documents of which it is aware.

9.    Updated privilege log.

Toro produced its updated privilege log on January 4, 2007.

10.    Engineering drawings relating to accused products and deck designs, including prototypes.

January 5, 2007
Page 4


We have not received from you a list of those engineering drawings you believe to be missing. This would greatly aid us in locating any documents you believe are missing.

    11.    <u>Toro responses to requests for proposals (RFPs) and related contracts.</u>

Toro does not have any additional RFP documents wherein Toro was solicited directly to participate in such a proposal. The only documents Toro could locate was the WCI RFP previously produced.

Very truly yours,

Anthony R. Zeuli

ARZ:cmf

# EXHIBIT 36

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                     -   -   -

 4    TEXTRON INNOVATIONS INC.,     :       Civil Action
                                    :
 5              Plaintiff,          :
                                    :
 6        v.                        :
                                    :
 7    TORO COMPANY,                 :
                                    :
 8              Defendant.          :    No. 05-486-GMS

 9                     -   -   -

10                   Wilmington, Delaware
                   Thursday, November 9, 2006
11                       9:15 a.m.
                     Telephone Conference
12                     -   -   -

13
      BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14
      APPEARANCES:
15
               EDMOND D. JOHNSON, ESQ.
16             The Bayard Firm
                    -and-
17             SCOTT L. ROBERTSON, ESQ., and
               DAVID M. YOUNG, ESQ.
18             Hunton & Williams
               (Washington, D.C.)
19
                            Counsel for Plaintiff
20
               DAVID E. MOORE, ESQ.
21             Potter Anderson & Corroon, LLP
                    -and-
22             EARL D. REILAND, ESQ.
               ANTHONY R. ZEULI, ESQ., and
23             THOMAS J. LEACH, ESQ.
               Merchant & Gould
24             (Minneapolis, Minnesota)

25                          Counsel for Defendant
```

1          MR. ZEULI:  The problem with that, Your Honor,

2    was, first, we did have that conversation, and Mr. Robertson

3    did say that he would go look for the specific, I think it

4    was six or seven mowers that we were able to identify that

5    had not previously been produced or identified by the

6    plaintiff.

7          What Mr. Robertson specifically said he would

8    not do, he said, I am not going to take your document

9    requests or even a major subset of them and search these

10   sister corporations.  I am not going to do that.  So he was

11   very clear.  He said, you identify the things that you want

12   me to search for, and I will do that.  And I said, look, I

13   will do that.  But please understand, I am not limiting it

14   to that.  And I believe my letter was very clear.  It said,

15   you have an obligation to search these companies.  There is

16   only five of them.  And it's broader than the four machines

17   or the five machines that he and I were able to agree on

18   that he would search for.

19          THE COURT:  Mr. Robertson.

20          MR. ROBERTSON:  Well, my point, Your Honor, is

21   Mr. Zeuli keeps referring to these companies.  For example,

22   Brouwer wasn't owned as a separate company.  We no longer

23   own Steiner.  We no longer have Buntin (phonetic), another

24   entity that was acquired a long time ago in a facility at

25   Louisville that has been closed for years.

1                What I told Mr. Zeuli was, I may have, and I am

2     still trying to wrap my arms around it, a warehouse that has

3     probably in excess of a thousand boxes of stuff that someone

4     just packed up, Your Honor, and put in that warehouse,

5     containing things like canceled checks and human resource

6     personnel files.

7                Now, I told Mr. Zeuli I would do my best to try

8     and get an index of those documents, those boxes, that have

9     been sitting there shuttered and collecting dust for years,

10    in the off chance it might have something relevant he is

11    looking for.  And I would make those boxes available for his

12    inspection as permitted by the Federal Rules of Civil

13    Procedure.

14               But to suggest I can go search a company that we

15    no longer own when I would expect the documents that

16    historic, if they have them, we are talking ten, 12 years

17    ago, maybe longer, in some instances, one of the products is

18    from the sixties that he is looking for, those documents are

19    long since gone, or somewhere where it's not readily

20    accessible to the two companies that continue to exist,

21    Ransomes and Jacobsen, those are the companies I searched to

22    find relevant documents.

23               The list that Mr. Zeuli gave me was 12 separate

24    products that he wanted me to specifically look for on this

25    search for prior art that he thinks is out there.

1     Obviously, he had some information about them.  He had some

2     brochures already about them.  And I said I would try and go

3     get further things.  I would even be willing to stipulate

4     that if they were distributed before the critical date of

5     the patent that at least they were distributed before the

6     critical date, if I had that information.  There is no

7     company Steiner, Your Honor, that still exists.  There is no

8     company Brouwer that still exists in that fashion.  It's

9     just not there anymore and my company doesn't own it.

10              THE COURT:  Mr. Zeuli, what would you have Mr.

11    Robertson do in situations like those just described?

12              MR. ZEULI:  One point on that, Your Honor.  They

13    just recently sold off those companies.  After the discovery

14    began in earnest in this case, after we served our document

15    requests, after, in August of this year, they sold off

16    Steiner, Ryan, Brouwer, Buntin and Bobcat, five companies.

17              THE COURT:  They were afraid of you, Mr. Zeuli.

18              MR. ZEULI:  I think so.

19              I mean, the question, Your Honor, is this:  Why

20    are there a thousand boxes of documents that haven't been

21    searched when discovery is set to close in a month and why

22    are there documents and machines that I have to give to Mr.

23    Robertson and say, we were able to find out about these?

24    Why haven't we seen documents?

25              It leads me to believe that a diligent search of

1   these five mower companies was not done and it should have

2   been done.  It's not going to be that arduous for Mr.

3   Robertson to do that.  He can do it or he can allow us

4   access to either Textron -- we would be happy to do an

5   on-site inspection down in Charlotte or Johnson Creek if he

6   can make that happen, so that we can see for ourselves that

7   a proper search for the mowers we are looking for have in

8   fact occurred.

9           THE COURT:  Are you willing to do that, Mr.

10  Robertson?

11          MR. ROBERTSON:  I told Mr. Zeuli in our

12  conference call I was going to facilitate that, Your Honor.

13  I think it's going to be looking for a needle in a haystack.

14          THE COURT:  If he wants to look --

15          MR. ROBERTSON:  These are all the documents that

16  were relevant to running this company.  To the extent I can

17  identify the documents that may have -- and I emphasize may

18  because no one has looked at these for a long time, may

19  have -- he is free to have at it.

20          Let me just emphasize, we told them about these

21  companies being sold I believe in March.  We told them what

22  our position was.  The document requests -- the companies

23  were sold in August, or at least two of them were.  And the

24  document requests we got specifically requesting a number of

25  these types of mowers, we didn't receive that until

1   September 22nd.

2              Obviously, there are going to be reasonable

3   constraints put on searches.  For example, Brouwer did not

4   make --

5              THE COURT:  Mr. Robertson, I think the issue has

6   been resolved.  I think you and Mr. Zeuli can arrange his

7   access, and if he wants to look for that proverbial needle,

8   let him do it.

9              MR. ROBERTSON:  Thank you, Your Honor.

10             THE COURT:  Let's go to Bullet No. 2, Mr. Zeuli.

11             MR. ZEULI:  One question and clarification.  I

12  was suggesting that Mr. Robertson make available to us the

13  Johnson Creek facility and the Charlotte facility.

14             THE COURT:  I think he said that he was willing

15  to do that.

16             MR. ZEULI:  Thank you very much.

17             Bullet No. 2 --

18             MR. ROBERTSON:  We don't own the Johnson Creek

19  facility.

20             THE COURT:  Are you able to arrange access?

21             MR. ROBERTSON:  We searched Johnson Creek

22  ourselves and already produced the documents from Johnson

23  Creek.

24             THE COURT:  Are you able to arrange access to

25  Johnson Creek for Mr. Zeuli?

# EXHIBIT 37

1

1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3            - - -

4  TEXTRON INNOVATIONS INC.,    :    Civil Action
                                :
5       Plaintiff,      :
                                :
6   v.                  :
                                :
7  TORO COMPANY,                :
                                :
8       Defendant.      :   No. 05-486-GMS

9            - - -

10          Wilmington, Delaware
            Thursday, January 11, 2007
11             9:30 a.m.
            Telephone Conference
12

13           - - -

    BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.
14

    APPEARANCES:
15
            EDMOND D. JOHNSON, ESQ.
16        Pepper Hamilton LLP
             -and-
17        SCOTT L. ROBERTSON, ESQ.
          Hunton & Williams
18         (Washington, D.C.)

19              Counsel for Plaintiff

20        RICHARD L. HORWITZ, ESQ., and
          DAVID E. MOORE, ESQ.
21        Potter Anderson & Corroon, LLP
             -and-
22        ANTHONY R. ZEULI, ESQ., and
          THOMAS LEACH, ESQ.
23        Merchant & Gould
          (Minneapolis, Minnesota)
24
                Counsel for Defendant
25

26

1   affiliates that are not parties to this litigation,

2   including Jacobsen, Steiner, Brower, Bunting (phonetic),

3   Ryan. I mean, all those things have been made available.

4        THE COURT: Mr. Zeuli, that would be a bit

5   disingenuous of Mr. Robertson, wouldn't you think?

6        MR. ZEULI: Can you clarify, Your Honor?

7        THE COURT: Were he doing what you suggested,

8   when he says "my company," he would just be making reference

9   to the holding.

10       MR. ZEULI: I just wanted to make sure.

11       THE COURT: You didn't mean to accuse him of

12  that.

13       MR. ZEULI: No.

14       THE COURT: I didn't think so.

15       What else? Let's close on Risboro. What else

16  would you suggest I do in this regard, Mr. Zeuli?

17       MR. ZEULI: Ask him to search the Ipswich

18  facility. We have been asking Mr. Robertson to search

19  Ipswich. We have information that documents relevant to

20  this case are in the United Kingdom in a facility called

21  Ipswich. To date, I don't have a date certain when I am

22  going to receive information from their search.

23       THE COURT: Mr. Robertson, you and Mr. Zeuli

24  have talked about Ipswich.

25       MR. ROBERTSON: This is a company in the U.K.,

27

1    again, Your Honor, that is another affiliate. We have

2    asked -- in fact, some of the engineering drawings we

3    obtained were from Ipswich. And Mr. Zeuli, when we had the

4    discussion about Ipswich, I said it is another company, it

5    is in the U.K. This is getting pretty costly and

6    burdensome. Could you please tell me specifically, give me

7    five types of documents you are specifically looking for in

8    Ipswich and I will try and do that for you. Is that a

9    reasonable compromise?

10        He said yes.

11        The next day I get a list of 11 categories of

12    documents, every document in the Ipswich facility.

13        I am trying to work with Mr. Zeuli to be

14    reasonable and still maintain costs. But we are talking

15    about six, seven, eight different companies that so far we

16    have searched, and tens of thousands, if not hundreds of

17    thousands of documents.

18        THE COURT: Mr. Zeuli, you fairly cavalierly

19    say, Judge, just order them to search Ipswich. My magic

20    wand goes only so far. I am not going to impose

21    unreasonable burdens on either party. I am going to require

22    that you gentlemen try to work this one out on your own.

23    There has got to be a solution other than just by pure

24    arbitrary Court order to this one.

25        Let's move on to the Daubert. I think that is

28

1    the last thing we need to talk about, other than the fact

2    and expert discovery deadlines. Is that correct?

3         MR. ZEULI: Actually, one more point.

4         THE COURT: Within this bullet? E-mails of key

5    employees and former employees? What is the difficulty

6    there?

7         MR. ZEULI: We have identified a number of key

8    employees and former employees, asked them to search through

9    their e-mails. We still do not have the e-mails.

10        THE COURT: Mr. Robertson?

11        MR. ROBERTSON: Your Honor, again, that is

12   really not accurate. First, we did search what we thought

13   would be the employees who would have responsive documents

14   in their e-mails. Obviously, Textron doesn't retain e-mails

15   from tens of years ago. What we have, Your Honor, is Mr.

16   Zeuli identified another list of additional key employees he

17   wanted us to search. We have made efforts to track that

18   down and we are doing that. I told Mr. Zeuli that right in

19   a conference call before Christmas.

20        Some of the employees we have now discovered

21   left in the nineties. We obviously don't have e-mails who

22   left the employment, several of them who left the employment

23   of Textron in the nineties. But I am following up on that.

24   And I will give them to the extent they still exist, Your

25   Honor. That is what I told Mr. Zeuli shortly before

# EXHIBIT 38

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TEXTRON INNOVATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-486 (GMS) |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| THE TORO COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF TEXTRON INNOVATIONS, INC.'S OBJECTIONS AND RESPONSES TO
SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

Plaintiff Textron Innovations, Inc. ("Textron"), by counsel, for its objections and

responses to Defendant The Toro Company's ("Toro") Second Set Of Requests For Production

Of Documents and Things states as follows:

## I. GENERAL RESPONSES AND GENERAL OBJECTIONS

TII incorporates by reference its General Responses and General Objections set forth in

its objections and answers to Toro's First Set of Interrogatories and in its objections and

responses to Toro's First Set of Requests for Production of Documents and Things, including all

responses and objections to all of Toro's terms, definitions and instructions thereto. In addition,

TII states the following additional general responses and general objections:

18.    TII objects to each of Toro's requests to the extent that they call for production of

documents or information that Toro has already produced to TII.

19.    TII objects to each of the requests that call for TII to determine when "Textron"

first became aware of a document or product. Such information is irrelevant, overbroad, and

unduly burdensome. To literally comply with such a request in conjunction with Toro's

definitions and instructions would require TII to interview tens of thousands of persons with

respect to their "first awareness" of nearly one-hundred documents and/or products.

## II. SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

### REQUEST NO. 69:

All documents to or from or about Risboro Turf, Hayter, Lesco, Nunes, Deere,
Simplicity, LasTec, Howard Price, Hustler, and Kilworth.

### OBJECTIONS TO REQUEST NO. 69:

TII incorporates by reference its General Objections stated above, and in particular

objects to this request on the grounds stated in General Objections 1, 2, 5, 8, and 10. TII

specifically objects to this request as being vague, overly broad, ambiguous, unduly burdensome,

and/or not reasonably calculated to lead to admissible evidence. This request asks for all

documents "to or from or about" these companies, without any limitation as to products or

matters that are actually relevant to the patents in suit and the subject matter of this action.

Moreover, this request is not limited by a timeframe relevant to this litigation.

### RESPONSE TO REQUEST NO. 69:

Subject to and without waiving the foregoing general and specific objections, to the

extent available, TII will produce a more reasonably defined set of relevant, responsive non-

privileged documents located after a reasonable search of documents in TII's possession, custody

or control.

### REQUEST NO. 70:

All documents to or from Mark Barthelmie or any other person that was associated with
Risboro Turf.

2

### OBJECTIONS TO REQUEST NO. 70:

TII incorporates by reference its General Objections stated above, and in particular objects to this request on the grounds stated in General Objections 1, 2, 8, and 10. TII specifically objects to this request as being vague, overly broad, ambiguous, unduly burdensome, and/or not reasonably calculated to lead to admissible evidence. This request asks for all documents "to or from" Mr. Barthelmie or others "associated with" Risboro Turf, without limitation to matters that are relevant to the patents in suit and the subject matter of this action. Moreover, the request is not limited by a timeframe relevant to this litigation.

### RESPONSE TO REQUEST NO. 70:

Subject to and without waiving the foregoing general and specific objections, to the extent available, TII will produce a more reasonably defined set of relevant, responsive non-privileged documents located after a reasonable search of documents in TII's possession, custody or control.

### REQUEST NO. 71:

All documents to or from Steve Chicken and/or Richard Bednar concerning gang-type mowers.

### OBJECTIONS TO REQUEST NO. 71:

TII incorporates by reference its General Objections stated above, and in particular objects to this request on the grounds stated in General Objections 1, 2, 5, 8, and 10. TII further objects on the ground that the request is vague and ambiguous with respect to documents "to or from Steve Chicken and/or Richard Bednar," overly broad, unduly burdensome, and/or to the extent it is not reasonably calculated to lead to admissible evidence.

3

**RESPONSE TO REQUEST NO. 71:**

Subject to and without waiving the foregoing objections, to the extent available, TII will produce relevant, responsive non-privileged documents located after a reasonable search of documents in TII's possession, custody or control.

**REQUEST NO. 72:**

All documents concerning Risboro Turf, including but not limited to, brochures, price lists, or news letters.

**OBJECTIONS TO REQUEST NO. 72:**

TII incorporates by reference its General Objections stated above, and in particular objects to this request on the grounds stated in General Objections 1, 2, 5, 8, and 10. TII specifically objects to this request as being vague, overly broad, ambiguous, unduly burdensome, and/or not reasonably calculated to lead to admissible evidence. This request asks for all documents "concerning" Risboro Turf, without limitation to products or matters that are relevant to the patents in suit and the subject matter of this action. Moreover, the request is not limited by a timeframe relevant to this litigation.

**RESPONSE TO REQUEST NO. 72:**

Subject to and without waiving the foregoing general and specific objections, to the extent available, TII will produce a more reasonably defined set of relevant, responsive non-privileged documents located after a reasonable search of documents in TII's possession, custody or control.

4

**REQUEST NO. 79:**

All documents concerning Risboro Turf's rotary cutting decks, including documents demonstrating when Textron became aware of Risboro Turf's rotary cutting decks and the extent of that knowledge.

**OBJECTIONS TO REQUEST NO. 79:**

TII incorporates by reference its General Objections stated above, and in particular

objects to this request on the grounds stated in General Objections 1, 2, 5, 8, and 10. TII

specifically objects to this request on the grounds that it is unduly burdensome to request that TII

determine when "Textron" first became aware of any of the subject "cutting decks" and the

extent of their knowledge. TII specifically objects to this request as being vague, overly broad,

ambiguous, unduly burdensome, and/or not reasonably calculated to lead to admissible evidence.

This request asks for all documents "concerning" Risboro Turf's rotary cutting decks, without

limitation to products or matters that are relevant to the patents in suit and the subject matter of

this action. Moreover, the request is not limited by a timeframe relevant to this litigation.

**RESPONSE TO REQUEST NO. 79:**

Subject to and without waiving the foregoing general and specific objections, to the

extent available, TII will produce relevant, responsive non-privileged documents located after a

reasonable search of documents in TII's possession, custody or control.

**REQUEST NO. 80:**

All documents concerning the Hayter Beaver T-24, including but not limited to any brochures, manuals or parts lists.

**OBJECTIONS TO REQUEST NO. 80:**

TII incorporates by reference its General Objections stated above, and in particular

objects to this request on the Grounds stated in General Objections 1, 2, 5, 8, and 10.

9

Dated:   October 23, 2006

Respectfully submitted,

TEXTRON INNOVATIONS INC.

By: _Clyll C. Cgceel_

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201


Attorneys for Plaintiff
TEXTRON INNOVATIONS INC.

45

# EXHIBIT 39

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

TEXTRON INNOVATIONS INC.,      )
                                     )
         Plaintiff,            )
                                     )   C.A. No. 05-486 (GMS)
v.                           )
                                     )   **JURY TRIAL DEMANDED**
THE TORO COMPANY,        )
                                     )
        Defendant.         )

## PLAINTIFF TEXTRON INNOVATIONS INC.'S OBJECTIONS TO DEFENDANT THE TORO COMPANY'S SECOND SET OF INTERROGATORIES

Edmond D. Johnson
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6539
Fax: (302) 421-8390

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Dated: January 19, 2007

*Attorneys for Plaintiff*
*Textron Innovations Inc.*

Plaintiff Textron Innovations Inc. ("TII" or "Plaintiff"), by counsel and pursuant to Fed. R. Civ. P. 26 and 33, hereby serves the following objections to The Toro Company's ("Toro" or "Defendant") Second Set of Interrogatories dated December 20, 2007.

## I.    GENERAL RESPONSES AND OBJECTIONS.

1.    TII incorporates by references all of its General Responses and Objections set forth in response to Toro's First Set of Interrogatories, including without limitation all objections on grounds of attorney-client privilege, work product, overbreadth, and undue burden.

2.    TII objects to all of the interrogatories on the ground that they were not timely served pursuant to the Scheduling Order for this case.

3.    TII objects to all of the interrogatories on the ground that the number of Toro's interrogatories, including their subparts, exceeds the maximum number of interrogatories permitted.

4.    TII objects to the instruction that TII should seek clarification of interrogatories. TII does not bear the burden of clarifying or seeking clarification of interrogatories that are vague or ambiguous.

## III.    SPECIFIC OBJECTIONS TO INTERROGATORIES

### INTERROGATORY NO. 17:

Identify all persons ever associated with TII, including but not limited to Ransomes, Inc., Textron, Inc., and Jacobsen, who were aware of the Risboro Turf Brochure (DDX 14) or the product identified in DDX 14.

### OBJECTIONS TO INTERROGATORY NO. 17:

In addition to the general objections, TII objects to this interrogatory on the ground that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and

unduly burdensome, particularly in light of Toro's definitions and instructions and the scope of the persons about whom the interrogatory pertains, namely, "all persons ever associated with TII, including but not limited to Ransomes, Inc., Textron, Inc., and Jacobsen." To literally respond to the interrogatory would require TII to interview at least thousands of persons to determine their supposed "awareness" of the subject matter. The interrogatory is also vague, ambiguous, and overbroad with respect to "all persons ever associated with TII." TII also objects to the interrogatory on the ground that it exceeds the permitted number of interrogatories, and on the ground that the interrogatory is overbroad because it is not limited by any relevant time frame.

### INTERROGATORY NO. 18:

Identify all persons responsible for the Risboro Turf distributorship account from 1993-2004.

#### OBJECTIONS TO INTERROGATORY NO. 18:

In addition to the general objections, TII objects to this interrogatory on the ground that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and moreover the interrogatory is based upon a flawed factual assumption that there was a "Risboro Turf distributorship account" for the duration of the stated time period. The interrogatory is also vague and ambiguous as to "all persons responsible for the Risboro Turf distributorship account" during the stated time period. TII also objects to the interrogatory on the ground that it exceeds the permitted number of interrogatories.

### INTERROGATORY NO. 19:

Identify all persons associated with TII, including but not limited to Ransomes, Inc., Textron, Inc., and Jacobsen, who where [sic] aware of the Lesco 500 Rotary mower.

3

**OBJECTIONS TO INTERROGATORY NO. 19:**

In addition to the general objections, TII objects to this interrogatory on the ground that it is overbroad, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome, particularly in light of Toro's definitions and instructions and the scope of the persons about whom the interrogatory pertains, namely, "all persons ever associated with TII, including but not limited to Ransomes, Inc., Textron, Inc., and Jacobsen." To literally respond to the interrogatory would require TII to interview at least thousands of persons to determine their supposed "awareness" of the subject matter. The interrogatory is also vague, ambiguous, and overbroad with respect to "all persons associated with TII." TII also objects to the interrogatory on the ground that it exceeds the permitted number of interrogatories, and on the ground that the interrogatory is overbroad because it is not limited by any relevant time frame.

**INTERROGATORY NO. 20:**

Identify all persons that where [sic] ever employed by TII, including but not limited to Ransomes, Inc., Textron, Inc., and Jacobsen, who previously worked for the following companies before 1997:

      a.)     Lesco; and

      b.)     Risboro Turf

**OBJECTIONS TO INTERROGATORY NO. 20:**

In addition to the general objections, TII objects to this interrogatory on the ground that it is vague, ambiguous, overly broad, not reasonably calculated to lead to the discovery of admissible evidence, and unduly burdensome, particularly in light of Toro's definitions and instructions and the scope of the persons about whom the interrogatory pertains, namely, "all persons ever employed by TII, including but not limited to Ransomes, Inc., Textron, Inc., and

Jacobsen." TII also objects to the interrogatory on the ground that it exceeds the permitted number of interrogatories.

Dated: January 19, 2007

Respectfully submitted,
**TEXTRON INNOVATIONS, INC.**

By:    _Clfl C. Greel_

Edmond D. Johnson
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
(302) 777-6539
Fax: (302) 421-8390

OF COUNSEL:

Scott L. Robertson
Christopher C. Campbell
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
Washington, D.C. 20006-1109
Telephone:  (202) 955-1500
Facsimile:   (202) 778-2201

Attorneys for Plaintiff
TEXTRON INNOVATIONS INC.

# EXHIBIT 40

BOB KRICK — EUROPE 9/95
COMPETITIVE EQUIP. (B)

CONFIDENTIAL
ATTORNEYS EYES
ONLY

CHD 013064



CHD 018510.02

# EXHIBIT 41

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 42

# Merchant & Gould

An Intellectual Property Law Firm

3200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota
55402-2215 USA
TEL 612.332.5300
FAX 612.332.9081
www.merchant-gould.com

A Professional Corporation

Direct Contact | 612.336.4665
Thomas J. Leach
tleach@merchant-gould.com

January 12, 2007

Christopher C. Campbell                                          **VIA EMAIL**
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102

 *Re:*   ***Textron, Inc. et al. v. The Toro Company***
        ***Our Ref: 6372.149USZA***

Dear Chris:

Enclosed is an article from *Golf & Groundscare* dated November/December 1997 stating that Risboro' Turf received the "Best Jacobsen Dealer 1991, 1992, 1993 and 1994."

Very truly yours,

Thomas Leach

TJL/aer
Enclosure(s)

Minneapolis/St. Paul
Denver
Seattle
Atlanta
Washington, DC

## BEST OF BRITISH



'Mark Barthelmie of Risboro' Turf delivers another Little John to Reading Borough Council's DSO

**A behind-the-scenes look at British turfcare manufacturers**

**· This month: RISBORO' TURF**

EXHIBIT
Crawforth
14

# Big Willy catches the eye

WHAT possible impression can you draw of a company that labels its main products Big Willy and Little John?

"They certainly stopped people in their tracks at the last BTME at Harrogate" says Mark Barthelmie, Risborough Turf's md "so I suppose that's a good enough reason for choosing slightly off-the-wall names"

"In any case I'm dead against blandly calling machines an XMC1004 where's the sense in that? You want people to remember your product -and calling it a catchy name is bound to stick in their mind"

The name, like most of Risboro' Turf ideas, came directly from his customers.

He was showing a group of local contractors the prototype of a pedestrian aerator he had developed when one said "By heck, that's some machine, it's built like a tank".

It was as simple as that. The name Big Willy was coined after the first tank into battle in World War I.

So the pattern was set. BW's smaller counterpart, a pedestrian scarifier, was coined Little John, and you can expect the series to continue with equally punchy names.

It is the Risboro' style to be direct and uncomplicated.

Mark comes from an engineering family, his father ran a local John Deere farm machinery dealership and he attended Rycotewood College to study agricultural and horticultural engineering.

Back in the business, Mark was always trying to find a solution to problems posed by greenkeepers or contractors.

"We always seemed to be modifying things, or coming up with designs for machines or accessories that nobody wanted to make in numbers"

Soon the lure of the farm machinery business faded as more and more machines hit the drawing board.

In order to develop the grass machinery side, Mark set up a machinery dealership near Chinnor, Oxon. Here was able to retail mainly professional equipment, whilst working on designs for his own specialist range, and keep a look out for imported items that he could distribute.

The first product he marketed was the Acrow Ball Picker from the US. "That got us into a number of golf courses where I was able to see at first hand what was wanted by the greenkeepers themselves"

The first manufactured product to emerge from Chinnor in 1991 was a mounted Sorrel roller.

"There was a demand for that type of machine, but nobody seemed to want to make it"

Armed with the roller, and an increasing range of imported ball picking machines as well as workshop equipment like the Heavy face plate grinder, Mark was ready to distribute to a wider customer base.

"We set up around 20 dealers around the country, who would demonstrate the machinery".

He asked very little of dealers except that they should stock a demonstration machine. "We did not ask them to stock machinery in depth, that was our job"

The idea for Big Willy again came from talking to users. "We were able to come up with a machine for which there was a market, but which mainstream manufacturers would not be interested in producing because of its limited appeal" says Mark.

"It has been a winner for us. It was designed from scratch, and then put out to test with some very demanding operators including the All England Tennis Club at Wimbledon".

"They came back with a check-list of improvements and changes that we have put into operation, and I must say that we are delighted how well the machine has been received".

"It has really put us on the map as a supplier of niche machines - there will always be a place in the market for our type of company"

The machines are made by an engineering company in nearby High Wycombe, but Risboro' do not place long runs. "We build 10 at a time, that way it is still economic, and we are not burdened by having unsold stocks around".

The company has now built up quite a portfolio of imported and home manufactured products, which in themselves look nothing like you find in the glossy brochure of one of the major manufacturers, but which obviously have a place in many a golf club or local authority.

Planning ahead is no problem. "I've got enough ideas and suggestions from users to keep me busy for 15 years" says Mark.

He does much of his work from an office he has created in his cottage adjoining his premises. Termed Fort Knox by his staff, he can shut himself away with his small development team and work on all those ideas he has in the melting pot - as well as being on hand to help out his wife with their one-year old son.

Mark is a great one for computers, and for the power of communication. He has developed his own web site (http://www.risboroturf.co.uk /rts if you want to have a look) and has produced a CD of his products.

The web site is getting around 1000 'hits' a month he says, and not only can he gather enquiries for his range of equipment, but customers can arrange for servicing, order spare parts or enquire about the price of equipment.

Risboro' Turf, is rightly proud of its achievement of being one of the first companies in the industry to be awarded ISO9002 certification.

Other awards line the walls of its offices, Best Product at SALTEX, as well as Best Jacobsen Dealer 1991, 1992,1993 and 1994.

For some reason Jacobsen decided to part company with Risboro' Turf a year or so ago, but Mark isn't someone to hang about and soon signed up with John Deere where he is now delighted to be selling alongside other main lines such as Etesia.

He enjoys the natural blend between manufacturing and retailing, and his enthusiasm for the new and unusual will surely see many more distinctive sounding models rolling out of Risboro' in the years ahead.

# EXHIBIT 43

Crawforth, David Bruce       11/28/2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


TEXTRON INNOVATIONS, INC.,

                Plaintiff,
and                               C.A. No. 05-486(GMS)

THE TORO COMPANY,
                Defendant.



        THE VIDEOTAPED DEPOSITION OF

          DAVID BRUCE CRAWFORTH

            November 28, 2006












            PRO-SYSTEMS COURT REPORTING
              4305 BRYANT AVENUE SOUTH
            MINNEAPOLIS, MINNESOTA 55409
                 (612) 823-2100

717ed5da-a683-41f7-ac0a-e72d3be93332

Crawforth, David Bruce    11/28/2006

Page 143

1    hoses.   That is a -- the middle-mounted cutter unit.

2        Q.   Where is that middle cutting unit in

3    relation to the front wheels?

4        A.   It is positioned centrally between the front

5    wheels.   And it is positioned midway between the

6    front axle of the machine and the back axle of the

7    machine.

8        Q.   Does a portion of the center cutting unit

9    extend between the front wheels?

10       A.   Yes.

11       Q.   Can you see the arms -- the lift arms in the

12   last page of DDX 47?

13       A.   Yes.   You can see the machine's right-hand

14   front arm.   And I've got my pen on it now.   It's the

15   black structure that runs across.

16       Q.   And to the right of that, on the right-hand

17   cutting unit, what is the silver object that has the

18   pipe running to it?

19       A.   That's the hydraulic motor.

20       Q.   Thank you.

21            I'm going to shift gears a little bit.   Do

22   you know a Steve Chicken?

23       A.   Yes.

24       Q.   How do you know Steve Chicken?

25       A.   I know of Steve Chicken.   I've never met

717ed5da-a683-41f7-ac0a-e72d3be93332

Crawforth, David Bruce    11/28/2006

Page 144

1    him.  And my recollection is being very excited

2    because at Risboro' Turf we were approached by

3    Ransomes to buy -- with a view to buy the RTS rotary

4    deck product.  They wanted to buy the -- the -- the

5    whole thing from us.  And that was -- that was an

6    amazing -- it's the only time it ever happened to us

7    at Risboro' Turf.  And so it was notable in that

8    respect.  It's the only time I've ever had to do it.

9         Q.  Is -- is there anything else that -- well,

10   do you know when that occurred?  Do you know

11   when -- when you say "the whole thing," do you mean

12   the idea or the machine itself?

13        A.  The --

14             MR. ROBERTSON:  Objection, leading.

15        A.  (Continuing) They wanted

16   to -- Jacobsen -- background.  Stop.  Start again.

17             Ransomes approached us and asked if the RTS

18   rotary decks intellectual property and -- was for

19   sale.  Mark, being very attracted to money, said

20   yes.  And asked me to price what we -- what he

21   thought we should ask for the intellectual property

22   rights to the RTS rotary decks.  It was only the

23   rotary decks that were in conversation.

24        Q.  Do you -- do you know when you were pricing

25   the rotary cutting units?

Crawforth, David Bruce    11/28/2006

Page 145

1              MR. ROBERTSON:  Objection, lacks

2     foundation.

3          A.   (Continuing) I priced the rotary cutting

4     units in early 2001.

5          Q.   How do you know that?

6          A.   Because the company in -- changed ownership

7     in the end of 2000.  Before that date I used to work

8     in a very small office in a very tucked-away place.

9     And -- which was not a very pleasant working

10    environment, but it was what I had.

11         Q.   Was that at Risboro' --

12         A.   At Risboro' Turf.

13         Q.   Okay.

14         A.   Now, when the new owners took control of the

15    company, they asked Mark Barthelmie, the previous

16    owner, to run -- be the managing director of

17    Risboro' -- RTS Products is what it became known as,

18    RTS Products.  So the machinery manufacturer,

19    distribution, intellectual development, RTS

20    Products -- become the managing director of that

21    side of the business.  And to facilitate that we

22    were brought together -- the people that were

23    involved in -- in RTS products were pulled out of

24    the dealership side and we were put into the newest,

25    smartest office in the whole place.  It was a

Crawforth, David Bruce    11/28/2006

Page 146

1    brand-new office.  It had just been built.  It was

2    part of a bigger complex.  And it was

3    air-conditioned.  And I had a wonderful, great big

4    curvy desk.  And I thought I had made it.  I

5    thought, I'm going to live like a lawyer.

6          Q.  So how did this new office help you date --

7          A.  Because it was my --

8          Q.  -- when you were dealing with --

9          A.  -- first job in the new office.  I could

10   remember sitting back on my lovely new chair and

11   telling Mark the figure that I thought it was worth.

12   And -- which was a dangerous occupation, telling

13   Mark numbers with money; you -- you provoked one of

14   two reactions.  He'd either -- and the figure that I

15   said to Mark Barthelmie was 10,000 pounds.  I said

16   to Mark, I think the -- the RTS products are worth

17   10,000 pounds.  And then I bit my tongue, waiting

18   for the reaction, which was one of two things.

19   Either he'd bite my head off and go mad -- and he

20   was a quite aggressive guy when he wanted to be.

21   He'd either say I was completely wrong and go mad or

22   he would accept it and -- and be very appreciative

23   of a valued judgment.  And thankfully it was the

24   latter.

25          Q.  Can you remember anything else that you did

Crawforth, David Bruce    11/28/2006

Page 147

1   or that Risboro' Turf did with respect to the

2   cutting units and --

3       A.  Yeah, we --

4       Q.  Steve Chicken and Ransomes?

5       A.  Yes.  We had to send a set of rotary decks

6   to Ransomes at Ipswich for appraisal.

7       Q.  How do you know that they were sent there?

8       A.  Because of the problem of getting them back.

9   We had a -- a big -- there was a -- come the end,

10  they didn't buy them.  And we were very

11  disappointed.  And Mark was a bit upset.  The -- the

12  unpleasant side of Mark showed.  And we had some

13  difficulties in retrieving the decks.  I don't have

14  any documents to support that other than my

15  recollections.  I just have my recollections of it.

16      Q.  About how long did Ransomes have the cutting

17  units?

18              MR. ROBERTSON:  Objection, lacks

19  foundation.

20      A.  (Continuing) Weeks.  Probably not months.

21  Yeah.  Weeks, but -- yeah, weeks.

22      Q.  Do you know of anything else that was sent

23  to Ransomes regarding the RTS rotary cutting units?

24      A.  Not that I can recall.  They may have asked

25  for documentation, but I don't really remember that.

Crawforth, David Bruce    11/28/2006

Page 148

1    Q.  Do you know how it is that Ransomes became

2    interested in the decks or who initiated the

3    communication?

4    A.  Ransomes --

5            MR. ROBERTSON:  Objection, lacks

6    foundation.

7    A.  (Continuing) Ransomes approached Risboro'

8    Turf.

9    Q.  How do you know that?

10   A.  Because the -- the rotary decks weren't for

11   sale.  They -- we weren't going to people, saying,

12   will you buy our rotary decks, will you buy our

13   rotary decks.  They weren't -- we weren't actively

14   selling them.  And it was a bolt out of the blue,

15   a -- Mark was -- Mark -- Mark Barthelmie was

16   very -- he was actually very pleased in the

17   beginning to -- very -- he was very flattered to

18   have received the call.  And came in and said,

19   "You'll" -- you know, "You'll never guess what.

20   You'll never guess who just rung me about RTS

21   decks."

22           So, yeah, it was -- it -- we were --

23   actually, we were all flattered that they were

24   interested in them.

25   Q.  Okay.