# EXHIBIT 3

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Attorney Docket No. 26.0.3.235/C

| | |
|---|---|
| In re Patent of: | ) |
| | ) |
| Richard D. Bednar et al. | ) |
| | ) |
| Patent No.    6,336,312 | ) |
| | ) |
| Issued            January 8, 2002 | ) |
| | ) |
| For    GANG-TYPE ROTARY LAWN | ) |
|         MOWER WITH MULTIPLE | ) |
|         REAR ROLLERS | ) |

## DETAILED REQUEST FOR *INTER PARTES* PATENT REEXAMINATION

Mail Stop *Inter Partes* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA   22313-1450

Sir:

Pursuant to 37 CFR 1.913, The Toro Company, the real party in interest and a third party requester, hereby requests **inter partes** reexamination of U.S. Patent 6,336,312.  A Request for *Inter Partes* Reexamination Transmittal Form (PTO/SB/58) is attached hereto.

The 312 patent is currently involved in patent litigation entitled Textron Innovations Inc. v The Toro Company in the United States District Court for the District of Delaware, Civil Action No. 05-486 (GMS).  A *Markman* hearing was held and the Court issued an Order Construing The Terms Of U.S. Patent Nos. 6,047,530; 6,336,311; and 6,336,312 on October 20, 2006.  A copy of this Order is attached hereto.  The case is currently scheduled for trial on June 25, 2007.

Toro requests that claims 1-5, 8-10, 14, 15, 19, 20 and 24-27 of the 312 patent be reexamined.  These are the same claims of the 312 patent that have been asserted against various Toro products in the above-identified litigation.

The basis for this request is the presence of substantial new questions of patentability as detailed hereafter in this Request. Toro will apply this prior art to the claims of the 312 patent in a manner consistent with the claim construction set forth in the Court's Order regarding claim construction.

## Identification of Related Patents and Reexaminations

As is apparent from the three patents contained in the Title to the Court's claim construction Order, there are three patents at issue between Textron and Toro in the pending litigation. All three patents deal with a gang rotary lawn mower. **Individual Reexamination Requests of each patent are being filed simultaneously in the PTO.** The patents, Reexamination Requests, and claims in each patent for which reexamination is requested are identified in the flowchart below:



The claims at issue in the patents are all directed to gang mowers equipped with particular rotary cutting deck assemblies. The Reexamination Requests themselves will explore this art in detail in showing why substantial new questions of patentability exist with respect to those claims in each patent for which reexamination is requested. Toro is requesting reexamination of all the claims in each patent that have been asserted against it in the related litigation.

The 530 and 311 patents have identical disclosures and are related to one another as parent – continuation. As is not surprising, the claims of the 530 and 311 patents are closely related. In fact, their claims are so close that some of the

prior art that serves as the basis for unpatentability of some claims in the 311 patent **will apply with equal force** to **all the claims** at issue in the 530 patent.

The 312 patent has claims directed to subject matter that was newly added as of the August 22, 2000 filing date of the 312 patent. Thus, new or additional prior art combinations will be set forth in this Reexamination Request to address the different questions of patentability raised by many of the claims of the 312 patent. However, **two claims** in the 312 patent are unpatentable based on some of the same prior art combinations set forth with respect to certain similar claims in the 311 patent.

Thus, the Reexamination Request in the 311 patent serves as a useful starting point in considering the reexamination of all three patents because the art applied to certain claims in the 311 patent flows out to reach all the claims in the 530 patent and two of the claims in the 312 patent. This is graphically demonstrated in the following chart:



I do not mean to say that independent claims 1, 2 or 10 of the 311 patent have exactly the same limitations as the claims in the 530 patent to which the arrows are directed or that dependent claims 4 or 12 of the 311 patent have exactly the same limitations as claim 4 in the 530 patent or claims 19 and 20 in the 312 patent. What I am saying is that at least some of the prior art applied in the 311 Reexamination Request to reject independent claims 1, 2 or 10 and dependent claims 4 or 12 of the 311 patent has structure that meets all of the limitations or features set forth in the claims in the other two patents to which the arrows are directed.

- 3 -

**The Appendix from the Reexamination Request of the 311 Patent**

The Reexamination Request in the 311 Patent contains an extensive background, description of prior art, and application of prior art in the section of the Request entitled "Detailed Explanation of the Pertinency and Manner of Applying the Patents and Printed Publications to Every Claim of the 311 Patent for Which Reexamination Is Requested". This section has various subsections thereof entitled:

- **General Background;**

- **Background Relating to Gang Mower Configurations;**

- **The Court's Claim Construction Applicable to Claim 1 of the 311 Patent;**

- **Background Relating to the Mower Traction Unit and Cutting Unit Support;**

- **The Rotary Gang Mower Disclosed in the 311 Patent;**

- **Introduction to the Rotary Gang Teachings;**

- **Detailed Explanation of the Rear Roller Teachings;**

- **Detailed Explanation of the Height of Cut (HOC) Teachings;**

- **Detailed Explanation of the Single Spindle Teachings;**

- **Detailed Explanation and Application of the Rotary Gang Teachings;**

  o **The Middlesworth 72 RR;**

  o **The Risboro RTS Rotary Cutters;**

  o **The Nunes 355 Rotary Mower;**

  o **The Lesco 500D Rotary Mower;**

- **Alternative Ways to Combine the Prior Art;**

  o **The Ransomes Boom Mower;**

  o **The Wulff Rotary Mower; and**

- 4 -

- **Summary.**

The reader of this Reexamination Request desirably should read and become familiar with the above material from the Reexamination Request of the 311 patent. Some familiarity with this material is presumed by the author hereof when it comes to the discussion of the substantial new questions of patentability at issue in this Reexamination Request relating to the 312 patent.

If the reader of this Reexamination Request has not yet read this material in the Reexamination Request of the 311 patent, then he or she should do so now. In case this material is not available to the reader of this Reexamination Request, all of this material from the Reexamination Request of the 311 patent is attached as an Appendix to this Reexamination Request. The Appendix contains the entire section from the Reexamination Request of the 311 patent entitled "Detailed Explanation of the Pertinency and Manner of Applying the Patents and Printed Publications to Every Claim of the 311 Patent for Which Reexamination Is Requested", including all of the various subsections thereof as listed above. **The attached Appendix comprises pages 10-52 of the Reexamination Request of the 311 patent.**

### Patents and Printed Publications Relied Upon In This Request

Toro will rely upon the list of patents and printed publications that are described and referenced in the Reexamination Request of the 311 patent. Rather than copy this list from the Reexamination Request of the 311 patent into the body of this Request, the patents and printed publications submitted to the PTO in conjunction with the Reexamination Request of the 311 patent have simply been listed on the attached Forms PTO 1449. Copies of each patent and printed publication used in conjunction with the Reexamination Request of the 311 patent are, of course, attached as well hereto.

There are three additional prior art patents and printed publications that Toro will rely upon in this Request. These three additional references are also being listed on the attached Forms PTO 1449 along with the prior art from the Reexamination Request of the 311 patent.

These three additional references comprise the following:

### Patents

- US 3,754,385 dated Aug. 28, 1973 to Hoffmeyer.

**Printed Publications**

- "Groundsmaster with Contour 66 Deck" brochure, dated 1999 on its face and more specifically dated February 1999, by the deposition testimony of Timothy Koch, the relevant pages of which are attached.

- "Groundsmaster with Contour 66 Triplex Rotary" photograph and captioned description, TurfNet Monthly, March 1999, published by TurfNet.com.

**Statement Pointing Out Each Substantial New Question of Patentability**

The following chart sets forth the claims for which reexamination is requested and shows the substantial new questions of patentability posed by the prior art references listed atop the various columns of the chart. The references listed atop the various columns of the chart can be applied to the claims either under 35 USC 102 (as indicated by the shaded cells) or under 35 USC 103.

In looking at this chart, substantial new questions of patentability are raised as to claims 19 and 20 using much of the same art and the art combinations set forth in the Reexamination Request of the 311 patent as applied to claims 4 or 12 of the 311 patent. While these art combinations will be explained again in this Reexamination Request, the reader hereof is requested to review the companion information contained in the Reexamination Request of the 311 patent, either by reading or having read such Reexamination Request or by referring to the same material contained in the attached Appendix.

| 312 Patent Claim | Contour 66 | Wulff Rotary Mower | Hoffmeyer | Ransomes Boom Mower | Risboro | Nunes 355/ Lesco 500D |
|---|---|---|---|---|---|---|
| 1 | 102 | 103 obvious to mount on any gang mower, e.g. Ransomes 250 Mower | 103 obvious in view of Risboro | | | |
| 2 | 102 | 103 | 103 | | | |
| 3 | 102 | 103 | 103 | | | |
| 4 | 102 | 103 | 103 further obvious in view of Rear Roller Teachings | | | |

| 312 Patent Claim | Contour 66 | Wulff Rotary Mower | Hoffmeyer | Ransomes Boom Mower | Risboro | Nunes 355/ Lesco 500D Rotary Mowers |
|---|---|---|---|---|---|---|
| 5 | 102 | 103 | 103 | | | |
| 8 | 102 | 103 | 103 | | | |
| 9 | 102 | 103 | 103 | | | |
| 10 | 103 | 103 | 103 | | | |
| 14 | 102 | 103 | 103 further obvious in view of Contour 66 or Wulff Rotary Mower | | | |
| 15 | 102 | 103 | 103 further obvious in view of Rear Roller Teachings | | | |
| 19 | 102 as Textron reads the claim if the Contour 66 is available as prior art as Toro believes. (See pgs. 27-28 hereof) | 103 (as applied to claims 4 or 12 of 311 patent) Obvious in view of HOC Teachings | | 103 (as applied to claims 4 or 12 of 311 patent) Obvious in view of Smith or Irgens | 103 (as applied to claims 4 or 12 of 311 patent) Obvious in view of HOC Teachings | 103 (as applied to claims 4 or 12 of 311 patent) Obvious in view of Rear Roller Teachings and HOC Teachings |
| 20 | 102 same as 19 | 103 | | 103 | 103 | 103 |
| 24 | 102 | 103 obvious to mount on any gang mower, e.g. Ransomes 250 Mower | 103 obvious in view of Risboro | | | |
| 25 | 102 | 103 | 103 | | | |
| 26 | 102 | 103 | 103 | | | |
| 27 | 102 | 103 | 103 | | | |

## Detailed Explanation of the Pertinency and Manner of Applying the Patents and Printed Publications to Every Claim of the 312 Patent for Which Reexamination Is Requested

### The New Subject Matter Contained in the 312 Patent

The CIP application that matured into the 312 patent added new subject matter in the form of Figs. 7-24 and relevant description pertaining to such new figures. In the parent application, only a single, wide, continuous roller extending substantially across the width of the deck was disclosed. As a general rule, the newly added subject matter recited in the relevant claims of the 312 patent is directed to various alternatives for this roller which all comprise shorter or partial width rollers or combinations of multiple shorter rollers.

This can be shown by comparing Fig. 3 (contained in the original disclosure) to Fig. 11 (contained in the new disclosure of the CIP). See the illustrations below:

This picture below shows the single rear roller 58 shown in the original disclosure of Fig. 3 of the parent application.



the wide rear roller of the original disclosure

The additional picture reproduced below is taken from one of the new figures contained in the 312 patent, namely from Fig. 11 of the 312 patent. This picture shows a shorter width segmented rear roller 210 made of roller segments or sections 200A–200D as well as two forwardly spaced rollers 202, 204. Together, all the rollers 202, 210 and 204 form a rolling path 206. In the 312 patent, rear roller 210 is referred to as a first roller, roller 202 as a second roller and roller 204 as a third roller. See Col. 6 of the 312 patent, Lines 20-41.



one of the multiple roller, partial width, roller variations that are newly disclosed in the 312 patent (other variations are shown in the 312 patent)

## Application of Prior Art to Claims 1-5, 8, 9, 10, 14, 15 and 24-27

- ### The Contour 66

In the concurrent litigation identified above, Textron has asserted various claims of the 312 patent against a Toro product known as the 3500-D. Putting aside claims 19 and 20 for the moment, the asserted claims comprise claims 1-5, 8, 9, 10, 14, 15 and 24-27. A copy of the Textron claim chart applying these claims to the 3500-D is attached hereto. Other columns of the claim chart applying the claims to other Toro products have been deleted to avoid confusion as it is the claim application by Textron to the 3500-D that is relevant to my purposes here.

Exhibit A from the Textron claim chart showing the 3500-D is set forth below. The annotations in the claim chart are Textron's.

**Toro 3500-D Gang-Type Rotary Lawn Mower**                    **Exhibit A**



The asserted claims of the 312 patent, again excluding claims 19 and 20, all relate to a roller "extending only partially across the width of said deck" in a cutting deck assembly. Some of the claims further recite an additional second or even third roller. In some claims, the additional roller is described as being offset relative to the partial width roller (e.g. Claim 2). In other claims, the pair of additional rollers are described as rotating together on the same axis (e.g. Claim 3) or on an axis of rotation that is different from the axis of rotation of the partial width roller (e.g. Claims 25 and 26). Yet other claims call for the additional second and third rollers to be ahead of the first roller (e.g. Claim 27).

Each rotary cutting deck assembly of the Toro 3500-D includes a single wide rear roller and a pair of laterally spaced front rollers that are at the very front of the cutting deck assembly. The front rollers are clearly visible in the above illustration of the Toro 3500-D. Only a small portion of the rear roller on one of the front cutting deck assemblies can be seen. If we enlarge the photo, I will illustrate what I mean concerning the front and rear rollers of the cutting deck assembly on the Toro 3500-D.



Textron sets forth in its claim chart various alternate theories for infringement by this structure. Its primary theory is that the rear roller of the deck assembly depicted above, despite being wide, is the "partial width" roller of the claims since the roller inherently is less wide than the two rearwardly extending mounts on the cutting deck assembly between which it is journalled. Textron can get down as far as it does in its claim chart application only if this primary theory holds true, namely only if the single wide roller at the rear of the cutting deck assembly is found to be the partial width roller of the claims. Toro does not agree with this interpretation from an infringement standpoint. However, since it has been advanced in litigation, the PTO should consider it in its conduct of the reexamination of the 312 patent.

A prototype of the cutting deck assembly of the Toro 3500-D was shown at the annual GCSSA Show, popularly known as the Golf Show, in February 1999 in Orlando, Florida. A printed brochure entitled "Groundsmaster with Contour 66 Deck" regarding this prototype was publicly available at this show and was distributed by Toro at this show. In fact, the brochure was picked up by employees of Textron who attended the show according to deposition testimony in the related litigation, including being picked up by one or more of the inventors of the 312 patent. The Contour 66 brochure was not disclosed by the 312 inventors or by Textron to the PTO during the prosecution of the 312 patent.

The Contour 66 brochure is a printed publication under 35 USC 102(b) against the claims of the 312 patent. The partial width roller claims of the 312 patent are clearly entitled only to the filing date of the CIP, namely only to the August 22, 2000 filing date of the application that matured into the 312 patent. This is more than a year after the distribution of the Contour 66 brochure at the February 1999 Golf Show.

In addition to the Toro Contour 66 brochure, a photograph and captioned description of the Contour 66 is contained in the March 1999 issue of TurfNet Monthly, published by TurfNet.com.    This is obviously a photograph and description of the same gang rotary mower shown in the Contour 66 brochure that was distributed the month earlier at the Golf Show.  In fact, the TurfNet.com publication is entitled "Orlando Show Recap" and is a summary of various products that had been shown by various manufacturers at the 1999 Golf Show. The TurfNet.com publication even shows some of the plaintiff's products as well. It was available on the internet for anyone to print for the purpose of reviewing the products at the Golf Show that had just been held weeks before the March 1999 date on the publication.

In any event, insofar as Textron applies claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent against the Toro 3500-D, these same claims are anticipated by the Contour 66 prototype illustrated and described in the aforementioned brochure.  I am attaching the photos of the Contour 66 brochure with my annotations or labels contained thereon.

Please note that all three cutting deck assemblies shown in the Contour 66 are capable of being slid to one side or another to adjust the position of the cutting swath provided collectively by the deck assemblies.  This is depicted in the second of the two photos in the brochure by the transparent depictions of the cutting deck assemblies, in which the assemblies are shown slid to either side of their usual position, compared to the more solid looking depiction of the cutting deck assemblies, in which the assemblies are in their usual position.  This is a patented feature of Toro's known as the Sidewinder.  It is also, in fact, present on the Toro 3500-D.  But, it has no bearing on the issues of patentability raised in this Reexamination Request.



- 13 -

I am also going to enlarge one rotary cutting deck assembly on this prototype and compare the prototype deck assembly shown in the brochure to the production deck assembly of the 3500-D. For the purposes of the group of claims set forth above, they are identical.



The March 1999 issue of <u>TurfNet Monthly</u> has a better photograph of the Contour 66 mower. Let's look at that one as well:



Just so there can be no doubt about the basic similarities between the Contour 66 and Toro 3500-D deck assemblies, all one really needs to do is to put them next to one another and compare them.  See the following.



This is the Toro 3500-D deck assembly accused by Textron of infringing claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent.



This is the Contour 66 deck assembly, which is a 102b reference against claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent.

If the rear roller of the Contour 66 is read as the first roller and the front rollers are read as the second and third rollers as Textron reads the corresponding rollers of the 3500-D in its primary theory of infringement, which reading simply applies the Contour 66 prior art to the claims as Textron applies the 3500-D to the claims, then claims 1-5, 8, 9, 14, 15 and 24-27 are anticipated under 35 USC 102(b) by the Contour 66.   Claim 10 would have been obvious under 35 USC 103 in view of the Contour 66.

See the attached Contour 66 claim chart "Using Textron's Primary Theory" which applies the Contour 66 cutting deck assemblies shown in the Contour 66 brochure to claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent.

Textron has also advanced an alternate theory of infringement regarding claims 1 and 24 of the 312 patent. In this alternate theory, Textron shifts gears and now reads the "partial width" roller of claims 1 and 24 on either one of the front rollers on the cutting deck assembly shown in the 3500-D. Obviously, the 102b reference to the Contour 66 shows similar front rollers. If Textron's alternate theory is correct, then the Contour 66 also reads on claims 1 and 24 under 35 USC 102(b).

See also the attached Contour 66 claim chart "Using Textron's Alternate Theory" which applies the Contour 66 cutting deck assemblies shown in the Contour 66 brochure to claims 1 and 24 of the 312 patent.

- **The Wulff Rotary Mower**

The Wulff Rotary Mower is a rotary cutting deck assembly that was designed for mounting on the lift arms of a gang mower. I will reproduce a general illustration I used in the Reexamination Request of the 311 patent showing the Wulff Rotary Mower with labels to show the roll and pitch axes.



As one can see, the Wulff Rotary Mower has a pair of front rollers. It also had a rear roller in the back, much like the rear roller in the Contour 66. **The rear roller cannot be seen in the above view, but is shown on page 3 of the Wulff publication (pg. Toro 073117).** In addition, the Wulff Rotary Mower had both the ability to roll about a fore and aft roll axis and to pitch about a laterally extending pitch axis, as indicated in the labels attached to the above drawing. This structure allowing both roll and pitch is shown in more detail in a larger, exploded view on page 4 of the Wulff publication (pg. Toro 073118). In that view, sleeve 3 defines the roll axis and pin 5 defines the pitch axis.

It would have been obvious under 35 USC 103 to one of ordinary skill in the art to simply mount five Wulff Rotary Mowers onto the roll pins on the existing five lift arms of the Ransomes 250 Fairway Mower in place of the existing reel cutting units as the Wulff Rotary Mower was built and sold for the purpose of converting reel gang mowers to rotary gang mowers and vise versa. When so mounted and using the same application that Textron advanced in either its Primary or Alternate Theory of infringement against the Contour 66, the resulting gang mower based on the use of the Wulff Rotary Mowers reads on claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent in the same way the Contour 66 reads on these claims. A separate claim chart is not needed for Wulff since the application to these claims tracks that of the Contour 66.

- **US Patent 3,754,385 to Hoffmeyer**

U.S. Patent 3,754,385 to Hoffmeyer is assigned to a subsidiary of Textron's known as Jacobsen. Both Jacobsen and Ransomes are owned by Textron. The Hoffmeyer patent goes back to 1973, over a quarter century prior to the time that the application that matured into the 312 patent was filed. Hoffmeyer was not disclosed by Textron to the PTO.

Hoffmeyer shows an arrangement of rollers on a multi-spindled cutting deck assembly that is similar to that in the Toro 3500-D or the Contour 66. Namely, there are two front rollers 14 that support the front of the deck assembly for rolling on the ground. There is also a rear roller support shaft 18 that mounts a segmented rear roller comprising a plurality of separated laterally spaced individual rollers 16 and 17.

I have reproduced and labeled the relevant figure from Hoffmeyer below.



- 17 -

It is true that the Hoffmeyer cutting deck assembly is not disclosed as being part of a gang rotary mower, though it is obviously intended to be attached to a traction unit and propelled by the traction unit due to the disclosed hitch plates 13. But, the ganging of multiple cutting deck assemblies together in the claimed configuration is hardly new as I demonstrated in any of the Rotary Gang Teachings in the Reexamination Request filed for the 311 patent. Let's go back for a moment to just one of those Rotary Gang Teachings - namely the Risboro RTS Rotary Cutters.

As the reader hereof will understand, either from having read the Reexamination Request of the 311 patent or from having reviewed the Appendix to this Reexamination Request that contains the relevant materials, the Risboro RTS Rotary Cutters comprised a gang rotary mower having three cutting deck assemblies arranged in a triplex configuration, namely a pair of cutting deck assemblies ahead of the front wheels and a single rear cutting deck assembly trailing the front cutting deck assemblies and covering the gap therebetween. I will reproduce the illustrations of the Risboro RTS Rotary Cutters from the Reexamination Request of the 311 patent for the sake of convenience.



right front RTS rotary cutting deck assembly

center rear RTS rotary cutting deck assembly (hidden in the shadows behind the front drive wheels)

left front RTS rotary cutting deck assembly

The Risboro RTS rotary cutting deck assembly was triangular in shape just like that of the Hoffmeyer deck assembly and enclosed three cutting blades in the same configuration – namely a center blade set forwardly of two rear

spaced blades.  I have attached a further drawing of one of the Risboro cutting deck assemblies showing the staggered configuration of the blades (note the blade spindle openings that are labeled in the drawing) as well as the use of a continuous rear roller.  See the drawing below.



Again, the Risboro cutting deck assembly shown above has three blades arranged in the same configuration and is shaped the same as the Hoffmeyer deck assembly.  Let me emphasize this point further by showing the Hoffmeyer and Risboro deck assemblies next to another as follows:



This is the Hoffmeyer deck assembly that is disclosed as a single deck assembly and not a gang deck assembly. Note the shape of the deck assembly, the arrangement of cutting blades, and the pair of front rollers.



This is the Risboro RTS Rotary Cutter deck assembly **that is disclosed for use in the claimed gang configuration of the 312 patent.** Again, note the shape of the deck assembly and the arrangement of the cutting blades along with the use of a single front roller rather than the pair of front rollers shown in Hoffmeyer.

It is clear from the above, that it would have been obvious to one of ordinary skill in the art under 35 USC 103 to simply use the Hoffmeyer deck assembly in the claimed gang configuration as taught by Risboro. For example, when the Risboro deck assemblies are replaced with the identically shaped Hoffmeyer deck assembly, the modified structure can be applied to claims 1-3, 8 and 24-27 of the 312 patent.

In addition, the Risboro RTS Rotary Cutters teach a continuous rear roller. Moreover, the Rear Roller Teachings contained in the Reexamination Request in the 311 patent all establish that a substantially continuous rear roller is desired to leave a continuous stripe. Thus, in order to provide this striping effect, it would have been obvious under 35 USC 103 to one of ordinary skill in the art to either abut the segments in the Hoffmeyer rear roller with one another as taught by the rear roller in Freier (in which the roller segments are abutted) or to simply use a continuous rear roller as taught by both Risboro and the other Rear Roller Teachings in the 311 Reexamination Request. When so modified, Hoffmeyer additionally reads on claims 4, 5 and 15 of the 312 patent.

- 20 -

Claim 14 of the 312 patent is further obvious under 35 USC 103 in view of the well known teachings in the art of making cutting deck assemblies pitch fore and aft. This is taught by the U-shaped cradles in the Contour 66 that are pivotally attached to the vertical connecting ears at each side of the rotary cutting deck assembly or by a number of other teachings, such as the lateral pivot pin 5 in the Wulff Rotary Mower as shown and described earlier in connection with the Wulff Rotary Mower. Accordingly, it would have been obvious to include this additional pitching action in the Hoffmeyer deck assembly to further improve its ground following ability.

See the attached Hoffmeyer claim chart that applies Hoffmeyer as modified above to claims 1-5, 8, 9, 10, 14, 15 and 24-27 of the 312 patent.

While I have suggested above that Hoffmeyer could be the base reference and could be modified by Risboro, the reverse is also true. Risboro already teaches gang rotary cutting deck assemblies in the gang configuration claimed by the 312 patent. It would further have been obvious that the single roller shown on the front of the Risboro deck assembly could have been replaced with a pair of front rollers as specifically taught by Hoffmeyer.

**Application of Prior Art to Claims 19 and 20**

That leaves claims 19 and 20 in the 312 patent to consider. These claims are **NOT** directed to an entire gang mower having a plurality of gang cutting deck assemblies. Rather, **claims 19 and 20 are directed to simply a single cutting deck assembly** for use in a gang mower. In a general sense, **claims 19 and 20 of the 312 patent have a subcombination / combination relationship to the overall gang mower claims in the other two patents, namely the 530 and 311 patents**. Thus, a reference teaching just a single deck assembly is sufficient to reject claims 19 and 20 as long as such a reference is inherently capable of being used as one cutting deck assembly in a gang mower having a plurality of such cutting deck assemblies.

Claims 19 and 20 are directed to the **height of cut adjustment structure that was extensively dealt with in the Reexamination Request of the 311 patent in conjunction with claims 4 and 12 of the 311 patent**. This height of cut adjustment structure involves the use of a pair of side plates to carry a rear roller at the rear ends of the side plates and a pair of front wheels at the front ends of the side plates. This construction was clearly summarized in the Reexamination Request for the 311 patent and is again illustrated below in the reproduced Fig. 2 of the 312 patent. To adjust the height of cut, the cutting deck is slid up and down between the side plates and then pinned in place by bolts 80 that pass through various aligned holes in the side plates and in the U-shaped mount that is attached to the cutting deck.

- 21 -



motor whose spindle drives the blade

cutting deck

left side plate

rear roller

right and left front wheels

right side plate

*Fig. 2.*

In the Reexamination Request of the 311 patent, various art combinations were set forth regarding the height of cut adjustment structure in the context of claims 4 and 12 of the 311 patent. These same art rejections apply equally to claims 19 and 10 of the 312 patent for the reasons set forth in the Reexamination Request in the 311 patent.

- **Ransomes Boom Mower**

I would like to particularly return to the Ransomes Boom Mower that shows a cutting deck assembly that has the basic height of cut adjustment structure at issue in claims 19 and 20. The only difference is that the Ransomes Boom Mower uses a front roller extending between the side plates rather than a pair of front wheels on the side plates. Otherwise, looking at the Ransomes Boom Mower and comparing it to the structure of the **single cutting deck assembly being claimed in claims 19 and 20 of the 312 patent,** one can find everything else. I will again reproduce below the illustration of the Ransomes Boom Mower used in the Reexamination Request of the 311.

- 22 -



In addition, the Ransomes Boom Mower was connected by a lift arm to a frame of the traction unit of the mower. Remember, the other photo from the 311 Reexamination Request showing the Ransomes Boom Mower, the photo that follows. This photo clearly shows the Ransomes Boom Mower in use and connected by a pivotal boom (the lift arm) to the frame of the mower. I have labeled the boom in the photo contained below:



Here, in claims 19 and 20 of the 312 patent, Ransomes recites only a single rotary cutting deck assembly having a particular height of cut adjustment structure that could be used on a gang mower. Yet, Ransomes had previously developed a very similar, though not entirely identical, rotary cutting deck assembly in its Ransomes Boom Mower – which was mounted on a lift arm just like the individual cutting units in a gang mower are mounted on lift arms. **The Ransomes Boom Mower and the pivotal boom shown above are inherently capable of being used as one cutting deck assembly on a gang mower having other cutting deck assemblies.** Thus, the preamble recitations in claim 19 are met by the Ransomes boom mower even though it was not specifically disclosed as used in a gang mower configuration. **Claim 19 is not directed to a gang mower per se or a particular gang mower configuration, but to just one cutting deck assembly used therein.**

At the time Ransomes was attempting to patent claims 19 and 20, Ransomes did not disclose to the PTO the Height of Cut Adjustment structure used in its Boom Mower.

The only thing that prevents the Ransomes Boom Mower from being a 102 reference against claims 19 and 20 of the 312 patent is its use of a front roller spanning between the side plates, rather than the use of a pair of front wheels carried on the side plates. Yet, the other Height of Cut teachings to Smith and Irgens show this, particularly the reference to Smith. I will go back and pull out for use yet another illustration from the Reexamination Request in

the 311 patent. This is the drawing showing how Smith changes the height of cut of his rotary cutting deck assembly.

In Smith, note the labeled left and right side plates. These side plates rotatably support a unitary, one-piece roller at the rear ends thereof. Two front wheels are carried on the front ends of the side plates with each front wheel being carried at the front end of each side plate. See the labeled right and left front wheels, namely front wheel 15 and front wheel 16. This side plate, rear roller, dual front wheel structure in Smith is a dead ringer for what is contained in the corresponding height of cut adjustment structure in the 312 patent, down even to the axle extending between the front wheels as the 312 patent shows and discloses a similar axle. For that matter, the Ransomes Boom Mower has just such an axle – though it carries a roller rather than a pair of spaced wheels.



The Ransomes Boom Mower and Smith both adjust the height of cut the same way and the same as in the 312 patent – by sliding the cutting deck up and down between the side plates and by holding the cutting deck in a vertically adjusted position on those side plates. The fasteners in Smith are adjustable wing nuts that can be tightened at different vertical positions in slots and in the Ransomes Boom Mower the fasteners are bolts that pass through slotted height adjustment holes in the side plates.

It would have been obvious under 35 USC 103 to one of ordinary skill in the art to modify the Ransomes Boom Mower to replace the continuous front

- 25 -

roller that is journalled on the front ends of the side plates with a pair or wheels carried on an axle that passes through the front ends of the side plates. This is the way Smith did it just as the 312 patent did it over 60 years later. As so modified, when the front roller in the Ransomes Boom Mower is replaced with the dual front wheel arrangement of Smith, the Ransomes Boom Mower reads on claims 19 and 20 of the 312 patent.

See the attached Ransomes Boom Mower claim chart that applies the Ransomes Boom Mower as modified above to claims 19 and 20 of the 312 patent.

- **Risboro RTS Rotary Cutters, Nunes 355/Lesco 500D Rotary Mowers, and the Wulff Rotary Mower As Applied to Claims 4 and 12 in the 311 Patent**

In addition to the basis for unpatentability based on the Ransomes Boom Mower, one can also refer to the other applications of various prior art references to claims 4 and 12 of the 311 patent as set forth in the Reexamination Request of the 311 patent. These art applications all begin with the rotary cutting deck assemblies shown in many of the Rotary Gang Teachings, including the Risboro RTS Rotary Turf Cutters, the Nunes 355 Rotary Gang Mower, the Lesco 500D Rotary Gang Mower, and the Wulff Rotary Mower. All of these Rotary Gang Teachings include rotary cutting deck assemblies that either have a rear roller (Risboro and Wulff) or could obviously be modified to have a rear roller (Nunes and Lesco).

As set forth in detail in the Reexamination Request of the 311 patent, in these roller equipped rotary cutting deck assemblies, it would have been obvious to one of ordinary skill in the art to change the height of cut by adapting the Height of Cut Teachings of Smith or Irgens to such deck assemblies. This adaptation simply involves mounting the rear roller and a pair of front wheels on a pair of side plates and by then changing the height of cut by sliding the cutting deck up and down relative to the side plates. This is clearly taught as a simple alternative structure for adjusting the height of cut in the Height of Cut Teachings discussed at length in the 311 Reexamination Request. This is a simple substitution of one well known height of cut adjustment method for another.

Please see the extensive discussion of this topic in conjunction with the application of the prior art to claims 4 and 12 of the 311 patent in the Reexamination Request of the 311 patent. The Risboro RTS Rotary Cutters, the Nunes 355 Rotary Mower, the Lesco 500D Rotary Mower, and the Wulff Rotary Mower as applied as set forth in the Reexamination Request of the 311 patent against claims 4 and 12 of the 311 patent, apply equally to claims 19 and 20 of the 312 patent.

See the attached Risboro RTS Rotary Cutters claim chart, the Nunes 355/Lesco 500D Rotary Mowers claim chart, and the Wulff Rotary Mower claim

- 26 -

<u>chart, both of which apply these references to claims 19 and 20 of the 312 patent.</u>

- **Contour 66**

I will now return to the Contour 66 in the context of claims 19 and 20 of the 312 patent. I had put them aside earlier when I applied the Contour 66 to claims 1-5, 8-10, 14, 15 and 24-27.

A critical question in terms of the application of the Contour 66 to claims 19 and 20 is whether or not claims 19 and 20 are entitled to the February 3, 1997 filing date of the parent application that matured into the 530 patent or only to the August 22, 2000 filing date of the CIP application that matured into the 312 patent. Toro believes that claims 19 and 20 of the 312 patent are entitled only to the August 22, 2000 filing date of the CIP application. Thus, in Toro's view, the Contour 66 is available as prior art against claims 19 and 20.

At first glance, the subject matter of claims 19 and 20 appear to be directed to the height of cut adjustment structure that was disclosed in the parent application. But, in this respect, there is a subtle, but important, difference in claim terminology. In the original disclosure contained in the parent application, the description of the roller, both in the specification and the claims (either the original or amended claims) was always of a roller that "extends substantially across the width of the deck" or "substantially across the width of the cutting path". There was no disclosure of any other roller. There was certainly no disclosure of the partial width rollers added in the disclosure of the CIP application. This was the new subject matter that was first disclosed to the public only in the CIP application.

However, unlike all the claims in the parent application and the original disclosure, claim 19 removes from the claim language the limitation that the roller "extends substantially across the entire width of the deck" of "substantially across the width of the cutting path". In this respect, claim 19 covers a roller of indeterminate length. However, there is no support for that in the original disclosure. The only support for an invention that could include both a roller that "extends substantially across the entire width of the deck" or "substantially across the width of the cutting path" as well as a roller of indeterminate length is the new matter relating to partial width rollers that was added by the CIP application. Thus, claims 19 and 20 are not entitled to the filing date of the parent, but only to the filing date of the CIP application. The narrowness of the original disclosure simply does not support the broadened recitation of roller in claim 19 and the only support for this broadened recitation is found in the new matter contained in the CIP application.

Additionally, as shown in Figs. 11, 13, 14 and 20 of the 312 patent, the 312 patent added new matter relating to segmented rollers and partial width

rollers. Fig. 11 shows a "segmented first roller 200 (that) is positioned behind a deck 201 laterally extending a distance less than the width of deck 201." See Col. 6, lines 20-23, of the 312 patent. Fig. 13 shows spaced apart rollers 236 that extend between the side plates. Rollers 236 are positioned such that they do not extend substantially across the entire width of the mower deck 245. Fig. 14 also illustrates a partial width roller 246 that extends between the side plates. In addition, the 312 patent further discloses a "V" shaped offset, segmented roller assembly (Fig. 22) similar to the assembly shown in Fig. 20. Figs. 11, 13, 14 and 20 of the '312 patent are reproduced below:



To be entitled to the earlier filing date, the subject matter claimed in claims 19 and 20 must be supported by the application to which priority is claimed. Entitlement to a filing date does not extend to subject matter that was not disclosed, but would be obvious over what is expressly disclosed. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997). It extends only to that which is disclosed. *Id.* The prior application itself must describe the invention in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought. *Id.* at 1572. Moreover, independent claims, such as claim 19, must be broad enough to include the limitations in claims that depend from them, such as claims 21 through 23. *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003). Dependent claims 21 through 23 include limitations, such as, segmented rollers

- 28 -

(claim 21) and offset segmented rollers (claim 23) that cover features only disclosed in the CIP application.

Moreover, Mr. Knurr, one of the joint inventors of the 312 patent, admitted in a deposition that partial width rollers and segmented rollers were new matter not previously disclosed in the parent applications. See the deposition testimony of Randal S. Knurr at pg. 265, line 19 - pg. 266 line 4, which testimony is attached hereto.

For all the reasons set forth above, claims 19 and 20 of the 312 patent are not entitled to the filing date of the earlier parent applications, but only to the August 22, 2000 filing date of the application that matured into the 312 patent.

As I noted earlier when I discussed the Contour 60 in relation to claims 1-5, 8-10, 14, 15 and 24-27, Textron has read claims 19 and 20 on the Toro 3500-D deck assemblies. This is shown in the Textron claim charts that are attached hereto.

If Textron is correct in its application of claims 19 and 20 to the Toro 3500-D as advanced in the concurrent litigation, and if the Contour 66 is available as prior art to claims 19 and 20 as Toro believes it is for the reasons noted above, then claims 19 and 20 are also unpatentable over the Contour 66. In fact, the Contour 66 is more like what is claimed in claims 19 and 20 than is the 3500-D as the cutting deck assemblies of the Contour 66 have a solid, one piece side plate on each side that extends from the front to the rear of the cutting deck assemblies with the rear roller being at one end of the side plates and the front rollers being at the front end of the side plates. Note the side plates as labeled in the bottom photograph on page 13 of this Request. The current 3500-D cutting deck assemblies lack such side plate support for the front and rear rollers.

Please note that the application of the Contour 66 to claims 19 and 20, which depends upon the filing date accorded to claims 19 and 20, is only one ground of unpatentability set forth in this Request for claims 19 and 20. The other grounds based upon the Wulff Rotary Mower, the Ransomes Boom Mower, the Risboro RTS Rotary Cutters, and the Nunes 355/Lesco 500D Rotary Mowers apply regardless of the effective filing date accorded to claims 19 and 20.

**Summary**

Clearly, the prior art relied upon in this Request raises substantial new questions of patentability regarding the 312 patent. All the requirements for inter partes reexamination have been met. The PTO should order such reexamination and find that at least claims 1-5, 8-10, 14, 15, 19, 20 and 24-27 of the 312 patent are unpatentable.

March 23, 2007                              Respectfully submitted,

                                            _James W. Miller_

                                            James W. Miller
                                            Registration No. 27,661
                                            Suite 1960 Rand Tower
                                            527 Marquette Avenue
                                            Minneapolis, MN   55402
                                            Telephone (612) 338-5915

| 312 Patent Claims | Contour 66 (Using Textron's Alternate Theory) |
|---|---|
| 1. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of the traction unit, the pair of front wheels and the single rear wheel as pictured; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "Powerful 35 hp Kubota Turbo Diesel" and "Patented Series/Parallel 3-wheel drive …", both mentioned in the brochure; |
| an operator's seat mounted on said frame; | the seat as pictured; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel as pictured; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | the left front cutting deck assembly and the right front cutting deck assembly, both of which are pictured ahead of the front wheels; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies and between said front wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear cutting deck assembly as pictured; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | the rotary cutting deck assemblies have individual hydraulic motors that each inherently have a spindle that mounts a cutting blade;<br><br>one of the front rollers according to Textron's alternate theory. |

| | |
|---|---|
| 24. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of the traction unit, the pair of front wheels and the single rear wheel as pictured; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "Powerful 35 hp Kubota Turbo Diesel" and "Patented Series/Parallel 3-wheel drive …", both mentioned in the brochure; |
| an operator's seat mounted on said frame; | the seat as pictured; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel as pictured; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | the left front cutting deck assembly and the right front cutting deck assembly, both of which are pictured ahead of the front wheels; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear cutting deck assembly as pictured; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first, second and third roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | the rotary cutting deck assemblies have individual hydraulic motors that each inherently have a spindle that mounts a cutting blade;<br><br>one of the front rollers according to Textron's alternate theory is the first roller, the other front roller and the rear roller are the other two rollers. |

| 312 Patent Claims | Contour 66 (Using Textron's Primary Theory) |
|---|---|
| 1. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of the traction unit, the pair of front wheels and the single rear wheel as pictured; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "Powerful 35 hp Kubota Turbo Diesel" and "Patented Series/Parallel 3-wheel drive …", both mentioned in the brochure; |
| an operator's seat mounted on said frame; | the seat as pictured; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel as pictured; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | the left front cutting deck assembly and the right front cutting deck assembly, both of which are pictured ahead of the front wheels; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies and between said front wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear cutting deck assembly as pictured; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | the rotary cutting deck assemblies have individual hydraulic motors that each inherently have a spindle that mounts a cutting blade; <br><br> the rear roller according to Textron's primary theory. |

| | |
|---|---|
| 2. The lawn mower of claim 1 wherein each of said front and rear deck assemblies further includes a second roller positioned in offset relation to said first roller. | either one of the front rollers. |
| 3. The lawn mower of claim 2 wherein each of said front and rear deck assemblies further includes a third roller having an axis of rotation aligned with an axis of rotation of said second roller. | the other front roller. |
| 4. The lawn mower of claim 3 wherein each of said first, second and third rollers define a rolling path substantially uninterrupted across the width of the deck. | as pictured in the brochure, the paths of the front rollers overlap the path covered by the rear roller to form a substantially uninterrupted rolling path. |
| 5. The lawn mower of claim 4 wherein said rolling path includes a portion traveled by both of said first and second rollers. | same as #4, the path covered by either front roller is subsequently rolled over again by the rear roller. |
| 8. The lawn mower of claim 1 wherein said first roller of said at least one front deck assembly defines a rolling path and said first roller of said corresponding at least one rear deck assembly defines a rolling path. | inherently true of the rear rollers of either of the front cutting deck assemblies and the rear roller of the rear cutting deck assembly. |
| 9. The lawn mower of claim 8 wherein said rolling path defined by said front deck assembly roller overlaps said rolling path defined by said rear deck assembly roller. | There must be overlap since three 25" wide deck assemblies (total of 75") provide a 66" wide cutting swath. |
| 10. The lawn mower of claim 8 wherein said rolling path defined by said front deck assembly roller includes an inboard edge aligned with an outboard edge of said rolling path defined by said rear deck assembly roller. | Obvious under 35 USC 103 to align the edges rather than use overlap. |

| | |
|---|---|
| 14. The lawn mower of claim 1 further including a lifting arm pivotally interconnecting each of said front deck assemblies to said frame, said lifting arm pivoting about an axis laterally extending across said deck assembly substantially parallel to the ground and perpendicular to the direction of travel. | the U-shaped carrier for each cutting deck assembly. |
| 15. The lawn mower of claim 1 wherein said first roller is a unitary, one-piece roller. | The rear roller is unitary. |

| | |
|---|---|
| 24. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of the traction unit, the pair of front wheels and the single rear wheel as pictured; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "Powerful 35 hp Kubota Turbo Diesel" and "Patented Series/Parallel 3-wheel drive ...", both mentioned in the brochure; |
| an operator's seat mounted on said frame; | the seat as pictured; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel as pictured; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | the left front cutting deck assembly and the right front cutting deck assembly, both of which are pictured ahead of the front wheels; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear cutting deck assembly as pictured; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first, second and third roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | the rotary cutting deck assemblies have individual hydraulic motors that each inherently have a spindle that mounts a cutting blade; the rear roller according to Textron's primary theory is the first roller; the two front rollers are the second and third rollers. |

| | |
|---|---|
| 25. The lawn mower of claim 24 wherein said first roller and said second roller are positioned in along different axes of rotation. | The front rollers rotate along one axis of rotation and the rear roller rotates along another axis of rotation. |
| 26. The lawn mower of claim 25 wherein said third roller and said second roller rotate about the same axis of rotation. | The axis of rotation of the front rollers are the same. |
| 27. The lawn mower of claim 26 wherein said second and third rollers are positioned forward of said first roller. | The front rollers are ahead of the rear roller. |

| 312 Patent Claims | Hoffmeyer<br>(Arranged in the Risboro Gang Configuration on the T24) |
|---|---|
| 1. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of the Risboro Beaver/Hayter T24 traction unit; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "engine" of the Risboro Beaver/Hayter T24 traction unit; |
| an operator's seat mounted on said frame; | the seat of the Risboro Beaver/Hayter T24 traction unit; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel of the Risboro Beaver/Hayter T24 traction unit; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | both of the plural front Hoffmeyer rotary cutting deck assemblies that will replace the two Risboro front cutting deck assemblies; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies and between said front wheels, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear Hoffmeyer rotary cutting deck assembly that will replace the center rear Risboro cutting deck assembly; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | any one of Hoffmeyer's cutting blades mounted on any one of Hoffmeyer's spindles;<br><br><br>Hoffmeyer's rear roller. |

| | |
|---|---|
| 2. The lawn mower of claim 1 wherein each of said front and rear deck assemblies further includes a second roller positioned in offset relation to said first roller. | either one of Hoffmeyer's front rollers. |
| 3. The lawn mower of claim 2 wherein each of said front and rear deck assemblies further includes a third roller having an axis of rotation aligned with an axis of rotation of said second roller. | the other Hoffmeyer front roller. |
| 4. The lawn mower of claim 3 wherein each of said first, second and third rollers define a rolling path substantially uninterrupted across the width of the deck. | further obvious that Hoffmeyer's rear roller could have closely abutting segments as taught by Freier or could be a continuous roller as taught by Risboro or the other Rear Roller Teachings. |
| 5. The lawn mower of claim 4 wherein said rolling path includes a portion traveled by both of said first and second rollers. | same as #4, the path covered by either front roller is subsequently rolled over again by the rear roller. |
| 8. The lawn mower of claim 1 wherein said first roller of said at least one front deck assembly defines a rolling path and said first roller of said corresponding at least one rear deck assembly defines a rolling path. | inherently true of the rear rollers of either of the front cutting deck assemblies and the rear roller of the rear cutting deck assembly. |
| 9. The lawn mower of claim 8 wherein said rolling path defined by said front deck assembly roller overlaps said rolling path defined by said rear deck assembly roller. | Rear roller overlap is typical on ganged cutting deck assemblies as taught by the Contour 66 deck and Risboro itself. Note spacing between Risboro front deck assemblies in the front view in the Risboro RTS Rotary Cutters brochure, the width of the deck assemblies, and the fact that the rear cutting deck assembly will substantially overlap the front cutting deck assemblies. |

| | |
|---|---|
| 10. The lawn mower of claim 8 wherein said rolling path defined by said front deck assembly roller includes an inboard edge aligned with an outboard edge of said rolling path defined by said rear deck assembly roller. | Obvious under 35 USC 103 to align the edges rather than use overlap. |
| 14. The lawn mower of claim 1 further including a lifting arm pivotally interconnecting each of said front deck assemblies to said frame, said lifting arm pivoting about an axis laterally extending across said deck assembly substantially parallel to the ground and perpendicular to the direction of travel. | Further obvious that the attachment to the Risboro lift arms could include a transverse pivot axis to provide fore and aft pitching as taught by the Contour 66 or the Nunes 355. |
| 15. The lawn mower of claim 1 wherein said first roller is a unitary, one-piece roller. | Further obvious that Hoffmeyer's rear roller could be a continuous rear roller as taught by Risboro or the Rear Roller Teachings other than Freier. |

| | |
|---|---|
| 24. A gang-type rotary lawn mower comprising: | |
| a frame supported by front wheels and at least one rear wheel for movement over the ground; | the frame of The Risboro Beaver/Hayter T24 traction unit; |
| a power source which is mounted on said frame and which drives at least two of said wheels; | the "engine" of The Risboro Beaver/Hayter T24 traction unit; |
| an operator's seat mounted on said frame; | the seat of The Risboro Beaver/Hayter T24 traction unit; |
| a steering system enabling the operator to steer said lawn mower; | the steering wheel of The Risboro Beaver/Hayter T24 traction unit; |
| at least two side-by-side front rotary cutting deck assemblies mounted on said frame in front of said front wheels, said front deck assemblies defining a gap between adjacent front deck assemblies; and | both of the plural front Hoffmeyer rotary cutting deck assemblies that will replace the two Risboro front cutting deck assemblies; |
| at least one rear rotary cutting deck assembly mounted on said frame behind said front deck assemblies, each rear deck assembly being aligned with a respective gap between adjacent front deck assemblies; | the center rear Hoffmeyer rotary cutting deck assembly that will replace the center rear Risboro cutting deck assembly; |
| each of said front and rear deck assemblies including a deck defining a downwardly opening space, at least one cutting blade mounted on a spindle for rotation therewith and a first, second and third roller supporting said deck for movement over the ground, said first roller extending only partially across the width of said deck. | any one of Hoffmeyer's cutting blades mounted on any one of Hoffmeyer's spindles; <br><br> Hoffmeyer's rear roller is the first roller, and Hoffmeyer's front rollers are the second and third rollers. |

| | |
|---|---|
| 25. The lawn mower of claim 24 wherein said first roller and said second roller are positioned in along different axes of rotation. | The front rollers rotate along one axis of rotation and the rear roller rotates along another axis of rotation. |
| 26. The lawn mower of claim 25 wherein said third roller and said second roller rotate about the same axis of rotation. | The axis of rotation of the front rollers is the same. |
| 27. The lawn mower of claim 26 wherein said second and third rollers are positioned forward of said first roller. | The front rollers are ahead of the rear roller. |

| 312 Patent Claims | Nunes 355/<br>Lesco 500D Rotary Mowers |
|---|---|
| 19. A cutting deck assembly for a gang-type rotary lawn mower having a frame, the cutting deck assembly comprising: | Nunes/Lesco both teach a fiveplex rotary gang mower; |
| a deck defining a downwardly opening space; | any of the Nunes/Lesco cutting deck assemblies; |
| at least one cutting blade mounted on a spindle for rotation therewith; | Nunes/Lesco are single spindled deck assemblies with one cutting blade |
| a pair of laterally-spaced, generally vertically extending side plates having forward ends;<br>a first front wheel supporting one of said side plates for movement over the ground;<br>a second front wheel supporting the other of said side plates for movement over the ground; | Obvious to adapt the Height of Cut Teachings to Nunes/Lesco (use a pair of side plates to support the wheels of Nunes/Lesco as taught by Smith or Irgens) |
| a roller extending between said side plates supporting said side plates for movement over the ground, wherein said deck is coupled to said side plates and located in front of said roller such that the height of said deck relative to the ground is adjustable by changing the position of said deck relative to said side plates; and | Obvious under 35 USC 103 to replace the two rear wheels of Nunes/Lesco with a rear roller as taught by the Rear Roller Teachings or further by Smith or Irgens, with the rear roller also being carried by the side plates as taught by Smith or Irgens<br>Obvious to adapt the Height of Cut Teachings to Nunes/Lesco (by changing the height of cut simply by moving the cutting deck up and down relative to the wheel and roller carrying side plates as taught by Smith, Irgens or Ransomes Boom Mower; and |
| a lifting arm adapted to pivotally interconnect said cutting deck assembly and the frame. | the lift arms provided on Nunes/Lesco to raise and lower the cutting deck assemblies. |
| 20. The lawn mower of claim 19 wherein said roller is a unitary, one-piece roller. | Obvious to use a unitary, one-piece roller as taught by Rear Roller Teachings, Risboro, Smith or Irgens. |

| 312 Patent Claims | Ransomes Boom Mower |
|---|---|
| 19. A cutting deck assembly for a gang-type rotary lawn mower having a frame, the cutting deck assembly comprising: | Inherent that the Ransomes Boom Mower could be used on a gang-type rotary lawn mower (already shown being used on a mower with a frame); |
| a deck defining a downwardly opening space; | the cutting deck as pictured in the Request; |
| at least one cutting blade mounted on a spindle for rotation therewith; | the rotary cutting blade as pictured in the Request; |
| a pair of laterally-spaced, generally vertically extending side plates having forward ends; | the pair of side plates (only one is pictured in the Request but there are two disposed on the left and right sides of the cutting deck); |
| a first front wheel supporting one of said side plates for movement over the ground; a second front wheel supporting the other of said side plates for movement over the ground; | Obvious in view of Smith to replace the front roller in the Ransomes Boom Mower with a pair of front wheels carried adjacent the forward ends of the side plates; |
| a roller extending between said side plates supporting said side plates for movement over the ground, wherein said deck is coupled to said side plates and located in front of said roller such that the height of said deck relative to the ground is adjustable by changing the position of said deck relative to said side plates; and | the rear roller of the Ransomes Boom Mower; the slotted height adjustment holes in the side plates and the bolts that go through those holes in vertically adjusted positions and then pin into the cutting deck; and |
| a lifting arm adapted to pivotally interconnect said cutting deck assembly and the frame. | the pivotal boom on which the Ransomes Boom Mower is carried. |
| 20. The lawn mower of claim 19 wherein said roller is a unitary, one-piece roller. | The rear roller in the Ransomes Boom Mower is a unitary, one-piece roller. |

| 312 Patent Claims | Risboro RTS Rotary Cutters |
|---|---|
| 19. A cutting deck assembly for a gang-type rotary lawn mower having a frame, the cutting deck assembly comprising: | Risboro teaches a gang mower with two front rotary cutting deck assemblies and one rear cutting deck assembly. |
| a deck defining a downwardly opening space; | any one of the Risboro front cutting deck assemblies or the Risboro rear cutting deck assembly; |
| at least one cutting blade mounted on a spindle for rotation therewith; | any one of the three Risboro spindles and blades; |
| a pair of laterally-spaced, generally vertically extending side plates having forward ends; | the side plates of the Risboro cutting deck; |
| a first front wheel supporting one of said side plates for movement over the ground; a second front wheel supporting the other of said side plates for movement over the ground; | Obvious to adapt the Height of Cut Teachings to Risboro (add a pair of front wheels to the side plates as taught by Smith or Irgens); |
| a roller extending between said side plates supporting said side plates for movement over the ground, wherein said deck is coupled to said side plates and located in front of said roller such that the height of said deck relative to the ground is adjustable by changing the position of said deck relative to said side plates; and | Risboro has a rear roller; Obvious to adapt the Height of Cut Teachings to Risboro (by changing the height of cut simply by moving the cutting deck up and down relative to the wheel and roller carrying side plates as taught by Smith, Irgens or the Ransomes Boom Mower); and |
| a lifting arm adapted to pivotally interconnect said cutting deck assembly and the frame. | the lift arm provided on Risboro to raise and lower the cutting deck assemblies. |
| 20. The lawn mower of claim 19 wherein said roller is a unitary, one-piece roller. | The Risboro rear roller is a unitary, one-piece roller. |


| 312 Patent Claims | Wulff Rotary Mower |
|---|---|
| 19. A cutting deck assembly for a gang-type rotary lawn mower having a frame, the cutting deck assembly comprising: | Wulff teaches a rotary cutting deck assembly; |
| a deck defining a downwardly opening space; | the Wulff mower pictured in the Request has such a deck; |
| at least one cutting blade mounted on a spindle for rotation therewith; | any one of the dual Wulff spindles and blades; |
| a pair of laterally-spaced, generally vertically extending side plates having forward ends; | the side plates at the rear of the Wulff mower carrying the roller; |
| a first front wheel supporting one of said side plates for movement over the ground; a second front wheel supporting the other of said side plates for movement over the ground; | Obvious to adapt the Height of Cut Teachings to Wulff (add a pair of front wheels to the side plates of Wulff as taught by Smith or Irgens); |
| a roller extending between said side plates supporting said side plates for movement over the ground, wherein said deck is coupled to said side plates and located in front of said roller such that the height of said deck relative to the ground is adjustable by changing the position of said deck relative to said side plates; and | Wulff has a rear roller carried by the side plates of Wulff; Obvious to adapt the Height of Cut Teachings to Wulff (by changing the height of cut simply by moving the cutting deck up and down relative to the wheel and roller carrying side plates as taught by Smith, Irgens or the Ransomes Boom Mower); and |
| a lifting arm adapted to pivotally interconnect said cutting deck assembly and the frame. | the lift arm that fits into the sleeve that defines the roll axis when the Wulff cutting deck assembly is mounted on the lift arm of a gang mower. |
| 20. The lawn mower of claim 19 wherein said roller is a unitary, one-piece roller. | The Wulff rear roller is a unitary, one-piece roller. |

# EXHIBIT 4

Westlaw.

Slip Copy

Slip Copy, 2006 WL 2375035 (D.Del.)
(Cite as: Slip Copy)

Page 1

C
Briefs and Other Related Documents
Abbott Diabetes Care, Inc. v. DexCom, Inc.D.Del.,2006.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ABBOTT DIABETES CARE, INC., Plaintiff,
v.
DEXCOM, INC., Defendants.
**C.A. No. 05-590 GMS.**

Aug. 16, 2006.

Mary B. Graham, James Walter Parrett, Jr., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, James F. Hurst, Stephanie S. McCallum, Pro Hac Vice, for Plaintiff.
John W. Shaw, Melanie K. Sharp, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Brian M. Kramer, David C. Doyle, M. Andrew Woodmansee, Morgan S. Adessa, Pro Hac Vice, for Defendants.

*MEMORANDUM*
GREGORY M. SLEET, District Judge.

**I. INTRODUCTION**

*1 On August 11, 2005, Abbott Diabetes Care, Inc. ( "Abbott") brought this declaratory judgment (Count I) and patent infringement (Count II) action against DexCom, Inc. ("DexCom"). Presently before the court are the following motions: (1) DexCom's Motion to Dismiss Abbott's Complaint (D.I.5); (2) DexCom's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61); and (3) DexCom's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25). For the reasons that follow, the court will grant in part and deny in part DexCom's motion to dismiss. The court will grant the motion to dismiss Abbott's declaratory judgment count and will deny the motion to dismiss the

infringement count. Additionally, the court will grant DexCom's motion to strike the "amended complaint," deny the renewed motion to dismiss the complaint as moot, and grant the motion to stay pending reexamination of Abbott's patents.

**II. BACKGROUND**

Abbott owns U.S. Patent Nos. 6,175,752 (the " 752 patent"), 6,284,478 (the " 478 patent"), 6,329,161 (the " 161 patent"), and 6,565,509 (the " 509 patent") (collectively, the "patents-in-suit"). The patents-in-suit are directed to methods, systems, and devices for continuously monitoring glucose levels in humans. (Compl.¶ 7.) The patented technology at issue offers an alternative monitoring system for diabetics, who currently monitor their glucose levels by pricking their fingers to draw blood several times a day. (D.I. 32, at 3; see 752 patent, Col. 1, ll. 21-26; 509 patent Col. 1, ll. 21-26.) According to the background of the invention sections of the 752 and 509 patents, the pricking technique does not permit the continuous monitoring of glucose, is painful and inconvenient, and results in inconsistencies in monitoring among individuals with diabetes. (See 752 patent, Col. 1, ll. 26-38; 509 patent, Col. 1. ll. 26-38.) Therefore, the technology described in the patents-in-suit was invented to address the need for a small and comfortable device that could continuously monitor glucose levels for days at a time, while permitting a patient to engage in normal activities. ( 752 patent, Col. 2, ll. 1-4; 509 patent, Col 2., ll. 5-8.) Each of the patents-in-suit relate to an aspect of the continuous glucose monitor, which involves implanting a glucose sensor in a patient and monitoring signals over the life of the sensor.[FN1] (D.I. 32, at 3.) The monitoring device provides patients with feedback regarding their glucose levels, and may even include an alarm to warn patients of dangerous glucose levels. (Id. at 3-4.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

FN1. The 752 and 509 patents relate to glucose monitoring devices and their methods of use, while the 478 and 161 patents relate to subcutaneous glucose sensors.

Abbott alleges that DexCom intends to market its STS ™ Continuous Glucose Monitoring System, which will infringe one or more claims of the patents-in-suit. The complaint states that DexCom filed a premarket approval application with the Food and Drug Administration (the "FDA") in March 2005, seeking approval to sell its product. (Compl.¶ 12.) The complaint further states that DexCom expects FDA approval by the second quarter of 2006.[FN2] (Id. ¶ 15.) In Count I, Abbott seeks declaratory relief in the form of a judicial declaration that DexCom's product will infringe one or more claims of each of the patents-in-suit. (Id. ¶ 25.)

FN2. As previously mentioned, Abbott filed its complaint on August 11, 2005. The FDA subsequently approved DexCom's glucose monitoring product, in March 2006.

*2 Further, Abbott alleges that, prior to filing its premarket approval application with the FDA, DexCom attended two "trade shows" where it publicized and displayed its glucose monitoring product. (Compl.¶ 16.) The complaint alleges that the products DexCom displayed at the trade shows were manufactured for the purpose of showcasing rather than for gathering information for submission to the FDA. (Id. ¶ 17.) Abbott alleges that DexCom's manufacture and display of its product constitutes an act of patent infringement. (Id. ¶ 28.)

On August 31, 2005, DexCom filed a motion to dismiss Abbott's complaint for lack of subject matter jurisdiction and failure to state a claim. Additionally, on February 22, 2006, DexCom filed a motion to stay the litigation pending reexamination of the patents-in-suit. On June 27, 2006, Abbott filed an amended complaint, which alleges further infringing acts on the part of DexCom and adds several patents to the suit. On

July 12, 2006, DexCom filed a motion to strike the "amended complaint" and renewed motion to dismiss.

### III. DISCUSSION

#### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Dexcom first contends that the court should dismiss Abbott's declaratory judgment claim because there is currently no "accused device" to compare against the claims of the patents-in-suit and, therefore, Abbott's claim is premature. In other words, DexCom contends the court lacks subject matter jurisdiction over Count I of Abbott's Complaint.

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure contests the jurisdiction of the Court to address the merits of a plaintiff's complaint. Such a challenge may present either a facial or a factual contest to subject matter jurisdiction. See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir.1977). When asserting a facial challenge, a defendant contends that the complaint alleges facts that, even if true, would be insufficient to establish the Court's jurisdiction. Gould Elecs. Inc. v. United States, 220 F.3d 169, 176 (3d Cir.2000). The present motion presents a facial challenge to the complaint because the jurisdictional facts are not in dispute. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiff's favor. See id. Additionally, the court must test the existence of jurisdiction as of the time the complaint was filed. Lang v. Pacific Marine and Supply Co., 895 F.2d 761, 764 (Fed.Cir.1990).

The Declaratory Judgment Act (the "Act") provides that "[i]n a case of actual controversy ... [a court of competent jurisdiction] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, before a court may exercise jurisdiction over a declaratory judgment action, the Act requires an "actual controversy between the parties ."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 3

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

*Medimmune, Inc. v. Centocor, Inc.*, 409 F.3d 1376, 1378-79 (Fed.Cir.2005) (citing *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1331 (Fed.Cir.2005)). "If the controversy requirement is met by a sufficient allegation of immediacy and reality ... a patentee [is able] to seek a declaration of infringement against a future infringer ... [just as] a future infringer is able to maintain a declaratory judgment action of noninfringement under the same circumstances." *Telectronics Pacing Sys., Inc v. Ventritrex, Inc.*, 982 F.2d 1520, 1526 (Fed.Cir.1992) (citing *Lang*, 895 F.2d at 764).

**\*3** However, a district court does not have jurisdiction to hear the action when there is no actual controversy. *Spectronics Corp. v. H .B. Fuller Co.*, 940 F.2d 631, 634 (Fed.Cir.1991), *cert. denied*, 112 S.Ct. 658 (1991). Moreover, "even assuming [the existence of] an actual controversy, the exercise of a court's jurisdiction over a declaratory judgment action is discretionary." *Telectronics*, 982 F.2d at 1526 (citations omitted).

Two elements must be present in order to meet the controversy requirement in a declaratory judgment action brought by a patentee against an alleged future infringer: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an infringement charge under 35 U.S.C. § 271(a), or be making meaningful preparation for such activity; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming. *Lang*, 895 F.2d at 764. In addition, the declaratory judgment plaintiff bears the burden of proving the existence of facts underlying its allegations of the existence of an actual controversy. *Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1399 (Fed.Cir.1984).

Applying the above-discussed elements to the present case, it is clear to the court from the record before it that Abbott's complaint did not present an actual controversy under the Act at the time it was filed. That is, Abbott has not demonstrated that DexCom produced or has prepared to produce a product that would be subject to an infringement

charge under 35 U.S.C. § 271. At the time Abbott filed its complaint, the FDA had not approved DexCom's product and Abbott could not predict when, or if, the FDA would approve the product. Indeed, Abbott states as much in its complaint, alleging that "DexCom ... *expects* FDA approval for marketing by the second quarter of 2006...." (Compl.¶ 15) (emphasis added).[FN3] Additionally, Abbott did not, and could not, allege with any certainty that "the device when approved would be the same device that began clinical trials[,]" as " product changes during testing are contemplated by statute, 21 U.S.C. § 360j(g)(2)(C)(iii) (1988)." *Telectronics*, 982 F.2d at 1527. Most important, Abbott did not allege nor does it now contend that DexCom has distributed sales literature, prepared to solicit orders, or engaged in any sales or marketing activity with regard to its glucose monitoring product. *See Lang*, 895 F.2d at 765; *Benitec Australia Ltd. v. Nucleonics, Inc.*, Civil Action No. 04-0174 JJF, 2005 U.S. Dist. LEXIS 22008, at \*9 (D.Del. Sept. 29, 2005); *Interdigital Tech. Corp. v. OKI Am., Inc.*, 845 F.Supp. 276, 284 (E.D.Pa.1994) ("Activity directed towards advertising or marketing the accused device is particularly important to a finding of a justiciable controversy.") Therefore, the court concludes that no controversy of sufficient immediacy and reality existed, at the time Abbott filed its complaint, to support declaratory judgment jurisdiction in the present case. As such, the court will dismiss Count I of Abbott's complaint.

> FN3. The court agrees with the argument Abbott makes in its answering brief, namely that FDA approval is not the standard by which it should evaluate whether an actual controversy existed at the time the complaint was filed. However, the court finds that the absence of FDA approval is evidence that the dispute between the parties is neither real nor immediate.

**B. Motion to Strike Abbott's "Amended Complaint"**

**\*4** DexCom next argues that the court should strike

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

the "Amended Complaint" because Abbott failed to seek leave of court to file what correctly should be termed a "supplemental pleading." Conversely, Abbott asserts that it properly amended its complaint under Federal Rule of Civil Procedure 15(a) to allege additional acts of infringement that occurred prior to and after it filed the initial complaint. The court is unpersuaded by Abbott's argument and will, therefore, strike its "Amended Complaint."

As Abbott points out in its briefing, "[a]n amended pleading generally is a modification to incorporate events that were unknown but occurred *prior* to the filing of the original pleading." (D .I. 66, at 7) (emphasis added) (citing 3 James Wm. Moore et al., Moore's Federal Practice § 15.02 (3d ed.1999)). On the other hand, "a supplemental pleading refers to additions to include transactions or occurrences that take place after the filing of the original pleading." (D.I. 66, at 7.) By Abbott's own words, it amended its complaint "to allege additional acts of infringement that occurred prior to and *after* " its initial complaint. (*Id* .) Because Abbott's "Amended Complaint" contains allegations regarding events that occurred after August 11, 2005-the filing date of the original complaint-it is governed by Federal Rule of Civil Procedure 15(d). Pursuant to Rule 15(d), "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Fed.R.Civ.P. 15(d); *see GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479, 483 (Fed.Cir.1996) (holding that district court did not abuse its discretion when " adhering to the motion requirement of Rule 15"); *Bronson v. Horn*, Civil Action No. 02-663, 2006 U.S. Dist. LEXIS 38791, at *5 (W.D. Pa. June 12, 2006) (dismissing supplemental complaint because it was not filed pursuant to a motion). Accordingly, because Abbott did not file a motion to supplement its complaint in the present case, the court will strike it from the docket for failure to comply with Rule 15(d).

**C. Motion to Dismiss for Failure to State a Claim**

Finally, with respect to dismissal, DexCom contends that Count II of Abbott's complaint fails to state a claim for which relief can be granted. According to DexCom, its display of glucose monitoring products at two scientific conferences is exempt under 35 U.S.C. § 271(e)(1).[FN4] Therefore, DexCom argues that Abbott has failed to state a claim for patent infringement.

> FN4. Section 271(e)(1) states, in pertinent part:
> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.
> 35 U.S.C. 271(e)(1).

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, in deciding a motion to dismiss, the factual allegations of the complaint must be accepted as true. *See Graves v. Lowery,* 117 F .3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer. " *Colburn v. Upper Darby Twp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss ." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). A court may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Thus, in order to prevail, a moving party must show "beyond doubt that the plaintiff can prove no set of facts in support of his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

claim [that] would entitle him to relief." *Conley,* 355 U.S. at 45-46.

**\*5** After having reviewed Abbott's complaint, the parties' submissions and relevant case law, the court concludes that DexCom cannot show that "beyond doubt" there exists "no set of facts" in support of Abbott's patent infringement claim. The language of section 271(e)(1) exempts potentially infringing activities "if performed solely for uses reasonably related to the development of information for FDA approval." *Telectronics,* 982 F.2d at 1523. Here, Abbott's complaint alleges that "[u]pon information and belief, the [DexCom] products displayed at the [two] trade shows were manufactured for the purpose of showcasing at the trade shows rather than for the purpose of gathering information." (Compl.¶ 17.) Abbott's complaint, therefore, alleges that DexCom's manufacture and display of products at scientific conferences or trade shows falls outside the safe harbor of section 271(e)(1). Based upon this allegation, and viewing the complaint in the light most favorable to Abbott, the court is unwilling to conclude at this juncture that no relief could be granted under any set of facts that Abbott could prove consistent with its patent infringement allegations.[FN5] Therefore, the court will deny DexCom's motion to dismiss Count II of the complaint.

> FN5. DexCom contends that the facts of the present case are on "all fours" with the facts of *Telectronics.* The court, however, finds that DexCom's reliance is misplaced because, in *Telectronics,* the Federal Circuit reviewed a district court's grant of summary judgment for the defendant, while here the court must decide a motion to dismiss. As DexCom well knows, the standard for granting a motion to dismiss is markedly different from the summary judgment standard. When deciding a Rule 56 motion, the court reviews "the pleadings, *depositions, answers to interrogatories,* and *admissions on file,* together with [any] affidavits," to determine whether "there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (emphasis added). In contrast, when deciding a motion to dismiss, the scope of the court's review is limited to the complaint. *See Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 560 (3d Cir.2002) ("As a general rule, the court may only consider the pleading that is attacked by an FRCP 12(b)(6) motion in determining its sufficiency.") Therefore, *Telectronics* is distinguishable in that the court made its determination after reviewing a more complete record than that which the court is permitted to review here. That is not to say that DexCom could not successfully attack Abbott's claim at a later stage of these proceedings. For example if, through discovery, DexCom adduces facts indicating that its conduct at the scientific conferences or trade shows falls within the section 271(e)(1) safe harbor, the court will likely entertain a motion for summary judgment at the appropriate time.

### D. Motion to Stay

DexCom has also filed a motion to stay the litigation pending reexamination of the patents-in-suit by the Patent and Trademark Office (the "PTO"). The decision to stay a case is firmly within the discretion of the court. *See Cost Bros., Inc. v. Travelers Indem. Co.,* 760 F.2d 58, 60 (3d Cir.1985). This authority applies equally to patent cases in which a reexamination by the PTO has been requested. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426-27 (Fed.Cir.1988) (noting that "[c]ourts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination.") (internal citations omitted). In determining whether a stay is appropriate, the court's discretion is guided by the following factors: "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Xerox Corp. v. 3*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

*Com Corp.,* 69 F.Supp.2d 404, 406 (W.D.N.Y.1999) (citing cases); *cf. United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (stating a similar test).

In opposing DexCom's motion, Abbott maintains that a stay would prevent it from seeking a preliminary injunction and enforcing its patent rights, thereby unduly prejudicing it and presenting it with a clear tactical disadvantage in the marketplace. The court is not persuaded. First, Abbott's argument is premised on its filing of a motion for preliminary injunction. Abbott, however, did not, and has not, filed any such motion, even though the FDA has recently approved DexCom's glucose monitoring product for marketing. Because Abbott has not filed a motion for preliminary injunction, its arguments relating to the court's rendering of an opinion on such a motion are moot. As such, the only other argument Abbott asserts with respect to undue prejudice is that it will be unable to enforce its patents while in reexamination. Abbott's position, however, assumes that the PTO will leave all of the more than 200 claims of the four patents-in-suit unaltered after reexamination. *See Applera Corp. v. Thermo Electron Corp.,* No. C.A. 04-1230 GMS, (D.Del. Dec. 28, 2005) (04-1230 D.I. 81 ¶ 6). Further, while Abbott may suffer some prejudice from a stay, the court is not persuaded that a stay would *unduly* prejudice Abbott, or present any clear tactical disadvantage. Accordingly, the first factor militates in favor of granting the requested stay.

*6 With respect to the second factor, Abbott argues that a stay will not simplify the issues, but prolong the litigation. According to Abbott, the only way to avoid prolonging the litigation would be if the reexamination resulted in the PTO invalidating all of the asserted claims of all of the patents-in-suit. The court cannot agree. Contrary to Abbott's position, the court finds that granting the stay will simplify the issues and focus the litigation. For example, if the PTO determines that some or all of the claims of the of the four patents undergoing reexamination are invalid, then many of the issues in the litigation will become moot. Additionally, it is beyond dispute that the court, as well as the

parties, would benefit from a narrowing of the variety of complex issues relating to the numerous claims at issue, which, if clearly defined, would streamline the discovery process and the remainder of the litigation. A stay, therefore, will conserve the resources of the parties and the court, thereby promoting efficiency. Moreover, the court would not run the risk of inconsistent rulings or issuing advisory opinions. *See Gioello Enters. Ltd. v. Mattel, Inc.,* No. C.A. 99-375 GMS, 2001 WL 125340, at *1 (D.Del. Jan. 29, 2001). The second factor, therefore, weighs in favor of granting the motion to stay.

Finally, the court finds that the third factor it must consider in its determination, i.e. whether discovery is complete and whether a trial date has been set, weighs in favor of granting the motion. In the present case, fact discovery is not scheduled to close until January 31, 2007 and, although already set, the trial is not scheduled to begin until October 9, 2007. [FN6] Thus, given its findings with respect to the first two factors, the court concludes that the balance of harms weighs in favor of granting a stay of this action. Accordingly, the court will grant DexCom's motion to stay.

FN6. See Amended Scheduling Order, D.I. 71 ¶¶ 2, 8.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The defendant's Motion to Dismiss Abbott's Complaint (D.I.5) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Count I of Abbott's complaint and DENIED with respect to Count II of Abbott's complaint.

2. The court shall dismiss Count I of Abbott's complaint without prejudice.

3. The plaintiff's Motion For Limited Jurisdictional Discovery and for a Corresponding Extension of the Briefing Schedule on DexCom's Motion to Dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

(D.I.9) is DENIED as moot.

4. The defendant's Motion to Strike the "Amended Complaint" and Renewed Motion to Dismiss Abbott's Complaint (D.I.61) is GRANTED in part and DENIED in part. The motion to strike the " amended complaint" is GRANTED and the renewed motion to dismiss is DENIED as moot.

5. The plaintiff's Amended Complaint (D.I.55) shall be stricken from the court's docket.

6. The defendant's Motion to Stay Pending Reexamination of the Patents-in-suit (D.I.25) is GRANTED.

D.Del.,2006.
Abbott Diabetes Care, Inc. v. DexCom, Inc.
Slip Copy, 2006 WL 2375035 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2540691 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 16, 2006) Original Image of this Document (PDF)
• 2006 WL 2546084 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Reply in Support of Its Motion to Strike ""Amended Complaint" and Renewed Motion to Dismiss Complaint (Aug. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 2546083 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Opening Brief in Support of Its Motion to Strike ""Amended Complaint" and Renewed Motion to Dismiss Complaint (Jul. 12, 2006) Original Image of this Document (PDF)
• 2006 WL 2304532 (Trial Pleading) Abbott Diabetes Care, Inc.'s Amended Complaint (Jun. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 2546082 (Trial Pleading) Abbott Diabetes Care, Inc.'s Amended Complaint (Jun. 27, 2006) Original Image of this Document (PDF)
• 2006 WL 1167904 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Reply in Support of its Motion to Stay Pending Re-Examination of the Patents in Suit (Mar. 21, 2006)
• 2006 WL 1167903 (Trial Motion, Memorandum and Affidavit) Abbott's Answering Brief in

Opposition to Dexcom's Motion to Stay Pending Reexamination of the Patents in Suit (Mar. 10, 2006)
• 2006 WL 1326975 () Declaration of Walter Bratic (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 542968 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Opening Brief in Support of its Motion to Stay Pending Re-Examination of the Patents in Suit (Feb. 22, 2006)
• 2006 WL 809203 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Opening Brief in Support of its Motion to Stay Pending Re-Examination of the Patents in Suit (Feb. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 859125 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Opening Brief in Support of its Motion to Stay Pending Re-Examination of the Patents in Suit (Feb. 22, 2006)
• 2005 WL 2492927 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Reply Brief in Support of Motion to Dismiss (Sep. 29, 2005)
• 2005 WL 2867804 (Trial Motion, Memorandum and Affidavit) Dexcom, Inc.'s Reply Brief in Support of Motion to Dismiss (Sep. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 4705051 (Trial Motion, Memorandum and Affidavit) DexCom, Inc.'s Reply Brief in Support of Motion to Dismiss (Sep. 29, 2005) Original Image of this Document (PDF)
• 2005 WL 2492931 (Trial Motion, Memorandum and Affidavit) Abbott Diabetes Care's Opposition to Dexcom's Motion to Dismiss (Sep. 22, 2005)
• 2005 WL 2867803 (Trial Motion, Memorandum and Affidavit) Abbott Diabetes Care's Opposition to Dexcom's Motion to Dismiss (Sep. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 4705050 (Trial Motion, Memorandum and Affidavit) Abbott Diabetes Care's Opposition to Dexcom's Motion to Dismiss (Sep. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 2867802 (Trial Motion, Memorandum and Affidavit) Abbott's Motion for Extension of the Briefing Schedule on Dexcom's Motion to Dismiss Pending Resolution of Abbott's Motion for Limited Jurisdictional Discovery (Sep. 19, 2005) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                           Page 8

Slip Copy, 2006 WL 2375035 (D.Del.)
**(Cite as: Slip Copy)**

• 2005 WL 2492930 (Trial Motion, Memorandum
and Affidavit) Reply in Support of Abbott's Motion
to take Limited Jurisdictional Discovery before
Responding to Dexcom's Motion to Dismiss (Sep.
16, 2005)
• 2005 WL 2867801 (Trial Motion, Memorandum
and Affidavit) Reply in Support of Abbott's Motion
to take Limited Jurisdictional Discovery before
Responding to Dexcom's Motion to Dismiss (Sep.
16, 2005) Original Image of this Document (PDF)
• 2005 WL 2492926 (Trial Motion, Memorandum
and Affidavit) Dexcom, Inc.'s Answering Brief in
Opposition to Abbott Diabetes Care, Inc.'s Motion
for Limited Juridictional Discovery and for A
Corresponding Extension of the Briefing Schedule
on Dexcom's Motion to Dismiss (Sep. 12, 2005)
• 2005 WL 2867800 (Trial Motion, Memorandum
and Affidavit) Dexcom, Inc.'s Answering Brief in
Opposition to Abbott Diabetes Care, Inc.'s Motion
for Limited Juridictional Discovery and for A
Corresponding Extension of the Briefing Schedule
on Dexcom's Motion to Dismiss (Sep. 12, 2005)
Original Image of this Document (PDF)
• 2005 WL 2237571 (Trial Motion, Memorandum
and Affidavit) Abbott's Motion for Limited
Jurisdictional Discovery and for A Corresponding
Extension of the Briefing Schedule on Dexcom'S
Motion to Dismiss (Sep. 6, 2005)
• 2005 WL 2492925 (Trial Motion, Memorandum
and Affidavit) Abbott's Motion for Limited
Jurisdictional Discovery and for A Corresponding
Extension of the Briefing Schedule on Dexcom's
Motion to Dismiss (Sep. 6, 2005)
• 2005 WL 2237569 (Trial Motion, Memorandum
and Affidavit) Dexcom, Inc.'s Opening Brief in
Support of its Motion to Dismiss the Complaint of
Abbott Diabetes Care, Inc. (Aug. 31, 2005)
• 2005 WL 4705054 (Trial Motion, Memorandum
and Affidavit) Dexcom, Inc.'s Opening Brief in
Support of Its Motion to Dismiss the Complaint of
Abbott Diabetes Care, Inc. (Aug. 31, 2005) Original
Image of this Document (PDF)
• 2005 WL 2237570 (Trial Pleading) Complaint
(Aug. 11, 2005)
• 2005 WL 4705049 (Trial Pleading) Complaint
(Aug. 11, 2005) Original Image of this Document
(PDF)
• 1:05cv00590 (Docket) (Aug. 11, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Briefs and Other Related Documents
Cognex Corp. v. National Instruments
Corp.D.Del.,2001.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
COGNEX CORPORATION, Plaintiff,
v.
NATIONAL INSTRUMENTS CORPORATION,
Defendant.
**No. Civ.A. 00-442-JJF.**

June 29, 2001.

Neal C. Belgam, and Dale R. Dube, of Blank Rome
Comisky & McCauley LLP, Wilmington, Delaware,
George M. Sirilla, G. Paul Edgell, and William P.
Atkins, of Pillsbury Winthrop LLP, Washington,
D.C., for Plaintiff, of counsel.
William J. Marsden, Jr., and John T. Meli, Jr., of
Fish & Richardson P.C., Wilmington, Delaware,
Frank E. Scherkenbach, David M. Barkan, and John
V. Picone III, of Fish & Richardson P.C., Menlo
Park, California, for Defendant, of counsel.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Pending before the Court in this patent
infringement action is Cognex Corporation's Motion
To Stay Or, In The Alternative, For An Extension
Of The Deadlines In This Case (D.I.84). By its
Motion, Plaintiff, Cognex Corporation ("Cognex"),
requests a stay or, in the alternative, a three month
delay in the proceedings in this case, because it has
requested a reexamination of the patent in suit by
the United States Patent and Trademark Office ("
PTO"). By letter dated May 29, 2001, Cognex
advised the Court that the PTO granted Cognex's
request for reexamination of United States Patent
No. 5,481,712 (the " '712 Patent"). Cognex
contends that reexamination of the '712 Patent will
narrow and/or resolve the issues in this case.
Specifically, Cognex contends that if the '712 Patent

is declared unpatentable, it is likely that the patent
litigation will be dismissed. On the other hand, if
the PTO finds the '712 Patent patentable over the
prior art, Cognex contends that the PTO decision
might encourage the parties to settle this action.

Defendant, National Instruments Corporation ("
National Instruments"), opposes any stay in this
case. Specifically, National Instruments contends
that a stay would cause National Instruments severe
prejudice because: (1) the litigation schedule and
trial date would be delayed causing National
Instruments additional expense; (2) Cognex would
be able to continue to hold the specter of litigation
over National Instruments and its customers; and
(3) Cognex has already forced National Instruments
to spend over a million dollars defending itself in
this action before requesting the stay, despite the
fact that Cognex had the materials necessary to seek
reexamination earlier.

After reviewing the parties' positions with respect to
the instant motion and the applicable law, the Court
concludes that a stay and/or extension is not
warranted in this case. Accordingly, for the reasons
discussed, the Court will deny Cognex's Motion To
Stay Or, In The Alternative, For An Extension Of
The Deadlines In This Case.

DISCUSSION

The decision to grant or deny a stay is within the
court's broad range of discretionary powers.
*Dentsply International, Inc. v. Kerr Manufacturing
Co.,* 734 F.Supp. 656, 658 (D.Del.1990) (citations
omitted). In determining whether a stay is
appropriate, the court should "weigh the competing
interests of the parties and attempt to maintain an
even balance." *Id.* In weighing the interests
involved, courts are generally guided by such
factors as (1) whether a stay would unduly prejudice
or present a clear tactical advantage to the
non-movant; (2) whether a stay will simplify the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

issues raised by the parties; and (3) whether discovery is complete and a trial date has been set. *Gioello Enterprises Ltd. v. Mattel, Inc.,* 2001 WL 125340 (D.Del. Jan.29, 2001); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991). In balancing these factors, courts must be particularly mindful of the consequences of the stay on other parties. *Dentsply International,* 734 F.Supp. at 658 (recognizing that Court must consider whether "there is 'even a fair possibility' that the stay would work damage on another party") (citations omitted). Where a stay will forestall the trial date agreed upon by the parties, this Court has required the party requesting the stay to "make a showing of 'a clear case of hardship or inequity' before the Court can enter a stay order." *Id.* (citing *Gold v. Johns-Manville Sales Corp.,* 723 F.2d 1068, 1076 (3d Cir.1983)).

*2 In this case, discovery was scheduled to close on May 4, 2001, less than three weeks before Cognex filed the instant Motion To Stay, and trial is scheduled for October 23, 2001.[FN1] Accordingly, Cognex must demonstrate a clear case of hardship or inequity before the Court will enter an order staying this action.

> FN1. Although discovery has since been extended until July 2001 by stipulation between the parties (D.I.106), the trial date in this case has not been changed.

After reviewing the parties' arguments, the Court concludes that Cognex cannot demonstrate a clear case of hardship or inequity, and that National Instruments would be prejudiced if the Court were to grant a stay in this case. Cognex primarily contends that reexamination will simplify the issues in this case such that the litigation may be settled or dismissed and the parties' expenses significantly reduced. However, as National Instruments points out, Cognex's complaint alleges a variety of claims which are not linked to the patent infringement claim, including claims of copyright and trademark infringement and unfair competition, all of which will require a trial.

In addition, Cognex contends that the reexamination

may result in changed claims, which would cause this action to be litigated twice, wasting the Court's and the parties' resources. However, the Court is unpersuaded by Cognex's contention. The trial in this case is scheduled for October 2001, and the PTO granted Cognex's request for reexamination in May 2001. Although Cognex disputes the figures provided by National Instruments concerning the pendency of applications in the PTO because National Instruments relies on original applications rather than reexamination applications, even Cognex's figures suggest that the median reexamination time is 16 months. Thus, given the current time tables for action in the PTO, the Court believes that the trial in this case will likely be completed prior to any action by the PTO. (D.I. 87 at Exh. G; D.I. 94, Exh. D).

Further, any hardship incurred by Cognex as a result of its request for reexamination is, in part, a result of Cognex's own making. National Instruments contends and Cognex has not disputed, that Cognex has had at least some of the documents it presented to the PTO in its request for reexamination for quite some time. National Instruments identified specific prior art references in its Answer to the Complaint in June 2000, yet Cognex waited until six months before the scheduled trial date in this case to seek reexamination of the '712 Patent.[FN2] Accordingly, the Court cannot conclude that Cognex has demonstrated a clear case of hardship or inequity justifying a stay in this case. *Dentsply,* 734 F.Supp. at 659 ("The Court will not elevate [a party's] failure to address its concerns in a timely fashion to an example of hardship warranting a stay."); *see also Remington Arms Company, Inc. v. Modern Muzzleloading, Inc.,* 1998 WL 1037920 (D.N.C. Dec.17, 1998) (denying stay where trial date set and defendant's delay in requesting reexamination with PTO was unjustified given that defendant knew of the prior art forming its request for reexamination well prior to its reexamination request).

> FN2. Although Cognex contends that National Instruments did not produce many of these documents until much later, National Instruments also contends and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Cognex has not disputed, that some of the documents Cognex presented to the PTO were in Cognex's possession as early as 1990, well before the inception of this litigation. Thus, it appears to the Court that Cognex still could have filed its request for reexamination at an earlier date.

*3 Moreover, given the late stage of Cognex's request, the Court finds that any delay in the trial date scheduled for this case would severely prejudice National Instruments. The parties have conducted extensive discovery in Delaware, California, Texas, Washington, D.C. and Massachusetts based on a schedule coinciding with the October 23 trial date. National Instruments has scheduled its experts and made trial support accommodations in Delaware based upon the October 23 trial date. Any deviation from the October trial date at this late stage in the litigation would necessarily prejudice National Instruments. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516 (E.D.Wash.1991) (denying plaintiff's motion for stay where parties conducted extensive discovery and trial date was set). Accordingly the Court will deny Cognex's request for a stay.

As for Cognex's request for alternative relief in the form of a three month extension, the Court notes that the discovery deadlines in this case have been extended by stipulation of the parties. This scheduling extension should address Cognex's time concerns without necessitating a change in the October 2001 trial date. Accordingly, at this time, the Court will deny Cognex's request for a three month extension.

CONCLUSION

For the reasons discussed, Cognex Corporation's Motion To Stay Or, In The Alternative, For An Extension Of The Deadlines In This Case will be denied.

An appropriate Order will be entered.

D.Del.,2001.

Cognex Corp. v. National Instruments Corp.
Not Reported in F.Supp.2d, 2001 WL 34368283 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:00CV00442 (Docket) (May. 02, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Page 2 of 4

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2003 WL 25283239 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
St. Clair Intellectual Property Consultants v. Sony
Corp.D.Del.,2003.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
ST. CLAIR INTELLECTUAL PROPERTY
CONSULTANTS, INC., Plaintiff,
v.
SONY CORPORATION, et al Defendants.
No. Civ.A. 01-557JJF.

Jan. 30, 2003.

Frederick L. Cottrell, III, Richards, Layton &
Finger, Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*
FARNAN, J.
*1 Pending before me is a Motion To Stay Pending
The Outcome Of Reexamination Proceedings
(D.I.202) filed by the Defendants ("Sony"). The
Plaintiff ("St.Clair") opposes the stay.

In considering Sony's motion, I have read the papers
submitted by the parties, The Patent Act of 1980,
Robert L. Harmon's discussion of the
Reexamination Procedure in his treatise, *Patents
and The Federal Circuit,* (5th ed.2001), and the
four (4) District of Delaware cases cited by the
parties, *Freeman v. Minnesota Mining & Mftr.
Comp.,* 661 F.Supp. 886 (D.Del.1987); *United
Sweetener USA, Inc. v. Nutrasweet Co.,* 766
F.Supp. 212 (D.Del.1991); *Rohm & Haas Co. v.
Brotech Corp.,* C.A. No. 90-109(JJF), 1992 U.S.
Dist. LEXIS 21721 (D.Del. July 16, 1992); and
*Gioello Enterprises, Ltd. v. Mattel,* C.A. No.
99-375(GMS), 2001 WL 125340 (D.Del. Jan.29,
2001)

In support of its motion, Sony contends that "there

is a liberal policy in favor of granting motions to
stay proceedings pending the outcome of USPTO
reexamination proceedings." *ASCII Corp. v. STD
Entm't USA, Inc.,* 844 F.Supp. 1378, 1381
(N.D.Cal.1994)

Sony argues that a stay in this case is appropriate
because: 1) St. Clair produces no products under the
patents-in-suit, and therefore, money damages will
be an adequate remedy for any delay a stay might
cause; 2) a stay permitting reexamination has the
potential to moot the entire action, or at least
simplify it dramatically.

St. Clair responds that a stay is not warranted
because: 1) Sony's request is made only to delay the
case; 2) discovery is complete and the trial date
weeks away and therefore, the delay that will result
while the reexamination proceedings go forward
will unduly prejudice St. Clair in the presentation of
its case; 3) St. Clair argues a stay will not simplify
the issues that the trial must resolve due to the "
non-overlapping issues" between the reexamination
and this litigation; and 4) St. Clair contends that
cancellation of the patent claims is unlikely.

Courts typically cite three factors that should guide
the exercise of a court's discretion when deciding
whether a stay is appropriate: 1) whether the
granting of a stay would cause the non-moving
party to suffer undue prejudice from any delay or
allow the moving party to gain a clear tactical
advantage over the non-moving party; 2) whether a
stay will simplify the issues for trial; and 3) whether
discovery is complete and a trial date set.

Applying these factors in the context of the parties'
arguments, I find that a delay in the commencement
of the February 2003 trial will unduly prejudice St.
Clair for the reasons it cites. I also find, as St. Clair
contends, that it is unlikely the pending
reexamination proceedings will do much to simplify
the issues that need to be tried in this case. And
finally, the fact that the instant motion was filed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2003 WL 25283239 (D.Del.)
**(Cite as: Slip Copy)**

after the close of discovery and weeks before the commencement of the scheduled trial date is persuasive.

**\*2** In addition to the three traditional factors, I have also considered whether a stay would substantially contribute to or result in a final disposition of this case or substantially contribute to a more efficient and less costly trial.

In this regard, I find that a stay will do neither because: 1) This case, like many, is about "the injunction." If successful at trial, St. Clair will aggressively seek an injunction against Sony. Sony will aggressively oppose St. Clair's efforts. In my view, the pending reexamination proceeding will not do much to contribute to this end game strategy. 2) The reexaminations requested by Sony, are more about the claim interpretation provided by me than any prior art contentions. 3) Lastly, I am persuaded that neither St. Clair nor Sony will be unduly prejudiced by proceeding to trial now, because I am convinced that a trial and appeal is what will finally resolve the parties' dispute.

NOW THEREFORE, FOR THE REASONS DISCUSSED, IT IS HEREBY ORDERED that Sony's Motion To Stay Pending The Outcome Of Reexamination Proceedings (D.I.202) is *DENIED.*

D.Del.,2003.
St. Clair Intellectual Property Consultants v. Sony Corp.
Slip Copy, 2003 WL 25283239 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24464488 (Trial Motion, Memorandum and Affidavit) Plaintiff St. Clair's Memorandum of Law in Support of its Motion to Strike the Testimony of Sony's Expert on Infringement, Alexander Trevor, and for Judgment of Infringement as a Matter of Law (Feb. 20, 2003) Original Image of this Document (PDF)
• 2003 WL 24841812 (Trial Motion, Memorandum and Affidavit) St. Clair's Memorandum of Law in Support of its Motion for Reconsideration of this Court's Decision to Grant Sony's Motion in Limine to Preclude St. Clair from Offering Evidence to

Antedate Prior Art (Feb. 19, 2003) Original Image of this Document (PDF)
• 2003 WL 24464486 (Trial Motion, Memorandum and Affidavit) Sony's Reply in Support of Sony's Motion for Summary Judgment of Invalidity as to U.S. Patent 5,138,459, and in Opposition to St. Clair's Cross-Motion that Kuhberger is not Prior Art (Feb. 5, 2003) Original Image of this Document (PDF)
• 2003 WL 24464487 (Trial Motion, Memorandum and Affidavit) Sony's Omnibus Motions in Limine on Liability Issues (Feb. 3, 2003) Original Image of this Document (PDF)
• 2003 WL 24464489 (Trial Motion, Memorandum and Affidavit) Sony's Opening Memorandum in Support of its Motion for Partial Summary Judgment that Claims 2, 3, 5, 6,12,13 and 17 of the "219 Patent are Invalid for Violation of Best Mode Requirement (Jan. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 24464490 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of their Motion for Summary Judgment of Invalidity and Noninfringement as to U.S. Patents 6,233,010; 6,094, 219; and 6,323,899 (Jan. 15, 2003) Original Image of this Document (PDF)
• 2003 WL 24464491 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of their Motion for Summary Judgment of Invalidity as to U.S. Patent 5,138,459 (Jan. 15, 2003) Original Image of this Document (PDF)
• 2002 WL 33029312 () Second Declaration of Thomas A. Gafford (Jul. 31, 2002) Original Image of this Document (PDF)
• 2002 WL 33029313 () Supplemental Declaration of Alexander B. Trevor (Jul. 30, 2002) Original Image of this Document (PDF)
• 2002 WL 33029311 () Declaration of Alexander B. Trevor (Jun. 29, 2002) Original Image of this Document (PDF)
• 1:01cv00557 (Docket) (Aug. 14, 2001)
• 2001 WL 34920911 () (Partial Testimony) (2001) Original Image of this Document (PDF)
• 2001 WL 34920912 () (Partial Testimony) (2001) Original Image of this Document (PDF)
• 2001 WL 34921001 () (Transcript) (2001) Original Image of this Document (PDF)
• 2001 WL 34921002 () (Transcript) (2001) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2003 WL 25283239 (D.Del.)
**(Cite as: Slip Copy)**


• 2001 WL 34921003 () (Transcript) (2001)
Original Image of this Document (PDF)
• 2001 WL 34921004 () (Transcript) (2001)
Original Image of this Document (PDF)
• 2001 WL 34922259 () (Partial Testimony) (2001)
Original Image of this Document (PDF)
• 2001 WL 34922313 () (Transcript) (2001)
Original Image of this Document (PDF)
• 2001 WL 34959999 (Trial Deposition and
Discovery) (2001) Original Image of this Document
(PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

# REDACTED

# EXHIBIT 8

# REDACTED

# EXHIBIT 9

# EXHIBIT 10

# REDACTED

# EXHIBIT 11

# REDACTED

# EXHIBIT 12

# REDACTED

# EXHIBIT 13

# REDACTED

# EXHIBIT 14

# REDACTED

# EXHIBIT 15

# REDACTED

# EXHIBIT 16

# REDACTED

# EXHIBIT 17

# REDACTED

# EXHIBIT 18

# REDACTED

# EXHIBIT 19

# REDACTED

# EXHIBIT 20

# REDACTED

# EXHIBIT 21

# REDACTED

# EXHIBIT 22

# REDACTED