# EXHIBIT 23

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
Briefs and Other Related Documents
Remington Arms Co., Inc. v. Modern Muzzleloading, IncM.D.N.C.,1998.Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.
REMINGTON ARMS COMPANY, INC., Plaintiff,
v.
MODERN MUZZLELOADING, INC., Defendant.
**No. 2:97CV00660.**

Dec. 17, 1998.

Christopher G. Daniel, Womble Carlyle Sandridge & Rice POD 84, Michael E. Ray, Womble Carlyle Sandridge & Rice POD 84, Winston-Salem, for Remington Arms Company, Inc., plaintiffs.
Daniel Alan M. Ruley, Bell, Davis & Pitt, P.A., James R. Fox, Bell, Davis & Pitt, P.A., William Kearns Davis, Bell, Davis & Pitt, P.A., Winston-Salem, Thad G. Long, Bradley, Arant, Rose & White, L.L .P., Birmingham, AL, Donald H. Zarley, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Timothy J. Zarley, Daniel J. Cosgrove, Zarley McKee Thomte Voorhees & Sease, P.L.C., Des Moines, IA, Dennis L. Thomte, Zarley McKee Thomte Voorhees & Sease, P.L.C., Omaha, NE, for Modern Muzzleloading, Inc., defendants.

ORDER
OSTEEN, District J.
*1 For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion To Stay District Court Proceedings Pending Reexamination [89] is denied.

MEMORANDUM OPINION

This matter comes before the court on Defendant's

Motion to Stay District Court Proceedings Pending Reexamination.

For the reasons discussed herein, the court will deny Defendant's Motion to Stay District Court Proceedings Pending Reexamination.

I. FACTUAL AND PROCEDURAL
BACKGROUND

On June 18, 1997, Plaintiff Remington Arms Company, Inc. (Remington), filed this lawsuit against Modern Muzzleloading, Inc. (Modern), alleging willful infringement of Plaintiff's U.S. Patent No. 5,606,817 entitled Muzzle-loading Firearm ('817 patent). (Pl.'s Resp. Mot. Stay at 1.) Modern timely filed an answer and counterclaim denying infringement and alleging invalidity of the patent. (Def.'s Answer and Countercl.)

In the fall of 1997, Defendant submitted its first request for reexamination to the Patent and Trademark Office (PTO) on the grounds that the claims of the '817 patent were obvious. The PTO denied Defendant's request for reexamination. (Pl.'s Resp. Mot. Stay at 1-2.) During the next few months, the parties engaged in extensive discovery which closed on July 30, 1998. *Id.* A trial date has been set for February 16, 1999. A Markman Hearing was scheduled for November 5, 1998, and was postponed pending the outcome of Defendant's Motion to Stay. *Id.* Several dispositive motions are also pending before this court. *Id.*

Although there is evidence in the record indicating that Defendant was aware of the prior art as early as May 5, 1998,[FN1] Defendant chose not to request a second reexamination of Plaintiff's patent until August 13, 1998, after dispositive motions by both parties were briefed and filed, a trial date was set, and two weeks after discovery had closed. On October 15, 1998, the PTO granted Defendant's second request for reexamination of the '817 patent.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 2

Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

*Id.* at 3. Modern has now moved this court to stay this litigation pending the outcome of the reexamination proceeding and Plaintiff has filed a response to Modern's motion to stay.

> FN1. There is also evidence which suggests that Defendant was aware of the prior art which forms the basis for its second request for reexamination as early as March 1998 when the Defendant received notice of a second lawsuit filed by Remington, for patent infringement, which disclosed some of the same prior art at issue in the present action. (Pl.'s Resp. Mot. Stay, Ex. 4 and Ex. 4A.)

## II. DISCUSSION

### A. Motion to Stay District Court Proceedings Pending Reexamination.

It is well settled that the decision to stay district court proceedings pending the outcome of a PTO reexamination proceeding "resides in the [sound] discretion of the district court." *Emhart Indus. Inc. v. Sankyo Seiki Mfg. Co.,* 3 U.S.P.Q.2d 1889, 1890 (N.D.Ill.1987). In determining whether to grant or deny a stay, "courts consider whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, whether a stay will simplify the issues in question and trial of the case, whether discovery is completed and whether a trial date has been set." *See Target Therapeutics Inc. v. SciMed Life Sys. Inc.,* 33 U.S.P.Q.2d 2022, 2023 (N.D.Cal.1995). While this court is cognizant of the advantages of granting the stay, this court finds that the many burdens associated with a stay outweigh the benefits.

### 1. Motion to Stay Would Not Be Judicially Efficient.

*2 The court agrees with Plaintiff that under the circumstances, granting the motion to stay would not be judicially efficient. Discovery has closed, a trial date has been set, and both parties have submitted dispositive motions which are presently pending before the court. (Pl.'s Resp. Mot. Stay at 2.) Finally, the Markman Hearing, originally scheduled for November 5, 1998, has already been postponed pending the outcome of Defendant's Motion to Stay. *Id.* Because a reading of the record suggests to the court that considerable monies have already been expended, staying the proceedings would only result in a waste of time and judicial resources, especially at this late stage of the litigation. *See Ascii Corp. v. STD Entertainment USA, Inc.,* 844 F.Supp. 1378, 1380 (N.D.Cal.1994) (Evidence that "substantial expense and time had been invested in the litigation [ ] would militate against granting the motion.").

In addition, other federal courts have declined to stay district court proceedings where discovery has been completed and a trial date has been set. *See Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516, 519 (E.D.Wash.1991) (denying plaintiff's motion to stay litigation where the parties had conducted extensive discovery and the case was set for trial); *Enprotech Corp. v. Autotech Corp.,* 15 U.S.P.Q.2d 1319, 1320 (N.D.Ill.1990) (finding that "[w]e are too far along the road to justify halting the journey while the defendant explores an alternate route"); *Accent Designs Inc. v. Jan Jewelry Designs Inc.,* 32 U.S.P.Q.2d 1036, 1039-40 (S.D.N.Y.1994) ; *Digital Magnetic Sys., Inc. v. Ansley,* 213 U.S.P.Q. 290 (W.D.Okla.1982) ("Parties should not be permitted to abuse the process by applying for reexamination after protracted, expensive discovery or trial preparation.").[FN2]

> FN2. The court also finds that a stay would be inappropriate because the average duration of a PTO reexamination proceeding is 19 months. (Pl.'s Resp. Mot. Stay, Ex. 2, PTO Data, at 3.)

Although Defendant contends, and the court does not disagree, that stays are to be liberally granted, the cases which have granted stays pending reexamination are easily distinguishable from the present action. Generally, courts grant stays where the case is in the early stages of litigation. *See Target Therapeutics,* 33 U.S.P.Q. at 2023 (Stay of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

proceedings is warranted where the action is in its early stages and the parties have not yet engaged in extensive discovery.); *accord Ascii*, 844 F.Supp. at 1381. Because this court finds the cases granting stays to be inapposite to the present matter, Defendant's reliance on these authorities is misplaced.

### 2. Stay of the Proceedings Would Be Unfairly Prejudicial to Plaintiff.

In ruling on a motion to stay proceedings, a court should consider whether a stay would unduly prejudice the non-moving party. *See United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991); *Wayne,* 782 F.Supp. at 519. In the present case, it is clear that Plaintiff will be prejudiced by staying the proceeding. Discovery has closed and a trial date has been set. In addition, the court is persuaded by Plaintiff's argument that since "a stay for reexamination could last for years ... [a]fter such a passage of time, Remington's prayer for relief to enjoin Modern from further infringement may no longer have value as technology or market conditions change." (Pl.'s Resp. Mot. Stay at 7.)

**\*3** The most compelling reason for denying the stay, however, is Defendant's unjustified delay in requesting a second reexamination with the PTO. Although Defendant maintains that the newly found prior art, which forms the basis for its second reexamination petition, was just recently discovered, this court finds evidence to the contrary. The record indicates that Defendant was aware of the prior art as early as May 5, 1998, if not sooner, when Defendant deposed the inventor of the patent. (Pl.'s Resp. Mot. Stay at 2; Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) [FN3]

> FN3. It is arguable that Defendant had knowledge of this prior art as early as March 1998, when Plaintiff filed a second but related patent infringement lawsuit against Modern. In the second action, Plaintiff attached a copy of the '073 patent to the complaint, which included some of

the prior art (i.e., Rodney patent) that Defendant now alleges Plaintiff should have disclosed to the PTO in its '817 patent application. Thus, Defendant was put on notice that the Rodney patent was relevant prior art in March 1998. (Pl.'s Resp. Mot. Stay at 2, Ex. 4 and Ex. 4A.)

Finally, Defendant has failed to convince the court that it was not fully aware of the existence of this material prior to deposing patent attorney Donald Huntley on July 6, 1997. On July 1, 1998, in the second but related patent action, Defendant filed a motion to amend the answer and counterclaim to add the affirmative defense of inequitable conduct based upon Plaintiff's failure to disclose material prior art, despite the fact that it had not yet deposed Mr. Huntley. (Resp. Def.'s Mot. Leave Am. Answer & Countercl. at 4.) This strongly suggests that Mr. Huntley's testimony was not critical to Defendant's discovering the existence of this undisclosed prior art.

Generally, courts are reluctant to stay proceedings where a party is using the reexamination process merely as a dilatory tactic. *See Freeman v. Minnesota Mining and Mfg. Co.,* 661 F.Supp. 886, 887 (D.Del.1987) (denying a stay where defendant knew of the prior art for eight months yet delayed in filing its request for reexamination). Therefore, Defendant's unjustified delay in filing its reexamination petition weighs in favor of denying the stay.

The PTO may ultimately conclude that in light of the undisclosed prior art, Plaintiff's patent is invalid. Even if this court, however, were to uphold the validity of the patent, it is well settled that "the two forums can quite correctly come to different conclusions regarding validity." *Whistler Corp. v. Dynascan Corp.,* 29 U.S.P.Q.2d 1866, 1872 (N.D.Ill.1993); *Output Tech. Corp. v. Dataproducts Corp.,* 22 U.S.P.Q.2d 1073-1074 (W.D.Wash.1991) ("[T]he Court and PTO have different functions and they are 'concepts not in conflict.' ").

While the court would surely benefit from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

expert opinion of the PTO, [FN4] and while awaiting the outcome of the reexamination process could possibly eliminate the need for trial if the claims are canceled, prejudice to Plaintiff counsels strongly against granting the stay. Therefore, in its discretion, this court will deny Defendant's Motion To Stay pending reexamination.

> FN4. *See Bausch & Lomb Inc. v. Alcon Lab., Inc.,* 914 F.Supp. 951, 953 (W.D.N.Y.1996); *Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516, 518 (E.D.Wash.1991); *United Sweetener USA, Inc. v. Nutrasweet Co.,* 766 F.Supp. 212, 217 (D.Del.1991) (finding that the PTO's expertise in construing the validity of a patent is a factor which weighs heavily in favor of granting a stay pending reexamination).

### III. CONCLUSION

For the reasons stated above, the court will deny Defendant's Motion To Stay District Court Proceedings Pending Reexamination.

An order in accordance with this memorandum opinion shall be filed contemporaneously herewith.

M.D.N.C.,1998.
Remington Arms Co., Inc. v. Modern Muzzleloading, Inc
Not Reported in F.Supp.2d, 1998 WL 1037920 (M.D.N.C.)

Briefs and Other Related Documents (Back to top)

• 2:97cv00660 (Docket) (Jun. 18, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 24

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1994 WL 68498 (N.D.Ill.), 1994-1 Trade Cases P 70,568
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Implant Innovations, Inc. v. Nobelpharma
ABN.D.Ill.,1994.
United States District Court, N.D. Illinois, Eastern
Division.
IMPLANT INNOVATIONS, INC., a Florida
Corporation, Plaintiff,
v.
NOBELPHARMA AB, a Swedish corporation,
Defendant.
**No. 93-C-7489.**

Feb. 25, 1994.

MEMORANDUM OPINION AND ORDER
NORDBERG, District Judge.
*1 This case is the third patent-antitrust case
between these parties filed here in the Northern
District of Illinois. Before the Court is the
Defendant's Motion to Dismiss or Stay the case.

I. BACKGROUND

On July 23, 1991, the Defendant in this case,
Nobelpharma AB ("NAB"), a Swedish corporation,
filed suit against the Plaintiff in this case, Implant
Innovations, Inc. ("3I"), a Florida corporation,
claiming that 3I infringed upon NAB's U.S. Patent
No. 4,330,891, issued to Per I. Branemark and Bo
Thuresson af Ekenstam, assignors to NAB (the "
Branemark Patent" or the " '891 Patent").

In that case, numbered 91-C-4632, Plaintiff herein,
3I, has filed two counterclaims claiming (1) that the
Branemark Patent is invalid and unenforceable, and
(2) that NAB's enforcement of the '891 Patent
violates several antitrust laws, including section 2 of
the Sherman Act, 15 U.S.C. § 2 (1988). The case
is currently before Judge Duff and is scheduled to
go to trial this Spring.

On August 3, 1993, NAB filed another patent action
against 3I; it was numbered 93-C-4666 and was
assigned to this Court. In number 93-C-4666,
NAB alleged three counts of patent infringement,
claiming that 3I infringed upon its U.S. Patent No.
5,000,685 issued to Ixidor Brajnovic and Lars
Jorneus, assignors to NAB (the " '685 Patent"), U.S.
Patent No. 5,069,622, issued to Lars Jorneus, *et al.,*
assignors to NAB (the " '622 Patent"), and U.S.
Patent No. 5,087,200 issued to Ixidor Brajnovic and
Lars Jorneus, assignors to NAB (the " '200 Patent").
Collectively, these patents are referred to as the "
Lars Patents"; the Lars Patents make claims related
to products called abutments or "caps" used in
connection with dental implants and prostheses.
NAB took a voluntary dismissal in that case,
pursuant to Rule 41(a) of the Federal Rules of Civil
Procedure, when 3I's counsel informed NAB that 3I
planned to raise U.S. Patent No. 3,987,499 (the "
'499 Patent") as a prior art anticipating NAB's
patents, particularly the '622 Patent. NAB
informed 3I that it was dismissing the action "
pending reexamination by the Patent Office." (Mot.
to Dismiss or Stay the Compl., Ex. B.) NAB has
subsequently indicated that it will seek
re-examination of only the '622 Patent in the United
States Patent and Trademark Office ("PTO").

On December 14, 1993, 3I sued NAB in the instant
action, numbered 93-C-7489. 3I's two count
complaint alleges, in Count One seeking a
declaratory judgment and equitable relief, that the
three Lars Patents are invalid and unenforceable
and, in Count Two seeking damages, that NAB's
attempts to enforce the Branemark and Lars Patents
violate section 2 of the Sherman Act, 15 U.S.C. § 2
(1988).

Before the Court is NAB's Motion to Dismiss or
Stay the Complaint in this action. In support of
dismissal, NAB argues that there is no present
controversy to support Count One of the Complaint
and that parts of Count Two are duplicative of 3I's
antitrust counterclaim in 91-C-4632, before Judge

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 2

Not Reported in F.Supp., 1994 WL 68498 (N.D.Ill.), 1994-1 Trade Cases P 70,568
(Cite as: Not Reported in F.Supp.)

Duff. Alternatively, NAB seeks a stay of this action pending resolution of 91-C-4632 and pending the Patent Office's re-examination of the Lars Patents. NAB also asserts that the allegations in this Complaint relating to the Branemark Patent should be stricken, due to the fact that the Branemark Patent is the subject of 91-C-4632.

**\*2** For the following reasons, the Motion is denied in part and granted in part.

## II. ANALYSIS

### A. Existence of a Controversy

In Count One of its Complaint, 3I seeks a declaratory judgment of the invalidity of the Lars Patents. In order to take jurisdiction to hear the merits of this claim, the Court must first determine that there exists a "case or controversy." *See* 28 U.S.C. § 2201 (1988). Determining whether there is an actual controversy in a patent action requires a two part inquiry of (1) whether the declaratory plaintiff has acted in a way that the patentee asserts infringes the patent, or is preparing to act in such a way; and (2) whether the patentee has created in the declaratory plaintiff, a reasonable apprehension of suit for infringement. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 936 (Fed.Cir.1993), *petition for cert. filed,* 62 U.S.L.W. 3454 (U.S. Dec. 22, 1993) (No. 93-1014). In making these determinations, the Court is to consider the "totality of the circumstances". *See International Medical Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.,* 787 F.2d 572, 575 (Fed.Cir.1986).

Where, as here, a patentee has explicitly asserted that some activity is an infringement, the first requirement in *Genentech* is satisfied. *See Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d at 936-37. At issue here is whether 3I faces an objectively reasonable apprehension of suit for infringement, in satisfaction of the second requirement in *Genentech.* NAB argues that there can be no such apprehension because it has withdrawn its suit for infringement and has stated that it will not bring suit "unless and until

patentability is confirmed following the submission of a request for re-examination" to the PTO. (Reply at 3.) The Court disagrees.

In the opinion of the Court, NAB is not at liberty to declare a controversy regarding its patents, by filing case No. 93-C-4666, call off the controversy, and still maintain a threat of suit. Here, unlike in *Grain Processing Corp. v. American Maize-Prods. Co.,* 840 F.2d 902, 905-06 (Fed.Cir.1988), which is relied upon by NAB, NAB clearly threatens a future infringement action. In *Grain Processing,* the patentee "steadfastly refused to assert infringement." *Id.* at 906. Additionally, the *Grain Processing* court noted that there was "nothing in the record to suggest that Maize [the alleged infringer] [would] be faced with a similar infringement suit in the future." *Id.* Such is not the case here. 3I is faced with the possibility of a similar suit in the future. The fact that this possible suit is not certain does not alter the Court's conclusion; "reasonable apprehension" does not require certainty. *See United Sweetner USA, Inc. v. Nutrasweet Co.,* 760 F.Supp. 400, 407 (D.Del.1991) (stating that a patentee's promise not to sue pending the outcome of a patent reexamination did not distinguish a declaratory judgment plaintiff's reasonable apprehension); *Procter & Gamble Co. v. Nabisco Brands, Inc.,* 711 F.Supp. 759, 777-79 (D.Del.1989) (distinguishing *Grain Processing*); *see also Level 1 Technologies, Inc. v. C.R. Bard, Inc.,* 839 F.Supp. 90 (D.Mass.1994) (stating that: "Future, theoretical possibilities of infringement are sufficient grounds for jurisdiction.").

**\*3** Similarly, with respect to 3I's antitrust claim, in Count Two, the Court is of the opinion that a case or controversy exists. There, 3I contends that NAB has wrongfully acquired and maintained monopoly power over several relevant markets. NAB has not contended that this count fails to state a claim upon which relief can be granted. In the opinion of the Court, given that NAB is alleged to currently exercise monopoly power in several relevant markets, this suit constitutes a "case or controversy".

Accordingly, with respect to NAB's "case or controversy" argument on both Counts One and Two, the Motion to Dismiss is denied.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00486-GMS    Document 244-6    Filed 04/18/2007    Page 9 of 69Page 4 of 5

Not Reported in F.Supp.
Page 3

Not Reported in F.Supp., 1994 WL 68498 (N.D.Ill.), 1994-1 Trade Cases P 70,568
**(Cite as: Not Reported in F.Supp.)**

### B. The '891 Patent Antitrust Claim

In Count Two, 3I makes several allegations relating to the Branemark Patent. NAB moves to dismiss or strike these allegations, contending that they duplicate allegations made in 3I's counterclaim in No. 91-C-4632. The Court agrees.

In *Colorado River Water Conservation District v. United States,* 424 U.S. 800 (1976), the Supreme Court expressed the view that, although "no precise rule has evolved", there is a "general principle" to avoid duplicative litigation in the federal courts. *Id.* at 817. In the opinion of the Court, this "general principle" applies here. 3I contends that the *Colorado River* should not apply here because the antitrust claims here and in 91-C-4632 are not identical. True, but the claims are virtually identical as they relate to the '891 Patent. To the extent that claims in Count Two relating to the '891 Patent here differ from those in the 91-C-4632 counterclaim, they should have been included in that case, as part of a Rule 13 compulsory counterclaim. In that regard, the allegations relating to the '891 Patent are hereby stricken from Count Two, pursuant to Fed.R.Civ.P. 12(f).[FN1]

### C. Motion to Stay

NAB requests the Court, in an alternative to dismissing this case on jurisdictional grounds, to stay both proceeding relating to both counts in this action pending the PTO's re-examination of the '622 Patent. This request is granted.

This Court has the inherent power to stay its proceedings pending the re-examination of a patent claim. *See Gould v. Control Laser Corp.,* 705 F.2d 1340, 1342 (Fed.Cir.1983) (citing H.R.Rep. No. 1307, 96th Cong., 2d Sess., pt. 1, at 4 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6460, 6463), *cert. denied,* 464 U.S. 935 (1983). By granting a stay, the Court does not terminate this action, but instead shifts to the PTO an issue currently involved in this dispute for the purpose of eliminating the need for a trial on that issue or to facilitate the trial of that issue. *Id.* In this Court's opinion, stays pending re-examination should not be granted when

substantial time and resources have already been invested in federal court litigation. *See, e.g., Wayne Automation Corp. v. R.A. Pearson Co.,* 782 F.Supp. 516 (E.D.Wash.1991) (denying plaintiff's request for a stay pending re-examination after extensive discovery had already taken place and after discovery and trial dates had been set); *Enprotech Corp. v. Autotech Corp.,* No. 88-C-4853, 1990 WL 37217 (N.D.Ill.1990) (denying defendant's request for a stay pending re-examination and stating that the most compelling basis for that decision was that discovery had been completed and the case set for trial). Here, however, little, if any, discovery has been taken, and the parties have not filed any substantive motions. Stays pending reexamination may be granted in these circumstances, particularly where the patentee has not abused the reexamination process. *See GPAC, Inc. v. D.W.W. Enters.,* Inc., 144 F.R.D. 60 (D.N.J.1992) (granting stay, in an opinion by a magistrate judge, where substantial discovery had not then occurred); *see also Brown v. Shimano Am. Corp.,* No. CV-88-6565, 1991 WL 133586 (C.D.Cal. Jan. 29, 1991) (granting stay in complex patent case, despite the delay caused, where movant had not abused the reexamination process). The Court cannot conclude that NAB has abused the reexamination process. A stay is therefore warranted.

**\*4** 3I first contends that a stay puts a "larger and larger cloud" over its head because it keeps accumulating potential damages. It also argues that re-examination exacerbates this problem due to the length of time taken by the PTO. These arguments are not persuasive. 3I operates at its peril based on its own legal interpretations of the Patent laws, whether or not a stay is granted. If, as 3I contends, the '622 Patent is invalid due to prior art, 3I should not be concerned.

3I also notes that NAB seeks re-examination as to only one of the three Lars Patents. The Court notes, however, that 3I has represented that it will not proceed with its infringement allegations until Patentability is confirmed. (Decl. of Alan I. Becker ¶ 3.) Thus, if the Patentability of the '622 Patent is not confirmed, NAB risks being estopped from proceeding with respect to either of the other Lars

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://web2.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=Split&vr=2.0&rlti=...    04/04/2007

Not Reported in F.Supp.                                                    Page 4

Not Reported in F.Supp., 1994 WL 68498 (N.D.Ill.), 1994-1 Trade Cases P 70,568
**(Cite as: Not Reported in F.Supp.)**

Patents, given its representations to this Court.

### III. CONCLUSION

Accordingly, NAB's Motion is denied in part and granted in part. This action will not be dismissed for lack of jurisdiction. However, those allegations in the Complaint relating to the '891 Patent are hereby stricken. Additionally, this action will be stayed, in its entirety, pending the PTO's timely re-examination of the '622 Patent. If that matter is not promptly pursued by NAB, the Court will consider a future motion to lift the stay.

> FN1. Of course, the remainder of that Count remains in the case.
> The Court makes no ruling regarding the admissibility in this case of any evidence relating to the '891 Patent.

N.D.Ill.,1994.
Implant Innovations, Inc. v. Nobelpharma AB
Not Reported in F.Supp., 1994 WL 68498 (N.D.Ill.), 1994-1 Trade Cases P 70,568

Briefs and Other Related Documents (Back to top)

• 1:93CV07489 (Docket) (Dec. 13, 1993)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 25

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1994 WL 121673 (S.D.N.Y.), 32 U.S.P.Q.2d 1036
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Accent Designs, Inc. v. Jan Jewelry Designs,
Inc.S.D.N.Y.,1994.
United States District Court, S.D. New York.
ACCENT DESIGNS, INC. and Jesse Bands, Inc.,
Plaintiffs,
v.
JAN JEWELRY DESIGNS, INC. and Jan
Brzozowski (an individual), Defendants.
**No. 92 Civ. 0482 (RWS).**

April 6, 1994.

Lackenbach    Siegel    Marzullo    Aronson    &
Greenspan, P.C., Scarsdale, NY, for plaintiffs;
Howard N. Aronson and Anita H. Grosz, of counsel.
Ladas & Parry, New York City, for defendants;
Alan K. Roberts and Clifford J. Mass, of counsel.

OPINION
SWEET, District Judge.
*1 The Plaintiffs Accent Designs, Inc. ("Accent")
and Jesse Bands, Inc. ("Jesse") (collectively, the "
Plaintiffs") have moved, pursuant to Local Rule
3(j), for reargument of the January 12, 1994 Order
denying Plaintiff's Motion to Stay these proceeding
pending the outcome of their request for
reexamination proceedings by the U.S. Patent and
Trademark Office (the "PTO").

This motion was considered fully submitted on
February 9, 1994. For the reasons set forth below,
the motion to reargue the Court's Order is denied.

*Parties*

Accent is a corporation duly organized under the
laws of the State of New York, having its principal
place of business in New York, New York.

Jesse is a corporation duly organized under the laws

of the State of New York, having its principal place
of business in New York, New York.

Defendant Jan Jewelry Designs, Inc. ("Jan") is a
corporation duly organized under the laws of the
State of New York, having its principal place of
business in New York, New York.

Jan Brzozowski ("Brzozowski") is a natural person
who is a citizen of the State of New York, residing
and domiciled in New York, New York.

*Prior Proceedings and Facts*

The prior proceedings, the underlying facts, and the
claims at issue have been thoroughly set forth in the
previous opinions of this Court, familiarity with
which are presumed. *See Accent Designs, Inc. v.
Jan Jewelry Designs, Inc.,* 827 F.Supp. 957, 961-62
(S.D.N.Y.1993) *("Accent I"); see also Accent
Designs, Inc. v. Jan Jewelry Designs, Inc.,* 92 Civ.
0482, 1994 WL 23274, 1994 U.S.Dist. LEXIS 539
(S.D.N.Y. Jan. 24, 1994) *("Accent II"*).

*Discussion*

1. *The Legal Standards of Local Rule 3(j)*

The standards controlling a motion for reargument
pursuant to Local Rule 3(j) and a motion to amend
the judgment pursuant to Rule 59(e), Fed.R.Civ.P.,
are the same. *See Morser v. AT & T Info. Sys.,* 715
F.Supp. 516, 517 (S.D.N.Y.1989); *Lotze v. Hoke,*
654 F.Supp. 605, 607 (E.D.N.Y.1987).

Local Rule 3(j) provides in pertinent part:
There shall be served with the notice of motion a
memorandum setting forth concisely the matters or
controlling decisions which counsel believes the
court has overlooked. No oral argument shall be
heard unless the court grants the motion and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 121673 (S.D.N.Y.), 32 U.S.P.Q.2d 1036
**(Cite as: Not Reported in F.Supp.)**

specially directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court.

Thus, to be entitled to reargument under Local Rule 3(j), the Plaintiffs must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion. *See Ameritrust Co. Nat'l Ass'n v. Dew,* 151 F.R.D. 237 (S.D.N.Y.1993); *Fulani v. Brady,* 149 F.R.D. 501, 503 (S.D.N.Y.1993); *East Coast Novelty Co. v. City of New York,* 141 F.R.D. 245, 245 (S.D.N.Y.1992); *B.N.E. Swedbank, S.A. v. Banker,* 791 F.Supp. 1002, 1008 (S.D.N.Y.1992); *Novak v. National Broadcasting Co.,* 760 F.Supp. 47, 48 (S.D.N.Y.1991); *Ashley Meadows Farm Inc. v. American Horse Shows Ass'n,* 624 F.Supp. 856, 857 (S.D.N.Y.1985).

**\*2** Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See Caleb & Co. v. E.I. Du Pont De Nemours & Co.,* 624 F.Supp. 747, 748 (S.D.N.Y.1985). In deciding a Local Rule 3(j) motion, the court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment. *See Morser,* 715 F.Supp. at 517; *Korwek v. Hunt,* 649 F.Supp. 1547, 1548 (S.D.N.Y.1986). As such, a party in its motion for reargument "may not advance new facts, issues or arguments not previously presented to the court." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* No. 86 Civ. 6447, 1989 WL 162315, at \*3, 1989 U.S.Dist. LEXIS 9145, at \*10 (S.D.N.Y. Aug. 4, 1989).

## II. *Plaintiffs' Motion for Reargument is Denied*

On January 12, 1994, this Court denied Plaintiffs' motion for an Order to Stay this proceeding pending the reexamination proceedings by the PTO. The Court's Order stated in full: "Motion for the stay is denied for the reasons set forth in *Starlight Associates.* So Ordered."

Plaintiffs base their request for reargument on the theory that this Court "disregarded the underlying

facts and rationale" of its own Opinion in *Starlight Assocs. v. Berkey-Colortran, Inc.,* 201 U.S.P.Q. (BNA) 307 (S.D.N.Y. Sept. 14, 1978) ("*Starlight Assocs.*"). The Plaintiffs assert that the Court erroneously denied the stay because the *Starlight Assocs.* decision concerned a stay in the context of the PTO's reconsideration of reissue application and not a patent reexamination.[FN1]

The Plaintiffs' interpretation of this Court's opinion in *Starlight Assocs.* is inaccurate. The holding in *Starlight Associates* focused on the Court's "inherent " power to control its calendar, to balance the " competing interests of the litigants and the orderly administration of justice." *Starlight Assocs.,* 201 U.S.P.Q. (BNA) 307 (S.D.N.Y. Sept. 14, 1978) (citing *Landis v. North American Co.,* 299 U.S. 248, 253-54 (1936); *CMAX Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir.1962)).

In denying the stay in *Starlight Assocs.* this Court noted that considerable time and effort had been extended in the discovery stage of the action, which was rapidly reaching its conclusion.[FN2] As such this Court felt that it would not "serve the interest of expediency and efficiency to grant a stay and delay the litigation further." *Starlight Assocs.,* 201 U.S.P.Q. (BNA) 307 (S.D.N.Y. Sept. 14, 1978) (noting that a finding by the Patent and Trademark Office will serve to moot that litigation).

Contrary to Plaintiffs' assertions otherwise, patent claims may survive the PTO's reexamination procedure. As the Federal Circuit has noted, the functions of the courts and the Patent Office are very different and " 'are concepts not in conflict.' " *Output Technology Corp. v. Dataproducts Corp.,* No. 90-1782D, 1991 WL 332547, 1991 U.S.Dist. LEXIS 20168, at \*6, 22 U.S.P.Q.2d (BNA) 1072 (W.D.Wash. Nov. 25, 1991) (quoting *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1428 (Fed.Cir.1985) quoting *In re Etter,* 756 F.2d 852, 857 (Fed.Cir.1985) (en banc)). In fact, the Federal Circuit has held that:
**\*3** The awkwardness presumed to result if the PTO and court reached different conclusions is more apparent than real. The two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 121673 (S.D.N.Y.), 32 U.S.P.Q.2d 1036
**(Cite as: Not Reported in F.Supp.)**

different conclusions. Furthermore, we see nothing untoward about the PTO upholding the validity of a reexamined patent which the district court later finds invalid. This is essentially what occurs when a court finds a patent invalid after the PTO has granted it. Once again, it is important that the district court and the PTO can consider different evidence. Accordingly, different result between the two forums may be entirely reasonable.

*Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1428 (Fed.Cir.1988).

As noted in *Starlight Assocs.,* it is well within this Court's powers to deny a stay of a proceeding. Further, in a case such as this, in which multiple opinions have been issued, discovery is well under way and no prejudice to either party is likely to ensue, there is simply no justification for further delay in the action. Accordingly, under the standards of Local Rule 3(j), the Plaintiffs have put forth no legal basis for a grant of their motion to reargue this Court's Order denying their request to stay these proceedings.

### Conclusion

For the reasons set forth above, Plaintiffs' motion for reargument, pursuant to Local Rule 3(j) is denied.

It is so ordered.

FN1. The Plaintiffs' Memorandum of Law then discusses the differences between patent reissues and patent reexaminations.

FN2. Courts commonly deny stays-in spite of concurrent PTO reexamination proceedings-where substantial proceedings, including discovery, has been completed. *See, e.g., Output Technology Corp. v. Dataproducts Corp.,* 1991 U.S.Dist. LEXIS 20168, 22 U.S.P.Q.2d (BNA) 1072 (W.D.Wash. Nov. 25, 1991) (denying stay after interrogatories and requests for production have been

exchanged); *Enprotech Corp. v. Autotech Corp.,* 15 U.S.P.Q.2d (BNA) 1319 (N.D.Ill. Mar. 15, 1990) (denying stay as discovery was nearly completed and case set for trial).

S.D.N.Y.,1994.

Accent Designs, Inc. v. Jan Jewelry Designs, Inc.
Not Reported in F.Supp., 1994 WL 121673 (S.D.N.Y.), 32 U.S.P.Q.2d 1036

Briefs and Other Related Documents (Back to top)

• 1:92cv00482 (Docket) (Jan. 22, 1992)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 26

LEXSEE 2001 U.S. DIST. LEXIS 13795



Caution
As of: Apr 04, 2007

### AMPHENOL T&M ANTENNAS, INC., Plaintiff, v. CENTURION INTERNATIONAL, INC., Defendant.

### No. 00 C 4298

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

*2001 U.S. Dist. LEXIS 13795*

**September 5, 2001, Decided**

**DISPOSITION:** [*1] Centurion's motion for stay denied and ATM's motion for sanctions denied without prejudice. ATM's motion for judgment regarding inequitable conduct claim granted without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff manufacturer sued defendant competitor for patent infringement. The competitor moved for a stay pending reexamination of the patent and the manufacturer moved for a judgment on the pleadings and sanctions in reference to the competitor's inequitable conduct counterclaim.

**OVERVIEW:** The manufacturer sued the competitor for patent infringement. The competitor moved for a stay of the proceedings pending reexamination of the patent by the patent office. The court denied the motion because the litigation had been underway for a significant period of time. Discovery was well underway, motions had been filed, expert reports were scheduled to be exchanged, a pretrial order was due, and a trial date had been set. A long stay could prejudice the manufacturer. It was unclear whether the reexamination would affect the litigation. The competitor's motion for a judgment on the pleadings based on inequitable conduct was not specific. It had to indicate the time, place, and content of any alleged misrepresentations by the manufacturer to the patent office. As a result, the manufacturer's motion for sanctions on the claim was inappropriate until after discovery had been completed.

**OUTCOME:** The motion for stay was denied. The motion for judgment regarding the inequitable conduct claim was granted. The motion for sanctions was denied.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations*
[HN1] A district court has the inherent power to manage its docket, including the power to stay proceedings pending the reexamination of a patent claim by the Patent and Trademark Office.

*Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations*
[HN2] A motion to stay an action pending resolution of a related matter in the Patent and Trademark Office is

Case 1:05-cv-00486-GMS    Document 244-6    Filed 04/18/2007    Page 17 of 69

Page 2
2001 U.S. Dist. LEXIS 13795, *1

directed to the sound discretion of the court.

*Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Reexaminations*
[HN3] Stays pending re-examination by the Patent and Trademark Office should not be granted when substantial time and resources have already been invested in federal court litigation.

*Civil Procedure > Judgments > Entry of Judgments > Stays of Proceedings > General Overview*
[HN4] The most compelling reason for the denial of a stay is the fact that discovery is almost completed and the case is set for trial.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN5] See Fed. R. Civ. P. 12(h)(2).

*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN6] A Fed. R. Civ. P. 12(c) motion is judged by the standards employed in deciding a motion brought under Fed. R. Civ. P. 12(b). Accordingly, a Rule 12(c) motion should not be granted unless it appears beyond doubt that the nonmovant cannot prove any facts that would support his claim for relief. In reviewing the motion, a court must view the facts of the nonmovant's claim in the light most favorable to the nonmoving party. The court is not permitted to consider materials outside the pleadings in deciding whether to grant a motion under Rule 12(c). Fed. R. Civ. P. 12(c).

*Patent Law > Inequitable Conduct > Burdens of Proof*
[HN7] In order to state a claim of inequitable conduct, a defendant needs to allege that the plaintiff committed affirmative misrepresentations of material fact, submitted false material information, or failed to disclose known material information during the prosecution of a patent with the intent to deceive the Patent and Trademark Office.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
*Patent Law > Inequitable Conduct > General Overview*
[HN8] Allegations of inequitable conduct are governed by the pleading requirements of Fed. R. Civ. P. 9(b), which requires that averments of fraud be pled with particularity.

*Patent Law > Inequitable Conduct > Burdens of Proof*
[HN9] In order to state a claim of inequitable conduct, a defendant must state the time, place, and content of any alleged misrepresentations that plaintiff made to the Patent and Trademark Office, and the requisite intent.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN10] In the case of pleadings, the sanctions issue under Fed. R. Civ. P. 11 normally will be determined at the end of the litigation.

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims > General Overview*
*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN11] Courts should not decide whether to grant sanctions for pleading violations until the party who has authored the pleading has had a full chance to develop its proof.

*Civil Procedure > Sanctions > Baseless Filings > General Overview*
[HN12] Fed. R. Civ. P. 11 is violated only when it is patently clear that a claim has absolutely no chance of success and all doubts should be resolved in favor of the signer.

**COUNSEL:** For AMPHENOL T&M ANTENNAS, INC., plaintiff: Roger Douglas Greer, Steven P. Fallon, Greer, Burns & Crain, Ltd., Chicago, IL.

For CENTURION INTL INC, defendant: Alan S. Dalinka, Richard Allan Janney, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

For CENTURION INTL INC, defendant: Shane M Niebergall, Dennis L Thomte, Zarley, McKee, Thomte, Voorhees & Sease, Omaha, NE.

2001 U.S. Dist. LEXIS 13795, *1

For CENTURION INTL INC, counter-claimant: Richard Allan Janney, Piper, Marbury, Rudnick & Wolfe, Chicago, IL.

For AMPHENOL T&M ANTENNAS, INC., counter-defendant: Roger Douglas Greer, Steven P. Fallon, Greer, Burns & Crain, Ltd., Chicago, IL.

For CENTURION INTL INC, counter-claimant: Shane M Niebergall, Dennis L Thomte, Zarley, McKee, Thomte, Voorhees & Sease, Omaha, NE.

JUDGES: Joan B. Gottschall, United States District Judge.

OPINION BY: Joan B. Gottschall

OPINION:

ORDER

Amphenol T&M Antennas, Inc. ("ATM") has filed suit against Centurion International, Inc. ("Centurion"), alleging infringement of its patent, U.S. Patent [*2] No. 6,034,639 ( '639 patent) entitled "Retractable Antenna for Portable Communicator." (Pl. Compl. P 2.) Specifically, ATM alleges that an antenna manufactured by Centurion for a Motorola wireless phone infringes the '639 patent. A number of motions in various stages of briefing are pending before the court. This opinion will address three that are fully briefed: Centurion's motion for a stay pending reexamination of the '639 patent by the Patent and Trademark Office ("PTO"); ATM's motion for judgment on the pleadings regarding Centurion's counterclaim of inequitable conduct; and ATM's motion for sanctions because of the filing of the inequitable conduct counterclaim. For the reasons set forth below, Centurion's motion for a stay and ATM's motion for sanctions are denied. ATM's motion for judgment regarding the inequitable conduct claim is granted without prejudice.

I. Centurion's Motion for a Stay

On July 11, 2001, the Patent and Trademark Office ("PTO") granted Centurion's request for reexamination of the '639 patent, stating that there is a "substantial new question of patentability" regarding the '639 patent. (Order Granting Request for Reexamination by PTO at 2.) Centurion [*3] moves for a stay of proceedings in this court, arguing that the PTO's reexamination of the '639 patent could substantially affect Centurion's exposure to liability and damages in the present lawsuit. n1 ATM vigorously opposes the motion, arguing, among other things, that a stay would be inappropriate given how far the litigation has progressed to this point.

n1 Centurion's motion for a stay was filed on May 31, 2001, two months before the PTO granted Centurion's request for reexamination of the '639 patent.

[HN1] A district court has the inherent power to manage its docket, including the power to stay proceedings pending the reexamination of a patent claim by the PTO. See Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983); see also Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999) [HN2] ("'A motion to stay an action pending resolution of a related matter in the [PTO] is directed to the sound discretion of the court.'") (citations omitted). Although courts [*4] have not agreed on all the factors guiding a decision as to whether to grant a stay, it appears that most courts observe at least one rule: [HN3] "Stays pending re-examination should not be granted when substantial time and resources have already been invested in federal court litigation." Implant Innovations, Inc. v. Nobelpharma AB, 1994 U.S. Dist. LEXIS 2033, *9, 1994 WL 68498, *3 (N.D.Ill. Feb. 25, 1994); Enprotech Corp. v. Autotech Corp., 1990 U.S. Dist. LEXIS 2926, 15 U.S.P.Q.2D (BNA) 1319, 1320 (N.D.Ill. 1990) (stating that [HN4] the "most compelling" reason for the denial of a stay "is the fact that discovery here is almost completed and the case is set for trial."); Xerox, 69 F. Supp. 2d at 406 (denying motion for stay because, among other things, "substantial time and expense have [already] been invested in the litigation by the parties and the Court."); Accent Designs, Inc. v. Jan Jewelry Designs, Inc., 1994 U.S. Dist. LEXIS 4130, *6, 1994 WL 121673, *2 (S.D.N.Y. Apr. 6, 1994) (upholding a prior denial of a stay motion because "considerable time and effort had been extended in the discovery stage of the action, which was rapidly reaching its conclusion.")

The present litigation is more [*5] than 13 months old. Discovery is well underway; Centurion has filed a motion for partial summary judgment of invalidity as to many of ATM's patent claims; and ATM has filed a motion for a preliminary injunction. Expert reports are

scheduled to be exchanged by the end of September, and a pretrial order is due at the beginning of December. A trial date has been set as well.

Centurion makes essentially two arguments in support of a stay. One is that the "amount of discovery [to date] cannot be an issue in deciding whether or not to stay the matter" (Centurion Reply at 5) because re-examination of the '639 patent will have a "dramatic effect on both the liability and damages issues before the court." (*Id.* at 1.) As support for its argument, Centurion cites statistics indicating that overall, "74% of patent[]" claims that the PTO examines are either invalidated or modified. (*Id.* at 2.) Therefore, Centurion argues, the case would have to be relitigated if the court were to move forward without first waiting for the PTO to reexamine the patent claims. Centurion's second argument is that ATM will "suffer no harm" from a grant of a stay. (*Id.* at 3.) Specifically, Centurion [*6] argues that ATM's lawsuit and its preliminary injunction motion rest on a number of unknown variables that would have to go ATM's way in order for it to prevail. Because of the unlikelihood of these events coming to pass, Centurion suggests, ATM would effectively not suffer any harm from being denied the chance to litigate during the pendency of the reexamination.

Centurion's arguments are unpersuasive. Though an exhibit to ATM's response brief indicates that 71% of patents that the PTO examines are modified in some way (U.S. PTO Ex Parte Reexamination Filing Data - March 31, 2001 ("Filing Data"), Exh. B to ATM Resp., at 2), it is unclear whether the PTO's reexamination of the '639 patent would affect litigation in the present suit. On the one hand, the PTO may not modify the '639 patent, in which case the parties would be in the same position at the end of the reexamination process as they are now. On the other hand, some of the '639 patent's claims could be altered in a way favorable to Centurion, but this result might have only a minimal effect on the pending litigation. For example, the court could eventually grant Centurion's motion for partial summary judgment as to invalidity [*7] of precisely the same claims that the PTO altered in Centurion's favor. In that case, the PTO's actions would be immaterial in their impact on this litigation.

What is clear is that there would be a long delay between the time that a stay is granted and the time that the PTO finishes its reexamination proceeding of the '639

patent. According to the PTO, the average pendency of a reexamination is approximately 20 months. (Filing Data at 2.) Such a long delay is important, in part, because ATM has filed a motion for a preliminary injunction. While it is unclear whether ATM will ultimately prevail in this motion, it is certain that if ATM has a good case and a long stay is granted, ATM will suffer great harm as Centurion infringes ATM's patent throughout the stay period and potentially reaps profits rightfully belonging to ATM.

Substantial time and resources have already been invested in the current litigation, and it is unclear whether the reexamination process will have any effect on the present lawsuit. Moreover, ATM could be prejudiced by a long stay. Centurion's motion for a stay is denied.

**II. ATM's Motion for Judgment on Centurion's Counterclaim of Inequitable Conduct [*8]**

In both its Answer and in its First Amended Answer to ATM's complaint, Centurion filed a counterclaim of "inequitable conduct," alleging that ATM misled the PTO in prosecuting its '639 patent because of alleged misrepresentations regarding prior art, specifically U.S. Patent Nos. 5,079,558 ( '558 patent) and 5,389,938 ( '938 patent). ATM filed a *Federal Rule of Civil Procedure 12(c)* motion for judgment on the pleadings regarding this counterclaim, asserting, under Rule 12(h)(2), that Centurion has failed to state a claim upon which relief can be granted. n2 Though ATM filed its Rule 12(c) motion before Centurion filed its First Amended Answer, the court will apply ATM's motion to the First Amended Answer because the inequitable conduct claim which is the subject of the motion is the same in both the Answer and the First Amended Answer.

> n2 [HN5] Rule 12(h)(2) provides that a "defense of failure to state a claim upon which relief can be granted . . . may be made . . . by motion for judgment on the pleadings." *Fed.R.Civ.Pro. 12(h)(2).*

[*9] [HN6]

A Rule 12(c) motion is judged by the standards employed in deciding a motion brought under Rule 12(b). *GATX Leasing Corp. v. Nat'l. Union Fire Ins. Co.,* 64 F.3d 1112, 1114 (7th Cir. 1995). "'Accordingly, [a Rule

12(c)] motion should not be granted unless it appears beyond doubt that [the nonmovant] cannot prove any facts that would support his claim for relief.'" *Id.* (citations omitted). In reviewing the motion, the court must view the facts of the nonmovant's claim "in the light most favorable to the nonmoving party." *Id.* The court is not permitted to consider materials outside the pleadings in deciding whether to grant a motion under Rule 12(c). *Fed.R.Civ.Pro. 12(c).*

[HN7] In order to state a claim of inequitable conduct, a defendant needs to allege that the plaintiff committed "affirmative misrepresentations of material fact," submitted "false material information," or failed to "disclose known material information during the prosecution of a patent . . . with the intent to deceive the PTO." *Life Technologies, Inc. v. Clontech Laboratories, Inc., 224 F.3d 1320, 1324 (Fed. Cir. 2000).* [HN8] Allegations of inequitable conduct are governed by the [*10] pleading requirements of Rule 9(b), which requires that averments of fraud be pled with particularity. *Videojet Systems Int'l., Inc. v. Inkjet, Inc., 1997 U.S. Dist. LEXIS 3378, *10, 1997 WL 124259, *4 (N.D.Ill. Mar. 17, 1997); Energy Absorption Systems v. Roadway Safety Service, Inc., 1993 U.S. Dist. LEXIS 9071, 28 U.S.P.Q.2D (BNA) 1079, 1080 (N.D.Ill. 1993); Sun-Flex Co. v. Softview Computer Products, 750 F. Supp. 962, 18 U.S.P.Q.2D (BNA) 1171, 1172 (N.D.Ill. 1990).* Therefore, [HN9] in order to state a claim of inequitable conduct, a defendant must state the "time, place, and content of any alleged misrepresentations that plaintiff made to the PTO, and the requisite intent." *Videojet, 1997 U.S. Dist. LEXIS 3378, 1997 WL 124259,* at *5.

Labeled as a "Fourth Affirmative Defense," Centurion's counterclaim of inequitable conduct states,

[the *'639* patent] is unenforceable due to inequitable conduct, specifically, *inter alia*, during prosecution of the *'639* patent in the [PTO] [sic] ATM misrepresented the disclosures of at least [the *'558* patent] and [the *'938* patent]. These misrepresentations were material because (a) the references render the *'639* patent invalid under *35 U.S.C. §§ 102* [*11] and *103*; and (b) if properly represented, the Examiner would not have allowed the *'639* patent to issue. The misrepresentations

were intentional and were for the purpose of obtaining issuance of the *'639* patent.

(Centurion's First Am. Ans. at 3-4).

Pointing out that Rule 9(b) governs pleadings of inequitable conduct, ATM argues that the only detailed allegation provided in Centurion's counterclaim is that ATM committed wrongdoing in failing to "properly represent" prior art, specifically the *'558* and *'938* patents. (ATM's Reply at 2) (quoting Centurion's First Am. Ans. at 3-4.) Interpreting this language to mean that Centurion accuses ATM of failing to explain or "stress the relevance" of prior art, ATM argues that such a failure on the part of ATM cannot, as a matter of Federal Circuit law, constitute inequitable conduct. (ATM's Reply at 2.) Contending that ATM has misunderstood its counterclaim, Centurion responds that the language of the counterclaim does not complain of ATM's failure to disclose information. Rather, Centurion argues, the language indicating ATM's failure to "properly represent" prior art actually means that ATM committed "intentional material misrepresentations" [*12] to the PTO regarding the *'558* and *'938* patents. (Centurion's Resp. at 2.)

ATM's Rule 12(c) motion is granted without prejudice. The court cannot decide what Centurion's inequitable conduct claim means because it fails to comply with the requirements of Rule 9(b). Under Rule 9(b), Centurion's counterclaim must indicate the "time, place, and content of any alleged misrepresentations" that ATM made to the PTO. *Videojet, 1997 U.S. Dist. LEXIS 3110, 1997 WL 124259,* at *5. The counterclaim does none of these things with any degree of specificity. Consequently, the court is even unable to determine which of the parties' competing interpretations of the counterclaim is correct. Centurion has twenty days to amend its answer in order to replead its counterclaim of inequitable conduct in conformity with Rule 9(b). If at the end of this time period, Centurion has failed to replead its counterclaim of inequitable conduct, this claim will be dismissed with prejudice.

### III. ATM's Motion for Sanctions

ATM has moved for sanctions under Rule 11(c)(1)(A), asserting that Centurion's counterclaim of inequitable conduct "is not reasonably founded in the law of inequitable conduct or upon any facts known [*13] to Centurion at the time of the pleading." (ATM Rule 11(c)(1)(A) Mtn. for Sanctions Due to Centurion's

Inequitable Conduct Counterclaim at 1.) Centurion vigorously opposes this motion, arguing that ATM misrepresented prior art and violated a "duty of candor" to the PTO. (Def. Resp. at 4.) In reply, ATM disputes Centurion's factual allegations.

The Advisory Committee Notes to Rule 11 state that [HN10] "in the case of pleadings, the sanctions issue under Rule 11 normally will be determined at the end of the litigation. . .." Advisory Committee Notes to Rule 11. In *Kaplan v. Zenner, 956 F.2d 149, 152 (7th Cir. 1992)*, the Seventh Circuit explained that "'the situation contemplated by the committee notes is one in which the basis for factual allegations in pleadings cannot be determined until such time as the party claiming those facts has had an adequate opportunity to develop his proof.'" (citations omitted).

ATM's motion for sanctions is denied without prejudice. As explained above, Centurion's counterclaim of inequitable conduct must be repleaded to conform with the strictures of Rule 9(b) if the claim is to remain a part of Centurion's answer. If Centurion chooses not to [*14] include a modified version of the counterclaim in its answer, one of ATM's prayers for relief (the striking of the counterclaim) will effectively have been satisfied. It is unclear whether ATM would subsequently renew its motion for sanctions. If Centurion chooses to replead its counterclaim properly, the counterclaim would remain a part of the suit, and discovery would proceed with regard to the counterclaim. Once discovery were completed, and if there were evidence indicating that Centurion committed wrongdoing in pleading the claim, ATM could move again for sanctions.

In light of the fact that discovery has not ended, that point is not now. ATM's motion for sanctions attacks the factual basis for Centurion's counterclaim. Centurion claims that it has not had a full opportunity to develop the basis of this counterclaim. (ATM Interrogatory No. 9, Exh. E to Pl. Mtn. for Sanctions, at 6.) *Kaplan* and the Advisory Committee's notes to Rule 11 suggest that [HN11] courts should not decide whether to grant sanctions for pleading violations until the party who has authored the pleading has had a full chance to develop its proof. In light of *Kaplan* and the Advisory Committee's notes, the [*15] court will not decide a motion for sanctions regarding Centurion's counterclaim until all the evidence is in. *See also* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1335, at 88 ("Many courts agree . . . that [HN12] Rule 11 is violated 'only when it is patently clear that a claim has absolutely no chance of success' and that all doubts should be resolved in favor of the signer.") (citations omitted). ATM's motion for sanctions is denied.

### Conclusion

For the foregoing reasons, Centurion's motion for a stay is denied, and ATM's motion for sanctions is denied without prejudice. ATM's motion for judgment regarding the inequitable conduct claim is granted without prejudice.

ENTER:

Joan B. Gottschall

United States District Judge

DATE: September 5, 2001

# EXHIBIT 27

LEXSEE 1996 U.S. DIST. LEXIS 14440


**SAN GIACOMO N.A., LTD., (a Delaware Corporation), Plaintiff, v. PILLIOD
FURNITURE, INC., (a North Carolina Corporation), Defendant.**

**2:95CV00739**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA, GREENSBORO DIVISION**

*1996 U.S. Dist. LEXIS 14440*

**August 13, 1996, Decided
August 13, 1996, FILED, ENTERED ON DOCKET**

**DISPOSITION:** [*1] San Giacomo's Motion to Stay
Proceedings DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Before the court was a
motion by plaintiff, a Delaware corporation, to stay
proceedings pending a reexamination of the validity of its
patent by the United States Patent and Trademark Office
(PTO). The Delaware corporation sought relief from
defendant, a furniture company incorporated in North
Carolina, for trade dress infringement, deceptive trade
practices, and unfair competition.

**OVERVIEW:** The Delaware corporation had filed a
patent-in-suit in the PTO for a box headboard design
developed by a designer. When the Delaware corporation
discovered that the furniture company was marketing a
line that included an alleged imitation of the headboard,
the complaint was filed. The Delaware corporation filed
documents with the PTO under *35 U.S.C.S. §§ 301*-307
to have the validity of the patent reexamined in light of
the prior art references submitted by the furniture
company. The test for deciding whether to grant a stay
was whether doing so would cause undue prejudice or
present a clear tactical disadvantage to the other party.
The court found that, in the present case, a stay was not
warranted because discovery would close in
approximately one month and because a trial date had
been set two months before the Delaware corporation had
filed its motion. The court had already examined the prior
art submitted by the furniture company and had compared

it to the Delaware corporation's design without the
technical expertise of the PTO. Also, the court found that
the furniture company would be unfairly prejudiced by
the potential accumulation of damages during the
reexamination period.

**OUTCOME:** The court denied the motion to stay
proceedings.

**LexisNexis(R) Headnotes**

*Patent Law > U.S. Patent & Trademark Office
Proceedings > Reexaminations*
[HN1] Any person may file a request for reexamination
by the Patent and Trademark Office (PTO) of any claim
of a patent based on prior art, *35 U.S.C.S. § 302*. The
primary purpose of the reexamination procedure is to
eliminate trial of that issue (when the patent is canceled)
or to facilitate trial of that issue by providing the district
court with the expert view of the PTO (when a claim
survives the reexamination proceeding). Such power
already resides with the court to prevent costly pretrial
maneuvering which attempts to circumvent the
reexamination procedure.

*Patent Law > U.S. Patent & Trademark Office
Proceedings > General Overview*
[HN2] In determining whether to grant a stay, courts
generally consider whether doing so would cause undue
prejudice or present a clear tactical disadvantage to the

1996 U.S. Dist. LEXIS 14440, *1

other party. Courts also consider the current stage of the litigation -- whether substantial discovery has been completed or whether the case has been set for trial. In addition, because the patent reexamination procedure was intended to provide federal courts with the expertise of the Patent and Trademark Office, courts have emphasized the benefit of this expertise where issues relevant to the prior art are involved. However, where these issues are not highly technical, the Patent and Trademark Office's expertise is less beneficial to the court.

COUNSEL: For SAN GIACOMO, N.A., LTD., (a Delaware Corporation), plaintiff: CHARLES ROBERT RHODES, RHODES, COATS & BENNETT, L.L.P., GREENSBORO, NC. JAMES LEE LESTER, RHODES, COATS & BENNETT, L.L.P., GREENSBORO, NC.

For PILLIOD FURNITURE, INC., (a North Carolina corporation), defendant: JOHN DAVID MAYBERRY, PETREE STOCKTON, WINSTON-SALEM, NC. JULIA CARDWELL ARCHER, PETREE STOCKTON, WINSTON-SALEM, NC.

For SID LENGER, objector: JOHN DAVID MAYBERRY, (See above). JULIA CARDWELL ARCHER, (See above).

For PILLIOD FURNITURE, INC., counter-claimant: JOHN DAVID MAYBERRY, PETREE STOCKTON, WINSTON-SALEM, NC. JULIA CARDWELL ARCHER, PETREE STOCKTON, WINSTON-SALEM, NC.

For SAN GIACOMO, N.A., LTD., counter-defendant: CHARLES ROBERT RHODES, RHODES, COATS & BENNETT, L.L.P., GREENSBORO, NC. JAMES LEE LESTER, RHODES, COATS & BENNETT, L.L.P., GREENSBORO, NC.

JUDGES: N. Carlton Tilley, Jr., United States District Judge

OPINION BY: N. Carlton Tilley, Jr.

OPINION:

### MEMORANDUM OPINION AND ORDER

TILLEY, District Judge.

Plaintiff has filed a Motion to Stay Proceedings pending a reexamination of the validity of its patent by the Patent and Trademark Office. [*2] For the reasons set forth below, IT IS ORDERED THAT Plaintiff's Motion to Stay Proceedings [35-1] is DENIED.

I.

On October 11, 1994, San Giacomo N.A., Ltd. ("San Giacomo") filed a patent-in-suit in the United States Patent and Trademark Office ("PTO") for a box headboard design developed by Carlo Bargagli-Stoffi, the C.E.O. of San Giacomo. San Giacomo first introduced this design at the October, 1993 International Home Furnishings Market in High Point, North Carolina, and is currently marketing the headboards under the name "Safari." In April of 1995, San Giacomo discovered that Pilliod Furniture, Inc. was marketing a "Rockspring" furniture line, which included a box headboard San Giacomo believed to be an imitation of its Safari headboard. On October 18, 1995, San Giacomo filed a Complaint against Pilliod seeking relief for trade dress infringement, deceptive trade practices and unfair competition.

On January 23, 1996, the PTO issued Design Patent No. *366,378* ("the '378 Patent") for the San Giacomo box headboard design. Three days later, on January 26, 1996, San Giacomo filed a Motion to Amend Complaint to add a claim for patent infringement and a Motion for Preliminary Injunction [*3] to enjoin Pilliod from marketing the Rockspring headboard San Giacomo believed infringed its rights under the '378 Patent. San Giacomo's Motion for Leave to Amend Complaint was granted. However, its Motion for Preliminary Injunction was denied, in large part because Pilliod, in response to San Giacomo's Motion for Preliminary Injunction, submitted prior art not presented to the patent examiner which indicated the Safari design was obvious and consequently unpatentable.

San Giacomo has filed documents with the PTO under the procedures set forth in *35 U.S.C. §§ 301*-307 to have the validity of the '378 Patent reexamined in light of the prior art references submitted by Pilliod. In its Motion to Stay Proceedings, San Giacomo seeks a stay in this case until the PTO can reexamine the validity of the '378 Patent.

II.

[HN1] Any person may file a request for reexamination by the PTO of any claim of a patent based on prior art. See *35 U.S.C. § 302.* The primary purpose of the reexamination procedure is to "eliminate trial of that issue (when the [patent] is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the [USPTO] (when a claim survives [*4] the reexamination proceeding)." *Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983),* cert. denied, *464 U.S. 935, 78 L. Ed. 2d 310, 104 S. Ct. 343 (1983).* Early drafts of the reexamination statute expressly provided for stays of court proceedings during the reexamination procedure. *Id. at 1342.* However, an express provision was deemed unnecessary by the House Committee because "such power already resides with the Court to prevent costly pretrial maneuvering which attempts to circumvent the reexamination procedure." Id. (quoting H.R. Rep. No. 1307 Part I, 96th Cong., 2d Sess. 4 (1980), U.S. Code Cong. & Admin. News 1980, pp. 6460, 6463).

[HN2] In determining whether to grant a stay, courts generally consider whether doing so would "cause undue prejudice or present a clear tactical disadvantage to the other party." *GPAC, Inc. v. D.W.W. Enterprises, Inc., 144 F.R.D. 60, 63 (D.N.J. 1992).* Courts also consider the current stage of the litigation -- whether substantial discovery has been completed or whether the case has been set for trial. *Id. at 64.* In addition, because the patent reexamination procedure was intended to provide federal courts with the expertise [*5] of the PTO, courts have emphasized the benefit of this expertise where issues relevant to the prior art are involved. *Id. at 63.* However, where these issues are not highly technical, the PTO's expertise is less beneficial to the court. *Freeman v. Minnesota Min. and Mfg. Co., 661 F. Supp. 886, 888 (D. Del. 1987).*

Cases in which stays have been granted have generally not developed far in the litigation process. In GPAC, the court granted the defendant's motion to stay, focusing on the fact that the parties had not engaged in substantial discovery, a final pre-trial order would not be submitted for some time, and the plaintiff had not demonstrated that it had invested substantial time and expense in preparation for trial. *GPAC, 144 F.R.D. at 64-65.* In *ASCII Corp. v. STD Entertainment USA, Inc., 844 F.R.D. 1378 (N.D. Cal. 1994),* the court granted the plaintiff's motion to stay primarily because the case had not been set for trial and "the parties [were] in the initial stages of the lawsuit and [had] undertaken little or no discovery." *Id. at 1381.* On the other hand, cases in which stays have been denied have generally progressed further in the litigation process. [*6] In *Enprotech Corp. v. Autotech Corp., 1990 U.S. Dist. LEXIS 2926, 15 U.S.P.Q.2d 1319 (N.D. Ill. 1990),* the court denied the defendant's motion to stay primarily because discovery was almost complete and the case had been set for trial. Id. at 1320. In addition, the Enprotech Court noted that the reexamination procedure would have only addressed the validity issue and would not have resolved the plaintiff's claims of inequitable conduct. Id.

In this case, a stay is not warranted. Discovery will close in approximately one month. A trial date has been set for over three months -- two months before San Giacomo filed this Motion. This Court has already examined the prior art submitted by Pilliod and compared it to the San Giacomo design without the technical expertise of the PTO. In addition, the reexamination proceedings, whatever the result, will not resolve all of the issues involved in this case. Pilliod has presented several defenses to the validity of the '378 Patent which will not be considered by the PTO during reexamination. n1 Finally, because the reexamination process could delay trial for over a year, n2 Pilliod would be unfairly prejudiced by the potential [*7] accumulation of damages during the reexamination proceeding. For all of these reasons, a stay is not justified in this case.

n1 The reexamination proceeding is limited to a review of patents and prior publications only. See *35 U.S.C. §§ 301, 302.* In addition to its defense of obviousness, Pilliod has asserted the invalidity of the '378 Patent under *35 U.S.C. § 102*(b) based on public use or offers to sell more than one year prior to the patent application. Pilliod has also asserted the unenforceability of the '378 Patent for inequitable conduct in failing to disclose material prior art to the PTO.

n2 San Giacomo did not receive the '378 Patent until 15 months after it applied for the patent on October 11, 1994.

III.

A stay of these proceedings pending reexamination of the validity of the '378 Patent by the PTO would not be

1996 U.S. Dist. LEXIS 14440, *7

an efficient means to resolve the dispute between the Parties. San Giacomo's Motion to Stay Proceedings is DENIED.

    This the 13th day of August, 1996.

N. Carlton Tilley, Jr.  [*8]

United States District Judge

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,                                    )
                                                 )
                    Plaintiff,                   )
                                                 )
          v.                                     )        Civil Action No. 05-160-KAJ
                                                 )
GENENCOR INTERNATIONAL, INC. and                 )
ENZYME DEVELOPMENT CORPORATION,                  )
                                                 )
                    Defendants.                  )

## ORDER

For the reasons set forth in the Post-Trial Findings of Fact and Conclusions of Law issued in this matter today,

IT IS HEREBY ORDERED that Plaintiff's Motion to join Novozymes of North America, Inc. as a party plaintiff in this case is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motion for a Permanent Injunction (D.I. 169) is GRANTED.

IT IS FURTHER ORDERED that the parties shall confer and, within ten days, submit a form of judgment order giving effect to the conclusions set forth in both the accompanying Findings of Fact and Conclusions of Law and the Findings of Fact and Conclusions of Law issued following the liability trial in this case.



UNITED STATES CIRCUIT JUDGE

February 16, 2007
Wilmington, Delaware

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NOVOZYMES A/S,                                          )
                                                       )
                    Plaintiff,                         )
                                                       )
        v.                                             )     Civil Action No. 05-160-KAJ
                                                       )
GENENCOR INTERNATIONAL, INC. and                       )
ENZYME DEVELOPMENT CORPORATION,                        )
                                                       )
                    Defendants.                        )

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Josy W. Ingersoll, Esq., Rolin P. Bissell, Esq., Karen E. Keller, Esq., Andrew A. Lundgren, Esq., Young Conaway Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801; Counsel for Plaintiff.

   Of Counsel: Joseph R. Robinson, Esq., Robert C. Sullivan, Jr., Esq., David Tellekson, Esq., Steven E. Lipman, Esq., Robert Schaffer, Esq., George C. Hykal, Esq., Darby & Darby PC, 805 Third Avenue, New York, New York 10022-7513.

Donald E. Reid, Esq., Jason A. Cincilla, Esq., Morris, Nichols, Arsht & Tunnell, 1201 North Market Street, 18th Floor, Wilmington, Delaware 19899; Counsel for Defendants.

   Of Counsel: Kenneth R. Adamo, Esq., Tharan Gregory Lanier, Esq., Jane L. Froyd, Esq., Jones Day, 2882 Sand Hill Road, Suite 240, Menlo Park, California 94025;

   Thomas E. Friebel, Esq., Jones Day, 222 East 41st Street, New York, New York 10017-6702.

February 16, 2007
Wilmington, Delaware



JORDAN, Circuit Judge[1]

## I.    INTRODUCTION

Novozymes A/S ("Novozymes") has sued Genencor International, Inc.

("Genencor") and Enzyme Development Corporation ("EDC") (collectively

"Defendants"), alleging infringement of U.S. Patent No. 6,867,031 (issued Mar. 15,

2005) (the "'031 patent"). Briefly, the technology at issue relates to alpha-amylase

enzymes that are used in the production of fuel ethanol. Trial of this matter was

bifurcated. The first bench trial focused on patent infringement, invalidity, and

unenforceability. In my post-trial Findings of Fact and Conclusions of Law issued on

August 24, 2006, I concluded that Defendants infringed claims 1, 3, and 5 of the '031

patent, that those claims are valid, and that the '031 patent is enforceable. *Novozymes*

*A/S v. Genencor Int'l, Inc.*, 446 F. Supp. 2d 297, 333-34 (D. Del. 2006). The second

bench trial, focusing on willfulness and damages, was held from October 10 to October

12, 2006. The following, issued pursuant to Federal Rule of Civil Procedure 52(a), are

my findings of fact and conclusions of law as to the issues in that second trial.

For the reasons set forth, I conclude that:

(1) Novozymes's subsidiary, Novozymes of North America, Inc. ("NZNA"), does

not have standing to join this lawsuit as a party plaintiff;[2]

---

[1]Sitting by designation.

[2]On July 25, 2006, almost five months after the end of the bench trial on liability,
Novozymes moved to modify the scheduling order to allow it to join NZNA as a party
plaintiff pursuant to Federal Rules of Civil Procedure 15 and 21. (Docket Item ["D.I."]
144.) After hearing the parties' arguments, I denied Novozymes's motion without
prejudice and allowed additional discovery regarding the relationship between
Novozymes and NZNA. (D.I. 178; D.I. 182 at 23:2-17.) The parties presented evidence
on the issue during the second bench trial in October 2006, and Novozymes renewed
its motion at trial (Trial Transcript, D.I. 213, A15000-A15557 ["Tr."] at A15361:21-25). I

(2) Novozymes is not entitled to lost profits damages;

(3) Defendants must pay reasonable royalty damages;

(4) Genencor willfully infringed the '031 patent;

(5) Novozymes is entitled to double damages and reasonable attorneys' fees;

and

(6) Defendants will be permanently enjoined from infringing the '031 patent.[3]

## II.   FINDINGS OF FACT[4]

A.   *The Parties*

1.     Novozymes is a Danish corporation with a place of business in
Bagsvaerd, Denmark. (Uncontroverted Facts, Docket Item ["D.I."] 101 at ¶ III.A.)
Novozymes is the sole assignee of the '031 patent, titled "Amylase Variants." ('031
patent.)

2.     Genencor is a Delaware corporation having a principal place of business
in Palo Alto, California. (Uncontroverted Facts, D.I. 101 at ¶ III.B.) Genencor sold an
alpha-amylase product under the brand name Spezyme® Ethyl. (*Id.* at ¶ III.V.)

---

incorporate my decision on that motion into these Findings of Fact and Conclusions of
Law. (*See infra* Section III.A.)

[3]Novozymes filed its Motion for a Permanent Injunction (D.I. 169) on September
1, 2006.

[4]Throughout these Findings of Fact and Conclusions of Law, I may have adopted
without attribution language suggested by one side or the other in this dispute. In all
such instances, the finding or conclusion in question has become my own, based upon
my review of the evidence and the law. To the extent that any of my findings of fact
may be considered conclusions of law or vice versa, they are to be considered as such.

  
Spezyme Ethyl infringes claims 1, 3, and 5 of the '031 patent. *Novozymes*, 446 F.
Supp. 2d at 321-22.

     3.     EDC is a Delaware corporation having a principal place of business in
New York, New York. (Uncontroverted Facts, D.I. 101 at ¶ III.C.) EDC was a United
States distributor of Spezyme Ethyl. (*Id.* at ¶ III.W.)

     B.     *The Relationship Between Novozymes and NZNA*

     4.     NZNA is an indirect wholly owned United States subsidiary of Novozymes.
(Uncontroverted Facts, D.I. 213 at A14503, ¶ III.E.) NZNA manufactures and
distributes industrial enzymes. (Olofson,[5] Trial Transcript, D.I. 213, A15000-A15557
["Tr."] at A15162:4-6.)

     5.     NZNA's board of directors has five members: four executives from the
parent company, Novozymes, and one officer from NZNA. (*Id.* at A15163:1-6; Meyer,[6]
Tr. at A15014:12-A15015:18.)

     6.     Day to day operations at NZNA are controlled by NZNA employees, but
strategic decisions, including those regarding marketing and tax strategies, are made by
the parent, Novozymes. (Olofson, Tr. at A15163:7-20.) Novozymes is organized into
industry strategy groups that are responsible for different businesses on a worldwide
basis. (Meyer, Tr. at A15010:7-A15011:2.) The Novozymes industry strategy group for
biofuel starch, for example, is responsible for portfolio planning, product introduction,

---

[5]Richard Olofson is a finance manager at NZNA. (Tr. at A15159:17-25.)

[6]Henrik Meyer is Novozymes's Vice President of Marketing. (Tr. at A15007:4-5.)

licensing, and intellectual property strategy for the biofuel starch business. (*Id.* at
A15012:4-18.)

7.     Novozymes sets the financial policies for its subsidiaries, including NZNA.
(Loft,[7] Tr. at A15055:4-14.)  To comply with certain regulatory requirements,
Novozymes consolidates the financial information from its subsidiaries into an overall
financial report that is available to the public and filed with securities regulators in
Denmark and the United States. (*Id.* at A15055:23-A15056:11, A15060:5-13; Olofson,
Tr. at A15164:19-A15165:6; Trial Exhibit ["TX"] 456A, D.I. 214 at A16550-A16591.)

8.     Novozymes owns the technology developed by itself and its subsidiaries.
(Meyer, Tr. at A15018:7-14.) That technology includes the '031 patent (*supra* Finding
of Fact ["FF"] ¶ 1; Meyer, Tr. at A15017:14-16) and another patent related to alpha-
amylases, U.S. Patent No. 6,297,038 (issued Oct. 2, 2001) (the "'038 patent") (Meyer,
Tr. at A15020:8-23). Novozymes is the sole assignee of both of those patents.

9.     According to agreements made with Novozymes, its subsidiaries have the
right to use Novozymes's technology. (Meyer, Tr. at A15018:1-2, A15018:15-22.)  Of
particular relevance here, on January 1, 1996, the predecessors in interest to
Novozymes and NZNA entered into a Technology Licence Agreement ("TLA") granting
NZNA a "non-exclusive non-transferable right and license, without right to sublicense, to
use the Technology in the process of producing enzymes, including finished products
and concentrates, and to make and use apparatus and machinery of implementing and
maintaining that process." (TX 240, D.I. 214 at A16028, ¶ 1.b.)  That agreement

---

[7]Benny Dalgaard Loft is Novozymes's Vice President of Finance.  (Tr. at
A15051:13-22.)

remains in effect and gives NZNA blanket rights to use Novozymes's technology
(Meyer, Tr. at A15022:19-22, A15023:8-11, A15024:14-18, A15025:23-A15026:7),
including the '031 and '038 patents (id. at A15027:6-13). According to the TLA,
Novozymes also covenants not to sue NZNA "under any patent that may issue in the
United States to [Novozymes] and which claims all or any part of the Technology." (TX
240, D.I. 214 at A16028, ¶ 1.c.)

      10.    In return for the use of Novozymes's technology, NZNA pays royalties at
the rate of 40% of net sales. (Loft, Tr. at A15063;4-23; TX 240, D.I. 214 at A16029-
A16030, ¶ 5.a, A16033 (amendment to ¶ 5.a).) That royalty rate was negotiated by
Novozymes, NZNA, and tax authorities from Denmark and the United States to provide
NZNA with the income level of similar companies in the United States. (Loft, Tr. at
A15074:17-A15075:8, A15076:8-19, A15077:24-A15078:12.)

      11.    Novozymes maintains control over licensing and litigation regarding its
technology. (Meyer, Tr. at A15048:19-25.) NZNA has "no authority" to license the
technology or sue for patent infringement. (Id.)

      12.    Novozymes has a general policy of not licensing what it considers "core
technology" outside of its corporate family. (Id. at A15015:19-A15016:21.) Core
technology relates to business interests in which Novozymes has a strong market
position and, often, a strong patent position. (Id. at A15016:12-21.) Novozymes
considers both the '031 and '038 patents to cover core technology in the area of fuel
ethanol production. (Id. at A15017:2-7, A15017:14-22, A15019:15-18.)

5

13.    Even with that general policy, Novozymes has licensed its core technology "when it really is worth it." (*Id.* at A15045:17-25.) For example, Novozymes has licensed core technology in the context of joint development agreements and in settlement of litigation. (*Id.* at A15046:1-A15048:7.)

C.    *The Competition Between NZNA and Genencor in the U.S. Fuel Ethanol Market*

1.    *The Use of Alpha-Amylases in Fuel Ethanol Production*

14.    The '031 patent relates to alpha-amylase enzymes. ('031 patent, 1:21-22.) Alpha-amylases break down starch molecules and "convert complex starch into smaller, simpler groups of glucose molecules." *Novozymes*, 446 F. Supp. 2d at 303. One commercial application of the enzymes is "the fuel ethanol industry, where ethanol fuel is produced from starch-rich crops such as corn, barley, and wheat." *Id.* at 304. "Alpha-amylases are used in the fuel ethanol industry to liquefy and reduce the viscosity of starch feedstocks so that they are easier to process in the manufacturing plant." *Id.*

15.    Alpha-amylases used in fuel ethanol production are typically subjected to high temperatures, so "the thermostability of the enzyme, its capacity to withstand high temperatures, is important to its effectiveness in industrial applications." *Id.*

16.    "One way to improve the thermostability of alpha-amylases is to add high levels of calcium to the starch slurry." *Id.* But that leads to an additional step in starch processing "that is inconvenient and increases costs." *Id.*

6

17.    The starch mixture can be acidic, so acid tolerance is also important for alpha-amylase effectiveness. (Faller,[8] Tr. at A15088:20-24.)

2.    *NZNA's Introduction of Liquozyme Alpha-Amylases in 1999*

18.    "In the U.S. Ethanol Market, alpha-amylase products are currently essentially supplied almost exclusively by two competitors, NZNA and Genencor." (Uncontroverted Facts, D.I. 213 at A14504, ¶ III.L.)

19.    NZNA manufactures and sells a group of alpha-amylase products under the brand name Liquozyme®. (*Id.* at A14503, ¶ III.E.) "NZNA is presently the only manufacturer and distributor of the Liquozyme Products in the United States." (*Id.* at A14503, ¶ III.F.) NZNA began selling Liquozyme in 1999. (Faller, Tr. at A15093:9-23.)

20.    "None of the Liquozyme Products practice the '031 Patent." (Uncontroverted Facts, D.I. 213 at A14503, ¶ III.H.)

21.    Prior to the introduction of Liquozyme, the market for alpha-amylases in dry mill[9] fuel ethanol production was dominated by Defendants. (Faller, Tr. at A15089:1-6, A15093:19-23.) Genencor sold an alpha-amylase under the brand name Spezyme Fred that was produced from a *Bacillus licheniformis* gene. (*Id.* at A15090:19-23; Crabb,[10] Tr. at A15366:15-20.) Also, wild type *Bacillus*

---

[8]Jeffrey Lyndon Faller is the Industry Sales Manager for the Ethanol Group at NZNA. (Tr. at A15085:16-21.)

[9]In the dry mill process, the entire kernel of corn is ground without being soaked, leaving many other components in the starch mixture that affect the performance of the alpha-amylases. (Faller, Tr. at A15108:24-A15109:3.)

[10]Dr. William Douglas Crabb is Genencor's Vice President of Applications. (Tr. at A15201:24-A15202:6, A15362:22-A15363:24.)

*stearothermophilus* alpha-amylases, G995 and G997, were marketed through EDC. (Faller, Tr. at A15090:23-24, A15091:22-24.)

22.     Compared to those alpha-amylases, Liquozyme was more thermostable, did not require added calcium, and was more acid tolerant. (*Id.* at A15089:14-A15090:12.) No alpha-amylase available from Genencor in 1999 had that combination of properties. (Beto,[11] Tr. at A15180:24-A15181:7, A15181:20-A15182:16; Crabb, Tr. at A15203:3-10.) Liquozyme eventually accounted for more than 80% of the dry mill fuel ethanol market, based at least in part on customer demand for its improved properties. (Faller, Tr. at A15093:24-A15094:21, A15101:12-A15102:1; Beto, Tr. at A15182:17-22.) Using Liquozyme, customers could produce more ethanol without having to expand their production facilities. (Faller, Tr. at A15097:7-A15098:25.)

3.     *Genencor's Introduction of Spezyme Ethyl Alpha-Amylases in 2004*

23.     In early 2002, Genencor acquired Enzyme BioSystems Limited ("EBS"). (Crabb, Tr. at A15371:10-20.) At that time, EBS had developed three alpha-amylases, including one named EBS1 that was the subject of litigation between Novozymes and EBS. (*Id.* at A15371:21-23, A15377:15-23, A15378:5-10; TX 228, D.I. 214 ["Crabb Declaration"] at A16005-06, ¶ 13.) Novozymes alleged that EBS1 alpha-amylase infringed the '038 patent. (Crabb Declaration at A16005-06, ¶ 13.) To settle the litigation, the parties agreed that EBS1 would be pulled from the market. (Meyer, Tr. at A15021:7-24; Crabb, Tr. at A15378:5-10.)

---

[11]Maurice Beto is Genencor's Senior Director of Technical Sales with the Grain Processing Group for the Americas. (Tr. at A15179:13-23.)

8

24.     Another EBS alpha-amylase named EBS2 was developed and, beginning in 2004, was sold by Genencor under the brand name Spezyme Ethyl. (Beto, Tr. at A15185:2-5; Crabb, Tr. at A15384:15-20.)  Spezyme Ethyl had "the same desirable properties" as Liquozyme: improved thermostability without the need for added calcium and improved acid tolerance. (Faller, Tr. at A15102:5-13; Crabb Declaration at A16005-06, ¶ 13.)  Throughout 2004 and early 2005, Genencor sold Spezyme Ethyl at a lower price than Liquozyme (Davis,[12] Tr. at A15295:9-17; TX 492A, D.I. 214 at A16646), and the availability of similar benefits at a lower price led many customers to switch products (Faller, Tr. at A15102:5-13).  Liquozymes's market share fell from more than 80% to approximately 50%. (Id. at A15103:4-10.)

4.     *Genencor's Reaction to the '031 Patent*

25.     On September 21, 2004, the U.S. Patent and Trademark Office issued a notice of allowance of the claims that eventually issued as Novozymes's '031 patent. *Novozymes*, 446 F. Supp. 2d at 312.  "On September 29, 2004, Novozymes sent a letter to Genencor providing a copy of the allowed claims . . . ." (Uncontroverted Facts, D.I. 213 at A14502, ¶ III.A.)  That letter expressed Novozymes's belief that the allowed claims covered Spezyme Ethyl.  (TX 320, D.I. 214 at A16074.)  The '031 patent issued on March 15, 2005 ('031 patent), and Novozymes sued Defendants for patent infringement on that same day (D.I. 1).

---

[12]Julie L. Davis presented expert testimony on damages for Novozymes.  (Tr. at A15228:1-A15229:18; TX 247, D.I. 214 at A16042-55.)

9

26.    Genencor continued to sell Spezyme Ethyl until at least September 2006. (TX 277A, D.I. 214 at A16062; see also Beto, Tr. at A15421:12-20 (agreeing that product had been shipped after Aug. 24, 2006).)

27.    Genencor takes the position that, when it received notice of Novozymes's allowed claims, it believed in good faith that those claims were invalid for obviousness in light of a 1989 publication authored by Suzuki et al. (the "Suzuki reference"). (D.I. 209 at 30-32.)

28.    Specifically, claims 1, 3, and 5 of the '031 patent cover engineered *Bacillus stearothermophilus* alpha-amylases that have a particular deletion of two amino acids. *Novozymes*, 446 F. Supp. 2d at 305-06. The parties do not to dispute that Spezyme Ethyl has that deletion. See id. at 313, 321-22 (noting that "the parties agree on the amino acid sequence of Spezyme Ethyl" and concluding that that sequence has the deletion). That same deletion in alpha-amylases from another organism, *Bacillus amyloliquefaciens*, was disclosed in the Suzuki reference. Id. at 308. According to Dr. Crabb, Genencor believed that Novozymes's claims were obvious in light of the Suzuki reference because "from a scientific standpoint, anyone that has read that paper would choose to make those deletions if they wanted to try and improve the thermostability of [*Bacillus*] *stearothermohilus* [alpha-amylase]." (Crabb, Liability Phase Trial Transcript, D.I. 213 at A5041:4-7.) Dr. Crabb further testified that, at the time Genencor decided to commercialize EBS2 (as Spezyme Ethyl), "Genencor believed that the specific deletion of EBS2 had been taught by Suzuki et al. in a 1989 publication." (Crabb Declaration at A16005-06, ¶ 13.)

10

29.    Genencor asserts that its belief was supported by an opinion of counsel

regarding the '038 patent.  (D.I. 209 at 31.)  The '038 patent issued from Application

No. 09/354,191 ('038 patent, cover page), a parent of Application No. 10/025,648 that

issued as the '031 patent ('031 patent, cover page).  According to that opinion,

Spezyme Ethyl "did not infringe any claim of the '038 patent."  (Crabb Declaration at

A16005, ¶ 13; see also Crabb, Tr. at A15218:19-25, A15385:21-25.)  Furthermore:

> Genencor was aware that [during the prosecution of the '038 patent]
> Novozymes had attempted to claim B. stearothermophilus α-amylases
> with a deletion corresponding to the deletion in EBS2, but the U.S. Patent
> Office had rejected those claims as obvious over Suzuki et al.  Therefore,
> Genencor concluded that Novozymes would not be able to obtain claims
> that encompass B. stearothermophilus α-amylases with the EBS2
> deletion.

(Crabb Declaration at A16006, ¶ 13; see also Crabb, Tr. at A15212:4-13, A15386:1-23.)

30.    Finally, Genencor asserts (D.I. 209 at 32 & n.23; D.I. 210 at 17) that its

belief in the obviousness of Novozymes's claims was supported by later developments

in this case, specifically the discovery of another publication, by Machius et al.,[13] and

my denial, on October 24, 2005, of Novozymes's motion for a preliminary injunction

because of substantial questions as to invalidity (D.I. 68 at 4-6).  (Crabb, Tr. at

A15392:19-A15393:7.)

31.    In stark contrast to its arguments about obviousness, however, Genencor

filed on April 8, 2005 a telling patent application in the U.S. Patent and Trademark

---

[13]The Machius reference, which was discussed at length in the liability phase of
trial, disclosed the location of the Suzuki deletion in the three-dimensional structure of a
particular alpha-amylase.  Novozymes, 446 F. Supp. 2d at 312-13.  Defendants
asserted that the '031 patent claims were obvious in light of that reference as well as
the Suzuki reference.  Id. at 323-24, 328-29.

Office. (Publication No. US 2006/0014265, published Jan. 19, 2006 and titled "Mutant Alpha-Amylases", TX 202, D.I. 213 at A8532.1-A8532.46.) That application claimed a *Bacillus stearothermophilus* alpha-amylase containing the deletion disclosed by the Suzuki reference (*id.* at A8532.44, claim 1) and cited the Suzuki reference (*id.* at A8532.14-A8532.15, ¶ 0013).

       5.   *Sales of Spezyme Ethyl Between March 2005 and September 2006*

    32.   Novozymes's damages expert, Ms. Davis, testified that if a 25% royalty were paid on Spezyme Ethyl sales in the U.S. fuel ethanol market and an 8% royalty on other Spezyme Ethyl sales, then the royalties would total $5,040,621 and $56,087 respectively. (Davis, Tr. at A15346:4-15.) To calculate those royalties, Ms. Davis took sales figures for the period between March 15, 2005, when the '031 patent issued, and September 30, 2006, based on Genencor records (TX 483, D.I. 214 at A16610-27), made one adjustment to those sales, and then applied the two royalty rates. (Davis, Tr. at A15347:16-A15348:20.)

    33.   The adjustment was for the sales by Genencor to its distributor EDC that were made at a discount from the price paid by the end customer. (*Id.* at A15348:1-12.) Ms. Davis took out that discount so that the royalty base reflected the sales price paid by Genencor's and EDC's customers rather than the price paid by EDC to Genencor. (*Id.*)

    34.   Working back from Ms. Davis's final royalty figures and her royalty rates, Spezyme Ethyl sales for the period between March 2005 and September 2006 were $20,162,484 for the U.S. fuel ethanol market and $701,088 for other Spezyme Ethyl sales.

6.    *The Fuel Ethanol Market After August 2006*

35.    On August 24, 2006, I issued Findings of Fact and Conclusions of Law in which I concluded that Defendants infringed claims 1, 3, and 5 of the '031 patent, that those claims are valid, and that the '031 patent is enforceable. *Novozymes*, 446 F. Supp. 2d at 333-34.

36.    Genencor stopped manufacturing Spezyme Ethyl on August 24, 2006. (Beto, Tr. at A15420:20-24.) However, some sales continued into September. (FF ¶ 26.)

37.    Of the 29 Spezyme Ethyl customers that Genencor had in August 2006, 22 of them either switched or agreed to switch to other Genencor products, including Spezyme Fred and another Genencor product introduced in June 2006 named Spezyme Xtra. (Beto, Tr. at A15423:4-A15424:21, A15194:12-15.) Of the seven remaining customers, three switched to Liquozyme and four were testing products from sources other than Genencor. (*Id.* at A15424:22-A15425:8.) While nine of the Spezyme Ethyl customers have switched to Spezyme Xtra (*id.* at A15423:11-13), that product must be used at a higher dose than Spezyme Ethyl to get equivalent results (Crabb, Tr. at A15203:20-A15204:2).

D.    *Licensing Activity*

38.    In 1995, Genencor licensed a group of patents to Novozymes's predecessor in interest, Novo Nordisk A/S. Those patents related to the expression of polypeptides in filamentous fungi. (TX 339, D.I. 214 at A16120-33; Davis, Tr. at A15279:3-9.) The license was the result of a negotiated settlement of litigation. (Davis, Tr. at A15280:5-12.) For polypeptides used for "therapeutical purposes," the royalty

13

rate was between 5% and 8% "depending on the normal royalty rate typically paid for comparable products in comparable markets." (TX 339, D.I. 214 at A16121, ¶ 1.6, A16125, ¶ 3.1; Davis, Tr. at A15280:15-A15281:1.)

39.     During the dispute over EBS1 alpha-amylase (see FF ¶ 23), Novozymes refused to license the '038 patent to Genencor "because this was core technology." (Meyer, Tr. at A15021:7-20.)

40.     According to Defendants' damages expert, Dr. Teece,[14] other licenses produced in this case had royalty rates between 0% and 4%. (Teece, Tr. at A15485:25-A15486:8.) Ms. Davis testified that "nearly all" of the licenses produced were cross-licenses or part of settlement agreements. (Davis, Tr. at A15278:20-A15279:2.)

41.     To support his opinion on a reasonable royalty, Dr. Teece also relied on deposition testimony of a Novozymes employee stating that the highest royalty rate for a Novozymes license with a party outside the Novozymes group of companies was 8%. (Teece, Tr. at A15486:9-16.)

42.     Finally, Dr. Teece relied on studies of royalty rates in various industries. First, a study by Lemley and Shapiro reported an average royalty of 9.6% for the biotechnology industry and 11.98% for the chemical industry. (Id. at A15486:17-A15487:6.) In that study, some royalties in pharmaceuticals and biotechnology ranged as high as 50%. (Id. at A15515:14-19, A15516:21-A15517:5.) Second, data from the Licensing Economic Review reported royalty averages of 4.7% for the chemical

---

[14]Dr. David John Teece presented expert testimony on damages for Defendants. (Tr. at A15432:4-A15433:3; TX 694, D.I. 214 at A16674-99.)

industry, 4.0% for the food industry, 7.3% for pharmaceuticals and biotechnology, and 5.0% for energy and environment. (*Id.* at A15489:5-22, A15490:8-13.) Third, a search by Dr. Teece and his staff of a licensing database showed royalties of 1% to 8% for catalyst-related technology in the chemical industry. (*Id.* at A15490:15-25; TX 771, D.I. 214 at A16870.)

III.    **CONCLUSIONS OF LAW**

1.    Jurisdiction over the subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338.

A.    *NZNA Does Not Have Standing to Join This Lawsuit*

2.    Novozymes has renewed its motion to join NZNA as a co-plaintiff. (*See supra* note 2.) Because NZNA does not have standing to sue for infringement of the '031 patent, I will deny Novozymes's motion.

3.    According to statute, "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). That limitation means that, "[g]enerally, one seeking money damages for patent infringement must have held legal title to the patent at the time of the infringement." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40-41 (1923)).

4.    "Under certain circumstances, [however,] a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the

15

patentee." *Id.* at 1552. That "does not mean that every licensee under a patent has a rightful place in an infringement suit." *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1031 (Fed. Cir. 1995). To join as a co-plaintiff, a licensee must usually have an exclusive license, meaning that the licensee has "received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well." *Rite-Hite,* 56 F.3d at 1552. A nonexclusive license, on the other hand, "may amount to no more than a covenant by the patentee not to sue the licensee . . . [with] the patentee reserving the right to grant others the same right." *Ortho,* 52 F.3d at 1031. "A holder of such a nonexclusive license suffers no legal injury from infringement and, thus, has no standing to bring suit or even join in a suit with the patentee." *Id.*

5.    "Determining whether a licensee is an exclusive licensee . . . is a question of ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant." *Textile Prods., Inc. v. Mead Corp.,* 134 F.3d 1481, 1484 (Fed. Cir. 1998). The surrounding circumstances may be relevant to that determination. For example, in *Kalman v. Berlyn Corp.,* 914 F.2d 1473 (Fed. Cir. 1990), the United States Court of Appeals for the Federal Circuit determined that a close corporation had standing to sue for patent infringement, where the patentee was one of the two shareholders and directors of the corporation and the corporation was the sole licensee of the patent. *Id.* at 1475-76, 1482. In that case, "when the nexus between the sole licensee and the patentee is so clearly defined . . . the sole licensee must be recognized as the real party in interest." *Id.* at 1482.

16

6.    In another case, the United States District Court for the District of New Hampshire concluded that the wholly owned subsidiary of the patentee had standing to sue. *Ricoh Co. v. Nashua Corp.*, 947 F. Supp. 21, 24 (D.N.H. 1996). There, "[a]lthough plaintiffs presented no direct evidence of the strictly exclusive nature of the license, all of the evidence presented at trial, taken together, strongly supports the inference that [the subsidiary] held an exclusive right to manufacture [the patented device], including the right to exclude others from doing so." *Id.* That conclusion was supported by the relationship between the corporations and the fact that the subsidiary was the sole licensee in the United States. *Id.*

7.    Novozymes argues that the circumstances here demonstrate that NZNA had an exclusive license to the '031, including the right to exclude others that is necessary to confer standing. (D.I. 207 at 26-30; D.I. 212 at 3-5.) First, NZNA is a wholly owned subsidiary of Novozymes. (FF ¶ 4.) Second, Novozymes sets the strategy for NZNA through the industry strategy groups and its control of NZNA's board of directors. (FF ¶ 6.) Third, Novozymes consolidates NZNA financial information into its financial reports. (FF ¶ 7.) Fourth, NZNA is the sole licensee of the '031 patent in the United States. (FF ¶ 8.) And fifth, Novozymes has a corporate policy of not licensing core technology outside of its family of companies. (FF ¶ 12.) According to Novozymes, those circumstances demonstrate that NZNA's license to use the '031 patent was effectively exclusive. (D.I. 209 at 28.)

8.    The written agreement between Novozymes and NZNA, however, expressly grants a "non-exclusive" license of Novozymes's patents, including the '031 patent, to NZNA. (FF ¶ 9.) According to the agreement, Novozymes also covenanted

17

not to sue NZNA for patent infringement. (*Id.*) Those terms indicate that the parties intended NZNA to have nonexclusive rights, with no right to exclude others under the patents. The written agreement is consistent with Novozymes's apparent intent to maintain complete control over licensing and litigation decisions regarding its patents. (FF ¶ 11.) Indeed, when "it really is worth it," Novozymes has licensed core technology to other entities in the United States. (FF ¶ 13.)

        9.      I conclude that Novozymes and NZNA intended for the license of Novozymes's technology to be nonexclusive. Although NZNA is a wholly owned subsidiary of Novozymes, the TLA is structured to approximate an arms length negotiation, with NZNA getting a license to Novozymes's technology in exchange for a royalty. The corporations established that relationship for their own purposes. (FF ¶¶ 9-10.) Importantly, Novozymes retained the right to license its technology to others, and it has done so. (FF ¶¶ 11, 13.) Thus, unlike the corporation in *Kalman*, the facts here do not show that the licensee, NZNA, is the "real party in interest," with a right to exclude under the '031 patent. Indeed, the terms of the TLA are expressly to the contrary. The presence of a written nonexclusive license here also distinguishes this case from *Ricoh*, where all the evidence supported the presence of an exclusive license. Here, the clearest indication of Novozymes's and NZNA's intent is their written agreement providing for a nonexclusive license.[15]

---

    [15]Novozymes also relies on *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1360-61 (Fed. Cir. 1999), as an example of a case where a corporation properly recovered the lost profits of its subsidiary. In that case, however, the defendant "stipulated in a pretrial order that [the parent corporation] does manufacture [the product]." *Id.* at 1361. The Federal Circuit held that the district court did not abuse its discretion in denying the defendant's motion, made late in the case, to

10.     I conclude that NZNA is a nonexclusive licensee of the '031 patent. As such, NZNA has no right to exclude others from practicing the '031 patent, and thus has no standing to sue Defendants for infringing that patent. I will therefore deny Novozymes's motion to add NZNA as a co-plaintiff.

B.     *Novozymes May Not Recover NZNA's Lost Profits*

11.     Novozymes argues that even if NZNA is not a party in this case, Novozymes is still entitled to recover damages for the profits that NZNA allegedly lost because of Defendants' infringement. (D.I. 207 at 24-26; D.I. 212 at 2-3.) According to Novozymes, "[m]ultinational corporate patentees . . . are not required to arrange their internal structures specifically to be eligible for full compensation [for patent infringement]." (D.I. 207 at 24.) Thus, the argument goes, this court should treat Novozymes and NZNA as a single economic unit, so that damage to NZNA may be recovered by Novozymes. (*Id.* at 25-26.)

12.     I will not ignore the organizational structure of Novozymes and its subsidiaries, and, therefore, Novozymes may not recover NZNA's alleged lost profits.

13.     The Federal Circuit has addressed whether a corporation that owns a patent, but does not sell any product on which it could claim lost profits, can recover the lost profits of a sister corporation that was a nonexclusive licensee of the patent. *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310-12 (Fed. Cir. 2004). In

---

withdraw the stipulation. *Id.* The Federal Circuit also noted that, even if the district court had allowed the stipulation to be withdrawn, "it would have been obligated to give [the plaintiff] the opportunity to join the subsidiary." *Id.* (citing *Kalman*, 914 F.2d at 1480.) That statement does not imply that joinder is appropriate under circumstances different from those in *Kalman*.

that case, even though the sister corporations collaborated to manufacture and sell products, "that relationship by itself [was] not sufficient to permit [the patentee] to claim [the other entity's] lost profits . . . ." *Id.* at 1311. The corporations were "not simply divisions of a single corporation, but [were] separate corporate entities." *Id.* The Court concluded:

> Their parent has arranged their corporate identities and functions to suit its own goals and purposes, but it must take the benefits with the burdens. While we do not speculate concerning the benefits that the two companies reap from dividing their operations and separating the owner of the patent from the seller of the patented product, [they] may not enjoy the advantages of their separate corporate structure and, at the same time, avoid the consequential limitations of that structure--in this case, the inability of the patent holder to claim the lost profits of its non-exclusive licensee.

*Id.*

14.    Novozymes tries to distinguish that precedent by arguing that, unlike the patentee in *Poly-America*, Novozymes is a Danish rather than American company and that Novozymes is attempting to recover its own profits rather than those of another corporation. (D.I. 212 at 3.) Novozymes fails to present any reason, and I can discern none, why the *Poly-America* decision should not apply when one of the companies is Danish. Novozymes's second argument, that it is trying to recover its own profits, simply begs the question of whether Novozymes can claim NZNA's profits as its own.[16]

---

[16]Novozymes also argues that *WMS Gaming*, 184 F.3d at 1360-61, supports its position that a parent corporation may recover a subsidiary's lost profits even if the subsidiary is not joined as a plaintiff. (Hearing Transcript, January 30, 2007, at 5:1-6:10.) Again, in that case, lost profits were awarded pursuant to a defense stipulation. (*See supra* note 15.) The case, therefore, does not stand for the general proposition that parents may recover the lost profits of their subsidiaries. Such a proposition would be directly contrary to the Federal Circuit's reasoning in *Poly-America*.

15.    Like the corporations in *Poly-America*, Novozymes has structured itself and its subsidiaries for its own goals and purposes. (*See* FF ¶ 10.) Novozymes must take the burdens of that structure along with the benefits. Novozymes may not blur the legal distinction between itself and NZNA to recover damages that Novozymes has not directly suffered.

16.    Therefore, Novozymes may not recover NZNA's alleged lost profits. Because Novozymes has presented no other evidence of lost profits, no lost profits damages will be awarded.

C.    *Defendants Must Pay a Reasonable Royalty on Sales of Spezyme Ethyl*

17.    As an alternative to lost profits, Novozymes argues that it is entitled to a royalty of 25% of Spezyme Ethyl sales in the U.S. fuel ethanol market and 8% for sales in other markets. (D.I. 207 at 22-24.) For the reasons that follow, I conclude that a reasonable royalty is 20% for the U.S. fuel ethanol market and 8% for other markets.

18.    "A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits." *Rite-Hite*, 56 F.3d at 1554 (citing 35 U.S.C. § 284). "The royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations . . . [taking place] as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Id.* "Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia-Pacific*." *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003)

21

(referring to *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120

(S.D.N.Y. 1970)).[17]

---

[17]The *Georgia-Pacific* factors are:

1.  The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2.  The rates paid by the licensee for the use of other patents comparable to the patent in suit.
3.  The nature and scope of the license . . . .
4.  The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention . . . .
5.  The commercial relationship between the licensor and licensee, such as, whether they are competitors . . . .
6.  The effect of selling the patented specialty in promoting sales of other products of the licensee . . . .
7.  The duration of the patent and the term of the license.
8.  The established profitability of the product made under the patent; its commercial success; and its current popularity.
9.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
11. The extent to which the infringer has made use of the invention . . . .
12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements . . . .
14. The opinion testimony of qualified experts.
15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee . . . would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F. Supp. at 1120.

1.    *Novozymes's Proposed Royalty Rate*

19.    Novozymes's damages expert, Ms. Davis, testified that she considered the fifteen *Georgia-Pacific* factors and found three to be the most relevant. First, Genencor and Novozymes's subsidiary NZNA are direct competitors in the U.S. fuel ethanol market. (Davis, Tr. at A15282:14-A15283:1.) Second, Spezyme Ethyl and NZNA's competing product, Liquozyme are highly profitable, with profit margins of 71% and 74% respectively. (*Id.* at A15283:25-A15284:23.) The third *Georgia-Pacific* factor that Ms. Davis heavily relied on was the result of a hypothetical negotiation between Genencor and Novozymes in March 2005, when the '031 patent issued. That factor, to some extent, incorporates the other *Georgia-Pacific* factors. (*Id.* at A15286:25-A15287:16.)

20.    Ms. Davis approached the hypothetical negotiation through two different analyses. First, she applied a method that she called the "rule of thumb". (*Id.* at A15289:22-A15291:14.) According to that method, the parties would expect to split the expected profit margin of the infringing product, with the patentee taking one quarter to one third of that margin as a royalty. (*Id.* at A15290:5-8.) While there is no particular analytical justification for that approach (Teece, Tr. at A15473:8-20), it has been used to estimate royalties (*id.* at A15473:23-25). Applying the rule of thumb to the expected 71% profit margin on Spezyme Ethyl, Ms. Davis calculated a reasonable royalty of 18% to 24%. (Davis, Tr. at A15291:12-14.)

21.    Second, Ms. Davis applied a method that she called the "analytical method." (*Id.* at A15291:15-A15292:19.) *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d

23

895, 899-900 (Fed. Cir. 1986) (discussing use of the analytical method in determining a reasonable royalty). According to that method, the parties would compare the expected profit margin of the infringing product to the typical profit margin for the relevant business. (*Id.* at A15291:18-22.) The difference in those margins would be used to estimate an appropriate royalty. (*Id.*) Here, Ms. Davis compared the 71% margin on Spezyme Ethyl to the 44% margin on Spezyme Fred, which was taken to be a typical margin for alpha-amylases in the fuel ethanol industry. (*Id.* at A15292:4-19.) The difference between those margins is 27%. (*Id.* at A15292:17-19.)

22.    Taking the results of the rule of thumb and analytical methods, and considering Genencor's and NZNA's direct competition in a highly profitable business, Ms. Davis concluded that Novozymes was entitled to a reasonable royalty of 25% on Spezyme Ethyl sales in the U.S. fuel ethanol market. (*Id.* at A15292:20-A15293:2.)

23.    For other markets, Ms. Davis used as a starting point the 5% to 8% royalty rate from the Genencor/Novo Nordisk license regarding filamentous fungi (FF ¶ 38). (Davis, Tr. at A15281:2-12, A15287:22-A15288:11.) She concluded that the high end of that range, 8%, would be a reasonable royalty for sales outside of the fuel ethanol market. (*Id.* at A15288:8-11.)

### 2.    Defendants' Criticisms

24.    Defendants' argument (D.I. 210 at 40-45) and the testimony of their expert, Dr. Teece, focus on several criticisms of Ms. Davis's conclusions.

25.    First, Dr. Teece testified that there is no analytical justification for the rule of thumb, and that it tends to be used only when there is no relevant transactional data

24

to support a royalty rate. (Teece, Tr. at A15473:8-20.) Furthermore, when it is used, the relevant number for the parties to split will not be the total profit margin for the infringing product, but instead the incremental profit, i.e. the difference between the margin for the infringing product and the margin for non-infringing alternatives. (*Id.* at A15474:1-9.) According to Dr. Teece, Spezyme Xtra was a non-infringing alternative that Genencor would have considered in a hypothetical negotiation in March 2005. (*Id.* at A15475:17-A15476:18; TX 769, D.I. 214 at A16866.) Depending on Genencor's expectations for Spezyme Xtra availability, Dr. Teece estimated the expected profits from sales of Xtra and subtracted those profits from the expected profits of Spezyme Ethyl to get an expected incremental profit. (TX 769, D.I. 214 at A16866.) Taking one fourth to one third of that incremental profit, rather than the total profit margin, according to the rule of thumb, yields a reasonable royalty of 5.7% to 7.5% if Xtra were available immediately in March 2005 and 8.3% to 11.0% if Xtra were not available until six months later. (*Id.*)

      26. Second, Dr. Teece criticized the use of the analytical method because of its dependence on the benchmark for "normal" profit margins and its dependence on the time period over which margins are measured. (Teece, Tr. at A15482:23-A15483:1; TX 770, D.I. 214 at A16868.) Regarding the benchmark, Dr. Teece again argued that Spezyme Xtra would be an available alternative to Ethyl, and using the 58% margin for Xtra, instead of the 44% margin for Fred, leads to an estimated royalty of 13%. (TX 770, D.I. 214 at A16868.)

      27. Dr. Teece also argued that the analytical method is overly sensitive to the time period over which profit margins are calculated. (Teece, Tr. at A15482:2-12.) Ms.

25

Davis did not include sales of Spezyme Ethyl between its launch in April 2004 and

October 2004 in her calculation of Ethyl profit margins, because she believed that initial

period included start-up costs that would lower the actual margin from the long term

margin that the parties would expect Ethyl to achieve. (Davis, Tr. at A15291:4-11.)

Indeed, when Dr. Teece included those sales, his profit margin for Ethyl was 65%

instead of 71%. (TX 770, D.I. 214 at A16868.) Comparing that 65% margin for Ethyl to

the 44% margin for Fred leads to an estimated 13% royalty by the analytical method.

(Id.; Teece, Tr. at A15482:5-12.) Comparing that 65% margin to the 58% margin for

Xtra leads to an even lower estimated royalty of 7%. (TX 770, D.I. 214 at A16868;

Teece, Tr. at A15482:20-A15483:1.)

      28.    Based on those criticisms, Dr. Teece testified that a reasonable royalty for

both the fuel ethanol market and other markets would be 8%. That 8% royalty is within

the 5.7% to 11% range taken from Dr. Teece's "corrected" rule of thumb analysis and

the 7% to 13% range taken from his "corrected" analytical method analysis. Also, the

royalty rate for the filamentous fungi license agreed to by Genencor and Novo Nordisk

was between 5% and 8%. (FF ¶ 38.) Dr. Teece also relied on testimony that the

highest royalty rate for a Novozymes license to an entity outside its group of companies

was 8%. (FF ¶ 41.) Finally, Dr. Teece relied on reported royalty rates for the

biotechnology and chemical industries, ranging from 1% to almost 12%. (FF ¶ 42.)

              3.    *Reasonable Royalty*

      29.    I conclude, based on all the evidence, that a reasonable royalty rate is

20% for sales in the fuel ethanol market and 8% for sales in other markets.

26

30.    First, I agree with Dr. Teece that the parties in a hypothetical negotiation would consider available, or soon to be available, alternatives to the infringing product. Thus, it would be a mistake to ignore the potential market entry of Spezyme Xtra. The fact that nine out of twenty-nine customers who purchased the infringing product, Spezyme Ethyl, in August 2006 switched to Xtra indicates that, even in March 2005, Genencor would have reasonably considered Xtra as a factor in the negotiation over royalties for Ethyl. I conclude that Novozymes's proposed 25% royalty rate, based in part on an analysis that discounted any effect from Xtra, is too high.

31.    On the other hand, the fact remains that Xtra was not introduced until June 2006. (FF ¶ 37.) So while Genencor would consider the possibility of marketing Xtra, the timing of market entry would have been uncertain in March 2005, when the hypothetical negotiation would have taken place. Also, Xtra is not a perfect substitute for Ethyl for all customers, as shown by the fact that only about one third of Genencor's Ethyl customers switched to Xtra in August 2006. Xtra is technically inferior to Ethyl, requiring a higher dose of enzyme to achieve comparable results. (Id.) Therefore, while Xtra would be a factor in negotiations, the parties would not reasonably expect all Ethyl customers to switch to Xtra, either immediately in March 2005 or six months later, as proposed by Dr. Teece. Accordingly, I conclude that Defendants' range of 5.7% to 13% is too low.

32.    As for Dr. Teece's criticism about the sensitivity of the analytical method to the time period chosen for calculating profit margins, I conclude that Ms. Davis presented a reasonable basis for choosing to exclude Spezyme Ethyl sales from the first six months after its introduction. (Davis, Tr. at A15291:4-11.) The parties'

27

expectation of long term profit margins would account for the effect of start-up costs on the initial profit margins. Therefore, the expected profit margin for Spezyme Ethyl would reasonably be 71% rather than 65%.

33.    A royalty rate of 20% for the fuel ethanol market adequately accounts for the possibility of Genencor's noninfringing substitutes, while also accounting for the uncertainty as to when substitutes would be available and the likelihood that some customers would reject those substitutes.

34.    While a 20% royalty rate is higher than the rates in other licenses offered by the parties and the average rates reported for the relevant industries, several of the *Georgia-Pacific* factors support a higher rate in this case. First, the parties are direct competitors in a highly profitable business, with profit margins of more than 70% for the parties' Spezyme Ethyl and Liquozyme products. (Conclusion of Law ["CL"] ¶ 19.) Second, Novozymes has a general policy of refusing to license core technology to entities outside its family of companies. (FF ¶ 12.) Indeed, Novozymes refused to license the '038 patent to Genencor during the settlement of the EBS1 litigation. (FF ¶ 39.) Third, the '031 patent term does not end until 2016. ('031 patent.) Fourth, the patented technology works better than many other available products, with improved thermostability and acid tolerance. (FF ¶ 24.) Fifth, Genencor made extensive use of the patented technology, as evidenced by its sales of more than seven million kilograms of Spezyme Ethyl between March 2005 and September 2006. (Davis, Tr. at A15285:13-A15286:3.) Considering all of the evidence, a 20% rate is reasonable for the U.S. fuel ethanol industry.

28

35.    I agree with both experts that an 8% royalty rate is reasonable for sales outside of the fuel ethanol market. That rate is consistent with the average rates for the relevant industries (FF ¶ 42), the rate for the filamentous fungi license (FF ¶ 38), and the opinions of both experts.

36.    I conclude that Ms. Davis's determination of the royalty base was appropriate. In particular, the parties to the hypothetical negotiation would reasonably correct for the discount on sales from Genencor through EDC so that the sales numbers represented the amount paid by the customer in the market. The corrected royalty base for the damages period is $20,162,484 for the U.S. fuel ethanol market and $701,088 for other markets.

37.    Applying the 20% royalty rate to the fuel ethanol market sales gives a royalty of $4,032,497. Applying the 8% royalty rate to the other sales gives a royalty of $56,087. Reasonable royalty damages thus total $4,088,584.

### 4.    Prejudgment Interest

38.    I also conclude that Novozymes should be awarded prejudgment interest on the damages award. "An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001). "[T]he discretion of the district court in denying prejudgment interest is limited to specific circumstances." *Id.* at 1346. Those circumstances include delay in filing suit and use of litigation tactics to delay the resolution of the lawsuit. *Id.* at 1361-62. There appear to be no such circumstances here, as Defendants apparently recognize, since they make no argument in response to

29

Novozymes's position (D.I. 207 at 30). Thus, Novozymes will be awarded prejudgment interest.

      D.    *Genencor Willfully Infringed the '031 Patent*

      39.    Novozymes argues that Genencor willfully infringed the '031 patent. (D.I. 207 at 31-37; D.I. 212 at 15-19.) For the following reasons, I agree.

      40.    "The tort of willful infringement arises upon deliberate disregard for the property rights of the patentee." *Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1378 (Fed. Cir. 2002). A party has "an affirmative duty of due care to avoid infringement of the known patent rights of others." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004). "The extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct, may provide grounds for a finding of willful infringement . . . ." *Hoescht Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1583 (Fed. Cir. 1996).

      41.    "Determination of willfulness is made on consideration of the totality of the circumstances . . . ." *Knorr-Bremse*, 383 F.3d at 1342. "The patentee bears the burden of persuasion and must prove willful infringement by clear and convincing evidence." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1368 (Fed. Cir. 2006). "The patentee must present threshold evidence of culpable behavior before the burden of production shifts to the accused to put on evidence that it acted with due care." *Id.* (internal quotation marks omitted).

42.    In September 2004, Novozymes sent a letter to Genencor with a copy of the allowed '031 patent claims, stating Novozymes's position that those claims covered Spezyme Ethyl. (FF ¶ 25.) Novozymes sued Genencor for patent infringement on March 15, 2005, the same day the allowed claims issued. (Id.) After receiving notice of Novozymes's claims, not only did Genencor continue to manufacture and sell Spezyme Ethyl, it also applied for its own patent claiming what appears to be, in essence, the same technology. (FF ¶¶ 26, 31.) Taken together, Genencor's behavior suggests that it deliberately continued to infringe Novozymes's claims on technology that Genencor itself believed was patentable.

43.    In response, Genencor argues that it had a good faith belief that Novozymes's claims were invalid for obviousness in light of the Suzuki reference. (D.I. 209 at 30-32.) Dr. Crabb testified that, in his scientific opinion, "anyone that has read that paper would choose to make the deletions" claimed in the '031 patent. (FF ¶ 28.) According to Dr. Crabb, Genencor also relied on an opinion of counsel regarding Novozymes's related '038 patent. (FF ¶ 29.)

44.    Genencor's arguments, however, are flatly contradicted by its representation to the Patent Office that its own claims were patentable. Genencor's application cited the Suzuki reference and claimed Bacillus stearothermophilus alpha-amylases with the Suzuki deletion. (FF ¶ 31.) Thus, when it filed its application, Genencor apparently did not believe that the Suzuki reference invalidated a patent claim on an alpha-amylase with the deletions described in the '031 patent. Genencor has not tried to distinguish its application from the '031 patent, instead arguing only that the application is just one piece of the totality of the evidence. (D.I. 209 at 33 n.24.)

31

Given that that piece is a sworn statement to the U.S. government, it has practically dispositive weight, within the circumstances of this case.

45.    I also conclude that Genencor's opinion of counsel regarding the '038 patent does not demonstrate a good faith belief in the '031 patent's invalidity. That opinion stated that the '038 patent, as issued, had no claims that covered Spezyme Ethyl and that during prosecution Novozymes had tried and failed to get such claims. (FF ¶ 29.) That opinion, however, fails to address the fact that Genencor knew that those claims were, in fact, allowed by the Patent Office during the later '031 patent prosecution. Therefore, that opinion, now incomplete in light of the Patent Office's later decision, does not support a reasonable belief in invalidity.

46.    Genencor also argues that its belief that the '031 patent was invalid is supported by later developments in this case, particularly my decision to deny Novozymes's motion for a preliminary injunction. (FF ¶ 30.) Because Novozymes had to carry a high burden to get preliminary relief and because the decision issued over a year after Genencor first received notice of Novozymes's claims, my decision provides little support for Genencor's position. Similarly, the later assertion of the Machius reference as support for invalidity does not establish good faith at the time Genencor received notice of the allowed claims.

47.    In sum, the totality of the evidence shows that, on receiving notice of Novozymes's claims, Genencor failed to exercise due care when it chose to continue making and selling the accused product until the end of the liability phase of this trial. Genencor's current assertion that it believed in good faith that Novozymes's claims were invalid is contrary to its own actions before the Patent Office. Therefore, I

32

conclude that Novozymes has shown by clear and convincing evidence that Genencor's infringement was willful.

E.    *Novozymes is Entitled to Enhanced Damages and Attorneys' Fees*

48.    Because Genencor willfully infringed the '031 patent, I conclude that this is an exceptional case, that Novozymes's damages award should be doubled, and that Novozymes should recover its reasonable attorneys' fees.

1.    *Enhanced Damages*

49.    In exceptional cases of patent infringement, a court "may increase the damages up to three times." 35 U.S.C. § 284. Because Genencor has willfully infringed the '031 patent, I conclude that this is an exceptional case. *See Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed Cir. 2002).

50.    Enhanced damages are appropriate if the "infringer is guilty of conduct upon which increased damages may be based," and if the "totality of the circumstances" supports an enhanced award. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)). "In exercising [its] discretion [to award enhanced damages], the trial court considers the weight of the evidence of the infringer's culpability, in light of the factors

33

included in *Read*."[18] *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1365 (Fed.
Cir. 1998) (internal citations omitted).

51.    I conclude that the most relevant *Read* factor here is the question of
"whether the infringer, when he knew of the other's patent protection, investigated the
scope of the patent and formed a good-faith belief that it was invalid or that it was not
infringed." *Read*, 970 F.2d at 827.  Genencor's decision to continue infringing without a
good faith belief in the '031 patent's invalidity is the basis for my finding of willful
infringement, and it supports an award of enhanced damages.  That Defendants failed
to take remedial action and continued to infringe until after the liability trial also supports
an enhanced award.  *See id.* (setting forth the voluntary withdrawal of the accused
product during litigation as a mitigating factor in determining enhanced damages).

52.    While the patent statute allows damages in exceptional cases to be
trebled, I conclude that other factors weigh in favor of a smaller award.  First,
Genencor's behavior as a party to the litigation was not objectionable.  *See Read*, 970

---

[18]The *Read* factors are:

(1)  whether the infringer deliberately copied the ideas or design of
another;
(2)  whether the infringer, when he knew of the other's patent protection,
investigated the scope of the patent and formed a good-faith belief that it
was invalid or that it was not infringed; . . .
(3)  the infringer's behavior as a party to the litigation[;] . . .
(4)  [d]efendant's size and financial condition[;] . . .
(5)  [c]loseness of the case[;] . . .
(6)  [d]uration of defendant's misconduct[;] . . .
(7)  [r]emedial action by the defendant[;] . . .
(8)  [d]efendant's motivation for harm[;] . . . [and]
(9)  [w]hether defendant attempted to conceal its misconduct.

970 F.2d at 827.

34

F.2d at 827. Second, contrary to Novozymes's assertions (D.I. 207 at 37), there is no evidence that Genencor copied Novozymes's ideas or design. *See Read*, 970 F.2d at 827. Indeed, the evidence is to the contrary. Genencor acquired EBS, the company that developed the enzyme that was sold as Spezyme Ethyl, in 2002, and it began selling Spezyme Ethyl in 2004. (FF ¶¶ 23-24.) Novozymes's '031 patent did not issue until 2005. Novozymes did not, and still does not, sell an alpha-amylase covered by the '031 patent. Thus, while Spezyme Ethyl infringes Novozymes's patent, Genencor and EBS apparently developed the enzyme on their own.

53.     Therefore, the totality of the circumstances here justifies an award of double damages to Novozymes, but not more than that.

2.     *Attorneys' Fees*

54.     In exceptional cases, a court may also "award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[T]he Court may consider the factors relevant to an enhanced damages award in determining whether attorneys' fees should be granted." *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 391 (D. Del. 2004).

55.     Here, the evidence that supports an award of double damages also supports an award of reasonable fees and costs.

56.     I note that Novozymes is only entitled to a reasonable award. At several points during this litigation, extra time and effort was spent because of Novozymes's own decisions. For example, during the litigation phase of trial, an issue arose as to the provenance of a protein sample whose amino acid sequence was part of Novozymes's case for infringement. *Novozymes*, 446 F. Supp. 2d at 314. The expense associated

35

with obtaining and analyzing a new sample should not be shifted to Defendants. As another example, Novozymes moved to join NZNA months after the liability phase of trial. (*Supra* note 2.) Again, the expense associated with that motion should not be shifted. Therefore, in its application for attorneys' fees, I will require Novozymes to justify its request by generally identifying the issues on which its attorneys spent their time, so inappropriate cost shifting is avoided.

F.    *Defendants will be Permanently Enjoined from Infringing the '031 Patent*

57.    Courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006).

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.* In *eBay*, the Supreme Court rejected the position that a patentee's "statutory right to exclude alone justifies [a] general rule in favor of permanent injunctive relief." *Id.* at 1840. The Court also rejected a categorical rule that a patentee's willingness to license its patent is enough to establish that the patentee would not suffer irreparable harm in the absence of an injunction. *Id.* "[T]raditional equitable principles do not permit such broad classifications." *Id.*

36

58.    I conclude that Novozymes has suffered irreparable harm because of Genencor's infringement of Novozymes's right to exclude others from practicing its patent. Contrary to Genencor's argument (D.I. 209 at 37, 39), the Supreme Court in *eBay* did not state that loss of the right to exclude could not be irreparable harm. Rather, the Court simply rejected the proposition that the patentee's right to exclude should always lead to injunctive relief for patent infringement. *eBay*, 126 S. Ct. at 1840. Here, Novozymes owns two related patents for alpha-amylases. It licenses both patents to its U.S. subsidiary, not only in exchange for a 40% royalty, but also with the expectation that the value of its subsidiary will increase with the successful marketing of the licensed technology. The subsidiary markets one of the two alpha-amylases, and Novozymes expects its patents to exclude competitors from marketing either of them. In those circumstances, even though Novozymes does not market the alpha-amylases itself, it has suffered harm beyond the reasonable royalty that it can recover from Defendants. And Novozymes will continue to suffer such irreparable harm if Defendants are not enjoined from infringing on Novozymes's right to exclude.

59.    Legal remedies are not adequate to compensate Novozymes for the infringement of its patent. Because Novozymes markets its technology by licensing it to a subsidiary, the legal remedy of lost profits damages is not available. Even if it were, the statutory right to exclude represents a benefit that, under these circumstances, cannot be equated by an award of cash. These are head-to-head competitors, and Novozymes has a right, granted by Congress, not to assist its rival with the use of proprietary technology.

60.     The balance of hardships tips in favor of Novozymes. While Novozymes
would suffer irreparable harm from future infringement, Defendants, who have
apparently pulled the infringing product from the market, will not be harmed by a
permanent injunction.

61.     Finally, there is no evidence that a permanent injunction would harm the
public. While the fuel ethanol industry has growing importance in a time of rising
energy prices, Novozymes has a competing product, and Genencor has products that
do not infringe the '031 patent.

62.     In conclusion, after weighing the factors set forth in *eBay*, I conclude that
Defendants should be enjoined from infringing the '031 patent.

## IV.     SUMMARY OF CONCLUSIONS

For the reasons set forth herein, Novozymes's motion to join NZNA as a party
plaintiff will be denied. Novozymes's motion for a permanent injunction will be granted.
An appropriate order will issue.

Furthermore, Defendants must pay reasonable royalty damages in the amount of
$4,088,584 plus prejudgment interest. Genencor has willfully infringed the '031 patent,
so the damages award will be doubled. Novozymes is entitled to reasonable attorneys'
fees and costs. The parties shall confer and, within ten days, submit a form of
judgment order giving effect to the foregoing conclusions, as well as the conclusions set
forth in my decision following the liability trial in this case. *See Novozymes*, 446 F.
Supp. 2d at 333-34.

38

# EXHIBIT 29

**TORO'S AWARENESS OF ALLEGED PRIOR ART**

| Alleged Prior Art Relied Upon by Toro in Reexam. Requests | Prior Art Not Included In Toro's Prior Art Statements 2.5.2002 | Prior Art in Patents '311 & '312 that Toro was Aware of on 8.1.2003 | Cited in Toro letter to Textron dated 5.27.2006 | Discussed In Crawford Declaration made on 6.1.2006 | Toro's Original Prior Art Statement 6.1.2006 | Toro's Document Production 7.17.2006 | Textron's Document Production 11.27.06 | Toro's 1st Amended Prior Art Statement 12.22.2006 | Document Inspection from Grounds Commercial Care 1.31.2007 |
|---|---|---|---|---|---|---|---|---|---|
| **Group A** | | | | | | | | | |
| US 1,954,579 | | | | | X | | | | |
| US 3,611,684 | | | | | X | | | | |
| US 3,968,630 | | | | | X | | | | |
| US 4,926,621 | X | | | | X | | | | |
| US 5,085,044 | | | | | X | | | | |
| PAU 11,914/70 | | | | | X | | | | |
| Beaver T24 brochure | | | | | X | | | | |
| "Cheap and Careful" article, Turf Management | | | | | X | | | | |
| Honda Brochure "Honda Lawn and Garden Care" | | | | | X | | | | |
| Dowdeswell Roller Mower | | | | | | X | | | |
| Kidworth Sovema EMHZ 72, Horticulture Week | | | | | | X | | | |
| Lesco Alleged Prior Art | | | | | | | | | |
| Middlesworth Brochure | | | X | | | | | | X |
| Middlesworth Hydro-Steer Brochure | X | | | | | | | | X |
| Middlesworth "Operator's manual and Parts List" | X | X | | | | | | | |
| Nunes Alleged Prior Art | | | | | | | | | |
| Ransomes Publication "Boom Mower Model BM425 Technical Manual" | | | | | | | X | | X |
| Ransomes Fairway AR-250 | | | | X | | | | X | |
| Risbrough Alleged Prior Art | | | | | | | | | |
| Wulff Spare Parts Catalogue "Klippeled Reservedelsiliste" | X | | | | | | | | |
| **Group B** | | | | | | | | | |
| US 4,304,086 | | | X | | | | | | |
| US 5,305,589 | | | | | X | | | X | |
| "Cream of the Crop" Article, Turf Management | | | | | X | | | X | |
| "Cutting A Systematic Swathe" Article, The Groundsman | X | | | | | | | X | |
| "Dansk Verdensryhed" Article | X | | | | | | | X | |
| "Fra graesaeder til gradig" Article | X | | | | | | | | |
| Wulff Mower Brochure "Led-delt rotorKlipper" Brochure | | | | | | | | X | |
| Machinery for Horticulture, Chapter 14 | | | | | | | | X | |
| Mountfield Lawn Rider Brochure | | | | | | | | X | X |
| "Rotaries Take to Golf Courses" Article, Grounds Maintenance | | | | | | | | X | |
| Simplicity Parts Manual FC Hydro Series | | | | | | | | | |
| Toro's Own Alleged 'Prior Art" Products | | | | | | | | | X |
| Turf Blazer 1260 Brochure, Landscape Management | | X | | | | | | | |