# EXHIBIT A

GOODWIN | PROCTER



May 2, 2007

# IP Alert

An informational newsletter from Goodwin Procter's Intellectual Property Group

## U.S. Supreme Court Re-Invigorates "Obviousness" in *KSR v. Teleflex* Decision

On April 30, 2007, Justice Kennedy delivered a unanimous decision of the U.S. Supreme Court reversing the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") and, in effect, re-invigorating obviousness under 35 U.S.C. § 103 as an available defense to a patent.

Under 35 U.S.C. § 103 a patent is rendered obvious where:

> the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The Federal Circuit, interpreting Section 103 and prior U.S. Supreme Court guidance, propounded and has been applying the "TSM test," short for "teaching, suggestion, or motivation." According to the Federal Circuit, under the TSM test "a patent claim is only proved obvious if 'some motivation or suggestion to combine the prior art teachings' can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art." Finding this test too "rigid," the U.S. Supreme Court reversed the Federal Circuit's finding of non-obviousness and advocated a more flexible approach.

### Procedural History

In the case before the Supreme Court, the District Court had originally applied the analysis set forth in the seminal U.S. Supreme Court case *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), to find that the asserted patent was invalid because there was "little difference" between the asserted claim and the prior art.

The Federal Circuit then reversed, finding that the District Court had not been strict enough in applying the TSM test and held that unless the "prior art references address[ed] the precise problem that the patentee was trying to solve, the problem would not motivate an inventor to look at those references." The Federal Circuit, in effect, held that "[o]bvious to try has long been held not to constitute obviousness."

### Obviousness Is Flexible, Not Rigid

The Supreme Court then reversed the Federal Circuit, stating "[w]e begin by rejecting the rigid approach of the Court of Appeals." The Supreme Court continued, explaining

that "our cases have set forth an expansive and flexible approach [to obviousness] inconsistent with the way the Court of Appeals applied its TSM test here." While acknowledging that *Graham* recognized the need for "uniformity and definiteness ... the principles laid down in *Graham* reaffirmed the 'functional approach' of its earlier decisions and ... set forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive [including] commercial success, long felt but unsolved needs, failure of others, etc."

## Summary Judgment of Obviousness Is Appropriate

The Supreme Court also addressed obviousness in the context of summary judgment. The Court rejected the notion that a "conclusory" expert affidavit is sufficient to create an issue of fact. In reversing the Federal Circuit on this issue, the Court noted:

> To the extent the [Federal Circuit] understood the *Graham* approach to exclude the possibility of summary judgment when an expert provides a conclusory affidavit addressing the question of obviousness, it misunderstood the role expert testimony plays in the analysis. In considering summary judgment on that question the district court can and should take into account expert testimony, which may resolve or keep open certain questions of fact. That is not the end of the issue, however. The ultimate judgment of obviousness is a legal determination. Graham, 383 U. S., at 17. Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.

## Ordinary Innovation Is Not Protectable by Patents

The Supreme Court also distinguished between "ordinary innovations," which are not protectable, and "inventions," which are patentable.

> We build and create by bringing to the tangible and palpable reality around us new works based on instinct, simple logic, ordinary inferences, extraordinary ideas, and sometimes even genius. These advances, once part of our shared knowledge, define a new threshold from which innovation starts once more. And as progress beginning from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts. *See* U. S. Const., Art. I, §8, cl. 8. These premises led to the bar on patents claiming obvious subject matter.

In other words, neither 35 U.S.C. § 103 nor *Graham* "disturbed th[e] Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art." In particular, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." If it is not, then it is obvious. The Court expressed skepticism regarding patents that simply combine previously known elements, as granting patents to

such "advances that would occur in the ordinary course without real innovation retards progress and may, …, deprive prior inventions of their value or utility."

**Presumption of Validity**

The Supreme Court also addressed the presumption of validity under 35 U.S.C. § 282, since the prior art was not before the PTO during prosecution. The Court noted that "the rationale underlying the presumption – that the PTO, in its expertise, has approved the claim – seems much diminished here."

**Conclusion**

The Supreme Court called for a flexible "common sense" approach where "what matters is the objective reach of the claim" as opposed to the particular motivation of the patentee. If a person of ordinary skill in the art would "be able to fit the teachings of multiple patents together like pieces of a puzzle," then the patent is obvious.

This decision by the Supreme Court is likely to have an effect on the way the Patent Office handles pending patent applications, and will also impact litigation of obviousness claims in courts all over the country. The popular wisdom is that the Supreme Court has likely re-invigorated obviousness as an available defense, and that this could make it more likely that certain types of patents – particularly patents that are based on combinations of elements already known in the art – will be found "obvious."

---

If you have any questions about the issues raised in this Alert, please contact:

| | | |
|---|---|---|
| **J. Anthony Downs** | jdowns@goodwinprocter.com | 617.570.1929 |
| **Benjamin Hershkowitz** | bhershkowitz@goodwinprocter.com | 212.459.7333 |
| **Thomas J. Scott, Jr.** | tscott@goodwinprocter.com | 202.346.4332 |

Full access to articles on IP law prepared by Goodwin Procter is available at:
http://www.goodwinprocter.com/Publications/Full%20Publication%20Index.aspx

Full access to all articles prepared by Goodwin Procter is available at:
http://www.goodwinprocter.com/PublicationSearchResults.aspx?search=all

---

This publication, which may be considered advertising under the ethical rules of certain jurisdictions, is provided with the understanding that it does not constitute the rendering of legal advice or other professional advice by Goodwin Procter LLP or its attorneys. Additionally, the foregoing discussion does not constitute tax advice. Any discussion of tax matters contained in this publication is not intended or written to be used, and cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter. © 2007 Goodwin Procter LLP. All rights reserved.

# EXHIBIT B

# United States Court of Appeals for the Federal Circuit

06-1402

LEAPFROG ENTERPRISES, INC.,

Plaintiff-Appellant,

v.

FISHER-PRICE, INC. and MATTEL, INC.,

Defendants-Appellees.

Ron E. Shulman, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for plaintiff-appellant. With him on the brief were Terry Kearney and Michael A. Berta.

James Galbraith, Kenyon & Kenyon LLP, of New York, New York, argued for defendants-appellees. With him on the brief were Richard L. DeLucia and John Flock; and John R. Hutchins, of Washington, DC. Of counsel was Jeffrey M. Butler, of New York, New York.

Appealed from: United States District Court for the District of Delaware

Judge Gregory M. Sleet

# United States Court of Appeals for the Federal Circuit

06-1402

LEAPFROG ENTERPRISES, INC.,

Plaintiff-Appellant,

v.

FISHER-PRICE, INC. and MATTEL, INC.,

Defendants-Appellees.

———————————

DECIDED: May 9, 2007

———————————

Before MAYER, LOURIE, and DYK, Circuit Judges.

LOURIE, Circuit Judge.

Leapfrog Enterprises, Inc. ("Leapfrog") appeals from the order of the United States District Court for the District of Delaware entering judgment of noninfringement and invalidity of claim 25 of Leapfrog's U.S. Patent 5,813,861 ("the '861 patent") in favor of Fisher-Price, Inc. and Mattel, Inc. (collectively "Fisher-Price"). We affirm.

BACKGROUND

Leapfrog filed suit in October 2003, alleging that Fisher-Price's PowerTouch product infringed claim 25 of the '861 patent. Leapfrog amended the complaint to add

Mattel, Inc. as a codefendant in September 2004. The '861 patent relates to a learning

device to help young children read phonetically. Claim 25 reads as follows:

> An interactive learning device, comprising:
>
> a housing including a plurality of switches;
> a sound production device in communication with the switches and
>     including a processor and a memory;
> at least one depiction of a sequence of letters, each letter being
>     associable with a switch; and
> a reader configured to communicate the identity of the depiction to the
>     processor,
>
> wherein selection of a depicted letter activates an associated switch to
> communicate with the processor, causing the sound production device to
> generate a signal corresponding to a sound associated with the selected
> letter, the sound being determined by a position of the letter in the
> sequence of letters.

'861 patent, col.10 ll.23-36.

In an April 7, 2005 Order, the trial court construed a number of terms from claim

25 of the patent. The court construed the phrase "selection of a depicted letter" to mean

"choosing a particular depicted letter from the depicted sequence of letters by

contacting or coming into proximity to that particular depicted letter." Leapfrog Enters.,

Inc. v. Fisher-Price, Inc., No. 03-927 (D. Del. Apr. 7, 2005).

The accused PowerTouch device consists of a hinged plastic housing containing

electronics and a speaker that opens to lie flat. When so opened, a user places a book

made for use with the device in a rectangular recess in the housing. The books contain

large, colorful pictures that also show words associated with the objects shown in those

pictures. The user may select one of multiple modes of operation. In phonics mode,

when the user touches one of the words on the page, the device pronounces the word,

then pronounces each phoneme of the word in sequence, and finally pronounces the

entire word again. The device relies on a grid of "crosspoints" located in the area underneath where the books are placed to detect the location on the page being touched by the user. The processor in the device may be programmed to associate a particular response with each crosspoint. Some of the words on the pages of the books are large enough that each letter of the word corresponds to a separate crosspoint. However, the phonics mode operates in the same manner for those words, with pronunciation of the word, the phonemes, and the word again, regardless which letter the user touches because each letter has been associated with the same response in the device's programming.

The case proceeded to trial, but the jury deadlocked on May 27, 2005. The parties stipulated that the case would be submitted to the trial court for decision, based on the record and the rulings made by the court at the time the case was submitted to the jury.

The trial court issued its decision on March 30, 2006, finding claim 25 of the '861 patent not infringed and invalid as obvious. The court found that the accused PowerTouch device could not practice the "selection of a depicted letter" because it only allowed selection of words rather than letters. The court thus found that the PowerTouch did not infringe claim 25. The court also concluded that claim 25 was invalid as obvious in view of the combination of U.S. Patent 3,748,748 to Bevan, the Texas Instruments Super Speak & Read ("SSR") device, and the knowledge of one of ordinary skill in the art as represented by the testimony of Fisher-Price's technical expert, Ronald Milner.

Leapfrog timely appealed.    We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

A. <u>Noninfringement</u>

The district court's determination of infringement is a question of fact that we review for clear error. <u>Abraxis Bioscience, Inc. v. Mayne Pharm. (USA) Inc.</u>, 467 F.3d 1370, 1375 (Fed. Cir. 2006). "Under the clear error standard, the court's findings will not be overturned in the absence of a definite and firm conviction that a mistake has been made." <u>Impax Labs., Inc. v. Aventis Pharm. Inc.</u>, 468 F.3d 1366, 1375 (Fed. Cir. 2006) (quotation omitted).

On appeal, Leapfrog does not challenge the district court's construction of the phrase "selection of a depicted letter," but argues that the court clearly erred in applying that construction to the facts of the case.  More specifically, Leapfrog argues that the PowerTouch does allow "choosing a particular depicted letter" because in at least some cases each letter of a word corresponds to a separate crosspoint.  Thus, the fact that the response of the device is the same, no matter which letter the user touches, is irrelevant because the user may still choose particular letters.

Fisher-Price also does not challenge the district court's claim construction, and Fisher-Price responds that the district court correctly determined that selection by choosing a particular letter is only meaningful if making one letter choice results in an outcome different from making a different letter choice.  Fisher-Price argues that the district court correctly found that only the word can be selected if the choice of letter, within a particular word, is irrelevant to the response of the device.

We find no clear error in the district court's application of the claim to the essentially undisputed facts of this case. The court's conclusion that the Fisher-Price PowerTouch only allows selection of a word rather than "a depicted letter" comports with its construction of "selection" to mean "choosing." The ordinary meaning of choice requires that the alternatives from which the choice is made will result in different possible outcomes. With the PowerTouch device, the same outcome results no matter which letter in the word the user touches. This understanding is also consistent with the way that selection of a depicted letter is described in the patent.

> Every time the child depresses a letter key, the book will recite the phoneme of the letter associated with that letter, in the context that the letter is used in the word or phrase depicted on the card, here "ball." Thus, for the example where the subject is "ball" as shown if the child depresses the correct letter key of "b" the processor will sound the phoneme "b" as "b" is pronounced in "ball."

'861 patent, col.6 ll.17-23. Most importantly, this understanding of selection is also most consistent with the language of claim 25 itself. The PowerTouch device does not generate a signal corresponding to a sound associated with the selected letter, as the claim requires. A signal corresponding to a word is not the same as a signal corresponding to a letter. If the claim were meant to encompass a device that always enunciates all the letters of a word no matter which letter was selected, the claim language requiring that "the sound be[] determined by a position of the letter in the sequence of letters" would be superfluous because no such determination would be necessary.

Leapfrog comes well short of supporting a definite and firm conviction that a mistake has been made, and we therefore affirm the district court's entry of judgment of noninfringement in favor of Fisher-Price.

06-1402                                   -5-

B. Obviousness

"Obviousness is a question of law, reviewed de novo, based upon underlying factual questions which are reviewed for clear error following a bench trial." Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1289 (Fed. Cir. 2006) (citing Ruiz v. A.B. Chance Co., 357 F.3d 1270, 1275 (Fed. Cir. 2004)).

Leapfrog argues that the district court engaged in improper hindsight in reaching its conclusion of obviousness by concluding that all of the limitations of the claim are found in the prior art. Leapfrog also argues that the court's finding that the Bevan device has the same functionality as claim 25 was clearly erroneous because the components of Bevan's device are mechanical, and thus different in structure and interrelation from the electronic components described in claim 25, and therefore cannot provide the same functionality. Leapfrog argues that there was inadequate evidence in the record to support a motivation to combine Bevan, the Texas Instruments SSR, and a reader to arrive at the invention of claim 25. Finally, Leapfrog argues that the district court did not properly consider the strong evidence of secondary considerations of nonobviousness.

In response, Fisher-Price argues that claim 25 is nothing more than the Bevan device, a toy that teaches reading based on the association of letters with their phonemic sounds, updated with modern electronics that were common by the time of the alleged invention. Fisher-Price also responds that particularized and specific motivations to combine need not be found in the prior art references themselves in the context of an improvement that arises from a desire to generally improve a known device (e.g., to make the product smaller, lighter, or less expensive) using newer

06-1402                                    -6-

technology.    Finally, Fisher-Price argues that the district court did give proper consideration to secondary considerations of nonobviousness, but simply concluded that those considerations were not sufficient to overcome the determination of obviousness based on primary considerations.

We agree with Fisher-Price that the district court correctly concluded that the subject matter of claim 25 of the '861 patent would have been obvious in view of the combination of Bevan, the SSR, and the knowledge of one of ordinary skill in the art. An obviousness determination is not the result of a rigid formula disassociated from the consideration of the facts of a case. Indeed, the common sense of those skilled in the art demonstrates why some combinations would have been obvious where others would not. See KSR Int'l Co. v. Teleflex Inc., 550 U.S. __, 2007 WL 1237837, at *12 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Thus, we bear in mind that the goal of the claim 25 device was to allow a child to press a switch associated with a single letter in a word and hear the sound of the letter as it is used in that word. In this way, the child would both associate the sound of the letter with the letter itself and be able to sound out the word one letter at a time to learn to read phonetically. Accommodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices.    Applying modern electronics to older mechanical devices has been commonplace in recent years.

The Bevan patent was one of the pieces of prior art relied upon by the district court, and it describes an electro-mechanical learning toy. In the preferred embodiment

06-1402                          -7-

of the Bevan device, a housing contains a phonograph record as a voice storage means, a speaker for playing sounds from the voice storage means, and an actuated electric motor to turn the record. Uniquely shaped puzzle pieces fit into correspondingly shaped openings in the top of the housing. Depressing the puzzle pieces in the openings causes the motor to turn the record and brings phonographic needles into contact with the portions of the record where the sounds associated with the puzzle pieces are stored so that they can be played through the speaker. In one embodiment, each puzzle piece is imprinted with one letter from a word, and pressing each puzzle piece produces the sound of a single letter in that word. Thus, although it relies on an electric motor and mechanical structures rather than a processor and related electronics, Bevan teaches an apparatus that achieves the goals described above of associating letters with their sounds and encouraging children to sound out words phonetically through a similar type of interaction. We therefore see no clear error in the district court's finding that the Bevan device has the same method of operation, viewed as a whole, as claim 25 of Leapfrog's '861 patent.

A second piece of prior art relied upon by the district court was the Texas Instruments SSR. The SSR is a more modern type of prior art learning toy, constructed with electronic components, that has a slightly different mode of operation than Bevan. The SSR has a hinged plastic housing that opens to lie flat. Books for use with the toy fit into a recess in the housing. The housing contains switches that can detect when a child presses on different areas of the books' pages. The housing also contains a processor, memory, and a speaker to produce sounds. In one mode of operation, the SSR allows the child to press the first letter of a word and hear the sound of that letter.

06-1402                               -8-

The remainder of the letters in the word are grouped together and played together. For example, the child can press the letter "t" and hear the t phoneme and then press "ug" to hear all the sounds in the word "tug." Similarly, the child can press the letter "b" and then "ug" to hear the sounds in "bug." The SSR does not include a reader that allows the processor to automatically identify the inserted book. Instead, the user can press a triangle printed on the first page of the book, and the processor determines from the location of the triangle printed on the page which book is inserted. Similarly, the user can press a star on each page of the book, and the processor determines from the location of the star on the page which page of the book is being viewed. Thus, the SSR provides a roadmap for one of ordinary skill in the art desiring to produce an electronics-based learning toy for children that allows the use of phonetic-based learning methods, including the association of individual letters with their phonemes.

We agree with the district court that one of ordinary skill in the art of children's learning toys would have found it obvious to combine the Bevan device with the SSR to update it using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost. While the SSR only permits generation of a sound corresponding to the first letter of a word, it does so using electronic means. The combination is thus the adaptation of an old idea or invention (Bevan) using newer technology that is commonly available and understood in the art (the SSR). We therefore also find no clear error in the finding of the district court that one of ordinary skill in the art could have utilized the electronics of the SSR device, with the method of

operation taught by Bevan, to allow a child to press each individual letter in a word and hear the individual phonemes associated with each letter to sound out the words.

This combination of Bevan and the SSR lacks only the "reader" of claim 25 of the '861 patent. The district court found that readers were well-known in the art at the time of the invention. As there is ample evidence in the record to support that finding, we find no clear error in the court's determination. Furthermore, the reasons for adding a reader to the Bevan/SSR combination are the same as those for using readers in other children's toys—namely, providing an added benefit and simplified use of the toy for the child in order to increase its marketability. Leapfrog presents no evidence that the inclusion of a reader in this type of device was uniquely challenging or difficult for one of ordinary skill in the art. See KSR, 2007 WL 1237837, at *15. Nor does Leapfrog present any evidence that the inclusion of a device commonly used in the field of electronics (a reader), and even in the narrower art of electronic children's toys, represented an unobvious step over the prior art. Our conclusion is further reinforced by testimony from the sole inventor at trial that he did not have a technical background, could not have actually built the prototype himself, and relied on the assistance of an electrical engineer and Sandia National Laboratory to build a prototype of his invention.

Finally, we do not agree with Leapfrog that the court failed to give proper consideration to secondary considerations. The district court explicitly stated in its opinion that Leapfrog had provided substantial evidence of commercial success, praise, and long-felt need, but that, given the strength of the prima facie obviousness showing, the evidence on secondary considerations was inadequate to overcome a final

06-1402                           -10-

conclusion that claim 25 would have been obvious. We have no basis to disagree with the district court's conclusion.

In light of our review of the evidence and the lack of any clear error in the district court's factual findings, we agree with the district court's conclusion that claim 25 of the '861 is invalid as obvious in view of the combination of Bevan, the SSR device, and the knowledge of one of ordinary skill in the art concerning readers.

CONCLUSION

For the reasons stated, we affirm the district court's grant of judgment that Fisher-Price's PowerTouch device does not infringe claim 25 of the '861 patent and that claim 25 of the '861 patent is invalid as obvious.

AFFIRMED

# EXHIBIT C

# Ruling toughens patent process

## Second decision gives software makers shelter

By Joan Biskupic
USA TODAY

WASHINGTON — The Supreme Court made it harder Monday for inventors to get patents on works that build on previous inventions. The court also offered new protection for software makers against infringement claims for exports.

The decisions in two closely watched patent cases continue a recent court pattern of clarifying patent law and suggesting limits on when inventors can win exclusive rights to make and sell an item.

The first case, *KSR International v. Teleflex*, testing when a work is truly new and worthy of patent, is likely to be more significant.

In a unanimous decision, the justices made clear that they believe standards for patents have become too loose, blurring distinctions between innovations that are "ordinary" and truly "extraordinary." They ruled that the lower court specializing in patents should be more open to challengers who claim a work should not have been patented because it was too "obvious" in light of prior works.

"Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may ... deprive prior inventions of their value or utility," Justice Anthony Kennedy wrote for the court.

The case involves two manufacturers of adjustable gas pedals. It began when Teleflex accused KSR International of violating one of its patents. KSR countered that Teleflex never should have gotten a patent on the pedal in question because it was "obvious," based on other works. The U.S. Court of Appeals for the Federal Circuit ruled KSR failed to make a sufficient case for "obviousness." Invoking a longstanding test, the court said KSR did not show existing technology would naturally have led to the Teleflex gas-pedal device.

Monday, the court said the Federal Circuit was too rigidly applying its test and that Teleflex's sensor

---

# Volvo stays true to its soul: Safety

## As other brands horn in on party, maker tries to freshen its image



Photo at top by Volvo, below by Tim I

**Old vs. new:** The Volvo 244 DL, above, fron Below, the S80 is Volvo's flagship model.



### Volvo vs. the competition

Volvo's sales have lagged behind the luxury segment leaders and were down more than 6% last year. CEO Anne Belec, CEO of Vo America, says Volvo ran out of the old version of its flagship S80; a new one went on sale in February.



Source: Autodata

By Jayne O'Donnell
USA TODAY

Volvo has long been known for building safe cars, but as competitors add more safety features — and brag about them — it's becoming difficult for the Swedish automaker to stand out.

Volvo was an early safety leader. "And it still is showing leadership in some areas," says Brian O'Neill, former president of the Insurance Institute for Highway Safety. "But it's hard to even say who's a leader anymore (be-

the attribute most often mentioned among Volvo's "above-average" qualities. Below average in the poll by GfK America were traits including acceleration, distinctive looks and "fun to drive," all of which Volvo had hoped would broaden its image.

"Our cars aren't ugly boxes anymore, and we do offer V-8 performance, but in the end, we are about protecting people," Volvo spokesman Dan Johnston says. "We're rather proud of who we are and where we're going."

Doolan says Volvo continues to emphasize safety, but the message may be getting lost.

both side and curtain

"I think it's going t short term to take (from Volvo) because and the perception is But, "it shouldn't be t

"There's no questi ture, and I think it a says, "Volvo clearly technology, and Volv whiplash preventic Swedes took more s the world."

peals for the Federal Circuit ruled KSR failed to make a sufficient case for "obviousness." Invoking a long-standing test, the court said KSR did not show existing technology would naturally have led to the Teleflex gas-pedal device.

Monday, the court said the Federal Circuit was too rigidly applying its test and that Teleflex's sensor could have been developed by a person of "ordinary skill."

The ruling could have an immediate impact on patent applications. "The decision gives our examiners more flexibility to use their considerable technical skills to reject obvious changes to existing technology," says Jon Dudas, director of the U.S. Patent and Trademark office.

In the software case, the justices overturned a lower court decision that ruled AT&T against Microsoft in a dispute involving Microsoft's export of a master version of its Windows operating system. The decision limits patent liability for U.S. companies that design software here and ship master disks overseas.

By a 7-1 vote, the justices said Microsoft did not trigger liability because it did not supply the copied components that ended up installed on foreign-made computers. Brad Smith, Microsoft's general counsel, said in a statement that the ruling "promotes a global patent system that works." He said the decision applies the law uniformly to software and other inventions.

*Contributing: Byron Acohido in Seattle*

Volvo has long been known for building safe cars, but as competitors add more safety features — and brag about them — it's becoming difficult for the Swedish automaker to stand out.

Volvo was an early safety leader, "And it still is showing leadership in some areas," says Brian O'Neill, former president of the Insurance Institute for Highway Safety. "But it's hard to even say who's a leader anymore (because) there's so much competition."

Anne Belec, CEO of Volvo Cars of North America, says safety is the "soul of our brand," and the automaker, owned by Ford Motor, welcomes the competition. "Everyone else's interest in safety all of a sudden elevated what we stand for," she says. "We've never deviated from our core message of safety."

Still, Volvo said last week that it is changing ad agencies to "move the brand forward" and "leverage . . . our rich heritage in safety." It replaced Euro RSCG with Arnold/Nitro. The first assignment will be campaigns for Volvo's highest-volume models, new versions of the V70 station wagon and XC70 crossover SUV.

Volvo sales were down 6% last year. Belec says the drop was not unexpected because the company sold out of the old version of its flagship S80 sedan — the new one went on sale in February — and the C70 coupe. Still, luxury rivals Lexus, Mercedes-Benz and BMW posted solid gains in 2006.

Volvo has tried to broaden its appeal beyond safety to performance, but it didn't take. Although V-8 engines will still be offered, the performance-oriented "R" models are being phased out this summer. "Call it a brave attempt," says former CEO Victor Doolan, who retired in 2005.

Safety remains the big reason why people buy Volvos. In a February survey of consumers considering luxury vehicles, safety was

including acceleration, distinctive looks and "fun to drive," all of which Volvo had hoped would broaden its image.

"Our cars aren't ugly boxes anymore, but in the end, we are about protecting people," Volvo spokesman Dan Johnston says. "We're rather proud of who we are and where we're going."

Doolan says Volvo continues to emphasize safety, but the message may be getting lost.

> "Our cars aren't ugly boxes anymore, and we do offer V-8 performance."
>
> — Dan Johnston, Volvo spokesman

"The message is right, but I don't think it has the frequency they need."

Meanwhile, Honda has been aggressively pitching safety after announcing that it would eventually make a long list of safety features standard equipment on all of its models.

By the end of 2006, all Honda and Acura models except its two sports cars had side air bags, side-curtain air bags and anti-lock braking systems as standard equipment. All light trucks have stability control standard. Its cars and trucks have front ends designed to minimize injury to pedestrians and to prevent taller vehicles from riding over smaller ones.

The Japanese automaker says it isn't trying to usurp Volvo's image. "Competitors always look at one another's ads, and in developing our 'Safety for Everyone' advertising, we did not study any one manufacturer more than any other," Honda spokesman Jeffrey Smith says.

Volvo can make the same claims as Honda and was, in fact, the first automaker to install

(from Volvo) because [...] and the perception is s[...] But, "it shouldn't be fa[...]

"There's no questio[...] ture, and I think it alw[...] says. "Volvo clearly h[...] technology, and Volvo [...] whiplash prevention [...] Swedes took more se[...] the world."

Fredrik Arp, CEO of [...] says the safety of its [...] equipment. It's built i[...] ple are injured in cases [...] ery aspect of design, [...] is not really what we'r[...]

Belec notes that wh[...] Volvo did a series o[...] frontal crash tests w[...] stalled. The engines w[...] within the empty spac[...] cars would have as [...] the question, 'How d[...] rollovers?'," says Nas[...] sor at George Washing[...]

Carl Nash, one of t[...] ta, Calif.-based Cente[...] says the Volvo XC90 S[...] of the dozens of othe[...] tested for roof streng[...] "Philosophically, the [...] rollovers?", says Nas[...] sor at George Washing[...]

Such distinctions a[...] world where most ve[...] federal and insuranc[...] and all automakers a[...] stall the latest safety t[...] curtain air bags and s[...]

"There's no reason [...] something beyond [...] "That's an ongoing [...] awhile. But our core i[...]

---

# Insurance covers unexpected hitches involve[...]

If your idea of the perfect wedding venue is a drive-through chapel in Vegas, this column is not for you. If, however, the wedding of your dreams involves a June ceremony with a dozen attendants, a sit-down dinner for 400 guests and an open bar, perhaps you should consider wedding insurance.



**By Sandra Block**

Wedding insurance will cover your losses if bad weather, airport delays, a military call-up or a sudden illness prevents you or your intended from getting to the church on time. If your caterer is shut down by the local health department, most insurance policies will cover the extra cost of finding a last-minute vendor to feed your guests.

Travelers Insurance added wedding insurance to its product line in February. Fireman's Fund Insurance plans to announce this week that it will expand its existing policy for weddings and other special events. WedSafe, a unit of Aon, also offers a wedding insurance policy.

The growth of these policies reflects the rising cost of weddings. The average amount spent on a wedding in 2006 was $27,852, according to the Condé Nast Bridal Group (see box). Nearly a third of couples end up spending more than they had planned, according to Condé Nast. Premiums range from $95 to more than $1,000, depending on the size of your wedding and the level of coverage you buy. Some costs that wedding

ga. Some reception venues include liability in the rental cost, but many of them require you to have your own coverage, says Rob Nuccio, CEO of RV Nuccio & Associates, program administrator for the Fireman's Fund policy.

▶ **Sudden death or illness.** If the groom has an appendicitis attack the day before the wedding, wedding insurance will cover the cost of non-refundable deposits. Likewise, insurance will cover your expenses if a parent's death or illness forces you to postpone the wedding.

▶ **Lost or damaged formalwear.** If the bridal store files for bankruptcy before you pick up your Vera Wang gown, wedding insurance will cover the cost of a new dress. Alan Tuvin, vice president of product management for Travelers, says lost or damaged wedding dresses are the most common types of claims Travelers has received since it started offering wedding insurance.

▶ **Photography mishaps.** Your wedding photos are supposed to provide a lifetime of memories, but what if they're all out of focus? Or the photographer simply disappears? Wedding insurance policies will cover the cost of reassembling your wedding party and retaking the photos or videos.

▶ **Stolen or damaged wedding gifts.**

There are also some things wedding insurance won't cover, including:

▶ **Change of heart.** Traditionally, wedding insurance has excluded deposits forfeited because of runaway brides or reluctant grooms. Wedding insurance is intended to cover events that are out of your control, such as a hurricane that makes your wedding site in-

**Bride and groom:** Models playing roles at [...] World don't need wedding insurance, but [...]

Walt D[...]

### Biggest increases in wedding [...]

Average wedding costs that have risen the mo[...] 1999:

| | 1999 | 2006 |
|---|---|---|
| Photography/video | $1,263 | $3,509 |
| Attendants' gifts | $299 | $616 |
| Wedding rings | $1,060 | $2,079 |
| Bouquets/other flowers | $775 | $1,177 |
| Bride/groom attire | $1,049 | $1,580 |

Source: Condé Nast Bridal Group

USA TODAY · TUESDAY, MAY 1, 2007 · 3B

# Ruling toughens patent process

## Second decision gives software makers shelter

By Joan Biskupic
USA TODAY

WASHINGTON — The Supreme Court made it harder Monday for inventors to secure patents on works that build on previous inventions.

The court also offered new protection for software makers against infringement claims for inventions.

The decision in two closely watched patent cases combine a recent court pattern of clarifying patent law and tightening limits on when inventors can win exclusive rights to make and sell an item.

The first case, KSR International v. Teleflex, testing when a work is truly new, was considered by patent lawyers as likely to be more significant.

In a unanimous decision, the justices made clear that they believe standards for patents have become too loose, blurring distinctions between innovations that are "ordinary" and truly "extraordinary."

They ruled that the lower court specializing in patents should be more open to challengers who claim a work should not have been patented because it is "obvious."

"Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may ... deprive prior inventions of their value or utility," Justice Anthony Kennedy wrote for the court.

The case involves two manufacturers of adjustable gas pedals. It began when Teleflex accused KSR International of violating one of its patents. KSR countered that Tel-

---

# Autos

# Volvo stays true to its Soul: Safety

## As other brands horn in on party, maker tries to freshen its image



Old vs. new: The Volvo 244DL, above, from the 1970s. Below, the S80 is Volvo's flagship model.

### Volvo vs. the competition

Volvo's sales have lagged behind the luxury segment leaders and were down more than 6% last year. CEO Anne Belec, CEO of Volvo Cars of North America, says Volvo ran out of the old version of its flagship S80, a new one went on sale in February.

| | Volvo | BMW | Lexus | Mercedes |
|---|---|---|---|---|
| | 8,881 / 10,696 | 19,274 / 29,010 | 19,658 / 24,835 | 12,494 / 21,627 |

Source: Autodata

---

# AT&T gives Net phone service a new push

## Plans to bundle it with cell service in 3-month trial

By Paul Davidson
USA TODAY

AT&T is breaking the long cease-fire among big local phone companies with a renewed push for its Internet phone service in two regions.

AT&T will bundle its little-publicized Internet phone service, called Voice, with its cellphone service and a three-month trial at 14 AT&T Wireless stores in Portland, Ore., and central New Jersey.

AT&T is promoting the discount package with store kiosks and direct-mail and online ads. AT&T Wireless users get a $5 discount and advantage for $19.99 mobile a month.

The gambit is noteworthy because AT&T and Verizon in New Jersey and Qwest and Verizon in Portland have been slow to market Internet phone service in a big way. If it goes well, AT&T could take the package elsewhere outside its mainly Midwestern and Southern U.S. local-service regions.

"We want to get a sense for how this sells," says AT&T spokesman Michael Coe. "It's something that we will look to potentially roll out more broadly."

A wider rollout could allow AT&T to fill a potential void left by Vonage, the No. 1 independent Internet phone service, with 2.1 million U.S. customers. Vonage's survival is threatened by its recent loss of a patent-infringement lawsuit brought by Verizon.

So far the big regional phone companies have not ventured into each other's markets with phone service that uses Internet technology. One rea-

### Telecom

# EXHIBIT D

LEXSEE



Caution
As of: May 16, 2007

## PAICE LLC, Plaintiff, v. TOYOTA MOTOR CORP., et al., Defendants.

## 2:04-CV-211-DF

## UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS, MARSHALL DIVISION

### 2006 U.S. Dist. LEXIS 61600

### August 16, 2006, Decided
### August 16, 2006, Filed

**SUBSEQUENT HISTORY:** Motion for new trial denied by *Paice LLC v. Toyota Motor Corp., 2006 U.S. Dist. LEXIS 61598 (E.D. Tex., Aug. 16, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee brought an action for **patent infringement** against defendants, and a jury found that defendants' accused hybrid vehicles infringed two claims of a patent but found no further infringement or willful infringement. The patentee filed a motion for the entry of a permanent injunction under *35 U.S.C.S. § 283.*

**OVERVIEW:** The patentee principally argued that it was entitled to a permanent injunction under § 283 because defendants were adjudged to be **infringers** of valid **patent** claims. The court, following the traditional four-factor test for equitable relief concluded that no injunction was warranted in the present case. The court

also considered the fact that the United States Supreme Court had determined that equitable relief was not mandatory in patent cases but instead were to be decided in accordance with traditional equitable considerations. The patentee failed to establish that it would be irreparably harmed absent an injunction due to the fact that the patentee's losses from defendants' sales of infringing products could be remedied by money damages in accordance with the reasonably royalty set by the jury. Further, the patentee did not demonstrate that defendants' infringement was to blame for the failure of the patentee's licensing program. Thus, the patentee failed to demonstrate that injunctive relief was warranted under any of the four relevant factors.

**OUTCOME:** The court **denied** the patentee's motion for entry of an **injunction and denied** as moot defendants' motion for a stay of any **injunction** entered. The court entered judgment for the patentee and against defendants for infringement, awarded damages and interest to

2006 U.S. Dist. LEXIS 61600, *

the patentee, and ordered defendants to pay an ongoing royalty to the patentee.

**CORE TERMS:** injunction, patent, infringement, infringed, license, hybrid, technology, licensing, monetary damages, public interest, infringing, licensees, permanent injunction, irreparable harm, equitable relief, hardship, four-factor, injunctive relief, enjoined, royalty, enjoining, equitable, monetary relief, prejudgment, compensate, issuance, willful, issuing, calculation, calculated

**LexisNexis(R) Headnotes**

*Civil Procedure > Remedies > Injunctions > Elements > General Overview*
*Civil Procedure > Remedies > Injunctions > Permanent Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1] The United States Supreme Court has determined that equitable relief is not mandatory in patent cases, but instead should be decided in accordance with traditional equitable considerations. To this end, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief: A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent **injunction.**

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Remedies > Injunctions > Elements > General Overview*

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] The decision whether to grant or **deny** injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN3] No presumption of irreparable harm shall automatically follow from a finding of **patent infringement.**

*Civil Procedure > Remedies > Injunctions > Elements > Irreparable Harm*
[HN4] Irreparable harm lies only where injury cannot be undone by monetary damages.

**COUNSEL:** [*1] For Paice LLP, Plaintiff: Samuel Franklin Baxter, Attorney at Law, Marshall, TX; Ahmed J Davis, Ruffin B Cordell, Fish & Richardson PC - Washington DC, Washington, DC; Robert E Hillman, Fish & Richardson PC, Bostan, MA.

For Toyota Motors Corp, a Japanese Corporation, Toyota Motor North America Inc, Toyota Motor Sales USA Inc, Defendants: Fred Grasso, Jeffrey Gerchick, Thomas R Makin, George E Badenoch, Kenyon &Kenyon DC, Washington DC; Nicholas H Patton, Patton & Tidwell, Texarkana, TX; John Flock, T Cy Walker, Kenyon & Kenyon - New York, New York, NY; Justin Kurt Truelove, Patton & Tidwell, Texarkana, TX.

For Toyota Motor North America Inc, Toyota Motor Sales USA Inc, Toyota Motors Corp, a Japanese Corporation, Counter Claimants: Fred

2006 U.S. Dist. LEXIS 61600, *

Grasso, Jeffrey Gerchick, Thomas R. Makin, Kenyon &Kenyon DC, Washington DC; Justin Kurt Truelove, Patton & Tidwell, Texarkana, TX.

**JUDGES:** DAVID FOLSOM, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DAVID FOLSOM

**OPINION:**

### ORDER

Before the Court is Plaintiff Paice LLC's ("Paice") Motion for Entry of an Injunction. Dkt. No. 207. Also before the Court is Defendants' Combined (1) Opposition to Paice LLC's Motion for Entry of an Injunction and (2) In the [*2] Alternative, Motion for a Stay of Any Injunction Entered and Plaintiff's Combined Response to Toyota's Motion for Stay and Reply in Support of Its Motion for Injunction. Dkt. Nos. 212 and 219, respectively. On April 25, 2006 the Court heard the parties on these motions. Subsequent to the hearing, the parties submitted letter briefing to the Court. 6/23/06 Letter from G. Badenoch, 6/30/06 Letter from R. Cordell, and 7/13/06 Letter from G. Badenoch. Having considered the motions, all other relevant briefing, and the applicable law, the Court finds that Plaintiff's Motion for **Injunction should be DENIED**.

### I. BACKGROUND

In this **patent infringement** action, Plaintiff claimed three of Defendants' hybrid vehicles infringe three of Plaintiff's patents, *U.S. Patent Nos. 5,343,970* ("the *'970 patent*"), *6,209,672* ("the *'672 patent*"), and *6,554,088* ("the *'088 patent*") (collectively, the "patents-in-suit"). n1 Plaintiff alleged that nine claims among three **patents** were literally **infringed** by Defendants' accused vehicles and that ten claims were infringed under the doctrine of equivalents. Plaintiff also argued that Defendants' alleged infringement was willful.

n1 A detailed explanation of each of the asserted patents and the underlying technology can be found in the Court's Claim Construction Order. Dkt. No. 91. The present Order assumes familiarity with the patents-in-suit.

[*3]

In December 2005, the case was tried to a jury. The jury found that Defendants' accused vehicles infringed claims 11 and 39 of the *'970 patent* under the doctrine of equivalents, but found no further infringement. The jury did not find Defendants' infringement was willful. Plaintiff now moves for entry of a permanent injunction.

### II. LEGAL PRINCIPLES

Recently the Supreme Court revisited the propriety of issuing permanent injunctions as a matter of course after a finding of **infringement** in **patent** cases. *eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839-1841, 164 L. Ed. 2d 641 (U.S. 2006)* (hereinafter "*eBay*"). Observing the existence of a "'general rule,' unique to patent disputes" that mandated the issuance of a permanent injunction once infringement and validity were decided, the Supreme Court explored the origins of this general rule and compared it to other instances in which courts are faced with deciding whether or not to issue equitable relief. *Id.* [HN1] The Supreme Court determined that equitable relief is not mandatory in patent cases, but instead should be decided in accordance with traditional equitable considerations. *Id.*

To this end, a plaintiff seeking [*4] a permanent injunction must satisfy a four-factor test before a court may grant such relief:

A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available

2006 U.S. Dist. LEXIS 61600, *

at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent **injunction**.

*Id.* Further, the Supreme Court held that:

> [HN2] [T]he decision whether to grant or **deny** injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.

*Id.* It is clear that the Supreme Court by its decision did not intend to part with long-standing decisions in equity. As noted by Chief Justice Roberts, "there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate." *Id. at 1841* (Roberts, C.J. concurring). [*5] And, as Justice Kennedy notes in his concurrence, "the existence of a right to exclude does not dictate the remedy for a violation of that right," which aligns equitable decisions in patent cases with other cases. *Id. at 1842* (Kennedy, J. concurring).

### III. THE PARTIES' POSITIONS

Plaintiff, seeking entry of a permanent injunction, principally argued that it is entitled to an injunction pursuant to *35 U.S.C. § 283* because the Defendants are adjudged **infringers** of its valid **patent** claims. Dkt. No. 207 at 2. Plaintiff additionally argued that no exceptional

circumstances exist for which an **injunction should be denied.** *Id.* Defendants responded in opposition to Plaintiff's motion but spent the majority of their pre-hearing brief arguing that any **injunction** that issues should be stayed pending the outcome of an appeal or the issuance of a decision in *eBay*. Dkt. No. 212. Less than a month after the hearing, the *eBay* opinion issued.

Following the traditional four-factor test for equitable relief, Defendants argue no injunction should issue as Plaintiff cannot meet its burden of demonstrating each of the factors, let alone any of the [*6] factors. Dkt. No. 222. According to Defendants, Plaintiff failed to demonstrate irreparable harm. *Id.* at 3. Defendants argue that, following from the Supreme Court's decision, irreparable harm cannot be presumed. Further, citing a decision in *z4 Technologies, Inc. v. Microsoft Corporation,* Defendants argue that the inability to license Plaintiff's patents to others without an injunction in hand is not a viable reason for issuing an injunction. Dkt. No. 222 at 3, *citing z4 Technologies, Inc. v. Microsoft Corp., 434 F. Supp. 2d 437 (E.D. Tex. 2006)*. Defendants also point to evidence demonstrating that there are reasons unrelated to Defendants' conduct that explain why Plaintiff's efforts to license its patents have been refused. *Id.* citing evidence at Dkt. No. 212, 5-6. Defendants argue there is no evidence supporting Plaintiff's contention that Defendants' sales of the accused vehicles have resulted in the harm Plaintiff alleges as Plaintiff does not sell vehicles. Dkt. No. 222 at 3-4.

Defendants argue that monetary damages are sufficient to compensate Plaintiff. Because Plaintiff does not manufacture competing vehicles, but rather is geared toward licensing [*7] its technology, Defendants argue that there is "no question" that monetary damages are sufficient. Dkt. No. 222 at 4. Defendants further argue that the claims found to be infringed make up only a "small component" of the overall accused vehicles. *Id.*

The two claims found to be infringed by equivalents are not to the entirety of the hybrid transmission, let alone the entire car. For there to be an entire working vehicle that meets [Defendants'] standards, there are many tens of thousands of separate parts that make up the various essential parts of the car . . . Any contribution of [Plaintiff's] technology to the accused vehicles is relatively minor when compared to the value of the overall vehicles sought to be enjoined. . . .

Dkt. No. 222 at 4. Defendants further cite the jury's reasonable royalty verdict as demonstrative of the relatively small contribution of that Plaintiff's invention to the accused vehicles as a whole:

Any contribution of [Plaintiff's] technology to the accused vehicles is relatively minor when compared to the value of the overall vehicle sought to be enjoined, as confirmed by the jury's verdict awarding reasonable royalty damages [*8] of only $ 25 per vehicle -- or 1/8th of one percent of the $ 20,000 price of a Prius and even less of a percentage of the price of the Highlander ($ 33,000) and the RX400h ($ 42,000).

Id.

Defendants argue that the third and fourth factors weigh against issuing a permanent injunction. According to Defendants, implementation of an injunction would cause substantial economic injury to it, its dealers, and its suppliers. An injunction would also severely damages its "reputation as the industry leader in bringing hybrid and other vehicles to market," argue Defendants. Id. at 4. And, Defendants argue, significant time and money have been invested in designing the accused devices while a redesign would be "extraordinarily expensive and a great hardship." Id. Defendants argue that there is "no discernable hardship" to Plaintiff in the absence of an injunction because Plaintiff seeks only licensing fees for the use of its patents. Id. Defendants also argue that an injunction would be contrary to the public interest as hybrid vehicles play an important role in "reducing harmful automobile emissions and American reliance on foreign oil." Id.

Lastly, Defendants remind [*9] the Court that, although accused, the jury did not find that Defendants' infringement was willful. Nor were they found to literally **infringe** Plaintiff's **patents** -- only two often asserted claims from one of three **patents** were found **infringed** under the doctrine of equivalents. Defendants argue that these facts should also be considered in determining whether an injunction should issue. Dkt. No. 222 at 4-5.

In response, Plaintiff argues that, even under the traditional four-factor test for equitable relief, they are entitled to a permanent injunction. Plaintiff argues it has proved it will suffer irreparable harm because, unless Defendants are enjoined from selling the infringing vehicles, it cannot succeed in its efforts to license its technology. Dkt. No. 223 at 2. Plaintiff argues that Defendants' infringement has had a "devastating effect" on its business resulting in great harm. Dkt. No. 207 at 6. During the hearing on this motion, Plaintiff's counsel related that Plaintiff was recently "sidelined" as potential parties to a joint venture chose to put the deal on hold while they await the outcome of this motion. 4/25/06 Hr. Tr. at 99. Plaintiff also cites testimony from Dr. Severinsky, [*10] the inventor of the '970 patent and Paice employee,

that potential licensees have refused to license Plaintiff's patents pending the outcome of this case. *Id.* at 2-3. Plaintiff argues that even if potential licensees refused licenses in the past for reasons unrelated to the current lawsuit, they are today refusing to license as they await the outcome of this suit. *Id.* at 3. Thus, Plaintiff argues, it is suffering harm from what amounts to a *de facto* stop work injunction. 4/25/06 Hr. Tr. at 106.

Addressing the second factor, Plaintiff argues that although it does not manufacture products utilizing the patented invention, this alone does not end the inquiry as to whether there is an adequate remedy at law for Defendants' infringement. Dkt. No. 223 at 3. Instead, Plaintiff argues, because it suffers irreparable harm, there is no adequate remedy at law. According to Plaintiff, without an injunction, Plaintiff will continue to loose licensing opportunities to other potential licensees. Dkt. No. 223 at 3. Further, regarding the relative import of the infringed claims to the accused vehicles, Plaintiff argues that the infringed claims "cover . . . the heart of what the Prius [*11] is all about." 4/25/06 Hr. Tr. at 105; *see also* Dkt. No. 223 at 4.

Plaintiff argues that the balance of hardships tips in favor of an injunction. According to Plaintiff, the infringing products that would be enjoined can be sold in other parts of the world. Further, Plaintiff argues, the infringing vehicles account for less than 2% of Defendants' worldwide revenue. *Id.*; *see also* 4/25/06 Hr. Tr. at 108. On the other hand, without an injunction, Plaintiff argues that it faces extinction. Dkt. No. 223 at 4.

Regarding the public interest, Plaintiff argues the that public interest in strong patent rights is better served by enforcing those rights through an injunction, particularly where a small company's **patents are infringed.** 4/25/06 Hr. Tr. at 111; Dkt. No. 223 at 5. Plaintiff also argues that enjoining sales of the accused vehicles would not leave the public with-

out options -- in fact, there are other hybrid alternatives on the market as well as vehicles that are more fuel efficient than the accused vehicles. 4/25/06 Hr. Tr. at 110.

## IV. DISCUSSION

Following the traditional four-factor test for equitable relief, the Court concludes that no **injunction** is warranted [*12] in this case. n2

> n2 As Plaintiff's motion for an **injunction is denied,** Defendant's cross-motion for a stay is moot and will not be addressed herein.

Plaintiff fails to establish that it will be irreparably harmed absent an **injunction.** The *eBay* decision demonstrates that [HN3] no presumption of irreparable harm should automatically follow from a finding of infringement. *See, e.g., 126 S. Ct. at 1840; see also* 6:06-CV-142, Docket No. 394, at 4. Plaintiff argues that, because no injunction has issued, it has been unsuccessful in its efforts to license its technology. Plaintiff's evidence, however, does not prove that the current litigation or the absence of an injunction have resulted in its inability to successfully license its technology.

Dr. Severinsky's testimony, cited by Plaintiff, addressed only his belief as to why potential licensees were reluctant to take licensees. Plaintiff's counsel's statements that the company was "sidelined" pending the outcome of this litigation are not evidence. [*13] There is evidence in the record, however, that potential licensees may have declined business deals because of Plaintiff's misrepresentations and improper business tactics. *See* 12/7/05 PM Trial Tr. at 46:25-49:1; DTX 745.

[HN4] Irreparable harm lies only where injury cannot be undone by monetary damages. *See Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981).* Plaintiff's losses from Defendant's sales of in-

fringing products can be remedied via monetary damages in accordance with the reasonable royalty set by the jury. As for Plaintiff's allegations of irreparable harm in the form of a failed licensing program, Plaintiff has not demonstrated Defendants' infringement is to blame for this failure. As the evidence demonstrates, there were other reasons Plaintiff may not have succeeded in licensing its technology.

Additionally, Plaintiff has not demonstrated that monetary relief will not aid its licensing efforts. As is discussed below, the entry of a judgment for monetary relief in conjunction with the jury's infringement and validity findings will affirm Plaintiff's patent rights, as would the issuance of an injunction. Although potential [*14] licensees will likely consider the outcome of this case in their licensing decisions, Plaintiff has not been prevented from continuing its licensing efforts. It is should also be noted that because Plaintiff does not compete for market share with the accused vehicles, concerns regarding loss of brand name recognition and market share similarly are not implicated.

For these reasons, Plaintiff has not demonstrated that it will suffer irreparable harm in the absence of an injunction.

Second, Plaintiff has not demonstrated that monetary damages are inadequate. According to Plaintiff, monetary damages paid by Defendants will not prevent further lost opportunities to license its technology to potential licensees. Plaintiff further argues that the infringed claims form the "heart" of the accused products. Infringing one's right to exclude alone, however, is insufficient to warrant injunctive relief. *126 S.Ct. at 1840*. Plaintiff does not demonstrate why other potential licensees would be less likely to take a license if this case ends with monetary damages instead of equitable relief. n3 In either case, the Plaintiff's patent rights are vindicated. The appropriateness of an [*15] injunction is determined after considering the traditional four factors addressed here.

n3 The Court notes that monetary relief could result in lower licensing rates than Plaintiff would desire. The Court also recognizes that, if an injunction were to issue, Plaintiff would have a more impressive bargaining tool. This consideration, however, doe not replace the four-factor test that must be satisfied for equitable relief.

Further, the Court disagrees with Plaintiff regarding the import of the two claims found infringed to the accused vehicles as a whole. The infringed claims relate to the hybrid transmissions of the accused vehicles, but form only a small aspect of the overall vehicles. The jury's damages award also indicates that the infringed claims constitute a very small part of the value of the overall vehicles. The jury, based on the entire record, determined an appropriate reasonable royalty rate that can be easily calculated on future sales of the accused devices thereby removing uncertainty from future [*16] damages calculations.

It is also of note that Plaintiff, throughout post-trial motions, has extended Defendants an offer to license its technology. 4/25/06 Hr. Tr. at 108. This offer further demonstrates the adequacy of monetary relief from Plaintiff's point of view. Thus, the Court finds that Plaintiff has not demonstrated monetary damages are an inadequate remedy to compensate for Defendants' infringement.

Third, the Court finds that the hardships balance against enjoining Defendants. Plaintiff again argues that this factor tips in its favor because it faces extinction absent an injunction while Defendants will experience only minor economic losses. This ignores the reality that two of the accused vehicles were introduced to the market during the 2006 model year and enjoining their sales will likely interrupt not only Defendants' business but that of related busi-

nesses, such as dealers and suppliers. The burgeoning hybrid market could also be stifled as the research and expense of bringing its product line to market would be frustrated. And the Court finds that enjoining Defendants will damage their reputation. Defendants face significant hardships if enjoined. Plaintiff's argument [*17] that it may go out of business unless Defendants are enjoined is again premised upon their contention that only injunctive relief will lead to a successful licensing program. As discussed above, the Court does not agree with this contention. Thus, the balance of hardships tips decidedly in favor of Defendants.

Lastly, the Court concludes that the public interest does not weigh heavily in either party's favor. As Plaintiff argues, there is a long recognized public interest in enforcing patent rights. The grant of injunctive relief for such enforcement, as the *eBay* case directs, should be determined using the traditional four-factor test. Relief in non-injunctive form also serves this public interest. Insofar as Defendants argue that an injunction would be contrary to the public interest in reducing dependence of foreign oil, the Court finds this argument unavailing. Defendants' hybrid vehicles are not the only hybrid alternatives on the market, and there has been no evidence demonstrating the demand for hybrid vehicles could not be met by such alternatives. Thus, Defendants have not demonstrated that enjoining the sale of their hybrid vehicles will disserve the public interest. [*18]

Having found that Plaintiff has failed to demonstrate that injunctive relief is warranted under any of the four relevant factors, the Court will **deny** Plaintiff's request.

## V. CONCLUSION

For all the above reasons, Plaintiff's Motion for Entry of an **Injunction,** Dkt. No. 207, is hereby **DENIED** and Defendants' Motion for a Stay of Any **Injunction** Entered, Dkt. No. 212, is **DENIED** as moot.

**SIGNED this 16th day of August, 2006.**

DAVID FOLSOM

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT**

Pursuant to *Rule 58 of the Federal Rules of Civil Procedure* and in accordance with the jury verdict delivered on December 20, 2005 and with the Court's contemporaneously filed Orders regarding Plaintiff's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial (Dkt. No. 209), Plaintiff's Motion for Entry of an Injunction (Dkt. No. 207), and Defendants' Motion for Judgment as a Matter of Law or in the Alternative, for a New Trial (Dkt. No. 208), the Court thereby enters judgment for Plaintiff Paice LLP and against Toyota Motor Corp., *a Japanese Corporation,* Toyota Motor North America Inc., and Toyota Motor [*19] Sales USA, Inc. (collectively "Defendants") for **infringement** of *U.S. Patent No. 5,343,970* ("the *'970 patent*"), claims 11 and 39. **IT IS THEREFORE ORDERED THAT** Plaintiff shall have and recover from Defendants, jointly and severally, the total sum of $ 4,269,950.00, together with pre-judgment interest calculated at the prime rate, compounded annually, together with post-judgment interest on the entire sum calculated pursuant to *28 U.S.C. § 1961.* The parties shall meet and confer in an attempt to reach agreement as to the calculation of pre-judgment interest at the prime rate and, within 14 days of the entry of this order, shall jointly submit such calculation to the Court. This Court retains jurisdiction to award Plaintiff amounts for pre-judgment interest.

For the reasons stated in this Court's contemporaneously filed order, Plaintiff's motion for injunctive relief was denied. Defendants are hereby **ORDERED**, for the remaining life of the *'970 patent*, to pay Plaintiff an ongoing royalty of $ 25.00 per infringing Prius II, Toyota Highlander, or Lexus RX400H (the "infringing vehicles"). Royalties shall be paid quarterly and shall be accompanied by an [*20] accounting

2006 U.S. Dist. LEXIS 61600, *

of the sales of infringing vehicles. Payments shall begin three months after the date of signing of this judgment and shall be made quarterly thereafter. The first payment shall include royalties for all infringing vehicles sold that were not accounted for in the jury's verdict. Payments not made within 14 days of the due date shall accrue interest at the rate of 10%, compounded monthly. Plaintiff shall have the right to request audits. It is anticipated that the parties may wish to agree to more comprehensive or convenient terms. The parties shall promptly notify the Court of any such agreement. The Court maintains jurisdiction to enforce this portion of the Final Judgment.

All relief not specifically granted herein is denied. All pending motions not previously ruled on are denied. This is a Final Judgment and is appealable.

**SIGNED this 16th day of August, 2006.**

DAVID FOLSOM

UNITED STATES DISTRICT JUDGE